**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE APPLICATION OF ANTONIO DEL VALLE RUIZ AND OTHERS FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782

Case No. 18 Misc. _____

---

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' APPLICATION AND PETITION FOR AN ORDER TO CONDUCT DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782**

Dated: March 5, 2018

Javier H. Rubinstein (Bar No. JR2875)
javier.rubinstein@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Lucila I. M. Hemmingsen (Bar No. LH2921)
lucila.hemmingsen@kirkland.com
Lauren Friedman (application for admission *pro hac vice* to be filed)
lauren.friedman@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Attorneys for Petitioners*

# TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ...................................................................... I

II. FACTUAL BACKGROUND ....................................................................... 3

    A.     The Parties and Other Relevant Entities ................................................ 3

    B.     Santander's Government-Ordered Acquisition of BPE ......................... 6

    C.     Petitioners and Other Investors Challenge the Resolution of BPE and the Taking of Their Investments ..................................................................... 9

III. ARGUMENT ............................................................................................. 10

    A.     The Standard for Discovery Under Section 1782 .................................. 11

    B.     The Requested Discovery Meets Each of the Threshold Requirements. ................ 12

            1.     Santander Is "Found" In the Southern District of New York, As It Maintains A Longstanding and Substantial Business Presence, With Branches and Offices that Were Involved With The Acquisition of BPE. .................................................................. 13

            2.     The Discovery Sought is for Use in Foreign Proceedings ......................... 16

            3.     Petitioners—the Plaintiffs in the Foreign Tribunals—Easily Meet the Standard of Being "Interested Persons" ............................................ 19

    C.     The *Intel* Factors Weigh Strongly In Favor of Granting Discovery ...................... 19

            1.     The First *Intel* Factor Favors Granting Discovery, As Santander Is Not A Party to Either Foreign Proceeding ................................................ 20

            2.     The Second *Intel* Factor Favors Discovery Because Petitioners Will Be Able To Present Relevant Evidence in Both Proceedings ................... 21

            3.     The Third *Intel* Factor Favors Discovery Because The Discovery Sought Does Not Seek An End-Run Around Foreign Proof-Gathering Restrictions. .............................................................. 22

            4.     The Requests Do Not Impose An Undue Burden ....................................... 23

IV. CONCLUSION ......................................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Accent Delight Int'l Ltd.*,
   869 F.3d 121 (2d Cir. 2017)...................................................................17

*In re Ex Parte Application of Alghanim*,
   No. 17 Misc. 406 (S.D.N.Y. Nov. 16, 2017) ...........................................13

*In re Application of Chevron Corp.*,
   709 F. Supp. 2d 283 (S.D.N.Y. 2010), *aff'd sub nom. Chevron Corp. v.
   Berlinger*, 629 F.3d 297 (2d Cir. 2011) ................................................16

*In re Ex Parte Application of Kleimar N.V.*,
   220 F. Supp. 3d 517 (S.D.N.Y. 2016).....................................................13

*In re Ex Parte Application of Kleimar N.V.*, No.
   16 Misc. 355, 2016 WL 6906712 (S.D.N.Y. Nov. 16, 2016) ................16

*In re Application of Okean B.V. & Logistic Sol. Int'l*,
   60 F. Supp. 3d 419 (S.D.N.Y. 2014).......................................................22

*In re Application of OOO Promnesfstroy*,
   No. M 19-99(RJS), 2009 WL 3335608 (S.D.N.Y. Oct 15, 2009) ..........21

*In re Application of Orlandini-Agrera*,
   No. 17 Misc. 354 (S.D.N.Y., Sept. 25, 2017) .........................................16

*In re Ex Parte Application of Qualcomm Inc.*,
   162 F. Supp. 3d 1029 (N.D. Cal. 2016)...................................................13

*In re Bayer AG*,
   146 F.3d 188 (3d Cir. 1998)..............................................................11, 23

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
   673 F.3d 76 (2d Cir. 2012)...............................................11, 12, 16, 22

*Euromepa, S.A. v. R. Esmerian, Inc.*,
   51 F.3d 1095 (2d Cir. 1995).....................................................................21

*In re Gianoli Aldunate*,
   3 F.3d 54 (2d Cir. 1993)..........................................................................11

*Ex Parte Gov't of the Lao People's Democratic Republic*,
   No. 115MC08232EJLREB, 2017 WL 2838051 (D. Idaho June 30, 2017) ............16

ii

*In re Gushlak*,
    No. 11-MC-218 NGG, 2012 WL 1514824 (E.D.N.Y. Apr. 30, 2012) ....................................11

*In re Application of Elvis Presley Enterprises LLC for an Order to Take
    Discovery Pursuant to 28 U.S.C. § 1782*, No. 15MC386 (DLC), 2016 WL
    843380 (S.D.N.Y. Mar. 1, 2016) ..........................................................................................20

*In re Application for Appointment of a Comm'r re Request for Judicial Assistance
    for the Issuance of Subpoena Pursuant to 28 U.S.C. 1782*,
    No. C 11-80136 RS MEJ, 2011 WL 2747302 (N.D. Cal. July 13, 2011) ............................23

*In re Ex Parte Application of Porsche Automobil Holding SE for an Order
    Pursuant to 28 U.S.C. §1782 Granting Leave to Obtain Discovery for Use in
    Foreign Proceedings*, No. 15-MC-417 (LAK), 2016 WL 702327 (S.D.N.Y.
    Feb. 18, 2016) ......................................................................................................................11

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004).......................................................................................................*passim*

*Investment Vehicles v. KPMG*,
    798 F.3d 113 (2d Cir. 2015)..................................................................................................19

*In re Mangouras*,
    No. 17-MC-172, 2017 WL 4990655 (S.D.N.Y. Oct. 30, 2017) ............................................23

*In re Mesa Power Grp., LLC*,
    No. CIV.A. 2:11-MC-280-E, 2012 WL 6060941 (D.N.J. Nov. 20, 2012) ............................16

*In re Metallgesellschaft AG*,
    121 F.3d 77 (2d Cir. 1997)..............................................................................................12, 22

*In re Microsoft Corp.*,
    428 F. Supp. 2d 188 (S.D.N.Y. 2006)....................................................................................22

*In re Republic of Kazakhstan for an Order Directing Discovery from Clyde & Co.
    LLP Pursuant to 28 U.S.C. sec. 1782*,
    110 F. Supp. 3d 512 (S.D.N.Y. 2015)....................................................................................13

