UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE APPLICATION OF ANTONIO DEL VALLE RUIZ AND OTHERS FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782, <br><br> Petitioners, | Case No. 18 Misc. _____ <br><br> **DECLARATION OF JAVIER H. RUBINSTEIN IN SUPPORT OF PETITION FOR 28 U.S.C. § 1782 DISCOVERY** |

1.     I, Javier H. Rubinstein, pursuant to 28 U.S.C. § 1782, declare as follows:

2.     I am a partner in the law firm of Kirkland & Ellis LLP, counsel for Petitioners, Antonio del Valle and others (collectively the "Petitioners"). I respectfully submit this declaration in support of Petitioners' Application and Petition for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding (hereafter, the "Petition") to obtain discovery in the United States from third-parties Banco Santander S.A. ("Banco Santander") and Santander Bank N.A. ("Santander U.S.A.," and together with Banco Santander, "Santander") relevant to, and in aid of, a foreign proceeding currently pending before the Court of Justice of the European Union, known as *Del Valle Ruiz and Others v. European Commission and Single Resolution Board*, Case T-510/17, filed August 4, 2017, at the General Court of the Court of Justice of the European Union (the "CJEU Litigation"), and a recently notified investment treaty arbitration to be initiated against the Kingdom of Spain pursuant to the Mexico-Spain Bilateral Investment Treaty (the "Investment Treaty Arbitration"). A true and accurate copy of the Application filed in the CJEU Litigation (the "CJEU Application") is attached hereto as **Exhibit 1**. A true and accurate copy of the notification letter dated January 22, 2018, sent by Petitioners to notify the Government of Spain of their

investment treaty claims and their intention to commence an arbitration pursuant to the terms of the Spain-Mexico Bilateral Investment Treaty (the "Notification Letter") is attached hereto as **Exhibit 2**.

3.      This Declaration is based on my personal knowledge or my review of relevant documents and records cited herein or attached hereto.

4.      The CJEU Litigation and the Investment Treaty Arbitration are both related to the loss of Petitioners' investment in Banco Popular Español S.A. ("Banco Popular" or "BPE"), arising from the government-ordered resolution of Banco Popular and sale to Banco Santander for 1 Euro, all of which took place on June 7, 2017. On that date, the European Union's Single Resolution Board ("SRB") and Spain's Fondo de Restructuración Ordenada Bancaria ("FROB") agreed to place Banco Popular into resolution (the "Resolution"). As part of this Resolution, the ordinary shares and additional tier one instruments of BPE were written down to zero, thereby completely wiping out the investments of shareholders and contingent convertible bonds. The additional tier two instruments of BPE were converted to shares; 100% of BPE's shares were then transferred to Santander for the nominal purchase price of 1 Euro. True and accurate copies of the publicly available, redacted versions of the Resolution orders of the SRB and FROB are attached hereto as **Exhibits 3** and **4**.

5.      Banco Popular was apparently the first EU financial institution ever to undergo resolution pursuant to the EU Single Resolution Mechanism. The Resolution caused widespread investor losses in Spain, Europe, and around the world, with 305,000 investors losing their investments in BPE overnight, with Bloomberg estimating investors' losses at more than €3.3 billion. A true and accurate copy of "Santander Rescues Popular as Spain Real Estate Loans Sink Lender", published in Bloomberg, is attached hereto as **Exhibit 5**.

6.      The circumstances leading to and surrounding the Resolution are still largely unknown, as EU and Spanish authorities have refused to provide complete information regarding the resolution process, the basis of the resolution decision itself, and the transaction that led to the handover of BPE to Santander for €1.  The resolution decision itself has not been fully disclosed (only a redacted version is publicly available).  *See* **Exhibit 3**.

7.      Petitioners now seek discovery of documents and information in the possession, custody and control of the Santander Respondents, including documents of Banco Popular that Santander took possession, custody and control of as from June 7, 2017. All of the documents and information requested from the Santander Respondents are directly relevant to the claims that Petitioners are asserting in the CJEU Litigation and the Investment Treaty Arbitration, and are sought for the purpose of submitting such documents as evidence in one or both proceedings.

I.      **BACKGROUND**

   A.      **Petitioners**

8.      Petitioners, a group of 55 Mexican investors, invested approximately 470 million Euros in Banco Popular shares and bonds (mostly common shares) between December 2013 and June 2017. *See* **Exhibit 2**.

9.      Petitioners' original investment in BPE was made in December 2013, through a capital increase BPE carried out exclusively for Petitioners, who acquired the totality of the shares issued in that capital increase.  As part of the original investment, Petitioners obtained a seat on the Board of Directors.  Later, Petitioners further invested in the bank through smaller purchases, and by participating in a capital increase conducted by BPE in April 2016.  Through their investments, Petitioners owned approximately 4.3% of BPE's shares as of the date of the Resolution. *See* **Exhibit 1**.

**B.**    **Respondent Santander and its Presence in New York**

10.    Banco Santander is a Spanish banking company whose first financial activity dates back to 1856. *See* "Over a Century of History," https://www.santander.com/csgs/Satellite/CFWCSancomQP01/es_ES/Corporativo/Acerca-del-Grupo/Mas-de-un-siglo-de-historia/1856-1930.html?wpid=1278697994821&leng=en_GB. As of December 31, 2016, Banco Santander's assets amounted to 1.339 trillion euros, making it the leading Spanish financial institution by volume of assets. *See* 2016 Annual Report of Santander at 106, https://www.santander.com/csgs/Satellite/CFWCSancomQP01/en_GB/pdf/Annual_report_2016.pdf. Santander is listed on the Madrid Stock Exchange (SAN) and the New York Stock Exchange (SAN) and is part of the Ibex 35, as well as the Dow Jones EURO STOXX 50. *See* "The Santander Share", https://www.santander.com/csgs/Satellite/CFWCSancomQP01/en_GB/Corporate/Shareholders-and-Investors/The-Share-Santander/Presence-in-indexes.html.

11.    The Santander Group includes a network of financial entities with a global presence, including entities located in the United States. *See* 2016 Annual Report of Santander at 33, https://www.santander.com/csgs/Satellite/CFWCSancomQP01/en_GB/pdf/Annual_report_2016.pdf. Santander has a longstanding and significant presence in New York. According to its public filings, Banco Santander S.A. has, since approximately 1978, maintained its United States branch in New York City, supervised by the New York State Department of Financial Services, and managing $14.8 billion in assets as of 2013. A true and accurate copy of excerpts from Santander's 2013 Resolution Plan (at 3) is attached hereto as **Exhibit 6**.

12.    In addition to providing wholesale banking for large corporations and financial institutions, Banco Santander S.A.'s New York Branch manages Santander's wholly-owned U.S.

4

subsidiaries (including Santander U.S.A. Holdings, Inc., and Santander Bank N.A.). Rankings show that as of 2013, Santander and its subsidiaries collectively constitute the ninth largest banking group in the New York Metropolitan Statistical Area with branches across the Southern District—including one less than three blocks away from this Courthouse. A true and accurate copy of "Deposit market share of banks in New York MSA" published by SNL Financial is attached hereto as **Exhibit 7**.  A true and accurate copy of a photograph depicting the Santander branch on Broadway, close to the courthouse is attached hereto as **Exhibit 8**.

13.    According to government records, Santander's New York branch is a hub from which Santander has extended billions of dollars in intragroup loans to Santander subsidiaries both in the U.S. and across Latin America. A true and accurate copy of excerpts from Santander Holdings USA, Inc.'s 10-Q filing for the third quarter of 2017 (at 141) is attached hereto as **Exhibit 9**.

14.    The CEO of Santander's U.S. operations, Scott Powell, lists his location on LinkedIn as New York City. A true and accurate copy of his LinkedIn profile is attached hereto as **Exhibit 10**. Based on a review of the Town of New Castle tax roll and his official Santander biography, it appears that his family resides in Chappaqua, and that he is a board member for two New York City-based non-profits.    *See*  Town of New Castle 2017 Final Roll, http://mynewcastle.org/departments/assessor/;    https://www.santanderbank.com/us/about/about-us/leadership.

15.    Banco Santander S.A. is listed on the New York Stock Exchange through sponsored American Depositary Receipts whose depositary is the Bank of New York Mellon.  Santander publicly claims that its "share has been trading on the New York Stock Exchange for more time than any other Spanish company."  A true and accurate copy of a Santander's Press Release entitled

"Santander celebrates 30 years of trading on the NYSE" is attached hereto as **Exhibit 11**. On June 1, 2017, less than one week before its acquisition of BPE, Santander's group CEO, José Antonio Álvarez Álvarez, celebrated the 30th anniversary of Santander's New York listing by ringing the New York Stock Exchange Closing Bell.  *Id.*.

16.     In October 2017, Santander held its group Global Strategy Update meeting, where its Executive Chair, CEO, and other senior executive presented to investors and analysts in New York.  A true and accurate copy of Santander's publication of the Group Strategy Update of October 10, 2017 in New York is attached hereto as **Exhibit 12**.

17.     Shortly after the announcement of its acquisition of BPE, Santander's executive leadership reportedly held high-level "roadshow" meetings with analysts and investors in New York to raise capital that it needed to raise in order to facilitate the acquisition and help for the merged entity to meet regulatory capital thresholds.  A true and accurate copy of an article entitled *Santander cierra su ampliación con demanda record de 58.000 millones; capta 7.072 millones* from Expansión is attached hereto as **Exhibit 13**.

