# EXHIBIT 1

## TO THE PRESIDENT AND MEMBERS OF THE GENERAL COURT OF THE COURT OF JUSTICE OF THE EUROPEAN UNION

## APPLICATION

Lodged pursuant to Articles 263 and 277 of the Treaty on the Functioning of the European Union (the "TFEU") and Article 86 of Regulation (EU) No 806/2014, by

## MR. ANTONIO DEL VALLE RUIZ AND OTHERS[1]

**Applicants**

represented by Pushpinder Saini QC and Jason Pobjoy of the Bar of England and Wales, and Richard Boynton, Solicitor of the Senior Courts of England and Wales, with an address for service at 30 St Mary's Axe, London, EC3A 8AF, telephone: +4402074692180, fax: +442074692001, email: richard.boynton@kirkland.com, service also to be accepted through eCuria.

**v.**

## (1) THE SINGLE RESOLUTION BOARD
## (2) THE EUROPEAN COMMISSION

**Defendants**

Application for (1) the annulment of (a) the Decision of the Single Resolution Board in its Executive Session of 7 June 2017 concerning the adoption of a resolution scheme in respect of Banco Popular Español, S.A., (the "Institution") with a Legal Entity Identifier: 80H66LPTVDLM0P28XF25 (SRB/EES/2017/08) (the "SRB Decision") and (b) Commission Decision (EU) 2017/1246 of 7 June 2017 endorsing the resolution scheme for Banco Popular Español, S.A. (notified under document C(2017) 4038) (the "Commission Decision"); and (2) a declaration that Articles 18 and 22 of Regulation (EU) No 806/2014 of the European Parliament and of the Council of 15 July 2014 establishing uniform rules and a uniform procedure for the resolution of credit institutions and certain investment firms in the framework of a Single Resolution Mechanism and a Single Resolution Fund and amending Regulation (EU) No 1093/2010 are illegal, and the consequential annulment of the SRB Decision and Commission Decision.

---

[1] A full list of the names and permanent addresses of each of the Applicants is at **Attachment A** to this Application.

## TABLE OF CONTENTS

I.     INTRODUCTION AND SUMMARY ........................................................ 3

II.    PARTIES ................................................................................................ 6

III.   SUBJECT-MATTER ............................................................................. 7
    A.   The Single Resolution Mechanism and the Single Resolution Board .................... 7
    B.   The SRM Regulation ................................................................................................ 9
    C.   Background leading up to the Contested Decisions ................................................ 9
    D.   The SRB Decision .................................................................................................. 15
    E.   The Commission Decision ...................................................................................... 18
    E.   Implementation of the SRB Decision and Commission Decision ........................ 18

IV.    FORM OF ORDER SOUGHT ............................................................ 19

V.    PLEAS IN LAW ................................................................................... 19
    A.   First plea in law: Article 18 of the SRM Regulation is unlawful, in that the process
    fails to provide stakeholders with an opportunity to be heard and allows for no judicial
    oversight, in violation of (a) Articles 41, 47 and 48 of the EU Charter and (b) the
    principle of proportionality ........................................................................................... 19
    B.   Second plea in law: The Contested Decisions infringed Articles 41, 47 and 48 of
    the EU Charter ................................................................................................................ 31
    C.   Third plea in law: The SRB and Commission infringed, without justification or
    proportion, the Applicants' right to property .............................................................. 32
    D.   Fourth plea in law: The SRB and Commission infringed Article 20 of the SRM
    Regulation by failing to undertake a proper and independent valuation prior to taking
    the Contested Decisions .............................................................................................. 36
    E.   Fifth plea in law: The SRB and Commission infringed Article 18(1) of the SRM
    Regulation in determining that the conditions precedent set out under Articles 18(1)(a)
    and (b) were satisfied ................................................................................................... 37
    G.   Sixth plea in law: The SRB and Commission infringed Article 21(1) of the SRM
    Regulation in determining that the conditions for the exercise of the power to write
    down or convert relevant capital instruments were satisfied ...................................... 41
    I.   Seventh plea in law: The SRB and Commission breached an essential procedural
    requirement by failing to provide an adequate statement of reasons for the Contested
    Decisions ...................................................................................................................... 41
    J.   Eighth plea in law: In selecting the sale of business tool, the SRB and Commission
    have failed to comply with (a) the principle of proportionality; and (b) the legitimate
    expectations of the Applicants by departing from the resolution plan without
    justification ................................................................................................................... 42
    K.   Ninth plea in law: Article 18 and 22 of the SRM Regulation breaches the
    principles relating to the delegation of powers ............................................................ 42

VII.   CONCLUSION .................................................................................... 44

ATTACHMENT A: THE APPLICANTS ..................................................... 45

SCHEDULE OF ANNEXES TO APPLICATION .......................................... 46

## I.     INTRODUCTION AND SUMMARY

1.     The Applicants apply, pursuant to Article 263 of the Treaty on the Functioning of the European Union (the "TFEU") for the annulment of:

    1.1.     The decision of the Single Resolution Board (the "SRB") in its Executive Session of 7 June 2017 concerning the adoption of a resolution scheme in respect of Banco Popular Español, S.A., ("Banco Popular") (SRB/EES/2017/08) (the "SRB Decision") **(Annex A.1)**; and

    1.2.     The decision of the European Commission (the "Commission") endorsing the resolution scheme for Banco Popular Español, S.A. dated 7 June 2017 (notified under document C(2017) 4038) (Commission Decision (EU) 2017/1246) (the "Commission Decision") **(Annex A.2)**,

(together, the "Contested Decisions").

2.     The Applicants also apply, pursuant to Article 277 TFEU, for a declaration that Articles 18 and 22 of Regulation (EU) No 806/2014 of the European Parliament and of the Council of 15 July 2014 establishing uniform rules and a uniform procedure for the resolution of credit institutions and certain investment firms in the framework of a Single Resolution Mechanism and a Single Resolution Fund and amending Regulation (EU) No 1093/2010 (the "SRM Regulation") **(Annex A.3)** are unlawful, and for the consequential annulment of the Contested Decisions.

3.     The Applicants in this case are all shareholders of Banco Popular and some hold bonds.  As a consequence of the Contested Decisions, the Applicants' shares and bonds in Banco Popular – which had a total value immediately prior to the Contested Decisions of €61,916,270.52 – were extinguished without any form of compensation, when Banco Popular was sold to Banco Santander S.A. ("Banco Santander") for the purchase price of €1. The precipitous actions of the Defendants were taken without any judicial oversight and without affording the Applicants any right to be heard. The Applicants were not provided with any of the material that formed the basis of the Contested Decisions and, despite requests from the Applicants' legal representatives, have still not been provided with that material. All of this occurred in circumstances where the Applicants – and indeed other stakeholders – were ready, willing and able to step in to ensure the ongoing viability of Banco Popular. In so acting, the Defendants have infringed the SRM Regulation, and in particular its underlying premise that resolution is a last resort, and acted contrary to the rule of law, the general principles that underpin the EU legal order and the fundamental rights codified under the EU Charter of Fundamental Rights.

4.     In short, the actions of the EU institutions threaten to undermine the protection of property interests which are one of the foundations of the EU. The actions were therefore directly contrary to the economic and public interests of the citizens of the EU.

5.      The Applicants rely on the following pleas in law:

5.1.    Article 18 of the SRM Regulation is unlawful, in that the process fails to provide stakeholders with an opportunity to be heard and allows for no judicial oversight, in violation of (a) Articles 41, 47 and 48 of the Charter of Fundamental Rights of the EU (the "EU Charter") and (b) the principle of proportionality ("*First plea in law*", at §§60-97 below).

5.2.    Irrespective of whether Article 18 of the SRM Regulation is unlawful, the Contested Decisions infringed Articles 41, 47 and 48 of the EU Charter ("*Second plea in law*", at §§98-99 below).

5.3.    The SRB and Commission infringed, without justification or proportion, the Applicants' right to property ("*Third plea in law*", at §§100-109 below).

5.4.    The SRB and Commission infringed Article 20 of the SRM Regulation by failing to undertake a proper and independent valuation prior to taking the Contested Decisions ("*Fourth plea in law*", at §§110-112 below).

5.5.    The SRB and Commission infringed Article 18(1) of the SRM Regulation in determining that the conditions precedent set out under Articles 18(1)(a) and (b) were satisfied ("*Fifth plea in law*", at §§113-129 below).

5.6.    The SRB and Commission infringed Article 21(1) of the SRM Regulation in determining that the conditions for the exercise of the power to write down or convert relevant capital instruments were satisfied ("*Sixth plea in law*", at §130 below).

5.7.    The SRB and Commission breached an essential procedural requirement in failing to provide an adequate statement of reasons for the Contested Decisions ("*Seventh plea in law*", at §§131-133 below).

5.8.    In selecting the sale of business tool, the SRB and Commission failed to comply with (a) the principle of proportionality; and (b) the legitimate expectations of the Applicants by departing from the resolution plan without justification ("*Eighth plea in law*", at §134 below).

5.9.    Articles 18 and 22 of the SRM Regulation breached the principles relating to the delegation of powers ("*Ninth plea in law*", at §§135-138 below).

6.      In support of these pleas, the Applicants rely on the witness statements of Antonio Del Valle Ruiz ("Ruiz WS") **(Ruiz WS, Annex A.4, page [X])** and Jaime Ruiz Sacristán ("Sacristán WS") **(Sacristán WS, Annex A.4, page [X])** and a preliminary expert report prepared by Miguel de la Mano, Executive Vice President at Compass Lexecon **(**"Compass Report") **(Compass Report, Annex A.6, page [X])**. Mr de la Mano was the former head of Economic Analysis and

Evaluation at DG Internal Market, and participated in the design of the SRM Regulation.

7.   In light of the strict deadline for lodging this Application, the Applicants have been compelled to institute these proceedings without sight of the majority of the critical documents relevant to the action. As at the date of filing this Application, the only documents that the Applicants have in respect of the Contested Decisions are the non-confidential version of the SRB Decision **(Annex A.1),** the Commission Decision **(Annex A.2)** and the decision of the Fondo de Reestructuración Ordenada Bancaria ("FROB") dated 7 July 2017 **(Annex A.7)**.

8.   The Applicants' legal representatives have written to the Commission, the SRB and the ECB requesting, on an urgent basis, copies of the confidential version of the SRB Decision, and copies of all documents relating to Contested Decisions (on a public and privileged basis).[2] To the extent that there are any confidentiality concerns, the letters requested that the nature of the concern be identified and a proportionate solution be proposed. No documents have been provided in response to these letters.[3] The Commission and SRB responded to the first request by an email and letter respectively, both dated 25 July 2017, and the ECB and Commission responded to the second request by email, on 21 and 24 July 2017 respectively, stating that the institutions did not intend to provide a response to the Applicants' requests until at least 14 August 2017.

9.   The principle of effective judicial protection requires that any evidence and information relied upon by the SRB and/or Commission must be provided to the Applicants sufficiently swiftly for them to be able properly to exercise their right to apply to the General Court for the annulment of the Contested Decisions and also to put this Court fully in a position to carry out its function of reviewing the lawfulness of the measures in question (see further §§98-99 below). In the event that the material is not forthcoming, the Applicants intend to apply to the Court for an order compelling disclosure of this material. The Applicants reserve their right to supplement the submissions and evidence set out in this Application, including, if required, the pleas in law, in response to this material.

10.  The SRB Decision and Commission Decision were made on 7 June 2017. Article 263 TFEU provides, "*the proceedings provided for in this Article shall be instituted within two months of the publication of the measure, or of its notification to the plaintiff, or, in the absence thereof, of the day on which it came to the knowledge of the latter, as the case may be*". The Applicants bring this Application within the two-month period from the publication of the measures as extended by 10 days on account of distance (*per* Article 60 of the Rules of Procedure), and thus within the timeframe mandated for an application under Article 263.

---

[2] The correspondence is at **Annex A.8 - A.17**.
[3] See responses from the Commission, SRB and ECB respectively at **Annex A.14 - 17**.

11.     The Applicants reserve their right to bring damages proceedings against the SRB and the Commission, pursuant to Article 87 of the SRM Regulation and Article 340 TFEU.

12.     The Applicants request that the language of the case be English.

## II.     **PARTIES**

13.     The full names and permanent addresses of the Applicants are set out in **Attachment A** to this Application. The Applicants are all Mexican individuals, legal entities established in Mexico or trust and limited partnership structures whose beneficiaries are Mexican.[4] As at 7 June 2017, immediately prior to the SRB Decision and Commission Decision, the Applicants were all shareholders and/or bondholders of Banco Popular. The Applicants shareholdings and bonds were extinguished as a consequence of the SRB Decision and Commission Decision. The respective shareholdings and/or bondholdings of each of the Applicants are set out in **Annex A.17** to this Application.[5]

14.     The Applicants have standing pursuant to Article 86(1) of the SRM Regulation and Article 263(4) TFEU on the basis that they are legal persons and the Contested Decisions are "*of direct and individual concern to them*".

15.     The Contested Decisions are of direct concern to the Applicants, in that they directly affect the legal rights of the Applicants.

16.     The Contested Decisions are also of individual concern to the Applicants. As a consequence of the Contested Decisions, the Applicants' respective shareholdings in Banco Popular have been cancelled. This satisfies the requirement that the relevant act "*affects them by reason of certain attributes which are peculiar to them or by reason of circumstances in which they are differentiated from all other persons and by virtue of these factors distinguishes them individually just as in the case of the person addressed [by the act]*": *Plaumann v Commission*, Case 25/62, EU:C:1963:17 (15 July 1963), 107. The addressees of the SRB Decision and the Commission Decision are the FROB and the SRB respectively. The Applicants' individual interest is self-evidently distinct from these bodies. In particular, the alleged infringements of fundamental rights alleged in this Application (Articles 17, 41, 47 and 48 of the EU Charter) are distinct to the Applicants.

17.     The Defendants are the SRB and the Commission.

---

[4] Supporting material confirming the legal status of each of the Applicants can be found, in an indexed form, in **Annex A.18**.

[5] Supporting material confirming the Applicants' respective shareholdings can be found, in an indexed form, in **Annex A.19**.

### III.   **SUBJECT-MATTER**

### A.   **The Single Resolution Mechanism and the Single Resolution Board**

18.     The Single Resolution Mechanism (the "SRM") is the European system for the resolution of failing banks. It complements the Single Supervisory Mechanism (the "SSM") for the supervision of banks in the European Union. In circumstances where a bank covered by the SRM[6] fails or is likely to fail, the SRM aims to manage its resolution effectively through the SRB and a Single Resolution Fund (the "SRF"), which is funded by the banking sector.

19.     The SRM was established by the SRM Regulation, which entered into force on 1 January 2015.

20.     The SRB is the centralised resolution authority for significant entities and groups and cross-banking groups established in Member States participating in the SRM. The SRB is responsible for the "*effective and consistent functioning of the SRM*".[7] In particular, it is responsible for drafting the resolution plans and adopting all decisions relating to resolutions for the entities covered by the SRM.[8] The SRB has been fully operational since 1 January 2016. The SRB derives its powers from the SRM Regulation and Directive 2014/59/EU of the European Parliament and of the Council of 15 May 2014 (the "Bank Recovery and Resolution Directive") **(Annex A.22)**.

