# EXHIBIT 2

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

Javier H. Rubinstein, P.C.
To Call Writer Directly:
(312) 862-3220
javier.rubinstein@kirkland.com

300 North LaSalle
Chicago, IL 60654

(312) 862-2000

www.kirkland.com

Facsimile:
(312) 862-2200

22 January 2018



Sr. Mariano Rajoy Brey
Presidente del Gobierno
Gobierno de España
Complejo de La Moncloa
Avda. Puerta de Hierro s/n
28071 Madrid
España

Re: Banco Popular Español -- Notice of Dispute Pursuant to Agreement on
the Promotion and Reciprocal Protection of Investments Between
United Mexican States and the Kingdom of Spain

Dear President Rajoy,

We write in our capacity as the duly authorized representatives of a group of shareholders
and bondholders having made significant investments in Banco Popular Español, S.A. (**BPE**).[1]
We hereby notify you of an investment dispute under the Agreement on the Promotion and
Reciprocal Protection of Investments Between the United Mexican States and the Kingdom of
Spain signed on 10 October 2006 (the **Treaty**). This notification is made on behalf of a group of
Mexican BPE shareholders and bondholders, which include 44 nationals of Mexico and 10
companies organized under the laws of Mexico (together, the **BPE Investors**).[2]

Specifically, the BPE Investors include the following 44 nationals of Mexico:

1. Antonio del Valle Ruiz
2. Abraham Abadi Tawil

---

[1] We attach as **Appendix A** all proxy documents confirming our due authority to act on behalf of the disputing
investors.

[2] As of the date of dispatch of this letter, no agreement or contract exists among the BPE Investors governing their
investment in BPE or the present investment dispute against the Government of Spain.

## KIRKLAND & ELLIS LLP

President Mr. Rajoy Brey
22 January 2018
Page 2

| | |
|---|---|
| 3. | Antonio Cosío Ariño |
| 4. | Alejandra Pérez Mina |
| 5. | Alejandro Finkler Kudler |
| 6. | Alejandra Rojas Velasco |
| 7. | Alonso de Garay Gutiérrez |
| 8. | Antonio del Valle Perochena |
| 9. | Arantzazu del Valle Diharce |
| 10. | Arturo Grinberg Kreimerman |
| 11. | Carlos Ruiz Sacristán |
| 12. | David Troice Jalife |
| 13. | Divo Milan Haddad |
| 14. | Edmundo del Valle Diharce |
| 15. | Elías Abadi Cherem |
| 16. | Enrique Rojas Blasquez |
| 17. | Eugenio Santiago Clariond Reyes |
| 18. | Fernando Ramos González de Castilla |
| 19. | Francisco Javier del Valle Perochena |
| 20. | Gerardo Madrazo Gómez |
| 21. | Germán Larrea Mota Velasco |
| 22. | Georgina Rojas Velasco |
| 23. | Isabel Rojas Velasco |
| 24. | Jacobo Troice Jalife |
| 25. | Jaime Abadi Cherem |
| 26. | Jaime Ruiz Sacristán |
| 27. | Jorge Esteve Recolons |
| 28. | Jorge Rojas Mota Velasco |
| 29. | José Eduardo del Valle Diharce |
| 30. | José Manuel Fierro Von Mohr |
| 31. | José María Casanueva Y Llaguno |
| 32. | Juan Pablo del Valle Perochena |
| 33. | Julio Andrés Maza Casas |
| 34. | Luis de Garay Russ |
| 35. | Luis Francisco Suinaga Aguilar |
| 36. | María Blanca del Valle Perochena |
| 37. | María de Guadalupe del Valle Perochena |
| 38. | María Eugenia Velasco Fernández |

KIRKLAND & ELLIS LLP

President Mr. Rajoy Brey
22 January 2018
Page 3

| | |
|---|---|
| 39. | María Rojas Velasco |
| 40. | Pedro de Garay Montero |
| 41. | Raimundo Esteban Istilart Elizalde |
| 42. | Rogelio Barrenechea Cuenca |
| 43. | Sofía de Garay Montero |
| 44. | Xochitl de Guadalupe Montero Motta (Xochitl Montero De De Garay) |

The BPE Investors also include the following 10 companies organized under the laws of Mexico:

| | |
|---|---|
| 45. | BBVA Bancomer Servicios, S.A., Institución de Banca Múltiple, Grupo Financiero BBVA Bancomer, as trustee of Trust F/703850 |
| 46. | Consultores CGEK, S.C. |
| 47. | Fondo Administrado 5, S.A de C.V., Fondo de Inversión de Renta Variable |
| 48. | GBM Capital Bursátil, S.A. de C.V., Fondo de Inversión de Renta Variable |
| 49. | GBM Fondo de Inversión Total, S.A. de C.V., Fondo de Inversión de Renta Variable |
| 50. | GBM Global, S.A. de C.V., Fondo de Inversión de Renta Variable |
| 51. | Grupo Bursátil Mexicano, S.A. de C.V., Casa de Bolsa, as trustee of Trusts F/000138; F/000139; F/101; and F/100 |
| 52. | Grow Investments S.A. de C.V. |
| 53. | Hechos con Amor, S.A. de C.V. |
| 54. | Inmobiliaria Asturval, S.A. de C.V. |
| 55. | Simple Investments, S.A. de C.V. |

We attach as **Appendix B** the documents necessary to establish the identity of each of the investors listed above and as **Appendix C** a list of their addresses. In this regard, we emphasize the confidential nature of the documentation provided, which includes sensitive information such as passport numbers and other personal and corporate information. We request that this documentation be treated as confidential and we reserve all rights in the event that the Spanish Government shares such documentation with third parties.

### Background on the Dispute

The BPE Investors invested significantly in BPE, having acquired roughly 172,516,812 shares and 9,950,000 bonds prior to the present dispute.

## KIRKLAND & ELLIS LLP

President Mr. Rajoy Brey
22 January 2018
Page 4

Pursuant to the Treaty, Spain has guaranteed certain protections and standards of treatment to Mexican investors who have made investments in Spain. The measures taken by Spain with respect to the investments made by the BPE Investors, as described herein, constitute a breach of multiple guarantees and protections provided under the Treaty, including, but not limited to, the following:

- Spain's obligation pursuant to Article III of the Treaty to give investors "treatment that shall be no less favourable than that given in similar circumstances to the investments of its own investors or to the investments of investors of any third State, whichever is more favourable to the investor";

- Spain's obligation pursuant to Article IV of the Treaty to ensure "treatment in accordance with international customary law, including fair and equitable treatment, as well as full protection and security"; and

- Spain's obligation pursuant to Article V of the Treaty not to "directly or indirectly, expropriate or nationalize an investment through measures equivalent to expropriation or nationalization ("expropriation"), unless it is: (a) for reasons of public interest; (b) on a non-discriminatory basis; (c) in accordance with the rule of law; and (d) upon payment of indemnification...."

Spain has taken multiple measures that directly breach the guarantees and protections established in the Treaty, including, but not limited to, the following:

- The Spanish Government actively participated in the design and decision-making process that ultimately led to the European Commission's and the Single Resolution Board (**SRB**)'s decision to resolve BPE, dated 7 June 2017 (the **Resolution**), including, among other things, its role as a member of the Executive Committee of the SRB. As SRB Chair Elke König confirmed in a recent public hearing of the ECON Committee of the European Parliament, the Resolution was taken jointly by the SRB and the Spanish government: "the SRB, together with the Spanish national authorities, unanimously decided to take resolution action with respect to Banco Popular."[3] As set forth below, Spain's acts and omissions in connection with the

---

[3] **Exhibit 1,**Transcript of ECON - Committee meeting 4, December 201,7 at page 4.
(http://web.ep.streamovations.be/index.php/event/stream/171204-1500-committee-econ).

