# EXHIBIT 52



translations@geotext.com
www.geotext.com

STATE OF CALIFORNIA )
)
)
COUNTY OF SAN FRANCISCO ) ss

### CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English of the attached article from Diario 16.

_____
Katherine Przybus, Project Manager
Geotext Translations, Inc.

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California, County of San Francisco

Subscribed and sworn to (or affirmed) before me on this 4th day of March, 2018, by Katherine Przybus, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature: _____

**BRADLEY RHYMER**
Commission No. 2160632
NOTARY PUBLIC-CALIFORNIA
SAN FRANCISCO COUNTY
My Comm. Expires JULY 22, 2020

New York t: +1.212.631.7432
Washington, D.C. t: +1.202.828.1267
Chicago t: +1.312.242.3756
Houston t: +1.713.353.3909
San Francisco t: +1.415.576.9500
London t: +44.20.7553.4100
Paris t: +33.1.42.68.51.47
Stockholm t: +46.8.463.11.87
Frankfurt t: +49.69.7593.8434
Hong Kong t: +852.2159.9143

# BBVA was interested in Popular but was not given time

*On June 4, the FROB [Spain's Fund for Orderly Bank Restructuring], through an external consultant, communicated to Sabadell, Santander, Bankia, CaixaBank, and BBVA that the resolution process for Banco Popular was beginning. On the morning of June 6, the timetable with the entire resolution and auction was already published.*

by *Esteban Cano* – 12/29/2017



[inline advertisement for Sanguino Abogados]

Throughout the process of Banco Popular's takeover by regulators and its subsequent sale to Santander for one euro, a process that has left more than 305,000 families in ruin, it is odd how the institutions responsible for decision-making have hidden behind external consultants to spread the blame or directly shift it to third parties. In the case at hand, it was the FROB that selected Arcano Financial Advisors S.L. and Jefferies International Limited to communicate to the different banking institutions of this country that Project Hippocrates had just begun.

STRICTLY PRIVATE AND CONFIDENTIAL

June 4, 2017

Dear Sirs:

We have contacted you in our role as an independent consultant of the FROB in relation to yesterday's exchange in order to evaluate your interest in signing this Letter of Confidentiality to participate in a potential acquisition transaction within the framework of the potential resolution of a major credit institution, in this case, operated by the Single Resolution Board and the FROB in accordance with Directive 2014/59/EU of the European Parliament and of the Council of May 15, 2014, establishing a framework for the recovery and resolution of credit institutions and investment firms.

Regardless of your participation in the process, in view of the obligation to secrecy and confidentiality demanded by art. 84 of Directive 2014/59/EU, transposed into our law by art. 59 of Law 11/2015 of June 18, on recovery and resolution of credit institutions and investment firms, we ask that you send us your acceptance of the confidentiality clause attached to this communication, signed by the person with the proper authorization.

Given the nature of the information you have been given, we ask that you submit the signed attachment before market opening tomorrow, June 5.

As you can see, it was already assumed that there would be an intervention with Popular on June 4, when it was proposed to these institutions that they participate "in a potential **acquisition transaction** within the framework of the **potential resolution of a major credit institution**." That letter was sent to Banco Sabadell, CaixaBank, Banco Santander, BBVA and Bankia.

The requested response was provided by all the institutions on the following day, June 5, two days before the intervention on behalf of Popular. Neither Sabadell, CaixaBank nor Bankia showed interest in participating in the transaction of acquiring Popular referenced in the document sent by Arcano and Jefferies, strangely, a company located in the same building—Edificio Beatriz—as the central offices of Banco Popular. In fact, that day was the start of the large withdrawals of deposits by public institutions and companies, in addition to other large Spanish corporations, which reached 14 billion euros. Many of those public entities claimed the downgrade to Popular's rating was the reason for those withdrawals; however, is it coincidence that those outflows of deposits occurred on the first business day after Project Hippocrates began?

