**EXHIBIT 58**



translations@geotext.com
www.geotext.com

STATE OF NEW YORK    )
                     )
                     )    ss
                     )
COUNTY OF NEW YORK   )

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English of the attached article, "The alleged scam by Emilio Saracho at Banco Popular (I)," dated November 20, 2017.

Dustin Paul Richard, Managing Editor
Geotext Translations, Inc.

Affirmed and subscribed before me this 4th day of March, 2018.

HOA WIN LY
Notary Public, State of New York
No. 01LY6323702
Qualified in New York County
Term Expires April 27, 2019

New York t: +1.212.631.7432
Washington, D.C. t: +1.202.828.1267
Chicago t: +1.312.242.3756
Houston t: +1.713.353.3909
San Francisco t: +1.415.576.9500
London t: +44.20.7553.4100
Paris t: +33.1.42.68.51.47
Stockholm t: +46.8.463.11.87
Frankfurt t: +49.69.7593.8434
Hong Kong t: +852.2159.9143

# The alleged scam by Emilio Saracho at Banco Popular (I)

*Any court could take many of the actions by Emilio Saracho as alleged scams. During his presidency, Popular lost over 14 billion euros in deposits, its market value and, consequently, it ruined over 305,000 families.*

By *Esteban Cano* - 11/20/2017



The most recent court actions, with the filing of involuntary bankruptcy (though it was dismissed), the receipt by the National Court of documentation submitted by Diario16, the increase in claims against Santander, and the information that calls very much into question the legality of the operation, are causing the entity headed by Ana Patricia Botín to advance the times in order to generate a situation of no-return making it impossible for the Court to halt or annul the operation. However, as we have published here before, this is an alleged scam accomplished through cheating to achieve an economic reward for Santander, damaging the holdings of over 305,000 families in ruin.

In the days prior to the intervention, there were offers to buy Popular or to resolve its situation. The communication from Barclays and Deutsche Bank offering the amount of 4 billion euros respectively for the capital increase of Popular because, as shown in the document published by Diario16 (and filed with the National Court), it was a "solvent and solid" entity. The Barclays letter is addressed to the general director assigned to the office of the president, Miguel Escrig, who was brought on by Saracho for his history with JP Morgan Chase. The one from Deutsche Bank is addressed to Saracho himself and they also mention how they contacted Escrig for the same reason.



*Letter sent by Barclays Bank to Popular on June 3.*

In addition to the dates of the missives—a few days prior to the intervention—it is very important that the two most important banks in the world recognized the **solvency, liquidity, and solidity of Popular**, something which Emilio Saracho denied even at the last Board of Directors meeting when he told the directors of an apocalyptic situation in which Saracho said things like "during this period, the Euro Stoxx Bank Index has had a markedly positive evolution, since year-to-date it has revalued 9.26%. This situation makes the Bank share prices considerably lower than their cash value, with the ratio between one and another being much lower than that of the comparable group of the Bank" or that **Popular was "meeting all of the capital requirements** that apply to it under applicable laws," but that the financial tension was affecting the liquidity position, something that he knew perfectly well because that was one of the primary objectives of Operation Washington in which he was one of the key elements. He also referred to the rating agencies that lowered the rating "between 1 and 3 grades, all of them leaving the senior debt of Banco Popular between 3 and 6 levels under "investment grade." Despite this Armageddon, that same day he asked KPMG to sell Popular's real estate property for 2 billion (Santander has sold 51% of that property for 5 billion).



Emilio Saracho
Banco Popular Español
José Ortega Y Gaset, 29
28006 Madrid

June 5, 2017

CONFIDENTIAL – DB letter on capital increase

Dear Emilio:

After many committee meetings and reviews this weekend, we have sent Miguel Escrig a letter in which we expressed the interest of Deutsche Bank in securing 50% of a possible capital increase of € 4 billion. Obviously, there are certain conditions, but the letter is based on our belief that with all of the circumstances that could occur realistically, an increase could be made that would stabilize the bank.



