# EXHIBIT 64

30.7.2014 EN Official Journal of the European Union L 225/1

I

*(Legislative acts)*

# REGULATIONS

**REGULATION (EU) No 806/2014 OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL**

**of 15 July 2014**

**establishing uniform rules and a uniform procedure for the resolution of credit institutions and certain investment firms in the framework of a Single Resolution Mechanism and a Single Resolution Fund and amending Regulation (EU) No 1093/2010**

THE EUROPEAN PARLIAMENT AND THE COUNCIL OF THE EUROPEAN UNION,

Having regard to the Treaty on the Functioning of the European Union, and in particular Article 114 thereof,

Having regard to the proposal from the European Commission,

After transmission of the draft legislative act to the national parliaments,

Having regard to the opinion of the European Central Bank [1],

Having regard to the opinion of the European Economic and Social Committee [2],

Acting in accordance with the ordinary legislative procedure [3],

Whereas:

(1) Over the past decades the Union has made progress in creating an internal market for banking services. A better integrated internal market for banking services is essential in order to foster economic growth in the Union and adequate funding of the real economy. However, the financial and economic crisis has shown that the functioning of the internal market in this area is under threat and that there is an increasing risk of financial fragmentation. This is a real source of concern in an internal market in which banks should be able to carry out significant cross-border activities. Interbank markets have become less liquid and cross-border bank activities are decreasing due to fear of contagion, lack of confidence in other national banking systems and in the ability of Member States to support banks.

(2) Divergences between national resolution rules in different Member States and corresponding administrative practices and the lack of a unified decision-making process for resolution in the banking union contribute to that lack of confidence and market instability, as they do not ensure predictability as to the possible outcome of a bank failure.

(3) In particular, the different incentives and practices of Member States in the treatment of creditors of banks under resolution and in the bail-out of failing banks with tax payers' money have an impact on the perceived credit risk, financial soundness and solvency of their banks and thus create an unlevel playing field. This undermines public confidence in the banking sector and obstructs the exercise of the freedom of establishment and the free provision of services within the internal market because financing costs would be lower without such differences in practices of Member States.

[1] OJ C 109, 11.4.2014, p. 2.
[2] OJ C 67, 6.3.2014, p. 58.
[3] Position of the European Parliament of 15 April 2014 (not yet published in the Official Journal) and decision of the Council of 14 July 2014.

(4)     Divergences between national resolution rules in different Member States and corresponding administrative practices may lead banks and customers to have higher borrowing costs only because of their place of establishment and irrespective of their real creditworthiness. In addition, customers of banks in some Member States face higher borrowing rates than customers of banks in other Member States, irrespective of their own creditworthiness.

(5)     The European Council on 18 October 2012 concluded that, 'In the light of the fundamental challenges facing it, the Economic and Monetary Union needs to be strengthened to ensure economic and social welfare as well as stability and sustained prosperity' and 'that the process towards deeper economic and monetary union should build on the Union institutional and legal framework and be characterised by openness and transparency towards Member States whose currency is not the euro and by respect for the integrity of the internal market'. To that end a banking union is established, underpinned by a comprehensive and detailed single rulebook for financial services for the internal market as a whole. The process towards establishing a banking union is characterised by openness and transparency towards non-participating Member States and by respect for the integrity of the internal market.

(6)     The European Parliament, in its resolution of 7 July 2010 with recommendations to the Commission on Cross-Border Crisis Management in the Banking Sector, requested the Commission to submit 'on the basis of Articles 50 and 114 of the Treaty on the Functioning of the European Union, one or more legislative proposals relating to an EU crisis-management framework, an EU financial stability fund, and a resolution unit' and, in its resolution of 20 November 2012 with recommendations to the Commission on the report of the Presidents of the European Council, the European Commission, the European Central Bank and the Eurogroup 'Towards a genuine Economic and Monetary Union', stated that 'breaking up the negative feedback loops between sovereigns, banks and the real economy is crucial for a smooth functioning of the EMU', stressed the 'urgent need for additional and far-reaching measures to solve the crisis in the banking sector' and for the 'realisation of a fully operational European banking union' while ensuring 'the continued proper functioning of the internal market for financial services and the free movement of capital'.

(7)     As a first step towards a banking union, the single supervisory mechanism established by Council Regulation (EU) No 1024/2013 ($^1$) (the 'SSM') is to ensure that the Union's policy relating to the prudential supervision of credit institutions is implemented in a coherent and effective manner, that the single rulebook for financial services is applied in the same manner to credit institutions in the euro area Member States and those non-euro area Member States who choose to participate in the SSM (the 'participating Member States'), and that those credit institutions are subject to supervision of the highest quality.

(8)     More efficient resolution mechanisms are an essential instrument to avoid damages that have resulted from failures of banks in the past.

(9)     As long as resolution rules, practices and approaches to burden-sharing remain national and the financial resources needed for funding resolution are raised and spent at national level, the internal market will remain fragmented. Moreover, national supervisors have strong incentives to minimise the potential impact of bank crises on their national economies by adopting unilateral action to ring-fence banking operations, for instance by limiting intra-group transfers and lending, or by imposing higher liquidity and capital requirements on subsidiaries in their jurisdictions of potentially failing parent undertakings. This restricts the cross-border activities of banks and thus creates obstacles to the exercise of fundamental freedoms and distorts competition in the internal market. Contentious home-host issues, although addressed in the context of SSM and of Directive 2014/59/EU of the European Parliament and of the Council ($^2$), may still reduce efficiency in cross-border resolution processes.

---

($^1$) Council Regulation (EU) No 1024/2013 of 15 October 2013 conferring specific tasks on the European Central Bank concerning policies relating to the prudential supervision of credit institutions (OJ L 287, 29.10.2013, p. 63).

($^2$) Directive 2014/59/EU of the European Parliament and of the Council of 15 May 2014 establishing a framework for the recovery and resolution of credit institutions and investment firms and amending Council Directive 82/891/EEC, and Directives 2001/24/EC, 2002/47/EC, 2004/25/EC, 2005/56/EC, 2007/36/EC, 2011/35/EU, 2012/30/EU and 2013/36/EU, and Regulations (EU) No 1093/2010 and (EU) No 648/2012, of the European Parliament and of the Council (OJ L 173, 12.6.2014, p. 190).

(10) In order to address those issues it has been necessary to intensify the integration of the resolution framework for credit institutions and investment firms ('institutions') in order to bolster the Union, restore financial stability and lay the basis for economic recovery. Directive 2014/59/EU is a significant step towards harmonisation of the rules relating to the resolution of banks across the Union and provides for cooperation among resolution authorities when dealing with the failure of cross-border banks. However, that Directive establishes minimum harmonisation rules and does not lead to centralisation of decision making in the field of resolution. It essentially provides for common resolution tools and resolution powers available for the national authorities of every Member State, but leaves discretion to national authorities in the application of the tools and in the use of national financing arrangements in support of resolution procedures. This ensures that authorities have the tools to intervene sufficiently early and quickly in an unsound or failing institution so as to ensure the continuity of the institution's critical financial and economic functions while minimising the impact of an institution's failure on the economy and financial system.

Although it confers regulatory and mediation tasks on the European Supervisory Authority (European Banking Authority) ('EBA'), established by Regulation (EU) No 1093/2010 of the European Parliament and of the Council (¹), Directive 2014/59/EU does not completely avoid the taking of separate and potentially inconsistent decisions by Member States regarding the resolution of cross-border groups which may affect the overall costs of resolution. Moreover, as it provides for national financing arrangements, it does not sufficiently reduce the dependence of banks on the support from national budgets and does not completely prevent different approaches by Member States to the use of the financing arrangements.

(11) For participating Member States, in the context of the Single Resolution Mechanism (SRM), a centralised power of resolution is established and entrusted to the Single Resolution Board established in accordance with this Regulation ('the Board') and to the national resolution authorities. That establishment is an integral part of the process of harmonisation in the field of resolution operated by Directive 2014/59/EU and by the set of uniform provisions laid down in this Regulation. The uniform application of the resolution regime in the participating Member States will be enhanced as a result of it being entrusted to a central authority such as the SRM. Furthermore, the SRM is interwoven with the process of harmonisation in the field of prudential supervision, brought about by the establishment of EBA, the single rulebook on prudential supervision (Regulation (EU) No 575/2013 of the European Parliament and of the Council (²) and Directive 2013/36/EU of the European Parliament and of the Council (³)), and, in the participating Member States, the establishment of the SSM to which the application of Union prudential supervision rules is entrusted. Supervision and resolution are two complementary aspects of the establishment of the internal market for financial services whose application at the same level is regarded as mutually dependent.

(12) Ensuring effective resolution decisions for failing banks within the Union, including on the use of funding raised at Union level, is essential for the completion of the internal market in financial services. Within the internal market, the failure of banks in one Member State may affect the stability of the financial markets of the Union as a whole. Ensuring effective and uniform resolution rules and equal conditions of resolution financing across Member States is in the best interests not only of the Member States in which banks operate but also of all Member States in general as a means of ensuring a level competitive playing field and improving the functioning of the internal market. Banking systems in the internal market are highly interconnected, bank groups are international and banks have a large percentage of foreign assets. In the absence of the SRM, bank crises in Member States participating in the SSM would have a stronger negative systemic impact also in non-participating Member States. The establishment of the SRM will ensure a neutral approach in dealing with failing banks and therefore increase stability of the banks of the participating Member States and prevent the spill-over of crises into non-participating Member States and will thus facilitate the functioning of the internal market as a whole. The

(¹) Regulation (EU) No 1093/2010 of the European Parliament and of the Council of 24 November 2010 establishing a European Supervisory Authority (European Banking Authority), amending Decision No 716/2009/EC and repealing Commission Decision 2009/78/EC (OJ L 331, 15.12.2010, p. 12).
(²) Regulation (EU) No 575/2013 of the European Parliament and of the Council of 26 June 2013 on prudential requirements for credit institutions and investment firms and amending Regulation (EU) No 648/2012 (OJ L 176, 27.6.2013, p. 1).
(³) Directive 2013/36/EU of the European Parliament and of the Council of 26 June 2013 on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms, amending Directive 2002/87/EC and repealing Directives 2006/48/EC and 2006/49/EC (OJ L 176, 27.6.2013, p. 338).

mechanisms for cooperation regarding institutions established in both participating and non-participating Member States should be clear, and no Member State or group of Member States should be discriminated against, directly or indirectly, as a venue for financial services.

(13) In order to restore trust and credibility in the banking sector, the European Central Bank (ECB) is currently conducting a comprehensive balance sheet assessment of all banks supervised directly. Such an assessment should assure all stakeholders that banks entering the SSM, and therefore falling within the scope of the SRM, are fundamentally sound and trustworthy.

(14) Following the establishment of the SSM by Regulation (EU) No 1024/2013 pursuant to which banks in the participating Member States are supervised either centrally by the ECB or by the national competent authorities within the framework of the SSM, there is a misalignment between the Union supervision of such banks and the national treatment of those banks in the resolution proceedings pursuant to Directive 2014/59/EU which will be addressed by the establishment of the SRM.

(15) This Regulation applies only in respect of banks whose home supervisor is the ECB or the national competent authority in Member States whose currency is the euro or in Member States whose currency is not the euro which have established a close cooperation in accordance with Article 7 of Regulation (EU) No 1024/2013. The scope of application of this Regulation is linked to the scope of application of Regulation (EU) No 1024/2013. Indeed, bearing in mind the significant level to which the supervisory tasks attributed to the SSM and resolution action are interwoven, the establishment of a centralised system of supervision operated under Article 127(6) of the Treaty on the Functioning of the European Union (TFEU) is fundamentally important to the process of harmonisation of resolution in participating Member States. The fact of being subject to supervision by the SSM constitutes a specific attribute that places the entities falling within the scope of application of Regulation (EU) No 1024/2013 in an objectively and characterised distinct position for resolution purposes. It is necessary to adopt measures to create an SRM for all Member States participating in the SSM in order to facilitate the proper and stable functioning of the internal market.

(16) Whilst banks in Member States remaining outside the SSM are subject to supervision, resolution and financial backstop arrangements which are aligned at national level, banks in Member States participating in the SSM are subject to Union arrangements for supervision and national arrangements for resolution and financial backstops. Because supervision and resolution are at two different levels within the SSM, intervention and resolution in banks in the Member States participating in the SSM would not be as rapid, consistent and effective as in banks in the Member States outside of the SSM. Therefore, a centralised resolution mechanism for all banks operating in the Member States participating in the SSM is essential to guarantee a level playing field.

(17) As long as supervision in a Member State remains outside the SSM, that Member State should remain responsible for the financial consequences of a bank failure. The SRM should therefore extend only to banks and financial institutions established in Member States participating in the SSM and subject to the supervision of the ECB and the national authorities within the framework of the SSM. Banks established in the Member States not participating in the SSM should not be subject to the SRM. Subjecting such Member States to the SRM would create the wrong incentives for them. In particular, supervisors in those Member States may become more lenient towards banks in their jurisdictions as they would not have to bear the full financial risk of their failures. Therefore, in order to ensure parallelism with the SSM, the SRM should apply to Member States participating in the SSM. As Member States join the SSM, they should also automatically become subject to the SRM. Ultimately, the SRM could potentially extend to the entire internal market.

(18)   In order to ensure a level playing field within the internal market as a whole, this Regulation is consistent with Directive 2014/59/EU. It therefore adapts the rules and principles of that Directive to the specificities of the SRM and ensures that appropriate funding is available to the latter. When the Board, the Council and the Commission exercise the powers conferred on them by this Regulation, they should be subject to the delegated acts, and regulatory and implementing technical standards, guidelines and recommendations adopted by EBA on the basis of respectively Articles 10 to 15 and Article 16 of Regulation (EU) No 1093/2010 within the scope of Directive 2014/59/EU. The Board, the Council and the Commission, in their respective capacities, should also cooperate with EBA in accordance with Articles 25 and 30 of Regulation (EU) No 1093/2010 and respond to requests of collection of information addressed to them by EBA in accordance with Article 35 of that Regulation. It is recalled that, according to the last sentence of Recital 32 of that Regulation, 'in cases where the relevant Union legislation confers discretion on [...] competent authorities, decisions taken by the Authority cannot replace the exercise in compliance with Union law of that discretion'. The same principle should extend to this Regulation, while fully respecting the principles enshrined in primary Union law. In the light of those key elements EBA should be able to perform its tasks effectively and to secure the equality of treatment between the Board, the Council, the Commission and the national authorities when performing similar tasks.

(19)   A single resolution fund ('Fund') is an essential element without which the SRM could not work properly. If the funding of resolution were to remain national in the longer term, the link between sovereigns and the banking sector would not be fully broken, and investors would continue to establish borrowing conditions according to the place of establishment of the banks rather than to their creditworthiness. The Fund should help to ensure a uniform administrative practice in the financing of resolution and to avoid the creation of obstacles for the exercise of fundamental freedoms or the distortion of competition in the internal market due to divergent national practices. The Fund should be financed by bank contributions raised at national level and should be pooled at Union level in accordance with an intergovernmental agreement on the transfer and progressive mutualisation of those contributions (the 'Agreement'), thus increasing financial stability and limiting the link between the perceived fiscal position of individual Member States and the funding costs of banks and undertakings operating in those Member States. To further break that link, decisions taken within the SRM should not impinge on the fiscal responsibilities of the Member States. In that regard, only extraordinary public financial support should be considered to be an impingement on the budgetary sovereignty and fiscal responsibilities of the Member States. In particular, decisions that require the use of the Fund or of a deposit guarantee scheme should not be considered to impinge on the budgetary sovereignty or fiscal responsibilities of the Member States.

(20)   This Regulation, together with Directive 2014/59/EU, establishes the modalities for the use of the Fund and the general criteria to determine the fixing and calculation of *ex-ante* and *ex-post* contributions. Participating Member States remain competent to levy the contributions from the entities located in their respective territories in accordance with Directive 2014/59/EU and with this Regulation. By means of the Agreement, the participating Member States will assume the obligation to transfer to the Fund the contributions that they raise at national level in accordance with Directive 2014/59/EU and this Regulation. During a transitional period, the contributions will be allocated to different compartments corresponding to each participating Member State (national compartments). Those compartments will be subject to a progressive merger so that they will cease to exist at the end of the transitional period. The Agreement will lay down the conditions upon which the parties thereto agree to transfer the contributions that they raise at national level to the Fund and to progressively merge the compartments. The entry into force of the Agreement will be necessary for the contributions raised by the parties to be transferred to the national compartments of the Fund. This Regulation lays down the powers of the Board for using and managing the Fund. The Agreement will determine how the Board is able to dispose of the national compartments that are progressively merged.

(21)   A centralised application of the resolution rules for institutions laid down in Directive 2014/59/EU by a single Union resolution authority in the participating Member States can be ensured only where the rules governing the establishment and functioning of the SRM are directly applicable in the Member States to avoid divergent interpretations across the Member States. Such direct applicability should bring benefits to the internal market as a whole because it will contribute to ensuring fair competition and to preventing obstacles to the free exercise of fundamental freedoms not only in the participating Member States but in the internal market as a whole.

(22)   Mirroring the scope of Regulation (EU) No 1024/2013, the SRM should cover all credit institutions established in the participating Member States. However, within the framework of the SRM, it should be possible to resolve directly any credit institution of a participating Member State in order to avoid asymmetries within the internal

market in respect of the treatment of failing institutions and creditors during a resolution process. To the extent that parent undertakings, investment firms and financial institutions are included in the consolidated supervision by the ECB, they should be included in the scope of the SRM. Although the ECB will not supervise those institutions on a solo basis, it will be the only supervisor that will have a global perception of the risk which a group, and indirectly its individual members, is exposed to. To exclude entities which form part of the consolidated supervision within the scope of the ECB from the scope of the SRM would make it impossible to plan for the resolution of groups and to adopt a group resolution strategy, and would make any resolution decisions much less effective.

(23)   Within the SRM, decisions should be taken at the most appropriate level. When adopting decisions under this Regulation, the Board and the national resolution authorities should apply the same material rules.

(24)   Since only institutions of the Union may establish the resolution policy of the Union and since a margin of discretion remains in the adoption of each specific resolution scheme, it is necessary to provide for the adequate involvement of the Council and the Commission, as institutions which may exercise implementing powers, in accordance with Article 291 TFEU. The assessment of the discretionary aspects of the resolution decisions taken by the Board should be exercised by the Commission. Given the considerable impact of the resolution decisions on the financial stability of Member States and on the Union as such, as well as on the fiscal sovereignty of Member States, it is important that implementing power to take certain decisions relating to resolution be conferred on the Council. It should therefore be for the Council, on a proposal from the Commission, to exercise effective control on the assessment by the Board of the existence of a public interest and to assess any material change to the amount of the Fund to be used in a specific resolution action. Moreover, the Commission should be empowered to adopt delegated acts to specify further criteria or conditions to be taken into account by the Board in the exercise of its different powers. Such a conferral of resolution tasks should not in any way hamper the functioning of the internal market for financial services. EBA should therefore maintain its role and retain its existing powers and tasks: it should develop and contribute to the consistent application of the Union legislation applicable to all Member States and enhance convergence of resolution practices across the Union as a whole.

(25)   In order to ensure conformity with the principles established in Article 3(3) of Directive 2014/59/EU, the Union institutions, when performing the tasks conferred on them by this Regulation, should ensure that appropriate organisational arrangements are in place.

(26)   The ECB, as the supervisor within the SSM, and the Board, should be able to assess whether a credit institution is failing or is likely to fail and whether there is no reasonable prospect that any alternative private sector or supervisory action would prevent its failure within a reasonable timeframe. The Board, if it considers all the criteria relating to the triggering of resolutions to be met, should adopt the resolution scheme. The procedure relating to the adoption of the resolution scheme, which involves the Commission and the Council, strengthens the necessary operational independence of the Board while respecting the principle of delegation of powers to agencies as interpreted by the Court of Justice of the European Union (the 'Court of Justice'). Therefore, this Regulation provides that the resolution scheme adopted by the Board enters into force only if, within 24 hours after its adoption by the Board, there are no objections from the Council or the Commission or the resolution scheme is approved by the Commission. The grounds on which the Council is permitted to object, on a proposal by the Commission, to the Board's resolution scheme should be strictly limited to the existence of a public interest and to material modifications by the Commission of the amount of the use of the Fund as proposed by the Board.

A change of 5 % or more to the amount of the Fund compared with the original proposal of the Board should be considered to be material. The Council should approve or object to the Commission's proposal without amending it. As an observer to the meetings of the Board, the Commission should, on an ongoing basis, check that the resolution scheme adopted by the Board complies fully with this Regulation, balances appropriately the different objectives and interests at stake, respects the public interest and that the integrity of the internal market is preserved. Considering that the resolution action requires a very speedy decision-making process, the Council and the Commission should cooperate closely and the Council should not duplicate the preparatory work already undertaken by the Commission. The Board should instruct the national resolution authorities which should take all necessary measures to implement the resolution scheme.

(27) The production of a group resolution scheme should facilitate coordinated resolution that is more likely to deliver the best result for all entities of a group. The Board or, where relevant, the national resolution authorities should have the power to apply the bridge institution tool at group level (which may involve, where appropriate, burden-sharing arrangements) to stabilise a group as a whole. Ownership of subsidiaries could be transferred to the bridge institution with a view to onward sale, either as a package or individually, when market conditions are appropriate. In addition, the Board or, where relevant, the national resolution authority should have the power to apply the bail-in tool at parent level.

(28) The Board should, in particular, be empowered to take decisions in relation to significant entities or groups, entities or groups directly supervised by the ECB or cross-border groups. The national resolution authorities should assist the Board in resolution planning and in the preparation of resolution decisions. For entities and groups which are not significant and not cross-border, the national resolution authorities should be responsible, in particular, for resolution planning, the assessment of resolvability, the removal of impediments to resolvability, the measures that the resolution authorities are entitled to take during early intervention, and resolution actions. Under certain circumstances the national resolution authorities should perform their tasks on the basis of and in accordance with this Regulation while exercising the powers conferred on them by, and in accordance with, the national law transposing Directive 2014/59/EU in so far as it is not in conflict with this Regulation.

(29) It is essential for the good functioning of the internal market that the same rules apply to all resolution actions, regardless of whether they are taken by the resolution authorities under Directive 2014/59/EU or within the framework of the SRM. The Commission should assess those measures under Article 107 TFEU.

(30) Where resolution action would involve the granting of State aid pursuant to Article 107(1) TFEU or as Fund aid, a resolution decision can be adopted after the Commission has adopted a positive or conditional decision concerning the compatibility of the use of such aid with the internal market. The decision of the Commission on Fund aid may impose conditions, commitments or undertakings in respect of the beneficiary. The conditions which may be imposed by the Commission may include, but are not limited to, burden-sharing requirements, including a requirement that losses are first absorbed by equity, and requirements as to contributions by hybrid capital holders, subordinated debt holders and senior creditors, including in accordance with the requirements of Directive 2014/59/EU; restrictions on the payment of dividends on shares or coupons on hybrid capital instruments, on the repurchase of own shares or hybrid capital instruments, or on capital management transactions; restrictions on acquisitions of stakes in any undertaking either through an asset or share transfer; prohibitions against aggressive commercial practices or strategies, or advertising support from public aid; requirements concerning market shares, pricing, product features or other behavioural requirements; requirements for restructuring plans; governance requirements; reporting and disclosure requirements, including as regards compliance with such conditions as may be specified by the Commission; requirements relating to the sale of the beneficiary or of all or part of its assets, rights and liabilities; requirements relating to the liquidation of the beneficiary.

(31) In order to ensure a swift and effective decision-making process in resolution, the Board should be a specific Union agency with a specific structure, corresponding to its specific tasks, and which departs from the model of all other agencies of the Union. Its composition should ensure that due account is taken of all relevant interests at stake in resolution procedures. Taking into account the missions of the Board, a Chair, a Vice-Chair and four further full-time members of the Board should be appointed on the basis of merit, skills, knowledge of banking and financial matters, and experience relevant to financial supervision, regulation and resolution of institutions. The Chair, the Vice-Chair and the four further full-time members of the Board should be chosen on the basis of an open selection procedure of which the European Parliament and the Council should be kept duly informed and which should respect the principle of gender balance, experience and qualification. The Commission should provide the competent committee of the European Parliament with the shortlist of candidates for the positions of Chair, Vice-Chair and the four further full-time members of the Board. The Commission should submit a proposal for the appointment of the Chair, the Vice-Chair and the four further full-time members of the Board to

the European Parliament for approval. Following the European Parliament's approval of that proposal, the Council should adopt an implementing decision to appoint the Chair, the Vice-Chair and the four further full-time members of the Board.

(32) The Board should operate in executive and plenary sessions. In its executive session, it should be composed of its Chair, its four further independent full-time members, which should act independently and objectively in the interest of the Union as a whole, and permanent observers appointed by the Commission and by the ECB. When deliberating on the resolution of an institution or group established within a single participating Member State, the executive session of the Board should convene and involve in the decision-making process the member appointed by the Member State concerned representing its national resolution authority. When deliberating on a cross-border group, the members appointed by the home and all host Member States concerned representing the relevant national resolution authorities should be convened and involved in the decision-making process of the executive session of the Board.

(33) The Board, in its executive session, should prepare all decisions concerning resolution procedure and, to the fullest extent possible, adopt those decisions. Because of the institution-specific nature of the information contained in the resolution plans, decisions concerning the drawing up, assessment, and approval of the resolution plans should be taken by the Board in its executive session. Regarding the use of the Fund, it is important that there is no first-mover advantage and that the outflows of the Fund are monitored. In order to ensure corresponding decision making by the Board, where resolution action is required above the threshold of EUR 5 000 000 000, any member of the plenary should be able, within a strict deadline, to request that the plenary session decide. Where liquidity support involves no or significantly less risk than other forms of support, in particular in the case of a short-term, one-off extension of credit to solvent institutions against adequate collateral of high quality, it is justified to give such a form of support a lower weight of only 0,5. Once the net accumulated use of the Fund in the previous consecutive 12 months reaches the threshold of EUR 5 000 000 000 per year, the plenary session should evaluate the application of the resolution tools, including the use of the Fund, and should provide guidance which the executive session should follow in subsequent resolution decisions. Guidance to the executive session should, in particular, focus on ensuring the non-discriminatory application of resolution tools, on avoiding a depletion of the Fund and differentiating appropriately between no-risk or low-risk liquidity and other forms of support.

(34) Since the participants in the decision-making process of the Board in its executive sessions would change depending on the Member State where the relevant institution or group operates, the permanent participants should ensure that the decisions throughout the different formations of the executive sessions of the Board are consistent, appropriate and proportionate.

(35) The Board should be able to invite observers to its meetings. The conferral of resolution tasks on the Board should be consistent with the framework of the European System of Financial Supervision ('ESFS') and its underlying objective to develop the single rulebook and enhance convergence of supervisory and resolution practices across the Union as a whole. In particular, EBA should assess and coordinate initiatives, in accordance with Regulation (EU) No 1093/2010, on resolution plans with a view to promoting convergence in that area. Therefore, as a general rule, the Board should always invite EBA when matters are discussed for which, in accordance with Directive 2014/59/EU, EBA is required to develop technical standards or to issue guidelines. Other observers, such as a representative of the European Stability Mechanism (ESM), may, where appropriate, also be invited to attend the meetings of the Board.

(36) The observers should be subject to the same requirements of professional secrecy as the members and the staff of the Board and staff exchanged with or seconded by participating Member States carrying out resolution duties.

(37) The Board should be able to establish internal resolution teams composed of its own staff and staff of the national resolution authorities, including, where appropriate, observers from non-participating Member States. Those internal resolution teams should be headed by coordinators appointed from the Board's senior staff, who might be invited as observers to participate in the executive sessions of the Board.

(38) The Board and the resolution authorities and competent authorities of the non-participating Member States should conclude memoranda of understanding describing in general terms how they will cooperate with one another in the performance of their tasks under Directive 2014/59/EU. The memoranda of understanding could, inter alia, clarify the consultation relating to decisions of the Board that have effect on subsidiaries established or branches located in the non-participating Member States, where the parent undertaking is established in a participating Member State. The memoranda should be reviewed on a regular basis.

(39) The Board should act independently. It should have the capacity to deal with large groups and to act swiftly and impartially. The Board should ensure that appropriate account is taken of national financial stability, financial stability of the Union and the internal market. Members of the Board should have the necessary expertise on bank restructuring and insolvency.

(40) When making decisions or taking actions in the exercise of the powers conferred by this Regulation, due account should be given to the importance for the internal market of the exercise of the right of establishment provided for in the TFEU, and, in particular, where possible, to the effects on the continuation of cross-border activities.

(41) In the light of the Board's missions and the resolution objectives which include the protection of public funds, the functioning of the SRM should be financed from contributions paid by the institutions established in the participating Member States.

(42) The Board, the Council where relevant, and the Commission should replace the national resolution authorities designated under Directive 2014/59/EU in respect of all aspects relating to the resolution decision-making process. The national resolution authorities designated under that Directive should continue to carry out activities relating to the implementation of resolution schemes adopted by the Board. In order to ensure transparency and democratic control, as well as to safeguard the rights of the Union institutions, the Board should be accountable to the European Parliament and to the Council for any decisions taken on the basis of this Regulation. For reasons of transparency and democratic control, national parliaments should have certain rights to obtain information about the activities of, and to engage in a dialogue with, the Board.

(43) The national parliament of a participating Member State, or the competent committee thereof, should be able to invite the Chair to participate in an exchange of views in relation to the resolution of institutions in that Member State together with a representative of the national resolution authority. Such a role for national parliaments is appropriate given the potential impact that resolution actions may have on public finances, institutions, their customers and employees, and the markets in the participating Member States. The Chair and the national resolution authorities should respond positively to such invitations to exchange views with the national parliaments.

(44) To ensure a uniform approach for institutions and groups the Board should be empowered to draw up resolution plans for such institutions and groups, after consulting the national competent and resolution authorities. It should be the general rule that the group resolution plans are prepared for the group as a whole and identify measures in relation to a parent undertaking as well as all individual subsidiaries that are part of a group. The group resolution plans should take into account the financial, technical and business structure of the relevant group. If individual resolution plans for entities that are a part of a group are prepared, the Board or, where relevant, the national resolution authorities should aim to achieve, to the extent possible, consistency with resolution plans for the rest of the group. The Board or, where relevant, the national resolution authorities should transmit the resolution plans and any changes thereto to the competent authority, in order to permanently keep it fully informed. The Board should assess the resolvability of institutions and groups, and take measures aimed at removing impediments to resolvability, if any. The Board should require the national resolution authorities to apply such appropriate measures designed to remove impediments to resolvability in order to ensure consistency and the resolvability of the institutions concerned. Given the sensitivity of the information contained in them, resolution plans should be subject to the requirements of professional secrecy laid down in this Regulation.

(45)  When applying resolution tools and exercising resolution powers, the principle of proportionality and the particularities of the legal form of an institution should be taken into account.

(46)  Resolution planning is an essential component of effective resolution. The Board should therefore have the power to require changes to the structure and organisation of institutions or groups to take measures which are necessary and proportionate to reduce or remove material impediments to the application of resolution tools and ensure the resolvability of the entities concerned. Due to the potentially systemic nature of all institutions, it is crucial, in order to maintain financial stability, that the Board, or, where relevant, the national resolution authorities, have the possibility to resolve any institution. In order to respect the right to conduct business laid down by Article 16 of the Charter of Fundamental Rights of the European Union (the 'Charter'), the Board's discretion should be limited to what is necessary to simplify the structure and operations of the institution solely to improve its resolvability. In addition, any measure imposed for such purposes should be consistent with Union law. Measures should neither directly nor indirectly be discriminatory on grounds of nationality, and should be justified by the overriding reason of being conducted in the public interest in financial stability. To determine whether an action was taken in the general public interest, the Board, acting in the general public interest, should be able to achieve the resolution objectives without encountering impediments to the application of resolution tools or its ability to exercise the powers conferred on it by this Regulation. Furthermore, action should not go beyond the minimum necessary to attain the objectives sought. When determining the measures to be taken, the Board or, where applicable, the national resolution authorities should take into account the warnings and recommendations of the European Systemic Risk Board ('ESRB') established by Regulation (EU) No 1092/2010 of the European Parliament and of the Council (¹).

(47)  Due to the potentially systemic nature of all institutions, it is crucial that the Board, where appropriate in co-operation with the national resolution authorities, is able to adopt resolution plans, assess the resolvability of any institution and group and, where necessary, take measures to address or remove impediments to the resolvability of any institution in the participating Member States. The failure of systemically important institutions, including those referred to in Article 131 of Directive 2013/36/EU, could pose a considerable risk to the functioning of the financial markets and could have a negative impact on financial stability. The Board should take due care, as a matter of priority, to establish the resolution plans of those systemically important institutions, as well as to assess their resolvability and to take all action necessary to address or remove all of the impediments to their resolvability, without prejudice to its independence and to its obligation to plan for the resolution and assess the resolvability of all of the institutions subject to its powers.