*Ukrnafta v. Carpatsky Petroleum Corp.*,
    No. 3:09-mc-265-JBA, 2009 WL 2877156 (D. Conn. Aug 27, 2009) ...................................20

**Statutes**

28 U.S.C. § 1782 ...............................................................................................................*passim*

Mexico-Spain Bilateral Investment Treaty, art. IX ..........................................................................2

**Other Authorities**

Diario Oficial de la Federación [DO], 19 de Mayo de 2008 (Mex.)
 https://www.gob.mx/cms/uploads/attachment/file/2422/SE_espana_appri.pdf .......................2

## MEMORANDUM OF LAW

Petitioners Antonio Del Valle Ruiz, et al. (collectively, "Petitioners"), respectfully submit this Memorandum of Law in support of their Application and Petition for an order authorizing them to conduct discovery, pursuant to 28 U.S.C. § 1782, from Banco Santander, S.A. and its affiliates Santander Holdings U.S.A., Inc., and Santander Bank N.A. (collectively, "Santander"), each of which is found in this District, in support of their pending lawsuit in the General Court of the Court of Justice of the European Union against the European Commission ("EC") and Single Resolution Board ("SRB"), and in support of their recently notified international arbitration proceedings against the Kingdom of Spain pursuant to the Agreement for the Reciprocal Promotion and Protection of Investments Between the United Mexican States and the Kingdom of Spain (the "Mexico-Spain Bilateral Investment Treaty"), both relating to the government-ordered resolution and acquisition of Banco Popular Español S.A. ("Banco Popular" or "BPE") by Banco Santander S.A. ("Banco Santander") for 1 Euro.

## I.    PRELIMINARY STATEMENT

This Application arises from the unprecedented, government-ordered "sale" of BPE, then the sixth largest bank in Spain, to Santander, for the price of one Euro, as part of a "resolution" ordered by the SRB and the Spanish Fondo de Resolución Ordenada Bancaria ("FROB") on June 7, 2017 (the "Resolution"). Under that Resolution, BPE shareholders and owners of contingent convertible bonds were completely wiped out; the mechanism used for resolution called for the cancellation of all shares and of Tier 1 bonds.

In the weeks prior to June 7, 2017, BPE was facing a run on bank deposits and a resulting liquidity crisis, caused in large part by billions of Euros in deposit withdrawals by Spanish government entities, along with statements by EU and Spanish officials indicating that Spain would

not provide financial assistance to BPE and that BPE was under "watch" for possible resolution, all of which predictably led to depositor panic. Days before the resolution, the Bank of Spain rejected BPE's request for emergency liquidity assistance despite the fact that BPE was solvent and had reportedly posted more than €50 billion in assets as collateral and in sharp contrast to the assistance that the Bank of Spain had previously provided to other Spanish banks facing liquidity issues. Ignoring multiple ongoing private transactions that would have allowed BPE to overcome its liquidity crisis, the Spanish government instead engineered the sale of BPE through an overnight "auction" process in which Santander was the only bidder, offering just one Euro even though barely a week earlier Santander was reportedly planning to bid at least *three billion* Euros for BPE.

Faced with the sudden taking of their investments in BPE, Petitioners initiated an action against the SRB and EC in the Court of Justice of the European Union ("CJEU"), seeking to annul the Resolution on the grounds that it violates EU law (a copy of the Application is attached as Exhibit 1 to the Declaration of Javier Rubinstein[1]) (the "CJEU Litigation"). Petitioners also sent a notification letter on January 22, 2018 to the Government of Spain, notifying Spain of Petitioners' claims alleging multiple breaches of the Mexico-Spain Bilateral Investment Treaty[2] and of their intention to initiate investor-state arbitration proceedings pursuant to Article IX of the Mexico-Spain Bilateral Investment Treaty (the "Investment Treaty Arbitration"). Santander, as a critical participant in the BPE resolution that has now acquired possession, custody and control of BPE's books and records, possesses information highly relevant to both the CJEU Litigation and the

---

[1]   Unless otherwise stated, "Ex." refers to exhibits to the Declaration of Javier Rubinstein ("Rubinstein Decl.").

[2]   *Acuerdo para la Promoción y Protección Recíproca de Inversiones entre los Estados Unidos Mexicanos y el Reino de España* [Treaty for the Reciprocal Promotion and Protection of Investments between the United Mexican States and the Kingdom of Spain], Diario Oficial de la Federación [DO], 19 de Mayo de 2008 (Mex.) https://www.gob.mx/cms/uploads/attachment/file/2422/SE_espana_appri.pdf.

contemplated Investment Treaty Arbitration. Petitioners bring this action to obtain discovery in aid of both proceedings.

Petitioners' application meets all of the requirements of 28 U.S.C. § 1782. Santander "resides or is found" in the Southern District of New York, both because of its 40-year systematic and continuous operations in New York and because it transacted business in New York to facilitate its acquisition of BPE. The discovery Petitioners seek is highly material to numerous issues in both the CJEU Litigation and the Investment Treaty Arbitration, including the financial condition and value of BPE on the date of resolution, the existence of private sector alternatives to resolution, the denial of BPE's request for liquidity assistance and the events that led to the "sale" of BPE to Santander. Each of the Supreme Court's *Intel* factors that guide the exercise of discretion under section 1782 favor the discovery sought here. Accordingly, this Court should grant Petitioners' application and permit Petitioners to conduct discovery upon Santander related to the Resolution of BPE and its acquisition by Santander.

## II.      FACTUAL BACKGROUND

### A.      The Parties and Other Relevant Entities

***Petitioners.*** Petitioners are a group of 55 BPE investors.[3] Collectively, Petitioners invested more than €470 Million (approximately $577 Million at current exchange rates) in BPE shares and bonds.[4] Petitioners originally invested through a 2013 capital increase BPE conducted exclusively for Petitioners and other Mexican investors; since then, Petitioners made further investments through market purchases and participation in a 2016 capital increase.[5] By June 2017, Petitioners owned around 4.3% of BPE.[6]

---

[3]      Rubinstein Decl. at ¶ 8 & Ex. 2.
[4]      *Id.*
[5]      *Id.* at ¶ 9 & Ex. 1.
[6]      *Id.*