18.     Prior to the acquisition, Santander had retained UBS and at least another New York-based investment banking and financial services company in order to explore financing for a takeover of Banco Popular. A true and accurate copy of an article entitled "Botín da pasos concretos en la compra del Popular: ficha asesores" published on Economía Digital on May 19, 2017 is attached hereto as **Exhibit 14**.

19.     New York partners of Santander's counsel, Davis Polk & Wardwell LLP, wrote letters to the SEC seeking exemptive relief from certain securities law requirements and drafted hundreds of pages of SEC disclosures related to the rights offering Santander undertook. A true and accurate copy of Banco Santander's Request for Exemptive Relief from Rules 101 and 102 of

Regulation M, filed before the SEC by Davis Polk on June 29, 2017 is attached hereto as **Exhibit 15**; a true and accurate copy of certain excerpts of the Prospectus is attached hereto as **Exhibit 16**; and a true and accurate copy of certain excerpts of the Prospectus Supplement is attached hereto as **Exhibit 17**.

20.     In the Prospectus Supplement issued on July 5, 2017 in connection with the U.S. capital offering, Santander stated (at p. S-31) that "The purpose of the Capital Increase is to reinforce and optimize the Bank's equity structure to adequately cover the addition of Banco Popular following the Acquisition. We intend to use the net proceeds from the Offer for general corporate purposes in connection with the Acquisition." **Exhibit 17**, at page S-31. Similar statements confirming that the purpose of the capital increase was related to the acquisition of Banco Popular are also found in a number of other filings made before the SEC.  For example, the Registration Statement filed on June 22, 2017, at page 13, states that "As previously announced, in connection with our recently announced acquisition of Banco Popular Español, S.A. ("Banco Popular"), we intend to carry out a share capital increase via rights offering of approximately €7 billion in order to cover the capital and provisions required to strengthen Banco Popular's balance sheet and to reinforce our own capital." **Exhibit 16**.  Various Reports of Foreign Issuers filed thereafter in support of the Registration Statement also contained similar statements.  For example, the Report of Foreign Issuer filed on July 5, 2017, at page 6, notes that "The Capital Increase aims to reinforce the Bank's and its group regulatory capital ratios following the acquisition of Banco Popular Español, S.A. [ ] on 7 June 2017."  A true and accurate copy certain excerpts of the Report of Foreign Issuer (Form 6-K) dated July 5, 2017 is attached hereto as **Exhibit 19**.  True and accurate copies of the Reports of Foreign Issuer (Form 6-K) dated July 27, 2017 and dated October 27, 2017 are attached hereto as **Exhibits 20** and **21**, respectively.

7

### C. Banco Popular Español, S.A.

21.     BPE was established in 1926. Over time, BPE grew and expanded and by June 7, 2017, BPE had become Spain's sixth largest bank, with total assets of approximately €147 billion. *See* Banco Popular's 2017 Q1 Results, http://www.grupobancopopular.com/ES/AccionistasInversores/Documents/Quarterly%20Report%201Q17.pdf; and summary of BPE History on Banco Popular's website, http://www.grupobancopopular.com/EN/InvestorRelations/CorporateGovernance/aboutpopular/History/Paginas/Inicio.aspx.

22.     Historically, BPE's core business consisted of a strong Spanish retail franchise, with a focus on lending to small and medium-sized enterprises. Since the mid-2000's, mortgages and other home loans to retail customers became increasingly important to BPE's business operation.     *See*     BPE's     2008     annual     report, http://www.grupobancopopular.com/EN/InvestorRelations/Documents/Annual%20Reports/AnnualReportenglishversion2008.pdf.

23.     As reflected in BPE's 2010 Annual Report, the collapse of the housing sector that precipitated the 2008-2009 financial crisis revealed the European banking system's exposure to toxic assets, including non-performing assets (NPAs) and other distressed debts. Like many European banks, BPE had many NPAs, but was working to manage their impact on its balance sheet. BPE wrote down large sums because of the NPAs it held and took a number of significant provisions.     *See*     BPE's     2010     Annual     Report, http://www.grupobancopopular.com/EN/InvestorRelations/Documents/Annual%20Reports/AnnualReport2010.pdf.

**D.     BPE's Measures To Address Its Financial Challenges**

24.     To address the effects of these long-standing financial issues related to its exposure to NPAs and other distressed debts, BPE implemented a variety of measures between 2012 and 2016 to improve its capital base, increase liquidity and stabilize the bank's financial condition. A true and accurate copy of the presentation of Banco Popular's CEO on October 5, 2016 is attached hereto as **Exhibit 22**.  Notwithstanding the effect of NPA's upon Banco Popular's balance sheet, Banco Popular never received any state aid prior to 2017. A true and accurate copy of the article *Popular in Fight to Survive as Bank Updates ECB on Situation* from Bloomberg is attached hereto as **Exhibit 23**.

25.     In 2013, the Spanish Supreme Court had declared prospectively void certain clauses in mortgages known as "floor clauses," as violating European consumer protection rules. Judgment No 241/2013 of 9 May 2013. In 2015, the Spanish Supreme Court reaffirmed that decision, holding that lenders only had to refund payments based on "floor clauses" after the date of the 2013 ruling. Judgment No 139/2015 of 25 March 2015. However, several consumers dissatisfied with these rulings brought cases claiming that European law required a full refund of all money earned on "floor clauses" since the first mortgage payment, and the issue was referred to the European Court of Justice. Consistent with a 2015 recommendation by the European Commission, the Court found that banks had to repay in full all money earned on "floor clauses." Joined Cases C-154/15, C-307/15, and C-308/15, *Naranjo v. Cajasur Banco SAU* (C.J.E.U. Dec. 21, 2016).  This forced Banco Popular to make an extraordinary provision of €350 million in 2016, reducing its full year after-tax profit to €105 million, a 69% reduction compared to the previous year. This presented a significant setback to BPE's recovery efforts. *See* BPE's 2016 Annual Report,

http://www.grupobancopopular.com/EN/InvestorRelations/FinancialInformation/Documents/2017/Annual%20Report_popular2016_%20PC_EN.pdf.

26.     In 2016 and 2017, BPE implemented a number of measures to stabilize and enhance the bank's financial position, including, among other things: (a) the sale of certain BPE assets (including NPAs) in order to improve its liquidity position; (b) a substantial capital increase that was approved by the BPE shareholders in April 2017; and (c) the potential sale of the bank to another financial institution. *See* **Exhibit 22**.

### 1. Sale of Assets

27.     In April 2017, at the annual BPE shareholder meeting, BPE announced plans to recapitalize and cleanse the bank of toxic assets through a combination of measures, including asset sales and capital increases. A true and accurate copy of a Reuters article entitled *Spain's Banco Popular to sell off assets to boost depleted capital* is attached hereto as **Exhibit 24**.

28.     During the shareholder meeting, BPE's CEO announced that BPE was planning to sell specific valuable assets (including its stakes in Banco Popular Portugal, Popular Private Banking, BX+, Allianz, Euroautomatic Cash, Wizink, and TotalBank, among others) to raise cash, cover losses from NPAs, and improve its liquidity position. *Id.* In the ensuing weeks, BPE carried out a number of these sales; many others were also at an advanced stage when the Resolution was announced. A true and accurate copy of excerpts from BPE's May 18, 2017, Board Meeting is attached hereto as **Exhibit 25**. According to BPE Board Minutes, in the five-week period from May 1, 2017 to June 6, 2017, BPE completed or was soon to complete a series of transactions, including:

a)   Transfer of Asset Backed Securities (over 300 million euros);

b)   Sale of corporate loans (over 500 million euros);

    c)   Sale of leasing portfolio (over 750 million euros);

    d)   Sale of Popular Servicios Financieros (over 150 million euros);

    e)   Sale of NPLs (over 50 million euros);

    f)   Sale of loans portfolio (over 1000 million euros);

    g)   Sale of shares in Wizink (board approval for sale had been obtained); and

    h)   Sale of shares in Targo Bank (closed a week before the Resolution).

A true and accurate copy of excerpts from a presentation entitled "Situación Liquidez" [Liquidity Situation] dated June 6, 2017, and a certified translation from Spanish into English of the same, is attached hereto as **Exhibit 26**.

    29.    In the first week of June, 2017, BPE was about to complete the sale of its subsidiary in Miami, TotalBank, with an offer of €400 million (US$545) million from the Chilean Banco de Crédito e Inversiones ("BCI"). *See* http://www.eleconomista.es/banca-finanzas/noticias/8369202/05/17/Popular-ultima-la-venta-de-TotalBank-por-encima-de-los-400-millones.html#. The closing was interrupted by the Resolution. The sale of TotalBank was later closed by Santander on December 1, 2017 to BCI for a lower price of US$ 528 million. *See* http://www.expansion.com/empresas/banca/2017/12/01/5a21259022601daf038b4572.html.

### 2. Capital Increase

    30.    At the April 2017 BPE shareholder meeting, shareholders voted to authorize the Board of Directors to increase the share capital up to 50% and issue fixed income securities to enhance the bank's capital position. A true and accurate copy of the minutes of that shareholder meeting is attached hereto as **Exhibit 27**. In addition to Petitioners, other investors also had expressed an interest in participating in the capital increase. Those investors included Andrónico Luksic, a high net-worth investor from Chile who invested €100 million in BPE earlier in 2017.

A true and accurate copy of an article from El País entitled *El grupo chileno Luksic compra el 3% del Popular con una inversión de 90 millones* [The Chilean Luksic Group buys 3% of Popular with an Investment of € 90 million] is attached hereto as **Exhibit 28**.