21.     A resolution made pursuant to the SRM Regulation involves the restructuring of a bank through the use of resolution tools. Pursuant to the SRM Regulation, there are four resolution tools: (a) the sale of business tool (permitting the total or partial disposal of an entity's assets, liabilities and/or shares to a private purchaser); (b) the bridge institution tool (part or all of the assets, liabilities and/or shares are transferred to a controlled temporary entity; (c) the asset separation tool (assets can be transferred to an asset management vehicle); and (d) the bail-in tool (equity and debt can be written down and converted, placing the burden on the shareholders and creditors of a bank, rather than on the public).[9]

22.     In applying the resolution tools, the SRB must take into account the resolution objectives and select the resolution tools which are best-suited to achieve these objectives. The Bank Recovery and Resolution Directive and the SRM Regulation set out the following resolution objectives: (a) to ensure the continuity of critical functions; (b) to avoid significant adverse effects on financial stability;

---

[6] A list of the banks presently within the SRB's direct remit can be found at:
https://srb.europa.eu/en/node/44 **(Annex A.21)**.
[7] SRM Regulation, Article 7(1) **(Annex A.3, page 54)**.
[8] SRM Regulation, Article 7(2) **(Annex A.3, page 54)**.
[9] SRM Regulation, Article 22 **(Annex A.3, page 77)**. The four resolution tools are addressed in Article 24 (Sale of business tool) **(Annex A.3, page 79)**, Article 25 (Bridge institution tool) **(Annex A.3, page 79)**, Article 26 (Asset separation tool) **(Annex A.3, page 80)**, and Article 27 (Bail-in tool) **(Annex A.3, page 80)**. See also SRM Regulation, Article 21 **(Annex A.3, page 76)**, which affords the SRB the power to write down or convert relevant capital instruments where the conditions laid out in SRM Regulation, Article 18, are met.

(c) to protect public funds; (d) to protect depositors; (e) to protect client funds and client assets.[10]

23.     In order to put an entity into resolution, the following three conditions precedent must be satisfied:

  23.1.   The bank is failing or likely to fail[11];

  23.2.   There are no supervisory or private sector measures that can restore the bank to viability within a reasonable timeframe[12]; and

  23.3.   Resolution is necessary in the public interest (i.e. the resolution objectives would not be met to the same extent if the bank were wound up under normal insolvency proceedings.[13]

24.     A decision to place an entity covered by the SRM under resolution involves cooperation by various entities, including the European Central Bank (the "ECB"), the SRB, the Commission, in some circumstances the Council, and the national resolution authorities. In summary, the standard procedure is as follows:

  24.1.   The SRB, in co-operation with the ECB, will determine whether the three conditions precedent are satisfied (§23 above). The first condition precedent (failing or likely to fail) is to be determined by the ECB, after consulting with the SRB.[14] The SRB may also determine the first condition precedent, but only if it has informed the ECB of its intention to do so and the ECB has not reacted within three days.[15] The SRB determines whether the second condition precedent (no alternative measures)[16] and third condition precedent (public interest) are satisfied.[17] The three conditions precedent are regarded as a critical safeguard to protect the interests of key stakeholders including shareholders (see §§113-129 below).

  24.2.   If the three conditions precedent for resolution are satisfied, the SRB will adopt a resolution scheme that determines the resolution tools and/or whether to use the SRF.[18] Prior to deciding on resolution action or the exercise of the power to write down or convert relevant capital

---

[10] SRM Regulation, Article 14 **(Annex A.3, page 66)**; Bank Recovery and Resolution Directive, Article 31 **(Annex A.22, page 67)**.
[11] SRM Regulation, Article 18(1)(a) **(Annex A.3, page 69)**.
[12] SRM Regulation, Article 18(1)(b) **(Annex A.3, page 69)**.
[13] SRM Regulation, Article 18(1)(c) **(Annex A.3, page 69)**.
[14] SRM Regulation, Article 18(1) **(Annex A.3, page 69)**. See also SRM Regulation, Article 18(4) **(Annex A.3, page 69)**.
[15] SRM Regulation, Article 18(1) **(Annex A.3, page 69)**.
[16] SRM Regulation, Article 18(1) **(Annex A.3, page 69)**.
[17] SRM Regulation, Article 18(1) **(Annex A.3, page 69)**. The relevant factors to take into account in assessing the public interest are set out in SRM Regulation, Article 14 **(Annex A.3, page 66)**.
[18] SRM Regulation, Article 18(6) **(Annex A.3, page 70)**. See also SRM Regulation, Article 23 **(Annex A.3, page 78)**.

instruments, the SRB must ensure that a fair, prudent and realistic valuation of the assets and liabilities of the entity is carried out by an independent person.[19]

24.3.    That decision is communicated to the Commission.[20] The scheme will enter into force if the Commission and/or the Council have expressed no objections within 24 hours of the transmission of the scheme by the SRB.[21]

24.4.    During this time the Commission can either endorse the scheme or object to the discretionary aspects of the resolution scheme.[22] It may also propose within 12 hours of the transmission of the scheme by the SRB that the Council, acting by simple majority, objects to the resolution scheme on the ground that the public interest criterion is not fulfilled or approves or objects to a material modification of the amount of the SRF provided for in the resolution scheme of the SRB.[23]

24.5.    The Council is required to take a decision on the Commission proposal within 24 hours from the transmission of the resolution scheme by the SRB.[24] If the Council objects to the placing of the institution under resolution on the ground that the public interest criterion is not satisfied, that institution shall be would up in accordance with the applicable national law. [25]

24.6.    If the resolution is endorsed, the resolution plan must be implemented by the relevant national resolution authorities, under the supervision of the SRB.[26]

## B.    The SRM Regulation

25.    The SRM Regulation is at **(Annex A.3)**.

## C.    Background leading up to the Contested Decisions

26.    Banco Popular was formed in 1926 as a local bank servicing Spanish customers. Over time Banco Popular grew and expanded and by 7 June 2017, Banco Popular had become Spain's fifth largest bank, with total assets of approximately €147

---

[19] SRM Regulation, Article 20(1) **(Annex A.3, page 73)**. Where an independent valuation is not possible, the SRB may carry out a provisional valuation of the assets and liabilities: Articles 20(3), 20(1). An independent valuation that complies with Article 20 must then be carried out as soon as practicable (Article 20(11)).

[20] SRM Regulation, Article 18(7) **(Annex A.3, page 70)**.

[21] SRM Regulation, Article 18(7) **(Annex A.3, page 70)**.

[22] SRM Regulation, Article 18(7) **(Annex A.3, page 70)**.

[23] SRM Regulation, Article 18(7) **(Annex A.3, page 70)**.

[24] SRM Regulation, Article 18(7) **(Annex A.3, page 70)**. See also Council Decision (EU) 2016/228 of 14 July 2015 on the resolution procedure **(Annex A.23, pages 3434 - 3437)**.

[25] SRM Regulation, Article 18(8) **(Annex A.3, page 71)**.

[26] SRM Regulation, Articles 18(9), 29 **(Annex A.3, pages 71, 84)**.

billion.

27.    Historically, Banco Popular's core business has consisted of a strong Spanish retail franchise, and the lending of credit to small and medium-sized enterprises ("SMEs"). However, since the mid-2000's mortgages and other home loans to retail customers became increasingly important to Banco Popular's business operation.

28.    The collapse of the housing sector, that precipitated the 2008-2009 financial crisis, revealed the European banking system's exposure to toxic assets, including non-performing assets ("NPAs") and other distressed debts. Like many other European banks, Banco Popular held many NPAs and had been managing their effect upon its balance sheet since 2008. Banco Popular has had to write down large sums as a result of the NPAs it held and has taken a number of significant provisions.

29.    Notwithstanding the effect of NPA's upon Banco Popular's balance sheet, Banco Popular never received any state aid prior to 2017. This stands in contrast to each of the other 10 Spanish banks which, according to a report published in 2012,[27] had all experienced capital shortfalls under adverse scenario stress tests and had all received state aid from the Spanish government.

30.    On 27 October 2015 the Commission announced that it had presented a report to the Court of Justice, stating that Spanish banks should refund to their customers the money earned on "*floor clauses*" since the date of the first mortgage payment.[28]   This measure forced Banco Popular to make an extraordinary provision of € 350 million, reducing its full year after-tax profit to €105 million, a 69% reduction compared to the previous year.

31.    On 21 December 2016, the Court of Justice delivered its judgment in *Gutiérrez Naranjo v Cajursur Banco SAU,* Joined Cases C-154/15 and C-307/15, EU:C:2016:980 (21 December 2016). This judgment required the Spanish Supreme Court to exclude the application of the "*floor clause*" such that the customer would be restored to the situation it would have been in had the clause had never existed. As a consequence, banks were forced to refund all profits that were deemed wrongfully obtained to the detriment of customers.

32.    On 20 January 2017, Royal Decree 1/2017 **(Annex A.26)** was published by the Spanish authorities. This Royal Decree confirmed the retroactive nullity of "*floor clauses*". According to Banco Popular's 2016 Annual Report, this measure resulted in a €229 million provision **(Annex A.27, page 3966)**.

33.    Banco Popular took a number of steps to address the effect these issues had on

---

[27] Oliver Wyman, "Asset Quality Review and Bottom-Up Stress Test Exercise", 28 September 2012 **(Annex A.24)**.

[28] See El País, "EU wants banks to refund all money earned from mortgage 'floor clauses'", October 27, 2015 **(Annex A.25)**

its balance sheet:

33.1.   On 20 January 2016, Banco Popular announced its decision to raise €8 billion through the sale of NPAs, and real-estate assets.[29]

33.2.   On 26 May 2016, Banco Popular announced a plan to increase the bank's capital by €2.5 billion through the issuance of roughly two billion new shares, sold at a price of € 1.25 per share (€ 0.50 plus an emission premium of € 0.75 per share).[30]

33.3.   Banco Popular announced a business plan alongside the presentation of the first period 2016 results, known as the "*Plan 2018*", which was aimed at improving the bank's profitability.[31] The plan set specific targets of efficiency and coverage ratios for 2018. In order to meet those targets Banco Popular decided to separate its business into two distinct business lines:

   33.3.1.   Its main business which was focused on banking but which excluded real estate loans. This side of the business made significant profits; and

   33.3.2.   Its real estate and related business lines, which made losses. The real estate business line would be focused on accelerating the reduction of NPAs.

33.4.   Banco Popular also effected a substantial redundancy programme.[32]

33.5.   In April 2017, Banco Popular announced that it was considering selling valuable assets (such as stakes in Banco Popular Portugal, Popular Private Banking, BX+, Allianz, Euroautomatic Cash, Wizink and Totalbank) to raise capital to cover losses from NPAs.[33]   These disposals were never made despite some of them being at an advanced stage at the time of the Contested Decisions.

34.   Despite these efforts, it was clear that Banco Popular still faced problems.  In April 2017 the then Chief Executive Officer of the bank informed shareholders that more capital was required.[34] In a shareholders' meeting of 9-10 April 2017 the shareholders voted to authorise the directors to increase the share capital and issue fixed income securities to address those shortfalls. Those powers were never

---

[29] See §21, **Ruiz WS, Annex A.4, page 144.**
[30] See §22, **Ruiz WS, Annex A.4, page 144.**
[31] See §30, **Ruiz WS, Annex A.4, page 146.**
[32] See §33, **Ruiz WS, Annex A.4, page 146.**
[33] See §15, **Sacristán WS, Annex A.5, page 1857.**
[34] See §3.5, **Compass Report, Annex A.4, page 2004.**

used due to the Defendants' precipitous Contested Decisions.

35.     Around the time of the April 2017 shareholders' meeting, outflows of deposits at Banco Popular retail franchises spiked.[35] Prior to that time, deposits had only decreased by 3% during the first quarter 2017.[36] According to the Asociación Española de Banca data, Banco Popular client deposits suffered a loss of €8.3 billion between January 2017 and April 2017, with €7 billion of that loss occurring between March and April 2017.

36.     On 21 April 2017, Moody's expressed concern regarding Banco Popular's solvency and creditworthiness. In particular, the agency remarked that Banco Popular exhibited rapidly deteriorating solvency levels, while its asset quality was still weak.[37] Despite having increased its NPA coverage ratio to 45%, Banco Popular, according to Moody's, was exhibiting a ratio below that of its domestic peers (which was 50% on average). In addition, Moody's noted that 32% of Banco Popular's loans were non-performing. The rating agency downgraded Banco Popular's standalone Baseline Credit Assessment from B1 to B3. This followed the downgrade of Banco Popular's short-term and long-term ratings by DBRS and Standard & Poor's on 6 April 2017 and 7 April 2017, respectively. These downgrades exacerbated the run on deposits which had already started.

37.     On 18 May 2017, eleconomista.es quoted the Minister of Economics, Luis de Guindos stating that Spain would not contribute funds to Banco Popular, and that Banco Popular was being supervised by the ECB, rather than by local authorities.[38]

38.     On 23 May 2017, the Chairman of the SRB, Elke König publically stated that Banco Popular was being "*observed*" by the SRB, which led depositors to conclude that Banco Popular was facing imminent resolution, which in turn led to a full scale run on the bank.

39.     On 31 May 2017, Reuters quoted Ms König, warning EU officials that Banco Popular might need to be wound-down, should it fail to find a buyer.[39] Ms König then made a public statement which neither confirmed nor denied the Reuters report.[40] This statement from Ms König did nothing to calm the markets.

---

[35] See Financial Times, "*Emergency funds failed to save Banco Popular from death spiral*", 8 June 2017 **(Annex A.28, pages 4116-4122)**

[36] Until then, deposits had only decreased 5%, see Banco Popular Q1 2017 Results **(Annex 29, page 4128)**

[37] On 21 April 2017, Moody's expressed concern regarding BPE's solvency and creditworthiness. In particular, the agency remarked that BPE exhibited rapidly deteriorating solvency levels, while its asset quality was still very weak. Despite having increased its NPA coverage ratio to 45%, BPE, according to Moody's, was exhibiting a ratio below that of its domestic peers (which was 50%, on average). In addition, Moody's noted that 32% of BPE's loans were non-performing. The rating agency therefore downgraded BPE's standalone Baseline Credit Assessment "BCA") to B3 from B1. See Moody's Action Report dated 21 April 2017 **(Annex A.30, pages 4171)**

[38] On 18 May 18 2017, eleconomista.es quoted the Minister of Economics, Luis de Guindos as affirming that Spain would not contribute funds to BPE, and that BPE was being supervised by the ECB, rather than by local authorities. See El Economista, "*Guindos asegura que no se va a inyectar dinero público en Banco Popular*", 18 May 2017 **(Annex A.31, page 4177)**

[39] See **Compass Report, Annex A.4, Exhibit 12, pages 2545 - 2548**

[40] See **Compass Report, Annex A.4, Exhibit 13, page 2549**

Following the statement, holders of significant assets withdrew them from Banco Popular.[41]

40.     The Applicants were ready, willing and able to support Banco Popular by investing in any attempts to raise capital proposed by the board.[42]

41.     The Applicants' collective view was encapsulated in a presentation drafted by Loro Partners LLC prepared for the benefit of the del Valle family in February 2017 **(Annex A.32)**. That presentation stated (inter alia):

  41.1.   "*hidden beneath the rubble is a deposit-funded banking franchise with the highest NIM in the industry (1.73%) and a hard-to-replicate and profitable SME business (17% market share*" **(Annex A.32, page 4183)**.[43]

  41.2.   "*Popular is worth €1.60 - 1.80 based on '18 bank's earning power, and worth more in M&A from a position of strength*" **(Annex A.32, page 4183)**.

  41.3.   "*There is tremendous value if shareholders could refocus on SME franchise*" **(Annex A.32, page 4188)**.

  41.4.   "*Popular's franchise and client service are strong, but can still be improved and tailwinds are in place for it to help itself - Ex head of Citi Spain*" **(Annex A.32, page 4188)**.

  41.5.   "*Price Recovery Helps the Value of its Real Estate NPAs*" **(Annex A.32, page 4196)**.