KIRKLAND & ELLIS LLP

President Mr. Rajoy Brey
22 January 2018
Page 5

> BPE Resolution — before, during and after the Resolution decision — violated the Treaty in multiple respects;

- To begin with, the Spanish government led the questionable and flawed process that resulted in the handover of BPE to Banco Santander, S.A. (**Santander**) for €1 — a process that commenced before any finding that BPE was "failing or likely to fail" and that significantly deviated from the Resolution Plan that was finalized by the Fondo de Reestructuración Ordenada Bancaria (**FROB**) and SRB in late 2016. Notably, BPE's Resolution Plan did *not* contemplate or provide for the use of the sale of business tool;

- On or about 4 June 2017, three days *before* any finding was made that BPE was "failing or likely to fail", the FROB launched "Project Hippocrates". As described by the FROB's advisors, Project Hippocrates was designed to facilitate the "eventual acquisition" of BPE, in apparent disregard of any private alternatives that could have averted the Resolution and the resulting significant damage to the BPE Investors.[4] On Tuesday, 6 June, the FROB issued a "Process Letter"[5] providing additional information regarding bidding requirements, along with a compressed transaction timetable that made it practically impossible for anyone other than Santander to present a bid by the stated deadline.[6] Aside from the data room that was opened on 5 June, the FROB stated that no additional information would necessarily be provided, including any information session: "FROB cannot guarantee that such a session will occur or that all questions raised will be answered." According to the Process Letter, bidders were required to submit a binding offer by no later than 24:00 CET on Tuesday, 6 June — the day after the data room was opened and the very same day that the Process Letter containing the

---

[4] **Exhibit 2**, Letter from Jefferies International International Limited and Arcano Asesores Financieros, S.L, as independent advisors of FROB, to Santander, 4 June 2017. On Sunday, 4 June, the FROB sent a communication to five selected banks, enclosing a confidentiality agreement that would enable those banks to "participate in an eventual acquisition [of BPE] within the framework of a potential resolution." Those who signed the confidentiality agreement were then to be given access to a virtual data room on Monday, 5 June.

[5] **Exhibit 3**, FROB Sale Process Letter, 6 June 2017.

[6] *See* **Exhibit 4**, "El beneficio de Santander aumentó un 10%, espoleado por Brasil", Expansión, 27 October 2017 ("Santander could do it because we had carried out a *due diligence* days [sic] 20 days beforehand. If not, it would have been impossible.")

## KIRKLAND & ELLIS LLP

President Mr. Rajoy Brey
22 January 2018
Page 6

bidding conditions was sent. The "selection of the winning bid" would then occur one hour after the deadline for submission of bids, at 1:00 am on Wednesday, 7 June. The "SRB's Resolution Scheme (if any)" would then be implemented by 5:30 am CET on 7 June and the Sale and Purchase Agreement would be executed by the same time. The closing and public announcement would then take place 90 minutes later, at 7:00 am on Wednesday, 7 June;

- While purporting to carry out a competitive bidding process for the purchase of BPE, Spain, in reality, carried out a fire sale of BPE through a sham auction that it conducted so as to ensure a pre-determined outcome with Santander as the only bidder. As noted above, the time frames set out by the FROB in its Process Letter of 6 June 2017 did not provide bidders other than Santander with sufficient time or information to enable them to submit a bid by the required deadline. Indeed, on the same day that the Process Letter was issued, BBVA wrote to the FROB complaining that the information they were provided was not sufficient to enable BBVA to submit a bid within the required timeframe:

> "In relation to the Hippocrates Project, I confirm that, given the limitations on price and the remaining conditions required in accordance with the process letter, as well as the insufficient information available, BBVA is not in a position to present an offer under the terms of that process letter and the purchase agreement (SPA) submitted today."[7]

BBVA also notably confirmed that, if it were given additional information and time, BBVA would be interested in participating in the bidding process:

> "Notwithstanding the foregoing, we also confirm that if sufficient information was available to allow its governing bodies to properly analyze the operation and the conditions, and if the conditions of the process could be modified, BBVA would be interested in participating in it."[8]

---

[7] **Exhibit 5**, Letter from BBVA, 6 June 2017 (partial version) (free translation from the original in Spanish).

[8] *Id.* (free translation from the original in Spanish).

KIRKLAND & ELLIS LLP

President Mr. Rajoy Brey
22 January 2018
Page 7

> BBVA's request for additional information and time was arbitrarily rejected by the FROB, predictably leaving Santander as the only "bidder" able to submit a bid within the constraints established by the FROB. As Santander's CEO Ana Botín explained on the day of the Resolution, "we were familiar with the bank's [BPE] data because we were shown that information in the previous process, and that allowed us to make an offer in a very short period of time."[9]

- Project Hippocrates also was carried out in a manner that all but ensured that the sale price would be far below BPE's fair market value. On 6 June 2017, the FROB wrote a letter to bidders setting out the following requirement as to the bid price: "Price must be an exact figure in Euros not a range and must be equal to or greater than one Euro (€1)."[10] With Santander left as the only bidder, "one Euro (€1)" is exactly what Santander offered — an amount far below BPE's fair market value and far less than the amount Santander and other banks had previously calculated as the value of BPE.[11] Nevertheless, on 7 June, the FROB quickly accepted Santander's 1 Euro offer and proposed to the SRB that Santander be declared the purchaser of Banco Popular: "the Governing Commission of the FROB … adopted unanimously the following agreement: to Propose BANCO SANTANDER, S.A. to the Single Resoolution Board as the successful bidder on the process of sale of BANCO POPULAR ESPAÑOL, S.A. shares, for the purpose of its designation as buyer in the resolution device of this entity";[12]

- In arranging and facilitating the sale of BPE, Spanish Government officials apparently engaged in secret, backdoor negotiations with BPE's rival bank Santander, even before the European Commission or the Single Resolution Board made any decision regarding the Resolution of BPE;

---

[9] **Exhibit 6**, "Guindos y Botín cerraron la compra de Banco Popular en el Club Bilderberg", El Economista, 8 June 2017 (http://www.eleconomista.es/banca-finanzas/noticias/8414603/06/17/Guindos-y-Botin-cerraron-la-venta-del-Popular-en-el-Club-Bilderberg.html) (free translation from the original in Spanish).

[10] **Exhibit 3**, FROB Sale Process Letter, 6 June 2017, page 4.

[11] *See* **Exhibit 7**,"El Popular era "inviable" y no podía atender ya la retirada de depósitos", El Independiente, 7 June 2017, page 2 (https://www.elindependiente.com/opinion/2017/06/07/popular-se-quedo-sin-dinero/) (the article mentions a previous offer from Santander for Banco Popular of €3 billion plus a €4 billion capital increase).

[12] **Exhibit 8**, Unanimous Decision of the FROB, 7 June 2017.

## KIRKLAND & ELLIS LLP

President Mr. Rajoy Brey
22 January 2018
Page 8

- Indeed, there are strong indications that Santander was aware it would be the pre-ordained "winner" of the Project Hippocrates process before the BPE Resolution was ordered by the SRB and FROB on 7 June 2017. For example, on or about 2 June 2017, a detailed "Action Plan" for a potential resolution was developed by Santander's long-standing outside counsel, Uría Menéndez.[13]  This Action Plan, prepared at least five days before the Resolution was ordered, contained detailed instructions for the new management team that would be taking over control of BPE as of "Day R" ["Día Resolución"]. The Action Plan included, among other things, detailed instructions regarding the removal of existing BPE management, precautionary measures to be taken against existing BPE management, and a detailed internal and external communications plan.[14] Santander also announced to the media on 6 June 2017, the day *before* the Resolution was announced and *before* acquisition proposals were even due to be submitted to the FROB, that Santander was launching a multi-billion Euro capital raise to facilitate its acquisition of BPE.[15]

---

[13]  **Exhibit 9**, "Santander remodela su asesoría jurídica", Expansión, 20 September 2012, page 1 (http://www.expansion.com/2012/09/19/juridico/1348088698.html). Indeed, Uría Menéndez has represented Santander in numerous occasions in the past, and has been representing Santander in all the administrative proceedings that have so far taken place with regard to BPE. *See* **Exhibit 10**, Santander SEC Registration Statement, 22 June 2017, Exhibit 5.1 ("Opinion and Consent of Uría Menendez Abogados, S.L.P., Spanish counsel to Banco Santander, S.A."); *see also* **Exhibit 11**, Capital Increase Dossier for Banco Santander, S.A., 13 December 2011; **Exhibit 12**, Admission for Negotiation of 1,213,592,234 Shares of Banco Popular, S.A., 13 January 2015; **Exhibit 13**, CIVIL JUDGMENT N° 232/2017, Court of the Province of Madrid, Section 13, Rec 864/2016, 19 May 2017 (https://www.iberley.es/jurisprudencia/sentencia-civil-n-232-2017-ap-madrid-sec-13-rec-864-2016-19-05-2017-47770992). In all these proceedings and transactions, Uría Menéndez has been leading counsel of Santander.