As we said before, neither Bankia nor Sabadell nor CaixaBank agreed to take part in the proceedings. The secrecy in the communication from Arcano that insisted on extreme confidentiality regarding Hippocrates even though they were not participating in the auction is not surprising. The institutions responded with this message:

June 4, 2017

Dear Sirs:

I am writing to you in my role as _____ of _____ with regard to the Letter of Confidentiality dated June 4, 2017, sent to us by the FROB via its independent consultant. We hereby confirm our knowledge and acceptance of the contents of said Letter of Confidentiality and agree to comply with the commitments and obligations of confidentiality and secrecy established therein, without restriction, as obligated parties with respect to the FROB.

Nevertheless, once both BBVA and Santander communicated that they were interested in participating in Project Hippocrates to deal with Banco Popular, for this reason they were sent the following communication:

*FROB Message to Banco de Santander*                                                      1 of 6  

15. This letter of confidentiality shall be interpreted in accordance with the provisions of ordinary Spanish law.

16. The parties submit expressly and irrevocably to the Courts and Tribunals of Madrid for all questions that may arise regarding the validity, interpretation, compliance or execution of this letter, expressly renouncing any other jurisdiction that might apply.

If you are in agreement with the contents of this letter, we request that you send to us three signed copies as a sign of agreement and acceptance of its terms and conditions.

On June 6 [illegible] communication that indicated the prices on which the purchase proposals should be based, i.e., the resolution was already being assumed even though Emilio Saracho had not yet declared that Popular was likely to fail, since the Board of Directors meeting was not held until 5:00 p.m. on that day. In particular, the FROB indicated that the price of the offers should start from the amount of 0.50 euros per share, to which 1.346 billion euros in perpetual bonds and 685 million for additional capital instruments had to be added. In total, the FROB was setting a price close to 4.9 billion euros for Banco Popular.



This letter replaces and supersedes the process letter dated June 5th

Strictly Private and Confidential

**FROB**

1. the price payable for the existing 4,196,858,092 ordinary shares of par value €0.50 per share (the "Existing Shares"). If the Price is below the nominal value of the Existing Shares, the difference up to the normal value will be written down. If the Price payable under this option is zero, please consider option 2 below; or

2. assuming that the Existing Shares are written down, the price payable for the ordinary shares of The Bank, to be issued upon conversion of 100% of Tier 1 additional capital instruments comprising 8,375 convertible perpetual bonds with an outstanding nominal value of €1,346,542,000 as of the Closing Date and whose ISIN codes are shown in Appendix 2. If the Price payable under this option is zero, please consider option 3 below; or

3. assuming that the Existing Shares and the AT1 additional capital instruments referred to in 2 above are written down, the price payable for the ordinary shares of The Bank, to be issued upon conversion of 100% of Tier 2 additional capital instruments composed of 453,949 bonds with an outstanding nominal value of €685,315,828 as of the Closing Date and whose ISIN codes are shown in Appendix 2.

There is also a table with the timetable of Popular's resolution, a timetable in which you can see that the intervention had already been set for days:

| | |
|---|---|
| Sunday 4 June 2017 | Signing of NDAs |
| Monday 5 June 2017 | Access to a Virtual Data Room (the "VDR"). Sending of Process Letter and Sale and Purchase Agreement. Meetings between FROB's advisors with each of the potential buyers to resolve doubts about the Process. |
| Tuesday 6 June 2017 | Meetings between potential buyers and/or their advisors and The Bank' management team to resolve any business questions. Such meetings may take the form of a face-to-face meeting at FROB's advisors' headquarters or, alternatively, via conference call. Please note that FROB cannot guarantee that such a session will occur or that all questions raised will be answered. |
| No later than Tuesday 6 June 2017 at 22:45 CET | Submission of limited comments to the Sale and Purchase Agreement. Please have senior representatives of your organisation, together with your legal, financial and accounting advisers, available from that time to answer any questions on your comments to the Sale and Purchase Agreement. |

| | |
|---|---|
| No later than Tuesday 6 June 2017 24:00 CET | Submission of Binding Offers. Please have senior representatives of your organisation, together with your legal, financial and accounting advisers, available from that time to answer any questions on your Binding Offer. |
| Wednesday 7 June 2017 01:00 CET | Contacts with bidders for finalization of the process and selection of winning bid. |
| Wednesday 7 June 2017 05:30 CET – CLOSING DATE | SRB's Resolution Scheme (if any), execution of the Sale and Purchase Agreement |
| Wednesday 7 June 2017 06:30 CET | FROB's Implementing Act. |
| Wednesday 7 June 2017 07:00 CET | Closing and announcement of the Transaction |