Deutsche Bank, Sociedad Anónima Española, business address: Paseo de la Castellana, 18, 2804[illegible], Madrid, registered in the Merchant Registry of Madrid, volume 28100, book 0, folio 1, section 8, page M506294, record 2, CIF: A[illegible]8[illegible]00[illegible]14

*Letter sent by Deutsche Bank to Emilio Saracho on June 5.*

Did Miguel Escrig communicate these offers to Saracho? Evidently, yes. However, did Saracho communicate the offers to the Board of Directors, as it was his duty? Evidently not. In the minutes of the last Board meeting held three days later, there is no mention of these proposals. The content of the communication from Deutsche Bank to Saracho himself, referencing how they communicated with Escrig previously without a reply, is significant.

The only plausible reason that they did not even consider the proposals by Deutsche Bank and Barclays is that Saracho had to fulfill his duty to place Popular into the hands of Santander however possible. This decision went against the bank's own rules and brought harm to shareholders, clients, and the entity itself, because of which **it can be understood as an alleged scam.**



June 6, 2017

VIA EMAIL

CONFIDENTIAL

Mr. Emilio Saracho, President
Banco Popular Español, S.A.
Velazquez 34, 28001
Madrid
Spain

RE:   Turtle Project – "Letter of Interest" dated March 23, 2017 (together with its amendments and communications of later dates, the "LOI").

Dear Mr. Saracho:

We make reference to the mutual negotiations for a potential merger (the "Transaction") of TotalBank ("TotalBank"), a corporation that belongs 100% to Banco Popular Español, S.A. ("BPE"), by absorption of City National Bank of Florida ("CNB"), an affiliate of Banco de Crédito e Inversiones ("Bci").

Despite considerable efforts by the parties in the past months, it has not been possible to reach an agreement regarding several critical points that were extremely important to Bci. Based on this, the Bci Board of Directors has decided not to move forward with the Transaction, and therefore we terminate the LOI and our negotiations.

As we communicated to your team, our offer (the "Offer") considered a price payable to BPE of US$ 545 million plus the assumption by Bci of the payments for change of control as contemplated in the contracts of certain primary executives of TotalBank and its CEO with BPE, plus a series of conditions that were an integral part of the Offer and that had an impact on our valuation (e.g., minimum capital of TotalBank, keeping deposits of BPE in TotalBank for a period of time, payment to TotalBank of commissions for servicing certain loans of BPE, among others). Given that you did not accept the conditions that were an integral part of the Offer, Bci made a counteroffer of US$ 540 million, assuming all costs for the change of control and accepting–among other things–the BPE position in those conditions mentioned above that impacted the valuation, increasing for Bci the value of the Transaction to over US$ 555 million. This new offer was not accepted by BPE according to what you reported to us yesterday.

We must also remember that, as Diario16 published, since Saracho halted the offer of Chilean BCI for the TotalBank one of 540 million euros for no apparent reason, a bank for which Santander expected to obtain 400 million euros. Was 540 million not enough and 400 is a magnificent operation? Instead, it was a new move by which Saracho sought to use up the balance of Popular to reach the alleged apocalyptic situation that was presented on June 6 at that Board of Directors Meeting.

After that Meeting, a letter was sent to the Sole Resolution Board indicating that Popular should be intervened due to a lack of liquidity, a missive that, as we published in Diario16, is of doubtful validity because, in the first place, its very configuration (with no seal or printed name in the closing and on a single page with only the bank header) and, in the second place, with a dubious signature that appears to be Saracho's, but that with sufficient expert review it could be determined that somebody else signed it.