(48)  Resolution plans should include procedures for informing and consulting employee representatives throughout the resolution processes where appropriate. Where applicable, collective agreements or other arrangements provided for by social partners, as well as by Union and national law on the involvement of trade unions and workers' representatives in company restructuring processes, should be complied with in that regard.

(49)  In relation to the obligation of drafting resolution plans, the Board, or, where relevant, the national resolution authorities, in the context of resolution plans and when using the different powers and tools at their disposal, should take into account the nature of an entity's business, shareholding structure, legal form, risk profile, size and legal status and interconnectedness to other institutions or to the financial system in general, the scope and complexity of its activities, whether it is a member of an institutional protection scheme (IPS) or other cooperative mutual solidarity systems, whether it exercises any investment services or activities and whether its failure and subsequent winding up under normal insolvency proceedings would be likely to have a significant negative effect on financial markets, on other institutions, on funding conditions, or on the wider economy, ensuring that the regime is applied in an appropriate and proportionate way and that the administrative burden relating to resolution plan preparation obligations is minimised. Whereas the contents and information specified in Section A of the Annex to Directive 2014/59/EU establish a minimum standard for entities with evident systemic relevance, it is permitted to apply different or significantly reduced resolution planning and information requirements on an institution-specific basis, and at a lower frequency for updates than one year. For a small entity of little interconnectedness and complexity, the resolution plan could be reduced. Further, the regime should be applied

---

(¹)  Regulation (EU) No 1092/2010 of the European Parliament and of the Council of 24 November 2010 on European Union macro-prudential oversight of the financial system and establishing a European Systemic Risk Board (OJ L 331, 15.12.2010, p. 1).

EN     Official Journal of the European Union     L 225/11

so as not to jeopardise the stability of financial markets. In particular, in situations characterised by broader problems or even doubts about the resilience of many entities, it is essential to consider the risk of contagion from the actions taken in relation to any individual entity.

(50)  Where Directive 2014/59/EU provides for the possibility of applying simplified obligations or waivers by the national resolution authorities in relation to the requirement of drafting resolution plans, a procedure should be provided for whereby the Board or, where relevant, the national resolution authorities could authorise the application of such simplified obligations.

(51)  In line with the capital structure of entities affiliated to a central body, for the purposes of this Regulation, the Board, or, where relevant, the national resolution authorities, should not be obliged to draw up separate resolution plans solely on the grounds that the central body to which those entities are affiliated is under direct supervision of the ECB. In the case of group resolution plans, the potential impact of the resolution actions in all the Member States where the group operates should be specifically taken into account in the drawing up of the plans.

(52)  The SRM should be based on the frameworks of Regulation (EU) No 1024/2013 and of Directive 2014/59/EU. Therefore, the Board should be empowered to intervene at an early stage where the financial situation or the solvency of an entity is deteriorating. The information that the Board receives from the national resolution authorities or the ECB at that stage is instrumental in making a determination on the action it might take in order to prepare for the resolution of the entity concerned.

(53)  In order to ensure rapid resolution action when it becomes necessary, the Board should closely monitor, in co-operation with the ECB or with the relevant national competent authority, the situation of the entities concerned and the compliance of those entities with any early intervention measure taken in their respect. In determining whether a private sector action could prevent within a reasonable timeframe the failure of an entity, the appropriate authority should take into account the effectiveness of early intervention measures undertaken within a timeframe set by the competent authority.

(54)  The Board, the national resolution authorities and the competent authorities, including the ECB, should, where necessary, conclude a memorandum of understanding describing in general terms how they will cooperate with one another in the performance of their respective tasks under Union law. The memorandum should be reviewed on a regular basis.

(55)  When making decisions or taking actions, in particular regarding entities established both in participating Member States and in non-participating Member States, possible adverse effects on those Member States, such as threats to the financial stability of their financial markets, and on the entities established in those Member States, should also be taken into consideration.

(56)  In order to minimise disruption of the financial market and of the economy, the resolution process should be accomplished in a short time. Depositors should be granted access at least to the guaranteed deposits as promptly as possible, and in any event within the same deadlines as provided for in Directive 2014/49/EU of the European Parliament and of the Council (¹). The Commission should, throughout the resolution procedure, have access to any information which it deems to be necessary to take an informed decision in the resolution process.

(57)  The decision to place an entity under resolution should be taken before a financial entity is balance sheet insolvent and before all equity has been fully wiped out. Resolution should be initiated after the determination that an entity is failing or is likely to fail and that no alternative private sector measures would prevent such failure within a reasonable timeframe. The fact that an entity does not meet the requirements for authorisation should not justify per se the entry into resolution, especially if the entity remains or is likely to remain viable. An entity should be considered to be failing or likely to fail where it infringes or is likely, in the near future, to infringe the

_____

(¹) Directive 2014/49/EU of the European Parliament and of the Council of 16 April 2014 on deposit guarantee schemes (OJ L 173, 12.6.2014, p. 149).

requirements for continuing authorisation, where the assets of the entity are, or are likely in the near future to be, less than its liabilities, where the entity is, or is likely in the near future to be, unable to pay its debts as they fall due, or where the entity requires extraordinary public financial support except in the particular circumstances laid down in this Regulation. The need for emergency liquidity assistance from a central bank should not, per se, be a condition that sufficiently demonstrates that an entity is, or is likely in the near future to be, unable to pay its liabilities as they fall due. If that facility were guaranteed by a State, an entity accessing such a facility would be subject to State aid rules. In order to preserve financial stability, in particular in the event of a systemic liquidity shortage, State guarantees of liquidity facilities provided by central banks or State guarantees of newly issued liabilities to remedy a serious disturbance in the economy of a Member State should not trigger the resolution framework provided that a number of conditions are met. In particular, the State guarantee measures should be approved under the State aid framework and should not be part of a larger aid package, and the use of the guarantee measures should be strictly limited in time. Member States' guarantees for equity claims should be prohibited.

When providing a guarantee, a Member State should ensure that the guarantee is sufficiently remunerated by the entity. Furthermore, the provision of extraordinary public financial support should not trigger resolution where, as a precautionary measure, a Member State takes an equity stake in an entity, including an entity which is publicly owned, which complies with its capital requirements. That may be the case, for example, where an entity is required to raise new capital due to the outcome of a scenario-based stress test or of the equivalent exercise conducted by macroprudential authorities which includes a requirement that is set to maintain financial stability in the context of a systemic crisis, but the entity is unable to raise capital privately in markets. An entity should not be considered to be failing or likely to fail solely on the basis that extraordinary public financial support was provided before the entry into force of this Regulation. Finally, access to liquidity facilities including emergency liquidity assistance by central banks may constitute State aid pursuant to the State aid framework.

(58)  Liquidation of a failing entity under normal insolvency proceedings could jeopardise financial stability, interrupt the provision of essential services, and affect the protection of depositors. In such a case there is a public interest in applying resolution tools. The objectives of resolution should therefore be to ensure the continuity of essential financial services, to maintain the stability of the financial system, to reduce moral hazard by minimising reliance on public financial support to failing entities, and to protect depositors.

(59)  However, the winding up of an insolvent entity through normal insolvency proceedings should always be considered before a decision is taken to maintain the entity as a going concern. An insolvent entity should be maintained as a going concern for financial stability purposes and with the use, to the extent possible, of private funds. That may be achieved either through sale to or merger with a private sector purchaser, or after having written down the liabilities of the entity, or after converting its debt to equity in order to effect a recapitalisation.

(60)  When taking or preparing decisions relating to resolution powers, the Board, the Council and the Commission should ensure that resolution action is taken in accordance with certain principles, including that shareholders and creditors bear an appropriate share of the losses, that the management should in principle be replaced, that the costs of the resolution of the entity are minimised, and that creditors of the same class are treated in an equitable manner. In particular, where creditors within the same class are treated differently in the context of resolution action, such distinctions should be justified in the public interest and should be neither directly nor indirectly discriminatory on the grounds of nationality.

(61)  The limitations on the rights of shareholders and creditors should comply with Article 52 of the Charter. The resolution tools should therefore be applied only to those entities that are failing or likely to fail, and only where necessary to pursue the objective of financial stability in the general interest. In particular, resolution tools should be applied where the entity cannot be wound up under normal insolvency proceedings without destabilising the financial system and the measures are necessary in order to ensure the rapid transfer and continuation of systemically important functions and where there is no reasonable prospect for any alternative private solution, including any increase of capital by the existing shareholders or by any third party, sufficient to restore the full viability of the entity.

30.7.2014          EN          Official Journal of the European Union          L 225/13

(62) Interference with property rights should not be disproportionate. As a consequence, affected shareholders and creditors should not incur greater losses than those which they would have incurred had the entity been wound up at the time that the resolution decision is taken. In the event of partial transfer of assets of an institution under resolution to a private purchaser or to a bridge institution, the residual part of the institution under resolution should be wound up under normal insolvency proceedings. In order to protect shareholders and creditors of the entity during the winding up proceedings, they should be entitled to receive in payment of their claims not less than what it is estimated they would have recovered if the entity as a whole had been wound up under normal insolvency proceedings.

(63) For the purpose of protecting the rights of shareholders and creditors, clear obligations should be laid down concerning the valuation of the assets and liabilities of the institution under resolution and, where required under this Regulation, the valuation of the treatment that shareholders and creditors would have received if the entity had been wound up under normal insolvency proceedings. It should be possible to commence a valuation already in the early intervention phase. Before any resolution action is taken, a fair, prudent and realistic valuation of the assets and liabilities of the entity should be carried out. Such valuation should be subject to a right of appeal only together with the resolution decision. In addition, where required under this Regulation, an *ex-post* comparison between the treatment that shareholders and creditors have received and the treatment they would have received under normal insolvency proceedings should be carried out after resolution tools have been applied. If it is determined that shareholders and creditors have received, in payment of their claims, less than the amount that they would have received under normal insolvency proceedings, they should be entitled to the payment of the difference where required under this Regulation. That difference, if any, should be paid by the Fund established in accordance with this Regulation.

(64) It is important that losses be recognised upon failure of the entity. The valuation of assets and liabilities of failing entities should be based on fair, prudent and realistic assumptions at the moment when the resolution tools are applied. The value of liabilities should not, however, be affected in the valuation by the entity's financial state. It should be possible, for reasons of urgency, that the Board makes a rapid valuation of the assets or the liabilities of a failing entity. That valuation should be provisional and should apply until an independent valuation is carried out.

(65) In order to ensure that the resolution process remains objective and certain, it is necessary to lay down the order in which unsecured claims of creditors against an institution under resolution should be written down or converted. In order to limit the risk of creditors incurring greater losses than if the institution had been wound up under normal insolvency proceedings, the order to be laid down should be applicable both in normal insolvency proceedings and in the write-down or conversion process under resolution. This would also facilitate the pricing of debt.

(66) The Board should decide on the detailed resolution scheme. The relevant resolution tools should include the sale of business tool, the bridge institution tool, the bail-in tool and the asset separation tool, which are also provided for in Directive 2014/59/EU. The scheme should also make it possible to assess whether the conditions for the write-down and conversion of capital instruments are met.

(67) When taking resolution actions, the Board should take into account and follow the measures provided for in the resolution plans unless the Board assesses, taking into account the circumstances of the case, that resolution objectives will be achieved more effectively by taking actions which are not provided for in those resolution plans.

(68) The resolution tools should include the sale of the business or shares of the institution under resolution, the setting up of a bridge entity, the separation of the performing assets from the impaired or under-performing assets of the failing entity, and the bail-in of the shareholders and creditors of the failing entity.

(69) Where the resolution tools have been used to transfer the systemically important services or viable business of an entity to a sound entity such as a private sector purchaser or bridge entity, the residual part of the entity should be liquidated.

(70) The sale of business tool should enable the sale of the entity or parts of its business to one or more purchasers without the consent of shareholders.

(71) Any net proceeds from the transfer of assets or liabilities of the institution under resolution when applying the sale of business tool should benefit the entity left in the winding-up proceedings. Any net proceeds from the transfer of instruments of ownership issued by the institution under resolution when applying the sale of business tool should benefit the owners of those instruments of ownership in the entity left in the winding up proceedings. Proceeds should be calculated net of the costs arisen from the failure of the entity and from the resolution process.

(72) The asset separation tool should enable authorities to transfer assets, rights or liabilities of an institution under resolution to a separate vehicle. That tool should be used only in conjunction with other tools to prevent an undue competitive advantage for the failing entity.

(73) An effective resolution regime should minimise the costs of the resolution of a failing entity borne by the taxpayers. It should also ensure that systemic entities can be resolved without jeopardising financial stability. The bail-in tool achieves that objective by ensuring that shareholders and creditors of the failing entity suffer appropriate losses and bear an appropriate part of the costs arising from the failure of the entity. The bail-in tool will therefore give shareholders and creditors of entities a stronger incentive to monitor the health of an entity during normal circumstances. It also meets the Financial Stability Board recommendation that statutory debt write-down and conversion powers be included in a framework for resolution, as an additional option in conjunction with other resolution tools.

(74) In order to ensure the necessary flexibility to allocate losses to creditors in a range of circumstances, it is appropriate that the bail-in tool be applicable both where the objective is to resolve the failing entity as a going concern if there is a realistic prospect that the entity viability may be restored, and where systemically important services are transferred to a bridge entity and the residual part of the entity ceases to operate and is wound down.

(75) Where the bail-in tool is applied with the objective of restoring the capital of the failing entity to enable it to continue to operate as a going concern, the resolution through bail-in should be accompanied by replacement of management, except where retention of management is appropriate and necessary for the achievement of the resolution objectives, and a subsequent restructuring of the entity and its activities in a way that addresses the reasons for its failure. That restructuring should be achieved through the implementation of a business reorganisation plan. Where applicable, such plans should be compatible with the restructuring plan that the entity is required to submit to the Commission under the Union State aid framework. In particular, in addition to measures aiming at restoring the long term viability of the entity, the plan should include measures limiting the aid to the minimum burden sharing, and measures limiting distortions of competition.

(76) It is not appropriate to apply the bail-in tool to claims in so far as they are secured, collateralised or otherwise guaranteed. However, in order to ensure that the bail-in tool is effective and achieves its objectives, it is desirable that it can be applied to as wide a range of the unsecured liabilities of a failing entity as possible. Nevertheless, it is appropriate to exclude certain kinds of unsecured liability from the scope of application of the bail-in tool. In order to protect holders of covered deposits, the bail-in tool should not apply to those deposits that are protected under Directive 2014/49/EU. In order to ensure continuity of critical functions, the bail-in tool should not apply to certain liabilities to employees of the failing entity or to commercial claims that relate to goods and services critical for the daily functioning of the entity. In order to honour pension entitlements and pension amounts

owed or owing to pension trusts and pension trustees, the bail-in tool should not apply to the failing entity's liabilities to a pension scheme, except for liabilities for pension benefits attributable to variable remuneration which do not arise from collective bargaining agreements. To reduce risk to systemic contagion, the bail-in tool should not apply to liabilities arising from a participation in payment systems which have a remaining maturity of less than seven days, or liabilities to entities, excluding entities that are part of the same group, with an original maturity of less than seven days.

(77) It should be possible to exclude or partially exclude liabilities in a number of circumstances, including where it is not possible to bail-in such liabilities within a reasonable timeframe, where the exclusion is strictly necessary and is proportionate to achieving the continuity of critical functions and core business lines, or where the application of the bail-in tool to liabilities would cause a destruction in value such that losses borne by other creditors would be higher than if those liabilities were not excluded from bail-in. It should also be possible to exclude or partially exclude liabilities where necessary to avoid the spreading of contagion and financial instability which may cause serious disturbance to the economy of a Member State. When carrying out the assessments, the Board or, where relevant, the national resolution authorities should give consideration to the consequences of a potential bail-in of liabilities stemming from eligible deposits held by natural persons and micro, small and medium-sized enterprises above the coverage level provided for in Directive 2014/49/EU.

(78) Where those exclusions are applied, the level of write-down or conversion of other eligible liabilities may be increased to take account of such exclusions subject to the 'no creditor worse off than under normal insolvency proceedings' principle being respected. Where the losses cannot be passed to other creditors, the Fund may make a contribution to the institution under resolution subject to a number of strict conditions including the requirement that losses totalling not less than 8 % of total liabilities including own funds have already been absorbed, and the funding provided by the Fund is limited to the lower of 5 % of total liabilities including own funds or the means available to the Fund and the amount that can be raised through *ex-post* contributions within three years.

(79) In extraordinary circumstances, where liabilities have been excluded and the Fund has been used to contribute to bail-in in lieu of those liabilities up to the permissible cap, the Board should be able to seek funding from alternative funding means.

(80) The minimum amount of bail-in of 8 % of total liabilities referred to in this Regulation should be calculated based on the valuation conducted in accordance with this Regulation. Historical losses which have already been absorbed by shareholders through a reduction in own funds prior to that valuation should not be included in that percentage.

(81) As the protection of covered depositors is one of the most important objectives of resolution, covered deposits should not be subject to the exercise of the bail-in tool. The deposit guarantee scheme, however, contributes to funding the resolution process by absorbing losses to the extent of the net losses that it would have had to suffer after compensating depositors in normal insolvency proceedings. The exercise of the bail-in powers would ensure that depositors continue to have access to their deposits which is the main reason why the deposit guarantee schemes have been established. Not providing for the involvement of those schemes in such cases would constitute an unfair advantage with respect to the remaining creditors which would be subject to the exercise of the powers by the resolution authority.

(82) Where deposits are transferred to another entity in the context of the resolution of an entity, depositors should not be insured beyond the coverage level provided for in Directive 2014/49/EU. Therefore, claims with regard to deposits remaining in the institution under resolution should be limited to the difference between the funds transferred and the coverage level provided for in Directive 2014/49/EU. Where transferred deposits are superior to the coverage level, the depositor should have no claim against the deposit guarantee scheme with regard to deposits remaining in the institution under resolution.

(83) To avoid entities structuring their liabilities in a manner that impedes the effectiveness of the bail-in tool, it is appropriate to establish that the entities should meet at all times a minimum requirement for own funds and eligible liabilities which may be subject to the bail-in tool, expressed as a percentage of the total liabilities and own funds of the entity.

(84) A top-down approach should be adopted when determining the minimum requirement for own funds and eligible liabilities within a group. That approach should recognise that resolution action is applied at the level of the individual legal entity, and that it is imperative that loss absorbing capacity is located in, or is accessible to, the entity within the group where losses occur. To that end, it should be ensured that loss absorbing capacity within a group is distributed across the group in accordance with the level of risk in its constituent legal entities. The minimum requirement for own funds and eligible liabilities necessary for each individual subsidiary should be separately assessed. Furthermore, it should be ensured that all capital and liabilities which are counted towards the consolidated minimum requirement for own funds and eligible liabilities are located in entities where losses are likely to occur, or are otherwise available to absorb losses.

This Regulation should allow for a multiple-point-of-entry or a single-point-of-entry resolution. The minimum requirement for own funds and eligible liabilities should reflect the resolution strategy which is appropriate to a group in accordance with the resolution plan. In particular, the minimum requirement for own funds and eligible liabilities should be required at the appropriate level in the group in order to reflect a multiple-point-of-entry or a single-point-of-entry approach contained in the resolution plan while keeping in mind that there could be circumstances where an approach different from that contained in the plan is used as it would allow, for instance, reaching the resolution objectives more efficiently. Against that background, regardless of whether a group has chosen the multiple-point-of-entry or the single-point-of-entry approach, all entities of the group should have at any time a robust minimum requirement for own funds and eligible liabilities so as to avoid the risk of contagion or of a bank run.

(85) The best method of resolution should be chosen depending on the circumstances of the case and, for that purpose, all of the resolution tools provided for in Directive 2014/59/EU should be available. When deciding on the resolution scheme, the Board, the Council and the Commission should, to the extent possible, respectively opt for the scheme that is the least costly for the Fund.

(86) Directive 2014/59/EU confers power on the national resolution authorities to write down and convert capital instruments, since the conditions for the write-down and conversion of capital instruments may coincide with the conditions for resolution and in such a case, an assessment is to be made of whether the sole write-down and conversion of the capital instruments is sufficient to restore the financial soundness of the entity concerned or whether it is also necessary to take resolution action. As a rule, it will be used in the context of resolution. The Board, under the control of the Commission or, where relevant, of the Council, should replace the national resolution authorities also in that function and should therefore be empowered to assess whether the conditions for the write-down and conversion of capital instruments are met and to decide whether to place an entity under resolution, if the requirements for resolution are also fulfilled.

(87) The efficiency and uniformity of resolution action should be ensured in all of the participating Member States. For that purpose, where a national resolution authority has not applied or has not complied with a decision by the Board pursuant to this Regulation or has applied it in a way which poses a threat to any of the resolution objectives or to the efficient implementation of the resolution scheme, the Board should be empowered to transfer to another person specified rights, assets or liabilities of an institution under resolution, to require the conversion of debt instruments which contain a contractual term for conversion in certain circumstances or to adopt any necessary action which significantly addresses the threat to the relevant resolution objective. Any action by a national resolution authority that would restrain or affect the exercise of powers or functions of the Board should be excluded.

(88) The relevant entities, bodies and authorities involved in the application of this Regulation should cooperate with each other in accordance with the duty of sincere cooperation enshrined in the Treaties.

(89) In order to enhance the effectiveness of the SRM, the Board should closely cooperate with EBA in all circumstances. Where appropriate the Board should also cooperate with the ESRB, the European Supervisory

Authority (European Insurance and Occupational Pensions Authority) ('EIOPA') established by Regulation (EU) No 1094/2010 of the European Parliament and of the Council (¹), the European Supervisory Authority (European Securities and Markets Authority) ('ESMA'), established by Regulation (EU) No 1095/2010 of the European Parliament and of the Council (²), and the other authorities which constitute the ESFS. Moreover, the Board should closely cooperate with the ECB and the other authorities empowered to supervise entities within the SSM, in particular for groups subject to the consolidated supervision by the ECB. To effectively manage the resolution process of failing banks, the Board should cooperate with the national resolution authorities at all stages of the resolution process. Thus, that cooperation is necessary not only for the implementation of resolution decisions taken by the Board, but also prior to the adoption of any resolution decision, at the stage of resolution planning or during the phase of early intervention. The Board should be able to cooperate with relevant resolution authorities and facilities financing direct or indirect public financial assistance.

(90) When applying resolution tools and exercising resolution powers, the Board should instruct the national resolution authorities to ensure that the representatives of the employees of the entities concerned are informed and, where appropriate, are consulted, as provided for in Directive 2014/59/EU.

(91) Since the Board replaces the national resolution authorities of the participating Member States in their resolution decisions, the Board should also replace those authorities for the purposes of the cooperation with non-participating Member States, including in the resolution colleges as referred to in Directive 2014/59/EU as far as the resolution functions are concerned.

(92) As many institutions operate not only within the Union, but internationally, an effective resolution mechanism needs to set out principles of cooperation with the relevant third-country authorities. Support to third-country authorities should be provided in accordance with the legal framework provided for in Article 88 of Directive 2014/59/EU. In order to ensure a coherent approach vis-à-vis third countries, the taking of divergent decisions in the participating Member States with respect to the recognition of resolution proceedings conducted in third countries in relation to institutions or parent undertakings which have subsidiaries or other assets, rights or liabilities located in the participating Member States should be avoided as far as possible. The Board should therefore be enabled to issue recommendations in that regard.

(93) In order to perform its tasks effectively, the Board should have appropriate investigatory powers. It should be able to require all necessary information either through the national resolution authorities, or directly, after informing them, and to conduct investigations and on-site inspections, where appropriate in cooperation with national competent authorities, making full use of all information available to the ECB and the national competent authorities. In the context of resolution, on-site inspections should be available for the Board to ensure that decisions are taken on the basis of fully accurate information and to monitor implementation by national authorities effectively.

(94) In order to ensure that the Board has access to all relevant information, the relevant entities and their employees or third parties to whom the entities concerned have outsourced functions or activities should not be able to invoke the requirements of professional secrecy to prevent the disclosure of information to the Board. At the same time, the disclosure of such information to the Board should not be deemed to infringe the requirements of professional secrecy.

(95) In order to ensure compliance with decisions adopted within the framework of the SRM, proportionate and dissuasive fines should be imposed in the event of an infringement. The Board should be entitled to impose fines or periodic penalty payments on undertakings for failure to comply with its decisions addressed to them.

(¹) Regulation (EU) No 1094/2010 of the European Parliament and of the Council of 24 November 2010 establishing a European Supervisory Authority (European Investment and Occupational Pensions Authority), amending Decision No 716/2009/EC and repealing Commission Decision 2009/79/EC (OJ L 331, 15.12.2010, p. 48).
(²) Regulation (EU) No 1095/2010 of the European Parliament and of the Council of 24 November 2010 establishing a European Supervisory Authority (European Securities and Markets Authority), amending Decision No 716/2009/EC and repealing Commission Decision 2009/77/EC (OJ L 331, 15.12.2010, p. 84).

(96)  Where a national resolution authority infringes the rules of the SRM by not using the powers conferred on it under national law to implement an instruction by the Board, the Member State concerned may be liable to make good any damage caused to individuals, including, where applicable, to the institution or group under resolution, or any creditor of any part of that entity or group in any Member State, in accordance with the relevant case-law.

(97)  In order to guarantee its full autonomy and independence, the Board should have an autonomous budget with revenues from obligatory contributions from the institutions in the participating Member States. Appropriate rules should be laid down governing the budget of the Board, the preparation of the budget, the adoption of internal rules specifying the procedure for the establishment and implementation of the budget, and the internal and external audit of the accounts.

(98)  This Regulation should be without prejudice to the ability of Member States to levy fees to cover the administrative expenses of their national resolution authorities.

(99)  Participating Member States have jointly agreed to ensure that non-participating Member States are to be reimbursed promptly and with interest for the amount that a non-participating Member State has paid in own resources in respect of any application of the Union budget for the purposes of meeting non-contractual liabilities and costs relating thereto in relation to the performance of tasks under this Regulation. Participating Member States have concluded an agreement to implement that commitment.

(100)  There are circumstances in which the effectiveness of the resolution tools applied may depend on the availability of short-term funding for the entity or a bridge entity, the provision of guarantees to potential purchasers, or the provision of capital to the bridge entity. Notwithstanding the role of central banks in providing liquidity to the financial system even in times of stress, it is therefore important to set up a fund to avoid that the funds needed for such purposes come from the national budgets. It should be the financial industry, as a whole, that finances the stabilisation of the financial system.

(101)  It is necessary to ensure that the Fund is fully available for the purpose of the resolution of failing institutions. Therefore, the Fund should not be used for any other purpose than the efficient implementation of resolution tools and resolution powers. Furthermore, it should be used only in accordance with the applicable resolution objectives and principles. Accordingly, the Board should ensure that any losses, costs or other expenses incurred in connection with the use of the resolution tools are first borne by the shareholders and the creditors of the institution under resolution. Only where the resources from shareholders and creditors are exhausted should the losses, costs or other expenses incurred with the resolution tools be borne by the Fund.

(102)  As a principle, contributions should be collected from the industry prior to, and independently of, any operation of resolution. When prior funding is insufficient to cover the losses or costs incurred by the use of the Fund, additional contributions should be collected to bear the additional cost or loss. Moreover, the Fund should be able to contract borrowings or other forms of support from institutions, financial institutions or other third parties in the event that the *ex-ante* and *ex-post* contributions are not immediately accessible or do not cover the expenses incurred by the use of the Fund in relation to resolution actions.

(103)  In order to avoid double payments, Member States should be able to make use of available financial means resulting from national bank levies, taxes or resolution contributions established between 17 June 2010 and 2 July 2014 for the purpose of the *ex-ante* contributions.

(104)  In order to reach a critical mass and to avoid pro-cyclical effects which would arise if the Fund had to rely solely on *ex-post* contributions in a systemic crisis, it is indispensable that the *ex-ante* available financial means of the Fund amount at least to a certain minimum target level.

(105) The target level of the Fund should be established as a percentage of the amount of covered deposits of all credit institutions authorised in the participating Member States. However, since the amount of the total liabilities of those institutions would be, taking into account the functions of the Fund, a more adequate benchmark, the Commission should assess whether covered deposits or total liabilities is a more appropriate basis and if a minimum absolute amount for the Fund should be introduced in the future, maintaining a level playing field with Directive 2014/59/EU.

(106) An appropriate time frame should be set to reach the target level for the Fund. However, it should be possible for the Board to adjust the contribution period to take into account significant disbursements made from the Fund.

(107) Ensuring effective and sufficient financing of the Fund is of paramount importance to the credibility of the SRM. The capacity of the Board to contract alternative funding means for the Fund should be enhanced in a manner that optimises the cost of funding and preserves the creditworthiness of the Fund. Immediately after the entry into force of this Regulation, the necessary steps should be taken by the Board in cooperation with the participating Member States to develop the appropriate methods and modalities permitting the enhancement of the borrowing capacity of the Fund that should be in place by the date of application of this Regulation.

(108) Where participating Member States have already established national resolution financing arrangements, they should be able to provide that the national resolution financing arrangements use their available financial means, collected from entities in the past by way of *ex-ante* contributions, to compensate entities for the *ex-ante* contributions which those entities should pay into the Fund. Such restitution should be without prejudice to the obligations of Member States under Directive 2014/49/EU.

(109) In order to ensure a fair calculation of contributions and provide incentives to operate under a model which presents less risk, contributions to the Fund should take account of the degree of risk incurred by the credit institution in accordance with Directive 2014/59/EU and with the delegated acts adopted pursuant thereto.

(110) In order to ensure the proper sharing of resolution costs between deposit guarantee schemes and the Fund, the deposit guarantee scheme to which an institution under resolution is affiliated should be required to make a contribution not greater than the amount of losses that it would have had to bear if the entity had been wound up under normal insolvency proceedings.

(111) So as to protect the value of the amounts held in the Fund, those amounts should be invested in sufficiently safe, diversified and liquid assets.

(112) Where close cooperation of a participating Member State whose currency is not the euro with the ECB is terminated in accordance with Article 7 of Regulation (EU) No 1024/2013, a fair partition of the cumulated contributions of the participating Member State concerned should be decided taking into account the interests of the participating Member State concerned and the Fund.

(113) The Commission should be empowered to adopt delegated acts in accordance with Article 290 TFEU in order to determine the rules for the calculation of the interest rate to be applied in the event of a decision on the recovery of misused amounts from the Fund and to guarantee the rights to good administration and of access to documents of beneficiaries in procedures in respect of such a recovery; determine the type of contributions to the Fund and the matters for which contributions are due, and the manner in which the amount of the contributions is calculated and the way in which they are to be paid; specify registration, accounting, reporting and other rules necessary to ensure that the contributions are paid fully and in a timely manner; determine the annual contributions necessary to cover the administrative expenditure of the Board before it becomes fully operational; determine the contribution system for institutions that have been authorised to operate after the Fund has reached its target level; determine the criteria for the spreading out in time of the contributions; determine the criteria for determining the number of years by which the initial period for reaching the target level can be extended; determine the criteria for establishing the annual contributions when the available financial means of the Fund diminishes below its target level after the initial period; determine the measures to specify the circumstances and conditions under which *ex-post* contributions may be temporarily deferred for individual institutions; and determine the detailed rules for the administration of the Fund and general principles and criteria for its investment strategy.

(114) The Council should, within the framework of the delegated acts adopted under Directive 2014/59/EU, adopt implementing acts to specify the application of the methodology for the calculation of individual contributions to the Fund, as well as the technical modalities for computing the flat contribution and the risk-adjusted contribution. That methodology should ensure that both the flat and the risk-adjusted elements in the formula for the calculation of individual contributions are accounted in a way that is consistent with resolution principles and in line with the delegated acts adopted pursuant to Article 103(7) of Directive 2014/59/EU. The methodology should take into account the principle of proportionality, without creating distortions between banking sector structures of the Member States.

(115) As reflected in the Declaration No 39 on Article 290 of the TFEU, the Commission, in accordance with the established practice, in preparation of draft delegated acts provided for in this Regulation, should continue to consult experts appointed by the Member States. It is also of particular importance in this area that the Commission, where relevant, carry out appropriate consultations during its preparatory work with the ECB and the Board in their fields of competence.