***Banco Popular.*** Banco Popular Español, S.A., founded in 1926, was Spain's sixth largest bank as of June 2017, with € 147 billion ($180 billion) in assets.[7] It also had operations in a number of other countries, including ownership of TotalBank, N.A., in the United States.[8] Historically, BPE's core business consisted of a strong Spanish retail franchise, with a focus on lending credit to small and medium-sized enterprises.[9] Since the mid-2000s, mortgages and other home loans to retail customers became increasingly important to BPE's business operation.[10] The collapse of the housing sector during the 2008-2009 financial crisis revealed the European banking system's exposure to toxic and non-performing assets (NPAs).[11] Like many European banks, BPE had many NPAs, but was working to manage their impact on its balance sheet.[12]

Through capital increases—including the ones in which Petitioners participated in 2016—and other prudent measures, BPE consistently passed all regulatory inspections and stress tests and complied with all regulatory requirements without any government assistance before 2017, unlike most banks in Spain.[13] A 2016 court ruling invalidating "floor clauses" (which limited interest rate reductions on variable rate mortgages) required BPE to set aside a €350 million reserve.[14] And beginning in December 2016, numerous Spanish government entities began to make substantial deposit withdrawals from BPE, weakening the bank's liquidity position.[15]

In order to stabilize the bank's financial position, in 2017 BPE planned sales of certain assets, along with a substantial capital increase and a possible sale of the company.[16] With

---

[7]    *Id.* at ¶ 21.
[8]    *Id.* at ¶ 28.
[9]    *Id.* at ¶ 22.
[10]    *Id.*
[11]    *Id.* at ¶ 23.
[12]    *Id.*
[13]    *Id.* at ¶ 24 & Ex. 23.
[14]    *Id.* at ¶ 25.
[15]    *Id.* at ¶ 37 & Ex. 38.
[16]    *Id.* at ¶ 26 & Ex. 22.

shareholder approval in April 2017, BPE executed or was in the process of executing: (i) a number of substantial asset sales, with key asset sales ready to be completed by early to mid-June 2017;[17] (ii) a capital increase, with Deutsche Bank, Barclays Bank, PIMCO, and Petitioners all prepared to invest more than enough capital;[18] and a sale of the bank, which process was extended until the end of June 2017.[19] All of those efforts were suddenly terminated by the resolution of Banco Popular.

*Santander.* Banco Santander, S.A., meanwhile, is one of the largest banks in the world.[20] It is the largest bank in Spain, and maintains substantial operations across the globe.[21] In the United States, Santander conducts business both directly and through wholly-owned subsidiaries. Banco Santander S.A. maintains a branch and its U.S. offices at 45 East 53rd Street in New York, regulated by the New York State Department of Financial Services, with $14.8 billion in deposits.[22] According to Federal Reserve filings, Santander's New York branch has extended billions of dollars in credit to other members of the Santander group, including its U.S. subsidiaries.[23] Santander Bank, N.A., likewise maintains numerous branches in New York, including a branch at 45 East 53rd Street, which it shares with Banco Santander, S.A.[24] Although Santander's U.S. subsidiaries list Boston as their headquarters, the CEO of Santander U.S., Scott Powell, lists his location on LinkedIn as New York City, appears to reside in Chappaqua, and is a board member

---

[17]   *Id.* at ¶¶ 27-29 & Exs. 25 & 26.
[18]   *Id.* at ¶¶ 30-31 & Exs. 27-31.
[19]   *Id.* at ¶¶ 32-34 & Exs. 32-34.
[20]   *Id.* at ¶ 10.
[21]   *Id.*
[22]   *Id.* at ¶ 11 & Ex. 6..
[23]   *Id.* at ¶ 13 & Ex. 9
[24]   *Id.* at ¶¶ 11-12.

for at least two New York non-profits, suggesting that a significant portion of Santander's U.S. executive functions in fact occur in this district.[25]

## B.    Santander's Government-Ordered Acquisition of BPE

Prior to the resolution of BPE, Santander participated in the  ongoing process to consider a private sale of the bank; Santander was widely reported to be interested. It accessed the virtual data room created by BPE[26] and, according to one of its directors, completed its diligence for a potential bid.[27] Santander retained UBS and a New York-based investment banking and financial services company as its financial advisors on the bid[28] and, as of late May, was rumored to be preparing a bid of € 3 billion.[29] To allow other bidders more time to prepare their bids, BPE's Board announced that it was extending the bid window from June 10, 2017, to June 30, 2017.[30]

In May 2017, BPE suffered from an increasing level of deposit withdrawals.  After an article on May 11, 2017 speculating that BPE was selling itself due to "bankruptcy risk,"[31] over one billion Euros in deposits were withdrawn in a single day.[32] BPE thus informed Spanish and European banking regulators that it would need liquidity assistance.[33] The same day, the Spanish Minister of the Economy, Luis de Guindos, stated that—although other banks had received liquidity assistance in the past—Spain was not envisioning granting any liquidity assistance to BPE.[34]

On May 23, 2017, the Chairman of the SRB, Elke König, publicly stated that BPE was being "*observed*" by the SRB, leading depositors to conclude that BPE was facing imminent

---

[25]   *Id.* at ¶ 14 & Ex. 10.
[26]   *Id.* at ¶ 32 & Ex. 32.
[27]   *Id.*
[28]   *Id.*
[29]   *Id.* at ¶ 33 & Ex. 33.
[30]   *Id.* at ¶ 34 & Ex. 34.
[31]   *Id.* at ¶ 38 & Ex. 39.
[32]   *Id.*
[33]   *Id.* at ¶ 38.
[34]   *Id.* at ¶ 38 & Ex. 40.

resolution, which in turn led to even larger deposit withdrawals.[35] A week later, on May 31, 2017, a quote from Ms. König was leaked to Reuters, reportedly stating that BPE might need to be wound down should it fail to find a buyer.[36] That same day, the SRB issued a press release in which it said it would "not comment on any bank-specific matters."[37] BPE by then was facing an all-out run on the bank, with €5.2 billion withdrawn in the last two weeks of May alone.[38] At the end of May, BPE requested €9.5 billion in emergency liquidity assistance, reportedly backed by more than €50 billion in assets posted as collateral.[39] The Bank of Spain only granted €3.5 billion in emergency liquidity assistance, reflecting an apparent and unprecedented 90% discount against the collateral posted.[40] The run on deposits continued to accelerate into the first week of June, with approximately €14 billion in withdrawals during that week, including €3 billion withdrawn on June 5, 2017 alone.[41]