31.     Other large investors also apparently confirmed their intention to participate in a capital increase and provided an estimate calculation on the amount of capital to be raised that would be necessary to provide financial stability to BPE.  In a June 3, 2017 letter to BPE, Barclays reportedly confirmed its support for the BPE Investors' proposed capital raise, offering to cover 50% of a €4 billion capital raise, expressing its view that "Popular is a solid franchise" and that following the capital raise "Popular has the potential to deliver attractive return on equity levels that would be attractive to new investors."  A true and accurate partial copy of the letter from Barclays, as published by *Diario16*, is attached hereto as **Exhibit 29**.  Similarly, on June 5, 2017, Deutsche Bank reportedly wrote to BPE confirming its interest in securing 50% of a possible €4 billion capital raise under specified conditions, and its view that the capital raise "could be accomplished to stabilize the bank."  A true and accurate copy of a partial copy of the letter from Deutsche Bank, as published in *Diario16*, is attached hereto as **Exhibit 30**.  Pacific Investment Management Company (PIMCO), one of the largest managers of fixed income securities in the world, also expressed its commitment to provide up to €300 million in the capital raise.  A true and accurate copy of the article *El rescate que no salvó al Popular: recibió el respaldo de la gestora Pimco ocho días antes de su resolución* [The rescue that did not save popular: it received the support of fund manager Pimco eight days before its resolution] from *El Mundo*, and a certified translation from Spanish into English  is attached hereto as **Exhibit 31**.

12

### 3. Private Sale of BPE

32. In the months prior to its Resolution, BPE was actively exploring a private sale of the bank. *See* https://www.reuters.com/article/banco-popular-es-ma/spains-banco-popular-hires-lazard-jpmorgan-for-sale-report-idUSL8N1ID7XU. As part of this process, in or around May 2017, BPE prepared and opened a virtual data room for potentially interested buyers. Several Spanish banks, including Santander, CaixaBank, BBVA, Sabadell and Bankia, reportedly were granted access to the virtual data room. According to media reports, Santander apparently was able to complete a full due diligence of BPE approximately 20 days before the Resolution, as one of Santander's directors later confirmed, and had retained UBS and another New York-based investment banking and financial services company as advisors on the contemplated bid. A true and accurate copy of the article *El beneficio de Santander aumenta un 10%, espoleado por Brasil* [Santander's profit increased by 10%, spurred by Brazil] in *Expansión*, and a certified translation from Spanish into English of the same, is attached hereto as **Exhibit 32**.

33. After completing its due diligence, Santander reportedly offered to pay €3 billion for BPE, along with an additional capital injection of €4 billion Euros. A true and accurate copy of article entitled *El Popular era "inviable" y no podía atender ya la retirada de depósitos* [Popular was "unviable," and could no longer meet the withdrawal of deposits] in *El Independiente*, and a certified translation from Spanish into English of the same, is attached hereto as **Exhibit 33**.

34. In order to give other potential bidders more time to consider and formulate a potential offer, BPE decided to extend the deadline for submission of bids, which originally was set to close on June 10, 2017, until the end of June. A true and accurate copy of article entitled

*Solution for Banco Popular is a capital raise or a sale - Spanish govt* in *Reuters* is attached hereto as **Exhibit 34**.

      E.      **Banco Popular's Liquidity Crisis**

          1.    **The Run on the Bank**

35.     Banco Popular, which was subject to ongoing inspection and supervision by the Banco de España and the European Central Bank, had been periodically inspected and undergone all required stress tests. Banco Popular passed its inspections and tests in 2016, and was found to have met all required capital levels. A true and accurate copy of 2016 EU-wide Stress test for Banco Popular is attached hereto as **Exhibit 35**.

36.     In the first half of 2017, BPE faced growing liquidity challenges due to increasing deposit withdrawal levels. A true and accurate copy of an article from the *Financial Times* entitled *Spain's Banco Popular shares hit new low amid sale doubts* is attached hereto as **Exhibit 36**. While deposits decreased by 3% during the first quarter 2017, data from the Bank of Spain Association shows that BPE client deposits suffered a loss of €8.3 billion between January 2017 and April 2017, with €7 billion of that loss incurred between March and April 2017. A true and accurate copy of excerpts from Banco Popular's Q1 2017 Quarterly Report is attached hereto as **Exhibit 37**.

37.     Between December 2016 and March 2017, entities of the Spanish Government reportedly withdrew approximately 40% of its deposits in BPE.  A true and accurate copy of an article in Expansión entitled *La Seguridad Social y algunas CCAA sacaron fondos de Popular antes de la resolución*, and a certified translation from Spanish into English of the same,  is attached hereto as **Exhibit 38**.

38.     On May 11, 2017, the news outlet *El Confidencial* published an article called "Urgent sale of Popular due to bankruptcy risk."  A true and accurate copy of extracts from board meeting minutes of June 6, 2017 referencing that article is attached hereto as **Exhibit 39**. The next day, BPE experienced deposit withdrawals of 1 billion Euros.  *Id*.  On May 18, BPE sent notice to the European Central Bank regarding breach of the minimum required liquidity coverage ratio and its plan to restore the required liquidity. *Id*.  Banco Popular requested that the ECB restore liquidity to the bank in order to allow BPE to comply with regulatory requirements.  That same day, *eleconomista.es* quoted Spanish Minister of Economy, Luis de Guindos, as stating that the Government "does not foresee injecting public resources" in Banco Popular, and that BPE "is supervised by the European Central Bank", not by Spanish authorities.  A true and accurate copy of the the article entitled *Guindos asegura que no se va a inyectar dinero público en Banco Popular* in El Economista is attached hereto as **Exhibit 40**.

39.     On May 23, 2017, the Chairman of the SRB, Elke König, publicly stated that BPE was being "*observed*" by the SRB.  *See* **Exhibit 31**.  A week later, on 31 May 2017, Reuters quoted Ms. König as warning EU officials that BPE might need to be wound down should it fail to find a buyer.  A true and accurate copy of an article entitled EU warned of wind-down risk for Spain's Banco Popular - source in Reuters is attached hereto as **Exhibit 41**. That same day, the SRB issued a press release in which it said it would "not comment on any bank-specific matters."  A true and accurate copy of SRB's press release dated May 31, 2017 is attached hereto as **Exhibit 42**.

40.     According to Sebastián Albella, the President of the CNMV, which is the rough Spanish equivalent of the SEC, the growing levels of deposit withdrawals were caused in substantial part by the public statements from Spanish government officials and the Chair of the

SRB. A true and accurate copy of Mr. Albella's declaration before the Investigative Commission at a hearing dated January 11, 2018 is attached hereto as **Exhibit 43**.

41.    The increasing volume of deposit withdrawals continued into the first week of June, 2017. As reported to the BPE Board, BPE lost more than 5 billion Euros in just the first two days of June. *See* **Exhibit 26**. On June 5, the bank lost almost 3 billion Euros in deposits. A true and accurate copy of a *Financial Times* article entitled *Banco Popular burnt through €3.6bn in two days ahead of rescue* is attached hereto as **Exhibit 44**. During the ten days prior to its Resolution, Banco Popular lost approximately 18 billion euros in deposits. *See* **Exhibit 33**. BPE's stock price also significantly fell, starting on June 1, 2017. A true and accurate copy of a chart depicting Banco Popular's share prices and volumes is attached hereto as **Exhibit 45**.

### 2. Requests for Emergency Liquidity Assistance

42.    Prior to June 1, 2017, BPE reportedly requested €9.5 billion in ELA from the Banco de España. *See* **Exhibit 39**. To support its ELA request, Banco Popular reportedly posted more than €52 billion in assets as collateral. A true and accurate copy of an article entitled *El Banco Popular pidió ya ayuda de emergencia al Banco de España dos meses antes de su debacle* [Banco Popular had already asked the Bank of Spain for emergency help two months before its collapse] in El Mundo, and a certified translation from Spanish into English of the same, is attached hereto as **Exhibit 46**.

43.    On or about June 1, the Banco de España provided €3.5 billion in ELA, less than 10% of the collateral value that was reportedly posted by BPE. *See* **Exhibit 39**. On or about June 5, 2017, the Banco de España informed BPE that no further ELA would be provided. A true and accurate copy of a Briefing Note of the European Parliament entitled *Regular public hearing with Danièle Nouy, Chair of the Single Supervisory Mechanism* is attached hereto as **Exhibit 47**.

16

44. On June 6, 2017, BPE's Board of Directors held an emergency meeting where the Board allegedly acknowledged that, as a result of the run on deposits, the bank would potentially not have enough liquidity to face its obligations. *See* **Exhibit 39**. The Board therefore communicated this situation to the SRB. *See* **Exhibit 3** at 8.

45. According to *El Mundo*, Banco Popular had been working with the Banco de España regarding its needs for potential emergency liquidity assistance since the end of March 2017. Since March 2017, Banco Popular was reportedly providing the Bank of Spain with regular updates on potential collateral to be used in the event Banco Popular had a need for ELA. In April, 2017, Banco Popular reportedly put in place "Operation Umbrella," consisting of a confidential listing of assets that could be presented to Banco de España as collateral for a potential need for ELA. *See* **Exhibit 46**.

**F.    The Resolution of Banco Popular**

**1.   The Resolution Mechanism**

46. Since the financial crisis, European authorities have been developing a "Banking Union." *See generally* http://europa.eu/rapid/press-release_MEMO-15-6164_en.htm?locale=en. The new banking union has two pillars: the Single Supervisory Mechanism ("SSM") and the Single Resolution Mechanism ("SRM"). *Id.* The SSM is a system of banking supervision for Europe, and comprises the European Central Bank ("ECB") and the national supervisory authorities of the participating countries. At all times, the SSM, in cooperation with national authorities, maintains a resolution plan on how to resolve a bank if it were to come to fail. *See* Regulation (EU) No 1024/2013.