42.     The Applicants appreciated that Banco Popular required additional capital if it was to overcome its short-term issues in order to allow the medium to long-term value to be released. However, the Applicants were willing to (and had the financial means to) back their assessment with a sizeable investment in Banco Popular to ensure that it remained an independent entity. The Applicants were willing to invest more money in order to protect their historic investment and participate in it's the bank's future recovery.[44]

43.     In order to assist the Applicants in identifying the best strategy for ensuring that their investment in Banco Popular was protected and the bank survived, the Applicants instructed an investment bank, Deutsche Bank, to prepare a report which addressed Banco Popular's financial position and which made a

---

[41] See §5.13 of **Compass Report, Annex A.4, page [X]**
[42] See  §37 of **Ruiz WS, Annex A.4, page 147**
[43] "*NIM*" refers to Net Interest Margin which is a measure of the difference between the interest income generated by banks or other financial institutions and the amount of interest paid out to their lenders such as deposit holders.
[44] See §§43-57 of **Ruiz WS, Annex A.4, page 148-151**

recommendation as to how much capital was needed.[45] The Deutsche Bank team concluded that €3 billion was required.[46] Mr. del Valle Ruiz requested that Deutsche Bank pass their conclusions on to the chairman of the Banco Popular board who wished to wait until an internal audit had been completed before he decided how much capital to raise.[47]

44.    In order to ensure that sufficient capital was raised, Mr. del Valle Ruiz contacted a number of investors. That group included Mr. Luksic, a high net-worth investor from Chile. Mr. del Valle Ruiz and Mr. Luksic agreed that[48] :

44.1.   Mr. Luksic would purchase around 3% of Banco Popular on the open market as an initial investment in order to strengthen the share price.

44.2.   Having made the initial purchase, Mr. Luksic and the Applicants would participate in any attempt from Banco Popular to raise more capital (whether via a rights issue or some other mechanism). Banco Popular's internal auditors were, at the time, producing a report in order to establish precisely how much capital was needed.[49] However, the Mexican shareholders were contemplated as investing approximately €1.3 billion and the Luksic family a further €300 million. Mr. del Valle Ruiz was also in talks with other very wealthy investors (such as Allianz and Crédit Mutuel) who were interested in investing should that be necessary.[50]

45.    On Friday 2 June 2017 Mr. del Valle Ruiz and Mr. Luksic discussed a meeting with a second investment bank, Media Bank, regarding how best to structure the capital raise. The meeting was arranged for 10:30 am on 5 June 2017.[51]

46.    Media Bank were content to assist during the initial conversations with Mr. del Valle Ruiz and Mr. Luksic. However, during the meeting they declared that they were unable to help, despite their previous enthusiasm.[52] The sale of Banco Popular to Banco Santander was agreed that evening.

47.    At the same time as the Applicants were working to develop a capital raising strategy, Banco Popular was engaged in a sales process.[53] This process was due to finish at the end of June.[54] The Applicants knew that if Banco Popular's capital deficiencies were not addressed then the sale process could result in the bank being sold to a third party. However, the Applicants thought that they had until the end of July to complete their investments and present a solution other than the sale of Banco Popular and, in any event, did not consider that if that sale went

---

[45] See §45 of **Ruiz WS, Annex A.4, page 149**
[46] See §45 of **Ruiz WS, Annex A.4, page 149**
[47] See §53 of **Ruiz WS, Annex A.4, page 150**
[48] See §46 of **Ruiz WS, Annex A.4, page 149**
[49] See §53 of **Ruiz WS, Annex A.4, page 150**
[50] See §31 of **Ruiz WS, Annex A.4, page 146**
[51] See §55 of **Ruiz WS, Annex A.4, page 150**
[52] See §55 of **Ruiz WS, Annex A.4, page 150**
[53] See §§16-20 of **Sacristán WS, Annex A.5, page 1857-1858**
[54] See §20 of **Sacristán WS, Annex A.5, page 1858**

through they would receive nothing for their shares. The Defendants' precipitous decision to sell Banco Popular to Banco Santander on 7 June 2017 not only wiped out the Applicant's substantial investment, it also deprived them of the right to affect that sale process and present the alternative solution they had been working on for some time (see further §§120-129 below).

48.     The Chairman of Banco Popular, Mr. Emilio Saracho, was fully aware of the Applicants' attempts to find an alternative solution to protect their investments as was the rest of the Banco Popular management team.[55]  Nevertheless, the sale of Banco Popular proceeded without the Applicants being given the opportunity to effect such a solution.

## D.     <u>The SRB Decision</u>

49.     On 7 June 2017, the SRB, in its Executive Session, made the SRB Decision. At the time of filing this Application, the only documents that the Applicants have in relation to the Contested Decisions are the non-confidential version of the SRB Decision **(Annex A.1)**, the Commission Decision **(Annex A.2)**, and the decision of the FROB **(Annex A.7)** (see §§6-10 above).

50.     According to the SRB Decision, the SRB had assessed that the conditions for resolution for Banco Popular, set out in SRM Regulation, Article 18(1),[56] were satisfied. In particular, the SRB Decision records that the SRB concluded as follows:

50.1.     As regards the first condition precedent (failing or likely to fail):

> "*2.1     In accordance with Article 18(1)(a) and 4(c) of the [SRM Regulation] and after consulting the SRB, the ECB has assessed that the Institution is failing, or in any case likely to fail in the near future, and notified the SRB on 6 June 2017. In particular [...REDACTED...] there are objective elements indicating that the Institution is likely in the near future to be unable to pay its debts or other liabilities as they fall due. [...REDACTED...]*
>
> *2.2     Following the ECB assessment, the SRB concludes that the condition specified in Article 18(1)(a) of the [SRM Regulation] is satisfied in respect of the Institution.*" (SRB Decision, p.9 **(Annex A.1, page 10)**).

50.2.     As regards the second condition precedent (no alternative measures):

> "*3.1     Following close cooperation with the ECB, the SRB concludes that there are no alternative measures which could prevent the failure of the Institution within a reasonable timeframe and, therefore, the condition specified in Article 18(1)(b) of the [SRM Regulation] is satisfied in respect of the Institution. In order to reach this conclusion, the SRB has taken into account, in particular, that there are no measures that could prevent the failure of the Institution.*

---

[55] See §47 of **Ruiz WS, Annex A.4, page 149.**
[56] See §23 above.

3.2.   *There is no reasonable prospect that any alternative private sector measures could prevent the failure of the institution. The lack of such measures can be inferred, in particular, from:*

(a)   *The Institution itself has recognized by letter to the ECB dated 6 June 2017 that it assesses that it meets the conditions for FOLTF;*

(b)   *The private sales process has not led to a positive outcome within a timeframe that would allow the Institution to be able to pay its debts or other liabilities as they fall due;*

(c)   *[...REDACTED...]*

(d)   *[...REDACTED...]*

3.3   *There is no reasonable prospect that any supervisory action, including early intervention measures could prevent the failure of the Institution. [...REDACTED...] [...REDACTED...] [...REDACTED...]*

3.4   *There is no reasonable prospect that the independent exercise of the write down and conversion powers, as referred to in Article 21 [SRM Regulation] would prevent the failure of the Institution within a reasonable timeframe. [...REDACTED...]* (SRB Decision, pp.9-10 **(Annex A.1, pages 10-11)**).

50.3.   As regards the third condition precedent (public interest):

"*4.1   Having considered all of the matters outlined in the following paragraphs and balancing the resolution objectives specified in Article 14(2) of the SRMR to the nature and circumstances of the current case in accordance with Articles 14(3) of the [SRM Regulation], the SRB concludes that the resolution action in the form of a sale of business tool in respect of the Institution is necessary in the public interest within the meaning of Articles 18(1)(c) and 18(5) of the [SRM Regulation].*" (SRB Decision, p.10 **(Annex A.1, pages 11-16)**).

The public interest factors taken into account by the SRB are summarised, with substantial redactions, at SRB Decision, §§4.2-4.4 **(Annex A.1, pages 11-12)**.

51.   The SRB Decision stated that "*in light of the urgency of the circumstances of the case, Deloitte carried out a provisional valuation, in accordance with Article 20(1) [SRM Regulation]*" (SRB Decision **(Annex A.1, page 9)**). This "*provisional valuation*" was carried out for the purpose of (a) assessing the economic value of assets and liabilities of the entity; (b) providing for an estimate of the treatment that the shareholders and creditors would have received if the entity had entered into normal insolvency proceedings; and (c) informing the decision on the share or instruments of ownership to be transferred and the SRB's understanding of what constitutes commercial terms for the purposes of the sale of business tool (SRB Decision, p.8 **(Annex A.1, page 9)**). The Applicants have not been provided with a copy of the "*provisional valuation*". We understand no final independent valuation has subsequently been carried pursuant to SRM Regulation, Article 20.

52.   The SRB Decision sets out details of the resolution tools that must be applied to

Banco Popular. The SRB concluded that the resolution tool to be applied to the Banco Popular shall "*consist in the sale of business pursuant to Article 24 of the SRMR for transferring shares to a purchaser. The write down and conversion of capital instruments will be exercised immediately before the application of the sale of business tool*" (SRB Decision, pp.16-17 (**Annex A.1, page 18**)).

53.     As regards the write down of capital instruments, the SRB determined:

53.1.   "*To write down the nominal amount of the Institution's share capital in an amount of EUR 2,098,429,046. This shall result in the cancellation of 100% of the Institution's share capital, consisting in 4,196,858,092 shares, of the same class and series, each with a nominal value of EUR 0.50 and represented by means of book-entries, which are publicly listed on the Spanish Stock Exchanges (Bolsas de Valores de Madrid, Barcelona, Bilbao y Valencia) under ISIN ES0113790531 (the "Existing Shares")*" (SRB Decision, p.17 (**Annex A.1, page 18**)).

53.2.   Subsequently, to convert all principal amounts of Additional Tier 1 instruments into newly issued shares of the Institution, each with a nominal amount (the "New Shares I"). The nominal amount of the New Shares I were then be written down to zero. This resulted in the cancellation of 100% of the New Shares I (SRB Decision, p.17 (**Annex A.1, page 18**)).

53.3.   Subsequently, to convert all principal amounts of Tier 2 instruments into newly issued shares of the Institution, each with a nominal amount (the "New Shares II") (SRB Decision, p.17 (**Annex A.1, page 18**)).

54.     As regards the exercise of the sale of business tool, the SRB determined that the New Shares II were to be transferred to Banco Santander, in consideration of a purchase price of "*EUR 1*" (SRB Decision, p.17 (**Annex A.1, page 18**)). The proceeds obtained from the sale of the New Shares II (i.e. the "*EUR 1*") were to be utilised in the following order of priority: "*(1) toward the payment of all reasonable costs and expenses incurred by the SRB and FROB in connection with the Transfer and the preparation of this resolution scheme, (2) toward the payment of a compensation of the holders of the Outstanding Tier 2 Principal Receivables affected by the mandatory conversion. In this respect, these holders of Outstanding Tier 2 Principal Receivables converted into New Shares II must be compensated to the extent possible and, between them, on a pro rata basis*" (SRB Decision, pp.19-20 (**Annex A.1, pages 19-20**)).

55.     The SRB Decision instructed the FROB to "*take all necessary measures to proceed with the execution and implementation of [the SRB Decision] in accordance with Article 18(9) and Article 29 of the [SRM Regulation]*" (SRB Decision, p.21 (**Annex A.1, page 22**)).

**E.**     **The Commission Decision**

56.    The SRB Decision was endorsed by the Commission, pursuant to SRM Regulation, Article 18(7),[57] in the Commission Decision. The Commission Decision stated as follows:

> "*THE EUROPEAN COMMISSION,*
>
> *Having regard to the Treaty on the Functioning of the European Union,*
>
> *Having regard to the Regulation (EU) No 806/2014 of the European Parliament and of the Council of 15 July 2014 establishing uniform rules and a uniform procedure for the resolution of credit institutions and certain investment firms in the framework of a Single Resolution Mechanism and a Single Resolution Fund and amending Regulation (EU) No 1093/2010, and in particular the second subparagraph of Article 18(7) thereof,*
>
> *Whereas:*
>
> (1)      *On 7 June 2017 at 05:13 the Single Resolution Board (SRB) transmitted a resolution scheme for Banco Popular Español S.A. to the Commission in accordance with Article 18(7) of Regulation (EU) No 806/2014.*
>
> (2)      *The SRB, in the resolution scheme, states that all conditions for resolution set out in the first subparagraph of Article 18(1) of Regulation (EU) No 806/2014 are met with respect to Banco Popular Español S.A., and assesses why resolution action is necessary in the public interest.*
>
> (3)      *The resolution scheme, in accordance with Article 18(6) of Regulation (EU) No 806/2014, places Banco Popular Español S.A. under resolution and determines the application of the sale of business tool to the institution under resolution. The resolution scheme also provides reasons for why all those elements are adequate.*
>
> (4)      *The Commission agrees with the resolution scheme. In particular, it agrees with the reasons provided by the SRB of why resolution is necessary in the public interest in accordance with Article 5 of Regulation (EU) No 806/2014.*
>
> (5)      *The resolution scheme as submitted by the SRB should therefore be endorsed,*
>
> *HAS ADOPTED THIS DECISION:*
>
> *Article 1*
>
> *The resolution scheme for Banco Popular Español S.A. is endorsed.*
>
> *Article 2*
>
> *This Decision is addressed to the Single Resolution Board.*
>
> *Done at Brussels, 7 June 2017.*" **(Annex A.2, page 27)**.

**E.**     **Implementation of the SRB Decision and Commission Decision**

57.    As explained at §55 above, the SRB Decision instructed the FROB to take all necessary measures to proceed with the execution and implementation of the SRB Decision, pursuant to Articles 18(9) and Article 29 of the SRM Regulation. On 7 June 2017 the FROB Governing Committee made a resolution adopting the measures required to implement the SRB Decision **(Annex A.7)**.

---

[57] See §24.3 above.

IV.   **FORM OF ORDER SOUGHT**

58.   The Applicants seek:

58.1.   Pursuant to Article 263 TFEU, the annulment of the SRB Decision and Commission Decision; and

58.2.   Pursuant to Article 277 TFEU, a declaration that Articles 18 and 22 of the SRM Regulation are unlawful, and for the consequential annulment of the SRB Decision and Commission Decision.

59.   The Applicants also seek their costs.

V.   **PLEAS IN LAW**

A.   **First plea in law: Article 18 of the SRM Regulation is unlawful, in that the process fails to provide stakeholders with an opportunity to be heard and allows for no judicial oversight, in violation of (a) Articles 41, 47 and 48 of the EU Charter and (b) the principle of proportionality**

60.   According to settled case-law, Article 277 TFEU gives expression to the general principle conferring upon any party to proceedings the right to challenge indirectly, in seeking annulment of a measure against which it can bring an action, the validity of previous acts of the institution which form the legal basis of the measure which is being challenged, if that party was not entitled under Article 263 TFEU to bring a direct action challenging those acts by which it was thus affected: *Inuit Tapiriit Kanatami and Others v Commission*, T-526/10, EU:T:2013:215 (25 April 2013), §24; *Islamic Republic of Iran Shipping Lines v Council*, Joined Cases T-14/14 and T87/14, EU:T:2017:102 (17 February 2017) ("*Islamic Republic of Iran Shipping v Council*"), §55.

61.   In order to invoke Article 277 TFEU, "*[t]he general measure claimed to be illegal must be applicable, directly or indirectly, to the issue with which the action is concerned and there must be a direct legal connection between the contested individual decision and the general measure in question*": *Islamic Republic of Iran Shipping v Council*, §55; *Moallem Insurance v Council*, T-182/13, EU:T:2014:624 (10 July 2014), §25.

62.   The Applicants are seeking that the General Court, pursuant to Article 277 TFEU, declare unlawful Article 18 of the SRM Regulation. The SRM Regulation is applicable, directly or indirectly, to the issue with which this Application is concerned, and there is a direct legal connection between the Contested Decisions and the SRM Regulation.