[14]  **Exhibit 14**, Memorandum from Uría Menéndez Titled "Day R Action Plan", 2 June 2017.  It is also notable that as the "Day R Action Plan" was being finalized, on 2 June 2017, Santander's CEO, Ana Botín, also met with the Spanish Minister of Economy, Luis de Guindos, at the meeting of the Club Bilderberg in Chantilly, Virginia. *See* **Exhibit 15**, Bilderberg Meeting Participants (http://www.bilderbergmeetings.org/participants.html), *and* **Exhibit 6**, "Guindos y Botín cerraron la compra de Banco Popular en el Club Bilderberg", El Economista, 8 June 2017 (http://www.eleconomista.es/banca-finanzas/noticias/8414603/06/17/Guindos-y-Botin-cerraron-la-venta-del-Popular-en-el-Club-Bilderberg.html).

[15]  **Exhibits 16**, "Santander estudia ampliar capital en 5.000 millones para comprar Popular", Expansión, 7 June 2017 (http://www.expansion.com/empresas/banca/2017/06/06/5936e857ca4741a2628b4697.html); **Exhibit 17**, "Santander planea una ampliación de capital de 5.000 millones para la compra del Popular", El Economista, 6 June 2017 (http://www.eleconomista.es/banca-finanzas/noticias/8411500/06/17/Santander-planea-una-ampliacion-de-capital-de-5000-millones-para-la-compra-del-Popular.html).

## KIRKLAND & ELLIS LLP

President Mr. Rajoy Brey
22 January 2018
Page 9

> And within only hours of the Resolution's announcement, Santander immediately replaced BPE's management team and Board of Directors, strongly suggesting that Santander was already prepared to implement its pre-arranged acquisition plan;

- In implementing the Resolution, the Spanish Government acted in a manner that breached the Treaty in multiple respects, including: (1) its failure to provide the BPE Investors with any notice or opportunity to be heard before the implementation of the Resolution, completely depriving the BPE Investors of their investments; (2) its failure to act transparently before implementing the Resolution, including its ongoing refusal to disclose the full content of its Resolution decision and the underlying factual and legal basis of its decision; and (3) its arbitrary implementation of the Resolution decision in violation and disregard of international law protecting the rights of foreign investors, including due process requirements of notice and the right to be heard before a deprivation of property;

- The Spanish Government arbitrarily failed to consider alternative private sector solutions that would have obviated the Resolution, including alternative plans to enhance BPE's capital position and its liquidity position. To begin with, the BPE Investors communicated to Banco de España their intention to invest €1 billion as part of a substantial capital increase. Likewise, in a 3 June 2017 letter to BPE, Barclays confirmed its willingness to participate in the proposed capital raise, while also expressing its view that "Popular is a solid franchise" and that, following the capital raise, "Popular has the potential to deliver return on equity levels that would be attractive to new investors."[16] Similarly, on 5 June 2017, Deutsche Bank also wrote a letter of support to BPE expressing its interest in securing 50% of the possible €4 billion capital raise under specified conditions, and its view that the capital raise "could be accomplished to stabilize the bank."[17] Pacific Investment Management Company (**PIMCO**), one of the largest managers of fixed income in the world, also expressed its commitment to provide up to €300 million in the

---

[16] **Exhibit 18,** Letter from Barclays to BPE, 3 June 2017.

[17] **Exhibit 19,** Letter from Deutsche Bank to BPE, 5 June 2017 (free translation from the original in Spanish)

# KIRKLAND & ELLIS LLP

President Mr. Rajoy Brey
22 January 2018
Page 10

capital raise.[18]  Additionally, a number of current and new prospective investors in BPE had also confirmed their interest in participating in such a capital increase. Among them, for example, was Chilean investor Andrónico Luksic, who, together with Mr. Antonio del Valle, the days prior to the Resolution, had actively met with investment banks that would have backed BPE's capital increase.  Having instead decided to proceed with its sale of BPE through Project Hippocrates, Spain never provided the BPE Investors or other investors the opportunity to implement these or other alternative measures that would have averted a Resolution of BPE and thereby protected their investments in BPE;

- The Spanish Government took active measures that damaged the financial condition of BPE prior to its Resolution that effectively destroyed the BPE Investors' investments, including: (1) its abrupt and unprecedented withdrawal of billions of Euros from BPE through multiple Spanish Government entities and institutions; and (2) its unprecedented public announcements that harmed the reputation of BPE and, predictably, caused a sudden increase in withdrawals of deposits.  Between December 2015 and December 2016, the Spanish Government withdrew roughly 40% of the deposits it held in BPE.[19]  These withdrawals concerned the BPE Board of Directors, which noted in a subsequent board meeting, in March 2017, that "the worsening of the liquidity situation" was "attributed principally to the withdrawal of $4 billion by the Treasury, issues of reputational perception and rating downgrade."[20]  Thereafter, on 18 May 2017, the Minister of Economy Luis de Guindos publicly announced that Spain would not "inject public resources" into BPE.  The Spanish Government's actions continued to damage the liquidity situation of BPE with huge deposit withdrawals in days and weeks leading up to the Resolution.  During the first week of June alone, at the most critital time

---

[18] **Exhibit 20**, "El rescate que no salvó al Popular", El Mundo, 11 December 2017 (http://www.elmundo.es/economia/2017/12/11/5a2d677aca4741706a8b45d0.html).

[19] **Exhibit 21**, Quarterly Report, Q4 2016, page. 17 (line 2 for "general government" deposits reflects a decline from €10 billion to €6 billion between December 2015 and December 2016).

[20] **Exhibit 22**, Minutes of the Board of Directors, 7 March 2017, page. 10 ("Mr. Antonio González-Adalid comments on the worsening of the liquidity situation examined in the last Risk Committe Session, explaining its main causes, attributed principally to the reduction of $4 billion by the Treasury, issues of reputational perception and rating downgrade.")     (free     translation     from     the     original     in     Spanish).

## KIRKLAND & ELLIS LLP

President Mr. Rajoy Brey
22 January 2018
Page 11

when the Spanish Government should have been taking steps to calm investors and stop the run on the bank, Spanish government agencies withdrew over €2.9 billion in deposits.[21] These acts unsurprisingly caused depositors to panic in response to the lack of Government confidence and significantly impaired BPE's liquidity position, the very circumstance that the FROB then utilized as the basis to justify the Resolution decision;

- In contrast to its response to other Spanish banks that were experiencing financial difficulties, and even though it had BPE under supervision for months, the Spanish Government arbitrarily refused, or failed to take measures to stabilize, BPE's liquidity position. The available measures would have included (1) granting BPE's request for Emergency Liquidity Assistance (**ELA**) for the full €9.5 billion requested (instead, it granted only the insufficient amount of €3.5 billion); (2) banning short sales; or (3) making statements designed to restore public confidence. As early as November 2016, BPE asked the Government for such regulatory assistance, but the Government failed to provide any support.[22] By contrast, the Spanish government has taken such stabilizing measures with regard to other Spanish banks before and even after the BPE Resolution. The Spanish Government's arbitrary failure to take any stabilization measures with respect to BPE violated the legitimate expectations of the BPE Investors. Had the Spanish government implemented these stabilization measures, the Resolution would not have taken place;

- The Spanish Government's refusal to provide BPE with the ELA that it requested was arbitrary and baseless. On or about 1 June 2017, the Banco de España granted BPE's request for ELA in the amount of approximately €3.5 billion. However, four days later, in the midst of the dramatic escalation of the bank run, the Banco de España denied BPE's additional ELA request of €6 billion, purportedly based on a lack of sufficient collateral, even though BPE reportedly had more than sufficient

---

[21] *See* **Exhibit 23**, "Los 68 clientes del Popular que huyeron a tiempo", El Mundo, 31 December 2017 (http://www.elmundo.es/economia/2017/12/31/5a47c3fcca4741f6738b460c.html).

[22] **Exhibit 24**, "CCOO presiona a la CNMV y el Banco de España para evitar los "ataques especulativos" al Popular", Crónica, 30 November 2016 (https://cronicaglobal.elespanol.com/business/banco-popular-ccoo-presiona-cnmv-banco-espana-evitar-ataques-especulativos_64190_102.html).