As you can see from the timetable, on the morning of June 6, it was indicated that the offers from the BBVA and Santander had to be submitted before 12 midnight of that day because an hour later, at 1:00 a.m. on June 7, the auction process would be completed so that the entire process of Popular's sale could be carried out at 5:30 a.m. We emphasize the fact that this communication from the FROB occurred on the morning of June 6, so Saracho had not yet declared the likelihood to fail as per the instructions received from the firm of Uría and Menéndez.

In the above timetable, we can also verify an important fact. The FROB states that the two institutions interested in Popular had access to the bank's information in a Virtual Data Room so they could assess Popular's situation for making an offer. Santander did not need this access since they already had knowledge of all the information regarding the sixth-biggest Spanish bank, since in March they hired the law firm of Uría and Menéndez for one million euros via Emilio Saracho when Ángel Ron was still president. When the purchase was announced, Santander had already had days to prepare the document to be submitted to the CNMV, a document including all that information.

However, the data offered in that Virtual Data Room must not have been very clear because the BBVA requested more time to analyze it and to decide what offer to make, time that they were not given, as they sent this to the FROB:



Madrid, June 6, 2017

Dear Sirs:

With respect to the confidential Project Hippocrates, I confirm that, having taken into account the price limits and other conditions imposed in the process letter, as well as the insufficient information available, BBVA is not willing to submit an offer under the terms of the process letter and sale and purchase agreement sent today.

Notwithstanding the foregoing, we also confirm that if sufficient information were available to permit our governing bodies to properly analyze the transaction and if the conditions of the process could be modified, BBVA would be interested in participating.

That lack of information based on the parameters indicated in the letter sent by the FROB on the morning of June 6 causes BBVA to withdraw and leaves Santander free to take Popular. That lack of information, and the refusal to grant more time, caused the Basque bank to submit an empty envelope to the bidding, with no offer. However, the Cantabrian institution did not have everyone on their side. At that same time, they were holding negotiations with senior executives from Popular in which they were discussing purchase numbers in amounts varying from 4 to 3.5 billion. As *Diario16* has been able to learn from highly qualified sources, when the moment of the bidding arrived, Santander supposedly had two envelopes prepared, one with an amount greater than 3 billion and the other with the offer for which they purchased Popular, that is, 1 euro.

The FROB itself publicly issued the following message the next day:

FROB
Executive Resolution Authority

**MS. LUCÍA CALVO VÉRGEZ, secretary of the Steering Committee of the FROB, public-law entity with its own legal personality, in accordance with article 52.2 of Law 11/2015 of June 18, on the recovery and resolution of credit institutions and investment firms ("Law 11/205"), hereby**

**CERTIFIES**

That, in the meeting of the FROB Steering Committee held on June 7, 2017, duly constituted, the following agreement was unanimously adopted:

To propose BANCO SANTANDER, S.A., to the Single Resolution Board as the successful bidder in the process of sale of the shares of BANCO POPULAR ESPAÑOL, S.A., for the purposes of its designation as purchaser in the mechanism of resolution of this institution.

For legal purposes I hereby issue this certificate in Madrid on June 7, 2017.

**SECRETARY**
[signature]
**Lucía Calvo Vérgez**

On Friday, June 30, the BOE granted legal status to the entire transaction.