*Letter from Popular to the JUR, reporting Popular's status of "likely to fail"*

On the other hand, on the morning of June 2, there was a telephone conversation between Joaquín Hervada Yáñez, Secretary of the Board of Directors, and one of the primary offices of Santander, a transcript of which was sent to Popular. In that transcript, the office advises how to justify to the Board of Directors that the bank was unviable although, as the transcript showed, it was essential to clarify that "it is not enough for there to be a more or less hypothetical possibility if the actual circumstances of the plans to avoid unviability clearly show that they are not realistic, though it may be possible that those measures to correct the breaches will be realized." On the other hand, it is recognized that "the communication of unviability does not carry the requirement to place the bank in resolution necessarily and immediately." On the afternoon of June 6, Saracho sent the allegedly false letter and Popular was intervened. There was a rush.

**URÍA MENENDEZ**

Note on unviability vs liquidity
<mark>Draft 06/02/2017</mark>
Confidential

**NOTE: CONVERSATION ABOUT FOLLOW-UP ON UNVIABILITY, LIQUIDITY, AND PROVISIONS**

Joaquin:

The ideas shared during our conversation this morning.

1. Directors have a duty to communicate "unviability."

    "Unviability" is a technical concept: "if the entity <u>significantly breaches</u> or it is <u>reasonably foreseen</u> that it will <u>significantly</u> breach the requirements of solvency and others in the <u>near future</u>" – such as the liquidity ratio (art 20, Law 11/2015).

    We will be in this situation if we <u>significantly</u> breach ratios, or we foresee that ratios will be <u>significantly</u> breached, unless we believe (i) that a ratio breach is not significant, <u>because it is one-time and reversible in the short term</u>; or (ii) that a foreseen breach will not occur, because <u>prior</u> to getting to the ratio breach situation we will have <u>avoided</u> the breach – with the capital increase, the generation of equity, the sale of a block of deteriorated assets, … <mark>Thus far, the sole ratio breach (that of LCR) was considered insignificant by the Board because there was a credible plan to return to compliance within the month of May.</mark>

**Esteban Cano**
Writer and Investigative Journalist

# La presunta estafa de Emilio Saracho en el Popular (I)

*Son muchos los comportamientos de Emilio Saracho que podrían ser tomados como una presunta estafa por cualquier tribunal. Durante su presidencia el Popular perdió más de 14.000 millones de euros en depósitos, su valor en bolsa y, en consecuencia, la ruina de más de 305.000 familias*

Por *Esteban Cano* - 20/11/2017



Los últimos acontecimientos judiciales, con la presentación de la solicitud de concurso necesario (aunque haya sido desestimada), la recepción por parte de la Audiencia Nacional de la documentación aportada por Diario16, el incremento de las demandas hacia el Santander y las informaciones que ponen muy en duda la legalidad de la operación están provocando que la entidad presidida por Ana Patricia Botín esté acelerando los tiempos para generar una situación de no retorno que haga imposible a la Justicia la paralización o la anulación de la operación. Sin embargo, tal y como hemos publicado en este medio, nos encontramos ante un presunto caso de estafa en el que a través de engaños se logró una recompensa económica para el Santander provocando un perjuicio patrimonial en las más de 305.000 familias arruinadas.

En los días previos a la intervención hubo ofertas para comprar el Popular o para resolver su situación. La comunicación por parte de Barclays y de Deutsche Bank en la que ofrecían una cantidad de 4.000 millones de euros respectivamente para una ampliación de capital del Popular porque, tal y como afirma el documento publicado por Diario16 (y presentado ante la Audiencia Nacional), era una entidad «solvente y sólida». La carta de Barclays va dirigida al director general adjunto a la presidencia Miguel Escrig traído por Saracho por su pasado en JP Morgan Chase. La de Deutsche Bank va dirigida al propio Saracho y también mencionan cómo se pusieron en contacto con Escrig por la misma razón.