(116) Resolution actions should be properly notified and, subject to the limited exceptions laid down in this Regulation, made public. However, as information obtained by the Board, the national resolution authorities and their professional advisers during the resolution process is likely to be sensitive, before the resolution decision is made public, that information should be subject to the requirements of professional secrecy. The fact that information on the contents and details of resolution plans and the result of any assessment of those plans may have far-reaching effects, in particular on the undertakings concerned, must be taken into account. Any information provided in respect of a decision before it is taken, be it on whether the conditions for resolution are satisfied, on the use of a specific tool or or of any action during the proceedings, must be presumed to have effects on the public and private interests concerned by the action. However, information that the Board and the national resolution authorities are examining a specific entity could be enough to have negative effects on that entity. It is therefore necessary to ensure that there are appropriate mechanisms for maintaining the confidentiality of such information, such as the content and details of resolution plans and the result of any assessment carried out in that context.

(117) To preserve the confidentiality of the work of the Board, its members and its staff, including the staff exchanged with or seconded by participating Member States for the purpose of carrying out resolution duties, should be subject to requirements of professional secrecy, even after their duties have ceased. Those requirements should also apply to other persons authorised by the Board, to persons authorised or appointed by the national resolution authorities of the Member States to conduct on-site inspections, and to observers invited to attend the plenary and executive sessions' meetings of the Board and to observers from non-participating Member States that take part in internal resolution teams. For the purpose of performing the tasks conferred on it by this Regulation, the Board should be authorised, subject to conditions, to exchange information with national or Union authorities and bodies.

(118) In order to ensure that the Board is assimilated in the ESFS, Regulation (EU) No 1093/2010 should be amended in order to include the Board in the concept of competent authorities established by that Regulation. Such assimilation of the Board and competent authorities pursuant to Regulation (EU) No 1093/2010 is consistent with the functions attributed to EBA pursuant to Article 25 of Regulation (EU) No 1093/2010 to contribute to and participate actively in the development and coordination of recovery and resolution plans and to aim to facilitate the resolution of failing entities and in particular cross-border groups.

(119) Until the Board is fully operational, the Commission should be responsible for the initial operations including the designation of an interim Chair to authorise all necessary payments on behalf of the Board.

(120) The SRM brings together the Board, the Council, the Commission and the resolution authorities of the participating Member States. The Court of Justice has jurisdiction to review the legality of decisions adopted by the Board, the Council and the Commission, in accordance with Article 263 TFEU, as well as for determining their non-contractual liability. Furthermore, the Court of Justice has, in accordance with Article 267 TFEU, competence to give preliminary rulings upon request of national judicial authorities on the validity and interpretation of acts of the institutions, bodies or agencies of the Union. National judicial authorities should be competent, in accordance with their national law, to review the legality of decisions adopted by the resolution authorities of the participating Member States in the exercise of the powers conferred on them by this Regulation, as well as to determine their non-contractual liability.

(121) This Regulation respects the fundamental rights and observes the rights, freedoms and principles recognised in particular by the Charter, and, in particular, the right to property, the protection of personal data, the freedom to conduct a business, the right to an effective remedy and to a fair trial and the right of defence, and should be implemented in accordance with those rights and principles.

(122) Since the objectives of this Regulation, namely setting up an efficient and effective single European framework for the resolution of entities and ensuring the consistent application of resolution rules, cannot be sufficiently achieved by the Member States but can rather be better achieved at the Union level, the Union may adopt measures, in accordance with the principle of subsidiarity as set out in Article 5 of the Treaty on European Union (TEU). In accordance with the principle of proportionality, as set out in that Article, this Regulation does not go beyond what is necessary in order to achieve those objectives.

(123) The Commission should review the application of this Regulation in order to assess its impact on the internal market and to determine whether any modifications or further developments are needed in order to improve the efficiency and the effectiveness of the SRM, in particular whether the banking Union needs to be completed with the harmonisation at Union level of insolvency proceedings for failed institutions.

(124) The transfer of contributions raised at national level under this Regulation should allow the Fund to operate and thus the resolution tools to be applied in an effective manner. Therefore, the provisions of this Regulation relating to resolution tools and the contributions should apply from 1 January 2016. From December 2015, it should be possible to postpone that date by periods of one month where the conditions allowing the transfer of the contributions raised at national level have not been met,

HAVE ADOPTED THIS REGULATION:

PART I

GENERAL PROVISIONS

*Article 1*

**Subject matter**

This Regulation establishes uniform rules and a uniform procedure for the resolution of the entities referred to in Article 2 that are established in the participating Member States referred to in Article 4.

Those uniform rules and that uniform procedure shall be applied by the Single Resolution Board established in accordance with Article 42 (the 'Board'), together with the Council and the Commission and the national resolution authorities within the framework of the single resolution mechanism ('SRM') established by this Regulation. The SRM shall be supported by a single resolution fund ('the Fund').

The use of the Fund shall be contingent upon the entry into force of an agreement among the participating Member States ('the Agreement') on transferring the funds raised at national level towards the Fund as well as on a progressive merger of the different funds raised at national level to be allocated to national compartments of the Fund.

*Article 2*

**Scope**

This Regulation shall apply to the following entities:

(a) credit institutions established in a participating Member State;

(b) parent undertakings, including financial holding companies and mixed financial holding companies, established in a participating Member State, where they are subject to consolidated supervision carried out by the ECB in accordance with Article 4(1)(g) of Regulation (EU) No 1024/2013;

(c) investment firms and financial institutions established in a participating Member State, where they are covered by the consolidated supervision of the parent undertaking carried out by the ECB in accordance with Article 4(1)(g) of Regulation (EU) No 1024/2013.

*Article 3*

**Definitions**

1.    For the purposes of this Regulation the following definitions apply:

(1)  'national competent authority' means any national competent authority as defined in Article 2(2) of Regulation (EU) No 1024/2013;

(2)  'competent authority' means a competent authority as defined in Article 4(2)(i) of Regulation (EU) No 1093/2010;

(3)  'national resolution authority' means an authority designated by a participating Member State in accordance with Article 3 of Directive 2014/59/EU;

(4)  'relevant national resolution authority' means the national resolution authority of a participating Member State in which an entity or a group's entity is established;

(5)  'conditions for resolution' means the conditions referred to in Article 18(1);

(6)  'resolution plan' means a plan drawn up in accordance with Article 8 or 9;

(7)  'group resolution plan' means a plan for group resolution drawn up in accordance with Articles 8 and 9;

(8)  'resolution objectives' means the objectives referred to in Article 14;

(9)  'resolution tool' means a resolution tool referred to in Article 22(2);

(10) 'resolution action' means the decision to place an entity referred to in Article 2 under resolution pursuant to Article 18, the application of a resolution tool or the exercise of one or more resolution powers;

(11) 'covered deposits' means deposits as defined in Article 2(1)(5) of Directive 2014/49/EU;

(12) 'eligible deposits' means eligible deposits as defined in Article 2(1)(4) of Directive 2014/49/EU;

(13) 'institution' means a credit institution, or an investment firm covered by consolidated supervision in accordance with Article 2(c);

(14) 'institution under resolution' means an entity referred to in Article 2 in respect of which a resolution action is taken;

(15) 'financial institution' means a financial institution as defined in Article 4(1)(26) of Regulation (EU) No 575/2013;

(16) 'financial holding company' means a financial holding company as defined in Article 4(1)(20) of Regulation (EU) No 575/2013;

(17) 'mixed financial holding company' means a mixed financial holding company as defined in point (21) of Article 4(1) of Regulation (EU) No 575/2013;

(18) 'Union parent financial holding company' means an EU parent financial holding company as defined in point (31) of Article 4(1) of Regulation (EU) No 575/2013;

(19) 'Union parent institution' means an EU parent institution as defined in point (29) of Article 4(1) of Regulation (EU) No 575/2013;

(20) 'parent undertaking' means a parent undertaking as defined in Article 4(1)(15)(a) of Regulation (EU) No 575/2013;

(21) 'subsidiary' means a subsidiary as defined in Article 4(1)(16) of Regulation (EU) No 575/2013;

(22) 'branch' means a branch as defined in Article 4(1)(17) of Regulation (EU) No 575/2013;

(23) 'group' means a parent undertaking and its subsidiaries that are entities as referred to in Article 2;

(24) 'cross-border group' means a group that has entities as referred to in Article 2 established in more than one participating Member State;

(25) 'consolidated basis' means the basis of the consolidated situation as defined in Article 4(1)(47) of Regulation (EU) No 575/2013;

(26) 'consolidating supervisor' means consolidating supervisor as defined in Article 4(1)(41) of Regulation (EU) No 575/2013;

(27) 'group-level resolution authority' means the resolution authority in the participating Member State in which the institution or parent undertaking subject to consolidated supervision at the highest level of consolidation within participating Member States in accordance with Article 111 of Directive 2013/36/EU is established;

(28) 'institutional protection scheme' or 'IPS' means an arrangement that meets the requirements laid down in Article 113(7) of Regulation (EU) No 575/2013;

(29) 'extraordinary public financial support' means State aid within the meaning of Article 107(1) TFEU or any other public financial support at supra-national level, which, if provided at national level, would constitute State aid, that is provided in order to preserve or restore the viability, liquidity or solvency of an entity referred to in Article 2 of this Regulation or of a group of which such an entity forms part;

(30) 'sale of business tool' means the mechanism for effecting a transfer by a resolution authority of instruments of ownership issued by an institution under resolution, or assets, rights or liabilities of an institution under resolution, to a purchaser that is not a bridge institution, in accordance with Article 24;

(31) 'bridge institution tool' means the mechanism for transferring instruments of ownership issued by an institution under resolution, or assets, rights or liabilities of an institution under resolution, to a bridge institution, in accordance with Article 25;

(32) 'asset separation tool' means the mechanism for effecting a transfer of assets, rights or liabilities of an institution under resolution to an asset management vehicle in accordance with Article 26;

(33) 'bail-in tool' means the mechanism for effecting the exercise of the write-down and conversion powers in relation to liabilities of an institution under resolution in accordance with Article 27;

(34) 'available financial means' means the cash, deposits, assets and irrevocable payment commitments available to the Fund for the purposes listed under Article 76(1);

(35) 'target level' means the amount of available financial means to be reached under Article 69(1);

(36) 'Agreement' means the agreement on the transfer and mutualisation of contributions to the Fund;

(37) 'transitional period' means the period from the date of application of this Regulation as determined under Article 99(2) and (6) until the Fund reaches the target level or 1 January 2024, whichever is earlier;

(38) 'financial instrument' means financial instrument as defined in point (50) of Article 4(1) of Regulation (EU) No 575/2013;

(39) 'debt instruments' means bonds and other forms of transferable debt, instruments creating or acknowledging a debt, and instruments giving rights to acquire debt instruments;

(40) 'own funds' means own funds as defined in Article 4(1)(118) of Regulation (EU) No 575/2013;

(41) 'own funds requirements' means the requirements laid down in Articles 92 to 98 of Regulation (EU) No 575/2013;

EN

(42) 'winding up' means the realisation of assets of an entity referred to in Article 2;

(43) 'derivative' means a derivative as defined in Article 2(5) of Regulation (EU) No 648/2012;

(44) 'write-down and conversion powers' means the powers referred to in Article 21;

(45) 'Common Equity Tier 1 instruments' means capital instruments that meet the conditions laid down in Article 28(1) to (4), Article 29(1) to (5) or Article 31(1) of Regulation (EU) No 575/2013;

(46) 'Additional Tier 1 instruments' means capital instruments that meet the conditions laid down in Article 52(1) of Regulation (EU) No 575/2013;

(47) 'Tier 2 instruments' means capital instruments or subordinated loans that meet the conditions laid down in Article 63 of Regulation (EU) No 575/2013;

(48) 'aggregate amount' means the aggregate amount by which the resolution authority has assessed that eligible liabilities are to be written down or converted, in accordance with Article 27(13);

(49) 'eligible liabilities' means the liabilities and capital instruments that do not qualify as Common Equity Tier 1, Additional Tier 1 or Tier 2 instruments of an entity referred to in Article 2 that are not excluded from the scope of the bail-in tool pursuant to Article 27(3);

(50) 'deposit guarantee scheme' means a deposit guarantee scheme introduced and officially recognised by a Member State pursuant to Article 4 of Directive 2014/49/EU;

(51) 'relevant capital instruments' means Additional Tier 1 instruments and Tier 2 instruments;

(52) 'covered bond' means an instrument as referred to in Article 52(4) of Directive 2009/65/EC of the European Parliament and of the Council (¹);

(53) 'depositor' means a depositor as defined in Article 2(1)(6) of Directive 2014/49/EU;

(54) 'investor' means an investor within the meaning of Article 1(4) of Directive 97/9/EC of the European Parliament and of the Council (²).

2.    In the absence of a relevant definition in paragraph 1 of this Article, the definitions referred to in Article 2 of Directive 2014/59/EU apply. In the absence of a relevant definition in paragraph 1 of this Article or in Article 2 of Directive 2014/59/EU, the definitions referred to in Article 3 of Directive 2013/36/EU apply.

*Article 4*

**Participating Member States**

1.    Participating Member States within the meaning of Article 2 of Regulation (EU) No 1024/2013 shall be considered to be participating Member States for the purposes of this Regulation.

2.    Where close cooperation between a Member State and the ECB is suspended or terminated in accordance with Article 7 of Regulation (EU) No 1024/2013, entities established in that Member State shall cease to be covered by this Regulation from the date of application of the decision to suspend or terminate close cooperation.

3.    In the event that the close cooperation with the ECB of a Member State whose currency is not the euro is terminated in accordance with Article 7 of Regulation (EU) No 1024/2013, the Board shall decide within three months after the date of adoption of the decision to terminate close cooperation, in agreement with that Member State, on the modalities for the recoupment of contributions that the Member State concerned has transferred to the Fund and any conditions applicable.

Recoupments shall include the part of the compartment corresponding to the Member State concerned not subject to mutualisation. If during the transitional period, as laid down in the Agreement, recoupments of the non-mutualised part

_____

(¹) Directive 2009/65/EC of the European Parliament and of the Council of 13 July 2009 on the coordination of laws, regulations and administrative provisions relating to undertakings for collective investment in transferable securities (UCITS) (OJ L 302, 17.11.2009, p. 32).

(²) Directive 97/9/EC of the European Parliament and of the Council of 3 March 1997 on investor-compensation schemes (OJ L 84, 26.3.1997, p. 22).

are not sufficient to permit the funding of the establishment by the Member State concerned of its national financial arrangement in accordance with Directive 2014/59/EU, recoupments shall also include the totality or a part of the part of the compartment corresponding to that Member State subject to mutualisation in accordance with the Agreement or otherwise, after the transitional period, the totality or a part of the contributions transferred by the Member State concerned during the close cooperation, in an amount sufficient to permit the funding of that national financial arrangement.

When assessing the amount of financial means to be recouped from the mutualised part or otherwise, after the transitional period, from the Fund, the following additional criteria shall be taken into account:

(a)  the manner in which termination of close cooperation with the ECB has taken place, whether voluntarily, in accordance with Article 7(6) of Regulation (EU) No 1024/2013, or not;

(b)  the existence of ongoing resolution actions on the date of termination;

(c)  the economic cycle of the Member State concerned by the termination.

Recoupments shall be distributed during a limited period commensurate to the duration of the close cooperation. The relevant Member State's share of the financial means from the Fund used for resolution actions during the period of close cooperation shall be deducted from those recoupments.

4.  This Regulation shall continue to apply to resolution proceedings which are ongoing on the date of application of a decision as referred to in paragraph 2.

*Article 5*

**Relation to Directive 2014/59/EU and applicable national law**

1.  Where, pursuant to this Regulation, the Board performs tasks and exercises powers, which, pursuant to Directive 2014/59/EU are to be performed or exercised by the national resolution authority, the Board shall, for the application of this Regulation and of Directive 2014/59/EU, be considered to be the relevant national resolution authority or, in the event of cross-border group resolution, the relevant group-level resolution authority.

2.  The Board, the Council and the Commission and, where relevant, the national resolution authorities, shall take decisions subject to and in compliance with the relevant Union law and in particular any legislative and non-legislative acts, including those referred to in Articles 290 and 291 TFEU.

The Board, the Council and the Commission shall be subject to binding regulatory and implementing technical standards developed by EBA and adopted by the Commission in accordance with Articles 10 to 15 of Regulation (EU) No 1093/2010 and to any guidelines and recommendations issued by EBA under Article 16 of that Regulation. They shall make every effort to comply with any guidelines and recommendations of EBA which relate to tasks of a kind to be performed by those bodies. Where they do not comply or do not intend to comply with such guidelines or recommendations EBA shall be informed thereof in accordance with Article 16(3) of that Regulation. The Board, the Council and the Commission shall cooperate with EBA in the application of Articles 25 and 30 of that Regulation. The Board shall also be subject to any decisions of EBA in accordance with Article 19 of Regulation (EU) No 1093/2010 where Directive 2014/59/EU provides for such decisions.

*Article 6*

**General principles**

1.  No action, proposal or policy of the Board, the Council, the Commission or a national resolution authority shall discriminate against entities, deposit holders, investors or other creditors established in the Union on grounds of their nationality or place of business.

2.    Every action, proposal or policy of the Board, the Council, the Commission, or of a national resolution authority in the framework of the SRM shall be undertaken with full regard and duty of care for the unity and integrity of the internal market.

3.    When making decisions or taking action which may have an impact in more than one Member State, and in particular when taking decisions concerning groups established in two or more Member States, due consideration shall be given to the resolution objectives referred to in Article 14 and all of the following factors:

(a)  the interests of the Member States where a group operates and in particular the impact of any decision or action or inaction on the financial stability, fiscal resources, the economy, the financing arrangements, the deposit guarantee scheme or the investor compensation scheme of any of those Member States and on the Fund;

(b)  the objective of balancing the interests of the various Member States involved and of avoiding unfairly prejudicing or unfairly protecting the interests of a Member State;

(c)  the need to minimise a negative impact for any part of a group of which an entity referred to in Article 2, which is subject to a resolution, is a member.

4.    When making decisions or taking actions, in particular regarding entities or groups established both in a participating Member State and in a non-participating Member State, possible negative effects on non-participating Member States, including on entities established in those Member States, shall be taken into consideration.

5.    The Board, the Council and the Commission shall balance the factors referred to in paragraph 3 with the resolution objectives referred to in Article 14 as appropriate to the nature and circumstances of each case and shall comply with the decisions made by the Commission under Article 107 TFEU and Article 19 of this Regulation.

6.    Decisions or actions of the Board, the Council or the Commission shall neither require Member States to provide extraordinary public financial support nor impinge on the budgetary sovereignty and fiscal responsibilities of the Member States.

7.    Where the Board takes a decision that is addressed to a national resolution authority, the national resolution authority shall have the right to specify further the measures to be taken. Such specifications shall comply with the decision of the Board in question.

*Article 7*

**Division of tasks within the SRM**

1.    The Board shall be responsible for the effective and consistent functioning of the SRM.

2.    Subject to the provisions referred to in Article 31(1), the Board shall be responsible for drawing up the resolution plans and adopting all decisions relating to resolution for:

(a)  the entities referred to in Article 2 that are not part of a group and for groups:

   (i)  which are considered to be significant in accordance with Article 6(4) of Regulation (EU) No 1024/2013; or

   (ii) in relation to which the ECB has decided in accordance with Article 6(5)(b) of Regulation (EU) No 1024/2013 to exercise directly all of the relevant powers; and

(b)  other cross-border groups.

3.    In relation to entities and groups other than those referred to in paragraph 2, without prejudice to the responsibilities of the Board for the tasks conferred on it by this Regulation, the national resolution authorities shall perform, and be responsible for, the following tasks:

(a)  adopting resolution plans and carrying out an assessment of resolvability in accordance with Articles 8 and 10 and with the procedure laid down in Article 9;

(b)  adopting measures during early intervention in accordance with Article 13(3);

(c) applying simplified obligations or waiving the obligation to draft a resolution plan, in accordance with Article 11;

(d) setting the level of minimum requirement for own funds and eligible liabilities, in accordance with Article 12;

(e) adopting resolution decisions and applying resolution tools referred to in this Regulation, in accordance with the relevant procedures and safeguards, provided that the resolution action does not require any use of the Fund and is financed exclusively by the tools referred to in Articles 21 and 24 to 27 and/or by the deposit guarantee scheme, in accordance with Article 79, and with the procedure laid down in Article 31;

(f) writing down or converting relevant capital instruments pursuant to Article 21, in accordance with the procedure laid down in Article 31.

If the resolution action requires the use of the Fund, the Board shall adopt the resolution scheme.

When adopting a resolution decision, the national resolution authorities shall take into account and follow the resolution plan as referred to in Article 9, unless they assess, taking into account the circumstances of the case, that the resolution objectives will be achieved more effectively by taking actions which are not provided for in the resolution plan.

When performing the tasks referred to in this paragraph, the national resolution authorities shall apply the relevant provisions of this Regulation. Any references to the Board in Article 5(2), Article 6(5), Article 8(6), (8), (12) and (13), Article 10(1) to (10), Articles 11 to 14, Article 15(1), (2) and (3), Article 16, the first subparagraph of Article 18(1), Article 18(2) and (6), Article 20, Article 21(1) to (7), the second subparagraph of Article 21(8), Article 21(9) and (10), Article 22(1), (3) and (6), Articles 23 and 24, Article 25(3), Article 27(1) to (15), the second sentence of the second subparagraph, the third subparagraph, and the first, third and fourth sentences of the fourth subparagraph of Article 27(16), and Article 32 shall be read as references to the national resolution authorities with regard to groups and entities referred to in the first subparagraph of this paragraph. For that purpose the national resolution authorities shall exercise the powers conferred on them under national law transposing Directive 2014/59/EU in accordance with the conditions laid down in national law.

The national resolution authorities shall inform the Board of the measures referred to in this paragraph that are to be taken and shall closely coordinate with the Board when taking those measures.

The national resolution authorities shall submit to the Board the resolution plans referred to in Article 9, as well as any updates, accompanied by a reasoned assessment of the resolvability of the entity or group concerned in accordance with Article 10.

4. Where necessary to ensure the consistent application of high resolution standards under this Regulation, the Board may:

(a) further to the notification by a national resolution authority of a measure under paragraph 3 of this Article pursuant to Article 31(1), within the appropriate timeframe having regard to the urgency of the circumstances, issue a warning to the relevant national resolution authority where the Board considers that the draft decision with regard to any entity or group referred to in paragraph 3 of this Article does not comply with this Regulation or with its general instructions referred to in Article 31(1)(a);

(b) at any time decide, in particular if its warning referred to in point (a) is not being appropriately addressed, on its own initiative, after consulting the national resolution authority concerned, or upon request from the national resolution authority concerned, to exercise directly all of the relevant powers under this Regulation also with regard to any entity or group referred to in paragraph 3 of this Article.

5. Notwithstanding paragraph 3 of this Article, participating Member States may decide that the Board exercise all of the relevant powers and responsibilities conferred on it by this Regulation in relation to entities and to groups, other than those referred to in paragraph 2, established in their territory. If so, paragraphs 3 and 4 of this Article, Article 9, Article 12(2), and Article 31(1) shall not apply. Member States that intend to make use of this option shall notify the Board and the Commission accordingly. The notification shall take effect from the day of its publication in the *Official Journal of the European Union*.

PART II

**SPECIFIC PROVISIONS**

TITLE I

**FUNCTIONS WITHIN THE SRM AND PROCEDURAL RULES**

CHAPTER 1

***Resolution planning***

Article 8

**Resolution plans drawn up by the Board**

1.    The Board shall draw up and adopt resolution plans for the entities and groups referred to in Article 7(2), and for the entities and groups referred to in Article 7(4)(b) and (5) where the conditions for the application of those paragraphs are met.

2.    The Board shall draw up the resolution plans, after consulting the ECB or the relevant national competent authorities and the national resolution authorities, including the group-level resolution authority, of the participating Member States in which the entities are established, and the resolution authorities of non-participating Member States in which significant branches are located insofar as relevant to the significant branch. To that end, the Board may require the national resolution authorities to prepare and submit to the Board draft resolution plans and the group-level resolution authority to prepare and submit to the Board a draft group resolution plan.

3.    In order to ensure effective and consistent application of this Article, the Board shall issue guidelines and address instructions to the national resolution authorities for the preparation of draft resolution plans and draft group resolution plans relating to specific entities or groups.

4.    For the purposes of paragraph 1 of this Article, the national resolution authorities shall submit to the Board all information necessary to draw up and implement the resolution plans, as obtained by them in accordance with Article 11 and Article 13(1) of Directive 2014/59/EU, without prejudice to Chapter 5 of this Title.

5.    The resolution plan shall set out options for applying the resolution tools and exercising resolution powers referred to in this Regulation to the entities and groups referred to in paragraph 1.

6.    The resolution plan shall provide for the resolution actions which the Board may take where an entity or a group referred to in paragraph 1 meets the conditions for resolution.

The information referred to in paragraph 9 shall be disclosed to the entity concerned.

When drawing up and updating the resolution plan, the Board shall identify any material impediments to resolvability and, where necessary and proportionate, outline relevant actions for how those impediments could be addressed, in accordance with Article 10.

The resolution plan shall take into consideration relevant scenarios including that the event of failure may be idiosyncratic or may occur at a time of broader financial instability or system wide events.

The resolution plan shall not assume any of the following:

(a)  any extraordinary public financial support besides the use of the Fund established in accordance with Article 67;

(b)  any central bank emergency liquidity assistance; or

(c)  any central bank liquidity assistance provided under non-standard collateralisation, tenor and interest rate terms.

7.    The resolution plan shall include an analysis of how and when an institution may apply, in the conditions addressed by the plan, for the use of central bank facilities and shall identify those assets which would be expected to qualify as collateral.

8.    The Board may require institutions to assist it in the drawing up and updating of the plans.

9.    The resolution plan for each entity shall include, quantified where appropriate and possible:

(a)  a summary of the key elements of the plan;

(b)  a summary of the material changes to the institution that have occurred after the latest resolution information was filed;

(c)  a demonstration of how critical functions and core business lines could be legally and economically separated, to the extent necessary, from other functions so as to ensure continuity upon the failure of the institution;

(d)  an estimation of the timeframe for executing each material aspect of the plan;

(e)  a detailed description of the assessment of resolvability carried out in accordance with Article 10;

(f)  a description of any measures required pursuant to Article 10(7) to address or remove impediments to resolvability identified as a result of the assessment carried out in accordance with Article 10;

(g)  a description of the processes for determining the value and marketability of the critical functions, core business lines and assets of the institution;

(h)  a detailed description of the arrangements for ensuring that the information required pursuant to Article 11 of Directive 2014/59/EU is up to date and at the disposal of the resolution authorities at all times;

(i)  an explanation as to how the resolution options could be financed without the assumption of any of the following:

    (i)   any extraordinary public financial support besides the use of the Fund established in accordance with Article 67;

    (ii)  any central bank emergency liquidity assistance; or

    (iii) any central bank liquidity assistance provided under non-standard collateralisation, tenor and interest rate terms;

(j)  a detailed description of the different resolution strategies that could be applied according to the different possible scenarios and the applicable timescales;

(k)  a description of critical interdependencies;

(l)  a description of options for preserving access to payments and clearing services and other infrastructures and an assessment of the portability of client positions;

(m) an analysis of the impact of the plan on the employees of the institution, including an assessment of any associated costs, and a description of envisaged procedures to consult staff during the resolution process, taking into account national systems for dialogue with social partners, where applicable;

(n)  a plan for communicating with the media and the public;

(o)  the minimum requirement for own funds and eligible liabilities required pursuant to Article 12 and a deadline to reach that level, where applicable;

(p)  where applicable, the minimum requirement for own funds and contractual bail-in instruments pursuant to Article 12, and a deadline to reach that level, where applicable;

(q)  a description of essential operations and systems for maintaining the continuous functioning of the institution's operational processes;

(r)  where applicable, any opinion expressed by the institution in relation to the resolution plan.

10.    Group resolution plans shall include a plan for the resolution of the group, headed by the Union parent under-taking established in a participating Member State, as a whole, either through resolution at the level of the Union parent undertaking or through break up and resolution of the subsidiaries. The group resolution plan shall identify measures for the resolution of:

(a)  the Union parent undertaking;

(b)  the subsidiaries that are part of the group and that are established in the Union;

(c)  the entities referred to in Article 2(b); and

(d)  subject to Article 33, the subsidiaries that are part of the group and that are established outside the Union.

11.    The group resolution plan shall:

(a)  set out the resolution actions to be taken in relation to group entities, both through resolution actions in respect of the entities referred to in Article 2(b) and subsidiary institutions and through coordinated resolution actions in respect of subsidiary institutions, in the scenarios provided for in paragraph 6;

(b)  examine the extent to which the resolution tools and powers could be applied and exercised in a coordinated way to group entities established in the Union, including measures to facilitate the purchase by a third party of the group as a whole, or separate business lines or activities that are delivered by a number of group entities, or particular group entities, and identify any potential impediments to a coordinated resolution;

(c)  include a detailed description of the assessment of resolvability carried out in accordance with Article 10;

(d)  where a group includes entities incorporated in third countries, identify appropriate arrangements for cooperation and coordination with the relevant authorities of those third countries and the implications for resolution within the Union;

(e)  identify measures, including the legal and economic separation of particular functions or business lines, that are necessary to facilitate group resolution where the conditions for resolution are met;

(f)  identify how the group resolution actions could be financed and, where the Fund and the financing arrangements from non-participating Member States established in accordance with Article 100 of Directive 2014/59/EU would be required, set out principles for sharing responsibility for that financing between sources of funding in different parti-cipating and non-participating Member States. The plan shall not assume any of the following:

(i)   any extraordinary public financial support besides the use of the Fund established in accordance with Article 67 of this Regulation and the financing arrangements from non-participating Member States established in accord-ance with Article 100 of Directive 2014/59/EU;

(ii)  any central bank emergency liquidity assistance; or

(iii) any central bank liquidity assistance provided under non-standard collateralisation, tenor and interest rate terms.

Those principles shall be set out on the basis of equitable and balanced criteria and shall take into account in particular Article 107(5) of Directive 2014/59/EU and the impact on financial stability in all Member States concerned.

The group resolution plan shall not have a disproportionate impact on any Member State.

12.    The Board shall determine the date by which the first resolution plans shall be drawn up. Resolution plans and group resolution plans shall be reviewed, and where appropriate updated, at least annually and after any material changes to the legal or organisational structure or to the business or the financial position of the entity or, in the case of group resolution plans, of the group including any group entity that could have a material effect on the effectiveness of the plan or that otherwise necessitates a revision of the resolution plan.

For the purpose of the revision or update of the resolution plans referred to in the first subparagraph, the institutions, the ECB or the national competent authorities shall promptly communicate to the Board any change that necessitates such revision or update.

30.7.2014 ⟦EN⟧ Official Journal of the European Union L 225/31

13.    The Board shall transmit the resolution plans and any changes thereto to the ECB or to the relevant national competent authorities.

*Article 9*

**Resolution plans drawn up by national resolution authorities**

1.    The national resolution authorities shall draw up and adopt resolution plans for the entities and for the groups, other than those referred to in Article 7(2), (4)(b) and (5), in accordance with Article 8(5) to (13).

2.    The national resolution authorities shall prepare resolution plans, after consulting the relevant national competent authorities and the national resolution authorities of the participating and non-participating Member States, in which significant branches are located, insofar as relevant to the significant branch.

*Article 10*

**Assessment of resolvability**

1.    When drafting and updating resolution plans in accordance with Article 8, the Board, after consulting the competent authorities, including the ECB, and the resolution authorities of non-participating Member States in which significant branches are located insofar as relevant to the significant branch, shall conduct an assessment of the extent to which institutions and groups are resolvable without the assumption of any of the following:

(a)  any extraordinary public financial support besides the use of the Fund established in accordance with Article 67;

(b)  any central bank emergency liquidity assistance; or

(c)  any central bank liquidity assistance provided under non-standard collateralisation, tenor and interest rate terms.

2.    The ECB or the relevant national competent authority shall provide the Board with a recovery plan or group recovery plan. The Board shall examine the recovery plan with a view to identifying any actions in the recovery plan which may adversely impact the resolvability of the institution or group and make recommendations to the ECB or the national competent authority on those matters.

3.    When drafting a resolution plan, the Board shall assess the extent to which such an entity is resolvable in accordance with this Regulation. An entity shall be deemed to be resolvable if it is feasible and credible for the Board to either liquidate it under normal insolvency proceedings or to resolve it by applying to it resolution tools and exercising resolution powers while avoiding, to the maximum extent possible, any significant adverse consequences for financial systems, including circumstances of broader financial instability or system wide events, of the Member State in which the entity is situated, or other Member States, or the Union and with a view to ensuring the continuity of critical functions carried out by the entity.

The Board shall notify EBA in a timely manner where an institution is deemed not to be resolvable.

4.    A group shall be deemed to be resolvable if it is feasible and credible for the Board to either liquidate group entities under normal insolvency proceedings or to resolve them by applying resolution tools and exercising resolution powers in relation to group entities while avoiding, to the maximum extent possible, any significant adverse consequences for financial systems, including circumstances of broader financial instability or system wide events, of the Member States in which group entities are established, or other Member States or the Union and with a view to ensuring the continuity of critical functions carried out by those group entities, where they can be easily separated in a timely manner or by other means.