During that same week, the Spanish Economy Minister, Luis de Guindos, met with Ana Botín, Santander's Executive Chair, at the Bilderberg Group's annual meeting in Chantilly, Virginia.[42] Santander's group C.E.O., José Antonio Álvarez Álvarez, was also in New York to ring the New York Stock Exchange's Closing Bell on June 1, 2017, celebrating the 30-year anniversary of Santander's trading on the New York Stock Exchange (although the actual anniversary was almost two months away).[43] After Minister de Guindos's return from the United States, the Bank of Spain announced on June 5 that Spain would not provide any further liquidity assistance.[44] This

---

[35]  *Id.* at ¶ 39 & Ex. 31.
[36]  *Id.* at ¶ 39 & Ex. 41.
[37]  *Id.* at ¶ 39 & Ex. 42.
[38]  *Id.* at ¶ 41 & Ex. 26.
[39]  *Id.* at ¶¶ 42-43 & Exs. 39, 46 & 47.
[40]  *Id.*
[41]  *Id.* at ¶ 41 & Ex. 44.
[42]  *Id.* at ¶ 63 & Ex. 60.
[43]  *Id.* at ¶ 15 & Ex. 11.
[44]  *Id.* at ¶ 43 & Ex. 47.

sealed BPE's fate; the next day, BPE's Board determined that it could not withstand the bank run and would be unable to open its doors because of its lack of liquidity, and informed banking regulators of this fact.[45]

On June 3, 2017, Spain's national bank resolution authority, the FROB, launched a tender process for the sale of BPE.[46] At that time, there was no finding that BPE was "failing or likely to fail," as required by the relevant regulations; nor was there any finding that other private sector alternatives were unavailable, also required by the relevant regulations. On June 4, the FROB invited five Spanish banks to sign non-disclosure agreements, providing them access the next day to a virtual data room.[47] On June 6, the FROB informed the five banks that bids were due at midnight that same day.[48]

Santander, which had previously conducted diligence on a bid for BPE, was the only one of the five in a position to bid that quickly.[49] BBVA, the second largest bank in Spain, wrote to the FROB complaining that it could not formulate a bid in such a short time, while expressing an interest in bidding if the timeline were extended and additional information was provided; the FROB refused BBVA's request.[50] Santander reportedly had drafted two bids—one for €3 billion and one for €1—and, after learning it was the only bidder, it submitted the one Euro bid.[51]

Within an hour, Santander's bid was accepted by the FROB, and the FROB recommended to the SRB that Santander be declared the purchaser of BPE.[52] Without any opportunity to be heard, over 300,000 BPE stockholders were wiped out, including Petitioners. Santander quickly replaced

---

[45]   *Id.* at ¶ 44 & Exs. 3 & 39.
[46]   *Id.* at ¶¶ 52-53 & Exs. 50-52.
[47]   *Id.* at ¶ 53 & Exs. 4 & 52.
[48]   *Id.* at ¶¶ 54-55 & Exs. 3 & 53.
[49]   *Id.* at ¶ 56.
[50]   *Id.* at ¶ 57 & Ex. 55.
[51]   *Id.* at ¶ 58 & Exs. 33, 53 & 54.
[52]   *Id.* at ¶ 59 & Ex. 4.

BPE's management and Board, took control of BPE's business, launched a €7 billion capital raise that included an offering in New York in order to facilitate its acquisition of BPE, began selling off BPE assets and integrating BPE into Santander.[53]

### C. Petitioners and Other Investors Challenge the Resolution of BPE and the Taking of Their Investments

On August 4, 2017, Petitioners filed a legal challenge in the CJEU, seeking annulment of BPE Resolution on the grounds that it violated EU law, including by failing to meet the statutory requirements for resolution.[54] Specifically, Petitioners contend that BPE was not "failing or likely to fail," because it was not insolvent but rather was suffering from a short-term liquidity crisis that was substantially caused by Spain itself, and that should have been addressed through emergency liquidity assistance that the Bank of Spain inexplicably refused to provide.[55] Second, Petitioners contend that there were numerous private sector measures available that could have stabilized the bank's financial condition  within a reasonable timeframe, and that should have averted the Resolution, including capital expansion that Petitioners and major international banks were prepared to achieve.[56] Petitioners also claim that the 1 Euro purchase was far below BPE's fair market value as of the date of resolution.[57]

Additionally, Petitioners, as Mexican nationals, are protected by the Mexico-Spain Bilateral Investment Treaty. Pursuant to the provisions of that treaty, Petitioners served notice on Spain on January 22, 2018 that they intend to invoke their right to pursue claims for breach of the Treaty through the arbitration mechanisms provided by the Mexico-Spain Bilateral Investment Treaty.[58] The Notification Letter starts a six-month "cooling off period", after which arbitration

---

[53] *Id.* at ¶¶ 61-65 & Exs 57-63.
[54] *Id.* at ¶¶ 66-67 & Ex. 1.
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.* at ¶¶ 79-80 & Ex. 66.

proceedings may commence.[59] Petitioners notified Spain that they intended to bring claims for, among other grounds, unlawful expropriation and denial of the "fair and equitable treatment" guaranteed by the Treaty.[60] Among other things, Petitioners claim that Spain: (1) violated Petitioners' legitimate expectations of good faith treatment for their investments in BPE by arbitrarily disregarding investors and preventing them from taking measures to protect their investment, including carrying out a private sale of BPE or raising additional capital for BPE; (2) violated Petitioners' legitimate expectations for a stable and predictable legal and regulatory environment for their investments in BPE by unreasonably refusing to take available regulatory measures to support BPE which Spain had consistently utilized in the past with regard to other troubled financial institutions; (3) violated Petitioners' legitimate expectations of even-handed and non-discriminatory treatment by offering preferential treatment to Santander; (4) violated due process and transparency requirements that form an essential component of fair and equitable treatment under international law, by conducting the sale process with Santander without any transparency, and by failing to provide Petitioners with advanced notice or adequate justification for the measures it took with regard to its investments in BPE; and (5) illegally expropriated Petitioners' shares in BPE and handed them over to Santander without any due process or compensation.[61]

## III.    ARGUMENT

Petitioners satisfy each of the necessary elements to obtain an order for discovery in aid of foreign proceedings under 28 U.S.C. § 1782. Section 1782 authorizes this Court to order discovery from any person found in this District to assist with pending or contemplated proceedings before

---

[59]    *Id.*
[60]    *Id.* at ¶¶ 82-88.
[61]    *Id.*

foreign tribunals. Applications under section 1782 are routinely decided by this Court on an *ex parte* basis,[62] generally in Part I, based on "modest prima facie elements" in order to effectuate "Congress's goal of providing equitable and efficacious discovery procedures." *In re Bayer AG*, 146 F.3d 188, 195 (3d Cir. 1998); *see also Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012) ("[T]he statute has, over the years, been given 'increasingly broad applicability.'" (citing *In re Gianoli Aldunate,* 3 F.3d 54, 57 (2d Cir. 1993)).