47. The SRM is designed to achieve the orderly resolution of failing banks in Europe. The SRM is comprised of the Single Resolution Board ("SRB"), a central resolution authority, and

the national resolution authorities of participating Member States of the EU.  *See* Regulation (EU) No. 806/2014.  Where a bank that is subject of supervision is found by the SRB to be failing or likely to fail, the SRB, working in cooperation with relevant national authorities, drafts the resolution plans and adopts all decisions relating to resolutions for the entities covered by the SRM. *Id.*  The SRB can also administer funds available through a Single Resolution Fund (the "SRF"), which is financed by contributions from banks.  *Id.*  The ECB is the supervisor of the SRM process, and plays a role in deciding whether the bank is failing or likely to fail ("FOLTF"). *Id.*

48.    According to the SRB, a resolution pursuant to the SRM Regulation involves the restructuring of a bank through a combination of available resolution tools. Pursuant to the SRM Regulation, there are four possible resolution tools:

    a.  the sale of business tool (total or partial disposal of an entity's assets, liabilities and/or shares to a private purchaser);

    b.  the bridge institution tool (transfer of part or all of the assets, liabilities and/or shares to a controlled temporary entity);

    c.  the asset separation tool (transfer of assets to an asset management vehicle); and

    d.  the bail-in tool (write-down or conversion of equity and debt, placing the burden on the shareholders and creditors of a bank, rather than on the public).

*Id*.  In applying the resolution tools, the SRB must take into account the resolution objectives and select the resolution tools best suited to achieve those objectives. *Id.*

49.    According to the SRM, to place an entity into resolution, the following three conditions precedent must be satisfied: (1) the bank is failing or likely to fail; (2) there are no supervisory or private sector measures that can restore the bank to viability within a reasonable timeframe; and (3) resolution is necessary for the public interest (i.e. preferable to normal insolvency proceedings). *Id.*

50. On October 2, 2015, as an EU Member State, Spain ratified the Intergovernmental Agreement, which funded and authorized the SRM within its territory. *See* Instrumento de ratificación del Acuerdo sobre la transferencia y mutualización de las aportaciones al Fondo Único de Resolución, hecho en Bruselas el 21 de mayo de 2014 [Instrument of Ratification of the Intergovernmental Agreement on the Transfer and Mutualization of Contributions to the Single Resolution Fund, done at Brussels on May 21, 2014]. The Agreement entered into force on January 1, 2016.

51. As required of all banks within the ambit of the SSM, BPE had a resolution plan in place that was designed to establish how the resolution of a particular bank would be carried out should such a resolution be required in the future. A true and accurate copy of BPE's Resolution Plan dated 2016 (redacted version that was made available by the SRB) is attached hereto as **Exhibit 49**. The BPE resolution plan was agreed by the SRB and by Banco de España. *Id.* As of December 5, 2016, the ECB's resolution plan included a bail-in and a consecutive restructuring of the bank under a public entity, measures designed to restore the bank's long-term viability. The resolution plan did not include the use of the sale of business tool to sell the bank to a third party. *Id.*

### 2. The Resolution of Banco Popular

52. On June 3, 2017, the SRB reportedly decided in an extended executive session (which Spain attended) that the FROB, Spain's resolution entity, should begin an open tender process to sell BPE. A true and accurate copy of the SRB Marketing Decision dated June 3, 2017 is attached hereto as **Exhibit 50**.

53. On June 3, 2017, the FROB launched "Project Hippocrates": a project designed to facilitate the "eventual acquisition" of BPE, in apparent disregard of any private alternatives that

could have averted resolution and the resulting significant damage to Petitioners. A true and accurate copy of extracts from a letter from the FROB to banks dated June 4, 2017 is attached hereto as **Exhibit 51**. On Sunday, June 4, the FROB sent a communication to five Spanish banks, enclosing a confidentiality agreement that would enable those banks to "participate in an eventual acquisition [of BPE] within the framework of a potential resolution." A true and accurate copy of an article entitled *El BBVA estaba interesado en el Popular pero no le dieron tiempo* in *Diario16*, containing excerpts of the June 4, 2017 letter the FROB sent to five Spanish banks, and a certified translation from Spanish into English of the same, is attached hereto as **Exhibit 52**. According to the letter, by signing the confidentiality agreement, the entities would then be given access to a virtual data room on Monday, June 5. This virtual data room was apparently the same one that Banco Popular had prepared and made available to interested entities during the private sale process it had carried out a month prior. A true and accurate copy of the FROB Decision dated June 7, 2017 is attached hereto as **Exhibit 4**.

54.    On Tuesday, June 6, the BCE reportedly issued its finding that Banco Popular was "failing or likely to fail". *See* **Exhibit 3**. On that same day, the FROB issued a "Process Letter" where it provided detailed information to potential bidders regarding bidding requirements and presented the compressed transaction timetable for the operation. A true and accurate copy of the FROB Process Letter dated June 6, 2017 is attached hereto as **Exhibit 53**. In that same letter, the FROB stated that no additional information would necessarily be provided and "[could not] guarantee that [any information] session will occur or that all questions raised will be answered." *Id*.

55.    Pursuant to the FROB's Process Letter, bidders were required to submit a binding offer by midnight on June 6, 2017. *Id*. The Process Letter also specified the following timeline:

a. the "selection of the winning bid" would occur one hour after bids were submitted, at 1:00 am on Wednesday, June 7;

b. the "SRB's Resolution Scheme (if any)" then would be implemented by 5:30 am CET on June 7;

c. the Sale and Purchase Agreement would be executed by the same time; and

d. the closing and public announcement would then take place 90 minutes later at 7:00 am on Wednesday, June 7.

*Id*.

56.    Of the five banks that were reportedly invited to participated in the BPE tender, Santander was allegedly the only bank that submitted a bid.  **Exhibit 3**.

57.    On June 6, 2017, BBVA, one of the entities contacted by the FROB, wrote to the FROB stating that "…given the limitations on price and the remaining conditions required in accordance with the process letter, as well as the insufficient information available, BBVA is not in a position to present an offer under the terms of that process letter and the purchase agreement (SPA) submitted today." A true and accurate copy of a partial letter as published by *Diario16* from BBVA to the FROB dated June 6, 2017 is attached hereto as **Exhibit 55**.  BBVA also stated in its letter that "if sufficient information was available to allow its governing bodies to properly analyze the operation and the conditions, and if the conditions of the process could be modified, BBVA would be interested in participating in it."  *Id.*  BBVA's request was apparently not granted and BBVA thus did not submit a bid. *See* **Exhibit 3**.

58.    The June 6, 2017 FROB Process Letter stated that the "[p]rice must be an exact figure in Euros not a range and must be equal to or greater than one Euro (€1)." *See* **Exhibit 53**. According to articles published in *El Independiente* and *Diario16*, Santander had discussed a previous offer with Banco Popular under which Santander would pay 3 billion Euros and also

commit to a 4 billion capital increase.  *See* **Exhibit 33**, and a true and accurate copy of the article *El Santander no puso el precio por el Popular, alguien se lo pudo indicar* [Santander did not set the price for the [Banco] Popular, someone could have indicated it [to Santander]] published in *Diario16* on December 28, 2017  is attached hereto as **Exhibit 54**.  It has also been reported in the media that Santander had prepared two different bids in the context of the auction organized by the FROB: one for 3 billion Euros, and the one for 1 Euro that ultimately presented once it received confirmation that BBVA was not going to present a bid, and it would be the only bidder in the process.  *Id*.

59.  On June 7, the FROB accepted Santander's 1 Euro offer and confirmed its decision to propose to the SRB that Santander be declared the purchaser of Banco Popular:  "the Governing Commission of the FROB … adopted unanimously the following agreement: to Propose BANCO SANTANDER, S.A. to the Single Resolution Board as the successful bidder on the process of sale of BANCO POPULAR ESPAÑOL, S.A. shares, for the purpose of its designation as buyer in the resolution device of this entity." *See* **Exhibit 4**.

60.  On June 7, 2017, the SRB entered its Decision SRB/EES/2017/08 concerning the adoption of a resolution scheme in respect of Banco Popular Español, S.A. (the "SRB Decision"), and the European Commission ("EC") entered Decision (EU) 2017/1246 endorsing the resolution scheme of Banco Popular Español, S.A. (the "EC Decision").  The SRB Decision released to the public (including Petitioners) was heavily redacted, and an unredacted version has not been released.  *See* **Exhibit 3**; a true copy of the EC Decision is attached hereto as **Exhibit 56**.

### 3.  Spain's and Santander's Pre-Approved Acquisition Plan

61.  On June 2, 2017, Uría & Menéndez, a Spanish law firm, reportedly prepared a memorandum entitled "Action Plan ´Day R´".  A true and accurate partial copy of the

memorandum prepared by Uría & Menéndez, entitled "Action plan -- Day R", as published in *Diario16*, is attached hereto as **Exhibit 57**. This document was partially published on November 20, 2017 by *Diario16* in an article entitled "La presunta estafa de Emilio Saracho en el Popular (I)." A true and accurate copy of the article by *Diario16* is attached hereto as **Exhibit 58**.

62.    Uría & Menéndez has reportedly served as Santander's counsel in the past and also served as Spanish counsel for Santander in relation to the Banco Popular acquisition, including Santander capital raise in 2017.   True and accurate copies of excerpts from Exhibit 5.1 to Santander's June 22, 2017, Form F-3 are attached here as **Exhibit 59**.