63.   By this first plea, the Applicants claim that the process set out under Article 18:

63.1.   Infringes the Applicants' right to be heard and rights to defence protected under Articles 41(1), 41(2)(a) and 48(2) EU Charter (see §§68-79 below);

63.2.   Infringes the Applicants' right to an effective remedy, protected under Article 47 EU Charter (see §§80-89 below); and

63.3.   Infringes the principle of proportionality (see §§90-93 below).

64.   In the event that this Court considers that the Applicants' right to be heard, rights to defence and right to an effective remedy, are adequately protected by the availability of judicial review to the CJEU pursuant to Article 263 TFEU, it will be imperative that the review undertaken by this Court is a "*full review*": see, e.g., See, e.g., <u>*Commission and others v Kadi*</u>, Joined Cases C-584/10 P, C-593/10 P, C-595/10 P, EU:C:2013:518 (18 July 2013) ("<u>*Kadi II*</u>"), §97 (see §§94-97 below).

65.   The right to be heard by administrative authorities, the rights of defence and the right to effective judicial review by an independent tribunal constitute fundamental rights that form part of the general principles of EU law. The importance of these rights has been repeatedly underlined by the EU Courts (see §§98-99 below).

66.   It is clear that both the SRB and the Commission are required to act in accordance with the rule of law, human rights and fundamental freedoms in exercising their respective powers under the SRM Regulation. Article 205 TFEU requires the EU's action on the international scene to be conducted in accordance with the rule of law, human rights and fundamental freedoms.[58] This is reflected in the Preamble to the SRM Regulation which provides that the Regulation "*respects the fundamental rights and observes the rights, freedoms and principles recognised in particular by the Charter, and, in particular, the right to property, the protection of personal data, the freedom to conduct a business, the right to an effective remedy and to a fair trial and the right of defence, <u>and should be implemented in accordance with those rights and principles</u>*" (recital (121)) (emphasis added) **(Annex A.3, page 49)**.

67.   The process adopted under SRM Regulation, Article 18, infringes each of these fundamental rights, for the reasons set out below.

*(1)*   <u>*The right to be heard and rights to defence (Articles 41(1), 41(2)(a) and 48(2) of the EU Charter)*</u>

68.   The right to be heard is a fundamental principle of Community law. It is affirmed in Article 41(2)(a) EU Charter which provides that the right to good

---

[58] Hence the Court of Justice in <u>*Kadi and Al Barakaat v Council*</u>, Joined Cases C-402/05 P and C-415/05 P, EU:C:2008:461 (3 September 2008) ("Kadi I") stated that "*fundamental rights form an integral part of the general principles of law whose observance the Court ensures*" (§283), "*respect for human rights is a condition of the lawfulness of Community acts*" (§284), and "*measures incompatible with respect for human rights are not acceptable in the Community*" (§284).

administration includes "*the right of every person to be heard, before any individual measure which would affect him or her adversely is taken*".[59] The right to be heard is also inherent in the broader obligation to ensure that every person has his or her affairs "*handled impartially, fairly and within a reasonable time by the institutions, bodies, offices and agencies of the Union*" (Article 41(1) EU Charter) and the rights of defence (Article 48(2) EU Charter).

69. The following principles can be derived from the case-law:

69.1. The right to be heard had been held to be a fundamental right which forms an integral part of the general principles of law, whose observance is ensured by the European Courts: <u>*Al-Jubail Fertilizer Company v Council*</u>, C-49/88, EU:C:1991:276 (27 June 1991), §15.

69.2. The right applies wherever an individual measure has an adverse impact, or a significant effect on an individual's interest: see Article 41(2)(a) EU Charter. Article 41(2)(a) is framed in terms of individual measures that adversely affect the party, with no specific requirement that the contested measure should be initiated against that specific party: see, e.g., <u>*M.M. v Minister for Justice, Equality and Law Reform and others*</u>, C-277/11, EU:C:2012:744 (22 November 2012) ("<u>*MM v Council*</u>"), §85 (and case-law cited therein).[60]

69.3. The right to be heard must be guaranteed even in the absence of any rules governing the procedure in question, or where legislation existed but did not take sufficient account of the right: <u>*MM v Council*</u>, §86.

69.4. The right to be heard guarantees every person the opportunity to make known his views effectively during an administrative procedure and *before* the adoption of any decision liable to affect his interests adversely: <u>*Transocean Marine Paint v Commission*</u>, Case 17-74, EU:C:1974:196 (23 October 1974), §15; <u>*Commission v Listrestal*</u>, C-32/95, EU:C:1996:402, §21; <u>*MM v Council*</u>, §87 (and case-law cited therein); European Ombudsman, The European Code of Good Administrative Behaviour (2005), Article 16 (**Annex A.34**).[61]

---

[59] Article 41 is "*based on the existence of the Union as subject to the rule of law whose characteristics were developed in the case-law which enshrined inter alia good administration as a general principle of law*": Explanatory Note on Article 41 (**Annex A.33, page 4219**).

[60] "*[T]he Court has always affirmed the importance of the right to be heard and its very broad scope in the EU legal order, considering that that right must apply in all proceedings which are liable to culminate in a measure adversely affecting a person (see, inter alia, Case 17/74 Transocean Marine Paint Association v Commission[1974] ECR 1063, paragraph 15; Krombach, paragraph 42; and Sopropé, paragraph 36).*"

[61] Article 16 provides: "*(1) In cases where the rights or interests of individuals are involved, the official shall ensure that, at every stage in the decision-making procedure, the rights of defence are respected. (2) Every member of the public shall have the right, in cases where a decision affecting his or her rights or interests has to be taken, to submit written comments and, when needed, to present oral observations before the decision is taken*" (**Annex A.34, page 4244**).

69.5.   The right to be heard requires that a party be placed in a position in which they may effectively make known their views on the evidence on which the decision is based and the relevant facts and circumstances: see *M.M. v Minister for Justice, Equality and Law Reform and others*, C-277/11, EU:C:2012:744 (22 November 2012), §87 (and case-law cited therein). The rights of defence, including the right of access to the file and to documents, guaranteed under Article 15(3) TFEU, and Articles 41(2)(b), 42 and 48(2) of the EU Charter Article 48(2), is one of the procedural safeguards which ensures that the right to be heard can be exercised effectively.

69.6.   The right to be heard also requires the relevant authorities to pay due regard to the observations submitted by the person concerned, examining carefully and impartially all the relevant aspects of the individual case and giving a detailed statement of reasons for their decision: *MM v Council*, §88 (and case-law cited therein).

69.7.   The right to be heard may be restricted only when the restriction concerned respects the essence of the fundamental right in question and, subject to the principle of proportionality, that it is necessary and genuinely meets objectives of general interest recognised by the European Union: EU Charter, Article 52(1); *Kadi II*, §101.

70.   The process mandated under Article 18 of the SRM Regulation fails to respect the fundamental right to be heard. The SRM Regulation does not contain any due process guarantee that requires parties who will be adversely impacted by a proposed resolution measure (such as the Applicants) to be afforded an opportunity to make their views known during the Article 18 resolution process. Indeed, the SRM Regulation provides for no opportunity at all for those whose rights would be adversely affected to be heard before the decision is made.

71.   As a result of the failure to afford such due process guarantees, the Applicants were only advised of the cancellation of their respective shareholdings in Banco Popular, and the sale of Banco Popular to Banco Santander for 1 euro, on 7 June 2017: i.e. the date of the Contested Decisions. Indeed, the majority of the Applicants were only informed about the Contested Decisions through media reports. As a result, the Applicants were deprived, among other things, of the opportunity to make representations regarding the availability of other private sector measures that could have restored Banco Popular to viability within a reasonable timeframe (see §§98-99 below).

72.   The failure to afford affected parties, such as the Applicants, with fundamental due process guarantees was a deliberate legislative choice. In the Impact Assessment accompanying the proposal for the creation of the SRM,[62] the

---

[62] Commission, Commission Staff Working Document, Impact Assessment, Accompanying the document "Proposal for a Directive of the European Parliament and of the Council establishing a framework for the recovery and resolution of credit institutions and investment firms and amending Council Directives 77/91/EEC and 82/891/EC, Directives 2001/24/EC, 2004/25/EC, 2005/56/EC, 2007/36/EC and

Commission accepted that the resolution tool may involve "*a significant interference with the fundamental rights of shareholders and creditors*" (p.39) **(Annex A.35, page 4292)**. The Impact Assessment acknowledged the need to scrutinise the proposal to ensure that it was consistent with the right to an effective remedy and to a fair trial, and the right to access to justice (p.63) **(Annex A.35, page 4316)**. The Impact Assessment acknowledged, in particular, that the resolution of banks "*involve administrative and judicial procedures*" and that the provisions concerning related rights "*such as due process and having an effective remedy against the measures are ... relevant (Article 47 of the Charter and Article 1 of the First Additional Protocol, and Articles 6 and 13 of the European Convention)*" **(Annex A.35, page 4468)**.[63]

73.     Notwithstanding this acknowledgment, the Impact Assessment appears to suggest that the absence of any due process guarantees can be justified on the basis of Article 52(1) of the EU Charter. The discussion on this is opaque. The Impact Assessment states (at pp.215-216 **(Annex A.35, pages 4468-4469)**):

> "*The case law of the European Court of Human Rights indicates that it will give Contracting States wider scope for restricting shareholders' rights to due process if they can show that it is an emergency and that the crisis requires expedited procedures. The restriction must not be disproportionate to the task the authorities set themselves. Articles 6 and 13 of the European Convention, furthermore, set out the shareholder's right to due process and to an 'effective remedy'. An effective remedy implies that national laws must afford to the individual or entity concerned procedural guarantees allowing a reasonable opportunity for presenting its case and effectively challenging the measures interfering with the rights guaranteed by that provision. Shareholders are thus entitled to have their grievance against the restructuring measures heard, even if the measures alleged to have violated the European Convention are taken by a competent authority and are justified in the public interest*".

74.     This statement appears to accept the shareholders are entitled to "*have their grievance against the restructuring measures heard*" **(Annex A.35, page 4469)**. The Applicants submit that that is plainly correct; however the SRM Regulation fails to provide any mechanism for this.

75.     Insofar as the Commission seeks to rely on (unidentified) Strasbourg case-law to justify an interference with shareholders' due process rights, that case-law does not support a complete abrogation of those rights, including the right to be heard.

76.     The European Court of Human Rights (the "ECtHR") has confirmed that the applicability of Article 6(1) to bankruptcy proceedings is "*beyond doubt*": see <u>*Capital Bank AD v Bulgaria*</u> (2007) 44 EHRR 48 ("*Capital Bank AD v Bulgaria*"), §86 **(Annex A.36)**[64]; <u>*Ismeta Bačić v Croatia*</u>, Application No. 43595/06 (19 June 2008), §19 **(Annex A.37)**.

---

2011/35/EC and Regulation (EU) No 1093/2010 COM(2012) SWD(2012) 166 final (6 June 2012) (the "Impact Assessment") **(Annex A.34)**.

[63] A reference to Article 41 of the EU Charter is conspicuously absent.

[64] Article 52(3) of the EU Charter provides that where there is a comparable European Convention on Human Rights (the "ECHR") right to a right contained in the EU Charter, the EU Charter rights must

77.    In *Capital Bank AD v Bulgaria*, a national authority had taken a decision to revoke a bank's licence without notifying the bank that it was envisaging regulatory action, and without taking into account the bank's representations and objections, if any (see §135) **(Annex A.36, page 4539)**. The bank was first notified after the decision had been taken (see §135) **(Annex A.36, page 4539)**. As a result, the bank was not able to state its objections to the findings of fact, or to mount a challenge to the administrative authority's conclusion that it was insolvent. The ECtHR acknowledged that the decision was "*imposed at a time of a serious banking and financial crisis which called for a prompt regulatory response from the authorities, consisting, inter alia, of the introduction of swift and seamless procedures for closing ailing banks*" (§114 **(Annex A.36, page 4531)**; see too at §136 **(Annex A.36, page 4538)**). However, the ECtHR made clear that this cannot justify the preclusion of due process guarantees in all cases. It considered that "*it ha[d] not been shown to the Court's satisfaction that other, less radical solutions would have failed to achieve the desired result*" (§115) **(Annex A.36, page 4532)**. The Court concluded that "*having regard to the prominent place held in a democratic society by the right to a fair trial ... the courts' decision to abide by the BNB's determination without subjecting it to any criticism or discussion, coupled with the absence of any means of scrutinizing that determination in direct review proceedings, was not justified*" (§115) **(Annex A.36, page 4532)**.

78.    The position set out by the ECtHR is consistent with the position adopted in EU Member States, where stakeholders (including, e.g., shareholders) are routinely afforded an opportunity to participate in domestic bankruptcy or insolvency proceedings, with judicial oversight. By way of illustration, under English insolvency proceedings a Judge is required to approve any measures which deprive creditors of their rights unless those creditors vote to approve the measures. Moreover, in all English insolvency proceedings creditors and shareholders are given notice of the insolvency proceedings and are afforded the opportunity to make representations or propose alternative solutions which the insolvency practitioner is obliged to consider. A similar approach is adopted in Spain, where there is judicial involvement and an opportunity for stakeholders to be heard before insolvency is declared. In the event that the present matter was dealt with at the national level, there would have therefore been judicial oversight, with an opportunity for key stakeholders (including the Applicants) to make representations.

79.    The Defendants cannot rely on potential urgency as a "*trump card*" to abrogate fundamental rights in all cases. There are ample precedents, at the EU Member State level (see, e.g., §78 above) which, consistent with the strict requirements under EU Charter, provide individuals with an opportunity to be heard in insolvency contexts, including where time is of the essence. The present context is not remotely comparable to the sanctions context, where a limitation on the right to be heard has been justified (at least prior to the adoption of initial

---

provide <u>at least</u> as much protection as that provided by the jurisprudence of the ECtHR. Article 52(3) expressly provides that "*this provision shall not prevent Union law from providing more expansive protection*". The ECHR and its associated jurisprudence thus provide a minimum level of protection.

measures) so as to prevent the dissipation of assets (*cf Kadi I*, §§338-339).[65] The potential need for speedy decision-making in certain cases cannot justify a wholesale abrogation of the due process rights that are guaranteed to parties adversely affected by a resolution measure, particularly given the far-reaching implications of such a measure. This is precisely the effect of the process codified under Article 18 of the SRM Regulation. Article 18 of the SRM Regulation is therefore unlawful.

*(2)*   *Right to effective judicial review*

80.   Article 47 of the EU Charter guarantees "*[e]veryone whose rights and freedoms guaranteed by the law of the Union are violated ... the right to an effective remedy before a tribunal*" (47(1)). Moreover, "*[e]veryone is entitled to a fair and public hearing, within a reasonable time by an independent and impartial tribunal properly established by law*" (Article 47(2)).

81.   The following principles can be derived from the case-law:

81.1.   The principle of effective judicial protection is a general principle of Community law stemming from the constitutional traditions common to the Member States, which has been enshrined in Articles 6 and 13 of the ECHR.[66] The principle has now been reaffirmed in Article 47 of the EU Charter: see *Kadi I*, §335; *Unibet*, C-432/05, EU:C:2006:755, §37; *Berlioz Investment Fund SA v Directeur de l'administration des contributions directes*, C-682/15, EU:C:2017:373 (16 May 2017) ("*Berlioz*"), §54.

81.2.   Article 47(2) EU Charter provides that everyone is entitled to a hearing by an independent and impartial tribunal. Compliance with that right assumes that a decision of an administrative authority that does not itself satisfy the conditions of independence and impartiality must be subject to subsequent control by a judicial body that must, in particular, have full jurisdiction to consider all the relevant issues: *Berlioz*, §55.[67] According to the consistent jurisprudence of the ECtHR, "*the characteristics of a judicial body with full jurisdiction include the power to quash in all*

---

[65] And even in this context, the Court emphasised that the appellants had a right to have the evidence used against them to justify the restrictive measure within a reasonable period after those measures were enacted, and that the applicants, at that time, were entitled to make their point of view known: see *Kadi I*, §348.