## KIRKLAND & ELLIS LLP

President Mr. Rajoy Brey
22 January 2018
Page 12

collateral to cover the full ELA request.[23] Had BPE's additional €6 billion ELA request been granted, BPE would have been able to withstand the run on the bank; there also would have been sufficient time to implement the capital increase and/or to give BBVA (and possibly other banks) the time that they needed to present a proposal to acquire BPE on a fair market value basis. Due to the Spanish government's arbitrary conduct, none of that was allowed to happen.

• The Spanish Government has at all times acted arbitrarily and without transparency, including its refusal to provide the documentation that it allegedly relied upon in taking each of the measures described above and the opaque process that led to the handover of BPE to Santander, all of which have deprived the BPE Investors of their investments and their rights;

• The cancelation of the the BPE Investors' shares in BPE, and their sale to Santander for the price of €1, completedly deprived them of their investments in BPE. As such, the BPE Investors' investments were unlawfully expropriated in violation of the Treaty because, among other things, they were provided no compensation whatsoever for the deprivation of their property interests in such investments, were afforded no due process whatsoever prior to the deprivation of their investments, and the expropriation of their investments was not for a public purpose, but rather only served to benefit Santander;

• For all of the reasons stated above, as well as others, Spain failed to provide the BPE Investors a stable and predictable legal and regulatory environment for their investments in BPE.

The Spanish Government's unlawful actions have resulted in a complete loss of the value of the BPE Investors' investment. The BPE Investors invested over €470 million in BPE over the course of more than three years, and their entire investment has been wiped out.

---

[23] *See* **Exhibit 25**, "Saracho pidió ayuda pública para el Popular pese a su exceso de liquidez", ABC, 8 January 2018. http://www.abc.es/economia/abci-saracho-pidio-ayuda-publica-para-popular-pese-exceso-liquidez-201801080221_noticia.html; **Exhibit 26**, "El Banco Popular pidió ya ayuda de emergencia al Banco de España dos meses antes de su debacle", El Mundo, 2 January 2018, (http://www.elmundo.es/economia/2018/01/02/5a4a203ce5fdea2e4d8b45e6.html).

# KIRKLAND & ELLIS LLP

President Mr. Rajoy Brey
22 January 2018
Page 13

Article IX of the Treaty provides that any dispute between a state party to the Treaty and an investor from the other state party relating to investments covered by the Treaty should, if possible, be resolved by amicable negotiation. In the event that the dispute is not resolved within six months from the time one party notifies the other of its existence, the investor may submit the dispute to international arbitration.

Consequently, the BPE Investors hereby notify Spain of the start of the period of amicable negotiations provided for in Article IX of the Treaty, and of their right to commence international arbitration against Spain in the event that the dispute is not amicably resolved through negotiation within the above-mentioned timeframe, which runs as of the date of delivery of this letter of intent.

Nothing in this letter should be considered a limitation of any kind on the issues of fact or law which the BPE Investors may invoke before an international arbitral tribunal. Given that Spain continues to refuse to share critical information regarding the Resolution, the BPE Investors fully reserve their rights to rely upon any information that may be made available to them in the future and to challenge other unlawful Spanish Government's conduct as evidence becomes available. This letter is being submitted in both English and Spanish. Both versions are equally valid. However, should there be any disagreement regarding the interpretation of this letter, the English version of the letter shall govern.

The BPE Investors reserve all of their rights under international law with regard to all of the above actions and measures. Subject always to such representation, the BPE Investors remain available to hold discussions with the Spanish Government in order to reach an amicable solution involving prompt and adequate compensation for the destruction of their investment in BPE. The following representatives are duly authorized to engage on behalf of the BPE Investors in such consultations and negotiations with Spanish Government representatives, with a view to establishing a constructive dialogue that would enable this matter to be resolved in an amicable manner.

Javier H. Rubinstein
Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL 60654
(312) 862-3220
javier.rubinstein@kirkland.com

### KIRKLAND & ELLIS LLP

President Mr. Rajoy Brey
22 January 2018
Page 14

     Lauren Friedman
     Kirkland & Ellis LLP
     601 Lexington Avenue
     New York, NY 10022
     +1-212-446-4958
     lauren.friedman@kirkland.com

     Lucila I. M. Hemmingsen
     Kirkland & Ellis LLP
     601 Lexington Avenue
     New York, NY 10022
     +1-212-446-5925
     lucila.hemmingsen@kirkland.com

The BPE Investors will ensure that one or more of such representatives are fully available to meet with the Government of Spain at a mutually convenient time and place.

## KIRKLAND & ELLIS LLP

President Mr. Rajoy Brey
22 January 2018
Page 13

Very truly yours,

KIRKLAND & ELLIS LLP

By: _____
Javier H. Rubinstein

Enclosures

## KIRKLAND & ELLIS LLP
### AND AFFILIATED PARTNERSHIPS

Javier H. Rubinstein, P.C.
Línea Directa:
(312) 862-3220
javier.rubinstein@kirkland.com

300 North LaSalle
Chicago, IL 60654

(312) 862-2000

www.kirkland.com

Facsímil:
(312) 862-2200

22 de enero de 2018



Don Mariano Rajoy Brey
Presidente del Gobierno
Gobierno de España
Complejo de La Moncloa
Avda. Puerta de Hierro s/n
28071 Madrid
España

Re: Banco Popular Español – Aviso de Intención en virtud del Acuerdo para la Promoción y Protección Recíproca de Inversiones entre los Estados Unidos Mexicanos y el Reino de España

Estimado Presidente Rajoy:

Nos dirigimos a Ud. en calidad de representantes debidamente autorizados de un grupo de accionistas y tenedores de bonos que han llevado a cabo importantes inversiones en Banco Popular Español, S.A. (**BPE**)[1]. Por la presente le notificamos una controversia en materia de inversión en el marco del Acuerdo para la Promoción y Protección Recíproca de Inversiones entre los Estados Unidos Mexicanos y el Reino de España suscrito el 10 de octubre de 2006 (el **Tratado**). Este aviso se presenta en nombre de un grupo de accionistas y tenedores de bonos Mexicanos de BPE, entre los cuales se encuentran 44 ciudadanos de México y 10 sociedades constituidas bajo el Derecho de México (conjuntamente, los **Inversores de BPE**)[2].

En concreto, los Inversores de BPE incluyen los siguientes 44 ciudadanos de México:

1. Antonio del Valle Ruiz
2. Abraham Abadi Tawil
3. Antonio Cosío Ariño
4. Alejandra Pérez Mina

---

[1] Adjuntamos como **Apéndice A** todos los poderes que otorgan la debida autorización para actuar en representación de cada uno de los inversores en la controversia.

[2] A la fecha de presentación de esta carta no existe un convenio o acuerdo entre los Inversores de BPE que regule su participación en la inversión en BPE ni en la controversia en materia de inversión con el Gobierno Español referida en la presente.

## KIRKLAND & ELLIS LLP

Presidente Rajoy Brey
22 de enero 2018
Página 2

| | |
|---|---|
| 5. | Alejandro Finkler Kudler |
| 6. | Alejandra Rojas Velasco |
| 7. | Alonso de Garay Gutiérrez |
| 8. | Antonio del Valle Perochena |
| 9. | Arantzazu del Valle Diharce |
| 10. | Arturo Grinberg Kreimerman |
| 11. | Carlos Ruiz Sacristán |
| 12. | David Troice Jalife |
| 13. | Divo Milan Haddad |
| 14. | Edmundo del Valle Diharce |
| 15. | Elías Abadi Cherem |
| 16. | Enrique Rojas Blasquez |
| 17. | Eugenio Santiago Clariond Reyes |
| 18. | Fernando Ramos González de Castilla |
| 19. | Francisco Javier del Valle Perochena |
| 20. | Gerardo Madrazo Gómez |
| 21. | Germán Larrea Mota Velasco |
| 22. | Georgina Rojas Velasco |
| 23. | Isabel Rojas Velasco |
| 24. | Jacobo Troice Jalife |
| 25. | Jaime Abadi Cherem |
| 26. | Jaime Ruiz Sacristán |
| 27. | Jorge Esteve Recolons |
| 28. | Jorge Rojas Mota Velasco |
| 29. | José Eduardo del Valle Diharce |
| 30. | José Manuel Fierro Von Mohr |
| 31. | José María Casanueva Y Llaguno |
| 32. | Juan Pablo del Valle Perochena |
| 33. | Julio Andrés Maza Casas |
| 34. | Luis de Garay Russ |
| 35. | Luis Francisco Suinaga Aguilar |
| 36. | María Blanca del Valle Perochena |
| 37. | María de Guadalupe del Valle Perochena |
| 38. | María Eugenia Velasco Fernández |
| 39. | María Rojas Velasco |
| 40. | Pedro de Garay Montero |
| 41. | Raimundo Esteban Istilart Elizalde |
| 42. | Rogelio Barrenechea Cuenca |
| 43. | Sofía de Garay Montero |
| 44. | Xochitl de Guadalupe Montero Motta (Xochitl Montero De De Garay) |