As you can see, it is the official institutions themselves that show how the transaction was predetermined and had to be hurried along for various reasons, primarily the appearance of tools that might have been able to save Banco Popular—for example, the capital increase offers from Barclays and Deutsche Bank for a joint total of 8 billion euros. We must also remember how Saracho did not submit all the guarantees that Popular had available to access the 9.5 billion of emergency liquidity assistance, since, from what was submitted, they had access to only 3.5 billion. The difference of 6 billion would have provided enough time to carry out a corporate sale transaction to a different institution, so more than 305,000 families would not have been ruined, or to start a process of capital increase in September, a process for which there was a lot of interest in the market, as

demonstrated in the offers from Barclays and Deutsche Bank. That time, with a president who was not working for third parties, could have been used to carry out transactions such as the one Santander itself carried out with the sale of real estate assets to BlackStone, as well as the collection of 5 billion from DTA. Popular was doomed a year ago when Operation Washington began because it was necessary to save Santander, even though the consequence of that rescue was the ruin of over 305,000 families.

**Esteban Cano**
Writer and investigative journalist


# El BBVA estaba interesado en el Popular pero no le dieron tiempo

*El día 4 de junio, el FROB, a través de un asesor externo, comunicó a Sabadell, Santander, Bankia, CaixaBank y BBVA, que se iniciaba el proceso de resolución del Banco Popular. El día 6 de junio por la mañana ya publicó el cronograma con todo el proceso de resolución y de la subasta*

Por *Esteban Cano* - 29/12/2017



 

En todo el proceso de la intervención del Banco Popular y su posterior venta al Santander por un euro, un proceso que ha dejado en la ruina a más de 305.000 familias, es curioso cómo las instituciones responsables de las tomas de decisiones se escudan en asesores externos para repartir la responsabilidad o, directamente, para trasladarla a terceros. En el caso que nos ocupa fue el FROB quien eligió a Arcano Asesores Financieros S.L. y a Jefferies International Limited para comunicar a las distintas entidades bancarias de este país que el Proyecto Hipócrates acababa de iniciarse.



Como se puede comprobar ya se estaba dando por hecho que el Popular iba a ser intervenido el día 4 de junio al proponer a las entidades participar «en una eventual **operación de adquisición** en el marco de una **potencial resolución de una entidad de crédito significativa**». Esa carta se envió a Banco Sabadell, CaixaBank, Banco Santander, BBVA y Bankia.

La respuesta que se solicita fue remitida por todas las entidades al día siguiente, día 5 de junio, dos días antes de que fuera intervenido el Popular. Ni Sabadell, ni CaixaBank, ni Bankia mostraron interés en participar en esa operación de adquisición del Popular a la que se refiere el documento enviado por Arcano y Jefferies, curiosamente una empresa que se encuentra en el mismo Edificio Beatriz donde estaban las oficinas centrales del Banco Popular. Precisamente, ese día comenzaron las grandes retiradas de depósitos por parte de las instituciones y empresas públicas, además de otras grandes corporaciones españolas que llegaron a alcanzar los 14.000 millones de euros. Muchos de esos organismos públicos alegaron la rebaja de las calificaciones del rating del Popular para justificar esas retiradas de depósitos, sin embargo, ¿es casual que esas salidas se produjeran en el primer día laborable después de que se activara el Proyecto Hipócrates?

Como decíamos, ni Bankia ni Sabadell ni CaixaBank aceptaron entrar en el procedimiento. No sorprende el secretismo que se incide en la comunicación de Arcano al insistir en la extrema confidencialidad de Hipócrates a pesar de que no entraran en la subasta. Las entidades respondieron con esta comunicación:



Sin embargo, una vez que tanto BBVA como Santander comunicaron que estaban interesados en participar en el Proyecto Hipócrates para hacerse con el Banco Popular y, por esta razón se les remitió la siguiente comunicación:

*Comunicación FROB al Banco de Santander*                                                                 *1 of 6*  ‹ ›



El día 6 de junio po_____ comunicación en la que indica los precios sobre los que se deben asentar las propuestas de compra, es decir, se daba ya por hecha la resolución a pesar de que Emilio Saracho aún no había declarado la inviabilidad del Popular porque la reunión del Consejo de Administración no se celebró hasta las 17 horas de ese día. En concreto, el FROB indicaba que el precio de las ofertas debía partir de un valor por acción de 0,50 euros, a lo que había que sumar 1.346 millones de euros por los bonos perpetuos y 685 millones por instrumentos adicionales de capital. En total, el FROB estaba poniendo un precio cercano a los 4.900 millones de euros por el Banco Popular.