*Carta enviada por Barclays Bank al Popular el día 3 de junio*

Además de las fechas de las comunicaciones —unos días antes de la intervención— es muy importante el reconocimiento por parte de dos de los bancos más importantes del mundo de la **solvencia, la liquidez y la solidez del Popular**, algo que el propio Emilio Saracho desmintió incluso en el último Consejo de Administración al plantear a los consejeros una situación apocalíptica en la que Saracho dijo cosas como «durante este periodo, el índice Euro Stoxx Bank Index ha tenido una evolución marcadamente positiva, ya que en lo que va de año se ha revalorizado un 9,26%. Esta situación provoca que el precio de las acciones del Banco sea significativamente menor que su valor contable, siendo la proporción entre uno y otro muy inferior a la del grupo de comparación del Banco» o que **el Popular estaba «cumpliendo con todos los requerimientos de capital** que les son de aplicación de acuerdo con la legislación aplicable», pero que la tensión financiera estaba afectando a la posición de liquidez, algo que él sabía perfectamente porque esa era uno de los principales objetivos de la Operación Washington de la que él era uno de los elementos clave. También hizo referencia a las agencias de rating que rebajaron la calificación «entre 1 y 3 grados, dejando todas ellas la deuda senior del Banco Popular entre 3 y 6 niveles por debajo del "grado de inversión"». A pesar de este Armagedón ese mismo día había encargado a KPMG la venta del patrimonio inmobiliario del Popular por un valor de 2.000 millones (el Santander ha vendido un 51% de ese patrimonio por 5.000 millones).



Carta enviada por Deutsche Bank a Emilio Saracho el día 5 de junio

¿Miguel Escrig trasladó estas ofertas a Saracho? Evidentemente, sí. No obstante, ¿trasladó Saracho las ofertas al Consejo de Administración como era su obligación? Evidentemente, no. En el acta de la última reunión del Consejo celebrada tres días después no hay ninguna mención a estas propuestas. Es significativo el contenido de la comunicación de Deutsche Bank que va dirigida al propio Saracho y en la que hacen referencia a cómo se dirigieron con anterioridad a Escrig sin recibir respuesta.

La única razón por la que se puede entender que ni siquiera se tuvieran en cuenta las propuestas de Deutsche Bank y Barclays es que Saracho debía cumplir con su objetivo de llevar al Popular a manos del Santander del modo que fuera. Esta decisión iba en contra de las propias normas del banco y provocó un perjuicio a accionistas, a clientes y a la propia entidad, por lo que **podría entenderse como una presunta estafa**.



6 de junio de 2017

**VIA EMAIL**

**CONFIDENCIAL**

Sr. Emilio Saracho, Presidente
Banco Popular Español, S.A.
Velazquez 34, 28001
Madrid
España

Ref: Proyecto Turtle – "Letter of Interest" de fecha 23 de marzo de 2017 (conjuntamente con sus modificaciones y comunicaciones de fechas posteriores, el "LOI").

Estimado Sr. Saracho:

Hacemos referencia a las negociaciones mutuas para una potencial fusión (la "Transacción") de TotalBank ("TotalBank"), sociedad 100% de propiedad de Banco Popular Español, S.A. ("BPE"), por absorción de City National Bank of Florida ("CNB"), filial de Banco de Crédito e Inversiones ("Bci").

A pesar de los considerables esfuerzos desarrollados por las partes en el curso de los últimos meses, no ha sido posible alcanzar un acuerdo en varios puntos críticos que eran de suma importancia para Bci. En virtud de lo anterior, el Directorio de Bci ha tomado la decisión de no seguir adelante con la Transacción, por lo que damos por terminada la LOI y nuestras negociaciones.

Tal como le comunicamos a vuestro equipo, nuestra oferta (la "Oferta") consideró un precio pagadero a BPE de US$545 millones más la asunción por parte de Bci de los pagos por cambio de control contemplados en los contratos de ciertos ejecutivos principales de TotalBank y de su CEO con BPE, más una serie de condiciones que eran parte integral de la Oferta y que tenían un impacto en nuestra valorización (e.g., capital mínimo de TotalBank, mantención por un período de tiempo de los depósitos de BPE en TotalBank, pago a TotalBank de comisiones por el servicio de ciertos créditos de BPE, entre otros). Dado que por vuestra parte no se aceptaron las condiciones que eran parte integral de la Oferta, Bci realizó una contraoferta de US$540 millones, asumiendo todos los costos por cambio de control y aceptando - entre otras materias - la posición de BPE en aquellas condiciones antes referidas que tenían impacto en la valorización, elevando para Bci el valor de la Transacción por sobre los US$555 millones. Esta nueva propuesta no fue aceptada por BPE según ustedes nos informaran en el día de ayer.