The Board shall notify EBA in a timely manner where a group is deemed not to be resolvable.

5.    For the purposes of paragraphs 3, 4 and 10, significant adverse consequences for the financial system or threat to financial stability refers to a situation where the financial system is actually or potentially exposed to a disruption that may give rise to financial distress liable to jeopardise the orderly functioning, efficiency and integrity of the internal market or the economy or the financial system of one or more Member States. In determining the significant adverse consequences the Board shall take into account the relevant warnings and recommendations of the ESRB and the relevant criteria developed by EBA in considering the identification and measurement of systemic risk.

6.    For the purpose of the assessment referred to in this Article, the Board shall examine the matters specified in Section C of the Annex to Directive 2014/59/EU.

7.    If, pursuant to an assessment of resolvability for an entity or a group carried out in accordance with paragraph 3 or 4, the Board, after consulting the competent authorities, including the ECB, determines that there are substantive impediments to the resolvability of that entity or group, the Board shall prepare a report, in cooperation with the competent authorities, addressed to the institution or the parent undertaking analysing the substantive impediments to the effective application of resolution tools and the exercise of resolution powers. That report shall consider the impact on the institution's business model and recommend any proportionate and targeted measures that, in the Board's view, are necessary or appropriate to remove those impediments in accordance with paragraph 10.

8.    The report shall also be notified to the competent authorities and to the resolution authorities of non-participating Member States in which significant branches of institutions which are not part of a group are located. It shall be supported by reasons for the assessment or determination in question and shall indicate how that assessment or determination complies with the requirement for proportionate application laid down in Article 6.

9.    Within four months from the date of receipt of the report, the entity or the parent undertaking shall propose to the Board possible measures to address or remove the substantive impediments identified in the report. The Board shall communicate any measure proposed by the entity or parent undertaking to the competent authorities, to EBA and, where significant branches of institutions that are not part of a group are located in non-participating Member States, to the resolution authorities of those Member States.

10.    The Board, after consulting the competent authorities, shall assess whether the measures referred to in paragraph 9 effectively address or remove the substantive impediments in question. If the measures proposed by the entity or parent undertaking concerned do not effectively reduce or remove the impediments to resolvability, the Board shall take a decision, after consulting the competent authorities and, where appropriate, the designated macro-prudential authority, indicating that the measures proposed do not effectively reduce or remove the impediments to resolvability, and instructing the national resolution authorities to require the institution, the parent undertaking, or any subsidiary of the group concerned, to take any of the measures listed in paragraph 11.

In identifying alternative measures, the Board shall demonstrate how the measures proposed by the institution would not be able to remove the impediments to resolvability and how the alternative measures proposed are proportionate in removing them. The Board shall take into account the threat to financial stability of those impediments to resolvability and the effect of the measures on the business of the institution, its stability and its ability to contribute to the economy, on the internal market for financial services and on the financial stability in other Member States and the Union as a whole.

The Board shall also take into account the need to avoid any impact on the institution or the group concerned which would go beyond what is necessary to remove the impediment to resolvability or would be disproportionate.

11.    For the purpose of paragraph 10, the Board, where applicable, shall instruct the national resolution authorities to take any of the following measures:

(a)  to require the entity to revise any intragroup financing agreements or review the absence thereof, or draw up service agreements (whether intra-group or with third parties) to cover the provision of critical functions;

(b)  to require the entity to limit its maximum individual and aggregate exposures;

(c)  to impose specific or regular additional information requirements relevant for resolution purposes;

(d)  to require the entity to divest specific assets;

(e)  to require the entity to limit or cease specific existing or proposed activities;

(f)  to restrict or prevent the development of new or existing business lines or sale of new or existing products;

(g)  to require changes to legal or operational structures of the entity or any group entity, either directly or indirectly under their control, so as to reduce complexity in order to ensure that critical functions may be legally and operationally separated from other functions through the application of the resolution tools;

(h)  to require an entity to set up a parent financial holding company in a Member State or a Union parent financial holding company;

(i)  to require an entity to issue eligible liabilities to meet the requirements of Article 12;

(j)  to require an entity to take other steps to meet the requirements referred to in Article 12, including in particular to attempt to renegotiate any eligible liability, Additional Tier 1 instrument or Tier 2 instrument it has issued, with a view to ensuring that any decision of the Board to write down or convert that liability or instrument would be effected under the law of the jurisdiction governing that liability or instrument.

Where applicable, the national resolution authorities shall directly take the measures referred to in points (a) to (j) of the first subparagraph.

12.     The national resolution authorities shall implement the instructions of the Board in accordance with Article 29.

13.     A decision made pursuant to paragraphs 10 and 11 shall meet the following requirements:

(a)  it shall be supported by reasons for the assessment or determination in question;

(b)  it shall indicate how that assessment or determination complies with the requirement for proportionate application laid down in paragraph 10.


*Article 11*

**Simplified obligations for certain institutions**

1.     The Board, on its own initiative after consulting a national resolution authority or upon proposal by a national resolution authority, may apply simplified obligations in relation to the drafting of resolution plans referred to in Article 8 or may waive the obligation of drafting those plans in accordance with paragraphs 3 to 9 of this Article.

2.     National resolution authorities may propose to the Board to apply simplified obligations to institutions or groups pursuant to paragraphs 3 and 4 or to waive the obligation of drafting resolution plans pursuant to paragraph 7. That proposal shall be reasoned and shall be supported by all of the relevant documentation.

3.     On receiving a proposal to apply simplified obligations pursuant to paragraph 2 of this Article, or when acting on its own initiative, the Board shall conduct an assessment of the institution or group concerned and shall apply simplified obligations, if the failure of the institution or group is not likely to have significant adverse consequences for the financial system or be a threat to financial stability within the meaning of Article 10(5).

For those purposes, the Board shall take into account:

(a)  the nature of the institution's or group's business, its shareholding structure, its legal form, its risk profile, size and legal status, its interconnectedness to other institutions or to the financial system in general, the scope and complexity of its activities;

(b)  its membership of an IPS or other cooperative mutual solidarity systems as referred to in Article 113(7) of Regulation (EU) No 575/2013;

(c) any exercise of investment services or activities as defined in Article 4(1)(2) of Directive 2014/65/EU of the European Parliament and of the Council (¹); and

(d) whether its failure and subsequent winding up under normal insolvency proceedings would be likely to have a significant negative effect on financial markets, on other institutions, on funding conditions, or on the wider economy.

The Board shall make the assessment referred to in the first subparagraph after consulting, where appropriate, the national macroprudential authority and, where appropriate, the ESRB.

4.    When applying simplified obligations, the Board shall determine:

(a) the contents and details of resolution plans provided for in Article 8;

(b) the date by which the first resolution plans are to be drawn up and the frequency for updating resolution plans which may be lower than that provided for in Article 8(12);

(c) the contents and details of the information required from institutions as provided for in Article 8(9) of this Regulation and in Section B of the Annex to Directive 2014/59/EU;

(d) the level of detail for the assessment of resolvability provided for in Article 10 of this Regulation, and in Section C of the Annex to Directive 2014/59/EU.

5.    The application of simplified obligations shall not in itself affect the Board's power to take any resolution action.

6.    Where simplified obligations are applied, the Board shall impose full, unsimplified obligations at any time if any of the circumstances that justified them no longer exist.

7.    Without prejudice to Articles 9 and 31, on receiving a proposal to waive the obligation of drafting resolution plans pursuant to paragraph 2 of this Article, or when acting on its own initiative, the Board shall, pursuant to paragraph 3 of this Article, waive the application of the obligation of drafting resolution plans to institutions affiliated to a central body and wholly or partially exempt from prudential requirements in national law in accordance with Article 10 of Regulation (EU) No 575/2013.

Where a waiver is granted in accordance with the first subparagraph, the obligation of drafting the resolution plan shall apply on a consolidated basis to the central body and institutions affiliated to it within the meaning of Article 10 of Regulation (EU) No 575/2013. For that purpose, any reference in this Chapter to a group shall include a central body and institutions affiliated to it within the meaning of Article 10 of Regulation (EU) No 575/2013 and their subsidiaries, and any reference to parent undertakings or institutions that are subject to consolidated supervision pursuant to Article 111 of Directive 2013/36/EU shall include the central body.

8.    Institutions that are subject to direct supervision by the ECB pursuant to Article 6(4) of Regulation (EU) No 1024/2013 or that constitute a significant share in the financial system of a participating Member State shall be the subject of individual resolution plans.

For the purposes of this paragraph, the operations of an institution shall be considered to constitute a significant share of that participating Member State's financial system where:

(a) the total value of its assets exceeds EUR 30 000 000 000; or

(b) the ratio of its total assets over the GDP of the Member State of establishment exceeds 20 %, unless the total value of its assets is below EUR 5 000 000 000.

9.    Where the national resolution authority which has proposed the application of simplified obligations or the grant of a waiver in accordance with paragraph 2 considers that the decision to apply simplified obligations or to grant the waiver must be withdrawn, it shall submit a proposal to the Board to that end. In that case, the Board shall take a decision on the proposed withdrawal taking full account of the justification for withdrawal put forward by the national resolution authority in the light of the factors or circumstances referred to in paragraph 3 or in paragraphs 7 and 8.

10.    The Board shall inform EBA of its application of this Article.

---

(¹) Directive 2014/65/EU of the European Parliament and of the Council of 15 May 2014 on markets in financial instruments and amending Directive 2002/92/EC and Directive 2011/61/EU (OJ L 173, 12.6.2014, p. 349).

*Article 12*

**Minimum requirement for own funds and eligible liabilities**

1.    The Board shall, after consulting competent authorities, including the ECB, determine the minimum requirement for own funds and eligible liabilities as referred to in paragraph 4, subject to write-down and conversion powers, which the entities and groups referred to in Article 7(2), and the entities and groups referred to in Article 7(4)(b) and (5) where the conditions for the application of these paragraphs are met, are required to meet at all times.

2.    When drafting resolution plans in accordance with Article 9, national resolution authorities shall, after consulting competent authorities, determine the minimum requirement for own funds and eligible liabilities, as referred to in paragraph 4, subject to write-down and conversion powers, which the entities referred to in Article 7(3) are required to meet at all times. In that regard the procedure established in Article 31 shall apply.

3.    In order to ensure effective and consistent application of this Article, the Board shall issue guidelines and address instructions to national resolution authorities relating to specific entities or groups.

4.    The minimum requirement for own funds and eligible liabilities shall be calculated as the amount of own funds and eligible liabilities expressed as a percentage of the total liabilities and own funds of the institution.

For the purpose of the first subparagraph derivative liabilities shall be included in the total liabilities on the basis that full recognition is given to counterparty netting rights.

5.    Notwithstanding paragraph 1, the Board shall exempt mortgage credit institutions financed by covered bonds which, according to national law, are not allowed to receive deposits, from the obligation to meet, at all times, a minimum requirement for own funds and eligible liabilities, as:

(a)  those institutions will be wound up through national insolvency procedures, or other type of procedures implemented in accordance with Article 38, 40 or 42 of Directive 2014/59/EU, provided for those institutions; and

(b)  such national insolvency procedures, or other type of procedures, will ensure that creditors of those institutions, including holders of covered bonds where relevant, will bear losses in a way that meets the resolution objectives.

6.    The minimum requirement for own funds and eligible liabilities referred to in paragraph 4 shall not exceed the amount of own funds and eligible liabilities sufficient to ensure that, if the bail-in tool were to be applied, the losses of an institution or a parent undertaking as referred to in Article 2, as well as of the ultimate parent undertaking of that institution or parent undertaking and any institution or financial institution included in the consolidated accounts of that ultimate parent undertaking, could be absorbed, and the Common Equity Tier 1 ratio of those entities could be restored to a level necessary to enable them to continue to comply with the conditions for authorisation and to continue to carry out the activities for which they are authorised under Directive 2013/36/EU or equivalent legislation and to sustain sufficient market confidence in the institution or parent undertaking referred to in Article 2 and the ultimate parent undertaking of that institution or parent undertaking and any institution or financial institution included in the consolidated accounts of that ultimate parent undertaking.

Where the resolution plan anticipates that certain classes of eligible liabilities might be excluded from bail-in under Article 27(5), or that certain classes of eligible liabilities might be transferred to a recipient in full under a partial transfer, the minimum requirement for own funds and eligible liabilities referred to in paragraph 4 shall not exceed the amount of own funds and eligible liabilities necessary to ensure that the institution or parent undertaking referred to in Article 2 has sufficient other eligible liabilities to ensure that losses of the institution or the parent undertaking referred to in Article 2 as well as of the ultimate parent undertaking of that institution or parent undertaking and any institution or financial institution included in the consolidated accounts of that ultimate parent undertaking could be absorbed and

the Common Equity Tier 1 ratio of those entities could be restored to a level necessary to enable them to continue to comply with the conditions for authorisation and to carry out the activities for which they are authorised under Directive 2013/36/EU or equivalent legislation and to sustain sufficient market confidence in the institution or parent undertaking and the ultimate parent undertaking of that institution or parent undertaking and any institution or financial institution included in the consolidated accounts of that ultimate parent undertaking.

The minimum requirement for own funds and eligible liabilities referred to in paragraph 4 shall not be inferior to the total amount of any own funds requirements and buffer requirements under Regulation (EU) No 575/2013 and Directive 2013/36/EU.

7.    Within the limits laid down in paragraph 6 of this Article, in order to ensure that an entity referred to in Article 2 can be resolved by the application of the resolution tools including, where appropriate, the bail-in tool, in a way that meets the resolution objectives, the determination referred to in paragraph 1 of this Article shall be made on the basis of the following criteria:

(a)  the size, the business model, the funding model and the risk profile of the institution and parent undertaking referred to in Article 2;

(b)  the extent to which the deposit guarantee scheme could contribute to the financing of resolution in accordance with Article 79;

(c)  the extent to which the failure of the institution and parent undertaking referred to in Article 2 would have significant adverse consequences for the financial system or would be a threat to financial stability within the meaning of Article 10(5), including, due to its interconnectedness with other institutions or with the rest of the financial system through contagion to other institutions.

8.    The determination shall specify the minimum requirement for own funds and eligible liabilities that the institutions are to comply with on an individual basis, and that parent undertakings are to comply with on a consolidated basis. The minimum aggregate amount requirement for own funds and eligible liabilities at consolidated level of a Union parent undertaking established in a participating Member State shall be determined by the Board, after consulting the consolidating supervisor, on the basis of the criteria laid down in paragraph 7, and of whether the third-country subsidiaries of the group are to be resolved separately in accordance with the resolution plan.

9.    The Board shall set the minimum requirement for own funds and eligible liabilities to be applied to the group's subsidiaries on an individual basis. Those minimum requirements for own funds and eligible liabilities shall be set at a level appropriate for the subsidiary having regard to:

(a)  the criteria listed in paragraph 7, in particular the size, business model and risk profile of the subsidiary, including its own funds; and

(b)  the consolidated requirement that has been set for the group.

10.    The Board may decide to waive the minimum requirement for own funds and eligible liabilities on an individual basis to a parent institution provided that the conditions laid down in points (a) and (b) of Article 45(11) of Directive 2014/59/EU are met. The Board may decide to waive the minimum requirement for own funds and eligible liabilities on an individual basis to a subsidiary provided that the conditions laid down in points (a), (b) and (c) of Article 45(12) of Directive 2014/59/EU are met.

11.    The Board, on its own initiative after consulting the national resolution authority or upon proposal by a national resolution authority, may decide that the minimum requirement for own funds and eligible liabilities as referred to in paragraph 1 is partially met on a consolidated or on an individual basis through contractual bail-in instruments, in full compliance with the criteria laid down in the first and second subparagraphs of paragraph 5 and in paragraph 7.

12. To qualify as a contractual bail-in instrument under paragraph 11, the Board must be satisfied that the instrument:

(a) contains a contractual term providing that, where the Board decides that the bail-in tool be applied to that institution, the instrument shall be written down or converted to the extent required before other eligible liabilities are written down or converted; and

(b) is subject to a binding subordination agreement, undertaking or provision under which in the event of normal insolvency proceedings, it ranks below other eligible liabilities and cannot be repaid until other eligible liabilities outstanding at the time have been settled.

13. The Board shall make any determination referred to in paragraph 1 of this Article, and, where relevant, in paragraph 11 of this Article, in parallel with the development and maintenance of the resolution plans pursuant to Article 8.

14. The Board shall address its determination to the national resolution authorities. The national resolution authorities shall implement the instructions of the Board in accordance with Article 29. The Board shall require that the national resolution authorities verify and ensure that institutions and parent undertakings maintain the minimum requirement for own funds and eligible liabilities laid down in paragraph 1 of this Article.

15. The Board shall inform the ECB and EBA of the minimum requirement for own funds and eligible liabilities that it has determined for each institution and parent undertaking under paragraph 1 and, where relevant, the requirements laid down in paragraph 11.

16. Eligible liabilities, including subordinated debt instruments and subordinated loans that do not qualify as Additional Tier 1 instruments or Tier 2 instruments, shall be included in the amount of own funds and eligible liabilities referred to in paragraph 1 only if they satisfy the following conditions:

(a) the instrument is issued and fully paid up;

(b) the liability is not owed to, secured by or guaranteed by the institution itself;

(c) the purchase of the instrument was not funded either directly or indirectly by the institution;

(d) the liability has a remaining maturity of at least one year;

(e) the liability does not arise from a derivative;

(f) the liability does not arise from a deposit which benefits from preference in the national insolvency hierarchy in accordance with Article 108 of Directive 2014/59/EU.

For the purpose of point (d) of the first subparagraph, where a liability confers upon its owner a right to early reimbursement, the maturity of that liability shall be the first date where such right arises.

17. Where a liability is governed by the law of a jurisdiction outside the Union, the Board may instruct national resolution authorities to require the institution to demonstrate that any decision of the Board to write down or convert that liability would be effected under the law of that jurisdiction, having regard to the terms of the contract governing the liability, international agreements on the recognition of resolution proceedings and other relevant matters. If the Board is not satisfied that any decision would be effected under the law of that jurisdiction, the liability shall not be counted towards the minimum requirement for own funds and eligible liabilities.

18. If the Commission submits a legislative proposal pursuant to Article 45(18) of Directive 2014/59/EU, it shall, if appropriate, submit a legislative proposal amending this Regulation in the same way.

CHAPTER 2

*Early intervention*

*Article 13*

**Early intervention**

1.    The ECB or national competent authorities shall inform the Board of any measure that they require an institution or group to take or that they take themselves pursuant to Article 16 of Regulation (EU) No 1024/2013, to Article 27(1) or Article 28 or 29 of Directive 2014/59/EU, or to Article 104 of Directive 2013/36/EU.

The Board shall notify the Commission of any information which it has received pursuant to the first subparagraph.

2.    From the date of receipt of the information referred to in paragraph 1, and without prejudice to the powers of the ECB and national competent authorities in accordance with other Union law, the Board may prepare for the resolution of the institution or group concerned.

For the purposes of the first subparagraph, the ECB or the relevant national competent authority shall closely monitor, in cooperation with the Board, the conditions of the institution or the parent undertaking and their compliance with any early intervention measure that was required of them.

The ECB or the relevant national competent authority shall provide the Board with all of the information necessary in order to update the resolution plan and prepare for the possible resolution of the institution and for valuation of the assets and liabilities of the institution in accordance with Article 20(1) to (15).

3.    The Board shall have the power to require the institution, or the parent undertaking, to contact potential purchasers in order to prepare for the resolution of the institution, subject to the criteria specified in Article 39(2) of Directive 2014/59/EU and the requirements of professional secrecy laid down in Article 88 of this Regulation.

The Board shall also have the power to require the relevant national resolution authority to draft a preliminary resolution scheme for the institution or group concerned.

The Board shall inform the ECB, the relevant national competent authorities and the relevant national resolution authorities of any action it takes pursuant to this paragraph.

4.    If the ECB or the national competent authorities intend to impose on an institution or a group any additional measure under Article 16 of Regulation (EU) No 1024/2013, under Article 27(1), 28 or 29 of Directive 2014/59/EU or under Article 104 of Directive 2013/36/EU, before the entity or group has fully complied with the first measure notified to the Board, they shall inform the Board before imposing such additional measure on the institution or group concerned.

5.    The ECB or the national competent authority, the Board and the relevant national resolution authorities shall ensure that the additional measure referred to in paragraph 4 and any action of the Board aimed at preparing for resolution under paragraph 2 are consistent.

CHAPTER 3

*Resolution*

*Article 14*

**Resolution objectives**

1.    When acting under the resolution procedure referred to in Article 18, the Board, the Council, the Commission, and, where relevant, the national resolution authorities, in respect of their respective responsibilities, shall take into account the resolution objectives, and choose the resolution tools and resolution powers which, in their view, best achieve the resolution objectives that are relevant in the circumstances of the case.

2.    The resolution objectives referred to in paragraph 1 are the following:

(a)  to ensure the continuity of critical functions;

(b)  to avoid significant adverse effects on financial stability, in particular by preventing contagion, including to market infrastructures, and by maintaining market discipline;

(c)  to protect public funds by minimising reliance on extraordinary public financial support;

(d)  to protect depositors covered by Directive 2014/49/EU and investors covered by Directive 97/9/EC;

(e)  to protect client funds and client assets.

When pursuing the objectives referred to in the first subparagraph, the Board, the Council, the Commission and, where relevant, the national resolution authorities, shall seek to minimise the cost of resolution and avoid destruction of value unless necessary to achieve the resolution objectives.

3.    Subject to different provisions of this Regulation, the resolution objectives are of equal significance, and shall be balanced, as appropriate, to the nature and circumstances of each case.

*Article 15*

**General principles governing resolution**

1.    When acting under the resolution procedure referred to in Article 18, the Board, the Council, the Commission and, where relevant, the national resolution authorities, shall take all appropriate measures to ensure that the resolution action is taken in accordance with the following principles:

(a)  the shareholders of the institution under resolution bear first losses;

(b)  creditors of the institution under resolution bear losses after the shareholders in accordance with the order of priority of their claims pursuant to Article 17, save as expressly provided otherwise in this Regulation;

(c)  the management body and senior management of the institution under resolution are replaced, except in those cases where the retention of the management body and senior management, in whole or in part, as appropriate to the circumstances, is considered to be necessary for the achievement of the resolution objectives;

(d)  the management body and senior management of the institution under resolution shall provide all necessary assistance for the achievement of the resolution objectives;

(e)  natural and legal persons are made liable, subject to national law, under civil or criminal law, for their responsibility for the failure of the institution under resolution;

(f)  except where otherwise provided in this Regulation, creditors of the same class are treated in an equitable manner;

(g)  no creditor shall incur greater losses than would have been incurred if an entity referred to in Article 2 had been wound up under normal insolvency proceedings in accordance with the safeguards provided for in Article 29;

(h)  covered deposits are fully protected; and

(i)  resolution action is taken in accordance with the safeguards in this Regulation.

2.    Where an institution is a group entity, without prejudice to Article 14, the Board, the Council and the Commission, when deciding on the application of resolution tools and the exercise of resolution powers, shall act in a way that minimises the impact on other group entities and on the group as a whole and minimises the adverse effect on financial stability in the Union and its Member States, in particular in the countries where the group operates.

3.   Where the sale of business tool, the bridge institution tool or the asset separation tool is applied to an entity referred to in Article 2 of this Regulation, that entity shall be considered to be the subject of bankruptcy proceedings or analogous insolvency proceedings for the purposes of Article 5(1) of Council Directive 2001/23/EC (¹).

4.   When deciding on the application of resolution tools and the exercise of resolution powers, the Board shall instruct national resolution authorities to inform and consult employee representatives where appropriate.

This is without prejudice to provisions on the representation of employees in management bodies as provided for by national law or practice.

*Article 16*

**Resolution of financial institutions and parent undertakings**

1.   The Board shall decide on a resolution action in relation to a financial institution established in a participating Member State, where the conditions laid down in Article 18(1) are met with regard to both the financial institution and with regard to the parent undertaking subject to consolidating supervision.

2.   The Board shall take a resolution action in relation to a parent undertaking referred to in point (b) of Article 2, where the conditions laid down in Article 18(1) are met with regard to both that parent undertaking and with regard to one or more subsidiaries which are institutions or, where the subsidiary is not established in the Union, the third-country authority has determined that it meets the conditions for resolution under the law of that third country.

3.   By way of derogation from paragraph 2 and notwithstanding the fact that a parent undertaking does not meet the conditions established in Article 18(1), the Board may decide on resolution action with regard to that parent undertaking when one or more of its subsidiaries which are institutions meet the conditions established in Article 18(1), (4) and (5) and their assets and liabilities are such that their failure threatens an institution or the group as a whole and resolution action with regard to that parent undertaking is necessary for the resolution of such subsidiaries which are institutions or for the resolution of the group as a whole. Where a national resolution authority informs the Board that the insolvency law of the Member State provides that groups be treated as a whole and resolution action with regard to the parent undertaking is necessary for the resolution of such subsidiaries which are institutions or for the resolution of the group as a whole, the Board may also decide on resolution action with regard to the parent undertaking.

For the purposes of the first subparagraph, when assessing whether the conditions in Article 18(1) are met in respect of one or more subsidiaries which are institutions, the Board may disregard any intra-group capital or loss transfers between the entities, including the exercise of write-down or conversion powers.

*Article 17*

**Order of priority of claims**

1.   When applying the bail-in tool to an entity referred to in Article 2 of this Regulation, and without prejudice to liabilities excluded from the bail-in tool under Article 27(3) of this Regulation, the Board, the Commission, or, where applicable, the national resolution authorities, shall decide on the exercise of the write-down and conversion powers, including on any possible application of Article 27(5) of this Regulation, and the national resolution authorities shall exercise those powers in accordance with Articles 47 and 48 of Directive 2014/59/EU and in accordance with the reverse order of priority of claims laid down in their national law, including the provisions transposing Article 108 of that Directive.

---

(¹) Council Directive 2001/23/EC of 12 March 2001 on the approximation of the laws of the Member States relating to the safeguarding of employees' rights in the event of transfers of undertakings, businesses or parts of undertakings or businesses (OJ L 82, 22.3.2001, p. 16).

2.   Participating Member States shall notify to the Commission and to the Board the ranking of claims against entities referred to in Article 2 in national insolvency proceedings on 1 July of every year or immediately, where there is a change of the ranking.

Where the bail-in tool is applied, the relevant deposit guarantee scheme shall be liable in the terms provided for in Article 79.

*Article 18*

**Resolution procedure**

1.   The Board shall adopt a resolution scheme pursuant to paragraph 6 in relation to entities and groups referred to in Article 7(2), and to the entities and groups referred to in Article 7(4)(b) and (5) where the conditions for the application of those paragraphs are met, only when it assesses, in its executive session, on receiving a communication pursuant to the fourth subparagraph, or on its own initiative, that the following conditions are met:

(a)  the entity is failing or is likely to fail;

(b)  having regard to timing and other relevant circumstances, there is no reasonable prospect that any alternative private sector measures, including measures by an IPS, or supervisory action, including early intervention measures or the write-down or conversion of relevant capital instruments in accordance with Article 21, taken in respect of the entity, would prevent its failure within a reasonable timeframe;

(c)  a resolution action is necessary in the public interest pursuant to paragraph 5.

An assessment of the condition referred to in point (a) of the first subparagraph shall be made by the ECB, after consulting the Board. The Board, in its executive session, may make such an assessment only after informing the ECB of its intention and only if the ECB, within three calendar days of receipt of that information, does not make such an assessment. The ECB shall, without delay, provide the Board with any relevant information that the Board requests in order to inform its assessment.

Where the ECB assesses that the condition referred to in point (a) of the first subparagraph is met in relation to an entity or group referred to in the first subparagraph, it shall communicate that assessment without delay to the Commission and to the Board.

An assessment of the condition referred to in point (b) of the first subparagraph shall be made by the Board, in its executive session, or, where applicable, by the national resolution authorities, in close cooperation with the ECB. The ECB may also inform the Board or the national resolution authorities concerned that it considers the condition laid down in that point to be met.

2.   Without prejudice to cases where the ECB has decided to exercise directly supervisory tasks relating to credit institutions pursuant to Article 6(5)(b) of Regulation (EU) No 1024/2013, in the event of receipt of a communication pursuant to paragraph 1 or where the Board intends to make an assessment under paragraph 1 on its own initiative in relation to an entity or group referred to in Article 7(3), the Board shall communicate its assessment to the ECB without delay.

3.   The previous adoption of a measure pursuant to Article 16 of Regulation (EU) No 1024/2013, to Article 27(1) or Article 28 or 29 of Directive 2014/59/EU, or to Article 104 of Directive 2013/36/EU is not a condition for taking a resolution action.

4.   For the purposes of point (a) of paragraph 1, the entity shall be deemed to be failing or to be likely to fail in one or more of the following circumstances:

(a)  the entity infringes, or there are objective elements to support a determination that the institution will, in the near future, infringe the requirements for continuing authorisation in a way that would justify the withdrawal of the authorisation by the ECB, including but not limited to the fact that the institution has incurred or is likely to incur losses that will deplete all or a significant amount of its own funds;

(b)  the assets of the entity are, or there are objective elements to support a determination that the assets of the entity will, in the near future, be less than its liabilities;

(c) the entity is, or there are objective elements to support a determination that the entity will, in the near future, be unable to pay its debts or other liabilities as they fall due;

(d) extraordinary public financial support is required except where, in order to remedy a serious disturbance in the economy of a Member State and preserve financial stability, that extraordinary public financial support takes any of the following forms:

  (i)  a State guarantee to back liquidity facilities provided by central banks in accordance with the central banks' conditions;

  (ii)  a State guarantee of newly issued liabilities; or

  (iii)  an injection of own funds or purchase of capital instruments at prices and on terms that do not confer an advantage upon the entity, where neither the circumstances referred to in points (a), (b) and (c) of this paragraph nor the circumstances referred to in Article 21(1) are present at the time the public support is granted.

In each of the cases referred to in points (i), (ii) and (iii) of point (d) of the first subparagraph, the guarantee or equivalent measures referred to therein shall be confined to solvent entities and shall be conditional on final approval under the Union State aid framework. Those measures shall be of a precautionary and temporary nature and shall be proportionate to remedy the consequences of the serious disturbance and shall not be used to offset losses that the entity has incurred or is likely to incur in the near future.

Support measures under point (d)(iii) of the first subparagraph shall be limited to injections necessary to address capital shortfall established in the national, Union or SSM-wide stress tests, asset quality reviews or equivalent exercises conducted by the ECB, EBA or national authorities, where applicable, confirmed by the competent authority.

If the Commission submits a legislative proposal pursuant to Article 32(4) of Directive 2014/59/EU, it shall, if appropriate, submit a legislative proposal amending this Regulation in the same way.

5.   For the purposes of point (c) of paragraph 1 of this Article, a resolution action shall be treated as in the public interest if it is necessary for the achievement of, and is proportionate to one or more of the resolution objectives referred to in Article 14 and winding up of the entity under normal insolvency proceedings would not meet those resolution objectives to the same extent.

6.   If the conditions laid down in paragraph 1 are met, the Board shall adopt a resolution scheme. The resolution scheme shall:

(a) place the entity under resolution;

(b) determine the application of the resolution tools to the institution under resolution referred to in Article 22(2), in particular any exclusions from the application of the bail-in in accordance with Article 27(5) and (14);

(c) determine the use of the Fund to support the resolution action in accordance with Article 76 and in accordance with a Commission decision taken in accordance with Article 19.

7.   Immediately after the adoption of the resolution scheme, the Board shall transmit it to the Commission.

Within 24 hours from the transmission of the resolution scheme by the Board, the Commission shall either endorse the resolution scheme, or object to it with regard to the discretionary aspects of the resolution scheme in the cases not covered in the third subparagraph of this paragraph.

Within 12 hours from the transmission of the resolution scheme by the Board, the Commission may propose to the Council:

(a) to object to the resolution scheme on the ground that the resolution scheme adopted by the Board does not fulfil the criterion of public interest referred to in paragraph 1(c);

(b) to approve or object to a material modification of the amount of the Fund provided for in the resolution scheme of the Board.

For the purposes of the third subparagraph, the Council shall act by simple majority.

The resolution scheme may enter into force only if no objection has been expressed by the Council or by the Commission within a period of 24 hours after its transmission by the Board.

The Council or the Commission, as the case may be, shall provide reasons for the exercise of their power of objection.

Where, within 24 hours from the transmission of the resolution scheme by the Board, the Council has approved the proposal of the Commission for modification of the resolution scheme on the ground referred to in point (b) of the third subparagraph or the Commission has objected in accordance with the second subparagraph, the Board shall, within eight hours modify the resolution scheme in accordance with the reasons expressed.