Banco Santander and its U.S. subsidiaries are found in the Southern District of New York, where they maintain a longstanding and substantial business presence, with offices and branches that were involved in a 2017 capital raise in New York to facilitate the acquisition of BPE. The information that Santander possesses is highly probative of Petitioners' claims in the CJEU and the recently notified Investment Treaty Arbitration. Accordingly, Petitioners' application to take discovery in aid of those proceedings should be granted.

## A.    The Standard for Discovery Under Section 1782

Section 1782 authorizes "[t]he district court of the district in which a person resides or is found [to] order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . . upon the application of any interested person." 28 U.S.C. § 1782(a). There are three threshold requirements that must be shown in order to grant an application: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in

---

[62]    *See In re Gushlak*, No. 11-MC-218 NGG, 2012 WL 1514824, at *3 n.4 (E.D.N.Y. Apr. 30, 2012) (citing several cases, including from this district, and noting that "courts routinely grant § 1782 applications ex parte, limiting respondents' challenges to after the subpoena is served"); *In re Ex Parte Application of Porsche Automobil Holding SE for an Order Pursuant to 28 U.S.C. §1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings*, No. 15-MC-417 (LAK), 2016 WL 702327, at *1 n.3 (S.D.N.Y. Feb. 18, 2016) ("As typically or, at least, frequently is the case in § 1782 proceedings, leave to serve the subpoenas was granted *ex parte*, which is appropriate because all questions with respect to the propriety of the grant of leave and with respect to the content to the subpoenas are available to every subpoenaed party via a motion to quash or the defense of an application to compel compliance with the subpoenas.").

a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *Brandi-Dohrn*, 673 F.3d 76 at 80.

When those three elements are satisfied, this Court then considers the four "*Intel* factors" that the Supreme Court has identified to guide courts' exercise of their discretion:

> First, when the person from whom discovery is sought is a participant in the foreign proceeding ... the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad. A foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence....

> Second, ... a court presented with a § 1782(a) request may take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance ...

> [Third,] a district court could consider whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States.

> [Finally,] unduly intrusive or burdensome requests may be rejected or trimmed.

*Id.* at 80–81 (quoting *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264–65 (2004)) (ellipses and alterations in original). A district court "must exercise [its] discretion under § 1782 in light of the twin aims of the statute: providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *In re Metallgesellschaft AG*, 121 F.3d 77, 79 (2d Cir. 1997) (internal quotation marks omitted).

**B.    The Requested Discovery Meets Each of the Threshold Requirements.**

Petitioners meet the three threshold requirements of section 1782: (1) Santander is "found" in the Southern District of New York; (2) the documents are for use in the pending proceeding before the General Court of Court of Justice of the European Union and in the recently-notified

investor-state international arbitration proceeding; and (3) as parties (or parties-to-be) to the foreign proceedings, Petitioners are the quintessential "interested persons."

     **1.**     **Santander Is "Found" In the Southern District of New York, As It Maintains A Longstanding and Substantial Business Presence, With Branches and Offices that Were Involved With The Acquisition of BPE.**

An entity "is found" in this district if it has a "systematic and continuous" presence in the Southern District of New York. *In re Republic of Kazakhstan for an Order Directing Discovery from Clyde & Co. LLP Pursuant to 28 U.S.C. sec. 1782*, 110 F. Supp. 3d 512, 515 (S.D.N.Y. 2015) ("Clyde & Co. LLP's partners' daily practice of law in this jurisdiction gives it the requisite 'systematic and continuous' presence to be 'found' here for purposes of section 1782."); *see also In re Ex Parte Application of Kleimar N.V.*, 220 F. Supp. 3d 517, 521 (S.D.N.Y. 2016) (defendant that conducted "systematic and regular business" in New York was "found" in this District).[63] Santander easily satisfies this standard—which is why this Court recently authorized discovery of Santander in another section 1782 proceeding. *In re Ex Parte Application of Alghanim*, No. 17 Misc. 406 (PKC), Doc. 7 (S.D.N.Y. Nov. 16, 2017) (granting application for section 1782 discovery of books and records held at Santander's New York branch at 45 East 53rd Street).

To begin with, Santander has a longstanding and significant presence in this District. Since 1978, Banco Santander S.A. has maintained its United States branch in New York City, supervised by the New York State Department of Financial Services, managing $14.8 billion in assets as of 2013 according to public records.[64] In addition to providing wholesale banking for large

---

[63] Courts in this District and others have noted that being "found" in a district is a broader standard than that required for general personal jurisdiction, in that a discovery target need not be incorporated in or have its principal place of business in the district to meet the "systematic and continuous" presence required for discovery. *See, e.g.*, *In re Republic of Kazakhstan*, 110 F. Supp. 3d at 515; *see also In re Ex Parte Application of Qualcomm Inc.*, 162 F. Supp. 3d 1029, 1036 (N.D. Cal. 2016) ("Through these in-district offices, Broadcom, Texas Instruments and VIA Technologies conduct 'systematic and continuous local activities' and thus may be found within the Northern District for the purposes of Section 1782.").

[64] Rubinstein Decl. at ¶ 11 & Ex. 11.

corporations and financial institutions, Banco Santander S.A.'s New York Branch manages Santander's wholly-owned U.S. subsidiaries (including Santander U.S.A. Holdings, Inc., and Santander Bank N.A.). Santander Bank N.A. likewise operates numerous branches in New York, including the location at 45 East 53rd Street that it shares with Banco Santander S.A. All told, Santander collectively constitutes the ninth largest banking group by deposit market share in the New York City area, with branches all across the Southern District—including one less than three blocks away from this Courthouse.[65] Santander's New York branch is a hub from which Santander extended billions of dollars in intragroup loans to Santander subsidiaries both in the U.S. and across Latin America.[66]

Santander also has made New York a focal point for its investors: Banco Santander S.A. is listed on the New York Stock Exchange through sponsored American Depositary Receipts (ADRs) whose depositary is Bank of New York Mellon, and has raised billions of dollars by trading its ADRs and ADSs on that exchange. Indeed, Santander touts the fact that its "share has been trading on the New York Stock Exchange for more time than any other Spanish company;"[67] its group C.E.O. celebrated that fact in June 2017 by ringing the New York Stock Exchange bell to celebrate the upcoming 30-year anniversary of Santander's listing—less than a week before the BPE acquisition was announced. In October 2017, Santander held its group Global Strategy Update meeting, where its Executive Chair, C.E.O., and other senior executive presented to investors and analysts in New York.[68] In short, Santander has for decades made New York a home-away-from-home.