63.    On June 2, 2017, Santander's Chair and Executive Director, Ana Botín, reportedly met with the Spanish Minister of Economy, Luis de Guindos, at the meeting of the Club Bilderberg in Chantilly, Virginia. A true and accurate copy of the list of meeting attendees published by the Club Bilderberg is attached hereto as **Exhibit 60**.

64.    On June 6, 2017, the day before the Resolution was publicly announced and before the results of the Banco Popular tender process were announced by the FROB, it was reported by two Spanish newspapers, *Expansión* and *El Economista*, that Santander was launching a multi-billion Euro capital raise to facilitate its acquisition of BPE.   A true and accurate copy of an article entitled *Santander estudia ampliar capital en 5.000 millones para comprar Popular* [Santander considers expanding capital by 5 billion to purchase Popular] in *Expansión* and *Santander planea una ampliación de capital de 5.000 millones para la compra del Popular* [Santander is planning a 5 billion capital increase in order to purchase Banco Popular] in *El Economista* are attached hereto as **Exhibits 61** and **62**, respectively.

65.     On June 7, 2017, Santander publicly announced that it had replaced BPE's management team and Board of Directors.  A true and accurate copy of Relevant Fact Nbr. 253044, and a certified translation from Spanish into English of the same, is attached hereto as **Exhibit 63**.

## II.     FOREIGN PROCEEDINGS

### A.     CJEU Litigation

66.     On August 4, 2017, Petitioners filed a legal challenge in the Court of Justice of the European Union ("CJEU") seeking: (1) the annulment of (a) the SRB Decision and (b) the EC Decision of June 7, 2017; and (2) a declaration that Articles 18 and 22 of Regulation (EU) No. 806/2014 of the European Parliament and of the Council of July 15, 2014 establishing uniform rules and a uniform procedure for the resolution of credit institutions and certain investment firms in the framework of a Single Resolution mechanism and a Single Resolution Fund and amending Regulation (EU) No 1093/2010 are illegal, and the consequential annulment of the SRB Decision and EC Decision, which resolved BPE and canceled the interests of all Banco Popular shareholders and junior bondholders. A true and accurate copy of Petitioners' Application is attached hereto as **Exhibit 1**.

67.     Petitioners allege in their CJEU Application that, among other things, the SRB Decision is unlawful because it failed to meet all these conditions necessary to impose a bank resolution.  Specifically, Petitioners contend that (1) Banco Popular was not "failing or likely to fail"; and (2) there were numerous private sector measures available that could have restored the bank to viability within a reasonable timeframe, and that should have averted the Resolution.

68.     Petitioners have not been access to a complete copy of the valuation report prepared by Deloitte, which is cited by the SRB as one of the factual bases for its Resolution decision. *See* **Exhibit 3**.

69.     Prior to their filing of the CJEU Litigation, Petitioners' counsel wrote to the EC, the SRB and the ECB, requesting, on an urgent basis, copies of the confidential version of the SRB Decision, and copies of all documents relating to the SRB Decision, the European Commission Decision and the FROB Decision.  However, neither the SRB nor the EC have provided these documents to Petitioners or any other investors.  The SRB has only made public a limited amount of documents, all of which are redacted.

70.     Petitioners' legal representatives have appealed the denial of document requests, but to date have not received the documents they have requested.

71.     The Santander Respondents are not parties to either the CJEU Litigation or the Investment Treaty Arbitration.

     1.  **Use of The Documents Sought From Santander and Banco Popular in the CJEU Litigation**

72.     Through their § 1782 Petition, Petitioners seek documents that are relevant to their claims in the CJEU Litigation.  Should this Court grant the Petition and order Santander to produce the documents hereby requested, Petitioners will have the opportunity to present relevant documents provided in the course of the CJEU Litigation.

73.     Petitioners brought their application challenging the SRB and EC's decision to adopt the resolution procedure on August 4, 2017.  The SRB and European Commission have obtained a number of extensions to the time by which they must serve their Defense to the Application. It is my understanding that their defenses have apparently been filed and are going through a regularization process at the CJEU. Petitioners expect to receive copies of both defenses in March. After the the defenses are received, Petitioners will be allowed to serve a Reply (at a date to be determined by the CJEU after service of the Defense) unless the General Court concludes that "a second exchange of pleadings is unnecessary because the contents of the file in the case are

sufficiently comprehensive".   In a case such as the CJEU Litigation, it is highly unlikely that such a determination will be made.

74.     Should the § 1782 Petition be granted, Petitioners will be able to utilize the documents produced by the Respondent when serving their Reply in the CJEU Litigation. There is no rule or regulation barring Petitioners from being able to submit any documents or information obtained through this action in the CJEU Litigation. Similarly, the European Union has no law or public policy against such discovery.   To the contrary, EU Courts have previously admitted evidence produced in actions filed in the United States in aid of the EU proceedings.

**B.     Investment Arbitration against Spain**

75.     On January 22, 2018, Petitioners served a Notification Letter to the Government of Spain, pursuant to Article IX of the Spain-Mexico Bilateral Investment Treaty ("Spain-Mexico BIT" or "Treaty").   A true and accurate copy of the Notification Letter, in both English and Spanish, dated January 22, 2017 is attached hereto as **Exhibit 2**. As set out in that Notification Letter, Petitioners claim that the Government of Spain had a direct role in the Resolution of BPE, not only by implementing the SRB Decision through the FROB, but also its involvement in sale of Banco Popular to Santander.

76.     By serving this Notification Letter, Petitioners complied with the notification of the dispute required under Article IX of the Spain-Mexico Bilateral Investment Treaty, thus allowing Petitioners to initiate an investment arbitration, should Petitioners and the Government of Spain not reach an agreement on the underlying dispute within the ensuing six months.

77.     According to the SRB Directive, in light of the consequences that the failure of an institution may have on the economy of an EU Member State and the possible need for public funds, "the Ministries of Finance and other relevant ministries should be closely involved, at an

26

early stage, in the process of crisis management and resolution." *See* **Exhibit 64**. SRB Chair Elke König testified in a recent public hearing of the ECON Committee of the European Parliament that "the SRB, together with the Spanish national authorities, unanimously decided to take resolution action with respect to Banco Popular." A true and accurate copy and a certified translation of the ECON - Committee meeting, December 4, 2017, 15:00 to 18:30, at 09:22 to 9:36 (available at http://web.ep.streamovations.be/index.php/event/stream/171204-1500-committee-econ) is attached hereto as **Exhibit 65**.

78.     As set out in Petitioners' Notification Letter, Petitioners claim that Spain's acts and omissions in connection with the BPE Resolution — before, during and after the Resolution decision — violated the Treaty in multiple respects. *See* **Exhibit 2**.

### 1.  Investment Treaty Protections

79.     The Spain-Mexico BIT contains certain protections and standards of treatment that the host State is obligated to provide to covered investors. This Treaty further provides that, if the host State does not comply with these standards of treatment and protections, the investor can bring an arbitration directly against the State for violations of the Treaty. *See* **Exhibit 66**.

80.     Among other provisions and investor protections:

a.  Article IV of the Treaty imposes on the State the obligation to provide to investors "treatment in accordance with international customary law, including fair and equitable treatment, as well as full protection and security";

b.  Article III of the Treaty imposes on the State the obligation to give investors "treatment that shall be no less favourable than that given in similar circumstances to the investments of its own investors or to the investments

of investors of any third State, whichever is more favourable to the investor"; and

c. Article V of the Treaty imposes on the State the obligation not to "directly or indirectly, expropriate or nationalize an investment through measures equivalent to expropriation or nationalization ("expropriation"), unless it is: (a) for reasons of public interest; (b) on a non-discriminatory basis; (c) in accordance with the rule of law; and (d) upon payment of indemnification…"

81.     According to their Notification Letter, Petitioners claim that Spain has violated all of these protections and guarantees of treatment through their actions and omissions in the resolution of Banco Popular. *See* **Exhibit 2**.

### 2.   Petitioner's Investment Treaty Claims

#### a.   *Denial of Fair and Equitable Treatment*

82.     Petitioners claim that the guarantees established under Articles III and IV of the Treaty include the obligation of the State to give investors treatment that is no less favorable than that granted to its own investors or to investors of third countries, to provide fair and equitable treatment, as well as full protection and security. *See* **Exhibit 2**.

83.     According to their Notification Letter, Petitioners claim that, in implementing the Resolution, the Spanish Government acted in a manner that breached Articles III and IV of the Treaty in multiple respects, including: (1) violating Petitioners' legitimate expectations to receive good faith treatment for their investments in BPE by unfairly preventing investors from taking measures to protect their investment, including carrying out a private sale of BPE and raising additional capital and liquidity for BPE; (2) violating Petitioners' legitimate expectations for a

stable and predictable legal and regulatory environment for their investments in BPE by unreasonably refusing to take regulatory measures at its disposal to support BPE; (3) violating Petitioners' legitimate expectations of even-handed and non-discriminatory treatment by offering preferential treatment to Santander; and (4) violating due process and transparency requirements, including failure to provide Petitioners with advanced notice or adequate justification for the measures it took with regard to its investments in BPE and failing to provide adequate explanation or justification for the measures it took. *See* **Exhibit 2**.