[66] See, e.g., *Unión de Pequeños Agricultores v Council*, C-50/00 P, EU:C:2002:462 (25 July 2002), §§38-39: "*The European Community is ... a community based on the rule of law in which its institutions are subject to judicial review of the compatibility of their acts with the Treaty and with the general principles of law which include fundamental rights. ... Individuals are therefore entitled to effective judicial protection of the rights they derive from the Community legal order, and the right to such protection is one of the general principles of law stemming from the constitutional traditions common to the Member States*".

[67] This position is confirmed in a long line of Strasbourg case-law: see, e.g., *Beaumartin v France* (1995) 19 EHRR 484, §38 **(Annex A.38, page 4569)**; *Družstevní Záložna Pria and others v Czech Republic*, Application No. 72034/01 (26 January 2009), §107 **(Annex A.39, page 107)**; *Capital Bank AD v Bulgaria*, §§99-108, 113 **(Annex A.36, page 4531)**.

*respects, on questions of fact and law, the decision of the body below. It must have jurisdiction to examine all questions of fact and law relevant to the dispute before it*".[68]

81.3.   The right to effective judicial review also contains procedural obligations, which are incumbent on the legislative and executive branches. In particular, there is an obligation on public authorities to reason their acts (see further, §§131-133 below). This is positively formulated in Article 296(2) TFEU and Article 41(2)(c) EU Charter. It also arises from the right to an effective judicial remedy. A statement of reasons is required "*in order to enable the entity concerned to exercise its right to bring an action*",[69] to "*defend their rights in the best possible conditions and to decide, with full knowledge of the relevant facts, whether there is any point in their applying to the Community judicature*",[70] and to "*put the [European Courts] fully in a position in which it may carry out the review of the lawfulness of the Community measure in question which is its duty under the EC Treaty*".[71]

81.4.   The right to effective judicial protection holds a prominent place in the firmament of fundamental rights. Although certain limitations of the right might be permitted if there are compelling interests, it is unacceptable in a democratic society to impair the very essence of that right. As the ECtHR held in <u>Klass v Germany</u> (1979-80) 2 EHRR 214, "*the rule of law implies, inter alia, that an interference by the executive authorities with an individual's rights should be subject to an effective control which should normally be assured by the judiciary, at least in the last resort, judicial control offering the best guarantees of independence, impartiality and a proper procedure*" (at §55) **(Annex A.41, page 4640)**.

82.   The process prescribed under Article 18 of the SRM Regulation fails to respect the fundamental right to effective judicial review. There is no judicial oversight of the resolution process set out under Article 18. Although an Appeal Board has been set up to review decisions of the SRB, there is no right to appeal a resolution decision made pursuant to Article 18 (see SRM Regulation, Article 85 **(Annex A.3, page 111)**).

83.   The process prescribed under Article 18 of the SRM Regulation is inconsistent with the position adopted in EU Member States, where there is judicial oversight of domestic bankruptcy or insolvency proceedings, including in emergency situations. The Applicants submit that the complete extinguishment of a shareholders' interests without any judicial oversight, and without affording the

---

[68] <u>Segame S.A. v France</u>, Application No. 4837/06 (7 June 2012), §55 (and case-law cited therein) **(Annex A.40, page 4616)**.

[69] <u>Fulmen and Fereydoun Malmoudian v Council</u>, T-439/10 and T-440/10, EU:T:2012:142 (21 March 2012), §87.

[70] <u>Kadi I</u>, §337. See also <u>Kadi II</u>, §100.

[71] <u>Kadi I</u>, §337. See also at §349.

shareholder basic due process guarantees, is incompatible with constitutional traditions common to the Member States.

84.   Specifically, at least in the common law Member States and in Spain (see §78 above), insolvency proceedings which have the effect of nullifying with permanence (as opposed to merely suspending) private law property rights require prior judicial endorsement on an inter partes basis. The rule of law considerations which demand such judicial involvement should also apply as a matter of principle within the EU legal order.

85.   The infringement of the right to effective judicial review cannot be remedied by the fact that there is a right to bring annulment proceedings in the CJEU by way of Article 263 TFEU (see SRM Regulation, Article 86 **(Annex A.3, page 112)**.[72]

86.   First, the remedies available to the General Court and the Court of Justice are ineffective. Aside from awarding interim relief and damages, the General Court is limited to declaring the relevant measure void, leaving it to the institution concerned to take the necessary measures to comply with the judgment of the Court (see Articles 264 and 266 TFEU). There is no authority for the General Court to issue an order against the relevant EU institution compelling it take specific action, such as to take steps to reverse the acts implementing the resolution.

87.   This limited right of judicial review, encompassing a limited range of remedies, was a deliberate legislative choice. In the Impact Assessment the Commission recognised that "*[s]afeguards need to be built in the framework in order to protect the interest of stakeholders if intrusive measures are implemented*" (p.63) **(Annex A.35, page 4316)**. One of these safeguards was "*rights for affected parties to judicial review of resolution actions, and compensation by way of damages if the action was ultra vires*" (p.63) **(Annex A.35, page 4316)**. The Commission went on to state: "*The limited right to judicial review (only review of vires, and remedies restricted to pecuniary damages) maximises the effective use of resolution tools and powers because they ensure the legal certainty of actions by authorities. However any further restriction on rights of challenge would be inconsistent with fundamental rights and the rule of law*" (p.63) **(Annex A.35, page 4316)**. The Commission considered that "*the restrictions imposed strike the right balance between ensuring the authorities have sufficient flexibility to intervene quickly and effectively and protecting legitimate rights. If those rights are subject to excessive restrictions, this could make EU markets less*

---

[72] This appears to be what is envisaged by the Commission. See, e.g., Opinion of the European Central Bank of 6 November 2013 (2014/C 109/02), which criticised the failure of the draft SRM Regulation to contain any "*provisions on judicial control and related matters with regard to resolution decisions*" 2.10) **(Annex A.42, page 4660)**. The ECB stated that it understood that the decisions of the SRB and Commission on resolution would "*remain subject to judicial review by the Court of Justice of the European Union*", and that this "*should guarantee due process rights to natural and legal persons affected by SRM decisions*" (§2.10) **(Annex A.42, page 4661)**. This ultimately led to the inclusion of SRM Regulation, Article 86.

*attractive, make funding more expensive, and might be inconsistent with fundamental rights*" (pp.63-64) **(Annex A.35, pages 4316-4317)**.

88.   The Applicants submit that Article 18 of the SRM Regulation fails to strike the right balance. It is clear that judicial mechanisms can be designed in a manner that allows for sufficient flexibility and timely decision-making, as routinely occurs in EU Member States in the context of insolvency proceedings (see §§76-79 above).

89.   Secondly, the Applicants anticipate that the Defendants will argue that this Court cannot investigate *de novo* the merits of the action. If that argument is accepted, it cannot be said that this Court has full jurisdiction in order to satisfy the requirements of effective judicial review (see further §§94-97 below).

*(3)*   *Proportionality*

90.   The Applicants submit that the arguments set out at §§60-89 above also render Article 18 of the SRM Regulation disproportionate.

91.   The principle of proportionality is one of the general principles of EU law and requires that measures implemented through EU law be appropriate to attaining (and rationally connected to) the legitimate objectives pursued by the legislation at issue and must not go beyond what is necessary to achieve them: see Article 5, Treaty on European Union (the "TEU"); *Makhlouf v Council*, T-433/13, EU:T:2016:27 (21 January 2016), §106 (and the case-law cited therein); and *Joint Stock Company 'Almaz-Antey' Air and Space Defence Corp v Council*, Case T-255/15, EU:T:2017:25 (25 January 2017), §100. The measures must be appropriate and necessary in order to achieve those objectives; where there is a choice between several appropriate measures, recourse must be had to the least onerous, and the disadvantages caused must not be disproportionate to the aims pursued. Hence, a reasonable relationship of proportionality must exist between the means employed and the aim sought to be realised, and a fair balance must be struck between the demands of the public interest and the interest of the individual concerned: *Kadi I*, §360.

92.   The SRM Regulation defines its objectives as the "*setting up of an efficient and effective single European framework for the resolution of entities and ensuring gthe consistnet application of resolution rules*" (SRM Regulation, recital (122) **(Annex A.3, page 49)**). The Preamble to the SRM Regulation expressly recognises the need to comply with the principle of proportionality, and to not go beyond what is necessary in order to achieve this objective (SRM Regulation, recital (122) **(Annex A.3, page 49)**).

93.   The Applicants accept that the objective set out above is legitimate. However, for the reasons set out at §§67-79 above, the adoption of a resolution process, by way of Article 18 of the SRM Regulation, that has no judicial oversight and fails to guarantee fundamental due process rights, including the right to be heard, goes beyond what is necessary to achieve those objectives.

*(4)*     *Full review by the CJEU*

94.     In the event that the Court determines that the infringements outlined above do not render Article 18 unlawful, the jurisprudence makes it clear that the Court must have <u>full jurisdiction</u> in determining this Application. The case-law that has developed in the context of sanctions is instructive. In that context, the Courts have emphasised the importance of "*Strict*", "*full and rigorous*" and "*intensive*" judicial review in order to comply with Article 47 EU Charter.[73]

95.     The point is set out in clear terms by the Court of Justice in <u>*Kadi II*</u> (at §§117-124) (emphasis added):

> "*117.   As regards court proceedings, in the event that the person concerned challenges the lawfulness of the decision to list or maintain the listing of his name in Annex I to Regulation No 881/2002, the review by the Courts of the European Union must extend to whether rules as to procedure and rules as to competence, including whether or not the legal basis is adequate, are observed (see, to that effect, the Kadi judgment, paragraphs 121 to 236; see also, by analogy, the judgment of 13 March 2012 in Case C-376/10 P Tay Za v Council, paragraphs 46 to 72).*
>
> *118.   The Courts of the European Union must, further, determine whether the competent European Union authority has complied with the procedural safeguards set out in paragraphs 111 to 114 of this judgment and the obligation to state reasons laid down in Article 296 TFEU, as mentioned in paragraph 116 of this judgment, and, in particular, whether the reasons relied on are sufficiently detailed and specific.*
>
> *119.   The effectiveness of the judicial review guaranteed by Article 47 of the Charter also requires that, as part of the review of the lawfulness of the grounds which are the basis of the decision to list or to maintain the listing of a given person in Annex I to Regulation No 881/2002 (the Kadi judgment, paragraph 336), the Courts of the European Union are to ensure that that decision, which affects that person individually (see, to that effect, judgment of 23 April 2013 in Joined Cases C-478/11 P to C-482/11 P Gbagbo and Others v Council, paragraph 56), <u>is taken on a sufficiently solid factual basis</u> (see, to that effect, Al-Aqsa v Council and Netherlands v Al-Aqsa, paragraph 68). That entails <u>a verification of the factual allegations in the summary of reasons underpinning that decision</u> (see to that effect, E and F, paragraph 57), with the consequence that judicial review cannot be restricted to an assessment of the cogency in the abstract of the reasons relied on, but must concern whether those reasons, or,*

---

[73]  See, e.g., <u>*Kadi II*</u>, §97; *E and F*, C-550/09, EU:C:2010:382 (29 June 2010), §57; <u>*Kadi I*</u>, §326; <u>*Yassin Abdullah Kadi v Commission*</u>, T-85/09, EU:T:2010:418 (30 September 2010), §§149-151; <u>*Organisation des Modjahedines du peuple d'Iran v Council*</u>, T-228/02, EU:T:2006:384 (12 December 2006), §§154-155. These principles have been restated, e.g., in <u>*Safa Nicu Sepahan Co v Council*</u>, T-384/11, EU:T:2014:986 (25 November 2014), §32; <u>*Sport-pari Zao v Council*</u>, T-439/11, EU:T:2014:1043 (9 December 2014), §§128-129; <u>*Vladimir Peftiev v Council*</u>, T-441/11, EU:T:2014:1041 (9 December 2014), §§167-168; <u>*Hamas v Council*</u>, T-400/10, EU:T:2014:1095 (17 December 2014), §90; <u>*Bank Tejarat v Council*</u>, T-176/12, EU:T:2015:43 (22 January 2015), §§35-39; <u>*Ayadi v Commission*</u>, T-527/09 RENV, EU:T:2015:205 (14 April 2015) §§61-64; <u>*Ipatau v Council*</u>, C-535/14 P, EU:C:2015:407 (18 June 2015), §42; <u>*Council v Bank Mellat*</u>, C-176/13 P, EU:C:2016:96 (18 February 2016) ("*Council v Bank Mellat*"), §§109-111; <u>*Akhras v Council*</u>, C-193/15 P, EU:C:2016:219 (7 April 2016), §56; <u>*Council v Bank Saderat Iran*</u>, C-200/13 P, EU:C:2016:284 (21 April 2016), §98; <u>*Al Matri v Council*</u>, T-545/13, EU:T:2016:376 (30 June 2016) ("*Al Matri v Council*"), §48; <u>*Yanukovych v Council*</u>, T-348/14, EU:T:2016:508 (15 September 2016), §101; and <u>*Tri-Ocean Trading v Council*</u>, T-709/14, EU:T:2016:459 (9 September 2016), §39.

> *at the very least, one of those reasons, deemed sufficient in itself to support that decision, is substantiated.*
>
> 120. *To that end, it is for the Courts of the European Union, in order to carry out that examination, to request the competent European Union authority, when necessary, <u>to produce information or evidence, confidential or not, relevant to such an examination</u> (see, by analogy, ZZ, paragraph 59).*
>
> 121. <u>*That is because it is the task of the competent European Union authority to establish, in the event of challenge, that the reasons relied on against the person concerned are well founded, and not the task of that person to adduce evidence of the negative, that those reasons are not well founded.*</u>
>
> 122. *For that purpose, there is no requirement that that authority produce before the Courts of the European Union all the information and evidence underlying the reasons alleged in the summary provided by the Sanctions Committee. It is however necessary that the information or evidence produced should support the reasons relied on against the person concerned.*
>
> 123. *If the competent European Union authority finds itself unable to comply with the request by the Courts of the European Union, it is then the duty of those Courts <u>to base their decision solely on the material which has been disclosed to them</u>, namely, in this case, the indications contained in the narrative summary of reasons provided by the Sanctions Committee, the observations and exculpatory evidence that may have been produced by the person concerned and the response of the competent European Union authority to those observations. If that material is insufficient to allow a finding that a reason is well founded, the Courts of the European Union shall disregard that reason as a possible basis for the contested decision to list or maintain a listing.*
>
> 124. <u>*If, on the other hand, the competent European Union authority provides relevant information or evidence, the Courts of the European Union must then determine whether the facts alleged are made out in the light of that information or evidence and assess the probative value of that information or evidence in the circumstances of the particular case and in the light of any observations submitted in relation to them by, among others, the person concerned.*</u>"

96.    The case-law since <u>*Kadi II*</u> has made clear that the Council (the decision-maker in that context) must be able to show that the statement of reasons for listing the Applicant is "*substantiated by sufficiently specific and concrete evidence*".[74] The Council's "*obligation to verify and establish that the reasoning relied on against a person or entity is well-founded before adopting restrictive measures ... arises from the requirement to observe the fundamental rights of the person or entity concerned, and in particular their right to effective judicial protection, which means that the <u>Council does not enjoy any discretion in that regard</u>*".[75] As the General Court has emphasised, "*the Council has a broad discretion in determining the criteria defining the category of persons subject to the restrictive measures at issue, <u>but not in determining whether a person satisfies those criteria</u>, the latter determination involving inter alia a process of legal characterisation over which the Courts of the European Union exercise <u>full review</u>*": <u>*Al Matri v Council*</u> (§51) (emphasis added). Critically, the "*judicial review cannot be restricted to an assessment of the cogency in the abstract of the reasons relied on, but must concern whether those reasons, or, at the very least,*

---

[74] <u>*Sergiy Klyuyev v Council*</u>, T-341/14, EU:T:2016:47 (28 January 2016), §38; see also <u>*Portnov v Council*</u>, T-290/14, EU:T:2015:806 (26 October 2015), §145-48; <u>*Stavytskyi v Council*</u>, T-486/14, EU:T:2016:45 (28 January 2016) §37; and <u>*Council v Bank Mellat*</u>, §§109-112.
[75] <u>*Jannatian v Council*</u>, T-328/14, EU:T:2016:86 (18 February 2016) §52.