También figuran las siguientes 10 sociedades constituidas bajo Derecho de México:

KIRKLAND & ELLIS LLP

Presidente Rajoy Brey
22 de enero 2018
Página 3

45.    BBVA Bancomer Servicios, S.A., Institución de Banca Múltiple, Grupo Financiero
       BBVA Bancomer como fiduciario en el Fideicomiso F/703850
46.    Consultores CGEK, S.C.
47.    Fondo Administrado 5, S.A de C.V., Fondo de Inversión de Renta Variable
48.    GBM Capital Bursátil, S.A. de C.V., Fondo de Inversión de Renta Variable
49.    GBM Fondo de Inversión Total, S.A. de C.V., Fondo de Inversión de Renta
       Variable
50.    GBM Global, S.A. de C.V., Fondo de Inversión de Renta Variable
51.    Grupo Bursátil Mexicano, S.A. de C.V., Casa de Bolsa como fiduciario en los
       Fideicomisos F/000138, F/000139, F/000101, y F/100
52.    Grow Investments, S.A. de C.V.
53.    Hechos con Amor, S.A. de C.V.
54.    Inmobiliaria Asturval, S.A. de C.V.
55.    Simple Investments, S.A. de C.V.

Adjuntamos como **Apéndice B** los documentos necesarios para establecer la identidad de cada uno de los inversores anteriormente referenciados, y como **Apéndice C** una lista de sus direcciones. En este sentido, enfatizamos el carácter confidencial de los documentos provistos, los que incluyen información y datos sensibles como números de pasaporte, de identidad, datos de constitución de sociedades, y otros. Por esta razón, solicitamos que dichos documentos sean tratados como confidenciales y nos reservamos todos los derechos en caso que el Gobierno de España comparta dichos documentos o datos con terceras partes.

**Trasfondo de la Controversia**

Los Inversores de BPE llevaron a cabo importantes inversiones en BPE, habiendo adquirido aproximadamente 172.516.812 acciones y 9.950.000 bonos con anterioridad a la presente controversia.

De conformidad con el Tratado, España garantizó determinadas protecciones y estándares de trato a aquellos inversores mexicanos que realizaran inversiones en España. Las medidas adoptadas por España en relación con las inversiones llevadas a cabo por los Inversores de BPE, tal y como se describen en la presente, suponen un incumplimiento de múltiples garantías y medidas de protección otorgadas bajo el Tratado, que incluyen, con carácter no excluyente, las siguientes:

- La obligación de España conforme al Artículo III del Tratado de otorgar a los inversores "un tratamiento que no será menos favorable que el otorgado, en circunstancias similares, a las inversiones de sus propios inversores o a las inversiones de inversores de cualquier tercer Estado, el que sea más favorable al inversor ";

## KIRKLAND & ELLIS LLP

Presidente Rajoy Brey
22 de enero 2018
Página 4

- La obligación de España conforme al Artículo IV del Tratado de garantizar un
  "trato acorde con el derecho internacional consuetudinario, incluído trato justo y
  equitativo, así como protección y seguridad plenas"; y

- La obligación de España conforme al Artículo V del Tratado de no "expropiar[] o
  nacionalizar[] una inversión, directa o indirectamente a través de medidas
  equivalentes a expropiación o nacionalización ("expropiación"), salvo que se: (a)
  por causa de utilidad pública; (b) sobre bases no discriminatorias; (c) conforme al
  principio de legalidad; y (d) mediante el pago de una indemnización …".

España ha adoptado una serie de medidas que incumplen de manera directa las garantías y
protecciones establecidas en el Tratado que incluyen, con carácter no excluyente, las siguientes:

- El Gobierno español participó de manera activa en el proceso de elaboración y toma
  de decisiones que finalmente condujo a la decisión de fecha 7 de junio de 2017 de
  la Comisión Europea y de la Junta Única de Resolución (**JUR**) por la que se aprobó
  la resolución de BPE (la **Resolución**), incluso en su papel como miembro del
  Comité Ejecutivo de la JUR. Tal como confirmó la Presidenta de la JUR Elke König
  en una audiencia pública del Comité ECON del Parlamento Europeo, la Resolución
  se adoptó de forma conjunta por la JUR y el Gobierno español: "la JUR, junto con
  las autoridades nacionales españolas, de forma unánime, decidieron llevar a cabo
  una acción de resolución con respecto a Banco Popular"[3]. Tal y como se explica a
  continuación, la conducta y pasividad de España con respecto a la Resolución de
  BPE — antes, durante y después de la Resolución — vulneró el Tratado en muchos
  aspectos;

- En primer lugar, el Gobierno de España lideró el cuestionable y deficiente proceso
  que resultó en la entrega de BPE a Banco Santander S.A. (**Santander**) por 1€ —
  un proceso que comenzó antes de que se decidiese que BPE "estaba en graves
  dificultades o existía la probabilidad de que fuera a estarlo" y que se desviaba de
  forma significativa del plan de Resolución adoptado por el Fondo de
  Reestructuración Ordenada Bancaria (**FROB**) y la JUR a finales de 2016 (el **Plan
  de Resolución de BPE**). Ha de destacarse que el Plan de Resolución de BPE *no*
  contemplaba o disponía el mecanismo de la venta como herramienta financiera;

- Alrededor del 4 de junio de 2017, tres días *antes* de que se decidiese que BPE
  "estaba en graves dificultades o existía la probabilidad de que fuera a estarlo", el
  FROB puso en marcha el "Proyecto Hippocrates". Tal y como ha sido descrito por
  los asesores del FROB, el Proyecto Hippocrates se diseñó para facilitar la "eventual

---

[3] **Documento 1**, Transcripción Certificada del ECON - Reunión de Comité, 4 de diciembre de 2017, página 4
(http://web.ep.streamovations.be/index.php/event/stream/171204-1500-committee-econ).

## KIRKLAND & ELLIS LLP

Presidente Rajoy Brey
22 de enero 2018
Página 5

adquisición" de BPE, ignorando por completo cualquier alternativa privada que podría haber evitado la Resolución y el consecuente daño significativo para los Inversores de BPE[4]. El martes 6 de junio, el FROB emitió una "Carta de Proceso"[5] que proporcionaba información adicional sobre los requisitos de licitación, junto con un condensado cronograma de operaciones que hacía prácticamente imposible que alguien que no fuese Santander pudiese presentarse a la licitación dentro de la fecha límite para hacerlo[6]. Más allá de la información contenida en la plataforma electrónica, cuyo acceso se otorgó el 5 de junio, el FROB indicó que no se proporcionaría necesariamente ninguna información adicional, inclusive alguna sesión informativa: "El FROB no puede garantizar que se realice una sesión de ese tipo o que se respondan todas las preguntas planteadas". De conformidad con la Carta de Proceso, los licitadores debían presentar una oferta vinculante antes de las 24:00 horas CET del martes 6 de junio, el día posterior a la apertura de la plataforma electrónica y el mismo día en que se envió la Carta de Proceso que contenía las condiciones de la licitación. La "selección de la oferta ganadora" se realizaría una hora después de la hora límite para la presentación de las ofertas, a la 1:00 de la mañana del miércoles 7 de junio. El "Esquema de Resolución de la JUR (de existir)" se pondría en marcha antes de las 5:30 de la mañana CET del 7 de junio y el Acuerdo de Compraventa se ejecutaría al mismo tiempo. El cierre y el anuncio público tendría lugar 90 minutos después, a las 7:00 de la mañana del miércoles, 7 de junio;