Además, incluye una tabla con el calendario de la resolución del Popular, un cronograma en el que se muestra cómo la intervención ya estaba determinada desde hacía días:

| | |
|---|---|
| Sunday 4 June 2017 | Signing of NDAs |
| Monday 5 June 2017 | Access to a Virtual Data Room (the "VDR"). Sending of Process Letter and Sale and Purchase Agreement. Meetings between FROB's advisors with each of the potential buyers to resolve doubts about the Process. |
| Tuesday 6 June 2017 | Meetings between potential buyers and/or their advisors and The Bank' management team to resolve any business questions. Such meetings may take the form of a face-to-face meeting at FROB's advisors' headquarters or, alternatively, via conference call. Please note that FROB cannot guarantee that such a session will occur or that all questions raised will be answered. |
| No later than Tuesday 6 June 2017 at 22:45 CET | Submission of limited comments to the Sale and Purchase Agreement. Please have senior representatives of your organisation, together with your legal, financial and accounting advisers, available from that time to answer any questions on your comments to the Sale and Purchase Agreement. |

| | |
|---|---|
| No later than Tuesday 6 June 2017 24:00 CET | Submission of Binding Offers. Please have senior representatives of your organisation, together with your legal, financial and accounting advisers, available from that time to answer any questions on your Binding Offer. |
| Wednesday 7 June 2017 01:00 CET | Contacts with bidders for finalization of the process and selection of winning bid. |
| Wednesday 7 June 2017 05:30 CET – CLOSING DATE | SRB's Resolution Scheme (if any), execution of the Sale and Purchase Agreement |
| Wednesday 7 June 2017 06:30 CET | FROB's Implementing Act. |
| Wednesday 7 June 2017 07:00 CET | Closing and announcement of the Transaction |

Como se puede comprobar en el cronograma, el mismo día 6 de junio por la mañana se estaba indicando que las ofertas tanto de BBVA como de Santander debían ser presentadas antes de las doce de la noche de ese día porque una hora más tarde, a la 1 de la madrugada del día 7 se finalizaría el proceso de subasta para que a las 5.30 se ejecutara todo el proceso de venta del Popular. Insistimos en el hecho de que esta comunicación del FROB se realizó el día 6 de junio por la mañana y, por lo tanto, Saracho aún no había declarado la inviabilidad siguiendo las instrucciones recibidas del despacho de Uría y Menéndez.

En el cronograma anterior también podemos comprobar un hecho importante. El FROB indica que las dos entidades que se interesaron por el Popular tendrían acceso a los datos del banco en una Virtual Data Room para que pudieran valorar la situación del Popular de cara a realizar una oferta. Al Santander no le hacía falta ese acceso puesto que ya tenía conocimiento de todos los datos del sexto banco español desde que en el mes de marzo contrataran por un millón de euros al despacho Uría y Menéndez a través de Emilio Saracho cuando aún era presidente Ángel Ron. El Santander ya llevaba días preparando el documento a presentar ante la CNMV cuando anunciaran la compra, un documento que incluía todos esos datos.

Sin embargo, los datos ofrecidos en esa Virtual Data Room no debieron ser muy claros porque el BBVA solicitó más tiempo para poder analizarlos y decidir qué oferta realizar, un tiempo que no se le dio porque remitieron una comunicación al FROB. Es esta:



> Madrid a 6 de junio de 2017
>
> Estimados Señores:
>
> En relación con el proyecto confidencial Hippocrates, les confirmo que, habida cuenta de las limitaciones de precio y las restantes condiciones impuestas en la carta de proceso (process letter), así como la insuficiente información disponible, BBVA no está en disposición de presentar una oferta en los términos de esa carta de proceso y del contrato de compraventa (SPA) remitidos en el día de hoy.
>
> No obstante lo anterior, igualmente les confirmamos que si se dispusiera de información suficiente que permita a sus órganos de gobierno analizar debidamente la operación y se pudieran modificar las condiciones del proceso, BBVA sí estaría interesado en participar en el mismo.