También hay que recordar, tal y como ha publicado Diario16, cómo Saracho paró la oferta del BCI chileno por el TotalBank de 540 millones de euros sin motivo aparente, un banco por el que el Santander espera obtener 400 millones de euros. ¿540 millones eran insuficientes y 400 son una operación magnífica? Más bien se trató de un nuevo movimiento por el que Saracho pretendía desgastar el balance del Popular para llegar a la presunta situación apocalíptica que se ofreció el día 6 de junio en ese Consejo de Administración.

Tras ese Consejo se envió una carta a la Junta Única de Resolución en la que se indicaba que el Popular debía ser intervenido por falta de liquidez, una comunicación que, tal y como ya hemos publicado en Diario16, tiene una dudosa validez por, en primer lugar, la propia configuración del mismo (sin sello ni antefirma y en un folio sólo con membrete del banco) y, en segundo lugar, con una firma dudosa que parece la de Saracho pero que con un peritaje adecuado se podría determinar que fue firmado por otra persona.



*Carta del Popular a la JUR informando de la situación "likely to fail" del Popular*

Por otro lado, durante la mañana del 2 de junio se produjo una conversación telefónica entre Joaquín Hervada Yáñez, secretario del Consejo de Administración, y uno de los despachos de referencia del Santander, una conversación cuya transcripción fue remitida al Popular. En esta transcripción se asesora desde el despacho cómo justificar ante el Consejo de Administración que el banco era inviable, aunque, tal y como se afirma en dicha transcripción, era fundamental dejar claro que «no basta con la posibilidad más o menos hipotética si las circunstancias reales de los planes para evitar la inviabilidad ponen de manifiesto que no son realistas, aunque sea posible que se hagan realidad esas medidas que corregirían los incumplimientos». Por otro lado, se reconoce que «la comunicación de inviabilidad no conlleva que el banco deba ser puesto en resolución necesariamente y de inmediato». La tarde del día 6 de junio Saracho envió la carta presuntamente falsa y el Popular fue intervenido. Había prisa.

URÍA MENÉNDEZ

Nota sobre inviabilidad vs liquidez
Borrador 2017 06 02
Confidencial

## NOTA: CONVERSACIÓN SOBRE SEGUIMIENTO DE INVIABILIDAD, LIQUIDEZ Y PROVISIONES

Joaquín:

Las ideas aportadas durante nuestra conversación de esta mañana.

1. Los administradores tienen obligación de comunicar la "inviabilidad".

   La "inviabilidad" es un concepto técnico: "si la entidad incumple de manera significativa o es razonablemente previsible que incumpla de manera significativa en un futuro próximo los requerimientos de solvencia y otros" – como el ratio de liquidez (art 20, Ley 11/2015).

   Estaremos en ese caso si incumplimos significativamente ratios, o prevemos que se incumplirán significativamente ratios, salvo que creamos (i) que un incumplimiento de ratios no es significativo, por ser puntual y reversible a corto plazo, o (ii) que un previsible incumplimiento no llegará a darse, porque antes de llegar a esa situación de incumplimiento de ratios habremos evitado incumplirlos – con el aumento de capital, la generación de plusvalías, la venta en bloque de activos deteriorados, … Hasta ahora, el único incumplimiento de ratios (el de LCR) se consideró por el consejo no significativo porque había un plan creíble para retornar al cumplimiento durante el mes de mayo.

### Esteban Cano

Escritor y Periodista de investigación