Where the resolution scheme adopted by the Board provides for the exclusion of certain liabilities in the exceptional circumstances referred to in Article 27(5), and where such exclusion requires a contribution by the Fund or an alternative financing source, in order to protect the integrity of the internal market, the Commission may prohibit or require amendments to the proposed exclusion setting out adequate reasons based on an infringement of the requirements laid down in Article 27 and in the delegated act adopted by the Commission on the basis of Article 44(11) of Directive 2014/59/EU.

8.   Where the Council objects to the placing of an institution under resolution on the ground that the public interest criterion referred to in paragraph 1(c) is not fulfilled, the relevant entity shall be wound up in an orderly manner in accordance with the applicable national law.

9.   The Board shall ensure that the necessary resolution action is taken to carry out the resolution scheme by the relevant national resolution authorities. The resolution scheme shall be addressed to the relevant national resolution authorities and shall instruct those authorities, which shall take all necessary measures to implement it in accordance with Article 29, by exercising resolution powers. Where State aid or Fund aid is present, the Board shall act in conformity with a decision on that aid taken by the Commission.

10.   The Commission shall have the power to obtain from the Board any information which it deems to be relevant for performing its tasks under this Regulation. The Board shall have the power to obtain from any person, in accordance with Chapter 5 of this Title, any information necessary for it to prepare and decide upon a resolution action, including updates and supplements of information provided in the resolution plans.

*Article 19*

**State aid and Fund aid**

1.   Where resolution action involves the granting of State aid pursuant to Article 107(1) TFEU or of Fund aid in accordance with paragraph 3 of this Article, the adoption of the resolution scheme under Article 18(6) of this Regulation shall not take place until such time as the Commission has adopted a positive or conditional decision concerning the compatibility of the use of such aid with the internal market.

In performing the tasks conferred on them by Article 18 of this Regulation, Union institutions shall act in conformity with the principles established in Article 3(3) of Directive 2014/59/EU and shall make public in an appropriate manner all relevant information on their internal organisation in this regard.

2.   On receiving a communication pursuant to Article 18(1) of this Regulation or on its own initiative, if the Board considers that resolution actions could constitute State aid pursuant to Article 107(1) TFEU, it shall invite the participating Member State or Member States concerned to immediately notify the envisaged measures to the Commission under Article 108(3) TFEU. The Board shall notify the Commission of any case in which it invites one or more Member States to make a notification under Article 108(3) TFEU.

3.   To the extent that the resolution action as proposed by the Board involves the use of the Fund, the Board shall notify the Commission of the proposed use of the Fund. The Board's notification shall include all of the information necessary to enable the Commission to make its assessments pursuant to this paragraph.

The notification under this paragraph shall trigger a preliminary investigation by the Commission during the course of which the Commission may request further information from the Board. The Commission shall assess whether the use of the Fund would distort, or threaten to distort, competition by favouring the beneficiary or any other undertaking so as, insofar as it would affect trade between Member States, to be incompatible with the internal market. The Commission shall apply to the use of the Fund the criteria established for the application of State aid rules as enshrined in Article 107 TFEU. The Board shall provide the Commission with the information that the Commission deems to be necessary to carry out that assessment.

If the Commission has serious doubts as to the compatibility of the proposed use of the Fund with the internal market, or where the Board has failed to provide the necessary information pursuant to a request of the Commission under the second subparagraph, the Commission shall open an in-depth investigation and shall notify the Board accordingly. The Commission shall publish its decision to open an in-depth investigation in the *Official Journal of the European Union*. The Board, any Member State or any person, undertaking or association whose interests may be affected by the use of the Fund, may submit comments to the Commission within such timeframe as may be specified in the notification. The Board may submit observations on the comments submitted by Member States and interested third parties within such timeframe as may be specified by the Commission. At the end of the period of investigation the Commission shall make its assessment as to whether the use of the Fund would be compatible with the internal market.

In making its assessments and conducting its investigations pursuant to this paragraph, the Commission shall be guided by all of the relevant regulations adopted under Article 109 TFEU as well as relevant communications, guidance and measures adopted by the Commission in application of the rules of the Treaties relating to State aid as are in force at the time the assessment is to be made. Those measures shall be applied as though references to the Member State responsible for notifying the aid were references to the Board, and with any other necessary modifications.

The Commission shall adopt a decision on the compatibility of the use of the Fund with the internal market, which shall be addressed to the Board and to the national resolution authorities of the Member State or Member States concerned. That decision may be contingent on conditions, commitments or undertakings in respect of the beneficiary.

The decision may also lay down obligations on the Board, the national resolution authorities in the participating Member State or Member States concerned or the beneficiary to enable compliance with it to be monitored. This may include requirements for the appointment of a trustee or other independent person to assist in monitoring. A trustee or other independent person may perform such functions as may be specified in the Commission decision.

Any decision pursuant to this paragraph shall be published in the *Official Journal of the European Union*.

The Commission may issue a negative decision, addressed to the Board, where it decides that the proposed use of the Fund would be incompatible with the internal market and cannot be implemented in the form proposed by the Board. On receipt of such a decision the Board shall reconsider its resolution scheme and prepare a revised resolution scheme.

4.   Where the Commission has serious doubts as to whether its decision under paragraph 3 is being complied with, it shall conduct the necessary investigations. For that purpose, the Commission may exercise such powers as are available to it under the regulations and other measures referred to in the fourth subparagraph of paragraph 3, and shall be guided by them.

5.   If, on the basis of the investigations carried out by the Commission, and after giving notice to the parties concerned to submit their comments, the Commission considers that the decision under paragraph 3 has not been complied with, it shall issue a decision to the national resolution authority in the participating Member State concerned requiring that authority to recover the misused amounts within a period to be determined by the Commission. The Fund aid to be recovered pursuant to a recovery decision shall include interest at an appropriate rate fixed by the Commission and shall be paid over to the Board.

The Board shall pay any amounts received under the first subparagraph into the Fund and take such amounts into consideration when determining contributions in accordance with Articles 70 and 71.

The recovery procedure referred to in the first subparagraph shall respect the right to good administration and the right of access to documents, of the beneficiaries, as laid down in Articles 41 and 42 of the Charter.

6.    Without prejudice to the reporting obligations that the Commission may establish in its decision under paragraph 3 of this Article, the Board shall submit to the Commission annual reports assessing the compliance of the use of the Fund with the decision under that paragraph, for the drawing up of which the Board shall make use of its powers under Article 34.

7.    Any Member State or any person, undertaking or association whose interests may be affected by the use of the Fund, in particular the entities referred to in Article 2, shall have the right to inform the Commission of any suspected misuse of the Fund incompatible with the decision under paragraph 3 of this Article.

8.    The Commission shall be empowered to adopt delegated acts in accordance with Article 93 concerning detailed rules of procedure concerning:

(a)  the calculation of the interest rate to be applied in the event of a recovery decision in accordance with paragraph 5;

(b)  the guarantees of the right to good administration and the right of access to documents referred to in paragraph 5.

9.    Where the Commission, following a recommendation of the Board or on its own initiative, considers that the application of resolution tools and actions does not respond to the criteria on the basis of which its initial decision under paragraph 3 was made, it may review such a decision and adopt the appropriate amendments.

10.    By way of derogation from paragraph 3, on application by a Member State, the Council may, acting unanimously, decide that the use of the Fund shall be considered to be compatible with the internal market, if such a decision is justified by exceptional circumstances. If, however, the Council has not made its attitude known within seven days of the said application being made, the Commission shall give its decision on the case.

11.    Participating Member States shall ensure that their national resolution authorities have the powers necessary to ensure compliance with any conditions laid down in a Commission decision pursuant to paragraph 3 and to recover misused amounts pursuant to a Commission decision under paragraph 5.

*Article 20*

**Valuation for the purposes of resolution**

1.    Before deciding on resolution action or the exercise of the power to write down or convert relevant capital instruments, the Board shall ensure that a fair, prudent and realistic valuation of the assets and liabilities of an entity referred to in Article 2 is carried out by a person independent from any public authority, including the Board and the national resolution authority, and from the entity concerned.

2.    Subject to paragraph 15, where all of the requirements laid down in paragraphs 1 and 4 to 9 are met, the valuation shall be considered to be definitive.

3.    Where an independent valuation in accordance with paragraph 1 is not possible, the Board may carry out a provisional valuation of the assets and liabilities of the entity referred to in Article 2, in accordance with paragraph 10 of this Article.

4.    The objective of the valuation shall be to assess the value of the assets and liabilities of an entity referred to in Article 2 that meets the conditions for resolution of Articles 16 and 18.

5.    The purposes of the valuation shall be:

(a)  to inform the determination of whether the conditions for resolution or the conditions for the write-down or conversion of capital instruments are met;

(b)  if the conditions for resolution are met, to inform the decision on the appropriate resolution action to be taken in respect of an entity referred to in Article 2;

(c)  when the power to write down or convert relevant capital instruments is applied, to inform the decision on the extent of the cancellation or dilution of instruments of ownership, and the extent of the write-down or conversion of relevant capital instruments;

(d)  when the bail-in tool is applied, to inform the decision on the extent of the write-down or conversion of eligible liabilities;

(e) when the bridge institution tool or asset separation tool is applied, to inform the decision on the assets, rights, liabilities or instruments of ownership to be transferred and the decision on the value of any consideration to be paid to the institution under resolution or, as the case may be, to the owners of the instruments of ownership;

(f) when the sale of business tool is applied, to inform the decision on the assets, rights, liabilities or instruments of ownership to be transferred and to inform the Board's understanding of what constitutes commercial terms for the purposes of Article 24(2)(b);

(g) in all cases, to ensure that any losses on the assets of an entity referred to in Article 2 are fully recognised at the moment the resolution tools are applied or the power to write down or convert relevant capital instruments is exercised.

6.    Without prejudice to the Union State aid framework, where applicable, the valuation shall be based on prudent assumptions, including as to rates of default and severity of losses. The valuation shall not assume any potential future provision of any extraordinary public financial support, any central bank emergency liquidity assistance, or any central bank liquidity assistance provided under non-standard collateralisation, tenor and interest rate terms to an entity referred to in Article 2 from the point at which resolution action is taken or the power to write down or convert relevant capital instruments is exercised. Furthermore, the valuation shall take account of the fact that, if any resolution tool is applied:

(a) the Board may recover any reasonable expenses properly incurred from the institution under resolution, in accordance with Article 22(6);

(b) the Fund may charge interest or fees in respect of any loans or guarantees provided to the institution under resolution, in accordance with Article 76.

7.    The valuation shall be supplemented by the following information as appearing in the accounting books and records of an entity referred to in Article 2:

(a) an updated balance sheet and a report on the financial position of an entity referred to in Article 2;

(b) an analysis and an estimate of the accounting value of the assets;

(c) the list of outstanding on-balance-sheet and off-balance-sheet liabilities shown in the books and records of an entity referred to in Article 2, with an indication of the respective credits and priority of claims referred to in Article 17.

8.    Where appropriate, to inform the decisions referred to in paragraph 5(e) and (f) of this Article, the information in paragraph 7(b) of this Article may be complemented by an analysis and estimate of the value of the assets and liabilities of an entity referred to in Article 2 on a market value basis.

9.    The valuation shall indicate the subdivision of the creditors in classes in accordance with the priority of claims referred to in Article 17 and an estimate of the treatment that each class of shareholders and creditors would have been expected to receive, if an entity referred to in Article 2 were wound up under normal insolvency proceedings. That estimate shall not affect the application of the 'no creditor worse off' principle referred to in Article 15(1)(g).

10.    Where, due to urgency in the circumstances of the case, either it is not possible to comply with the requirements laid down in paragraphs 7 and 9, or paragraph 3 applies, a provisional valuation shall be carried out. The provisional valuation shall comply with the requirements laid down in paragraph 4 and, in so far as reasonably practicable in the circumstances, with the requirements laid down in paragraphs 1, 7 and 9.

The provisional valuation referred to in the first subparagraph shall include a buffer for additional losses, with appropriate justification.

11.    A valuation that does not comply with all of the requirements laid down in paragraphs 1 and 4 to 9 shall be considered to be provisional until an independent person as referred to in paragraph 1 has carried out a valuation that is fully compliant with all of the requirements laid down in those paragraphs. That *ex-post* definitive valuation shall be carried out as soon as practicable. It may be carried out either separately from the valuation referred to in paragraphs 16, 17 and 18, or simultaneously with and by the same independent person as that valuation, but shall be distinct from it.

The purposes of the *ex-post* definitive valuation shall be:

(a) to ensure that any losses on the assets of an entity referred to in Article 2 are fully recognised in the books of accounts of that entity;

(b) to inform the decision to write back creditors' claims or to increase the value of the consideration paid, in accordance with paragraph 12 of this Article.

12.     In the event that the *ex-post* definitive valuation's estimate of the net asset value of an entity referred to in Article 2 is higher than the provisional valuation's estimate of the net asset value of that entity, the Board may request the national resolution authority to:

(a) exercise its power to increase the value of the claims of creditors or owners of relevant capital instruments which have been written down under the bail-in tool;

(b) instruct a bridge institution or asset management vehicle to make a further payment of consideration in respect of the assets, rights or liabilities to an institution under resolution, or as the case may be, in respect of the instruments of ownership to the owners of those instruments of ownership.

13.     Notwithstanding paragraph 1, a provisional valuation conducted in accordance with paragraphs 10 and 11 shall be a valid basis for the Board to decide on resolution actions, including instructing national resolution authorities to take control of a failing institution or on the exercise of the write-down or conversion power of relevant capital instruments.

14.     The Board shall establish and maintain arrangements to ensure that the assessment for the application of the bail-in tool in accordance with Article 27 and the valuation referred to in paragraphs 1 to 15 of this Article are based on information about the assets and liabilities of the institution under resolution that is as up to date and complete as is reasonably possible.

15.     The valuation shall be an integral part of the decision on the application of a resolution tool or on the exercise of a resolution power or the decision on the exercise of the write-down or conversion power of capital instruments. The valuation itself shall not be subject to a separate right of appeal but may be subject to an appeal together with the decision of the Board.

16.     For the purposes of assessing whether shareholders and creditors would have received better treatment if the institution under resolution had entered into normal insolvency proceedings, the Board shall ensure that a valuation is carried out by an independent person as referred to in paragraph 1 as soon as possible after the resolution action or actions have been effected. That valuation shall be distinct from the valuation carried out under paragraphs 1 to 15.

17.     The valuation referred to in paragraph 16 shall determine:

(a) the treatment that shareholders and creditors, or the relevant deposit guarantee schemes, would have received if an institution under resolution with respect to which the resolution action or actions have been effected, had entered normal insolvency proceedings at the time when the decision on the resolution action was taken;

(b) the actual treatment that shareholders and creditors have received in the resolution of an institution under resolution; and

(c) whether there is any difference between the treatment referred to in point (a) of this paragraph and the treatment referred to in point (b) of this paragraph.

18.     The valuation referred to in paragraph 16 shall:

(a) assume that an institution under resolution with respect to which the resolution action or actions have been effected, would have entered normal insolvency proceedings at the time when the decision on the resolution action was taken;

(b) assume that the resolution action or actions had not been effected;

(c) disregard any provision of extraordinary public financial support to an institution under resolution.

EN     Official Journal of the European Union     30.7.2014

*Article 21*

**Write-down and conversion of capital instruments**

1.    The Board shall exercise the power to write down or convert relevant capital instruments acting under the proce-dure laid down in Article 18, in relation to the entities and groups referred to in Article 7(2), and to the entities and groups referred to in Article 7(4)(b) and (5), where the conditions for the application of those paragraphs are met, only where it assesses, in its executive session, on receiving a communication pursuant to the second subparagraph or on its own initiative, that one or more of the following conditions are met:

(a)  where the determination has been made that the conditions for resolution specified in Articles 16 and 18 have been met, before any resolution action is taken;

(b)  the entity will no longer be viable unless the relevant capital instruments are written down or converted into equity;

(c)  in the case of relevant capital instruments issued by a subsidiary and where those relevant capital instruments are recognised for the purposes of meeting own funds requirements on an individual basis and on a consolidated basis, unless the write-down or conversion power is exercised in relation to those instruments, the group will no longer be viable;

(d)  in the case of relevant capital instruments issued at the level of the parent undertaking and where those relevant capital instruments are recognised for the purposes of meeting own funds requirements on an individual basis at the level of the parent undertaking or on a consolidated basis, unless the write-down or conversion power is exercised in relation to those instruments, the group will no longer be viable;

(e)  extraordinary public financial support is required by the entity or group, except in any of the circumstances set out in point (d)(iii) of Article 18(4).

The assessment of the conditions referred to in points (a), (c) and (d) of the first subparagraph shall be made by the ECB, after consulting the Board. The Board, in its executive session, may also make such assessment.

2.    Regarding the assessment of whether the entity or group is viable, the Board, in its executive session, may make such an assessment only after informing the ECB of its intention and only if the ECB, within three calendar days of receipt of such information, does not make such an assessment. The ECB shall, without delay, provide the Board with any relevant information that the Board requests in order to inform its assessment.

3.    For the purposes of paragraph 1 of this Article, an entity referred to in Article 2 or a group shall be deemed to be no longer viable only if both of the following conditions are met:

(a)  that entity or group is failing or is likely to fail;

(b)  having regard to timing and other relevant circumstances, there is no reasonable prospect that any action, including alternative private sector measures or supervisory action (including early intervention measures), other than the write-down or conversion of relevant capital instruments, independently or in combination with resolution action, would prevent the failure of that entity or group within a reasonable timeframe.

4.    For the purposes of point (a) of paragraph 3 of this Article, that entity shall be deemed to be failing or to be likely to fail where one or more of the circumstances referred to in Article 18(4) occur.

5.    For the purposes of point (a) of paragraph 3, a group shall be deemed to be failing or to be likely to fail where the group infringes, or there are objective elements to support a determination that the group, in the near future, will infringe its consolidated prudential requirements in a way that would justify action by the ECB or the national compe-tent authority, including but not limited to the fact that the group has incurred or is likely to incur losses that will deplete all or a significant amount of its own funds.

6.    A relevant capital instrument issued by a subsidiary shall not be written down to a greater extent or converted on worse terms pursuant to Article 59(3)(c) of Directive 2014/59/EU than equally ranked capital instruments at the level of the parent undertaking which have been written down or converted.

7.    If one or more of the conditions referred to in paragraph 1 are met, the Board, acting under the procedure laid down in Article 18, shall determine whether the powers to write down or convert relevant capital instruments are to be exercised independently or, in accordance with the procedure under Article 18, in combination with a resolution action.

8.    Where the Board, acting under the procedure laid down in Article 18 of this Regulation, determines that one or more of the conditions referred to in paragraph 1 of this Article are met, but the conditions for resolution in accordance with Article 18(1) of this Regulation are not met, it shall instruct, without delay, the national resolution authorities to exercise the write-down or conversion powers in accordance with Articles 59 and 60 of Directive 2014/59/EU.

The Board shall ensure that before national resolution authorities exercise the power to write down or convert relevant capital instruments, a valuation of the assets and liabilities of an entity referred to in Article 2 or a group is carried out in accordance with Article 20(1) to (15). That valuation shall form the basis of the calculation of the write-down to be applied to the relevant capital instruments in order to absorb losses and the level of conversion to be applied to relevant capital instruments in order to recapitalise the entity referred to in Article 2 or the group.

9.    Where one or more of the conditions referred to in paragraph 1 are met, and the conditions referred to in Article 18(1) are also met, the procedure laid down in Article 18(6), (7) and (8) shall apply.

10.    The Board shall ensure that the national resolution authorities exercise the write-down or conversion powers without delay, in accordance with the priority of claims pursuant to Article 17 and in a way that produces the following results:

(a)  Common Equity Tier 1 items are reduced first in proportion to the losses and to the extent of their capacity;

(b)  the principal amount of Additional Tier 1 instruments is written down or converted into Common Equity Tier 1 instruments or both, to the extent required to achieve the resolution objectives set out in Article 14 or to the extent of the capacity of the relevant capital instruments, whichever is lower;

(c)  the principal amount of Tier 2 instruments is written down or converted into Common Equity Tier 1 instruments or both, to the extent required to achieve the resolution objectives set out in Article 14 or to the extent of the capacity of the relevant capital instruments, whichever is lower.

11.    The national resolution authorities shall implement the instructions of the Board and exercise the write-down or conversion of relevant capital instruments in accordance with Article 29.

*Article 22*

**General principles of resolution tools**

1.    Where the Board decides to apply a resolution tool to an entity or group referred to in Article 7(2) or to an entity or group referred to in Article 7(4)(b) and (5) where the conditions for the application of those paragraphs are met, and that resolution action would result in losses being borne by creditors or their claims being converted, the Board shall instruct the national resolution authorities to exercise the power to write down and convert relevant capital instruments in accordance with Article 21 immediately before or together with the application of the resolution tool.

2.    The resolution tools referred to in point (b) of Article 18(6) are the following:

(a)  the sale of business tool;

(b)  the bridge institution tool;

(c)  the asset separation tool;

(d)  the bail-in tool.

3.    When adopting the resolution scheme referred to in Article 18(6), the Board shall take into consideration the following factors:

(a)  the assets and liabilities of the institution under resolution on the basis of the valuation pursuant to Article 20;

(b)  the liquidity position of the institution under resolution;

(c) the marketability of the franchise value of the institution under resolution in the light of the competitive and economic conditions of the market;

(d) the time available.

4.    The resolution tools shall be applied to meet the resolution objectives specified in Article 14, in accordance with the resolution principles specified in Article 15. They may be applied either individually or in any combination, except for the asset separation tool which may be applied only together with another resolution tool.

5.    Where the resolution tools referred to in point (a) or (b) of paragraph 2 of this Article are used to transfer only part of the assets, rights or liabilities of the institution under resolution, the residual entity referred to in Article 2 from which the assets, rights or liabilities have been transferred, shall be wound up under normal insolvency proceedings.

6.    The Board may recover any reasonable expenses properly incurred in connection with the use of the resolution tools or powers in one or more of the following ways:

(a) as a deduction from any consideration paid by a recipient to the institution under resolution or, as the case may be, to the owners of instruments of ownership;

(b) from the institution under resolution, as a preferred creditor; or

(c) from any proceeds generated as a result of the termination of the operation of the bridge institution or the asset management vehicle, as a preferred creditor.

Any proceeds received by national resolution authorities in connection with the use of the Fund shall be reimbursed to the Board.

*Article 23*

**Resolution Scheme**

The resolution scheme adopted by the Board under Article 18 shall establish, in accordance with any decision on State aid or Fund aid, the details of the resolution tools to be applied to the institution under resolution concerning at least the measures referred to in Article 24(2), Article 25(2), Article 26(2) and Article 27(1), to be implemented by the national resolution authorities in accordance with the relevant provisions of Directive 2014/59/EU as transposed into national law, and determine the specific amounts and purposes for which the Fund shall be used.

The resolution scheme shall outline the resolution actions that should be taken by the Board in relation to the Union parent undertaking or particular group entities established in the participating Member States with the aim of meeting the resolution objectives and principles as referred to in Articles 14 and 15.

When adopting a resolution scheme, the Board, the Council and the Commission shall take into account and follow the resolution plan as referred to in Article 8 unless the Board assesses, taking into account the circumstances of the case, that the resolution objectives will be achieved more effectively by taking actions which are not provided for in the resolution plan.

In the course of the resolution process, the Board may amend and update the resolution scheme as appropriate in light of the circumstances of the case. For amendments and updates the procedure laid down in Article 18 shall apply.

In addition, the resolution scheme shall provide, where appropriate, for the appointment by the national resolution authorities of a special manager for the institution under resolution pursuant to Article 35 of Directive 2014/59/EU. The Board may establish that the same special manager is appointed for all of the entities affiliated to a group where that is necessary in order to facilitate solutions redressing the financial soundness of the entities concerned.

*Article 24*

**Sale of business tool**

1.    Within the resolution scheme, the sale of business tool shall consist of the transfer to a purchaser that is not a bridge institution of the following:

(a)  instruments of ownership issued by an institution under resolution; or

(b)  all or any assets, rights or liabilities of an institution under resolution.

2.    Concerning the sale of business tool, the resolution scheme shall establish:

(a)  the instruments, assets, rights and liabilities to be transferred by the national resolution authority in accordance with Article 38(1) and (7) to (11) of Directive 2014/59/EU;

(b)  the commercial terms, having regard to the circumstances and the costs and expenses incurred in the resolution process, pursuant to which the national resolution authority shall make the transfer in accordance with Article 38(2), (3) and (4) of Directive 2014/59/EU;

(c)  whether the transfer powers may be exercised by the national resolution authority more than once in accordance with Article 38(5) and (6) of Directive 2014/59/EU;

(d)  the arrangements for the marketing by the national resolution authority of that entity or those instruments, assets, rights and liabilities in accordance with Article 39(1) and (2) of Directive 2014/59/EU;

(e)  whether the compliance with the marketing requirements by the national resolution authority is likely to undermine the resolution objectives in accordance with paragraph 3 of this Article.

3.    The Board shall apply the sale of business tool without complying with the marketing requirements laid down in point (e) of paragraph 2 when it determines that compliance with those requirements would be likely to undermine one or more of the resolution objectives and in particular where the following conditions are met:

(a)  it considers that there is a material threat to financial stability arising from or aggravated by the failure or likely failure of the institution under resolution; and

(b)  it considers that compliance with those requirements would be likely to undermine the effectiveness of the sale of business tool in addressing that threat or achieving the resolution objective specified in point (b) of Article 14(2).

*Article 25*

**Bridge institution tool**

1.    Within the resolution scheme, the bridge institution tool shall consist of the transfer to a bridge institution of any of the following:

(a)  instruments of ownership issued by one or more institutions under resolution;

(b)  all or any assets, rights or liabilities of one or more institutions under resolution.

2.    With regard to the bridge institution tool, the resolution scheme shall establish:

(a)  the instruments, assets, rights and liabilities to be transferred to a bridge institution by the national resolution authority in accordance with Article 40(1) to (12) of Directive 2014/59/EU;

(b)  the arrangements for the setting up, the operation and the termination of the bridge institution by the national resolution authority in accordance with Article 41(1), (2), (3) and (5) to (9) of Directive 2014/59/EU;

(c)  the arrangements for the marketing of the bridge institution or its assets or liabilities by the national resolution authority in accordance with Article 41(4) of Directive 2014/59/EU.

3.    The Board shall ensure that the total value of liabilities transferred by the national resolution authority to the bridge institution does not exceed the total value of the rights and assets transferred from the institution under resolution or provided by other sources.

*Article 26*

**Asset separation tool**

1.    Within the resolution scheme, the asset separation tool shall consist of the transfer of assets, rights or liabilities of an institution under resolution or a bridge institution to one or more asset management vehicles.

2.    Concerning the asset separation tool, the resolution scheme shall establish:

(a)  the assets, rights and liabilities to be transferred by the national resolution authority to an asset management vehicle in accordance with Article 42(1) to (5) and (8) to (13) of Directive 2014/59/EU;

(b)  the consideration for which the assets, rights and liabilities are to be transferred by the national resolution authority to the asset management vehicle in accordance with the principles established in Article 20 of this Regulation, with Article 42(7) of Directive 2014/59/EU and with the Union State aid framework.

Point (b) of the first subparagraph shall not prevent the consideration having nominal or negative value.

*Article 27*

**Bail-in tool**

1.    The bail-in tool may be applied for any of the following purposes:

(a)  to recapitalise an entity referred to in Article 2 of this Regulation that meets the conditions for resolution to the extent sufficient to restore its ability to comply with the conditions for authorisation (to the extent that those conditions apply to the entity) and to continue to carry out the activities for which it is authorised under Directive 2013/36/EU or Directive 2014/65/EU, where the entity is authorised under those Directives, and to sustain sufficient market confidence in the institution or entity;

(b)  to convert to equity or reduce the principal amount of claims or debt instruments that are transferred:

  (i)  to a bridge institution with a view to providing capital for that bridge institution; or

  (ii)  under the sale of business tool or the asset separation tool.

Within the resolution scheme, concerning the bail-in tool, the following shall be established:

(a)  the aggregate amount by which eligible liabilities must be reduced or converted, in accordance with paragraph 13;

(b)  the liabilities that may be excluded in accordance with paragraphs 5 to 14;

(c)  the objectives and minimum content of the business reorganisation plan to be submitted in accordance with paragraph 16.

2.    The bail-in tool may be applied for the purpose referred to in point (a) of paragraph 1 only if there is a reasonable prospect that the application of that tool, together with other relevant measures including measures implemented in accordance with the business reorganisation plan required by paragraph 16 will, in addition to achieving relevant resolution objectives, restore the entity in question to financial soundness and long-term viability.

Any of the resolution tools referred to in Article 22(2)(a), (b) and (c), and the bail-in tool referred to in point (d) of that paragraph, shall apply, as appropriate, where the conditions laid down in the first subparagraph are not met.

3.    The following liabilities, whether they are governed by the law of a Member State or of a third country, shall not be subject to write-down or conversion:

(a)  covered deposits;

(b)  secured liabilities including covered bonds and liabilities in the form of financial instruments used for hedging purposes which form an integral part of the cover pool and which, in accordance with national law, are secured in a way similar to covered bonds;

(c) any liability that arises by virtue of the holding by an institution or entity referred to in Article 2 of this Regulation of client assets or client money, including client assets or client money held on behalf of UCITS as defined in Article 1(2) of Directive 2009/65/EC or of AIFs as defined in Article 4(1)(a) of Directive 2011/61/EU of the European Parliament and of the Council (¹), provided that such client is protected under the applicable insolvency law;

(d) any liability that arises by virtue of a fiduciary relationship between an entity referred to in Article 2 (as fiduciary) and another person (as beneficiary), provided that such beneficiary is protected under the applicable insolvency or civil law;

(e) liabilities to institutions, excluding entities that are part of the same group, with an original maturity of less than seven days;

(f) liabilities with a remaining maturity of less than seven days, owed to systems or operators of systems designated in accordance with Directive 98/26/EC of the European Parliament and of the Council (²) or their participants and arising from the participation in such a system;

(g) a liability to any one of the following:

(i) an employee, in relation to accrued salary, pension benefits or other fixed remuneration, except for the variable component of remuneration that is not regulated by a collective bargaining agreement;

(ii) a commercial or trade creditor arising from the provision to the institution or entity referred to in Article 2 of goods or services that are critical to the daily functioning of its operations, including IT services, utilities and the rental, servicing and upkeep of premises;

(iii) tax and social security authorities, provided that those liabilities are preferred under the applicable law;

(iv) deposit guarantee schemes arising from contributions due in accordance with Directive 2014/49/EU.

Point (g)(i) of the first subparagraph shall not apply to the variable component of the remuneration of material risk takers as identified in Article 92(2) of Directive 2013/36/EU.

4.    The scope of the bail-in tool referred to in paragraph 3 of this Article shall not prevent, where appropriate, the exercise of the bail-in powers to any part of a secured liability or a liability for which collateral has been pledged that exceeds the value of the assets, pledge, lien or collateral against which it is secured or to any amount of a deposit that exceeds the coverage level provided for in Article 6 of Directive 2014/49/EU.

The Board shall ensure that all secured assets relating to a covered bond cover pool remain unaffected, segregated and with enough funding.

Without prejudice to the large exposure rules in Regulation (EU) No 575/2013 and Directive 2013/36/EU, and in order to provide for the resolvability of entities and groups, the Board shall instruct the national resolution authorities to limit, in accordance with Article 10(11)(b) of this Regulation, the extent to which other institutions hold liabilities eligible for a bail-in tool, save for liabilities that are held at entities that are part of the same group.

5.    In exceptional circumstances, where the bail-in tool is applied, certain liabilities may be excluded or partially excluded from the application of the write-down or conversion powers where:

(a) it is not possible to bail-in that liability within a reasonable time notwithstanding the good faith efforts of the relevant national resolution authority;

(b) the exclusion is strictly necessary and is proportionate to achieve the continuity of critical functions and core business lines in a manner that maintains the ability of the institution under resolution to continue key operations, services and transactions;

---

(¹) Directive 2011/61/EU of the European Parliament and of the Council of 8 June 2011 on Alternative Investment Fund Managers and amending Directives 2003/41/EC and 2009/65/EC and Regulations (EC) No 1060/2009 and (EU) No 1095/2010 (OJ L 174, 1.7.2011, p. 1).
(²) Directive 98/26/EC of the European Parliament and of the Council of 19 May 1998 on settlement finality in payment and securities settlement systems (OJ L 166, 11.6.1998, p. 45).