---

[65]    Rubinstein Decl. at ¶ 12 & Ex. 8.
[66]    Rubinstein Decl. at ¶ 13 & Ex. 9.
[67]    Rubinstein Decl. at ¶ 15 & Ex. 11.
[68]    Rubinstein Decl. at ¶ 16 & Ex. 12.

Moreover, Santander's activities in New York also are related to the subject-matter of the discovery Petitioners seek. Within days of the resolution and government-ordered acquisition of BPE, Santander's executive leadership held high-level "roadshow" meetings with analysts and investors in New York to raise capital that it needed in order to facilitate the acquisition of BPE and help the merged entity meet regulatory capital thresholds.[69] Indeed, even *before* the sudden seizure of BPE stock, Santander had retained investment banks in New York in order to explore financing for a takeover of BPE.[70] New York partners of Santander's longtime counsel, Davis Polk & Wardwell LLP, wrote letters to the SEC seeking exemptive relief from certain securities law requirements[71] and drafted hundreds of pages of SEC disclosures related to the rights offering Santander undertook.[72] That rights offering was, by Santander's own acknowledgement, directly related to the acquisition: Santander's Prospectus Supplement stated that: "The purpose of the Capital Increase is to reinforce and optimize the Bank's equity structure to adequately cover the addition of BPE following the Acquisition. We intend to use the net proceeds from the Offer for general corporate purposes in connection with the Acquisition."[73] Indeed, drafting those disclosures would almost certainly have required Davis Polk to review many of the documents Petitioners seek here. Santander's New York capital raise was part of a broader €7 billion capital raise that it had specifically earmarked to facilitate its acquisition of Banco Popular. One might also infer that Mr. Álvarez' presence in New York, less than a week before the acquisition, was for more than a bell-ringing photo-op, especially since Santander's 30th anniversary was more than two months away.

---

[69]  *E.g., Id.* at ¶ 20 & Exs. 17-19.
[70]  Rubinstein Decl. at ¶ 32 & Ex. 32. The headquarters of the investment banking and financial services company retained by Santander are in New York, making it likely that at least some of the work on the transaction occurred in New York.
[71]  Rubinstein Decl. at ¶ 19 & Ex. 16-17.
[72]  Rubinstein Decl. at ¶¶ 19-20 & Exs. 15-21.
[73]  Ex. 17 at S-31.

In short, Santander has had a significant, continuous presence in New York for decades, and has conducted activities here related to the subjects for which Petitioners seek discovery. It thus "resides or is found" in this District.

### 2. The Discovery Sought is for Use in Foreign Proceedings

Under Section 1782, a "proceeding in a foreign or international tribunal" is understood broadly. The Supreme Court has specifically referenced "the European Court of Justice" (of which the General Court is a part) and "arbitral tribunals" as examples of proceedings that qualify. *Intel*, 542 U.S. at 258 ("[T]he term 'tribunal' ... includes investigating magistrates, administrative and arbitral tribunals, and quasi-judicial agencies, as well as conventional civil, commercial, criminal, and administrative courts; in addition to affording assistance in cases before the European Court of Justice, § 1782, as revised in 1964, permits the rendition of proper aid in proceedings before the European Commission in which the Commission exercises quasi-judicial powers" (internal quotation marks and brackets omitted)).[74] A court may not consider whether the information sought would be discoverable or admissible in the foreign proceeding. *Brandi-Dohrn*, 673 F.3d at 82 ("Accordingly, as a district court should not consider the *discoverability* of the evidence in the foreign proceeding, it should not consider the *admissibility* of evidence in the foreign proceeding in ruling on a section 1782 application."). Instead, it considers "the *practical ability* of an applicant

---

[74] While there has been some dispute about whether *Intel* overruled prior cases refusing to aid *private* arbitral panels, courts have readily held that investor-state arbitration panels created by international treaties qualify for assistance under the statute. *E.g.*, *In re Application of Chevron Corp.*, 709 F. Supp. 2d 283, 291 (S.D.N.Y. 2010) (holding UNCITRAL arbitral tribunal qualified as a foreign tribunal), *aff'd sub nom. Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2011) (noting the district court's holding but finding it unnecessary to resolve the appeal); *In re Mesa Power Grp., LLC*, No. CIV.A. 2:11-MC-280-E, 2012 WL 6060941, at *5 (D.N.J. Nov. 20, 2012) (holding UNCITRAL arbitral tribunal adjudicating investor-state claims under NAFTA qualified as foreign tribunal); *Ex Parte Gov't of the Lao People's Democratic Republic*, No. 115MC08232EJLREB, 2017 WL 2838051, at *2 (D. Idaho June 30, 2017) ("BIT arbitrations satisfy the international tribunal requirement of § 1782."); *In re Ex Parte Application of Kleimar N.V.*, No. 16 Misc. 355, 2016 WL 6906712, at *2-3 (S.D.N.Y. Nov. 16, 2016) (holding London-based arbitration qualified as foreign tribunal); *In re Application of Orlandini-Agrera*, No. 17 Misc. 354, Doc. 7 (S.D.N.Y., Sept. 25, 2017) (granting application in aid of international arbitral proceeding).

to place a beneficial document—or the information it contains—before a foreign tribunal." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 131 (2d Cir. 2017).

Both the CJEU proceeding and the imminent international arbitration proceedings satisfy this requirement. The information sought—which pertains to the events that led to BPE's Resolution and sale to Santander, the existence of viable alternative options to Resolution, the valuation of BPE, and the fairness of the 1 Euro purchase price paid by Santander—is material to both proceedings. In the CJEU proceeding, Petitioners seek to show that the Resolution ordered by the SRB and FROB was unlawful, not only because it violated petitioner's property and due process rights, but because the resolution did not meet the legal requirements for resolution of an EU financial institution.  Specifically petitioners claim that BPE was not "failing or likely to fail," as required by the EU Regulation, and that there were private sector alternatives that would have averted the need for resolution (pursuant to the EU Regulation, if such alternatives exist, resolution cannot be ordered as it is a measure of last resort). Petitioners also claim that the 1 Euro purchase price was far below BPE's fair market value. The discovery petitioners seek is directly relevant to all of these claims.