84.   In their Notification Letter, Petitioners additionally claim that Spain breached its obligation to provide the Petitioners with fair and equitable treatment by the following actions and/or omissions on the part of the Spanish Government:

   a.   The Spanish government undertook an arbitrary and opaque process to sell BPE to Santander for €1.  This process commenced before any finding that BPE was "failing or likely to fail," and implemented a resolution mechanism (i.e. the sale of business to Santander) that deviated from the resolution plan that Banco Popular had finalized with the FROB and the SRB in late 2016;

   b.   The Spanish Government arbitrarily failed to consider alternative private sector solutions that would have obviated the need for a Resolution, which included plans to improve BPE's capital and liquidity position.  Instead, the Spanish Government proceeded with the sale of BPE in a manner that was neither fair, transparent, competitive or calculated to a maximum, fair market value price for Banco Popular. In so doing, Spain failed to provide Petitioners the opportunity to implement other alternative measures that

were being developed and were ready to be launched to prevent Banco Popular from being resolved, and would have therefore protected their own investment;

c.  The Spanish Government took concrete actions that hindered Banco Popular's financial standing and effectively destroyed the Petitioners' investment by (i) withdrawing billions of Euros from BPE through multiple Spanish Government entities and institutions, and (ii) making public announcements that directly impacted BPE's reputation and caused a sudden increase in deposits. Spain's deposit withdrawals significantly impaired BPE's liquidity position, which the FROB then utilized as the basis to justify the Resolution decision;

d.  The Spanish Government arbitrarily refused to provide BPE with the emergency liquidity assistance (ELA) that it requested.  As described in the Background section above, the Banco de España refused to grant Banco Popular the ELA for the amount apparently requested (9 billion Euros), purportedly based on a lack of sufficient collateral, even though BPE reportedly had more than sufficient collateral to cover the full ELA request.[1] Had BPE's ELA request been granted in the full amount requested, BPE would have been able to withstand the run on the bank, and there would have been sufficient time to implement the other measures to stabilize the

---

[1]  See "El Banco Popular pidió ya ayuda de emergencia al Banco de España dos meses antes de su debacle," *El Mundo*, 2 January 2017, http://www.elmundo.es/economia/2018/01/02/5a4a203ce5fdea2e4d8b45e6.html

bank's financial condition and potentially sell BPE on a fair market value basis.

e.   In addition to failing to grant the ELA, the Spanish Government also failed to take other measures that could have helped Banco Popular obtain stability, such as by: (1) banning short sales, or (2) making public statements designed to restore public confidence. Had the Spanish government implemented these stabilization measures, there would have been no basis for ordering the resolution of Banco Popular.

f.   For the reasons summarized above, Petitioners claim that the Spanish Government violated Article IV of the Treaty, causing them to lose all of their investments in Banco Popular.

*See* **Exhibit 2**.

### b.   *Expropriation*

85.   According to their Notification Letter, Petitioners also claim that Spain violated Article V of the Treaty, which prohibits expropriation unless it: (a) is in the public interest; (b) is for non-discriminatory reasons; (c) complies with due process requirements; and (d) is accompanied by fair market value compensation. *See* **Exhibit 2**. Petitioners claim that the Spanish Government did not meet these requirements; rather, they claim that Spain unlawfully expropriated Petitioners' investment in Banco Popular, as evidenced by the following facts:

a.   Petitioners were completely deprived of their investment in BPE by virtue of the cancelation of their equity interests in BPE;

b. Petitioners were afforded no due process prior to the deprivation of their investments, in violation of the Treaty as well as Spanish law, which requires a hearing before the taking of property;

c. Petitioners were provided no compensation whatsoever (let alone market value) for the deprivation of their property interests; and there was no plan for them to receive any compensation given that Spain accepted to sell the asset for 1 Euro, far less than the bank's fair market value;

d. The expropriation of Petitioners' investments was not for a public purpose. Had Spain merely wanted to avoid a publicly funded bailout of BPE (which no one ever requested), it could have explored other options to stabilize the bank.

*See* **Exhibit 2**.

### 3. Petitioners will have the Opportunity to present Documents Requested from Santander in the Investment Treaty Arbitration

86.    Petitioners will be filing their Request for Arbitration in approximately five months, if they cannot reach an amicable agreement with the Government of Spain before that time.  If the §1782 Petition is granted, Petitioners will have the opportunity to present relevant documents to the Arbitral Tribunal. Granting Petitioners access to the documents requested from Santander will be essential in enabling Petitioners to present evidence relevant to their claims.

87.    The breadth and scope of documents and information that is admissible within an investment treaty arbitration procedure is broad.  In general, arbitration rules and the practice of document production in arbitration are flexible regarding the types of documents that will be permitted and considered by arbitrators. The arbitral tribunal will have discretion to determine the relevance it gives to each of those documents.  Petitioners will have the opportunity to present any

documents produced by Santander as a result of any order of this Court in the arbitration proceeding, for the arbitral tribunal's consideration.

88.    I am aware of no law or public policy within the context of investment treaty arbitration that would preclude the requested discovery in this proceeding. To the contrary, Section 1782 discovery is a common part of investment treaty arbitration practice.

## III.   THE DOCUMENTS REQUESTED FOR USE IN THE CJEU LITIGATION AND INVESTMENT TREATY ARBITRATION.

### A.   Possession of Documents Requested

89.    In this §1782 proceeding, Petitioners are seeking documents and information that are in the possession, custody and control of Santander, including its wholly-owned subsidiary, Banco Popular.

90.    Attached hereto as Appendix A is a table setting out each document request, the background behind the request, and the relevance of the requested documents in the CJEU Litigation and/or the Investment Treaty Arbitration.

### B.   Categories of Documents Requested

91.    The following is a summary of the categories of documents requested in Petitioners' proposed subpoena and request for documents.

92.    **Category 1:** Documents regarding Banco Popular's financial information necessary to prepare any valuation of Banco Popular, including any such valuation prepared in the context of the Resolution Decision and used by the SRB and the FROB, as well as any valuations made by Santander during the private sale of Banco Popular prior to the resolution as well as during the resolution process, that led to the offer of 1 Euro presented by Santander.  This category includes, among others, correspondence and documents exchanged regarding the analysis of the liquidity and solvency position of Banco Popular, including the report prepared by Deloitte, on

which the SRB based its decision to resolve Banco Popular. This category includes **Request Nos. 1-4, 6, 13-19, 21** detailed in Appendix A.

93.     **Category 2:** Documents regarding Banco Popular's requests for emergency liquidity assistance, including Banco Popular's communications with the Banco de España and its refusal to grant the amounts of emergency liquidity assistance requested by Banco Popular. This category includes, among others, documents provided by FROB to Santander in the context of the resolution of Banco Popular, including communications regarding the request for ELA. This category includes Request No. 7, detailed in Appendix A.

94.     **Category 3:** Documents regarding the decision by the SRB and the FROB to place Banco Popular into resolution, including the analysis of any private measures available to Banco Popular that would have avoided such resolution, as well as the analysis of the change of resolution scheme undertaken by the SRB and the FROB.  This category includes, among other things, correspondence and documents exchanged regarding the decision taken by the BCE that Banco Popular was failing or likely to fail, the decision by the SRB and/or the FROB to place Banco Popular into resolution, and the decision by the SRB and/or the FROB to select the sale of asset tool for the resolution of Banco Popular.  This category includes Request Nos. **3, 4, 11 and 20** detailed in Appendix A.

95.     **Category 4:** Documents relating to and/or reflecting Spain's involvement in the Resolution of Banco Popular, including communications between the Spanish Government and Santander relating to Santander's acquisition of Banco Popular.  This category includes, among other things, correspondence between Banco Popular and/or Santander with the Spanish Government (including the FROB, the Comisión Nacional de Mercado Valores ("CNMV"), and the Banco de España) regarding the potential resolution and sale of Banco Popular, including any

tax or other incentives granted by the Spanish government to Santander. This category includes Request Nos. **5, 7-10, 12**, detailed in Appendix A.

*     *     *

96.     Based on the foregoing, I affirm that discovery sought against Santander by this Petition is relevant to, and will aid, Petitioners in presenting their claims in the CJEU Litigation and the Investment Treaty Arbitration.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed in Chicago, Illinois, on March 5, 2018.

_____
            Javier H. Rubinstein

# APPENDIX A

**APPENDIX A TO DECLARATION OF JAVIER H. RUBINSTEIN**

**DOCUMENT REQUESTS**

| No. | Category | Background | Relevance |
|-----|----------|------------|-----------|
| 1. | Please produce all Documents created in the period between January 1, 2016 and June 7, 2017, relating to any actual or contemplated acquisition of BPE by Santander, including, but not limited to, valuations of BPE and/or the assets of BPE, risk assessments of BPE's credit and real estate portfolio, plans to sell BPE's credit and real estate portfolio, assessments of BPE's liquidity, assessments of BPE's capital requirements, plans to raise capital in connection with any acquisition of BPE, post-acquisition business plans, plans of post-acquisition synergies, acquisition costs, and due diligence reports. | Banco Santander conducted a due diligence process in preparation for its potential acquisition of Banco Popular, including preparation of a binding offer to purchase Banco Popular that was to be presented on June 6, 2017.<br><br>In the course of this due diligence process, Banco Santander had access to non-public Banco Popular records and documents.<br><br>Following the Resolution, Santander immediately took control of Banco Popular, including the immediate replacement of Banco Popular's management team and Board of Directors (many of whom also serve as members of the management and board of Santander). Following its acquisition, Santander has taken | This transaction is at the core of both the E.U. and international arbitration proceedings, where Petitioners challenge the € 1 acquisition of BPE by Santander. These analyses are relevant to issues including the circumstances of the Resolution and sale of BPE, whether Santander paid fair market value, whether the preconditions under the Single Resolution Mechanism Regulation were met, whether Spain treated BPE investors fairly, and the quantum of any damages in the international arbitration proceedings. |