*one of those reasons, deemed sufficient in itself to support that decision, are substantiated by sufficiently specific and concrete evidence*": *Rotenberg v Council*, T-720/14, EU:T:2016:689 (30 November 2016) at §70 (emphasis added).

97.    In the event that this Court determines that these proceedings constitute the effective judicial review mandated by Article 47 EU Charter, the principles set out in the restrictive measures context will apply. These principles are relevant, in particular, the Court's determination of the fourth, fifth and sixth pleas in law. In the context of each of these pleas, the Court will be required to "*determine whether the facts alleged are made out in the light of that information or evidence and assess the probative value of that information or evidence in the circumstances of the particular case and in the light of any observations submitted in relation to them by, among others, the person concerned*": *Kadi II*, §124.

B.    **Second plea in law: The Contested Decisions infringed Articles 41, 47 and 48 of the EU Charter**

98.    Irrespective of whether Article 18 of the SRM Regulation itself is unlawful, the Contested Decisions infringed Articles 41, 47 and 48 of the EU Charter in respect of the Applicants. This is because the Contested Decisions were adopted without affording the Applicants the due process guarantees protected under Articles 41, 47 and 48 of the EU Charter, including, the right to be heard, and the rights of defence and the right to effective judicial protection. The Applicants repeat the submissions set out at §67-89 above.

99.    The Applicants draw the Court's attention to the following in particular:

99.1.    The Applicants received no notice of the Contested Decisions. They were first informed of the Contested Decisions on 7 June 2017, after the Decisions had been made. The vast majority of the Applicants were only informed about the Contested Decisions through media reports. The Applicants were not provided with any opportunity to be heard in advance of the Contested Decisions being made.

99.2.    The failure to afford the Applicants with an opportunity to be heard was particularly egregious in circumstances where (a) the impact of the Contested Decisions was to completely deprive the Applicants of their property rights with no compensation; (b) there is a presumption that resolution is a mechanism of last resort, and one of the key conditions precedent which the Defendants were required to satisfy in order to put a company in resolution was to satisfy itself that no supervisory or private sector measures were available; and (c) the Applicants were, as the management team of Banco Popular knew, perfectly positioned to make representations as to the availability of supervisory or private sector measures and, as discussed below, were in fact ready, willing and able to provide such assistance as was required.

99.3.   As a result of the failure to afford the opportunity to be heard, the Applicants were not provided with the evidence that formed the basis of the Contested Decisions in advance of those Decisions being made. The Applicants have, even now, not been provided with copies of any of the key documents which formed the basis for the Contested Decisions. Despite repeated requests, the Defendants have refused to provide copies of this material in advance of the deadline for lodging the Application (see §7 above). In light of the strict deadline under Article 263 TFEU, the Applicants have been compelled to bring these proceedings, and formulate their claims, without sight of the key documents upon which the Defendants based the Contested Decisions. This is directly contrary to the principle of effective judicial protection and the rule of law, and should not be countenanced by this Court.

99.4.   The Defendants have failed to provide any reasons which could conceivably justify the haste at which the Contested Decisions were made, and the complete abrogation of the Applicants' fundamental due process rights. To the extent that prompt decision-making was required (for some reason, as yet unidentified), the Applicants would have been able to satisfy any timetable set by the Defendants, to ensure that they were able to have their point of view heard.

99.5.   There was no judicial oversight of the process conducted by the Defendants. This stands in stark contrast to the position adopted, at least in the common law Member States, where insolvency proceedings which had the effect of nullifying with permanent private law property rights (as has occurred in this case) would require prior judicial endorsement.

## C.   Third plea in law: The SRB and Commission infringed, without justification or proportion, the Applicants' right to property

100.   Article 17(1) of the EU Charter provides: "*Everyone has the right to own, use, dispose of and bequeath his or her lawfully acquired possessions. No one may be deprived of his or her own possessions, except in the public interest and in the cases and under the conditions provided for by law, subject to fair compensation being paid in good time for their loss. The use of property may be regulated by law in so far as is necessary for the general interest*". Pursuant to Article 52(3) of the EU Charter, Article 17(1) is to be construed consistently with Article 1 of Protocol 1 of the ECHR ("A1P1"). Article 52(3) makes clear that the ECHR acts as a floor, but not as a ceiling, for the scope of EU Charter rights.[76] It is clear that both the SRB and the Commission are required to act in accordance with the right protected under Article 17(1) of the EU Charter.

101.   The following principles can be derived from the case-law:

---

[76] See §81.1 above. See also *Kadi I*, §356, which provides that "*[i]n order to assess the extent of the fundamental right to respect for property, a general principle of Community law, account is to be taken of, in particular, Article 1 of the First Additional Protocol to the ECHR, which enshrines that right*".

101.1. There is an autonomous concept of "*possessions*" at the EU level. It encompasses all rights and interests in the nature of an asset: see *Sky Österreich GmbH v Österreichischer Rundfunk*, C-283/11, EU:C:2013:28 (22 January 2013), §34. It applies to any rights with an asset value creating an established legal position under the legal system, enabling the holder to exercise those rights autonomously and for benefit: *Id*. The right to property can be exercised in relation to a company share: see *Bramelid and Malström v Sweden* (1983) 5 EHRR 249, 255 **(Annex A.43, page 4684)**.[77]

101.2. The property rights protected under Article 17 EU Charter and A1P1 had been classically identified as containing three limbs: see, e.g., *Sporrong and Lönroth v Sweden* (1982) 5 EHRR 35, §61 **(Annex A.44, page 4707)**. The first rule describes the principle of peaceful enjoyment of property and is set out in the first sentence of Article 17(1) (and the first sentence of the first paragraph of A1P1). The second rule relates to deprivation of possessions. The third rule recognises that States are entitled to control the use of property.

101.3. The right to property protected under Article 17 is not absolute. Article 52(1) EU Charter requires that any limitation on the exercise of the rights and freedoms recognised by the EU Charter (including the right to property under Article 17) must satisfy the following conditions: (a) it must be provided by law; (b) it must respect the essence of the right; and (c) subject to the principle of proportionality, it must be necessary and proportionate in pursuit of a legitimate aim.

101.4. As the language of Article 51(1) makes clear, (a), (b) and (c) are separate conditions, all of which must all be satisfied. The clear and unambiguous language of Article 52(1) reflects the long-established EU case-law. In *Nold v Commission*, Case 4-73, EU:C:1974:51 (14 May 1974) ("*Nold*"), a 1974 decision of the European Court of Justice, the Court held that it is legitimate that property rights should be subject to certain limits justified by the overall objectives pursued by the Community, "*on condition that the substance of these rights is left untouched*" (§14). See also *Digital Rights Ireland*, Joined Cases C-293/12 and C-594/12, EU:C:2014:238 (8 April 2014), §§38-39; *Maximillian Schrems v Data Protection Commissioner joined party Digital Rights Ireland Ltd*, C-362/14, EU:C:2015:650 (6 October 2015), §§92-95; Case T-187/11 *Trabelsi v Council*, C-187/11, EU:T:2013:273 (28 May 2013) ("*Trabelsi*"), §§76-81. In *Trabelsi*, the Court was addressing an interference with property rights arising from the application of restrictive measures freezing a person's assets. At §81, the Court identified the need under Article 52(1)

---

[77] "*Such a share is an object of a complex nature: it certifies the fact of membership and the rights which are attached to it (notably the right to vote), it represents part of the capital of the company and also constitutes, to some degree, a title to property in the fortune of the company. In the event, NK's shares had, undoubtedly, an economic value. The Commission, therefore, considers that, for the purposes of Article 1 of Protocol No. 1, those shares of NK which were held by the applicants were 'possessions' giving rise to a property right*" **(Annex A.43, page 4684)**.

for a limitation not to impair the "*essential content*" or "*substance*" of the property right as being a requirement which was <u>additional</u> to the requirement that any limitation on the right should be necessary and proportionate to the aim pursued. In doing so, the Court applied <u>*Nold*</u>.

101.5.   The paradigm example of an interference that fails to respect the essence or substance of the Article 17 property right is the deprivation of property without compensation. Under Article 17(1) of the Charter "*No one may be deprived of his or her possessions, except in the public interest and in the cases and under the conditions provided by law, <u>subject to fair compensation being paid in good time for their loss</u>. The use of property may be regulated by law in so far as is necessary for the general interest*" (emphasis added).[78] Article 17 thus makes it explicit that a person may not be deprived of their property unless fair compensation is paid. There is no authority that suggests that Article 17 would permit a deprivation of property without compensation in any circumstances.

101.6.   In cases where the essence or substance of the right is respected, the interference must still be proportionate. The principle of proportionality is summarised at §§90 and 93 above. Where there is a choice between several appropriate measures, recourse must be had to the least onerous, and the disadvantages caused must not be disproportionate to the aims pursued. Hence, a reasonable relationship of proportionality must exist between the means employed and the aim sought to be realised, and a fair balance must be struck between the demands of the public interest and the interest of the individual concerned.[79] The procedural requirements inherent in Article 17 and A1P1 require that the procedures for imposing a measure restricting the right to property must afford the person concerned a reasonable opportunity of putting his case to the competent authorities.

102.   Applying these principles, the Applicants submit that the Defendants have violated the Applicants' rights under Article 17 EU Charter.

103.   The property of the Applicants with which there has been interference are the Applicants' shares and bonds in Banco Popular. Both the shares and the bonds constitute "*possessions*" for the purposes of Article 17 (see §101 above). This is accepted by the Commission in the Impact Assessment ("*[a] share is capable of being economically valued as any other possession. Therefore, Article 1 of the First Additional Protocol protects bank owners' property interests in their shares. The Court therefore protects shareholdings against deprivation and*

---

[78] Although there is no express reference to compensation in A1P1, the case-law makes clear that a deprivation of property without compensation of an amount reasonably related to the value of the property will constitute a disproportionate interference that cannot be justified, save in exceptional circumstances: see <u>*James v United Kingdom*</u> (1986) 8 EHRR 123, §54 (**Annex A.45, page 4748**); <u>*Draon -v- France*</u> (2006) 42 EHRR 807, §79 (**Annex A.46, page 4827**).

[79] <u>*Kadi I*</u>, §360.

*certain forms of governmental control and interference*" (Impact Assessment, p.214 **(Annex A.35, page 4467)**).

104.  The Defendants have, by the Contested Decisions, interfered with the Applicants' right not to be deprived of their possessions (the second rule, identified at §101.2 above) and/or their right to peaceful enjoyment of their possessions (the first rule, identified at §101.2 above). The write down of the nominal value of Banco Popular's share capital, which resulted in the cancellation of 100% of Banco Popular's share capital (see §3 above), is a paradigm case of deprivation. The same is true of the conversion of the bonds to shares, and the subsequent write down of those shares (see §52 above). As a consequence of the Contested Decisions, the Applicants' shares and bonds have lost all appreciable economic value and the deprivation is permanent.

105.  The interference by the Defendants is unjustifiable because it is not subject to "*conditions provided for by law*": cf *Capital Bank AD Bulgaria*, §133 **(Annex A.36, page 4536)**.[80] The Applicants rely, in particular, on the following: (a) the non-satisfaction of the conditions precedent in Article 18(1)(a) and Article 18(1)(b) of the SRM Regulation (see §§113-129 below); (b) the non-satisfaction of the conditions precedent in Article 21(1) of the SRM Regulation (§130 below); (c) the failure to carry out a proper valuation in accordance with Article 22 (§137 below); and (d) the fact that the Contested Decisions were adopted without proper due process safeguards (see §§70-79 above).

106.  Moreover, the interference is unjustifiable because of the absence of any compensation to the Applicants. The complete deprivation of the Applicants' possessions without any compensation fails to respect the essence of their property rights (see §§101.1-101.6 above). This gives rise to a free-standing violation. For the reasons given above, the requirement not to impair the essence of a right does not form an element of proportionality.

107.  In the Impact Assessment, the Commission acknowledged that "*the most relevant provision*" impacted by the SRM Regulation is Article 17 EU Charter (p.214) **(Annex A.35, page 4467)**. The Commission acknowledged, in terms, that "*The State may (only) deprive shareholders of their shares subject to conditions provided by law and to general principles of international law, where there is a public or general interest justifying the measures and against the payment of 'fair' compensation*" (p.214) **(Annex A.35, page 4467)** (emphasis added). The Commission acknowledged that "*[s]hareholders are creditors are entitled to be compensated for the value of their shares or credits that they would be entitled to under normal liquidation of the company*" (p.215) **(Annex A.35, page 4468)**, and states that a "*safeguard*" in the SRM Regulation "*is the requirements that the amount of compensation should be determined by reference to the value of the*

---

[80] "*[T]he Court reiterates that the first and most important requirement of Art. 1 of Protocol No. 1 is that any interference by a public authority with the peaceful enjoyment of possessions should be lawful: the second sentence of the first paragraph authorises a deprivation of possessions only 'subject to conditions provided for by law' and the second paragraph recognises that the states have the right to control the use of property by enforcing 'laws'. Moreover, the rule of law, one of the fundamental principle of a democratic society, is inherent in all of the Articles of the Convention*" **(Annex A.35, page 4536)**.

*business as assessed by an independent valuer*" (p.215) **(Annex A.35, page 4468)** and the requirement that "*compensation should ensure that shareholders and creditors do not receive less favourable treatment as a result of the application of the resolution tools or use of the resolution power than they would have received if this tool or power had not been used and the entire credit institution had instead entered insolvency under the applicable national law*" (p.215) **(Annex A.35, page 4468)**. The Commission stated that these "*rules concerning compensation preserve the essence of the right to property ... This essence is preserved under the principles governing compensation*" **(Annex A.35, page 4468)**.

108.   However, in the present case a full independent valuation has not been undertaken (see §51 above; SRB Decision, p.8 **(Annex A.1, page 9)**), there has been no subsequent valuation to ensure that the compensation paid to the Applicants (i.e. none) was fair, and as a result, no compensation has been paid. Any such valuation must take into account a range of scenarios, and cannot be based on the fact that a particular resolution tool has already been selected. The value of a company that is facing an imminent fire sale will invariably be very different to the value of a company that is not. Irrespective of the purported safeguards built into the SRM Regulation, the essence of the Applicants' rights have not been respected in the present case. The interference infringes Article 17 EU Charter for this reason alone.

109.   In any event, and irrespective of whether the interference fails to respect the essence or substance of the Applicants' property rights, the interference is disproportionate. This is because: (a) the Contested Decisions were imposed without proper safeguards enabling the Applicants to put their case effectively to the SRB and/or Commission (see §70-79 above); (b) the Applicants' have not received any compensation; and (c) the SRB and/or Commission have failed to demonstrate that the resolution tools adopted, including the complete extinguishment of the Applicants' property rights, constitute the least onerous means of ensuring any legitimate objective (see §93 above).