- Aunque pretendía hacerse parecer como un proceso competitivo de licitación para la compra de BPE, España, en realidad, realizó una venta fugaz de BPE a través de un proceso de subasta "a modo", que dirigió con el fin de asegurar el resultado predeterminado de dejar a Santander como el único licitador. Tal y como se ha indicado anteriormente, los plazos fijados por el FROB en su Carta de Proceso de 6 de junio de 2017, no otorgaban a licitadores que no fuesen Santander ni tiempo ni información suficiente que les permitiese presentar una oferta dentro del plazo límite establecido. De hecho, el mismo día que la Carta de Proceso fue emitida, BBVA escribió al FROB manifestando quejas con respecto al hecho de que la

---

[4] **Documento 2**, Carta de Jefferies International Limited y Arcano Asesores Financieros, S.L., como asesores independientes del FROB, a Santander, 4 de junio de 2017. El domingo 4 de junio, el FROB envió una comunicación a cinco bancos seleccionados, adjuntando un acuerdo de confidencialidad que permitiría a esos bancos "participar en una eventual adquisición [de BPE] dentro del marco de una posible resolución". A aquellos que firmasen el acuerdo de confidencialidad se les daría acceso a un plataforma electrónica de datos el lunes 5 de junio.

[5] **Documento 3**, Carta de Proceso del FROB, 6 de junio de 2017.

[6] *Ver* **Documento 4**, "El beneficio de Santander aumentó un 10%, espoleado por Brasil", Expansión, 27 de octubre de 2017 ("Santander pudo hacerlo porque habíamos hecho una *due dilligence* días [sic] 20 días atrás. Si no, habría sido imposible").

## KIRKLAND & ELLIS LLP

Presidente Rajoy Brey
22 de enero 2018
Página 6

información que se les proporcionó no fue suficiente para permitir a BBVA presentar una oferta de licitación dentro del plazo límite establecido:

> "En relación con el proyecto confidencial Hippocrates, les confirmo que, habida cuenta de las limitaciones de precio y las restantes condiciones impuestas en la carta de proceso (*process letter*), así como la insuficiente información disponible, BBVA no está en disposición [sic] de presentar una oferta en los términos de esa carta de proceso y del contrato de compraventa (*SPA*) remitidos en el día de hoy"[7].

Es destacable que BBVA también confirmaba que, si se le hubiese dado información y tiempo adicional, habría estado interesado en participar en el proceso de licitación:

> "No obstante lo anterior, igualmente les confirmamos que si se dispusiera de información suficiente que permita a sus órganos de gobierno analizar debidamente la operación y se pudieran modificar las condiciones del proceso, BBVA sí estaría interesado en participar en el mismo"[8].

La solicitud de información y tiempo adicional de BBVA fue rechazada de forma arbitraria por el FROB, dejando, de forma previsible, a Santander como el único "licitador" capaz de presentar una oferta de licitación en cumplimiento con las constreñidas condiciones establecidas por el FROB. Tal y como explicó la Presidenta del Santander, Ana Botín, el día de la Resolución, "[c]onocíamos los datos del Popular porque nos los habían mostrado en el proceso anterior, [...] lo que posibilitó que pudiéramos formular una propuesta tan rápida"[9];

- El Proyecto Hippocrates también se llevó a cabo de una forma que aseguraba que el precio de venta de BPE estuviese muy por debajo del valor justo de mercado. El 6 de junio de 2017, el FROB remitió una carta a los licitadores estableciendo los requisitos con respecto al precio de licitación: "el precio debe ser una cantidad exacta en Euros, no un rango, y debe ser igual o mayor a un Euro (€1)"[10]. Puesto que Santander había quedado como único licitador disponible, "un Euro (€1)" fue

---

[7] **Documento 5**, Carta de BBVA, 6 de junio de 2017 (versión parcial).

[8] *Ibid.*

[9] **Documento 6**, "Guindos y Botín cerraron la compra de Banco Popular en el Club Bilderberg", El Economista, 8 de junio de 2017 (http://www.eleconomista.es/banca-finanzas/noticias/8414603/06/17/Guindos-y-Botin-cerraron-la-venta-del-Popular-en-el-Club-Bilderberg.html).

[10] **Documento 3**, Carta de Proceso del FROB, 6 de junio de 2017, página 4.

# KIRKLAND & ELLIS LLP

Presidente Rajoy Brey
22 de enero 2018
Página 7

exactamente lo que Santander ofreció — cantidad muy por debajo del valor justo de mercado de BPE y muy por debajo del valor que Santander y otros bancos habían calculado previamente como valor de BPE[11]. No obstante lo anterior, el 7 de junio, el FROB rápidamente aceptó la oferta de 1 Euro de Santander y propuso a la JUR que Santander fuese declarado como el comprador de Banco Popular: "la Comisión Rectora del FROB … adoptó por unanimidad el siguiente acuerdo: [p]roponer a […] BANCO SANTANDER, S.A., como adjudicatario del proceso de venta de las acciones de BANCO POPULAR ESPAÑOL, S.A., a los efectos de su designación como comprador en el dispositivo de resolución de esta entidad"[12];

- Con el fin de acordar y proponer la venta de BPE, los funcionarios del Gobierno español, presuntamente, tuvieron negociaciones secretas paralelas con el Santander, uno de los competidores directos de BPE, a la hora de tramitar y facilitar la venta de BPE, incluso antes de que la Comisión Europea o la Junta Única de Resolución tomasen ninguna decisión en relación a la Resolución de BPE;

- En efecto, existen claros indicios de que Santander estaba al tanto de que sería el "ganador" predeterminado del Proyecto Hippocrates antes de que la JUR y el FROB ordenasen la Resolución de BPE el 7 de junio de 2017. Por ejemplo, alrededor del 2 de junio de 2017, el que ha sido de antaño asesor jurídico de Santander, Uría Menéndez[13], desarrolló un "Plan de Acción" detallado para una potencial resolución. Este plan de acción, preparado al menos cinco días antes de que se ordenase la resolución de BPE, contenía instrucciones detalladas con respecto al nuevo equipo de gestión que tomaría el control de BPE a partir del "Día R" [Día Resolución]. El Plan de Acción incluía, entre otros aspectos, medidas de

---

[11] *Véase* **Documento 7**, "El Popular era "inviable" y no podía atender ya la retirada de depósitos", El Independiente, 7 de junio de 2017, página 2 (https://www.elindependiente.com/opinion/2017/06/07/popular-se-quedo-sin-dinero/ ) (el artículo menciona una oferta previa de Santander a BPE de €3 mil millones más €4 mil millones de aumento de capital).

[12] **Documento 8**, Decisión del FROB, 7 de junio de 2017.

[13] **Documento 9**, "Santander remodela su asesoría jurídica", Expansión, 20 de septiembre de 2012, página 1 (http://www.expansion.com/2012/09/19/juridico/1348088698.html). En efecto, Uría Menéndez ha representado a Santander en múltiples ocasiones en el pasado, y actualmente representa a Santander en los procedimientos contenciosos-administrativos relacionados con la venta de BPE. *Véanse* **Documento 10**, Declaración de Registro ante la SEC de Santander, 22 de junio de 2017, Anexo 5.1 ("Opinión y Consentimiento de Uría Menendez Abogados, S.L.P., abogados españoles de Banco Santander, S.A."); *véase también* **Documento 11**, Folleto Ampliación de Capital de Banco Santander, S.A. , 13 de diciembre de 2011; **Documento 12**, Admisión a Negociación de Acciones en Virtud del Aumento de Capital de Banco Santander, 13 de enero de 2015; **Documento 13**, Sentencia CIVIL N° 232/2017, Audiencia Provincial de Madrid, Sección 13, Rec 864/2016 de 19 de mayo de 2017 (https://www.iberley.es/jurisprudencia/sentencia-civil-n-232-2017-ap-madrid-sec-13-rec-864-2016-19-05-2017-47770992). En todos estos procedimientos y operaciones, Uría Menéndez aparece como representante de Santander.