Esa falta de información en base a los parámetros indicados en la carta remitida por el FROB en la mañana del 6 de junio hace que el BBVA se retire y deje al Santander vía libre para hacerse con el Popular. Esa falta de información, y la negativa a dar más tiempo, hizo que el banco vasco presentara en la subasta un sobre vacío, sin ningún tipo de oferta. Sin embargo, en la entidad cántabra no las tenían todas consigo. En esos mismos instantes se estaban celebrando negociaciones con altos ejecutivos del Popular en las que se manejaban cifras de compra por un valor que oscilaba entre los 4.000 y los 3.500 millones. Según ha podido saber Diario16 a través de fuentes muy cualificadas, cuando llegó el momento de la subasta el Santander tenía presuntamente preparados dos sobres, uno con una cantidad superior a los 3.000 millones y otro con la oferta por la que compró el Popular, es decir, 1 euro.

El propio FROB hizo público al día siguiente el siguiente comunicado:



> **FROB**
> Autoridad de Resolución Ejecutiva
>
> DOÑA LUCÍA CALVO VÉRGEZ, secretaria de la Comisión Rectora del FROB, entidad de Derecho público con personalidad jurídica propia, de conformidad con el artículo 52.2 de la Ley 11/2015, de 18 de junio, de recuperación y resolución de entidades de crédito y empresas de servicios de inversión ("Ley 11/2015"), por la presente
>
> CERTIFICA
>
> Que, en la reunión de la Comisión Rectora del FROB celebrada en el día 7 de junio de 2017, debidamente constituida, se adoptó por unanimidad el siguiente acuerdo:
>
> Proponer a la Junta Única de Resolución al BANCO SANTANDER, S.A., como adjudicatario del proceso de venta de las acciones de BANCO POPULAR ESPAÑOL, S.A., a los efectos de su designación como comprador en el dispositivo de resolución de esta entidad.
>
> Para que así conste y surta los efectos legales oportunos, expido la presente certificación, en Madrid, 7 de junio de 2017.
>
> LA SECRETARIA
> Lucía Calvo Vérgez

El viernes día 30 de junio, el BOE dio legalidad a toda la operación.

Como se puede comprobar son las propias instituciones oficiales las que muestran cómo la operación estaba predeterminada y que se tuvo que acelerar por varios motivos, principalmente la entrada de herramientas que hubieran podido salvar al Banco Popular como, por ejemplo, las ofertas de ampliación de capital de Barclays y de Deutsche Bank por un valor conjunto de 8.000 millones de euros. También hay que recordar cómo Saracho no presentó todas las garantías de las que disponía el Popular para acceder a los 9.500 millones de la línea de liquidez urgente, puesto que, con lo que se presentó, sólo se tuvo acceso a 3.500 millones. La diferencia de 6.000 millones hubiera dado el tiempo suficiente tanto para realizar una operación corporativa de venta a otra entidad en la que no se tuviese que arruinar a más de 305.000 familias o iniciar un proceso de ampliación de capital en el mes de septiembre, un proceso para el que había mucho interés en el mercado, tal y como se demuestra en las ofertas de

Barclays y de Deutsche Bank. Ese tiempo, con un presidente que no trabajara para terceros, podría haberse utilizado para ejecutar operaciones como la que el propio Santander realizó con la venta de los activos inmobiliarios a BlackStone, además del cobro de los 5.000 millones de los DTA. El Popular estaba sentenciado desde hacía un año cuando se inició la «Operación Washington» porque era necesario para salvar al Santander, aunque ese rescate tuviera como consecuencia la ruina de más de 305.000 familias.

**Esteban Cano**

Escritor y Periodista de investigación

✉