(c) the exclusion is strictly necessary and proportionate to avoid giving rise to widespread contagion, in particular as regards eligible deposits held by natural persons and micro, small and medium-sized enterprises, which would severely disrupt the functioning of financial markets, including of financial market infrastructures, in a manner that could cause a serious disturbance to the economy of a Member State or of the Union; or

(d) the application of the bail-in tool to those liabilities would cause a destruction in value such that the losses borne by other creditors would be higher than if those liabilities were excluded from bail-in.

Where an eligible liability or class of eligible liabilities is excluded or partially excluded under this paragraph, the level of write-down or conversion applied to other eligible liabilities may be increased to take account of such exclusions provided that the level of write-down and conversion applied to other eligible liabilities complies with the principle laid down in point (g) of Article 15(1).

6.   Where an eligible liability or class of eligible liabilities is excluded or partially excluded pursuant to paragraph 5, and the losses that would have been borne by those liabilities have not been passed on fully to other creditors, a contribution from the Fund may be made to the institution under resolution to do one or both of the following:

(a) cover any losses which have not been absorbed by eligible liabilities and restore the net asset value of the institution under resolution to zero in accordance with point (a) of paragraph 13;

(b) purchase instruments of ownership or capital instruments in the institution under resolution, in order to recapitalise the institution in accordance with point (b) of paragraph 13.

7.   The Fund may make a contribution referred to in paragraph 6 only where:

(a) a contribution to loss absorption and recapitalisation equal to an amount not less than 8 % of the total liabilities including own funds of the institution under resolution, measured at the time of resolution action in accordance with the valuation provided for in Article 20(1) to (15), has been made by shareholders, the holders of relevant capital instruments and other eligible liabilities through write-down, conversion or otherwise; and

(b) the contribution from the Fund does not exceed 5 % of the total liabilities including own funds of the institution under resolution, measured at the time of resolution action in accordance with the valuation provided for in Article 20(1) to (15).

8.   The contribution of the Fund referred to in paragraph 7 of this Article may be financed by:

(a) the amount available to the Fund which has been raised through contributions by entities referred to in Article 2 of this Regulation in accordance with the rules laid down in Directive 2014/59/EU and in Article 67(4) and Articles 70 and 71 of this Regulation;

(b) where the amounts referred to in point (a) of this paragraph are insufficient, amounts raised from alternative funding means in accordance with Articles 73 and 74.

9.   In extraordinary circumstances, further funding may be sought from alternative financing sources after:

(a) the 5 % limit specified in point (b) of paragraph 7 has been reached; and

(b) all unsecured, non-preferred liabilities, other than eligible deposits, have been written down or converted in full.

10.   As an alternative or in addition, where the conditions laid down in points (a) and (b) of paragraph 9 are met, a contribution may be made from resources which have been raised through *ex-ante* contributions in accordance with Article 70 and which have not yet been used.

11.   For the purposes of this Regulation, Article 44(8) of Directive 2014/59/EU shall not apply.

12.   When taking the decision referred to in paragraph 5, due consideration shall be given to:

(a) the principle that losses should be borne first by shareholders and next, in general, by creditors of the institution under resolution in order of preference;

(b) the level of loss absorbing capacity that would remain in the institution under resolution if the liability or class of liabilities were excluded; and

(c) the need to maintain adequate resources for resolution financing.

13.    The Board shall assess, on the basis of a valuation that complies with the requirements of Article 20(1) to (15), the aggregate of:

(a)  where relevant, the amount by which eligible liabilities must be written down in order to ensure that the net asset value of the institution under resolution is equal to zero; and

(b)  where relevant, the amount by which eligible liabilities must be converted into shares or other types of capital instruments in order to restore the Common Equity Tier 1 capital ratio of either:

    (i)   the institution under resolution; or

    (ii)  the bridge institution.

The assessment referred to in the first subparagraph shall establish the amount by which eligible liabilities need to be written down or converted in order to restore the Common Equity Tier 1 capital ratio of the institution under resolution, or, where applicable, establish the ratio of the bridge institution taking into account any contribution of capital by the Fund pursuant to point (d) of Article 76(1), and to sustain sufficient market confidence in the institution under resolution or the bridge institution and enable it to continue to meet, for at least one year, the conditions for authorisation and to continue to carry out the activities for which it is authorised under Directive 2013/36/EU or Directive 2014/65/EU.

Where the Board intends to use the asset separation tool referred to in Article 26, the amount by which eligible liabilities need to be reduced shall take into account a prudent estimate of the capital needs of the asset management vehicle as appropriate.

14.    Exclusions under paragraph 5 may be applied either to completely exclude a liability from write-down or to limit the extent of the write-down applied to that liability.

15.    The write-down and conversion powers shall comply with the requirements on the priority of claims laid down in Article 17 of this Regulation.

16.    The national resolution authority shall immediately submit to the Board the business reorganisation plan received in accordance with Article 52(1), (2) and (3) of Directive 2014/59/EU from the management body or the person or persons appointed in accordance with Article 72(1) thereof.

Within two weeks from the date of submission of the business reorganisation plan, the relevant national resolution authority shall provide the Board with its assessment of the plan. Within one month from the date of submission of the business reorganisation plan, the Board shall assess the likelihood that the plan, if implemented, will restore the long term viability of an entity referred to in Article 2. The assessment shall be completed in agreement with the national competent authority or the ECB, where relevant.

Where the Board is satisfied that the plan would achieve that objective, it shall allow the national resolution authority to approve the plan in accordance with Article 52(7) of Directive 2014/59/EU. Where the Board is not satisfied that the plan would achieve that objective, it shall instruct the national resolution authority to notify the management body or the person or persons appointed in accordance with Article 72(1) of that Directive of its concerns and require the amendment of the plan in a way that addresses those concerns in accordance with Article 52(8) of that Directive. In both cases this shall be done in agreement with the national competent authority or the ECB, where relevant.

Within two weeks from the date of receipt of such a notification, the management body or the person or persons appointed in accordance with Article 72(1) of Directive 2014/59/EU shall submit an amended plan to the national resolution authority for approval. The national resolution authority shall submit to the Board the amended plan and its assessment of such plan. The Board shall assess the amended plan, and shall instruct the national resolution authority to notify the management body or the person or persons appointed in accordance with Article 72(1) of Directive 2014/59/EU within one week whether it is satisfied that the plan, as amended, addresses the concerns notified or whether further amendment is required.

The Board shall communicate the group business reorganisation plan to EBA.

Official Journal of the European Union

*Article 28*

**Monitoring by the Board**

1.    The Board shall closely monitor the execution of the resolution scheme by the national resolution authorities. For that purpose, the national resolution authorities shall:

(a)  cooperate with and assist the Board in the performance of its monitoring duty;

(b)  provide, at regular intervals established by the Board, accurate, reliable and complete information on the execution of the resolution scheme, the application of the resolution tools and the exercise of the resolution powers, that might be requested by the Board, including on the following:

   (i)   the operation and financial situation of the institution under resolution, the bridge institution and the asset management vehicle;

   (ii)  the treatment that shareholders and creditors would have received in the liquidation of the institution under normal insolvency proceedings;

   (iii) any ongoing court proceedings relating to the liquidation of the assets of the institution under resolution, to challenges to the resolution decision and to the valuation or relating to applications for compensation filed by the shareholders or creditors;

   (iv)  the appointment, removal or replacement of evaluators, administrators, accountants, lawyers and other professionals that may be necessary to assist the national resolution authority, and on the performance of their duties;

   (v)   any other matter that is relevant for the execution of the resolution scheme including any potential infringement of the safeguards provided for in Directive 2014/59/EU that may be referred to by the Board;

   (vi)  the extent to which, and manner in which, the powers of the national resolution authorities referred to in Articles 63 to 72 of Directive 2014/59/EU are exercised by them;

   (vii) the economic viability, feasibility, and implementation of the business reorganisation plan provided for in Article 27(16).

The national resolution authorities shall submit to the Board a final report on the execution of the resolution scheme.

2.    On the basis of the information provided, the Board may give instructions to the national resolution authorities as to any aspect of the execution of the resolution scheme, and in particular the elements referred to in Article 23 and to the exercise of the resolution powers.

3.    Where necessary in order to achieve the resolution objectives, the resolution scheme may be amended. The procedure laid down in Article 18 shall apply.

*Article 29*

**Implementation of decisions under this Regulation**

1.    National resolution authorities shall take the necessary action to implement decisions referred to in this Regulation, in particular by exercising control over the entities and groups referred to in Article 7(2), and the entities and groups referred to in Article 7(4)(b) and (5) where the conditions for the application of those paragraphs are met, by taking the necessary measures in accordance with Article 35 or 72 of Directive 2014/59/EU and by ensuring that the safeguards provided for in that Directive are complied with. National resolution authorities shall implement all decisions addressed to them by the Board.

For those purposes, subject to this Regulation, they shall exercise their powers under national law transposing Directive 2014/59/EU and in accordance with the conditions laid down in national law. National resolution authorities shall fully inform the Board of the exercise of those powers. Any action they take shall comply with the Board's decisions pursuant to this Regulation.

When implementing those decisions, the national resolution authorities shall ensure that the applicable safeguards provided for in Directive 2014/59/EU are complied with.

2.    Where a national resolution authority has not applied or has not complied with a decision by the Board pursuant to this Regulation or has applied it in a way which poses a threat to any of the resolution objectives under Article 14 or to the efficient implementation of the resolution scheme, the Board may order an institution under resolution:

(a)  in the event of action pursuant to Article 18, to transfer to another person specified rights, assets or liabilities of an institution under resolution;

(b)  in the event of action pursuant to Article 18, to require the conversion of any debt instruments which contain a contractual term for conversion in the circumstances provided for in Article 21;

(c)  to adopt any other necessary action to comply with the decision in question.

The Board shall adopt a decision referred to in point (c) of the first subparagraph only if the measure significantly addresses the threat to the relevant resolution objective or to the efficient implementation of the resolution scheme.

Before deciding to impose any measure the Board shall notify the national resolution authorities concerned and the Commission of the measure it intends to take. That notification shall include details of the envisaged measures, the reasons for those measures and details of when the measures are intended to take effect.

The notification shall be made not less than 24 hours before the measures are to take effect. In exceptional circumstances where it is not possible to give 24 hours' notice, the Board may make the notification less than 24 hours before the measures are intended to take effect.

3.    The institution under resolution shall comply with any decision taken referred to in paragraph 2. Those decisions shall prevail over any previous decision adopted by the national resolution authorities on the same matter.

4.    When taking action in relation to issues which are subject to a decision taken pursuant to paragraph 2, national resolution authorities shall comply with that decision.

5.    The Board shall publish on its official website either a copy of the resolution scheme or a notice summarising the effects of the resolution action, and in particular the effects on retail customers. The national resolution authorities shall comply with the applicable procedural obligations provided for in Article 83 of Directive 2014/59/EU.

CHAPTER 4

*Cooperation*

*Article 30*

**Obligation to cooperate and information exchange within the SRM**

1.    The Board shall inform the Commission of any action it takes in order to prepare for resolution. With regard to any information received from the Board, the members of the Council, the Commission as well as the Council and the Commission staff shall be subject to the requirements of professional secrecy laid down in Article 88.

2.    In the exercise of their respective responsibilities under this Regulation, the Board, the Council, the Commission, the ECB and the national resolution authorities and national competent authorities shall cooperate closely, in particular in the resolution planning, early intervention and resolution phases pursuant to Articles 8 to 29. They shall provide each other with all information necessary for the performance of their tasks.

3.    The ECB or the national competent authorities shall transmit to the Board and the national resolution authorities the group financial support agreements authorised and any changes thereto.

4.    For the purposes of this Regulation, the ECB may invite the Chair of the Board to participate as an observer in the Supervisory Board of the ECB established in accordance with Article 19 of Regulation (EU) No 1024/2013. Where deemed to be appropriate the Board may appoint another representative to replace the Chair for that purpose.

5.    For the purposes of this Regulation, the Board shall appoint a representative which shall participate in the Resolution Committee of EBA established in accordance with Article 127 of Directive 2014/59/EU.

6.    The Board shall endeavour to cooperate closely with any public financial assistance facility including the European Financial Stability Facility (EFSF) and the European Stability Mechanism (ESM), in particular in the extraordinary circumstances referred to in Article 27(9) and where such a facility has granted, or is likely to grant, direct or indirect financial assistance to entities established in a participating Member State.

7.    Where necessary, the Board shall conclude a memorandum of understanding with the ECB and the national resolution authorities and the national competent authorities describing in general terms how they will cooperate under paragraphs 2 and 4 in the performance of their respective tasks under Union law. The memorandum shall be reviewed on a regular basis and shall be published subject to the requirements of professional secrecy.

*Article 31*

**Cooperation within the SRM**

1.    The Board shall perform its tasks in close cooperation with national resolution authorities. The Board shall, in cooperation with national resolution authorities, approve and make public a framework to organise the practical arrangements for the implementation of this Article.

In order to ensure effective and consistent application of this Article, the Board:

(a)  shall issue guidelines and general instructions to national resolution authorities according to which the tasks are performed and resolution decisions are adopted by national resolution authorities;

(b)  may at any time exercise the powers referred to in Articles 34 to 37;

(c)  may request, on an ad hoc or continuous basis, information from national resolution authorities on the performance of the tasks carried out by them under Article 7(3);

(d)  shall receive from national resolution authorities draft decisions on which it may express its views, and, in particular, indicate the elements of the draft decision that do not comply with this Regulation or with the Board's general instructions.

For the purposes of evaluating resolution plans, the Board may request national resolution authorities to submit to the Board all information necessary, as obtained by them in accordance with Article 11 and Article 13(1) of Directive 2014/59/EU, without prejudice to Chapter 5 of this Title.

2.    Article 13(4) to (10) and Articles 88 to 92 of Directive 2014/59/EU shall not apply to relations between national resolution authorities. The joint decision and any decision taken in the absence of a joint decision as referred to in Article 45(9) to (13) of Directive 2014/59/EU shall not apply. The relevant provisions of this Regulation shall apply instead.

*Article 32*

**Consultation of, and cooperation with, non-participating Member States and third countries**

1.    Where a group includes entities established in participating Member States as well as in non-participating Member States or third countries, without prejudice to any approval by the Council or the Commission required under this Regulation, the Board shall represent the national resolution authorities of the participating Member States for the purposes of consultation and cooperation with non-participating Member States or third countries in accordance with Articles 7, 8, 12, 13, 16, 18, 55, and 88 to 92 of Directive 2014/59/EU.

Where a group includes entities established in participating Member States and subsidiaries established, or significant branches located, in non-participating Member States, the Board shall communicate any plans, decisions or measures referred to in Articles 8, 10, 11, 12 and 13 relevant to the group to the competent authorities and/or the resolution authorities of the non-participating Member State, as appropriate.

2.    The Board, the ECB and the resolution authorities and competent authorities of the non-participating Member States shall conclude memoranda of understanding describing in general terms how they will cooperate with one another in the performance of their tasks under Directive 2014/59/EU.

Without prejudice to the first subparagraph, the Board shall conclude a memorandum of understanding with the resolution authority of each non-participating Member State that is home to at least one global systemically important institution, identified as such pursuant to Article 131 of Directive 2013/36/EU.

3.    Each memorandum shall be reviewed on a regular basis and shall be published subject to the requirements of professional secrecy.

4.    The Board shall conclude, on behalf of the national resolution authorities of participating Member States, non-binding cooperation arrangements in line with the EBA framework cooperation arrangements referred to in Article 97(2) of Directive 2014/59/EU. The Board shall notify EBA of any such cooperation arrangement.

*Article 33*

**Recognition and enforcement of third-country resolution proceedings**

1.    This Article shall apply in respect of third-country resolution proceedings unless and until an international agreement as referred to in Article 93(1) of Directive 2014/59/EU enters into force with the relevant third country. It shall also apply following the entry into force of an international agreement as referred to in Article 93(1) of that Directive with the relevant third country to the extent that recognition and enforcement of third-country resolution proceedings is not governed by that agreement.

2.    The Board shall assess and issue a recommendation addressed to the national resolution authorities on the recognition and enforcement of resolution proceedings conducted by third-country resolution authorities in relation to a third-country institution or a third-country parent undertaking that has:

(a) one or more Union subsidiaries established in one or more participating Member States; or

(b) assets, rights or liabilities located in one or more participating Member States or governed by the law of participating Member States.

The Board shall conduct its assessment, after consulting the national resolution authorities and, where a European resolution college is established pursuant to Article 89 of Directive 2014/59/EU, with the resolution authorities of non-participating Member States.

The assessment shall give due consideration to the interests of each individual participating Member State where a third-country institution or parent undertaking operates, and in particular to the potential impact of the recognition and enforcement of the third-country resolution proceedings on the other parts of the group and the financial stability in those Member States.

3.    The Board shall recommend to refuse the recognition or enforcement of the resolution proceedings referred to in paragraph 1, if it considers that:

(a) the third-country resolution proceedings would have an adverse effect on financial stability in a participating Member State;

(b) creditors, including in particular depositors located or payable in a participating Member State, would not receive the same treatment as third-country creditors and depositors with similar legal rights under the third-country home resolution proceedings;

(c) recognition or enforcement of the third-country resolution proceedings would have material fiscal implications for the participating Member State; or

(d) the effects of such recognition or enforcement would be contrary to the national law of the participating Member State.

4.    National resolution authorities shall implement the recommendation of the Board and ask for the recognition or enforcement of the resolution proceedings in their respective territories, or shall explain in a reasoned statement to the Board why they cannot implement the recommendation of the Board.

5.    When exercising resolution powers in relation to third-country entities, national resolution authorities shall, where relevant, exercise the powers conferred on them on the basis of the provisions referred to in Article 94(4) of Directive 2014/59/EU.

CHAPTER 5

*Investigatory powers*

*Article 34*

**Requests for information**

1.   For the purpose of performing its tasks under this Regulation, the Board may, through the national resolution authorities or directly, after informing them, making full use of all of the information available to the ECB or to the national competent authorities, require the following legal or natural persons to provide all of the information necessary to perform the tasks conferred on it by this Regulation:

(a)  the entities referred to in Article 2;

(b)  employees of the entities referred to in Article 2;

(c)  third parties to whom the entities referred to in Article 2 have outsourced functions or activities.

2.   The entities and persons referred to in paragraph 1 shall supply the information requested pursuant to that paragraph. The requirements of professional secrecy shall not exempt those entities and persons from the duty to supply that information. The supply of the information requested shall not be deemed to infringe the requirements of professional secrecy.

3.   Where the Board obtains information directly from those entities and persons, it shall make that information available to the national resolution authorities concerned.

4.   The Board shall be able to obtain, including on a continuous basis, any information necessary for the exercise of its functions under this Regulation, in particular on capital, liquidity, assets and liabilities concerning any institution subject to its resolution powers.

5.   The Board, the ECB, the national competent authorities and the national resolution authorities may draw up memoranda of understanding with a procedure concerning the exchange of information. The exchange of information between the Board, the ECB, the national competent authorities and the national resolution authorities shall not be deemed to infringe the requirements of professional secrecy.

6.   National competent authorities, the ECB where relevant, and national resolution authorities shall cooperate with the Board in order to verify whether some or all of the information requested is already available. Where such information is available, national competent authorities, the ECB where relevant, or national resolution authorities shall provide that information to the Board.

*Article 35*

**General investigations**

1.   For the purpose of performing its tasks under this Regulation, and subject to any other conditions laid down in relevant Union law, the Board may, through the national resolution authorities or directly, after informing them, conduct all necessary investigations of any legal or natural person referred to in Article 34(1) established or located in a participating Member State.

To that end, the Board may:

(a)  require the submission of documents;

(b)  examine the books and records of any legal or natural person referred to in Article 34(1) and take copies or extracts from such books and records;

(c)  obtain written or oral explanations from any legal or natural person referred to in Article 34(1) or their representatives or staff;

(d)  interview any other natural or legal person who consents to be interviewed for the purpose of collecting information relating to the subject matter of an investigation.

2.    The natural or legal persons referred to in Article 34(1) shall be subject to investigations launched on the basis of a decision of the Board.

Where a person obstructs the conduct of the investigation, the national resolution authorities of the participating Member State where the relevant premises are located shall afford, in accordance with national law, the necessary assistance including facilitating the access by the Board to the business premises of the natural or legal persons referred to in Article 34(1), so that those rights can be exercised.

*Article 36*

**On-site inspections**

1.    For the purpose of performing its tasks under this Regulation, and subject to other conditions laid down in relevant Union law, the Board may, in accordance with Article 37 and subject to prior notification to the national resolution authorities and the relevant national competent authorities concerned, and, where appropriate, in cooperation with them, conduct all necessary on-site inspections at the business premises of the natural or legal persons referred to in Article 34(1). Where the proper conduct and efficiency of the inspection so require, the Board may carry out the on-site inspection without prior announcement to those legal persons.

2.    The officials of and other persons authorised by the Board to conduct an on-site inspection may enter any business premises and land of the legal persons subject to an investigation decision adopted by the Board pursuant to Article 35(2) and shall have all of the powers referred to in Article 35(1).

3.    The legal persons referred to in Article 34(1) shall be subject to on-site inspections on the basis of a decision of the Board.

4.    Officials of, and other accompanying persons authorised or appointed by, the national resolution authorities of the Member States where the inspection is to be conducted shall, under the supervision and coordination of the Board, actively assist the officials of, and other persons authorised by, the Board. To that end, they shall enjoy the powers referred to in paragraph 2. Officials of, and other accompanying persons authorised or appointed by, the national resolution authorities of the participating Member States concerned shall also have the right to participate in the on-site inspections.

5.    Where the officials of and other accompanying persons authorised or appointed by the Board find that a person opposes an inspection ordered pursuant to paragraph 1, the national resolution authorities of the participating Member States concerned shall afford them the necessary assistance in accordance with national law. To the extent necessary for the inspection, that assistance shall include the sealing of any business premises and books or records. Where that power is not available to the national resolution authorities concerned, it shall exercise its powers to request the necessary assistance of other national authorities.

*Article 37*

**Authorisation by a judicial authority**

1.    If an on-site inspection provided for in Article 36(1) and (2) or the assistance provided for in Article 36(5) requires authorisation by a judicial authority in accordance with national rules, such authorisation shall be applied for.

2.    Where authorisation as referred to in paragraph 1 of this Article is applied for, the national judicial authority shall control that the decision of the Board is authentic and that the coercive measures envisaged are neither arbitrary nor excessive, taking into account the subject matter of the inspection. In its control of the proportionality of the coercive measures, the national judicial authority may ask the Board for detailed explanations, in particular relating to the grounds the Board has for suspecting that an infringement of the decisions referred to in Article 29 has taken place, the seriousness of the suspected infringement and the nature of the involvement of the person subject to the coercive measures. However, the national judicial authority shall not review the necessity for the inspection or demand to be provided with the information on the Board's file. The lawfulness of the Board's decision shall be subject to review only by the Court of Justice.

CHAPTER 6

**Penalties**

*Article 38*

**Fines**

1.    Where the Board finds that an entity referred to in Article 2 has intentionally or negligently committed one of the infringements listed in paragraph 2, the Board shall take a decision imposing a fine in accordance with paragraph 3.

An infringement by such an entity shall be considered to have been committed intentionally if there are objective factors which demonstrate that the entity or its management body or senior management acted deliberately to commit the infringement.

2.    The fines shall be imposed on entities referred to in Article 2 for the following infringements:

(a)  where they do not supply the information requested in accordance with Article 34;

(b)  where they do not submit to a general investigation in accordance with Article 35 or an on-site inspection in accordance with Article 36;

(c)  where they do not comply with a decision addressed to them by the Board pursuant to Article 29.

3.    The basic amount of the fines referred to in paragraph 1 of this Article shall be a percentage of the total annual net turnover including the gross income consisting of interest receivable and similar income, income from shares and other variable or fixed-yield securities, and commissions or fees receivable in accordance with Article 316 of Regulation (EU) No 575/2013 of the undertaking in the preceding business year, or, in the Member States whose currency is not the euro, the corresponding value in the national currency on 19 August 2014, and included within the following limits:

(a)  for the infringements referred to in paragraph 2(a) and (b), the basic amount shall amount to at least 0,05 % and shall not exceed 0,15 %;

(b)  for the infringements referred to in paragraph 2(c), the basic amount shall amount to at least 0,25 % and shall not exceed 0,5 %.

In order to decide whether the basic amount of the fines should be set at the lower, the middle or the higher end of the limits referred to in the first subparagraph, the Board shall take into account the annual turnover in the preceding business year of the entity concerned. The basic amount shall be at the lower end of the limit for entities whose annual turnover is below EUR 1 000 000 000, the middle of the limit for the entities whose annual turnover is between EUR 1 000 000 000 and 5 000 000 000 and the higher end of the limit for the entities whose annual turnover is higher than EUR 5 000 000 000.

4.    The basic amounts referred to in paragraph 3 shall be adjusted, if necessary, by taking into account the aggravating or mitigating factors referred to in paragraphs 5 and 6, in accordance with the relevant coefficients referred to in paragraph 9.

The relevant mitigating coefficient shall be applied one by one to the basic amount. If more than one mitigating coefficient is applicable, the difference between the basic amount and the amount resulting from the application of each individual mitigating coefficient shall be subtracted from the basic amount.

The relevant aggravating coefficient shall be applied one by one to the basic amount. If more than one aggravating coefficient is applicable, the difference between the basic amount and the amount resulting from the application of each individual aggravating coefficient shall be added to the basic amount.

5.    The following aggravating factors shall apply in respect of the fines referred to in paragraph 1:

(a)  the infringement has been committed intentionally;

(b)  the infringement has been committed repeatedly;

(c) the infringement has been committed over a period exceeding three months;

(d) the infringement has revealed systemic weaknesses in the organisation of the entity, in particular in its procedures, management systems or internal controls;

(e) no remedial action has been taken since the infringement was identified;

(f) the entity's senior management has not cooperated with the Board in carrying out its investigations.

6.　The following mitigating factors shall apply in respect of the fines referred to in paragraph 1:

(a) the infringement has been committed over a period of less than 10 working days;

(b) the entity's senior management can demonstrate that they have taken all measures necessary to prevent the infringement;

(c) the entity has brought quickly, effectively and completely the infringement to the Board's attention;

(d) the entity has voluntarily taken measures to ensure that a similar infringement cannot be committed in the future.

7.　Notwithstanding paragraphs 2 to 6, the fines applied shall not exceed 1 % of the annual turnover of the entity referred to in paragraph 1 concerned in the preceding business year.

By way of derogation from the first subparagraph, where the entity has directly or indirectly benefited financially from that infringement and where profits gained or losses avoided because of the infringement can be determined, the fine shall be at least equal to that financial benefit.

Where an act or omission of an entity referred to in paragraph 1 constitutes more than one infringement listed in paragraph 2, only the higher fine calculated in accordance with this Article and relating to one of those infringements shall apply.

8.　In the cases not covered by paragraph 2, the Board may recommend to national resolution authorities to take action in order to ensure that appropriate penalties are imposed in accordance with Articles 110 to 114 of Directive 2014/59/EU and with any relevant national legislation.

9.　The Board shall apply the following adjustment coefficients linked to aggravating factors when calculating the fines:

(a) if the infringement has been committed repeatedly, for every time it has been repeated, an additional coefficient of 1,1 shall apply;

(b) if the infringement has been committed over a period exceeding three months, a coefficient of 1,5 shall apply;

(c) if the infringement has revealed systemic weaknesses in the organisation of the entity, in particular in its procedures, management systems or internal controls, a coefficient of 2,2 shall apply;

(d) if the infringement has been committed intentionally, a coefficient of 2 shall apply;

(e) if no remedial action has been taken since the infringement was identified, a coefficient of 1,7 shall apply;

(f) if the entity's senior management has not cooperated with the Board in carrying out its investigations, a coefficient of 1,5 shall apply.

The Board shall apply the following adjustment coefficients linked to mitigating factors when calculating the fines:

(a) if the infringement has been committed over a period of less than 10 working days, a coefficient of 0,9 shall apply;

(b) if the entity's senior management can demonstrate that they have taken all measures necessary to prevent the infringement, a coefficient of 0,7 shall apply;

(c) if the entity has brought quickly, effectively and completely the infringement to the Board's attention, a coefficient of 0,4 shall apply;

(d) if the entity has voluntarily taken measures to ensure that a similar infringement cannot be committed in the future, a coefficient of 0,6 shall apply.

*Article 39*

**Periodic penalty payments**

1.    The Board shall, by a decision, impose a periodic penalty payment in respect of an entity referred to in Article 2 in order to compel:

(a)  that entity to comply with a decision adopted under Article 34;

(b)  a person referred to in Article 34(1) to supply complete information which has been required by a decision pursuant to that Article;

(c)  a person referred to in Article 35(1) to submit to an investigation and, in particular, to produce complete records, data, procedures or any other material required and to complete and correct other information provided in an investigation launched by a decision taken pursuant to that Article;

(d)  a person referred to in Article 36(1) to submit to an on-site inspection ordered by a decision taken pursuant to that Article.

2.    A periodic penalty payment shall be effective and proportionate. A periodic penalty payment shall be imposed on a daily basis until the entity referred to in Article 2 or person concerned complies with the relevant decisions referred to in points (a) to (d) of paragraph 1 of this Article.

3.    Notwithstanding paragraph 2, the amount of a periodic penalty payment shall be 0,1 % of the average daily turnover in the preceding business year. A periodic penalty payment shall be calculated from the date stipulated in the decision imposing the periodic penalty payment.

4.    A periodic penalty payment may be imposed for a period of no more than six months following the notification of the Board's decision.

*Article 40*

**Hearing of the persons subject to the proceedings**

1.    Before taking any decision imposing a fine and/or periodic penalty payment under Article 38 or 39, the Board shall give the natural or legal persons subject to the proceedings the opportunity to be heard on its findings. The Board shall base its decisions only on findings on which the natural or legal persons subject to the proceedings have had the opportunity to comment.

2.    The rights of defence of the natural or legal persons subject to the proceedings shall be fully complied with during the proceedings. They shall be entitled to have access to the Board's file, subject to the legitimate interest of other persons in the protection of their business secrets. The right of access to the file shall not extend to confidential information or internal preparatory documents of the Board.

*Article 41*

**Disclosure, nature, enforcement and allocation of fines and periodic penalty payments**

1.    The Board shall publish the decisions imposing penalties referred to in Article 38(1) and Article 39(1), unless such disclosure could endanger the resolution of the entity concerned. The publication shall be on an anonymous basis, in any of the following circumstances:

(a)  where the information published contains personal data and following an obligatory prior assessment, such publication of personal data is found to be disproportionate;

(b)  where publication would jeopardise the stability of financial markets or an ongoing criminal investigation;

(c)  where publication would cause, insofar as it can be determined, disproportionate damage to the natural or legal persons involved.

Alternatively, in such cases, the publication of the data in question may be postponed for a reasonable period if it is foreseeable that the reasons for anonymous publication will cease to exist within that period.

The Board shall inform EBA of all fines and periodic penalty payments imposed by it under Articles 38 and 39 and shall provide information on the appeal status and outcome thereof.

2.    Fines and periodic penalty payments imposed pursuant to Articles 38 and 39 shall be of an administrative nature.

3.    Fines and periodic penalty payments imposed pursuant to Articles 38 and 39 shall be enforceable.

Enforcement shall be governed by the applicable procedural rules in force in the participating Member State in the territory of which it is carried out. The order for its enforcement shall be appended to the decision without any other formality than verification of the authenticity of the decision by the authority which the government of each participating Member State shall designate for that purpose and which it shall make known to the Board and to the Court of Justice.

When those formalities have been completed on application by the party concerned, the latter may proceed to enforcement in accordance with the national law, by bringing the matter directly before the competent body.

Enforcement may be suspended only by a decision of the Court of Justice. However, the courts of the participating Member State concerned shall have jurisdiction over complaints that enforcement is being carried out in an irregular manner.

4.    The amounts of the fines and periodic penalty payments shall be allocated to the Fund.

PART III

**INSTITUTIONAL FRAMEWORK**

TITLE I

**THE BOARD**

*Article 42*

**Legal status**

1.    The Board is hereby established. The Board shall be a Union agency with a specific structure corresponding to its tasks. It shall have legal personality.

2.    In each Member State, the Board shall enjoy the most extensive legal capacity accorded to legal persons under national law. It may, in particular, acquire or dispose of movable and immovable property and be a party to legal proceedings.

3.    The Board shall be represented by its Chair.

*Article 43*

**Composition**

1.    The Board shall be composed of:

(a) the Chair appointed in accordance with Article 56;

(b) four further full-time members appointed in accordance with Article 56;

(c) a member appointed by each participating Member State, representing their national resolution authorities.

2.    Each member, including the Chair, shall have one vote.

3.    The Commission and the ECB shall each designate a representative entitled to participate in the meetings of executive sessions and plenary sessions as a permanent observer.