In the upcoming arbitration, as set out in their recent notification to the Spanish government, Petitioners claim that Spain's actions in facilitating the resolution of BPE and the acquisition of BPE by Santander for 1 Euro, violate the Treaty between Mexico and Spain. Specifically, Petitioners claim, among other things, that Spain's actions violated the Treaty's guarantees of "fair and equitable treatment" and other protections provided under customary international law, as set out in Article IV of the Treaty, and of protection against expropriation as set out in Article V of the Treaty. As set out in the Notification Letter, Spain facilitated Santander's acquisition of BPE through a combination of opaque actions that culminated in an overnight

auction with Santander as the only bidder. Spain quickly accepted Santander's proposed purchase price of 1 Euro, a price which Petitioners claim was far below BPE's fair market value. Petitioners also claim that Spain took actions that precipitated BPE's downfall, including public statements that exacerbated a run on BPE's deposits. Spanish government bodies also withdrew billions of Euros of deposits in the weeks before the resolution, thereby exacerbating a liquidity crisis that the Spanish government later relied upon to justify the handover of BPE to Santander. When asked to provide emergency liquidity assistance to help it cope with the liquidity crisis, as Spain had previously supported other banks, Spain inexplicably refused.

The information that petitioners seek is specifically relevant to the claims summarized above, seeking information regarding, among other things: (1) BPE's financial condition and value at the time the Resolution was ordered, (2) the circumstances that led to the Resolution and the government-ordered sale of BPE to Santander, (3) the basis upon which the SRB and the FROB ordered the Resolution of BPE and approved its sale to Santander, (4) whether the 1 Euro purchase properly reflected BPE's fair market value, and (5) whether there were other alternative transactions that could have averted the Resolution and spared Petitioners and more than 300,000 other investors the damage they suffered by virtue of the expropriation of their investments. A chart listing each of petitioners' document requests, explaining the background to each request and its relevance to petitioners' claims in the CJEU litigation and the international arbitration, is attached to the Declaration of Javier Rubinstein as Attachment A.

The CJEU litigation already is pending and underway. As for the international arbitration, petitioners' Notification Letter constitutes the first step in the dispute resolution required by the Mexico-Spain Bilateral Investment Treaty, thereby triggering a six-month "cooling off" period before the arbitration can commence. While the arbitration itself cannot yet be commenced, as the

Supreme Court has noted, a proceeding need not have actually commenced at the time when discovery is sought; it need only "be within reasonable contemplation." *Intel*, 542 U.S. at 259. The Second Circuit has explained that this requires "some objective indicium that the action is being contemplated." *Certain Funds, Accounts, and/or Inv. Vehicles v. KPMG*, 798 F.3d 113, 123 (2d Cir. 2015). Petitioners' Notification Letter (also known as a "trigger letter") is analogous to the role of a Notice of Claim under the Federal Tort Claims Act, notifying Spain that Petitioners have claims and that unless they are resolved in short order, arbitration will commence. It is an unambiguous and objective indicium that arbitration proceedings are imminently contemplated.

### 3. Petitioners—the Plaintiffs in the Foreign Tribunals—Easily Meet the Standard of Being "Interested Persons"

Finally, Section 1782 requires persons seeking discovery to show that they possess an interest in the foreign proceedings. While Section 1782 broadly covers those with the right to participate and submit evidence in foreign proceedings, *see Certain Funds, Accounts &/or Inv. Vehicles*, 798 F.3d at 120, there is "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s] who may invoke § 1782." *Intel Corp.*, 542 U.S. at 256. Petitioners are parties to the pending European proceeding and the anticipated international arbitration proceeding, and thus are plainly "interested person[s]."

### C. The *Intel* Factors Weigh Strongly In Favor of Granting Discovery

Once the threshold requirements under section 1782 are met, the Court considers the four discretionary "*Intel* factors." *See supra* at 12. Each factor favors granting the requested discovery here. *First*, Santander is not a party (and cannot be made a party) to either the European court proceeding or the investment treaty arbitration; those tribunals thus cannot order Santander to produce any evidence. *Second*, there is no reason to believe that either the European court or the arbitral tribunal would be unreceptive to evidence revealed by section 1782 discovery, and both

cases are fact-intensive proceedings to which the discovery sought is directly relevant. *Third*, Petitioners are acting in good faith and are not seeking to avoid any foreign restriction on gathering evidence. And *fourth*, the requests are carefully circumscribed and targeted to key questions in the foreign proceedings so as to avoid undue burden.

### 1. The First *Intel* Factor Favors Granting Discovery, As Santander Is Not A Party to Either Foreign Proceeding

The first *Intel* factor asks whether the party from whom discovery is sought is a party to the foreign proceeding. "[W]hen the person from whom discovery is sought is a participant in the foreign proceeding ... the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Intel*, 542 U.S. at 264. That is because "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." *Id.* Thus, courts are often skeptical of requests made against parties to the foreign proceedings or against their privies (such as parent corporations and attorneys). *E.g.*, *In re Application of Elvis Presley Enters. LLC for an Order to Take Discovery Pursuant to 28 U.S.C. § 1782*, No. 15MC386 (DLC), 2016 WL 843380, at *3 (S.D.N.Y. Mar. 1, 2016) ("Although SME is not a party to the German proceeding, Arista is its wholly-owned subsidiary. As such, Arista has access to the documents and information held by SME.").

Here, Santander is not a party to the foreign proceedings. Neither Santander nor any related company could be made a party to either the European proceedings or the international arbitration. *Cf. Ukrnafta v. Carpatsky Petroleum Corp.*, No. 3:09-mc-265-JBA, 2009 WL 2877156, at *5 (D. Conn. Aug 27, 2009) (discovery target was "not a participant, nor [was] it expected to be a participant, of the arbitration proceedings."). The European proceedings seek to invalidate the SRB's Resolution Decision; as such, only the European Commission and SRB can be proper respondents. The investment treaty arbitration proceedings, by their nature, can be brought only

against a signatory *State*—in this case Spain. Santander cannot be made a party to those proceedings.