1

**APPENDIX A TO DECLARATION OF JAVIER H. RUBINSTEIN**

| No. | Category | Background | Relevance |
|---|---|---|---|
| | | numerous decisions regarding the Banco Popular business, including the sale of multiple bank assets. By virtue of its operational control of Banco Popular, Santander has possession, custody and control of Banco Popular's documents and business records. | |
| 2. | Please produce all retention agreements with any professional advisor (other than your legal counsel) or vendor in connection with any actual or contemplated acquisition of BPE by Santander, including, but not limited to, any retention agreement with Citigroup and UBS or any affiliate thereof. | Spanish media reports indicate that Santander retained advisors for a planned bid for BPE months before the June 6 acquisition. | Retention of advisors is relevant to determining whether and when Santander planned a prior bid for billions of Euros, as Petitioners allege, to establishing jurisdiction, and to establishing the circumstances of the Resolution and sale. |
| 3. | Please produce all Documents related to Due Diligence for any contemplated acquisition of BPE by Santander or any other party, including questions posed by or requests for information or documents from potential acquirers of BPE (including, but not limited to, Santander) and the responses to any such questions, the contents of the BPE Virtual Data Room, and the contents of the Single Resolution Board SharePoint. | Spanish media reports indicate that BPE and a number of other potential purchasers conducted acquisition diligence on BPE prior to the Resolution, and that Santander may have been the only entity to have completed that diligence. | Due Diligence is relevant to whether the preconditions under the Single Resolution Mechanism Regulation were met, to the fairness of the resolution sale process, to damages in the international arbitration, and to establishing the circumstances of the Resolution and sale. |

2

**APPENDIX A TO DECLARATION OF JAVIER H. RUBINSTEIN**

| No. | Category | Background | Relevance |
|---|---|---|---|
| 4. | Please produce all Communications between Santander and any Regulator in the United States or Spain related to the acquisition of BPE by Santander, including, but not limited to, Communications relating to regulatory approval of the acquisition of BPE or sale of TotalBank, N.A., a subsidiary of BPE. | Santander is known to have submitted numerous regulatory submissions in connection with the acquisition of BPE, under both U.S. and Spanish banking and securities regulatory requirements. | Regulatory filings and other communications are likely to contain a highly reliable source of information relevant to almost every factual issue in both proceedings, including the preconditions under the Single Resolution Mechanism, damages in the international arbitration, the accuracy of information in the Single Resolution Board's valuation report created by Deloitte, and establishing the circumstances of the Resolution and sale. |
| 5. | Please produce all Communications between Santander or BPE and the Government of Spain, relating to the actual or potential acquisition of BPE by Santander or any other purchaser. | Petitioners allege, based on reports in the Spanish media of communications between senior Spanish politicians and Santander, that the process for the sale of BPE was collusive and essentially structured to expropriate Petitioners and hand over BPE to the politically-connected Santander. | Communications with the Government of Spain are relevant to the issue in the international arbitration of whether Spain intentionally sought to benefit Santander rather than treating BPE investors fairly, and to establishing the circumstances of the Resolution and sale. |

3

**APPENDIX A TO DECLARATION OF JAVIER H. RUBINSTEIN**

| No. | Category | Background | Relevance |
|---|---|---|---|
| 6. | Please produce all Communications between Santander or BPE and Deloitte relating to the actual or potential resolution of BPE, the actual or potential acquisition of BPE by Santander or any other purchaser, or the valuation of BPE in connection with "Project Hippocrates." | Deloitte conducted a valuation of BPE as a basis for the Single Resolution Board's resolution decision. | Communications with Deloitte are relevant to determining whether the preconditions for resolution under the Single Resolution Mechanism Regulation were met. The Deloitte valuation is central to the European proceedings, and its accuracy (including whether Santander had any influence over it) is at the core of the case. |
| 7. | Please produce all Communications between Santander or BPE and the Government of Spain relating to any request for Emergency Liquidity Assistance by BPE, including any Communications regarding the collateral required or posted by BPE in connection with any such request. | Spain initially stated that BPE would not be granted Emergency Liquidity Assistance, despite having granted assistance to other banks facing runs or similar liquidity issues in the past, and belatedly granted much less assistance than the amount of collateral would normally dictate. The initial refusal, Petitioners allege, was a substantial factor in causing a run on the bank. | The failure to grant Emergency Liquidity Assistance on customary terms is at issue in the international arbitration as, among other things, a denial of Fair and Equitable Treatment, and is also relevant to establishing the circumstances surrounding the Resolution and sale. |
| 8. | Please produce all Communications between Santander or BPE and the Government of Spain relating to the Resolution of BPE. | Prior to its Resolution, Banco Popular regularly communicated with the Spanish government. By virtue of its acquisition and | These communications are relevant to establishing the circumstances of the Resolution and sale of BPE, including the issue of whether |

## APPENDIX A TO DECLARATION OF JAVIER H. RUBINSTEIN

| No. | Category | Background | Relevance |
|---|---|---|---|
| | | operational control of Banco Popular, Banco Santander now has possession, custody and control of such communications.<br><br>In addition, the Spanish government communicated with and provided information to Banco Santander in connection with the sale of Banco Popular. Said sale was conducted by the FROB, an organ of the Spanish government. Petitioners also allege that Santander communicated with senior Spanish politicians prior to the Resolution. | Spain improperly intended to favor Santander in the sale process at the expense of BPE investors. |
| 9. | Please produce all Communications between Santander or BPE and the Government of Spain in the period between January 1, 2016 and June 7, 2017, relating to any actual or potential private transaction by BPE designed to improve the financial condition of BPE. | Prior to its Resolution, Banco Popular regularly communicated with the Spanish government. By virtue of its acquisition and operational control of Banco Popular, Banco Santander now has possession, custody and control of such communications. | These documents are relevant to determining whether a private alternative to resolution existed, whether the preconditions for Resolution under the Single Resolution Mechanism Regulation were met, determining the circumstances of the Resolution and sale, and the issue of whether Spain improperly favored |

5

# APPENDIX A TO DECLARATION OF JAVIER H. RUBINSTEIN

| No. | Category | Background | Relevance |
|---|---|---|---|
| | | In addition, Petitioners allege that Santander communicated with senior Spanish politicians regarding a potential acquisition of BPE. | Santander at the expense of BPE investors. |
| 10. | Please produce all Documents relating to any state aid or tax incentives provided or to be provided in connection with or as a result of the actual or potential acquisition of BPE by Santander or Santander's ownership of BPE, including, but not limited to, any state aid or tax incentives relating to losses incurred by BPE prior to the Acquisition. | Spain has previously been alleged to have structured tax incentives to favor Santander's acquisitions in violation of European State Aid law. Additionally, the tax treatment of the acquisition may indicate intent to benefit Santander. | These documents are relevant to the issue of whether Spain acted to favor Santander at the expense of BPE investors or offered Santander benefits that were not generally available. |
| 11. | Please produce all Communications in Your possession, custody, or control between the Spanish Government, on the one part, and the Single Resolution Board, European Commission, or European Central Bank, on the other, relating to BPE, including, but not limited to, any actual or potential Resolution of BPE, alternative options for BPE other than Resolution, and whether normal insolvency proceedings would have increased or reduced losses to creditors or investors. | These documents would have been created during the regulatory process related to the resolution of BPE. | These documents are relevant to determining the circumstances of the Resolution and sale, to the issue of whether the preconditions under the Single Resolution Mechanism Regulation were met, to the issue of whether Spain acted to favor Santander at the expense of BPE investors, and to damages. |
| 12. | Please produce all Documents not covered by Request Nos. __ through __ above and relating to any meeting, conversation, telephone call, discussion, or other written or oral communication between Santander and the Government of Spain, relating to BPE, for the period prior to June 7, 2017, | These meetings, conversations, and other communications would have occurred as part of the Resolution and sale process. | These documents are relevant to determining the circumstances of the Resolution and sale, to the issue of whether the preconditions under the Single Resolution |

6

APPENDIX A TO DECLARATION OF JAVIER H. RUBINSTEIN

| No. | Category | Background | Relevance |
|---|---|---|---|
| | including, but not limited to, the actual or potential Resolution of BPE and any actual or potential acquisition of BPE by Santander. | | Mechanism Regulation were met, to the issue of whether Spain acted to favor Santander at the expense of BPE investors, and to damages. |
| 13. | Please produce all Documents, for the period on or before June 7, 2017 and/or the dates noted in each request below, relating to or reflecting internal or external reviews of:<br><br>a. BPE's credit portfolio for the 2016 and 2017 fiscal years;<br><br>b. BPE's asset provisioning, including any recommended changes to be made to BPE's asset provisioning for the 2016 and 2017 fiscal year;<br><br>c. The evolution of deposits in BPE, including the extent of deposit withdrawals, for the period between 2015 and 2017;<br><br>d. BPE's credit portfolio, including any reviews conducted by the European Central Bank or the Bank of Spain in the period between January 1, 2016 and June 7, 2017; and<br><br>e. BPE's capital requirements, conducted during the period January 1, 2016 to June 7, 2017, including all report documents related to such reviews; | These documents were created by BPE, as reflected in Board documents, and relate to key measures that affect its regulatory compliance and valuation. Since the acquisition, they have been in Santander's control, and in some instances have been used by Santander to produce consolidated financial statements. | These documents are relevant to determining the circumstances of the Resolution and sale, to the issue of whether the preconditions under the Single Resolution Mechanism Regulation were met (including whether BPE was failing or likely to fail and whether the Santander transaction was superior for BPE investors to normal insolvency proceedings and whether €1 represented the fair market value of BPE), to the issue of whether Spain acted to favor Santander at the expense of BPE investors, and to damages. |
| 14. | Please produce all internal or external presentations provided to or made by the Management Committee or Board of Directors of BPE, together with any documents referenced | These documents were created by BPE, as reflected in Board documents, and relate to key | These documents are relevant to determining the circumstances of the Resolution and sale, to the |