**D.     Fourth plea in law: The SRB and Commission infringed Article 20 of the SRM Regulation by failing to undertake a proper and independent valuation prior to taking the Contested Decisions**

110.   Article 20 is set out at **Annex A.3, pages 73-75**. The Contested Decisions were based on a provisional valuation (SRB Decision, p.8 **(Annex A.1, page 9)**). This is permitted where a full independent valuation is "*not possible*" due to "*urgency in the circumstances of the case*" (SRM Regulation, Articles 20(3), 20(1) **(Annex A.3, page 73)**). The Defendants have failed to provide any justification for failing to carrying out a full independent valuation in the present case. This is particularly important, given that this has been identified as one of the key "*safeguards*" designed to protect the Applicants' fundamental property rights (see §70-79 above). As the SRM Regulation states, "*[t]he valuation shall be an integral part of the decision on the application of a resolution tool or on the exercise of a resolution power or the decision on the exercise of the write-down or conversion power of capital* instruments" (SRM Regulation, Article 20(15) **(Annex A.3,**

**page 75)**). The Applicants do not accept that it was "*not possible*" to comply with the obligations set out under Article 20.

111.   Notwithstanding repeated requests (see §8 above), the Applicants have not been provided with a copy of the provisional valuation that was carried out. The Applicants are therefore not presently in a position to plead to whether that provisional valuation complied with the obligations set out under Article 20 of the SRM Regulation.

112.   In any event, where a full valuation that is fully compliant with the obligations under Article 20 has not been carried out prior to taking resolutions actions,  that valuation must be carried out "*as soon as practicable*" (SRM Regulation, Article 20(11) **(Annex A.3, page 74)**). Insofar as the Applicants are aware, no such valuation has been carried out.

E.   **Fifth plea in law: The SRB and Commission infringed Article 18(1) of the SRM Regulation in determining that the conditions precedent set out under Articles 18(1)(a) and (b) were satisfied**

113.   Article 18 is set out at **Annex A.3, pages 69-71**. In order to put an entity into resolution, three conditions precedent must be satisfied (§23 above):

   113.1. the bank must be failing or likely to fail (SRM Regulation, Article 18(1)(a));

   113.2. there must be no supervisory or private sector measures that can restore the bank to viability within a reasonable timeframe (Article 18(1)(b)); and

   113.3. resolution must be necessary in the public interest (Article 18(1)(c)).

114.   The three conditions precedent are critical to the operation of the resolution scheme established under the SRM Regulation. In the Impact Assessment the Commission recognised that "*[h]ard triggers for resolution would bring transparency to the resolution framework by making it known ex-ante to stakeholders when a possible public intervention might be prompted*" (p.39) **(Annex A.35, page 4292)**. The Commission appropriately recognised that "*as the possible tools may involve a significant interference with the fundamental rights of shareholders and creditors, the triggers for resolution must ... ensure that resolution action is not taken before all other realistic recovery options are exhausted (resolution is a 'last resort') and that the intervention is in the public interest*" (p.39) **(Annex A.35, page 4292)**.

115.   The Impact Assessment later describes the triggers for resolution as a "*safeguard*" that had been built into the framework "*to protect the interest of stakeholders if intrusive measures are implemented*" (at p.63) **(Annex A.35, page 4316)**. This "*safeguard*" is described in the following terms:

> "[T]riggers for resolution aim to ensure that resolution is taken as late as possible before the point of actual insolvency. A trigger that requires the bank to be insolvent is too late for resolution because of the rapid and precipitous value destruction associated with insolvency. In particular, one of the trigger conditions requires that no viable private sector alternative is available to present the failure of the institution. This aims to ensure that resolution intervention is a last resort, and will not be made if there are other, less expropriating measures that could be taken that would be likely to redress the problem within a suitable timeframe. Moreover resolution can be triggered only in the overwhelming interest of the public" (p.63) **(Annex A.35, page 4316)**.

116.   The Applicants submit that the conditions precedent set out under Article 18(1)(a) and Article 18(1)(b) have not been satisfied in the present case. The Defendants erred in law and in fact in determining that they had been.[81] In adjudicating this plea in law, in order to comply with the requirements of Article 47 EU Charter, the Court is required to undertake a full and intensive judicial review (see §§64-79 above). In particular, the Defendants will be required to demonstrate that their conclusions are substantiated by sufficiently specific and concrete evidence.

117.   In particularising this plea, the Applicants have been constrained by the Defendants' failure to provide any relevant disclosure (see §§8, 9, 10 above). This includes, in particular, the unredacted SRB Decision, the assessment made by the ECB that Banco Popular was failing or likely to fail, and the provisional valuation. The Applicants reserve their right to supplement the submissions and evidence set out below after full disclosure has been provided.

*Article 18(1)(a)*

118.   In order to satisfy Article 18(1)(a), the Defendants are required to demonstrate that Banco Popular was failing or likely to fail. The onus is on the Defendants to demonstrate that this condition precedent was satisfied. The only evidence provided by the Defendants to date is that set out at SRB Decision, §§2.1-2.2 (much of which has been redacted) (see §50 above) (Compass Report, **Annex A.4, page [X]**). This is manifestly insufficient to demonstrate that Article 18(1)(a) has been satisfied.

119.   In fact, as at 7 June 2017 the condition precedent set out under Article 18(1)(a) was not satisfied. As the narrative set out in the witness statements of Mr Ruiz and Mr Sacristán, and the analysis in the Compass Report of Miguel de la Mano demonstrates,  Banco Popular was facing a temporary liquidity problem, caused by a run on deposits, and not a fundamental solvency crisis. The SRB Decision confirms that the ECB's finding that Article 18(1)(a) was satisfied was based on the fact that Banco Popular's liquidity position had "*rapidly deteriorated*" **(Annex A.1, page 6)** (see also Compass Report, §§3.13 (Compass Report, **Annex A.4, page 2006**). However, as explained by Mr. de la Mano (who participated in designing the SRM Framework within the Commission), a temporary liquidity

---

[81] Although the decisions were principally taken by the SRB, in consultation with the ECB, the SRB's determination was endorsed by the Commission (see §56 above). The Commission Decision stated in terms: "*The Commission agrees with the resolution scheme. In particular, it agrees with the reasons provided by the SRB of why resolution is necessary in the public interest in accordance with Article 5 of Regulation (EU) No 806/2014*" **(Annex A.2, page 27)**.

crisis alone is insufficient to establish that Article 18(1)(a) is satisfied; the extreme step of imposing resolution was not intended for such situations. (Compass Report, **Annex A.4, page 2002**). The fact that a liquidity problem as opposed to a more deep-seated solvency issue was facing the Bank has also since been confirmed by the Chair of the ECB Supervisory Board, Danièle Nouy. In the Chair's own words, the ECB's decision on Article 18(1)(a) was taken on the basis of insufficient liquidity and that, at that time, "the objective elements were not sufficient for the ECB to determine that the institution was failing or likely to fail on the basis of its capital position" (**Annex A.47, page 4849**). This is supportive of the submission that the ECB did not have sufficient basis to conclude that Banco Popular was failing or likely to fail (Compass Report, **Annex A.4, page 2030**). The requirements of Article 18(1)(a) were not satisfied in this case.

*Article 18(1)(b)*

120.   In order to satisfy Article 18(1)(b), the Defendants are required to demonstrate that there were no supervisory or private sector measures that could restore Banco Popular to viability within a reasonable timeframe. This condition precedent aligns with the fact that resolution was expressly intended to be a solution of "*last resort*" (see §99.2 above) (see Compass Report, **Annex A.4, page 2024**).

121.   The onus is on the Defendants to demonstrate that this condition precedent was satisfied. The only evidence provided by the Defendants to date is that set out at SRB Decision, §§3.1-4 (much of which has been redacted) (see §50 above). This is manifestly insufficient to demonstrate that Article 18(1)(b) has been satisfied.

122.   The Defendants failure to satisfy Article 18(1)(b) has been compounded by the failure to afford the Applicants' the opportunity to be heard. As explained above (§§40-48), the Applicants were perfectly positioned to make representations as to the availability of supervisory or private sector measures and, as discussed below, were in fact ready, willing and able to provide such assistance as was required. As a result of the failure to provide the Applicants with an opportunity to be heard, it appears that these measures were not taken into consideration by the Defendants.

123.   As to private sector measures, the SRB Decision records that the absence of any alternative private sector measure can be "*inferred*" from certain factors. It is striking that the Defendants were willing to take such draconian measures on the basis of inference alone. An inference is plainly insufficient to satisfy the strict requirements of Article 18(1)(b).

124.   The first factor relied upon in the SRB Decision is the assertion that Banco Popular had recognised in a letter to the ECB dated 6 June 2017 that it considered that it was failing or likely to fail. No such inference can be drawn from that letter. Even if the letter can be relied upon to support the first condition precedent, which the Applicants do not accept, for the reasons given at §§118-119 above, the letter be relied upon to satisfy the second, distinct, condition precedent.

125.    The second factor is the assertion that the private sales process did not lead to a positive outcome within a timeframe that would have allowed Banco Popular to pay its debts or other liabilities as they fell due, As to that, to the extent that the sales process did not lead to a positive outcome within the timeframe arbitrarily stipulated by the SRB, this was a problem of the SRB's own making. As explained above (§§38-39) the statements made (on repeated occasions) by the SRB directly contributed to the liquidity issues Banco Popular faced. The SRB's own role in precipitating the liquidity issues that Banco Popular faced was a key factor that ought to have been taken into account by the SRB in its assessment of the private sales process, and the availability of private sector measures more generally.

126.    In any event, as at 7 June 2017, there was at least one viable private sector measure that could have restored Banco Popular to viability within a reasonable timeframe, and which Defendants failed to consider.

127.    The Applicants refer to the witness statements of Mr. Ruiz and Mr. Sacristán, and the evidence summarised at §§40-48 above. That evidence, which is corroborated by concrete and objective contemporaneous documents, demonstrates that immediately prior to the Contested Decisions large stakeholders, including the Applicants, were prepared to inject significant amounts of capital to assist Banco Popular to overcome its short-term liquidity problems. Such a capital injection would have restored confidence in the bank and would, at the very least, have afforded additional time for the private sales process to be properly carried out. The senior management of Banco Popular were well aware of the prospect of a private sector solution. These capital injections would have obviated the need for the Defendants to take the action that they did and would have preserved the property rights of the Applicants. It does not appear from the Contested Decisions that the Defendants gave any consideration at all to these proposals. This is the clearest possible violation of Article 18(1)(b) and the presumption that resolution is a mechanism of last result, which underpins the entire scheme established under the SRM Regulation (see Impact Assessment, p.63 **(Annex A.35, page 4316))**.

128.    As to supervisory measures, the SRB Decision simply asserts that "[*t*]*here is no reasonable prospect that any supervisory acting, including early intervention measures could prevent the failure of the Institution*". The remainder of this section is redacted. The SRB has provided no evidence in support of this assertion. There is, for instance, no consideration of the possibility of the provision of sufficient emergency liquidity assistance, notwithstanding the fact that such a measures: (a) had been regularly provided to Spanish and other European banks in the past[82]; (b) would have addressed the SRB's immediate concerns regarding the liquidity position of Banco Popular, and provided sufficient time for the sales process to run its course; and (c) would have afforded the SRB sufficient time to ensure that there were no other private sector measures available. It is also clear that Banco Popular had substantial collateral to justify

---

[82] **Compass Report, Annex A.4, page [X]**

receipt of ELA.[83] As explained in Mr. de la Mano's Report, emergency liquidity assistance is designed precisely for cases such as this; had such measures been properly utilized, resolution could have been completed avoided.[84]  It is also self-evidently unfair and improper for the SRB to (at least in part) precipitate a liquidity problem within Banco Popular and then rely upon that same problem to deprive the Applicants of their property rights when other solutions were readily available.

129.    All of the above information could have been provided to the Defendants if the Applicants had been afforded an opportunity to be heard in advance of the Contested Decisions.

**G.      Sixth plea in law: The SRB and Commission infringed Article 21(1) of the SRM Regulation in determining that the conditions for the exercise of the power to write down or convert relevant capital instruments were satisfied**

130.    Article 21 is set out at **Annex A.3, page 76**.  In  order to exercise its power to write down or convert relevant capital instruments, the Defendants must be satisfied that one of the conditions in Article 21(1) have been satisfied. The onus is on the Defendants to demonstrate that one of the conditions have been satisfied. Insofar as the Defendants seek to rely on Article 21(1)(b) ("*the entity will no longer be viable unless the relevant capital instruments are written down or converted into equity*"), the Applicants repeat the submissions and evidence set out at §§116-119 above.

**I.      Seventh plea in law: The SRB and Commission breached an essential procedural requirement by failing to provide an adequate statement of reasons for the Contested Decisions**

131.    Article 296 TFEU provides *"Legal acts shall state the reasons on which they are based ..."*.  This obligation is also inherent in Articles 41, 47 and 48 EU Charter. As the Court of Justice held in *Council v Bamba*, C-417/11 P, EU:C:2012:718 (15 November 2012), §§50-53:

> *"The statement of reasons required by Article 296 TFEU must disclose in a <u>clear and unequivocal fashion</u> the reasoning followed by the institution which adopted the measure in such a way as to enable the person concerned to ascertain the reasons for the measures and to enable the court having jurisdiction to exercise its power of review ...*
>
> *... where the person concerned is not afforded the opportunity to be heard before the adoption of an initial decision to freeze funds, compliance with the obligation to state reasons is all the more important because it constitutes the sole safeguard enabling the person concerned, at least after the adoption of that decision, to make <u>effective use of the legal remedies available to him</u> in order to challenge the lawfulness of that decision.*
>
> *Therefore, the statement of reasons for an act of the Council which imposes a measure freezing funds must ... identify the <u>actual and specific reasons</u> why the Council considers, in the exercise of its discretion, that that measure must be adopted in respect of the*

---

[83] **Compass Report, Annex A.4, page 2023**
[84] **Compass Report, Annex A.4, page [X]**

> *person concerned.*
>
> *The statement of reasons ... must, however, be appropriate to the act at issue and the context in which it was adopted"* (emphasis added).

132.   The reasoning for the measure "*must be provided to the person concerned by the measure before the latter brings an action against it. Non-compliance with the duty to state reasons cannot be regularised by the fact that the person concerned becomes cognisant thereof during proceedings before the EU judicature*": <u>Sina Bank v Council</u>, T-15/11, EU:T:2012:661 (11 December 2012), §56.

133.   The Defendants have failed to comply with the obligation to provide the actual and specific reasons for adopting the Contested Decisions. As regards the SRB, all that has been provided is a redacted version of the SRB Decision which omits the key reasoning of the SRB. The SRB has failed to provide any of the underlying evidence upon which it based its decision. As regards the Commission, the Commission decision simply asserts that the Commission endorses the conclusions of the SRB. The Commission has failed to provide an explanation as to the assessments that it undertook to satisfy itself that the relevant conditions were satisfied, and that the resolution tool proposed by the SRB was the most appropriate and proportionate. All of the circumstances both demanded and permitted a complete and precise set of reasons to be given. In failing to do so, the Defendants have breached this essential procedural requirement.

**J.   Eighth plea in law: In selecting the sale of business tool, the SRB and Commission have failed to comply with (a) the principle of proportionality; and (b) the legitimate expectations of the Applicants by departing from the resolution plan without justification**

134.   In the event that the Defendants are able to demonstrate that the conditions precedent set out under Article 18 are satisfied, the Applicants reserve their right to submit that the resolution scheme ultimately adopted by the Defendants infringes the principle of proportionality, and the Applicants legitimate expectations that the resolution plan concluded in December 2016 would be followed. The Applicants are presently not in a position to particularise this plea, in light of the Defendants' failure to provide access to any of the relevant disclosure. This includes, in particular, the unredacted SRB Decision, the assessment made by the ECB that Banco Popular was failing or likely to fail, and the provisional valuation. The Applicants reserve their right to supplement these submissions after full disclosure has been provided.