### KIRKLAND & ELLIS LLP

Presidente Rajoy Brey
22 de enero 2018
Página 8

precaución a adoptar respecto del equipo de gestión de BPE ya existente, y un plan de comunicaciones internas y externas detallado[14]. El 6 de Junio de 2017, el día *anterior* al anuncio de la Resolución y *anterior* a que venciese el plazo para presentar ante el FROB las propuestas de adquisición, el Santander estaba realizando una ampliación de capital multimillonaria, para facilitar la adquisición de BPE[15]. Y tan sólo unas horas después del anuncio de Resolución, Santander, de manera inmediata, sustituyó el equipo de gestión y al Consejo de Administración de BPE, lo cual implica de manera clara que Santander ya estaba preparado para poner en marcha su plan de adquisición previamente acordado;

- Al implementar la Resolución, el Gobierno español actuó de forma que vulneró el Tratado de varias maneras, entre las que se incluyen: (1) el incumplimiento de la obligación de proporcionar a los inversores de BPE la posibilidad de ser escuchados antes de ejecutar la Resolución, privando por completo a los Inversores de BPE de sus inversiones; (2) el incumplimiento de la obligación de actuar de manera transparente previo a adoptar la Resolución, lo que incluye la continua denegación de información sobre todo el contenido de la decisión de Resolución así como sobre la fundamentación fáctica y jurídica de dicha decisión; y (3) la arbitraria puesta en marcha de la decisión de Resolución infringiendo y menospreciando de esta manera el derecho internacional que protege los derechos de los inversores extranjeros, incluyendo el derecho a un debido proceso con todas las garantías en relación con el deber de notificación y el derecho a ser escuchado antes de ser sometido a una privación de su propiedad;

- El Gobierno español, arbitrariamente, no tomó en consideración otras soluciones alternativas del sector privado que habrían evitado la Resolución; asimismo, tampoco tuvo en cuenta los planes alternativos que habrían mejorado la situación patrimonial y la liquidez de BPE. En primer lugar, los Inversores de BPE ya habían manifestado al Banco de España su intención de invertir mil millones de Euros como parte de una ampliación significativa de capital. De igual manera, en una

---

[14] **Documento 14**, Memorándum de Uría Menéndez titulado "Día 'R', Protocolo de Actuación", 2 de junio de 2017. También es destacable que, mientras que el "Plan de Acción del Día R" se estaba terminando, el 2 de junio de 2017, la Presidenta de Santander, Ana Botín, se reunió con el Ministro de Economía de España, Luis de Guindos, en la Reunión del Club Bilderberg en Chantilly, Virginia. *Véase* **Documento 15**, Participantes en las Reuniones Bilderberg (http://www.bilderbergmeetings.org/participants.html); y **Documento 6**, "Guindos y Botín cerraron la compra de Banco Popular en el Club Bilderberg", El Economista, 8 de junio de 2017 (http://www.eleconomista.es/banca-finanzas/noticias/8414603/06/17/Guindos-y-Botin-cerraron-la-venta-del-Popular-en-el-Club-Bilderberg.html).

[15] **Documento 16**, "Santander estudia ampliar capital en 5.000 millones para comprar Popular", Expansión, 7 de junio de 2017 (http://www.expansion.com/empresas/banca/2017/06/06/5936e857ca4741a2628b4697.html); **Documento 17**, "Santander planea una ampliación de capital de 5.000 millones para la compra del Popular", El Economista, 6 de junio de 2017 (http://www.eleconomista.es/banca-finanzas/noticias/8411500/06/17/Santander-planea-una-ampliacion-de-capital-de-5000-millones-para-la-compra-del-Popular.html).

## KIRKLAND & ELLIS LLP

Presidente Rajoy Brey
22 de enero 2018
Página 9

carta de fecha 3 de junio de 2017 remitida a BPE, Barclays confirmó su apoyo al aumento de capital propuesto por los inversores de BPE, exponiendo sus opiniones de que "Popular es una franquicia sólida" y de que, tras el aumento de capital, "Popular tiene potencial para brindar un rendimiento de capital atractivo para nuevos inversores"[16]. Asimismo, el 5 de junio de 2017, Deutsche Bank también escribió una carta de apoyo mostrando su interés en asegurar el 50% del posible aumento de capital de 4 mil millones de Euros bajo ciertas condiciones, y su opinión de que el aumento de capital "se podría hacer [para] ... estabilizar[] el banco"[17]. Pacific Investment Management Company (**PIMCO**), uno de los mayores administradores de ingresos fijos del mundo, también expresó su compromiso de proveer hasta 300 millones de Euros en el aumento de capital[18]. Adicionalmente, un número de inversores actuales y nuevos potenciales inversores en BPE confirmaron también su interés en participar en dicho aumento de capital. Entre ellos, se encontraba, por ejemplo, el inversor chileno Andrónico Luksic, quien, junto con el Sr. Antonio del Valle, los días antes de la Resolución, se había reunido de forma activa con bancos de inversión que habrían apoyado la ampliación de capital de BPE. En cambio, al decidir proceder con la venta de BPE por medio del Proyecto Hippocrates, España nunca ofreció a los Inversores de BPE la oportunidad de poner en marcha estas medidas, ni otras medidas alternativas, que habrían evitado la Resolución de BPE y que, por consiguiente, habrían protegido las inversiones en BPE de los Inversores de BPE;

- El Gobierno español, de forma activa, adoptó medidas que perjudicaron la situación financiera de BPE de manera previa a su Resolución. Entre estas medidas, que, a la postre, destruyeron las inversiones de los Inversores de BPE, se encuentran las siguientes: (1) una retirada de miles de millones de Euros de BPE abrupta y sin precedentes por parte de varias entidades e instituciones gubernamentales españolas; y (2) anuncios públicos y sin precedentes que dañaron la reputación de BPE y, de manera predecible, produjeron un aumento repentino de la retirada de depósitos. Entre diciembre de 2015 y diciembre de 2016, el Gobierno de España retiró aproximadamente el 40% de los depósitos que tenía en BPE[19]. Estas retiradas preocuparon al Consejo de Administración de BPE, que indicó en su sesión subsiguiente, en marzo de 2017, que "el empeoramiento de la situación de liquidez"

---

[16] **Documento 18**, Carta de Barclays a BPE, 3 de junio de 2017.

[17] **Documento 19**, Carta de Deutsche Bank a BPE, 5 de junio de 2017.

[18] **Documento 20**, "El rescate que no salvó al Popular", El Mundo, 11 de diciembre de 2017
(http://www.elmundo.es/economia/2017/12/11/5a2d677aca4741706a8b45d0.html).

[19] **Documento 21**, Informe Cuatrimestral, Q4 2016, p. 17 (línea 2 para depósitos del "gobierno general" demuestra una reducción de 10 mil millones de Euros a 6 mil millones de Euros entre diciembre de 2015 y diciembre de 2016).

## KIRKLAND & ELLIS LLP

Presidente Rajoy Brey
22 de enero 2018
Página 10

era "centrada[] en la reducción de 4mil MM del Tesoro, cuestiones de percepción reputacional y las bajadas de rating"[20]. A continuación, el 18 de mayo de 2017, el Ministro de Economía Luis de Guindos anunció públicamente que España no iba a "inyectar recursos públicos" a BPE. Las acciones del Gobierno español continuaron dañando la situación de liquidez de BPE con una enorme retirada de depósitos por parte de entidades públicas en los días y semanas previos a la Resolución. Solo durante la primera semana de junio, en el momento más crítico cuando el Gobierno español debería haber adoptado medidas para tranquilizar a los inversores y detener la huida de depósitos, agencias del Gobierno español retiraron más de 2.9 mil millones de Euros en depósitos[21]. Como es lógico, estos hechos causaron que los depositarios entrasen en pánico en respuesta a la falta de confianza por parte del Gobierno y perjudicaron, de manera significativa, la posición de liquidez de BPE, es decir, fueron la causa del mismo hecho que luego fue empleado por el FROB como base para justificar la decisión de Resolución;

- A diferencia de las soluciones ofrecidas a otros bancos españoles que estaban experimentando dificultades financieras, y a pesar de tener a BPE bajo supervisión durante meses, el Gobierno español, de forma arbitraria, se negó o pasó por alto la posibilidad de adoptar medidas que lograrían estabilizar la situación de liquidez. Las medidas disponibles hubieran incluido: (1) la concesión a BPE de la solicitud de Asistencia de Liquidez de Emergencia (**ALE**) por el monto total de 9.5 mil millones de Euros solicitados (concediendo, en su lugar, sólo la cantidad de 3.5 mil millones de Euros, insuficiente a todas luces); (2) la prohibición de las ventas en corto; o (3) la emisión de declaraciones institucionales destinadas a restaurar la confianza de la opinión pública. De hecho, ya en noviembre de 2016, BPE solicitó al Gobierno la adopción de medidas de estabilización, pero el Gobierno denegó dicho apoyo[22]. Por el contrario, el Gobierno español adoptó dichas medidas de estabilización en relación con otros bancos españoles, antes e incluso después de la Resolución de BPE. La no adopción por parte del Gobierno español, de forma arbitraria, de medidas de estabilización en relación con BPE vulneró las expectativas legítimas de los Inversores de BPE. De haberse implementado estas

---

[20] **Documento 22**, Acta del Consejo de Adminitración, 7 de marzo de 2017, página 10 ("Don Antonio González-Adalid comenta el empeoramiento de la liquidez examinada en la pasada sesión de la Comisión de Riesgos, explicando sus principales causas, centradas en la reducción de 4mil MM del Tesoro, cuestiones de percepción reputacional y las bajadas de rating").