The representatives of the Commission and the ECB shall be entitled to participate in the debates and shall have access to all documents.

4.    In the event of more than one national resolution authority in a participating Member State, a second representative shall be allowed to participate as observer without voting rights.

5.    The Board's administrative and management structure shall comprise:

(a)  a plenary session of the Board, which shall perform the tasks referred to in Article 50;

(b)  an executive session of the Board, which shall perform the tasks referred to in Article 54;

(c)  a Chair, which shall perform the tasks referred to in Article 56;

(d)  a Secretariat, which shall provide the necessary administrative and technical support on the performing of all the tasks assigned to the Board.


*Article 44*

**Compliance with Union law**

The Board shall act in compliance with Union law, in particular with the Council and the Commission decisions pursuant to this Regulation.


*Article 45*

**Accountability**

1.    The Board shall be accountable to the European Parliament, the Council and the Commission for the implementation of this Regulation, in accordance with paragraphs 2 to 8.

2.    The Board shall submit an annual report to the European Parliament, the national parliaments of participating Member States in accordance with Article 46, the Council, the Commission and the European Court of Auditors on the performance of the tasks conferred on it by this Regulation. Subject to the requirements of professional secrecy, that report shall be published on the Board's website.

3.    The Chair shall present that report in public to the European Parliament, and to the Council.

4.    At the request of the European Parliament, the Chair shall participate in a hearing by the competent committee of the European Parliament on the performance of the resolution tasks by the Board. A hearing shall take place at least annually.

5.    The Chair may be heard by the Council, at the Council's request, on the performance of the resolution tasks by the Board.

6.    The Board shall reply orally or in writing to questions addressed to it by the European Parliament or by the Council, in accordance with its own procedures and in any event within five weeks of receipt of a question.

7.    Upon request, the Chair shall hold confidential oral discussions behind closed doors with the Chair and Vice-Chairs of the competent committee of the European Parliament where such discussions are required for the exercise of the European Parliament's powers under the TFEU. An agreement shall be concluded between the European Parliament and the Board on the detailed modalities of organising such discussions, with a view to ensuring full confidentiality in accordance with the requirements of professional secrecy imposed on the Board by this Regulation and when the Board is acting as a national resolution authority under the relevant Union law.

8.    During any investigations by the European Parliament, the Board shall cooperate with the European Parliament, subject to the TFEU and regulations referred to in Article 226 thereof. Within six months of the appointment of the Chair, the Board and the European Parliament shall conclude appropriate arrangements on the practical modalities of the exercise of democratic accountability and oversight over the exercise of the tasks conferred on the Board by this Regulation. Subject to the power of the European Parliament pursuant to Article 226 TFEU, those arrangements shall

30.7.2014          EN          Official Journal of the European Union          L 225/67

cover, inter alia, access to information, including rules on the handling and protection of classified or otherwise confidential information, cooperation in hearings, as referred to in Article 45(4) of this Regulation, confidential oral discussions, reports, responding to questions, investigations and information on the selection procedure of the Chair, the Vice-Chair, and the four members referred to in Article 43(1)(b) of this Regulation.

*Article 46*

**National parliaments**

1.    Due to the specific tasks that are conferred on the Board by this Regulation, national parliaments of the participating Member States, by means of their own procedures, may request the Board to reply and the Board is obliged to reply in writing to any observations or questions submitted by them to the Board in respect of the functions of the Board under this Regulation.

2.    When submitting the report provided for in Article 45(2), the Board shall simultaneously submit that report directly to the national parliaments of the participating Member States. National parliaments may address to the Board their reasoned observations on that report. The Board shall reply orally or in writing to any observations or questions addressed to it by the national parliaments of the participating Member States, in accordance with its own procedures.

3.    The national parliament of a participating Member State may invite the Chair to participate in an exchange of views in relation to the resolution of entities referred to in Article 2 in that Member State together with a representative of the national resolution authority. The Chair is obliged to follow such invitation.

4.    This Regulation shall be without prejudice to the accountability of national resolution authorities to national parliaments in accordance with national law for the performance of tasks not conferred on the Board, the Council or the Commission by this Regulation and for the performance of activities carried out by them in accordance with Article 7(3).

*Article 47*

**Independence**

1.    When performing the tasks conferred on them by this Regulation, the Board and the national resolution authorities shall act independently and in the general interest.

2.    The Chair, the Vice-Chair and the members referred to in Article 43(1)(b) shall perform their tasks in conformity with the decisions of the Board, the Council and the Commission. They shall act independently and objectively in the interest of the Union as a whole and shall neither seek nor take instructions from the Union's institutions or bodies, from any government of a Member State or from any other public or private body.

In the deliberations and decision-making processes within the Board, they shall express their own views and vote independently.

3.    Neither the Member States, the Union's institutions or bodies, nor any other public or private body shall seek to influence the Chair, the Vice-Chair or the members of the Board.

4.    In accordance with the Staff Regulations of Officials as laid down by Council Regulation (EEC, Euratom, ECSC) No 259/68 (¹) (the 'Staff Regulations') referred to in Article 87(6) of this Regulation, the Chair, the Vice-Chair and the members referred to in Article 43(1)(b) of this Regulation shall, after leaving service, continue to be bound by the duty to behave with integrity and discretion as regards the acceptance of certain appointments or benefits.

*Article 48*

**Seat**

The Board shall have its seat in Brussels, Belgium.

---

(¹) Regulation (EEC, Euratom, ECSC) No 259/68 of the Council of 29 February 1968 laying down the Staff Regulations of Officials and the Conditions of Employment of Other Servants of the European Communities and instituting special measures temporarily applicable to officials of the Commission (OJ L 56, 4.3.1968, p. 1).

TITLE II

**PLENARY SESSION OF THE BOARD**

*Article 49*

**Participation in plenary sessions**

All members of the Board referred to in Article 43(1) shall participate in its plenary sessions.

*Article 50*

**Tasks**

1.    In its plenary session, the Board shall:

(a)  adopt, by 30 November each year, the Board's annual work programme for the following year, based on a draft put forward by the Chair and shall transmit it for information to the European Parliament, the Council, the Commission, and the ECB;

(b)  adopt and monitor the annual budget of the Board in accordance with Article 61(2), and approve the Board's final accounts and give discharge to the Chair in accordance with Article 63(4) and (8);

(c)  subject to the procedure referred to in paragraph 2, decide on the use of the Fund, if the support of the Fund in that specific resolution action is required above the threshold of EUR 5 000 000 000 for which the weighting of liquidity support is 0,5;

(d)  once the net accumulated use of the Fund in the last consecutive 12 months reaches the threshold of EUR 5 000 000 000, evaluate the application of the resolution tools, in particular the use of the Fund, and provide guidance which the executive session shall follow in subsequent resolution decisions, in particular, if appropriate, differentiating between liquidity and other forms of support;

(e)  decide on the necessity to raise extraordinary *ex-post* contributions in accordance with Article 71, on the voluntary borrowing between financing arrangements in accordance with Article 72, on alternative financing means in accordance with Articles 73 and 74, and on the mutualisation of national financing arrangements in accordance with Article 78, involving support of the Fund above the threshold referred to in point (c) of this paragraph;

(f)  decide on the investments in accordance with Article 75;

(g)  adopt the annual activity report on the Board's activities referred to in Article 45, which shall present detailed explanations on the implementation of the budget;

(h)  adopt the financial rules applicable to the Board in accordance with Article 64;

(i)  adopt an anti-fraud strategy, proportionate to fraud risks taking into account the costs and benefits of the measures to be implemented;

(j)  adopt rules for the prevention and management of conflicts of interest in respect of its members;

(k)  adopt its rules of procedure and those of the Board in its executive session;

(l)  in accordance with paragraph 3 of this Article, exercise, with respect to the staff of the Board, the powers conferred by the Staff Regulations on the Appointing Authority and by the Conditions of Employment of Other Servants of the European Union as laid down by Council Regulation (EEC, Euratom, ECSC) No 259/68 ('Conditions of Employment') on the Authority Empowered to Conclude a Contract of Employment ('the appointing authority powers');

(m)  adopt appropriate implementing rules for giving effect to the Staff Regulations and the Conditions of Employment in accordance with Article 110 of the Staff Regulations;

(n)  appoint an Accounting Officer, subject to the Staff Regulations and the Conditions of Employment, who shall be functionally independent in the performance of his or her duties;

(o) ensure adequate follow-up to findings and recommendations stemming from the internal or external audit reports and evaluations, as well as from investigations of the European Anti-Fraud Office (OLAF);

(p) take all decisions on the establishment of the Board's internal structures and, where necessary, their modification;

(q) approve the framework referred to in Article 31(1) to organise the practical arrangements for the cooperation with the national resolution authorities.

2.    When taking decisions, the plenary session of the Board shall act in accordance with the objectives as specified in Articles 6 and 14.

For the purposes of point (c) of paragraph 1, the resolution scheme prepared by the executive session is deemed to be adopted unless, within three hours from the submission of the draft by the executive session to the plenary session, at least one member of the plenary session has called a meeting of the plenary session. In the latter case, a decision on the resolution scheme shall be taken by the plenary session.

3.    In its plenary session, the Board shall adopt, in accordance with Article 110 of the Staff Regulations, a decision based on Article 2(1) of the Staff Regulations and on Article 6 of the Conditions of Employment, delegating relevant appointing authority powers to the Chair and establishing the conditions under which the delegation of powers can be suspended. The Chair shall be authorised to sub-delegate those powers.

In exceptional circumstances, the Board in its plenary session may by way of a decision temporarily suspend the delegation of the appointing authority powers to the Chair and any sub-delegation by the latter and exercise them itself or delegate them to one of its members or to a staff member other than the Chair.

*Article 51*

**Meeting of the plenary session of the Board**

1.    The Chair shall convene and chair meetings of the plenary session of the Board in accordance with Article 56(2)(a).

2.    The Board in its plenary session shall hold at least two ordinary meetings per year. In addition, it shall meet on the initiative of the Chair, or at the request of at least one-third of its members. The representative of the Commission may request the Chair to convene a meeting of the Board in its plenary session. The Chair shall provide reasons in writing if he or she does not convene a meeting in due time.

3.    Where relevant, the Board may invite observers in addition to those referred in Article 43(3) to participate in the meetings of its plenary session on an ad hoc basis, including a representative of EBA.

4.    The Board shall provide for the secretariat of the plenary session of the Board.

*Article 52*

**General provisions on the decision-making process**

1.    The Board, in its plenary session, shall take its decisions by a simple majority of its members, unless otherwise provided for in this Regulation. Each voting member shall have one vote. In the event of a tie, the Chair shall have a casting vote.

2.    By way of derogation from paragraph 1, decisions referred to in Article 50(1)(c) and (d) as well as on the mutualisation of national financing arrangements in accordance with Article 78, limited to the use of the financial means available in the Fund, shall be taken by a simple majority of the Board members, representing at least 30 % of contributions. Each voting member shall have one vote. In the event of a tie, the Chair shall have a casting vote.

EN

3.    By way of derogation from paragraph 1 of this Article, decisions referred to in Article 50(1), which involve the raising of *ex-post* contributions in accordance with Article 71, on voluntary borrowing between financing arrangements in accordance with Article 72, on alternative financing means in accordance with Article 73 and Article 74, as well as on the mutualisation of national financing arrangements in accordance with Article 78, exceeding the use of the financial means available in the Fund, shall be taken by a majority of two thirds of the Board members, representing at least 50 % of contributions during the eight-year transitional period until the Fund is fully mutualised and by a majority of two thirds of the Board members, representing at least 30 % of contributions from then on. Each voting member shall have one vote. In the event of a tie, the Chair shall have a casting vote.

4.    The Board shall adopt and make public its rules of procedure. The rules of procedure shall establish more detailed voting arrangements, in particular the circumstances in which a member may act on behalf of another member and including, where appropriate, the rules governing quorums.

TITLE III

**EXECUTIVE SESSION OF THE BOARD**

*Article 53*

**Participation in the executive sessions**

1.    The Board in its executive session is composed of the Chair and the four members referred to in Article 43(1)(b). The Board, in its executive session, shall meet as often as necessary.

Meetings of the Board in its executive session shall be convened by the Chair on his or her own initiative or at the request of any of the members, and shall be chaired by the Chair.

Where relevant, the Board in its executive session may invite observers in addition to those referred to in Article 43(3), including a representative of EBA, and shall invite national resolution authorities of non-participating Member States, when deliberating on a group that has subsidiaries or significant branches in those non-participating Member States, to participate at its meetings. The participation shall be on an ad hoc basis.

2.    In accordance with paragraphs 3 and 4, the members of the Board referred to in Article 43(1)(c) shall participate in the executive sessions of the Board.

3.    When deliberating on an entity referred to in Article 2 or a group of entities established only in one participating Member State, the member appointed by that Member State shall also participate in the deliberations and in the decision-making process, and the rules laid down in Article 55(1) shall apply.

4.    When deliberating on a cross-border group, the member appointed by the Member State in which the group-level resolution authority is situated, as well as the members appointed by the Member States in which a subsidiary or entity covered by consolidated supervision is established, shall also participate in the decision-making process, and the rules laid down in Article 55(2) shall apply.

5.    The members of the Board referred to in Article 43(1)(a) and (b) shall ensure that the resolution decisions and actions, in particular with regard to the use of the Fund, across the different formations of the executive sessions of the Board are coherent, appropriate and proportionate.

*Article 54*

**Tasks**

1.    The Board, in its executive session, shall:

(a)  prepare all of the decisions to be adopted by the Board in its plenary session;

(b)  take all of the decisions to implement this Regulation, unless this Regulation provides otherwise.

2.    In exercising its duties pursuant to paragraph 1 of this Article, the Board shall:

(a)  prepare, assess and approve resolution plans for entities and groups referred to in Article 7(2), and for the entities and groups referred to in Article 7(4)(b) and (5), where the conditions for the application of those paragraphs are met, in accordance with Articles 8, 10 and 11;

(b)  apply simplified obligations to certain entities and groups referred to in Article 7(2), and entities and groups referred to in Article 7(4)(b) and (5), where the conditions for the application of those paragraphs are met, in accordance with Article 11;

(c)  determine the minimum requirement for own funds and eligible liabilities that entities and groups referred to in Article 7(2), and entities and groups referred to in Article 7(4)(b) and (5), where the conditions for the application of those paragraphs are met, need to meet at all times in accordance with Article 12;

(d)  provide the Commission, as early as possible, with a resolution scheme in accordance with Article 18 accompanied by all relevant information allowing in due time the Commission to assess and decide or, where appropriate, propose a decision to the Council, pursuant to Article 18(7);

(e)  decide upon the Board's part II of the budget on the Fund, in accordance with Article 60.

3.    Where necessary because of urgency, the Board in its executive session may take certain provisional decisions on behalf of the Board in its plenary session, in particular on administrative management matters, including budgetary matters.

4.    The Board in its executive session shall keep the Board in its plenary session informed of the decisions it takes on resolution.

*Article 55*

**Decision-making**

1.    When deliberating on an individual entity or a group established only in one participating Member State, if all members referred to in Article 53(1) and (3) are not able to reach a joint agreement by consensus within a deadline set by the Chair, the Chair and the members referred to in Article 43(1)(b) shall take a decision by a simple majority.

2.    When deliberating on a cross-border group, if all members referred to in Article 53(1) and (4) are not able to reach a joint agreement by consensus within a deadline set by the Chair, the Chair and the members referred to in Article 43(1)(b) shall take a decision by a simple majority.

3.    In the event of a tie, the Chair shall have a casting vote.

TITLE IV

**CHAIR**

*Article 56*

**Appointment and tasks**

1.    The Board shall be chaired by a full-time Chair.

2.    The Chair shall be responsible for:

(a)  preparing the work of the Board, in its plenary and executive sessions, and convening and chairing its meetings;

(b)  all staff matters;

(c)  matters of day-to-day administration;

(d)  the establishment of a draft budget of the Board in accordance with Article 61(1) and the implementation of the budget of the Board, in accordance with Article 63;

(e) the management of the Board;

(f) the implementation of the annual work programme of the Board;

(g) the preparation, each year, of a draft of the annual report referred to in Article 45 with a section on the resolution activities of the Board and a section on financial and administrative matters.

In the performance of the tasks referred to in this Article, the Chair shall be assisted by a dedicated staff.

3.    The Chair shall be assisted by a Vice-Chair.

The Vice-Chair shall carry out the functions of the Chair in his or her absence or reasonable impediment, in accordance with this Regulation.

4.    The Chair, the Vice-Chair and the members referred to in Article 43(1)(b) shall be appointed on the basis of merit, skills, knowledge of banking and financial matters, and of experience relevant to financial supervision, regulation as well as bank resolution. The Chair, the Vice-Chair and the members referred to in Article 43(1)(b) shall be chosen on the basis of an open selection procedure, which shall respect the principles of gender balance, experience and qualification. The European Parliament and the Council shall be kept duly informed at every stage of that procedure in a timely manner.

5.    The term of office of the Chair, of the Vice-Chair and of the members referred to in Article 43(1)(b) shall be five years. Subject to paragraph 7 of this Article, that term shall not be renewable.

The Chair, the Vice-Chair and the members referred to in Article 43(1)(b) shall not hold office at national, Union, or international level.

6.    After hearing the Board, in its plenary session, the Commission shall provide to the European Parliament a shortlist of candidates for the positions of Chair, Vice-Chair and members referred to in Article 43(1)(b) and inform the Council of the shortlist.

By way of derogation from the first subparagraph, for the appointment of the first members of the Board following the entry into force of this Regulation, the Commission shall provide the shortlist of candidates without hearing the Board.

The Commission shall submit a proposal for the appointment of the Chair, the Vice-Chair and the members referred to in Article 43(1)(b) to the European Parliament for approval. Following the approval of that proposal, the Council shall adopt an implementing decision to appoint the Chair, the Vice-Chair and the members referred to in Article 43(1)(b). The Council shall act by qualified majority.

7.    By way of derogation from paragraph 5, the term of office of the first Chair appointed after the entry into force of this Regulation shall be three years. That term shall be renewable once for a period of five years. The Chair, the Vice-Chair, and the members referred to in Article 43(1)(b) shall remain in office until their successors are appointed.

8.    A Chair whose term of office has been extended shall not participate in another selection procedure for the same post at the end of the overall period.

9.    If the Chair or the Vice-Chair or a member referred to in Article 43(1)(b) no longer fulfil the conditions required for the performance of his or her duties or has been guilty of serious misconduct, the Council may, on a proposal from the Commission which has been approved by the European Parliament, adopt an implementing decision to remove him or her from office. The Council shall act by qualified majority.

For those purposes, the European Parliament or the Council may inform the Commission that it considers the conditions for the removal of the Chair, the Vice-Chair or the members referred to in Article 43(1)(b) from office to be fulfilled, to which the Commission shall respond.

TITLE V

**FINANCIAL PROVISIONS**

*CHAPTER 1*

***General provisions***

*Article 57*

**Resources**

1.     The Board shall be responsible for devoting the necessary financial and human resources to the performance of the tasks conferred on it by this Regulation.

2.     The funding of the Board's budget or its resolution activities under this Regulation may under no circumstances engage the budgetary liability of the Member States.

*Article 58*

**Budget**

1.     The Board shall have an autonomous budget which is not part of the Union budget. Estimates of all of the Board's revenue and expenditure shall be prepared for each financial year, corresponding to the calendar year, and shall be shown in the Board's budget.

2.     The Board's budget shall be balanced in terms of revenue and expenditure.

3.     The budget shall comprise two parts: Part I for the administration of the Board and Part II for the Fund.

*Article 59*

**Part I of the budget on the administration of the Board**

1.     The revenues of Part I of the budget shall consist of the annual contributions necessary to cover the annual estimated administrative expenditure.

2.     The expenditure of Part I of the budget shall include at least staff, remuneration, administrative, infrastructure, professional training and operational expenses.

3.     This Article is without prejudice to the right of the national resolution authorities to levy fees in accordance with national law, in respect of their administrative expenditures of the types referred to in paragraphs 1 and 2, including expenditures for cooperating with and assisting the Board.

*Article 60*

**Part II of the budget on the Fund**

1.     The revenues of Part II of the budget shall consist, in particular, of the following:

(a)  contributions paid by institutions established in the participating Member States in accordance with Article 67(4) and Articles 69, 70 and 71;

(b)  loans received from other resolution financing arrangements in non-participating Member States in accordance with Article 72(1);

(c)  loans received from financial institutions or other third parties in accordance with Articles 73 and 74;

(d) returns on the investments of the amounts held in the Fund in accordance with Article 75;

(e) any part of the expenses incurred for the purposes indicated in Article 76 which are recovered in the resolution proceedings.

2.    The expenditure of Part II of the budget shall consist of the following:

(a) expenses for the purposes indicated in Article 76;

(b) investments in accordance with Article 75;

(c) interest paid on loans received from other resolution financing arrangements in non-participating Member States in accordance with Article 72(1);

(d) interest paid on loans received from financial institutions or other third parties in accordance with Articles 73 and 74.

*Article 61*

**Establishment and implementation of the budget**

1.    By 15 February each year, the Chair shall draw up a draft budget of the Board, including a statement of estimates of the Board's revenue and expenditure for the following year together with the establishment plan and shall submit it to the Board for adoption.

2.    By 31 March each year, the Board in its plenary session shall, where necessary, adjust the draft submitted by the Chair and adopt the final budget of the Board together with the establishment plan.

*Article 62*

**Internal audit and control**

1.    An internal audit function shall be set up within the Board, to be performed in compliance with the relevant international standards. The internal auditor, appointed by the Board, shall be responsible to it for verifying the proper operation of budget implementation systems and budgetary procedures of the Board.

2.    The internal auditor shall advise the Board on dealing with risks, by issuing independent opinions on the quality of management and control systems and by issuing recommendations for improving the conditions of implementation of operations and promoting sound financial management.

3.    The responsibility for putting in place internal control systems and procedures suitable for performing the tasks of the internal auditor shall lie with the Board.

*Article 63*

**Implementation of the budget, presentation of accounts and discharge**

1.    The Chair shall act as authorising officer and shall implement the Board's budget.

2.    By 1 March of the following financial year, the Board's Accounting Officer shall send the provisional accounts, accompanied by the report on budgetary and financial management during the financial year, to the Court of Auditors for observations.

By 31 March of the following financial year, the Board's Accounting Officer shall submit the report on budgetary and financial management to the members of the Board, and to the European Parliament, the Council and the Commission.

3.    By 31 March each year, the Chair shall transmit to the European Parliament, the Council and the Commission the Board's provisional accounts for the preceding financial year.

4.    On receipt of the Court of Auditors' observations on the Board's provisional accounts, the Chair, acting on his or her own responsibility, shall draw up the Board's final accounts and shall send them to the Board in its plenary session, for approval.

5.    The Chair shall, following the approval by the Board, by 1 July each year, send the final accounts for the preceding financial year to the European Parliament, the Council, the Commission, and the Court of Auditors.

6.    Where observations are received from the Court of Auditors, the Chair shall send a reply by 30 September.

7.    By 15 November each year, the final accounts for the preceding financial year shall be published in the *Official Journal of the European Union*.

8.    The Board, in its plenary session, shall give discharge to the Chair in respect of the implementation of the budget.

9.    The Chair shall submit at the request of either the European Parliament or the Council, any information referred to in the Board's accounts to the requesting Union institution, subject to the requirements of professional secrecy laid down in this Regulation.

*Article 64*

**Financial rules**

The Board shall, after consulting the Court of Auditors and the Commission, adopt internal financial provisions specifying, in particular, the detailed procedure for establishing and implementing its budget in accordance with Articles 61 and 63.

As far as is compatible with the particular nature of the Board, the financial provisions shall be based on the framework financial Regulation adopted for bodies set up under the TFEU in accordance with Article 208 of Regulation (EU, Euratom) No 966/2012 of the European Parliament and of the Council (¹).

*Article 65*

**Contributions to the administrative expenditures of the Board**

1.    Entities referred to in Article 2 shall contribute to part I of the budget of the Board in accordance with this Regulation and the delegated acts on contributions adopted pursuant to paragraph 5 of this Article.

2.    The amounts of the contributions shall be fixed at such a level as to ensure that the revenue in respect thereof is in principle sufficient for part I of the budget of the Board to be balanced each year.

3.    The Board shall determine and raise, in accordance with the delegated acts referred to in paragraph 5 of this Article, the contributions due by each entity referred to in Article 2 in a decision addressed to the entity concerned. The Board shall apply procedural, reporting and other rules ensuring that contributions are paid fully and in a timely manner.

4.    The amounts raised in accordance with paragraphs 1, 2, 3 shall be used only for the purposes of this Regulation.

---

(¹)  Regulation (EU, Euratom) No 966/2012 of the European Parliament and of the Council of 25 October 2012 on the financial rules applicable to the general budget of the Union and repealing Council Regulation (EC, Euratom) No 1605/2002 (OJ L 298, 26.10.2012, p. 1).

5.    The Commission shall be empowered to adopt delegated acts on contributions in accordance with Article 93 in order to:

(a)  determine the type of contributions and the matters for which contributions are due, the manner in which the amount of the contributions is calculated, and the way in which they are to be paid;

(b)  specify registration, accounting, reporting and other rules referred to in paragraph 3 necessary to ensure that the contributions are paid fully and in a timely manner;

(c)  determine the annual contributions necessary to cover the administrative expenditure of the Board before it becomes fully operational.

*Article 66*

**Anti-fraud measures**

1.    For the purposes of combating fraud, corruption and any other unlawful activity under Regulation (EU, Euratom) No 883/2013 of the European Parliament and of the Council (¹), within six months from the day the Board becomes operational, it shall accede to the Interinstitutional Agreement of 25 May 1999 concerning internal investigations by OLAF and shall immediately adopt appropriate provisions applicable to all staff of the Board using the template set out in the Annex to that Interinstitutional Agreement.

2.    The Court of Auditors shall have the power of audit, on the basis of documents and on the spot, over the beneficiaries, contractors and subcontractors who have received funds from the Board.

3.    OLAF may carry out investigations, including on-the-spot checks and inspections with a view to establishing whether there has been fraud, corruption or other illegal activity affecting the financial interests of the Union in connection with a contract funded by the Board in accordance with the provisions and procedures laid down in Council Regulation (Euratom, EC) No 2185/96 (²) and Regulation (EU, Euratom) No 883/2013.

CHAPTER 2

**The Single Resolution Fund**

Section 1

**Constitution of the Fund**

*Article 67*

**General provisions**

1.    The Single Resolution Fund ('the Fund') is hereby established. It shall be filled in accordance with the rules on transferring the funds raised at national level towards the Fund as laid down in the Agreement.

2.    The Board shall use the Fund only for the purpose of ensuring the efficient application of the resolution tools and exercise of the resolution powers referred to in Part II, Title I and in accordance with the resolution objectives and the principles governing resolution referred to in Articles 14 and 15. Under no circumstances shall the Union budget or the national budgets be held liable for expenses or losses of the Fund.

3.    The owner of the Fund shall be the Board.

4.    Contributions referred to in Articles 69, 70 and 71 shall be raised from entities referred to in Article 2 by the national resolution authorities and transferred to the Fund in accordance with the Agreement.

*Article 68*

**Requirement to establish resolution financing arrangements**

Participating Member States shall establish financing arrangements in accordance with Article 100 of Directive 2014/59/EU and with this Regulation.

---

(¹) Regulation (EU, Euratom) No 883/2013 of the European Parliament and of the Council of 11 September 2013 concerning investigations conducted by the European Anti-Fraud Office (OLAF) and repealing Regulation (EC) No 1073/1999 of the European Parliament and of the Council and Council Regulation (Euratom) No 1074/1999 (OJ L 248, 18.9.2013, p. 1).

(²) Council Regulation (Euratom, EC) No 2185/96 of 11 November 1996 concerning on-the-spot checks and inspections carried out by the Commission in order to protect the European Communities' financial interests against fraud and other irregularities (OJ L 292, 15.11.1996, p. 2).

*Article 69*

**Target level**

1.    By the end of an initial period of eight years from 1 January 2016 or, otherwise, from the date on which this paragraph is applicable by virtue of Article 99(6), the available financial means of the Fund shall reach at least 1 % of the amount of covered deposits of all credit institutions authorised in all of the participating Member States.

2.    During the initial period referred to in paragraph 1, contributions to the Fund calculated in accordance with Article 70, and raised in accordance with Article 67(4), shall be spread out in time as evenly as possible until the target level is reached, but with due account of the phase of the business cycle and the impact that pro-cyclical contributions may have on the financial position of contributing institutions.

3.    The Board shall extend the initial period referred to in paragraph 1 for a maximum of four years in the event that the Fund has made cumulative disbursements in excess of 0,5 % of the total amount of covered deposits referred to in paragraph 1 and where the criteria of the delegated act referred in paragraph 5(b) are met.

4.    If, after the initial period referred to in paragraph 1, the available financial means diminish below the target level specified in that paragraph, the regular contributions calculated in accordance with Article 70 shall be raised until the target level is reached. After the target level has been reached for the first time and where the available financial means have subsequently been reduced to less than two-thirds of the target level, those contributions shall be set at a level allowing for reaching the target level within six years.

The regular contribution shall take due account of the phase of the business cycle, and the impact pro-cyclical contributions may have when setting annual contributions in the context of this paragraph.

5.    The Commission shall be empowered to adopt delegated acts in accordance with Article 93 to specify the following:

(a)  criteria for the spreading out in time of the contributions to the Fund calculated under paragraph 2;

(b)  criteria for determining the number of years by which the initial period referred to in paragraph 1 can be extended under paragraph 3;

(c)  criteria for establishing the annual contributions provided for in paragraph 4.

*Article 70*

**Ex-ante contributions**

1.    The individual contribution of each institution shall be raised at least annually and shall be calculated pro-rata to the amount of its liabilities (excluding own funds) less covered deposits, with respect to the aggregate liabilities (excluding own funds) less covered deposits, of all of the institutions authorised in the territories of all of the participating Member States.

2.    Each year, the Board shall, after consulting the ECB or the national competent authority and in close cooperation with the national resolution authorities, calculate the individual contributions to ensure that the contributions due by all of the institutions authorised in the territories of all of the participating Member States shall not exceed 12,5 % of the target level.

Each year the calculation of the contributions for individual institutions shall be based on:

(a)  a flat contribution, that is pro-rata based on the amount of an institution's liabilities excluding own funds and covered deposits, with respect to the total liabilities, excluding own funds and covered deposits, of all of the institutions authorised in the territories of the participating Member States; and

(b)  a risk-adjusted contribution, that shall be based on the criteria laid down in Article 103(7) of Directive 2014/59/EU, taking into account the principle of proportionality, without creating distortions between banking sector structures of the Member States.

The relation between the flat contribution and the risk-adjusted contributions shall take into account a balanced distribution of contributions across different types of banks.

In any case, the aggregate amount of individual contributions by all of the institutions authorised in the territories of all of the participating Member States, calculated under points (a) and (b), shall not exceed annually the 12,5 % of the target level.

3.    The available financial means to be taken into account in order to reach the target level specified in Article 69 may include irrevocable payment commitments which are fully backed by collateral of low-risk assets unencumbered by any third-party rights, at the free disposal of and earmarked for the exclusive use by the Board for the purposes specified in Article 76(1). The share of those irrevocable payment commitments shall not exceed 30 % of the total amount of contributions raised in accordance with this Article.

4.    The duly received contributions of each entity referred to in Article 2 shall not be reimbursed to those entities.

5.    Where participating Member States have already established national resolution financing arrangements, they may provide that those arrangements use their available financial means, collected from institutions between 17 June 2010 and the date of entry into force of Directive 2014/59/EU, to compensate institutions for the *ex-ante* contributions which those institutions may be required to pay into the Fund. Such restitution shall be without prejudice to the obligations of Member States laid down in Directive 2014/49/EU.

6.    The delegated acts specifying the notion of adjusting contributions in proportion to the risk profile of institutions, adopted by the Commission under Article 103(7) of Directive 2014/59/EU, shall be applied.

7.    The Council, acting on a proposal from the Commission, shall, within the framework of the delegated acts referred to in paragraph 6, adopt implementing acts to determine the conditions of implementation of paragraphs 1, 2, and 3, and in particular in relation to:

(a)  the application of the methodology for the calculation of individual contributions;

(b)  the practical modalities for allocating to institutions the risk factors specified in the delegated act.

*Article 71*

**Extraordinary ex-post contributions**

1.    Where the available financial means are not sufficient to cover the losses, costs or other expenses incurred by the use of the Fund in resolution actions, extraordinary *ex-post* contributions from the institutions authorised in the territories of participating Member States shall be raised, in order to cover the additional amounts. Those extraordinary *ex-post* contributions shall be calculated and allocated between institutions in accordance with the rules laid down in Articles 69 and 70.