### 2. The Second *Intel* Factor Favors Discovery Because Petitioners Will Be Able To Present Relevant Evidence in Both Proceedings

Under the second *Intel* factor, this Court looks to whether the foreign tribunal would be receptive to evidence obtained through section 1782. *In re Application of OOO Promnesftstroy*, No. M 19-99(RJS), 2009 WL 3335608, at *7 (S.D.N.Y. Oct 15, 2009) (describing second factor as inquiring into whether the foreign proceeding would "*reject* evidence obtained with the aid of section 1782." (emphasis in original)). There is a strong presumption that the foreign tribunal will be receptive to evidence obtained in the United States, with the Second Circuit holding that "[a]bsent specific directions to the contrary from a foreign forum, the statute's underlying policy should generally prompt district courts to provide some form of discovery assistance." *Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995). In order to deny discovery because of lack of receptiveness, a court must find "authoritative proof that [the] foreign tribunal would reject evidence obtained with the aid of section 1782." *Id.* at 1100.

Both the European court and the arbitral tribunal will be receptive to evidence obtained through these proceedings. In the international arbitration proceedings, tribunals routinely accept broad categories of evidence, including evidence derived from Section 1782 proceedings.[75] Because the proceedings have not yet formally commenced, Petitioners will have multiple opportunities to submit the evidence they collect to the arbitral tribunal.[76] Similarly, in the European proceeding, petitioners will have the opportunity to present documents after the EU respondents have submitted their defense.[77]

---

[75] Rubinstein Decl., at ¶¶ 86-88.
[76] *Id.*
[77] *Id.*

**3.** **The Third *Intel* Factor Favors Discovery Because The Discovery Sought Does Not Seek An End-Run Around Foreign Proof-Gathering Restrictions.**

The third *Intel* factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. The Supreme Court expressly rejected in *Intel* the notion that Section 1782 requires that the evidence be discoverable in the foreign proceeding itself, and the Second Circuit has added that the specific documents or testimony discovered need not be admissible abroad. *Brandi-Dohrn*, 673 F.3d at 82 ("While *Intel* concerned the discoverability of evidence in the foreign proceeding, we see no reason why it should not extend to the admissibility of evidence in the foreign proceeding. As in *Intel*, there is no statutory basis for any admissibility requirement."); *see Intel*, 542 U.S. at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions—reasons that do not necessarily signal objection to aid from United States federal courts."). Nor is there any requirement to exhaust one's remedies in the foreign court first; "a 'quasi-exhaustion requirement,'" the Second Circuit has held, "finds no support in the plain language of the statute and runs counter to its express purposes." *In re Metallgesellschaft AG*, 121 F.3d at 79. Rather, this factor looks primarily to whether the discovery sought seriously offends the public policy of the forum state or the United States. *In re Application of Okean B.V. & Logistic Sol. Int'l*, 60 F. Supp. 3d 419, 428–30 (S.D.N.Y. 2014) (rejecting discovery of documents "attorney-client communications protected under Russian and Ukrainian client confidentiality and personal data privacy laws," because "it would offend core tenets of our legal system (and those of Russia and Ukraine)."); *see also In re Microsoft Corp.*, 428 F. Supp. 2d 188, 195 (S.D.N.Y. 2006) (rejecting Microsoft's request for discovery of IBM's communications as a confidential informant in antitrust proceedings before the European Commission).

Here, there is no reason to believe that any of the discovery sought violates public policy. Petitioners do not seek customer account information, state secrets, or attorney-client communications—they merely seek documents and communications that are in the possession of private parties regarding a major transaction. Neither the European Union nor the arbitral tribunal have any law or public policy against such discovery.[78] To the extent that Spanish law and public policy is relevant to this analysis,[79] neither does Spain[80]; *see also   In re Application for Appointment of a Comm'r re Request for Judicial Assistance for the Issuance of Subpoena Pursuant to 28 U.S.C. 1782*, No. C 11-80136 RS MEJ, 2011 WL 2747302, at *5 (N.D. Cal. July 13, 2011) (granting section 1782 discovery in aid of Spanish court proceedings). Moreover, if Santander reasonably believes that any individual documents present foreign legal concerns, Petitioners are of course prepared to accommodate such concerns should they occur.

### 4.    The Requests Do Not Impose An Undue Burden

The final *Intel* factor looks to whether the requests are "unduly intrusive or burdensome." 542 U.S. at 265. The standard is substantially the same as in ordinary domestic civil litigation. "The reference in § 1782 to the Federal Rules suggests that under ordinary circumstances the standards for discovery under those rules should also apply when discovery is sought under the statute." *In re Bayer AG*, 146 F.3d at 195.

Here, the requests are narrowly tailored and directly relevant to questions in the foreign proceedings. Indeed, Petitioners' counsel have prepared a table explaining the importance of each

---

[78]    Rubinstein Decl., at 74.
[79]    A court in this District has recently held that purported Spanish restrictions on discovery in criminal proceedings were not relevant when discovery was sought in order to file a case before the European Court of Human Rights against Spain. *In re Mangouras*, No. 17-MC-172, 2017 WL 4990655, at *8 (S.D.N.Y. Oct. 30, 2017) ("Mangouras now seeks to use discovery before different tribunals and for different purposes. Thus, while the Court affords some weight to the Spanish court's earlier denial of Mangouras's similar discovery requests, the changed circumstances of his application weigh in favor of disclosure.").
[80]    Declaration of Pedro Rubio ("Rubio Decl."), at ¶ 36.

request, which is attached as Attachment to Javier Rubinstein's declaration. To the extent that the documents sought are voluminous, these documents are readily available to Santander and have been utilized by Santander to facilitate its acquisition of BPE and ensuing integration. It also should be noted that while Santander may not be a party to the proceedings commenced by Petitioners, Santander is hardly a distant third party with no connection to the proceedings. To the contrary, Santander played a critical role in the Resolution and acquisition of BPE. Santander has also publicly proclaimed the commercial and financial advantages that it derived from that acquisition.[81] Whatever burden respondents may incur by producing the requested discovery, it is both modest and proportionate given the circumstances.

## IV.    CONCLUSION

Santander has unique and important information regarding the forced acquisition of BPE that is of critical importance to foreign proceedings in Europe and imminent international arbitration proceedings. This Court should grant Petitioners' application and grant leave to conduct discovery under section 1782 in aid of those proceedings.

---

[81]    Rubio Decl., at ¶ 24.

Dated: New York, NY
March 5, 2018

Kirkland & Ellis LLP


/s/ Javier H. Rubinstein
Javier H. Rubinstein (Bar No. JR2875)
javier.rubinstein@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Lucila I. M. Hemmingsen (Bar No. LH2921)
lucila.hemmingsen@kirkland.com
Lauren Friedman (application for admission
*pro hac vice* to be filed)
lauren.friedman@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Attorneys for Petitioners