**APPENDIX A TO DECLARATION OF JAVIER H. RUBINSTEIN**

| No. | Category | Background | Relevance |
|---|---|---|---|
| | therein, relating to the financial condition of BPE or plans to improve the financial condition of BPE, including but not limited to (i) the action plan to recover the Liquidity Coverage Ratio referred to in a presentation given to the Board of Directors on June 6, 2017; (ii) the documents underlying the projection in that presentation of BPE's deposits between June 6 and June 16, 2017; (iii) the business plan approved on May 31, 2017, referenced in that same presentation; (iv) the documents underlying the charts in that same presentation of deposit inflows and outflows between December 31, 2016, and June 6, 2017. | measures that affect its regulatory compliance and valuation. Since the acquisition, they have been in Santander's control, and in some instances have been used by Santander to produce consolidated financial statements. | issue of whether the preconditions under the Single Resolution Mechanism Regulation were met (including whether BPE was failing or likely to fail and whether the Santander transaction was superior for BPE investors to normal insolvency proceedings and whether €1 represented the fair market value of BPE), to the issue of whether Spain acted to favor Santander at the expense of BPE investors, and to damages. |
| 15. | Please produce all BPE Board Minutes and all materials provided to the Board of Directors of BPE relating to the financial condition of BPE or plans to improve the financial condition of BPE. | These documents were created by BPE, as reflected in Board documents, and relate to key measures that affect its regulatory compliance and valuation. Since the acquisition, they have been in Santander's control, and in some instances have been used by Santander to produce consolidated financial statements. | These documents are relevant to determining the circumstances of the Resolution and sale, to the issue of whether the preconditions under the Single Resolution Mechanism Regulation were met (including whether BPE was failing or likely to fail and whether the Santander transaction was superior for BPE investors to normal insolvency proceedings), to the issue of whether Spain acted to |

8

APPENDIX A TO DECLARATION OF JAVIER H. RUBINSTEIN

| No. | Category | Background | Relevance |
|-----|----------|------------|-----------|
| | | | favor Santander at the expense of BPE investors, and to damages. |
| 16. | Please produce all valuations of BPE's business, including BPE's assets, created by or for BPE between November 1, 2016, and June 7, 2017. | Petitioners understand that during the private sale process, BPE and its advisors would have generated valuations of BPE. | Valuation is a key factor under the Single Resolution Mechanism Regulation, and these valuations are directly relevant to whether the preconditions for Resolution were met, including whether Banco Popular was "failing or likely to fail" as of June 6, 2017, whether there were private sector alternatives to resolution, and whether the €1 price paid by Banco Santander for the purchase of Banco Popular reflected the bank's fair market value as of June 6, 2017. These documents are also relevant to the circumstances of the Resolution and sale and to damages. |
| 17. | Please produce all offers or Communications received by BPE from any third party between April 15, 2017, and June 7, 2017, relating to any actual or potential interest in participating in a BPE capital increase or recapitalization, including, but not limited to: (i) the Barclays letter dated June 3, 2017 (a partial copy of which is attached); (ii) the Deutsche | These are documents related to BPE's efforts to perform a recapitalization or capital increase after the shareholders' meeting in 2017. Petitioners are aware of several expressions of interest in | The availability of private alternatives to resolution is relevant to the preconditions for Resolution under the Single Resolution Mechanism Regulation, to the facts and circumstances concerning the |

9

**APPENDIX A TO DECLARATION OF JAVIER H. RUBINSTEIN**

| No. | Category | Background | Relevance |
|-----|----------|------------|-----------|
|  | Bank letter dated June 5, 2017 (a partial copy of which is attached); (iii) all email exchanges between Miguel Escrig (Finance Manager in BPE) and Eduardo Timpanaro (Morgan Stanley) on or around April 25-16, 2017; and (iv) any letters received from PIMCO relating to interest in a capital increase, along with any Documents related to such Communications. | participating in a recapitalization, including those listed here. | Resolution and sale of BPE, and to damages. |
| 18. | Please produce all Documents dated between November 1, 2016, and June 7, 2017, relating to any potential sale or acquisition of BPE by any third party, including any proposal or expression of interest in the acquisition of BPE by any third party. | These are documents related to BPE's efforts to sell the company after the shareholders' meeting in 2017. Santander and several other banks participated in this process. | The availability of private alternatives to resolution is relevant to the preconditions for Resolution under the Single Resolution Mechanism Regulation, to the facts and circumstances concerning the Resolution and sale of BPE, and to damages. It is also relevant to whether Spain sought to benefit Santander after Santander had accessed the Virtual Data Room, and to whether, as Petitioners contend, Santander had previously expressed an interest in paying billions of euros for BPE. |
| 19. | Please produce all Documents dated between April 1, 2017, and June 7, 2017, regarding any asset sale by BPE, including any proposal or expression of interest by a third party in any asset sale by BPE. | These are documents related to BPE's efforts to sell subsidiaries, asset portfolios, and other BPE assets after the shareholders' meeting in 2017. Several | The availability of private alternatives to resolution is relevant to the preconditions for Resolution under the Single Resolution Mechanism Regulation, to the facts |

10

APPENDIX A TO DECLARATION OF JAVIER H. RUBINSTEIN

| No. | Category | Background | Relevance |
|-----|----------|------------|-----------|
|     |          | transactions were approved or in the process of being negotiated at the time of resolution. | and circumstances concerning the Resolution and sale of BPE, and to damages. |

11

## APPENDIX A TO DECLARATION OF JAVIER H. RUBINSTEIN

| 20. | Please produce all documents and communications prepared, sent by or received by Banco Popular and/or Banco Santander to or from the FROB and/or Jefferies International Limited ("Jefferies") and/or Arcano Asesores Financieros ("Arcano"), or their respective affiliates, between April 1, 2017 and June 7, 2017, in relation to the sale of BPE, including, but not limited to:<br><br>Minutes of or Documents prepared in connection with the meeting of the FROB on June 3, 2017 that were shared with BPE and/or Santander;<br><br>Communications received from the FROB, Jeffries and/or Arcano regarding "Project Hippocrates";<br><br>All Documents and information obtained from the 'Virtual Data Room' prepared by the FROB, Jefferies and/or Arcano for potential bidders to review the available information of BPE prior to the submission of their bids;<br><br>All Documents, information, letters and/or communications shared with other entities who were invited to participate in Project Hippocrates (including Sabadell, CaixaBank, Bankia and BBVA) that were also shared with or communicated to Santander and/or Banco Popular;<br><br>All Documents reflecting any comments submitted by Santander to the Sale and Purchase Agreement on or around June 6, 2017;<br><br>All Documents prepared by Santander in relation to the auction process and acquisition of BPE, including, but not limited to, all offer letters prepared to be presented in the auction, including the one actually presented offering a price | The Spanish Government has acknowledged that it "implemented" the decision to sell Banco Popular to a third party. In order to implement the sale of Banco Popular to Banco Santander, the Spanish Government, its divisions and/or entities necessarily communicated with Santander and other interested entities in connection with the negotiation and consummation of that purchase. | This information is relevant and material to the international arbitration because it will establish the facts and circumstances that resulted in the sale of Banco Popular to Santander for €1. Said sale plays a central element in the claims to be asserted by the petitioners in said arbitration. |
|---|---|---|

12

## APPENDIX A TO DECLARATION OF JAVIER H. RUBINSTEIN

| No. | Category | Background | Relevance |
|---|---|---|---|
| | of 1 Euro, and any other offer that was prepared but not presented, having a price higher than 1 Euro; Communications from the FROB, Jefferies and/or Arcana to Santander regarding the finalization of the auction process and selection of the winning bid for BPE on or around June 6 or 7, 2017. | | |
| 21. | Please produce all Documents regarding or reflecting BPE's liquidity position between January 1, 2017 and June 7, 2017, including, but not limited to: Presentations, reports, and/or any documents created by BPE's Liquidity Committee; the Report entitled "Medidas extraordinarias de Refuerzo de Liquidez" dated on or about June 7, 2017; the Report entitled "Liquidez: Situación y Actuaciones" presented by Banco Popular's Chairman, Emilio Saracho, to the Board of Directors in a meeting on or around April 2, 2017; and any documents related to the "Project Umbrella," launched on or around April 28, 2017, with the goal of creating a list of all available assets that could be presented to the BdE as collateral for a potential request for ELA. | Banco Popular was exploring various alternative private solutions that would have avoided the need for a Resolution of the Bank, including a major capital increase, the sale of Banco Popular assets in order to improve its liquidity position, and the possible sale of the bank to other third parties. Additionally, in order for those private solutions to be feasible, BPE was working to obtain ELA to stabilize the bank and allow for long-term solutions to be implemented. | These documents are relevant and material to both the ongoing proceeding before the CJEU and the international arbitration regarding, among other things, whether there were private sector alternatives that would have avoided the need for a resolution of Banco Popular, and the extent to which such private alternatives were considered by the Spanish Government and/or by the SRB prior to the Resolution decision. |

13