**K.   Ninth plea in law: Article 18 and 22 of the SRM Regulation breaches the principles relating to the delegation of powers**

135.   The legal framework for the conferral of powers on agencies has been set through the case-law of the European Courts. The leading case is <u>Meroni v Haute autorité</u>, C-9/56, EU:C:1958:7 ("<u>Meroni</u>"). That case stands for the proposition that any delegation involving "*discretionary power implying a wide margin of discretion*

*which may, according to the use which is made of it, make possible the execution of actual economic policy*" (at p.152) would constitute an unlawful delegation of power. This is because "*it replaces the choices of the delegator by the choices of the delegate, bring[ing] about an actual transfer of responsibility*" (at p.152).

136. The Applicants submit that the delegation of powers to the SRB set out under Articles 18 and 22 of the SRM Regulation breach the principles relating to the delegation of powers laid down in <u>*Meroni*</u>.

137. The Applicants' final plea is based on the following arguments:

137.1. First, the SRB's determination as to whether the three conditions precedent set out under Article 18(1) of the SRB Regulation entails a very large measure of discretion, in particular as to whether there are any supervisory or private sector measures that can restore the bank to viability within a reasonable timeframe (Article 18(1)(b)), and whether resolution is in the public interest (Article 18(1)(c)). The third condition precedent, in particular, involves highly subjective judgment. It requires the SRB to arbitrate between conflicting public interests, make value judgment and carry out complex economic assessments (see, e.g., the resolution objectives that must be considered under Article 14, which must be considered pursuant to Article 18(5); and the SRB Decision at pp.10-17 **(Annex A.1, pages 11-18)**). In doing so, the SRB will be involved in the implementation of actual economic policy: namely, the resolution policy of the Union. These decisions will have long-term consequences as to the general overall confidence in the markets.

137.2. Secondly, the SRB has a wide-ranging discretion when deciding which resolution tool to adopt: see Article 18(6) and Article 22. In particular, the SRB must be guided by the factors set out under Article 14 of the SRB Regulation. This requires the SRB to adopt a decision which, <u>in its view</u>, best achieves the resolution objectives, including (a) to ensure the continuity of critical functions; (b) to avoid significant adverse effects on financial stability; (c) to protect public funds by minimising reliance on extraordinary public financial support; (d) to protect depositors; and (e) to protect client funds and client assets. These objectives encompass tests which are inherently subjective.

137.3. Thirdly, in many cases the decisions taken by the SRB are permanent, and therefore have significant long-term consequences (*contra* the position in <u>*UK v Parliament and Council*</u>, C-270/12, EU:C:2014:18 (22 January 2014), §50.

137.4. Fourthly, the SRM Regulation expressly acknowledges the conferral of powers gives rise to delegation issues. Recital (26) of the SRM Regulation states that "*[t]he procedure relating to the adoption of the resolution scheme, which involves the Commission and the Council, strengthens the necessary operational independence of the board while respecting the*

> *principle of delegation of powers to agencies as interpreted by the Court of Justice of the European Union*" **(Annex A.3, page 34)**. This explains why Article 18(6) provides that "*[w]ithin 24 hours from the transmission of the resolution scheme by the Board, the Commission shall either endorse the resolution scheme, or object to it with regard to the discretionary aspects of the resolution scheme…*" " **(Annex A.3, page 70)**. The Applicants submit that this is a cosmetic solution that cannot be used to circumvent the principles set out in <u>*Meroni*</u>. In light of the timeframes provided (24 hours maximum), it is impossible for the Commission to undertake any more than a cursory assessment as to whether the Article 18(1) conditions precedent are satisfied, and whether the resolution tool that has been adopted by the SRB is the most appropriate in light of the resolution objectives. This can be seen by looking at the timing of the decisions taken in the present case. The resolution scheme was adopted by the SRB and transmitted to the Commission at 05.13 (see Commission Decision, §1 **(Annex A.2, page 27)**. The Commission had endorsed the scheme by 07.30 (see SRB press release dated 7 June 2017, and time-stamped as 07.30).[85] This demonstrates very clearly that, as a matter of practice, it is the SRB that is making the resolution policy, with the Commission simply retaining a rubber-stamp function in an attempt to address the delegation concerns. This is a clear violation of the <u>*Meroni*</u> principles and is impermissible.

138.   For these reasons, the Applicants request that the General Court, pursuant to Article 277 TFEU, declare unlawful Articles 18 and 22 of the SRM Regulation.

## VII.   <u>CONCLUSION</u>

139.   For the reasons set out above, the Applicants respectfully request that the General Court makes the orders set out at §§4-59 above.

**For and on behalf of the Applicants**

_____          _____          _____

**Pushpinder Saini QC**          **Jason Pobjoy**          **Richard Boynton**

**Dated the 4th day of August 2017**

---

[85]          https://srb.europa.eu/en/node/315.

## ATTACHMENT A: THE APPLICANTS

1. Antonio Del Valle Ruiz
2. Alejandra Pérez Mina
3. Alejandro Finkler Kudler
4. Alonso de Garay Gutiérrez
5. Arantzazu Del Valle Diharce
6. Arturo Grinberg Kreimerman
7. Carlos Ruiz Sacristán
8. Edmundo Del Valle Diharce
9. Elias Abadi Cherem
10. Enrique Rojas Blasquez
11. Eugenio Santiago Clariond Reyes
12. Fernando Ramos Gonzalez de Castilla
13. Gerardo Madrazo Gómez
14. Germán Larrea Mota Velasco
15. Jacobo Troice Jalife
16. Jaime Abadi Cherem
17. Jorge Esteve Recolons
18. José Eduardo Del Valle Diharce
19. José Manuel Fierro Von Mohr
20. José María Casanueva Y Llaguno
21. Juan Pablo Del Valle Perochena
22. Julio Andrés Maza Casas
23. Luís de Garay Russ
24. Luis Francisco Suinaga Aguilár
25. María De Guadalupe Del Valle Perochena
26. Rogelio Barrenechea Cuenca
27. Xochitl de Guadalupe Montero Motta (Xochitl Montero De De Garay)
28. Inmobiliaria Asturval
29. Bauhaus Partners Ltd
30. DGFAM Fund, LP
31. Eureka Global PTE LTD (Divo Milan Hadad)
32. Fideicomiso 70385-0 Bancomer (Antonio Cosío Y Familia)
33. Fideicomiso Tanoak LTD (Eugenio Clarion D)
34. GBM Capital Bursátil, S.A. de C.V., Fondo de Inversión de Renta Variable
35. GBM Fondo de Inversión Total, S.A. de C.V. Fondo de Renta Variable
36. GBM Global, S.A. de C.V., Fondo de Renta Variable
37. Grow Investments, LP
38. Grupo Bursatil Mexicano, S.A. de C.V. Fid. 000139
39. Hechos Con Amor S.A. De C.V
40. Miura LP
41. Simple Investments LP
42. Terra Gamma Partners CV

## SCHEDULE OF ANNEXES TO APPLICATION

| Annex Number | Description | Page Numbers | Reference(s) in the Application |
|---|---|---|---|
| A.1 | Non-confidential version of the decision of the Single Resolution Board of 7 June 2017 concerning the adoption of a resolution scheme in respect of Banco Popular Español S.A. (SRB/EES/2017/08) | 1 - 25 | §§ 1.1, 7, 49, 50.1, 50.2, 50.3, 51, 52, 53.1, 53.2, 53.3, 54, 55, 108, 110, 119, 137.1 |
| A.2 | European Commission decision endorsing the resolution scheme for Banco Popular Español S.A. dated 7 June 2017 (2017/1246) | 26-27 | §§ 1.2, 7, 56, 116, 137.4 |
| A.3 | Regulation (EU) No 806/2014 of the European Parliament and of the Council of 15 July 2014 establishing uniform rules and a uniform procedure for the resolution of credit institutions and certain investment firms in the framework of a Single Resolution Mechanism and a Single Resolution Fund and amending Regulation (EU) No 1093/2010 | 28 - 118 | §§ 1.2.1.1, 17, 18, 19, 20.1, 20.2, 20.3, 21.1, 21.2, 21.3, 21.4, 21.5, 21.6, 22, 66, 82, 85, 92, 110, 112, 113, 130, 137.4 |
| A.4 | Witness statement of Antonio Del Valle Ruiz dated 3 August 2017 (translation and original) | 119-1840 | §§ 6, 33.1, 33.2, 33.3, 33.4 |
| A.5 | Witness statement of Jaime Ruiz Sacristán dated 3 August 2017 (translation and original) | 1842-1978 | §§ 6, |
| A.6 | Expert report prepared by Miguel de la Mano, Executive Vice President of Compass Lexecon, dated 3 August 2017 | 1994 - 2644 | §§ 6, 118, 119 |
| A.7 | 7 June 2017 Resolution of the Fondo de Reestructuración Ordenada Bancaria (FROB) Governing Committee adopting the measures required to implement the Decision of the Single Resolution Board in its Extended Executive Session of 7 June 2017 concerning the adoption of the resolution scheme in respect of Banco Popular Español, S.A., addressed to | 2645 - 2661 | §§ 7, 57 |

| | | | | |
|---|---|---|---|---|
| | FROB, in accordance with Article 29 of Regulation (EU) No. 806/2014 of the European Parliament and of the Council of 15 July 2014 establishing uniform rules and a uniform procedure for the resolution of credit institutions and certain investment firms in the framework of a Single Resolution Mechanism and a Single Resolution Fund and amending Regulation (EU) No 1093/2010. | | | |
| A.8 | Letter from Ontier España to the European Commission dated 7 July 2017 requesting the confidential version of SRB Decision and documents relevant to the Contested Decisions | 2662 - 2664 | § 8 | |
| A.9 | Letter from Ontier España to the SRB dated 7 July 2017 requesting the confidential version of SRB Decision and documents relevant to the Contested Decisions | 2665 - 2667 | § 8 | |
| A.10 | Letter from Ontier to the ECB dated 7 July 2017 requesting the confidential version of SRB Decision and documents relevant to the Contested Decisions | 2668 - 2669 | § 8 | |
| A.11 | Letter from Kirkland & Ellis International LLP to the European Commission dated 20 July 2017 requesting the confidential version of SRB Decision and documents relevant to the Contested Decisions | 26670 - 2672 | § 8 | |
| A.12 | Letter from Kirkland & Ellis International LLP to the SRB dated 20 July 2017 requesting the confidential version of SRB Decision and documents relevant to the Contested Decisions | 2673 - 2676 | § 8 | |
| A.13 | Letter from Kirkland & Ellis International LLP to the ECB dated 20 July 2017 requesting the confidential version of SRB Decision and documents relevant to the Contested Decisions | 2677 - 2679 | § 8 | |
| A.14 | E-mail from the European Commission to Ontier España dated 25 July 2017 | 2680 - 2681 | § 8 | |
| A.15 | Letter from the Single Resolution Board to Ontier España dated 25 July 2017 | 2682 - 2684 | § 8 | |

| A.16 | E-mail response from ECB to Kirkland & Ellis International LLP dated 21 July 2107 | 2685 - 2687 | § 8 |
| A.17 | E-mail response from Commission to Kirkland & Ellis International LLP dated 21 July 2017 | 2688 - 2690 | § 8 |
| A.18 | Copy of Passport for each individual Applicant or Power of Attorney/Letter of Authorization and corporate documentation for each corporate Applicant | 2691 - 2984 | § 13 |
| A.19 | Index of respective shareholdings and/or bondholdings of each of the Applicants in Banco Popular | 2985 - 2987 | § 13 |
| A.20 | Documentary evidence of each Applicant's respective shareholdings in Banco Popular Español S.A. | 2988 - 3189 | § 13 |
| A.21 | List of the entities and groups directly supervised by the European Central Bank as of 1 April 2017 and list of other cross-border groups as of 6 June 2016, which collectively fall within the Single Resolution Board's remit | 3190 - 3274 | § 18 |
| A.22 | Directive 2014/59/EU of the European Parliament and of the Council of 14 May 2015 | 3275 - 3434 | §§ 20, 22 |
| A.23 | Council Decision (EU) 2016/228 of 14 July 2015 on the resolution procedure | 3435 - 3437 | § 24.5 |
| A.24 | Oliver Wyman report titled "Asset Quality Review and Bottom-Up Stress Test Exercise" dated 28 September 2012 | 3438 - 3533 | § 29 |
| A.25 | El País, "EU wants banks to refund all money earned from mortgage 'floor clauses'", October 27, 2015 | 3534 - 3537 | § 30 |

| A.26 | Spanish Royal Decree 1/2017 dated 20 January 2017 | 3538 - 3546 | § 32 |
| A.27 | Banco Popular Annual Report 2016 | 3547 - 4115 | § 32 |
| A.28 | Financial Times, "Emergency funds failed to save Banco Popular from death spiral", 8 June 2017 | 4116 - 4122 | § 35 |
| A.29 | Banco Popular Q1 2017 Financial Results | 4123 - 4170 | § 35 |
| A.30 | Moody's Rating Action Report, dated 21 April 2017 | 4171 - 4176 | § 36 |
| A.31 | El Economista, "Guindos asegura que no se va a inyectar dinero público en Banco Popular", 18 May 2017 | 4177 - 4180 | § 37 |
| A.32 | Loro Partners, LLC presentation "Returning Banco Popular to its Glory Days", dated February 2017 | 4181 - 4206 | §§ 41, 41.1, 41.1, 41.3, 41.4, 41.5 |
| A.33 | Explanations Relating to the Charter of Fundamental Rights (2007/C 303/02) | 4207 - 4226 | § 68 |
| A.34 | The European Ombudsman, "The European Code of Good Administrative Behaviour", 2005 | 4227 - 4251 | § 69.4 |
| A.35 | European Commission, Impact Assessment accompanying the document "Proposal for a Directive of the European Parliament and of the Council establishing establishing a framework for the recovery and resolution of credit institutions and investment firms and amending Council Directives 77/91/EEC and 82/891/EC, | 4252 - 4499 | §§ 72, 73, 74, 87, 103, 107, 114, 115, 127 |

| | | | |
|---|---|---|---|
| | Directives 2001/24/EC, 2002/47/EC, 2004/25/EC, 2005/56/EC, 2007/36/EC and 2011/35/EC and Regulation (EU) No 1093/2010" dated 6 June 2012 | | |
| A.36 | *Capital Bank AD v Bulgaria*, 49429/99, [2005] ECHR 752, (2007) 44 EHRR 48 | 4500 - 4541 | §§ 76, 77, 80, 105 |
| A.37 | *Ismeta Bačić v Croatia*, Application No. 43595/06 (19 June 2008) | 4542 - 4556 | § 76 |
| A.38 | *Beaumartin v France*, 15287/89, (1995) 19 EHRR 484 | 4557 - 4572 | § 81.2 |
| A.39 | *Družstevní Záložna Pria and others v Czech Republic*, Application No. 72034/01 (26 January 2009) | 4573 - 4599 | § 81.2 |
| A.40 | Segame S.A. v France, Application No. 4837/06 (7 June 2012) | 4600 - 4618 | § 81.2 |
| A.41 | *Klass v Germany* (1979-80) 2 EHRR 214 | 4619 - 4651 | § 81.4 |
| A.42 | Opinion of the European Central Bank of 6 November 2013 (2014/C 109/02) | 4652 - 4676 | § 85 |
| A.43 | *Bramelid and Malström v Sweden* (1983) 5 EHRR | 4677 - 4688 | § 101.1 |
| A.44 | *Sporrong and Lönroth v Sweden* (1982) 5 EHRR 35 | 4689 - 4734 | § 101.2 |

| A.45 | *James v United Kingdom* (1986) 8 EHRR 123 | 4735 - 4801 | § 101.5 |
| A.46 | *Draon v France* (2006) 42 EHRR 807 | 4802 - 4846 | § 101.5 |
| A.47 | Letter from Daniele Nouy to Dr Michael Meister MEP dated 20 July 2017 | 4847 - 4850 | § 119 |
| A.48 | Practicing Certificates for Pushpinder Saini QC; Jason Pobjoy and Richard Boynton | 4851 - 4854 | N/A |