[21] *Véase* **Documento 23**, "Los 68 clientes del Popular que huyeron a tiempo", El Mundo, 31 de diciembre de 2017 (http://www.elmundo.es/economia/2017/12/31/5a47c3fcca4741f6738b460c.html).

[22] **Documento 24**, "CCOO presiona a la CNMV y el Banco de España para evitar los "ataques especulativos" al Popular", Crónica, 30 de noviembre de 2016.

## KIRKLAND & ELLIS LLP

Presidente Rajoy Brey
22 de enero 2018
Página 11

medidas de estabilización por parte del Gobierno español, la Resolución no habría tenido lugar;

- La negativa del Gobierno español a proporcionar a BPE con la ALE solicitada fue arbitrara e infundada. Alrededor del 1 de junio de 2017, el Banco de España concedió a BPE la solicitud de ALE en una cantidad de 3.5 mil millones de Euros. Sin embargo, cuatro días después, en medio de la dramática y exponencial huida de depósitos a la que se enfrentó el Banco de España denegó la solicitud adicional de 6 mil millones de Euros de ALE, basándose, aparentemente, en una falta de garantías suficientes para cubrir la totalidad de ALE solicitada, a pesar de que BPE supuestamente tenía garantías más que suficientes para cubrir la totalidad del pedido de ALE[23]. Si se le hubiesen concedido a BPE los 6 mil millones addicionales de ALE solicitados, BPE habría sobrevivido a la huida de depósitos; habría habido suficiente tiempo para poner en marcha el aumento de capital y/o dar a BBVA (y posiblemente a otros bancos) el tiempo necesario para presentar una propuesta para adquirir a BPE a un precio justo de mercado. La conducta arbitraria del Gobierno de España impidió que algo de esto pudiese ocurrir;

- El Gobierno español ha actuado en todo momento de forma irregular y sin transparencia, incluso negándose a facilitar la documentación en la que, supuestamente, se apoyó para adoptar cada una de las medidas arriba descritas, y el opaco proceso de entrega a Santander, que han supuesto la privación a los Inversores de BPE de sus inversiones y de sus derechos;

- La amortización de las acciones de BPE, y su posterior venta al Santander por el precio de €1, privó completamente de sus inversiones en BPE a los Inversores de BPE. De esta manera, las inversiones de los Inversores de BPE fueron expropiadas ilícitamente, vulnerando con ello el Tratado, porque, entre otras consideraciones, no se les ofreció indemnización alguna al ser privados de sus participaciones en tales inversiones; en el curso del procedimiento, no se siguieron todas las garantías previstas legalmente; y tampoco la expropiación de sus inversiones fue destinada a un fin de utilidad pública, sino al beneficio del Santander;

- Por todos los motivos anteriormente expuestos, y por muchos otros adicionales, España no ofreció, a nivel jurídico y regulatorio, un entorno estable y previsible para las inversiones de los Inversores de BPE.

---

[23] *Veáse* **Documento 25**, "Saracho pidió ayuda pública para el Popular pese a su exceso de liquidez", ABC, 8 de enero de 2018. http://www.abc.es/economia/abci-saracho-pidio-ayuda-publica-para-popular-pese-exceso-liquidez-201801080221_noticia.html; **Documento 26**, "El Banco Popular pidió ya ayuda de emergencia al Banco de España dos meses antes de su debacle", El Mundo, 2 de enero de 2018, (http://www.elmundo.es/economia/2018/01/02/5a4a203ce5fdea2e4d8b45e6.html).

## KIRKLAND & ELLIS LLP

Presidente Rajoy Brey
22 de enero 2018
Página 12

Las acciones ilícitas del Gobierno Español han tenido como resultado la pérdida total del valor de las inversiones de los Inversores de BPE.  Los Inversores de BPE invirtieron más de 470 millones de Euros en BPE en el transcurso de más de tres años, y su inversión ha desaparecido injustificadamente por completo.

El Artículo IX del Tratado establece que cualquier controversia que surja entre un estado que sea Parte del Tratado y un inversor de otro estado parte en relación a inversiones amparadas por el Tratado deberá, de ser posible, resolverse con arreglo a un acuerdo amistoso. En caso de que la controversia no se resuelva dentro de los seis meses siguientes a la presentación del aviso de intención, el inversor podrá someter la reclamación a arbitraje internacional.

Por consiguiente, por la presente, los Inversores de BPE notifican a España el comienzo del plazo de negociaciones amistosas recogido en el Artículo IX del Tratado, y su derecho a iniciar un procedimiento de arbitraje internacional contra España en caso de que la controversia no se resuelva de manera amistosa a través de la negociación entre las partes, dentro del plazo antes señalado que comienza con la presentación de esta comunicación que constituye el aviso de intención referido.

Ningún contenido de esta carta deberá interpretarse de forma restrictiva a las cuestiones de hecho y de Derecho que puedan invocar los Inversores de BPE ante un tribunal arbitral internacional.  Dado que España sigue negándose a compartir información esencial en relación a la Resolución, los Inversores de BPE se reservan plenamente el derecho a apoyarse en cualquier información que pudiera estar a su disposición en el futuro y a impugnar cualesquiera otras conductas ilícitas por parte del Gobierno Español de las que tenga conocimiento conforme a la aparición de nuevas pruebas disponibles. Esta carta se presenta tanto en inglés como en español. Ambas versiones son igualmente válidas. Sin embargo, de existir alguna divergencia con respecto a la interpretación de esta carta, prevalecerá la versión en inglés.

Los Inversores de BPE se reservan todos sus derechos en cuanto a las acciones y medidas que, conforme a Derecho internacional, han sido descritas con anterioridad. Asimismo, los Inversores de BPE, quedan sujetos en todo caso a las anteriores manifestaciones, y reiteran su disponibilidad para mantener conversaciones con el Gobierno Español en aras de alcanzar una solución amistosa en relación con la negociación de una indemnización rápida y adecuada como consecuencia de la pérdida de su inversión en BPE. Los siguientes representantes están debidamente autorizados por parte de los Inversores de BPE para participar en consultas y negociaciones necesarias con los representantes del Gobierno Español, con el fin de entablar un diálogo constructivo que permita alcanzar una solución amistosa en este asunto.

Javier H. Rubinstein
Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL 60654

# KIRKLAND & ELLIS LLP

Presidente Rajoy Brey
22 de enero 2018
Página 13

> (312) 862-3220
> javier.rubinstein@kirkland.com
>
> Lauren Friedman
> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, NY 10022
> +1-212-446-4958
> lauren.friedman@kirkland.com
>
> Lucila I. M. Hemmingsen
> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, NY 10022
> +1-212-446-5925
> lucila.hemmingsen@kirkland.com

Los Inversores de BPE procurarán que uno o más de dichos representantes tengan plena disponibilidad para reunirse con el Gobierno de España en la fecha y lugar que resulten mutuamente convenientes para las partes.

KIRKLAND & ELLIS LLP

Presidente Rajoy Brey
22 de enero 2018
Página 14

Atentamente,

KIRKLAND & ELLIS LLP

Firmado:

Nombre: Javier H. Rubinstein

Adjuntos