The total amount of extraordinary *ex-post* contributions per year shall not exceed three times the annual amount of contributions determined in accordance with Article 70.

2.    The Board shall, on its own initiative after consulting the national resolution authority or upon proposal by a national resolution authority, defer, in whole or in part, in accordance with the delegated acts referred to in paragraph 3, an institution's payment of extraordinary *ex-post* contributions in accordance with paragraph 1 if it is necessary to protect its financial position. Such a deferral shall not be granted for a period of longer than six months but may be renewed on request of the institution. The contributions deferred pursuant to this paragraph shall be made later at a point in time when the payment no longer jeopardises the institution's financial position.

3.    The Commission shall be empowered to adopt delegated acts in accordance with Article 93 to specify the circumstances and conditions under which the payment of *ex-post* contributions by an entity referred to in Article 2 may be partially or entirely deferred pursuant to paragraph 2 of this Article.

*Article 72*

**Voluntary borrowing between resolution financing arrangements**

1.    The Board shall decide to make a request to voluntarily borrow for the Fund from resolution financing arrangements within non-participating Member States, in the event that:

(a)  the amounts raised under Article 70 are not sufficient to cover the losses, costs or other expenses incurred by the use of the Fund in relation to resolution actions;

(b)  the extraordinary *ex-post* contributions provided for in Article 71 are not immediately accessible; and

(c)  the alternative funding means provided for in Article 73 are not immediately accessible on reasonable terms.

2.    Those resolution financing arrangements shall decide on such a request in accordance with Article 106 of Directive 2014/59/EU. The borrowing conditions shall be subject to Article 106(4), (5) and (6) of Directive 2014/59/EU.

3.    The Board may decide to lend to other resolution financing arrangements within non-participating Member States if a request is made in accordance with Article 106 of Directive 2014/59/EU. The lending conditions shall be subject to Article 106(4), (5) and (6) of Directive 2014/59/EU.

*Article 73*

**Alternative funding means**

1.    The Board may contract for the Fund borrowings or other forms of support from those institutions, financial institutions or other third parties, which offer better financial terms at the most appropriate time so as to optimise the cost of funding and preserve its reputation in the event that the amounts raised in accordance with Articles 70 and 71 are not immediately accessible or do not cover the expenses incurred by the use of the Fund in relation to resolution actions.

2.    The borrowing or other forms of support referred to in paragraph 1 shall be fully recouped in accordance with Articles 69, 70 and 71 within the maturity period of the loan.

3.    Any expenses incurred by the use of the borrowings specified in paragraph 1 shall be borne by Part II of the budget of the Board and not by the Union budget or the participating Member States.

*Article 74*

**Access to financial facility**

The Board shall contract for the Fund financial arrangements, including, where possible, public financial arrangements, regarding the immediate availability of additional financial means to be used in accordance with Article 76, where the amounts raised or available in accordance with Articles 70 and 71 are not sufficient to meet the Funds' obligations.

S e c t i o n   2

**A d m i n i s t r a t i o n   o f   t h e   F u n d**

*Article 75*

**Investments**

1.    The Board shall administer the Fund in accordance with this Regulation and delegated acts adopted under paragraph 4.

2.    The amounts received from an institution under resolution or a bridge institution, the interests and other earnings on investments and any other earnings shall benefit only the Fund.

3.    The Board shall have a prudent and safe investment strategy that is provided for in the delegated acts adopted pursuant to paragraph 4 of this Article, and shall invest the amounts held in the Fund in obligations of the Member States or intergovernmental organisations, or in highly liquid assets of high creditworthiness, taking into account the delegated act referred to in Article 460 of Regulation (EU) No 575/2013 as well as other relevant provisions of that Regulation. Investments shall be sufficiently sectorally, geographically and proportionally diversified. The return on those investments shall benefit the Fund.

4.    The Commission shall be empowered to adopt delegated acts on the detailed rules for the administration of the Fund and general principles and criteria for its investment strategy, in accordance with the procedure laid down in Article 93.

Section 3

## Use of the Fund

*Article 76*

## Mission of the Fund

1.    Within the resolution scheme, when applying the resolution tools to entities referred to in Article 2, the Board may use the Fund only to the extent necessary to ensure the effective application of the resolution tools for the following purposes:

(a)  to guarantee the assets or the liabilities of the institution under resolution, its subsidiaries, a bridge institution or an asset management vehicle;

(b)  to make loans to the institution under resolution, its subsidiaries, a bridge institution or an asset management vehicle;

(c)  to purchase assets of the institution under resolution;

(d)  to make contributions to a bridge institution and an asset management vehicle;

(e)  to pay compensation to shareholders or creditors if, following an evaluation pursuant to Article 20(5) they have incurred greater losses that they would have incurred, following a valuation pursuant to Article 20(16), in a winding up under normal insolvency proceedings;

(f)  to make a contribution to the institution under resolution in lieu of the write-down or conversion of liabilities of certain creditors, when the bail-in tool is applied and the decision is made to exclude certain creditors from the scope of bail-in in accordance with Article 27(5);

(g)  to take any combination of the actions referred to in points (a) to (f).

2.    The Fund may be used to take the actions referred to in paragraph 1 also with respect to the purchaser in the context of the sale of business tool.

3.    The Fund shall not be used directly to absorb the losses of an entity referred to in Article 2 or to recapitalise such an entity. In the event that the use of the Fund for the purposes in paragraph 1 of this Article indirectly results in part of the losses of an entity referred to in Article 2 being passed on to the Fund, the principles governing the use of the Fund set out in Article 27 shall apply.

4.    The Board may not hold the capital contributed to in accordance with point (f) of paragraph 1 for a period exceeding five years.

*Article 77*

## Use of the Fund

The use of the Fund shall be contingent upon the Agreement whereby the participating Member States agree to transfer to the Fund the contributions that they raise at national level in accordance with this Regulation and with Directive 2014/59/EU and shall comply with the principles laid down in that Agreement.

Accordingly, until the Fund reaches the target level referred to in Article 69, but until no later than eight years after the date of application of this Article, the Board shall use the Fund in accordance with principles founded on a division of the Fund into national compartments corresponding to each participating Member State, as well as on a progressive merger of the different funds raised at national level to be allocated to national compartments of the Fund, as laid down in the Agreement.

*Article 78*

**Mutualisation of national financing arrangements in the case of group resolution involving institutions in non-participating Member States**

In the case of a group resolution involving institutions established in one or more participating Member States on the one hand, and institutions established in one or more non-participating Member States on the other hand, the Fund shall contribute to the financing of the group resolution in accordance with the provisions laid down in Article 107(2) to (5) of Directive 2014/59/EU.

*Article 79*

**Use of deposit guarantee schemes in the context of resolution**

1.    Participating Member States shall ensure that when the Board takes resolution action, provided that that action ensures that depositors continue to have access to their deposits, the deposit guarantee scheme to which the institution is affiliated shall be liable for the amounts specified in Article 109(1) and (4) of Directive 2014/59/EU.

The relevant deposit guarantee scheme shall subrogate to the rights and obligations of covered depositors in liquidation proceedings for an amount equal to its payment.

2.    The determination of the amount by which the deposit guarantee scheme is liable in accordance with paragraph 1 of this Article shall comply with the conditions referred to in Article 20.

3.    Before deciding, in accordance with paragraph 2 of this Article, the amount by which the deposit guarantee scheme is liable, the Board shall consult the concerned designated authority within the meaning of Article 2(1)(18) of Directive 2014/49/EU, taking fully into account the urgency of the matter.

4.    Where eligible deposits at an institution under resolution are transferred to another entity through the sale of business tool or the bridge institution tool, the depositors have no claim under Directive 2014/49/EU against the deposit guarantee scheme in relation to any part of their deposits at the institution under resolution that are not transferred, provided that the amount of funds transferred is equal to or more than the aggregate coverage level provided for in Article 6 of that Directive.

5.    Notwithstanding paragraphs 1 to 4, if the available financial means of a deposit guarantee scheme are used in accordance therewith and are subsequently reduced to less than two-thirds of the target level of the deposit guarantee scheme, the regular contribution to the deposit guarantee scheme shall be set at a level allowing for reaching the target level within six years.

The liability of a deposit guarantee scheme shall not be greater than the amount equal to 50 % of its target level pursuant to Article 10(2) of Directive 2014/49/EU.

In any circumstances, the deposit guarantee scheme's participation under this Regulation shall not exceed the losses it would have incurred in a winding up under normal insolvency proceedings.

TITLE VI

## OTHER PROVISIONS

*Article 80*

### Privileges and Immunities

Protocol No 7 on the Privileges and Immunities of the European Union annexed to the TEU and to the TFEU shall apply to the Board and its staff.

*Article 81*

### Language arrangements

1.    Council Regulation No 1 (¹) shall apply to the Board.

2.    The Board shall decide on the internal language arrangements for the Board.

3.    The Board may decide which of the official languages to use when sending documents to Union institutions or bodies.

4.    The Board may agree with each national resolution authority on the language or languages in which the documents to be sent to or by the national resolution authorities shall be drafted.

5.    The translation services required for the functioning of the Board shall be provided by the Translation Centre of the bodies of the European Union.

*Article 82*

### Staff

1.    The Staff Regulations, the Conditions of Employment and the rules adopted jointly by the Union institutions, for the purpose of applying them shall apply to the staff of the Board.

By way of derogation from the first subparagraph, the Chair, the Vice-Chair and the four members referred to in Article 43(1)(b) shall, respectively, be on a par with a Vice-President, Judge and Registrar of the Court of Justice regarding emoluments and pensionable age, as defined in Regulation (EC) No 422/67/EEC, 5/67/Euratom of the Council (²). They shall not be subject to a maximum retirement age. For aspects not covered by this Regulation or by Regulation (EC) No 422/67/EEC, 5/67/Euratom, the Staff Regulations and the Conditions of Employment shall apply by analogy.

2.    The Board, in agreement with the Commission, shall adopt the necessary implementing measures, in accordance with the arrangements provided for in Article 110 of the Staff Regulations.

3.    In respect of its staff, the Board shall exercise the powers conferred on the appointing authority by the Staff Regulations and on the authority entitled to conclude contracts by the Conditions of Employment.

*Article 83*

### Staff exchange

1.    The Board may make use of seconded national experts or other staff not employed by the Board.

2.    The Board in its plenary session shall adopt appropriate decisions laying down rules on the exchange and secondment of staff from and among the national resolution authorities to the Board.

_____

(¹) Council Regulation No 1 determining the languages to be used by the European Economic Community (OJ 17, 6.10.1958, p. 385).
(²) Regulation (EC) No 422/67/EEC, No 5/67/Euratom of the Council of 25 July 1967 determining the emoluments of the President and Members of the Commission, of the President, Judges, Advocates-General and Registrar of the Court of Justice, of the President, Members and Registrar of the General Court and of the President, Members and Registrar of the European Union Civil Service Tribunal (OJ L 187, 8.8.1967, p. 1).

3.    The Board may establish internal resolution teams composed of its own staff and staff of the national resolution authorities, as well as observers from non-participating Member States' resolution authorities, where appropriate.

4.    Where the Board establishes internal resolution teams as provided for in paragraph 3 of this Article, it shall appoint coordinators of those teams from its own staff. In accordance with Article 51(3), the coordinators may be invited as observers to attend the meetings of the executive session of the Board in which the members appointed by the respective Member States participate in accordance with Article 53(3) and (4).

*Article 84*

**Internal committees**

The Board may establish internal committees to provide it with advice and guidance on the discharge of its functions under this Regulation.

*Article 85*

**Appeal Panel**

1.    The Board shall establish an Appeal Panel for the purposes of deciding on appeals submitted in accordance with paragraph 3.

2.    The Appeal Panel shall be composed of five individuals of high repute, from the Member States and with a proven record of relevant knowledge and professional experience, including resolution experience, to a sufficiently high level in the fields of banking or other financial services, excluding current staff of the Board, as well as current staff of resolution authorities or other national or Union institutions, bodies, offices and agencies who are involved in performing the tasks conferred on the Board by this Regulation. The Appeal Panel shall have sufficient resources and expertise to provide expert legal advice on the legality of the Board's exercise of its powers. Members of the Appeal Panel and two alternates shall be appointed by the Board for a term of five years, which may be extended once, following a public call for expressions of interest published in the *Official Journal of the European Union*. They shall not be bound by any instructions.

3.    Any natural or legal person, including resolution authorities, may appeal against a decision of the Board referred to in Article 10(10), Article 11, Article 12(1), Articles 38 to 41, Article 65(3), Article 71 and Article 90(3) which is addressed to that person, or which is of direct and individual concern to that person.

The appeal, together with a statement of grounds, shall be filed in writing at the Appeal Panel within six weeks of the date of notification of the decision to the person concerned, or, in the absence of a notification, of the day on which the decision came to the knowledge of the person concerned.

4.    The Appeal Panel shall decide upon the appeal within one month after the appeal has been lodged.

The Appeal Panel shall decide on the basis of a majority of at least three of its five members.

5.    The members of the Appeal Panel shall act independently and in the public interest. For that purpose, they shall make a public declaration of commitments and a public declaration of interests indicating any direct or indirect interest which might be considered to be prejudicial to their independence or the absence of any such interest.

6.    An appeal lodged pursuant to paragraph 3 shall not have suspensive effect.

However, the Appeal Panel may, if it considers that circumstances so require, suspend the application of the contested decision.

7.    If the appeal is admissible, the Appeal Panel shall examine whether it is well founded. It shall invite the parties to the appeal proceedings to file observations on its own notifications or on communications from the other parties to the appeal proceedings, within specified time limits. Parties to the appeal proceedings shall be entitled to make oral representations.

8.    The Appeal Panel may confirm the decision taken by the Board, or remit the case to the latter. The Board shall be bound by the decision of Appeal Panel and it shall adopt an amended decision regarding the case concerned.

9.    The decisions of the Appeal Panel shall be reasoned and notified to the parties.

10.    The Appeal Panel shall adopt and make public its rules of procedure.

*Article 86*

**Actions before the Court of Justice**

1.    Proceedings may be brought before the Court of Justice in accordance with Article 263 TFEU contesting a decision taken by the Appeal Panel or, where there is no right of appeal to the Appeal Panel, by the Board.

2.    Member States and the Union institutions, as well as any natural or legal person, may institute proceedings before the Court of Justice against decisions of the Board, in accordance with Article 263 TFEU.

3.    In the event that the Board has an obligation to act and fails to take a decision, proceedings for failure to act may be brought before the Court of Justice in accordance with Article 265 TFEU.

4.    The Board shall take the necessary measures to comply with the judgment of the Court of Justice.

*Article 87*

**Liability of the Board**

1.    The Board's contractual liability shall be governed by the law applicable to the contract in question.

2.    The Court of Justice shall have jurisdiction to give judgement pursuant to any arbitration clause contained in a contract concluded by the Board.

3.    In the case of non-contractual liability, the Board shall, in accordance with the general principles common to the laws concerning the liability of public authorities of the Member States, make good any damage caused by it or by its staff in the performance of their duties, in particular their resolution functions, including acts and omissions in support of foreign resolution proceedings.

4.    The Board shall compensate a national resolution authority for the damages which it has been ordered to pay by a national court, or which it has, in agreement with the Board, undertaken to pay pursuant to an amicable settlement, which are the consequences of an act or omission committed by that national resolution authority in the course of any resolution under this Regulation of entities and groups referred to in Article 7(2), and of entities and groups referred to in Article 7(4)(b) and (5) where the conditions for the application of those paragraphs are met or pursuant to the second subparagraph of Article 7(3). That obligation shall not apply where that act or omission constituted an infringement of this Regulation, of another provision of Union law, of a decision of the Board, of the Council, or of the Commission, committed intentionally or with manifest and serious error of judgement.

5.    The Court of Justice shall have jurisdiction in any dispute relating to paragraphs 3 and 4. Proceedings in matters arising from non-contractual liability shall be barred after a period of five years from the occurrence of the event giving rise thereto.

6.    The personal liability of its staff towards the Board shall be governed by the provisions laid down in the Staff Regulations or Conditions of Employment applicable to them.


*Article 88*

**Professional secrecy and exchange of information**

1.    Members of the Board, the Vice-Chair, the members of the Board referred to in Article 43(1)(b), the staff of the Board and staff exchanged with or seconded by participating Member States carrying out resolution duties shall be subject to the requirements of professional secrecy pursuant to Article 339 TFEU and the relevant provisions in Union legislation, even after their duties have ceased. They shall in particular be prohibited from disclosing confidential information received during the course of their professional activities or from a competent authority or resolution authority in connection with their functions under this Regulation, to any person or authority, unless it is in the exercise of their functions under this Regulation or in summary or collective form such that entities referred to in Article 2 cannot be identified or with the express and prior consent of the authority or the entity which provided the information.

Information subject to the requirements of professional secrecy shall not be disclosed to another public or private entity except where such disclosure is due for the purpose of legal proceedings.

Those requirements shall also apply to potential purchasers contacted in order to prepare for the resolution of an entity pursuant to Article 13(3).

2.    The Board shall ensure that individuals who provide any service, directly or indirectly, permanently or occasionally, relating to the discharge of its duties, including officials and other persons authorised by the Board or appointed by the national resolution authorities to conduct on-site inspections, are subject to the requirements of professional secrecy equivalent to those referred to in paragraph 1.

3.    The requirements of professional secrecy referred to in paragraph 1 shall also apply to observers who attend the Board's meetings and to observers from non-participating Member States who take part in internal resolution teams in accordance with Article 83(3).

4.    The Board shall take the necessary measures to ensure the safe handling and processing of confidential information.

5.    Before any information is disclosed, the Board shall ensure that it does not contain confidential information, in particular, by assessing the effects that the disclosure could have on the public interest as regards financial, monetary or economic policy, on the commercial interests of natural and legal persons, on the purpose of inspections, on investigations and on audits. The procedure for checking the effects of disclosing information shall include a specific assessment of the effects of any disclosure of the contents and details of resolution plans as referred to in Articles 8 and 9, the result of any assessment carried out under Article 10 or the resolution scheme referred to in Article 18.

6.    This Article shall not prevent the Board, the Council, the Commission, the ECB, the national resolution authorities or the national competent authorities, including their employees and experts, from sharing information with each other and with competent ministries, central banks, deposit guarantee schemes, investor compensation schemes, authorities responsible for normal insolvency proceedings, resolution and competent authorities from non-participating Member States, EBA, or, subject to Article 33, third-country authorities that carry out functions equivalent to those of a resolution authority, or, subject to strict confidentiality requirements, with a potential purchaser for the purposes of planning or carrying out a resolution action.


*Article 89*

**Data protection**

This Regulation shall be without prejudice to the obligations of Member States relating to their processing of personal data under Directive 95/46/EC of the European Parliament and of the Council (¹) or the obligations of the Board, the Council and the Commission relating to their processing of personal data under Regulation (EC) No 45/2001 of the European Parliament and of the Council (²) when fulfilling their responsibilities.

---

(¹) Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the protection of individuals with regard to the processing of personal data and on the free movement of such data (OJ L 281, 23.11.1995, p. 31).
(²) Regulation (EC) No 45/2001 of the European Parliament and of the Council of 18 December 2000 on the protection of individuals with regard to the processing of personal data by the Community institutions and bodies and on the free movement of such data (OJ L 8, 12.1.2001, p. 1).

*Article 90*

**Access to documents**

1.    Regulation (EC) No 1049/2001 of the European Parliament and of the Council (¹) shall apply to documents held by the Board.

2.    The Board shall, within six months of the date of its first meeting, adopt the practical measures for applying Regulation (EC) No 1049/2001.

3.    Decisions taken by the Board under Article 8 of Regulation (EC) No 1049/2001 may be the subject of a complaint to the European Ombudsman or of proceedings before the Court of Justice, following an appeal to the Appeal Panel, referred to in Article 85 of this Regulation, as appropriate, under the conditions laid down in Articles 228 and 263 TFEU respectively.

4.    Persons who are the subject of the Board's decisions shall be entitled to have access to the Board's file, subject to the legitimate interest of other persons in the protection of their business secrets. The right of access to the file shall not extend to confidential information or internal preparatory documents of the Board.

*Article 91*

**Security rules on the protection of classified and sensitive non-classified information**

The Board shall apply the security principles contained in the Commission's security rules for protecting European Union Classified Information (EUCI) and sensitive non-classified information, as set out in the Annex to Commission Decision 2001/844/EC, ECSC, Euratom (²). Applying the security principles shall include applying provisions for the exchange, processing and storage of such information.

*Article 92*

**Court of Auditors**

1.    The Court of Auditors shall produce a special report for each 12-month period, starting on 1 April each year.

2.    Each report shall examine whether:

(a) sufficient regard was had to economy, efficiency and effectiveness with which the Fund has been used, in particular the need to minimise the use of the Fund;

(b) the assessment of Fund aid was efficient and rigorous.

3.    Each report under paragraph 1 shall be produced within six months of the end of the period to which the report relates.

4.    Following consideration of the final accounts prepared by the Board in accordance with Article 63, the Court of Auditors shall prepare a report on its findings by 1 December following each financial year. The Court of Auditors shall, in particular, report on any contingent liabilities (whether for the Board, the Council, the Commission or otherwise) arising as a result of the performance by the Board, the Council and the Commission of their tasks under this Regulation.

5.    The European Parliament and the Council may request that the Court of Auditors examine any other relevant matters falling within their competence set out in Article 287(4) TFEU.

6.    The reports referred to in paragraphs 1 and 4 shall be sent to the Board, the European Parliament, the Council and the Commission and shall be made public without delay.

7.    Within two months of the date on which each report under paragraph 1 is made public the Commission shall provide a detailed written response which shall be made public.

Within two months of the date on which each report under paragraph 4 is made public the Board, the Council and the Commission shall each provide a detailed written response which shall be made public.

---

(¹) Regulation (EC) N0 1049/2001 of the European Parliament and of the Council of 30 May 2001 regarding public access to European Parliament, Council and Commission documents (OJ L 145, 31.5.2001, p. 43).

(²) Commission Decision 2001/844/EC, ECSC, Euratom of 29 November 2001 amending its internal Rules of Procedure (OJ L 317, 3.12.2001, p. 1).

8.    The Court of Auditors shall have the power to obtain from the Board, the Council and the Commission any information relevant for performing the tasks conferred on it by this Article. The Board, the Council and the Commission shall provide any relevant information requested within such a timeframe as may be specified by the Court of Auditors.

PART IV

**POWERS OF EXECUTION AND FINAL PROVISIONS**

*Article 93*

**Exercise of the delegation**

1.    The power to adopt delegated acts is conferred on the Commission subject to the conditions laid down in this Article.

2.    The delegation of power referred to in Article 19(8), Article 65(5), Article 69(5), Article 71(3) and Article 75(4) shall be conferred for an indeterminate period of time from the relevant dates referred to in Article 99.

3.    The Commission shall ensure consistency between delegated acts adopted pursuant to this Regulation and delegated acts adopted pursuant to Directive 2014/59/EU.

4.    The delegation of power referred to in Article 19(8), Article 65(5), Article 69(5), Article 71(3) and Article 75(4) may be revoked at any time by the European Parliament or by the Council. A decision of revocation shall put an end to the delegation of the power specified in that decision. It shall take effect the day following the publication of the decision in the *Official Journal of the European Union* or at a later date specified therein. It shall not affect the validity of any delegated acts already in force.

5.    As soon as it adopts a delegated act, the Commission shall notify it simultaneously to the European Parliament and to the Council.

6.    A delegated act adopted pursuant to Article 19(8), Article 65(5), Article 69(5), Article 71(3) and Article 75(4) shall enter into force only if no objection has been expressed either by the European Parliament or the Council within a period of three months of notification of that act to the European Parliament and the Council or if, before the expiry of that period, the European Parliament and the Council have both informed the Commission that they will not object. That period shall be extended by three months at the initiative of the European Parliament or the Council.

7.    The Commission shall not adopt delegated acts where the scrutiny time of the European Parliament is reduced through recess to less than five months, including any extension.

*Article 94*

**Review**

1.    By 31 December 2018, and every three years thereafter, the Commission shall publish a report on the application of this Regulation, with a special emphasis on monitoring the potential impact on the smooth functioning of the internal market. That report shall evaluate:

(a)  the functioning of the SRM, its cost efficiency, as well as the impact of its resolution activities on the interests of the Union as a whole and on the coherence and integrity of the internal market for financial services, including its possible impact on the structures of the national banking systems within the Union, in comparison with other banking systems, and regarding the effectiveness of cooperation and information sharing arrangements within the SRM, between the SRM and the SSM, and between the SRM, national resolution authorities, competent authorities and resolution authorities of non-participating Member States, in particular assessing whether:

 (i)  there is a need that the functions allocated by this Regulation to the Board, to the Council and to the Commission, be exercised exclusively by an independent Union institution and, if so, whether any changes of the relevant provisions are necessary including at the level of primary law;

 (ii)  cooperation between the SRM, the SSM, the ESRB, EBA, ESMA and EIOPA, and the other authorities which form part of the ESFS, is appropriate;

(iii)  the investment portfolio in accordance with Article 75 is made of sound and diversified assets;

(iv)  the link between sovereign debt and banking risk has been broken;

(v)  governance arrangements, including the division of tasks within the Board and the composition of the voting arrangements both in the executive and the plenary sessions of the Board and its relations with the Commission and the Council are appropriate;

(vi)  the reference point for setting the target level for the Fund is adequate and in particular, whether covered deposits or total liabilities are a more appropriate basis and if a minimum absolute amount for the Fund should be established in order to avoid volatility in the flow of financial means to the Fund and to ensure the stability and adequacy of the financing of the Fund over time;

(vii)  it is necessary to modify the target level established for the Fund and the level of contributions in order to ensure a level playing field within the Union;

(b)  the effectiveness of independence and accountability arrangements;

(c)  the interaction between the Board and EBA;

(d)  the interaction between the Board and the national resolution authorities of non-participating Member States and the effects of the SRM on those Member States, and the interaction between the Board and relevant third-country authorities as defined in Article 2(1)(90) of Directive 2014/59/EU;

(e)  the necessity of taking steps in order to harmonise insolvency proceedings for failed institutions.

2.    The report shall be submitted to the European Parliament and to the Council. The Commission shall make accompanying proposals, as appropriate.

3.    When reviewing Directive 2014/59/EU, the Commission is invited also to review this Regulation, as appropriate.

*Article 95*

**Amendment to Regulation (EU) No 1093/2010**

Regulation (EU) No 1093/2010 is amended as follows:

(1)  In Article 4, point (2) is replaced by the following:

'(2)  "competent authorities" means:

(i)  competent authorities as defined in point (40) of Article 4(1) of Regulation (EU) No 575/2013, including the European Central Bank with regard to matters relating to the tasks conferred on it by Regulation (EU) No 1024/2013, in Directive 2007/64/EC, and as referred to in Directive 2009/110/EC;

(ii)  with regard to Directives 2002/65/EC and 2005/60/EC, the authorities competent for ensuring compliance with the requirements of those Directives by credit and financial institutions;

(iii)  with regard to deposit guarantee schemes, bodies which administer deposit guarantee schemes pursuant to Directive 2014/49/EU of the European Parliament and of the Council (*), or, where the operation of the deposit guarantee scheme is administered by a private company, the public authority supervising those schemes pursuant to that Directive; and

(iv)  with regard to Directive 2014/59/EU of the European Parliament and of the Council (**) and to Regulation (EU) No 806/2014 of the European Parliament and of the Council (***), the resolution authorities, defined in Article 3 of Directive 2014/59/EU, the Single Resolution Board, established by Regulation (EU) No 806/2014, and the Council and the Commission when taking actions under Article 18 of Regulation (EU) No 806/2014, except where they exercise discretionary powers or make policy choices.

---

(*)  Directive 2014/49/EU of the European Parliament and of the Council of 16 April 2014 on deposit guarantee scheme (OJ L 173, 12.6.2014, p. 149).
(**)  Directive 2014/59/EU of the European Parliament and of the Council of 15 May 2014 establishing a framework for the recovery and resolution of credit institutions and investment firms and amending Council Directive 82/891/EEC, and Directives 2001/24/EC, 2002/47/EC, 2004/25/EC, 2005/56/EC, 2007/36/EC, 2011/35/EU, 2012/30/EU and 2013/36/EU, and Regulations (EU) No 1093/2010 and (EU) No 648/2012, of the European Parliament and of the Council (OJ L 173, 12.6.2014, p. 190).
(***)  Regulation (EU) No 806/2014 of the European Parliament and of the Council of 15 July 2014 establishing uniform rules and a uniform procedure for the resolution of credit institutions and certain investment firms in the framework of a Single Resolution Mechanism and a Single Resolution Fund and amending Regulation (EU) No 1093/2010 (OJ L 225, 30.7.2014, p. 1).';

(2) In Article 25, the following paragraph is inserted:

'1a.    The Authority may organise and conduct peer reviews of the exchange of information and of the joint activities of the Board referred to in Regulation (EU) No 806/2014 and national resolution authorities of Member States non-participating in the Single Resolution Mechanism in the resolution of cross-border groups to strengthen effectiveness and consistency in outcomes. To that end, the Authority shall develop methods to allow for objective assessment and comparison.';

(3) In Article 40(6), the following subparagraph is added:

'For the purpose of acting within the scope of Directive 2014/59/EU, the Chair of the Single Resolution Board shall be an observer to the Board of Supervisors.'.

*Article 96*

**Replacement of national resolution financing arrangements**

From the date of application referred to in Article 99(2) and (6) of this Regulation, the Fund shall be considered to be the resolution financing arrangement of the participating Member States under Articles 99 to 109 of Directive 2014/59/EU.

*Article 97*

**Headquarters Agreement and operating conditions**

1.    The necessary arrangements concerning the accommodation to be provided for the Board in the Member State where its seat is located and the facilities to be made available by that Member State, as well as the specific rules applicable in that Member State to the Chair, members of the Board in its plenary session, Board staff and members of their families shall be laid down in a Headquarters Agreement between the Board and that Member State, concluded after obtaining the approval of the Board in its plenary session and no later than 20 August 2016.

2.    The Member State where the Board's seat is located shall provide the best possible conditions to ensure the proper functioning of the Board, including multilingual, European-oriented schooling and appropriate transport connections.

*Article 98*

**Start of the Board's activities**

1.    The Board shall become fully operational by 1 January 2015.

2.    The Commission shall be responsible for the establishment and initial operation of the Board until the Board has the operational capacity to implement its own budget. For that purpose:

(a) until the Chair takes up his or her duties following his or her appointment by the Council in accordance with Article 56, the Commission may designate a Commission official to act as interim Chair and exercise the duties assigned to the Chair;

(b) by way of derogation from Article 50(1)(l) and until the adoption of a decision as referred to in Article 50(3), the interim Chair shall exercise the appointing authority powers;

(c) the Commission may offer assistance to the Board, in particular by seconding Commission officials to carry out the activities of the agency under the responsibility of the interim Chair or the Chair.

3.    The interim Chair may authorise all payments covered by appropriations entered in the Board's budget and may conclude contracts, including staff contracts.

*Article 99*

**Entry into force**

1.    This Regulation shall enter into force on the twentieth day following that of its publication in the *Official Journal of the European Union*.

2.    With the exceptions set out in paragraphs 3 to 5, this Regulation shall be applicable from 1 January 2016.

3.    By way of derogation from paragraph 2 of this Article, the provisions relating to the powers of the Board to collect information and cooperate with the national resolution authorities for the elaboration of resolution planning, under Articles 8 and 9 and all of the other related provisions shall apply from 1 January 2015.

4.    By way of derogation from paragraph 2 of this Article, Articles 1 to 4, 6, 30, 42 to 48, 49, Article 50(1)(a), (b) and (g) to (p), Article 50(3), Article 51, Article 52(1) and (4), Article 53(1) and (2), Articles 56 to 59, 61 to 66, 80 to 84, 87 to 95 and 97 and 98 shall apply from 19 August 2014.

5.    By way of derogation from paragraph 2 of this Article, Article 69(5), Article 70(6) and (7) and Article 71(3), which empower the Council to adopt implementing acts and the Commission to adopt delegated acts, shall apply from 1 November 2014.

6.    From 1 January 2015, the Board shall submit a monthly report approved in its plenary session to the European Parliament, to the Council and to the Commission on whether the conditions for the transfer of contributions to the Fund have been met.

From 1 December 2015, where those reports show that the conditions for the transfer of contributions to the Fund have not been met, the application of the provisions referred to in paragraph 2 shall be postponed by one month each time. The Board shall submit a further report each time at the end of that month.

This Regulation shall be binding in its entirety and directly applicable in all Member States.

Done at Strasbourg, 15 July 2014.

|                                  |                          |
| -------------------------------- | ------------------------ |
| *For the European Parliament*    | *For the Council*        |
| *The President*                  | *The President*          |
| M. SCHULZ                        | S. GOZI                  |