# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE APPLICATION OF ANTONIO DEL VALLE RUIZ AND OTHERS FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782 | Case No. 1:18-mc-00085-ER |

# DECLARATION OF JUAN MANUEL RODRÍGUEZ CÁRCAMO IN SUPPORT OF THE RESPONSE TO THE APPLICATION FOR ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782

Dated: April 12, 2018

I, Juan Manuel Rodríguez Cárcamo, declare the following, pursuant to 28 U.S.C. § 1746:

1.     I serve as counsel for Banco Santander, S.A. ("Santander") in the proceedings before the European Union (the "EU") General Court (the "EU General Court") known as *Del Valle Ruiz and Others* v. *European Commission and Single Resolution Board*, case T-510/17 (the "EU Proceeding") and in other proceedings in relation to the resolution of Banco Popular Español S.A. ("Popular").

2.     I am a Partner at the law firm Pérez-Llorca. I am licensed to practice law in Spain and my practice focuses on EU law and Spanish law, particularly in regulated markets, including banking. I have practised before the EU courts since 2004 and I am a member of the Permanent Delegation to the EU Court of Justice of the Council of Bars and Law Societies of Europe (CCBE), which represents the bars and law societies of 45 countries from the EU, the European Economic Area and wider Europe.

3.     I submit this Declaration in Support of the Response to the Application for an Order to Take Discovery for Use in Foreign Proceedings Pursuant to 28 U.S.C. § 1782 filed today by Santander, Santander Holdings U.S.A., Inc., and Santander Bank, N.A.

4.     This declaration is based on my personal knowledge, my review of the Application and its supporting documents, and the other documents and records cited herein or attached hereto.

## I.     BACKGROUND ON THE RESOLUTION PROCEEDINGS OF POPULAR

## A.     The Single Supervisory Mechanism and the Single Resolution Mechanism

5.     In recent years, the EU has made progress in creating an internal market for banking services. This process has largely been the consequence of the financial and economic

crisis, which showed that the functioning of the internal market is under threat and that there is an increasing risk of financial fragmentation.[1]

6.     As a first step towards a banking union, the Council of the EU adopted the Single Supervisory Mechanism (the "SSM") in October 2013 to ensure that the EU's policy relating to the prudential supervision of credit institutions is implemented in a coherent and effective manner, that the single rulebook for financial services is applied in the same manner to credit institutions in the euro area Member States and those non-euro area Member States who choose to participate in the SSM, and that those credit institutions are subject to supervision of the highest quality.[2]  The SSM comprises the European Central Bank ("ECB") and the supervisory authorities of the EU's participating member states.

7.     In the past, because of the vital role played by banks, and in the absence of effective resolution regimes, authorities have often had to put up taxpayers' money to restore trust and avoid a contagion effect of failing banks on the real economy.[3]

8.     In view of the critical role that banks play in the European economies, the EU decided that financial difficulties in banks of the Banking Union needed to be resolved in an orderly, quick and efficient manner, avoiding undue disruption to the bank's activities and to the

---

[1] *See* Regulation (EU) N° 806/2014 of the European Parliament and of the Council of 15 July 2014 establishing uniform rules and a uniform procedure for the resolution of credit institutions and certain investment firms in the framework of a Single Resolution Mechanism and a Single Resolution Fund and amending Regulation (EU) N° 1093/2010 (the "SRM Regulation") (Official Journal (the "OJ") L 225, 30.7.2014, p. 1), Whereas 1.  A true and correct copy of the SRM Regulation is attached hereto as **Exhibit 1**.

[2] *See* SRM Regulation, Whereas 7 (Ex. 1).  A true and correct copy of Council Regulation (EU) N° 1024/2013 of 15 October 2013 conferring specific tasks on the European Central Bank concerning policies relating to the prudential supervision of credit institutions (the "SSM Regulation") (OJ L 287, 29.10.2013, p. 63) is attached hereto as **Exhibit 2**.

[3]     Single    Resolution    Board,    *What    is    a    bank    resolution?*,    paragraph    3,    *available    at* https://srb.europa.eu/en/content/what-bank-resolution.

rest of the financial system.[4]  While for most banks these goals can be achieved through normal insolvency proceedings, some banks are too systemically significant and interconnected to allow for their liquidation through a normal insolvency process.[5]

9.      Rather than relying on taxpayers to bail out these banks, in July 2014 the European Parliament and the Council of the EU adopted the Single Resolution Mechanism (the "SRM") to put an end to potential domino effects by distributing losses to banks' shareholders and creditors rather than on the taxpayers.[6]

10.      Therefore, for participating Member States (*i.e.* Member States whose currency is the Euro, as is the case of Spain), the SRM established a centralised power of resolution and entrusted to a new regulator, the Single Resolution Board (the "SRB"), the authority to effect the resolution of significant financial institutions.[7]  The SRM is therefore one of the pillars of the Banking Union, alongside the SSM and the Common Deposit Insurance Scheme.

11.      The SRM Regulation sets the following objectives for the resolution process:  (i) to ensure the continuity of critical functions; (ii) to avoid significant adverse effects on financial stability, in particular by preventing contagion, including to market infrastructures, and by maintaining market discipline; (iii) to protect public funds by minimising reliance on extraordinary public financial support; (iv) to protect depositors; and (v) to protect client funds and client assets.[8]

---

[4]  Single Resolution Board, *What is a bank resolution?*, paragraph 2, *available at* https://srb.europa.eu/en/content/what-bank-resolution.

[5]  Single Resolution Board, *What is a bank resolution?*, paragraph 4, *available at* https://srb.europa.eu/en/content/what-bank-resolution

[6]  Single Resolution Board, *What is a bank resolution?*, paragraph 5, *available at* https://srb.europa.eu/en/content/what-bank-resolution

[7] *See* SRM Regulation, Whereas 11 (Ex. 1).

[8] *See* SRM Regulation art. 14(2) (Ex. 1).

12.     When acting under the resolution procedure, the SRB, the Council of the EU, the European Commission and, where relevant, the national resolution authorities, shall take all appropriate measures to ensure that the resolution action is taken in accordance with the following principles:

(i)      the shareholders of the institution under resolution bear first losses;

(ii)     creditors of the institution under resolution bear losses after the shareholders in accordance with the order of priority of their claims;

(iii)    the management body and senior management of the institution under resolution are replaced, except in those cases where the retention of the management body and senior management, in whole or in part, as appropriate to the circumstances, is considered to be necessary for the achievement of the resolution objectives;

(iv)    the management body and senior management of the institution under resolution shall provide all necessary assistance for the achievement of the resolution objectives;

(v)     natural and legal persons are made liable, subject to national law, under civil or criminal law, for their responsibility for the failure of the institution under resolution;

(vi)    except where otherwise provided, creditors of the same class are treated in an equitable manner;

(vii)   no creditor shall incur greater losses than would have been incurred if the entity had been wound up under normal insolvency proceedings (the "no creditor worse off" principle);

(viii)  covered deposits are fully protected; and

(ix)   resolution action is taken in accordance with the safeguards in the SRM Regulation.[9]

13.   Accordingly, this new regulatory framework is founded on the idea that the shareholders and creditors of an entity under resolution must be the first to bear losses in accordance with the order of priority of claims laid down in insolvency law as a means of minimising the effects of an entity's resolution on taxpayers.

14.   The SRB has concluded a Cooperation Arrangement with the United States Federal Deposit Insurance Corporation (the "FDIC") concerning the resolution of insured depository institutions and certain other financial companies with cross-border operations in the United States and the European Banking Union (the "Cooperation Arrangement").[10]

15.   In the Cooperation Arrangement, the FDIC and the SRB agreed that managing a crisis involving the cross-border activities of a firm is a matter of common interest for the United States and the European Banking Union[11] and that, where possible and feasible, the FDIC and the SRB should implement resolution options that are consistent with their respective resolution objectives, in particular aimed at pursuing financial stability and protecting insured depositors, insurance policy holders and other retail customers, duly considering the potential impact of their resolution actions on the financial stability of the United States and the European Banking Union.[12]

---

[9] *See* SRM Regulation art. 15(1) (Ex. 2).

[10] A true and correct copy of the Cooperation Arrangement by the FDIC and the SRB concerning the resolution of insured depository institutions and certain other financial companies with cross-border operations in the United States and the European Banking Union is attached hereto as **Exhibit 3**.

[11] *See* Cooperation Arrangement ¶ 12 (Ex. 3).

[12] *See* Cooperation Arrangement ¶ 14 (Ex. 3).

**B.     The Resolution Procedure**

16.     Within the SRM, resolution occurs at the point where the authorities determine that three requirements are met: (i) a bank is "*failing or likely to fail*" ("FOLTF"), (ii) there is no other supervisory or private sector intervention that can restore the institution to viability within a short timeframe and (iii) normal insolvency proceedings would cause financial instability while having an impact on the public interest.[13]

17.     An institution shall be deemed to be FOLTF in one or more of the following circumstances:[14]

(i)     the entity infringes, or there are objective elements to support a determination that the institution will, in the near future, infringe the requirements for continuing authorisation in a way that would justify the withdrawal of the authorisation by the ECB, including but not limited to the fact that the institution has incurred or is likely to incur losses that will deplete all or a significant amount of its own funds;

(ii)     the assets of the entity are, or there are objective elements to support a determination that the assets of the entity will, in the near future, be less than its liabilities;

(iii)     the entity is, or there are objective elements to support a determination that the entity will, in the near future, be unable to pay its debts or other liabilities as they fall due;

(iv)     extraordinary public financial support is required except where, in order to remedy a serious disturbance in the economy of a Member State and preserve financial stability, that extraordinary public financial support takes any of the

---

[13] *See* SRM Regulation art. 18(1) (Ex. 1).

[14] *See* SRM Regulation art. 18(4) (Ex. 1).

following forms: (a) a State guarantee to back liquidity facilities provided by central banks in accordance with the central banks' conditions; (b) a State guarantee of newly issued liabilities; or (c) an injection of own funds or purchase of capital instruments at prices and on terms that do not confer an advantage upon the entity.

18.     Where the ECB assesses that the entity is FOLTF, it shall communicate that assessment without delay to the European Commission and to the SRB.[15]  At that point, the SRB adopts the resolution scheme.[16]

19.     The resolution procedure also involves the European Commission and the Council of the EU.  The Commission shall either endorse the resolution scheme or object to it.  The resolution scheme may enter into force only if the Council of the EU or the Commission have expressed no objection within a period of 24 hours after the SRB informs them of the resolution scheme.[17]

20.     Before any resolution action is taken, the SRB must carry out a fair, prudent and realistic valuation of the assets and liabilities of the entity.  It is possible, for reasons of urgency, that the SRB must make a rapid valuation of the assets or the liabilities of a failing entity. That valuation is provisional and applies until an independent valuation is carried out.[18]

21.     In addition, an *ex-post* comparison between the treatment that shareholders and creditors have received and the treatment they would have received under normal insolvency proceedings must be carried out after resolution tools have been applied.  If the SRB determines

---

[15] *See* SRM Regulation art. 18(1), subparagraph 4 (Ex. 1).

[16] *See* SRM Regulation art. 18(1), subparagraph 1 (Ex. 1).

[17] *See* SRM Regulation art. 18(7) (Ex. 1).

[18] *See* SRM Regulation art. 20 (Ex. 1).

that shareholders and creditors have received, in payment of their claims, less than the amount that they would have received under normal insolvency proceedings, they are entitled to the payment of the difference.[19]

22.     The SRM Regulation establishes four tools with which the SRB may effect a resolution. These tools are (i) the sale of the business or shares of the institution under resolution, (ii) the setting up of a bridge entity, (iii) the separation of the performing assets from the impaired or under-performing assets of the failing entity, and (iv) the bail-in of the shareholders and creditors of the failing entity.[20] The resolution tools may be applied either individually or in any combination, except for the asset separation tool, which may be applied only together with another resolution tool.[21]

23.     In addition to these tools, the SRB shall exercise the power to write down or convert relevant capital instruments when one or more of the following conditions are met[22]:

(i)     where the conditions for resolution specified have been met, before any resolution action is taken;

(ii)    the entity will no longer be viable unless the relevant capital instruments are written down or converted into equity;

(iii)   in the case of relevant capital instruments issued by a subsidiary and where those relevant capital instruments are recognised for the purposes of meeting own funds requirements on an individual basis and on a consolidated basis, unless the write-

---

[19] *See* SRM Regulation art. 76(1)(e) (Ex. 1).

[20] *See* SRM Regulation art. 22(2) (Ex. 1).

[21] *See* SRM Regulation art. 22(4) (Ex. 1).

[22] *See* SRM Regulation art. 21(1) (Ex. 2).

down or conversion power is exercised in relation to those instruments, the group will no longer be viable;

(iv)     in the case of relevant capital instruments issued at the level of the parent undertaking and where those relevant capital instruments are recognised for the purposes of meeting own funds requirements on an individual basis at the level of the parent undertaking or on a consolidated basis, unless the write-down or conversion power is exercised in relation to those instruments, the group will no longer be viable;

(v)      extraordinary public financial support is required by the entity or group, except in some circumstances.

24.     The resolution scheme should make it possible to assess whether the conditions for the write-down and conversion of capital instruments are met.  Since the conditions for the write-down and conversion of capital instruments may coincide with the conditions for resolution and in such a case, the SRB must make an assessment of whether the sole write-down and conversion of the capital instruments is sufficient to restore the financial soundness of the entity concerned or whether, in addition to the write-down and conversion, it is also necessary to take resolution action by implementing one of the four resolution tools (sale of business, bridge entity, separation, or bail-in).[23]

25.     The sale of business tool shall consist of the transfer to a purchaser that is not a bridge institution of instruments of ownership issued by an institution under resolution or all or any assets, rights or liabilities of an institution under resolution.[24]

---

[23] *See* SRM Regulation art. 21(7) (Ex. 1).

[24] *See* SRM Regulation art. 24(1) (Ex. 1).

26.     In the event the SRB elects to employ this tool, the resolution scheme shall establish: (i) the instruments, assets, rights and liabilities to be transferred by the national resolution authority; (ii) the commercial terms, having regard to the circumstances and the costs and expenses incurred in the resolution process, pursuant to which the national resolution authority shall make the transfer; (iii) whether the transfer powers may be exercised by the national resolution authority more than once; (iv) the arrangements for the marketing by the national resolution authority of that entity or those instruments, assets, rights and liabilities; and (v) whether the compliance with the marketing requirements by the national resolution authority is likely to undermine the resolution objectives.[25]

27.     The SRB shall apply the sale of business tool without complying with the marketing requirements when it determines that compliance with those requirements would be likely to undermine one or more of the resolution objectives, particularly where it considers that there is a material threat to financial stability arising from or aggravated by the failure or likely failure of the institution under resolution; and it considers that compliance with those requirements would be likely to undermine the effectiveness of the sale of business tool in addressing that threat or achieving the resolution objective.[26]

28.     Each Member State shall designate one or, exceptionally, more resolution authorities empowered to apply the resolution tools that the SRB determines are appropriate and to exercise the resolution powers.[27]

---

[25] *See* SRM Regulation art. 24(2) (Ex. 1).

[26] *See* SRM Regulation art. 24(3) (Ex. 1).

[27] Article 3(1) of the Directive 2014/59/EU of the European Parliament and of the Council of 15 May 2014 establishing a framework for the recovery and resolution of credit institutions and investment firms and amending Council Directive 82/891/EEC, and Directives 2001/24/EC, 2002/47/EC, 2004/25/EC, 2005/56/EC, 2007/36/EC, 2011/35/EU, 2012/30/EU and 2013/36/EU, and Regulations (EU) N° 1093/2010 and (EU) N° 648/2012, of the European Parliament and of the Council (OJ L 173, 12.6.2014, p. 190).

29.     In Spain, Law 11/2015,[28] further developed by Royal Decree 1012/2015,[29] establishes the FROB as the national resolution authority that must implement the resolution schemes adopted by the SRB with regard to significant Spanish financial institutions.[30]   Law 11/2015 is therefore compatible with the provisions of the SRM Regulation, especially concerning the functions of EU authorities within the framework of the SRM, and the national authorities' duty to collaborate with the EU authorities to ensure that any decisions taken by those authorities within their powers are duly implemented in Spain.[31]

30.     Pursuant to the division of powers between the SRB and the national resolution authorities, the SRB is responsible for adopting all decisions relating to resolution for financial institutions that are considered to be significant in accordance with Article 6.4 of the SSM Regulation.[32]   In turn, the national resolution authorities are responsible for applying the resolution actions that the SRB imposes and following the SRB's instructions in this regard.[33]

## C.     Actions Taken to Effect the Resolution of Popular

31.     Prior to its resolution, Popular was a credit institution established in a Member State participating in the SRM, and was considered to be a significant entity pursuant to Article 6(4) of the SSM Regulation.  Accordingly, the SRB was the authority responsible for adopting all decisions concerning the resolution of Popular, including the power to place the entity under resolution and to adopt the appropriate resolution scheme.

---

[28] Law 11/2015, of 18 June 2015, on the recovery and resolution of credit institutions and investment firms (the "Law 11/2015"), Spanish Official Journal ("BOE") nº 146, 19.06.2015.

[29] Royal Decree 1012/2015, of 6 November 2015, developing Law 11/2015, BOE nº. 267, 07.11.2015.

[30] Law 11/2015 art. 1(1).

[31] Fourth Additional Provision of Law 11/2015 § 1.

[32] SRM Regulation art. 7(2) (Ex. 1); SSM Regulation art. 6.4 (Ex. 2).

[33] *See* SRM Regulation arts. 18(9) and 29 (Ex. 1).

32.     Antonio Del Valle Ruiz, one of the Petitioners, served as a director of Popular from April 7, 2014 to approximately September 28, 2016.[34]   According to Popular's annual reports, which are publicly available, Mr. Del Valle represented a "group of Mexican shareholders."[35]

33.     Jaime Ruiz Sacristán, also one of the Petitioners, replaced Mr. Del Valle and served as a director of Popular from September 28, 2016 until the entire board of directors resigned on June 7, 2017 in conjunction with the resolution of Popular.[36]   According to Popular's annual reports, Mr. Ruiz represented the "group of Mexican shareholders" after Mr. Del Valle's resignation.[37]

34.     On June 7, 2017, the SRB adopted the Decision concerning the adoption of a resolution scheme in respect of Popular (SRB/EES/2017/08) (the "SRB Decision").[38]

35.     As the SRB Decision makes clear, the liquidity situation of Popular had significantly deteriorated since October 2016.   Between October 2016 and June 2017, Popular had disclosed its need for extraordinary provision from the Bank of Spain, changed some of the membership of Board of Directors, including its Chief Executive Officer, and had seen its rating downgraded because of the material cash outflow across all customer segments. As a result,

---

[34] A true and correct copy of the Relevant Fact Notification submitted to the Spanish National Securities Market Commission announcing Mr. Del Valle's election as a director, along with a certified translation into English of the same, is attached hereto as **Exhibit 4**.   A true and correct copy of the Relevant Fact Notification submitted to the Spanish National Securities Market Commission announcing Mr. Del Valle's resignation as a director and Mr. Ruiz's election as a director is attached hereto as **Exhibit 5**.

[35] True and correct copies of relevant excerpts from the Annual Reports of Popular from 2014 through 2016 are attached hereto as **Exhibit 6**, **Exhibit 7**, and **Exhibit 8**, respectively.

[36] *See* Ex. 5.   In addition, a true and correct copy of the Relevant Fact Notifications submitted to the Spanish National Securities Market Commission announcing the resignation of the board of directors, along with a certified translation into English of the same, is attached hereto as **Exhibit 9**.

[37] 2016 Annual Report of Popular at 169 (Ex. 8).

[38] A true and correct copy of the non-confidential version of the SRB Decision is attached hereto as **Exhibit 10**.

Popular had insufficient options to restore its liquidity position and meet its liabilities as they fell due.[39]

36.      In April 2017, Popular initiated a private sales process with a view to achieving its sale to a strong competitor, which would restore the financial situation of the bank.  The deadline for potential purchasers interested in acquiring Popular to submit their offers was initially set on June 10, 2017.  In the beginning of June, this deadline was extended to end of June.  However, the negotiations did not lead to a positive outcome.[40]

37.      On May 23, 2017, the SRB hired Deloitte to perform an independent valuation of Popular.[41]

38.      On May 24, 2017, the SRB requested that Popular provide the information necessary to conduct the required valuation of the institution.[42]

39.      On June 2, 2017, the ECB informed the SRB that, as a result of "significant deposit outflows," Popular "may not be able to pay its liabilities as they fall due within the following week."[43]

40.      On the same day, the SRB requested that Popular supply information about its private sale process and to stand ready to provide potential purchasers participating in a potential marketing procedure of the resolution authorities, with access to the Virtual Data Room (the "VDR") established as part of the private sale process.[44]

_____

[39] *See* SRB Decision, Whereas 23 and 24  (Ex. 10).

[40] *See* SRB Decision, Whereas 26(a) (Ex. 10).

[41] *See* SRB Decision, Whereas 41 (Ex. 10).

[42] *See* SRB Decision, Whereas 28 (Ex. 10).

[43] *See* SRB Decision, Whereas 29 (Ex. 10).

[44] *See* SRB Decision, Whereas 30 (Ex. 10).

41.     On June 3, 2017, following the receipt of information from Popular regarding the private sale process, the SRB decided to initiate the marketing procedure of the bank and provided the FROB with the marketing requirements, adopting the Decision of the Executive Session of the Board of June 3, 2017 concerning the marketing of Popular (SRB/EES/2017/06) (the "Marketing Decision") that same day.[45]

42.     The Marketing Decision detailed the conditions and requirements of the sales procedure.  The sale procedure had to be as transparent as possible.[46]  The Marketing Decision pointed out that Popular had contacted various potential bidders operating on the Spanish and international markets during the private sale process.  Five parties had expressed initial interest and been invited to present non-binding offers during the private sale process.[47]

43.     The SRB decided that the FROB would only contact those five parties, Santander being among them, given that inviting a larger number of participants:

(i)      may result in additional uncertainty and in a loss of market confidence, increasing the probability of leakage and thus, the risk that the Popular may enter resolution within an extremely short timeframe;

(ii)     might increase the complexity of the process, which is inconsistent with the urgency and the very limited time that is expected to be available for the marketing procedure; and

---

[45] SRB Decision, Whereas 31 (Ex. 10); Decision of the Executive Session of the Board of 3 June 2017 concerning the marketing of Banco Popular Español (SRB/EES/2017/06).  A true and correct copy of the Marketing Decision is attached hereto as **Exhibit 11**.

[46] Marketing Decision art. 2(a) (Ex. 11).

[47] *See* Marketing Decision art. 2(a)(i) (Ex. 11).

(iii)    would had been probably unnecessary because it was doubtful whether bidders

that had not shown interest so far in the private sale process would submit

offers.[48]

44.    Ultimately, the SRB determined in the Marketing Decision that contacting a

broader range of purchasers would have undermined the effectiveness of the sale of business

tool.[49]

45.    On June 3, 2017, the FROB requested that Santander and the other four identified

potential purchasers sign a non-disclosure agreement.   On June 4, 2017, Santander and one

another interested potential purchaser signed non-disclosure agreements (the "NDA").[50]

46.    On June 5, 2017, the FROB provided potential purchasers access to the VDR.[51]

47.    That same day, given the deterioration of Popular's financial condition,[52] the SRB

carried out its own provisional valuation of Popular (the "Valuation 1 Report") to inform

whether the conditions for resolution were met.[53]   As a result of the Valuation 1 Report, the SRB

concluded that Popular was operating under stress conditions and the markets were discounting a

shortfall of the coverage of non-performing loans, as well as the implementation of the future

regulation, which was affecting the liquidity conditions of the group.   The Valuation 1 Report

also concluded that, if the shortfall of coverage materialised and there were no additional

measures to increase the capital in place, Popular would likely be in breach of its capital

---

[48] *See* Marketing Decision art. 2(a)(i) (Ex. 11).

[49] *See* Marketing Decision art. 2(a)(i) (Ex. 11).

[50] *See* SRB Decision, Whereas 32 and 33 (Ex. 10).

[51] *See* SRB Decision, Whereas 34 (Ex. 10).

[52] SRM Regulation, art. 20(1) (Ex. 1).

[53] SRM Regulation arts. 20(3), (10)  (Ex. 1).

requirements and that the Popular's liquidity and funding conditions would trigger an assessment that Popular was FOLTF.[54]

48.     On June 6, 2017, the ECB communicated to the SRB its assessment that (i) the measures taken by Popular had not been sufficient to reverse the deterioration of its liquidity position,[55] (ii) the sale of Popular to a stronger competitor was not foreseeable in a timeframe that allowed Popular to be able to pay its debts or other liabilities as they fall due,[56] and (iii) there were no available supervisory or early intervention measures that could restore the liquidity position of Popular in an immediate way and allow it to ensure sufficient time in order to implement a corporate transaction or other solution.[57]   Consequently, the ECB concluded that Popular was FOLTF.[58]

49.     On the same date, Popular notified the ECB that its Board of Directors had assessed that Popular was likely to fail.[59]

50.     On the same date, Deloitte submitted its independent provisional valuation report to the SRB (the "Valuation 2 Report") assessing the economic value of Popular's equity and providing an estimate of the treatment that Popular's shareholders and creditors could expect if Popular was wound up under normal insolvency proceedings.   The Valuation 2 Report valued Popular's equity in a range between €1.3 billion and € –8.2 billion, with the best estimate within

---

[54] *See* Valuation 1 Report, 3 8.  A true and correct copy of the Valuation 1 Report published by the SRB is attached hereto as **Exhibit 12**.

[55] *See* FOLTF Assessment ¶ 17.  A true and correct copy of the non-confidential version of the FOLTF Assessment published by the ECB is attached hereto as **Exhibit 13**.

[56] *See* FOLTF Assessment ¶ 18 (Ex. 13).

[57] *See* FOLTF Assessment ¶ 18 (Ex. 13).

[58] *See* SRB Decision, Whereas 37, art. 2.1 (Ex. 10).

[59] *See* SRB Decision, Whereas 36 (Ex. 10).

that range being € –2.0 billion.[60]  The SRB therefore concluded that the shareholders would not incur any greater losses under the resolution scheme than they would have incurred under normal insolvency proceedings.[61]

      51.     On the same date, FROB sent the potential purchasers a sale process letter (the "Sale Process Letter"), which superseded an earlier sale process letter.  The Sale Process Letter defined the object of the transaction, established the timeline for the sale process, specified the binding offer content, and regulated the presentation of the binding offer.  Among other conditions, the purchaser was expressly obligated to implement the liquidity mechanisms that may be necessary to ensure the continuity of those activities, services and operations whose interruption could disrupt the provision of essential services, affect creditors or depositors, or jeopardize Popular's financial stability.[62]  In addition, there could not be any condition for the execution of the transaction in the terms specified in the Sale Process Letter.[63]  A binding offer could be automatically disqualified if it contained material or substantial changes to the proposed sale agreement.  Likewise, in the event that any potential bidder decided not to submit an offer, that bidder would have been obliged to return or destroy all confidential information it had obtained in the process. [64]

      52.     Santander submitted its binding offer to the FROB on June 7, 2017.[65]  The FROB received no other valid and binding offer.[66]

---

[60] *See* Valuation 2 Report at 1, Executive Summary 1.1.  A true and correct copy of the Valuation 2 Report published by the SRB is attached hereto as **Exhibit 14**.

[61] *See* SRB Decision art. 6.10 (Ex. 10).

[62] *See* Sale Process Letter, "*Binding Offer: Content*," § 6.  A true and correct copy of the Sale Process Letter is attached hereto as **Exhibit 15**.

[63] *See* Sale Process Letter, "*Binding Offer: Content*," §§ 6 and 7 (Ex. 15).

[64] *See* Sale Process Letter, "*Other aspects*" (Ex. 15).

[65] *See* SRB Decision, Whereas 38 (Ex. 10).

53.     The SRB Decision of that same date assessed that the conditions for resolution, as referred to in Article 18(1) of the SRM Regulation, were met, namely[67]:

(i)     The entity was FOLTF.  In particular, taking into account the rapidly deteriorating liquidity situation of the entity, the ECB considered that there were sufficient grounds supporting the determination that the Institution would, in the near future, be unable to pay its debts as they fall due.

(ii)    There was no reasonable prospect that any alternative private sector measures or supervisory action would prevent the failure of Popular within a reasonable timeframe.  Given that the private sale process initiated by Popular had not led to a positive outcome and given the difficulties of the entity to mobilise sufficient additional liquidity within the given timeframe, the SRB determined that this condition was met.

(iii)   Resolution would be necessary in the public interest. The SRB concluded that action would be necessary to:

(a)     ensure the continuity of critical functions, and

(b)     avoid adverse effects on financial stability.

(iv)    The SRB also assessed that the winding up of Popular under normal insolvency proceedings would not meet those resolution objectives to the same extent.

54.     The SRB decided to exercise its power to write-down and convert capital instruments to address the shortfall in the value of Popular, and then the sale of business tool to effect Popular's transfer to Santander.  All of the existing shares (Common Equity Tier 1), and

---

[66] *See* SRB Decision art. 6.6 (Ex. 10).

[67] *See* SRB's Notice summarising the effects of the Resolution of Popular at 1.  A true and correct copy of the Notice is attached hereto as **Exhibit 16**.

Additional Tier 1 debt instruments were written down, while Tier 2 debt instruments were converted into new shares. Those new shares were then sold to Santander for the price of €1.[68]

55.     That same day, the FROB entered into a shares sale and purchase agreement with Santander.[69]

56.     Also that same day, the European Commission adopted the Decision (EU) 2017/1246 of 7 June 2017 endorsing the resolution scheme for Popular (the "European Commission Decision").[70]

57.     On the same date, the FROB issued a Decision adopting the necessary measures to implement the resolution scheme of Popular established by the SRB Decision (the "FROB Decision").[71]

58.     Finally, to comply with the requirement set out in SRM Regulation that no shareholder or creditor shall incur greater losses than would have been incurred if the entity had been wound up under normal insolvency proceedings, Deloitte is currently preparing a Valuation 3 Report for the purpose of determining whether shareholders or creditors of Popular would have received a better treatment if its resolution had taken place under national insolvency proceedings.[72]

## II.     THE PROCEDURES FOR CHALLENGING THE RESOLUTION

59.     The Treaty on the Functioning of the European Union (the "TFEU") establishes that any natural or legal person may institute proceedings against an act addressed to that person

---

[68] See SRB Decision art. 6.5 (Ex. 10).

[69] See SRB Decision art. 6.8 (Ex. 10).

[70] OJ L 178, 11.7.2017, p. 15.

[71] A true and correct copy of the FROB Implementing Decision is attached hereto as **Exhibit 17**.

[72] See SRM Regulation art. 15(1) (Ex. 1); FROB Implementing Decision (Ex. 17).

or which is of direct and individual concern to them.[73]   These actions are known as actions for annulment.   Decisions of the SRB, as the SRB Decision on Popular, can therefore be challenged before the EU General Court through this type of action.[74]

60.     In addition, any party may, in proceedings in which an act of general application adopted by an institution, body, office or agency of the Union is at issue, invoke before the EU Court of Justice the inapplicability of that act.[75]   These allegations can be invoked as an independent ground for annulment and are known as pleas of illegality.

61.     In the case of non-contractual liability, the EU shall, in accordance with the general principles common to the laws of the Member States, make good any damage caused by its institutions or by its servants in the performance of their duties and the EU General Court shall have jurisdiction in disputes relating to compensation for damage in such cases.[76]   These actions are known as actions for damages.

62.     There are currently 98 actions brought by former shareholders and convertible bondholders challenging the resolution of Popular:   65 actions have been brought against the SRB; one action has been brought against the European Commission; 30 actions have been brought against the SRB and the European Commission; one action has been brought against the SRB and the ECB; and one action has been brought against the ECB, the European Parliament and the European Council.   The relief sought in these actions include some of the following:   the annulment of the SRB Decision, the annulment of the European Commission Decision, the declaration that the SRM Regulation is illegal, and/or a compensation for damages.

---

[73] TFEU art. 263(4).

[74] TFEU art. 263(4); SRM Regulation art. 86(2) (Ex. 1).

[75] TFEU art. 277.

[76] TFEU arts. 268, 340.

### III.   THE EU GENERAL COURT AND THE EU PROCEEDING

#### A.   Santander's Intervention into the EU Proceeding

63.   The form of order that the 42 Petitioners that are litigating before the EU General Court seek is to (i) annul the SRB Decision and the European Commission Decision endorsing the resolution scheme; (ii) declare illegal Articles 18 and 22 of the SRM Regulation; and (iii) order the SRB and the European Commission to bear the costs of the litigation.

64.   Pursuant to Article 40(2) of the Statute of the EU Court of Justice, which applies to the EU General Court pursuant to its Article 53, a party should be permitted to intervene in a proceeding before the EU General Court if it can show to the court's satisfaction that it has an interest in the result of the case.

65.   According to settled EU case law, the concept of "an interest in the result of the case" is defined in light of the precise subject-matter of the dispute and is understood to mean a direct, existing interest in the ruling on the forms of order sought, and not an interest in relation to the pleas in law put forward.   The Court of Justice has held that the concept of an interest in the result of the case must be construed as an interest in the decision on the claims relating specifically to the act whose annulment is sought.[77]   In that regard, the court must ascertain whether the intervener is directly affected by the contested measure and whether his interest in the result of the case is established.[78]   An interest in the result of the case can be considered to be

---

[77] Orders of the President of the EU Court of Justice of 23 July 1998, *Alexopoulou v Commission*, Case 155/98, EU:C:1998:398, paragraph 12, 8 June 2012, *Schenker AG v Deutsche Lufthansa AG and Others*, Case C-365/12 P, EU:C:2012:337, paragraph 10, 21 December 2016, *Commission v Spain*, Case C-128/16 P, EU:C:2016:1006, paragraph 9 and of 26 October 2016, *Bionorica y Diapharm v Commission*, Case C-596/15 P y and Case C-597/15 P, EU:C:2016:829, paragraph 6.

[78] Orders of the President of the EU Court of Justice of 8 June 2012, *Schenker AG v Deutsche Lufthansa AG and Others*, Case C-365/12 P, EU: C: 2012:337, paragraph 10 21 December 2016, *Commission v Spain*, C-128/16 P, EU:C:2016:1006, paragraph 10 and of 27 February 2015, *Mory and others v Commission*, C-33/14 P, EU:C:2015:135, paragraph 7.

sufficiently direct only to the extent to which that result is likely to alter the legal position of the person seeking leave to intervene.[79]

66.     Santander has a direct and existing interest in the EU Proceeding.  The SRB Decision expressly created rights and obligations for Santander.[80]  In addition, if the Petitioners' form of order sought is granted, Santander's legal position would be altered.

67.     Santander has therefore requested to intervene in all the actions currently pending before the EU General Court with regard to the resolution of Popular, including the action brought by the Petitioners.[81]  It is my understanding that Popular and the Kingdom of Spain have also requested to intervene.

68.     The EU General Court has not yet ruled on any application to intervene.

**B.      Obtaining Documents Within the EU Proceeding**

69.     An intervener shares most of the rights and obligations of a party.   Once Santander is authorized to intervene in the proceedings, it shall receive a copy of every procedural document served on the main parties and will have a right to submit a statement in intervention.[82]  Santander will also have a right to intervene in the oral hearing and to respond to oral questions from the EU General Court.[83]

---

[79] Orders of the President of the EU Court of Justice of 21 December 2016, *Commission vs Spain*, C-128/16 P, EU:C:2016:1006, paragraph 10 and of 26 October 2016, *Bionorica y Diapharm v Commission*, C-596/15 P and C-597/15 P, EU:C:2016:829, paragraph 7, and Order of the Vice-President of the European Court of Justice of 6 October 2015, *Comité d'entreprise de la SNCM v Commission*, C-410/15 P, EU:C:2015:669, paragraph 6.

[80] *See* Article 6.5 of the SRB Decision (Exhibit 10).

[81] A true and correct copy of the acknowledgement of receipt by the EU General Court of the application for leave to intervene submitted by Santander in the EU Proceeding is attached hereto as **Exhibit 18**.  A true and correct copy of the EU General Court's certificate declaring that the application for leave to intervene submitted by Santander in the EU Proceeding  is still pending to be decided on is attached hereto as **Exhibit 19.**

[82] Article 144(7) and 145(1) of the Rules of Procedure of the General Court of 4 March 2015 (OJ 2015 L 105, p. 1) as last amended on 13 July 2016 (OJ 2016 L 217, p. 73) (the "RPGC").

[83] RPGC art. 106(1).

70.     The EU General Court also has broad powers to request documents and testimony of interveners in the proceedings.[84]   Therefore, Santander and any other intervener will have to supply all documents and testimony that the EU General Court requests and considers desirable for the proceedings.[85]

71.     The EU General Court may also require the Member States and institutions, bodies, offices and agencies that are not parties to the case to supply all information which the court considers necessary for the proceedings.[86]   Thus, the EU General Court can order the SRB, the European Commission, the ECB, the Kingdom of Spain, and other third parties to produce documents related to the resolution of Popular.

72.     The Petitioners have expressly indicated in their Application before the EU General Court that they intend to apply to the EU General Court for an order compelling disclosure the documents sustaining the Decisions on the resolution of Popular.[87]

**B.      Other Procedures for the Petitioners to Obtain the Information Requested in the Section 1782 Action**

73.     Apart from the EU General Court's authority to request parties, interveners, or third parties to provide it with all the documents that it considers necessary to decide whether to annul the Decisions on the Resolution of Popular, the Petitioners have additional and independent procedures to obtain information and documentation about the Resolution of Popular regardless of the EU Proceeding.

---

[84] RPGC arts. 89(3)(c), 93.1.

[85] Statute of the EU Court of Justice art. 24(1).

[86] Statute of the EU Court of Justice art. 24(2).

[87] Petitioner's Application submitted to the EU General Court ¶ 9 (Rubenstein Decl. Ex. 1).

74.     The EU recognises that citizens have a right to access to documents held by all institutions, offices, bodies and agencies.[88]   This right is enshrined in Article 42 of the EU Charter and is further developed in Regulation 1049/2001.[89]

75.     EU law also provides that any person may institute proceedings against the decisions of the institutions relating access to documents.[90]

76.     In the context of the SRM, parties who are the subject of the SRB's decisions have a specific right to access to the SRB's file.  This right of access to the file shall not extend to confidential information or internal preparatory documents of the SRB and is subject to the legitimate interest of other persons in the protection of their business secrets.[91]

77.     Persons who are not the subject of the SRB's decision (as is the case of the shareholders and creditors of an entity subject to resolution) do not have that specific right within the SRM.   But in such cases, access to the documents held by the SRB is determined in accordance with Regulation 1049/2001, *i.e.* in application of the general regime on public access as EU citizens, not as the subject of an SRB decision.[92]

78.     The right of access to documents is not absolute.  Under Article 4 of Regulation 1049/2001, institutions shall refuse access to a document where disclosure would undermine the protection of public interest, confidentiality of information, or commercial interests.   These exceptions are also contained in Articles 4(1)(a), 4(1)(c) and 4(2) of the ECB Decision on public

---

[88] EU Charter art. 42.

[89] Regulation (EC) N° 1049/2001 of the European Parliament and of the Council of 30 May 2001 regarding public access to European Parliament, Council and Commission documents (OJ L 145, 31.5.2001, p. 43).   A true and correct copy of Regulation 1049/2001 is attached hereto as **Exhibit 20**.

[90] TFEU arts. 15(3), 263.

[91] SRM Regulation art. 90(4) (Ex. 1).

[92] SRM Regulation art. 90(1) (Ex. 1).

access,[93] in Articles 4(1)(a), 4(1)(c) and 4(2) of the SRB Decision on public access,[94] as well as in Article 90 of the SRM Regulation.

79.     The SRB's decisions on access to documents under Regulation 1049/2001 may be the subject of a complaint to the European Ombudsman or of an appeal to an Appeal Panel,[95] which is composed of five individuals of high repute from the Member States and with a proven record of relevant knowledge and professional experience, including resolution experience, to a sufficiently high level in the fields of banking or other financial services.[96] The appeal, together with a statement of grounds, shall be filed in writing at the Appeal Panel within six weeks of the date of notification of the decision to the person concerned[97] and the Appeal Panel shall decide upon the appeal within one month after the appeal has been lodged.[98]

80.     All decisions on access to documents are then fully reviewable before the EU General Court, and on appeal on points of law before the EU Court of Justice within two months of their notification.[99] Therefore, access to documents, including confidential documents, is under the ultimate authority of the EU General Court.

81.     In June, July, and August 2017, many shareholders of Popular requested access to all the documents relating to the resolution of Popular to the SRB.  The SRB denied access to these documents primarily on the basis of (a) the public interest as regards

---

[93] Decision of the European Central Bank of 4 March 2004 on public access to European Central Bank documents (ECB/2004/3) (OJ L 80, 18.3.2004, p. 42).  A true and correct copy of the ECB's decision on public access is attached hereto as **Exhibit 21**.

[94] SRB Decision of 9 February 2017 on public access to the Single Resolution Board documents.  A true and correct copy of the ECB's decision on public access is attached hereto as **Exhibit 22**.

[95] *See* SRM Regulation art. 90(3) (Ex. 1).

[96] *See* SRM Regulation art. 85(2) (Ex. 1).

[97] *See* SRM Regulation art. 85(3) (Ex. 1).

[98] *See* SRM Regulation art. 85(4) (Ex. 1).

[99] TFEU art. 263(6).

the financial stability, (b) a general presumption of non-accessibility because the documents form part of the confidential documentation of an SRB resolution procedure file, and (c) the protection of the commercial interests of Popular and Santander under Article 4 of Regulation 1049/2001.  Some of its decisions were subject of an appeal to the Appeal Panel.

82.     On November 28, 2017, the Appeal Panel of the SRB adopted several Decisions ordering the SRB to disclose some of these documents.[100]

83.     On February 1, 2018, the SRB published the non-confidential versions of the documents, in compliance with the Appeal Panel decisions, which are currently available in the SRB's webpage.[101] These documents are:

(i)     A considerably less redacted version of the SRB Decision.

(ii)    The Valuation 1 Report.

(iii)   The Valuation 2 Report.

(iv)    The 2016 Resolution Plan for Popular.

(v)     The Sale Process Letter.

(vi)    The SRB Marketing Decision and cover letter.

(vii)   Explanatory note from the SRB explaining that it had decided to disclose most information in the relevant documents.

84.     Some shareholders have challenged these decisions of the Appeal Panel of the SRB before the EU General Court.[102]  Santander has submitted an application for leave to intervene in some of these cases in support of the SRB.

---

[100] A true and accurate copy of the SRB's Appeal Panel Decisions issued in cases 40/17, 41/17 and 42/17 on access to documents are attached hereto as **Exhibit 23**.

[101] *See* https://srb.europa.eu/en/content/banco-popular.

[102] *See* cases T-16/18 and T-62/18.

85.     The Petitioners state that they also requested access to documents to the SRB, immediately after the resolution, and that they have appealed the denial of their request.[103] As of this date the EU General Court has not made public any action brought by the Petitioners against any SRB decision denying their request to access documents.  Because the decisions of the Appeal Panel are published previously redacted, I cannot ascertain whether their alleged appeal has been found well founded or not.

86.     As for the ECB, in June 2017, a non-confidential version of the FOLTF assessment was made public by the ECB on its webpage.  In the months that followed, many former Popular investors requested access to a full version of the FOLTF assessment and any other document relating to the resolution of Popular to the ECB.  The ECB denied access to these documents.

87.     Some shareholders have challenged these ECB decisions before the EU General Court.[104]  Santander has submitted applications for leave to intervene in these cases in support of the ECB.  I can locate no record indicating that the Petitioners have challenged any ECB decision on access to documents. As of the date of this submission, the EU General Court has not made public any appeal by the Petitioners challenging any ECB decision denying their request to access documents.

88.     Spanish law also provides a right of access to information produced by public authorities in the exercise of their duties, subject to exceptions.[105]  In accordance with these provisions, some shareholders of Popular have requested access to the FROB's file on the

---

[103] *See* Rubenstein Decl. ¶ 69–70, Ex. 1 ¶ 8.

[104] *See* cases T-827/18 and T-15/18.

[105] Article 105(b) of the Spanish Constitution; Law 19/2013, of 9 December 2013, on transparency, access to public information and good governance, BOE nº 295, 10.12.2013.

resolution of Popular, and have challenged FROB's decisions on their request on access to documents before the Council.

89.   The so-called Transparency and Good Governance Council, which may hear appeals of decisions denying access to documents, has already rendered decisions on access upholding claimants' requests, and has ordered the FROB to give access to the applicants to most of the documents requested.   I can locate no record indicating that the Petitioners have requested any document related to the resolution of Popular from the FROB.

**C.     Rules on Information Requests That Concern an EU Institution and Confidentiality**

90.   When it comes to measures of inquiry that can directly or indirectly concern an EU institution that will eventually be brought before the EU General Court, the judgment issued in the case *First and Franex* precludes all national courts of the EU Member States from enacting such orders.   Thus, a request of discovery to a Member State court ordering the production of documents of an EU authority for the purposes of providing such documents in the EU General Court would be illegal under EU law. Such a request must be made to the EU General Court and not to a national court.   The rationale is that the EU General Court has all the necessary powers to issue measures of inquiry with the aim of producing all the necessary means of evidence.[106]

91.   All documents relating to the resolution of Popular are subject to confidentiality.   Santander, as purchaser of Popular in a resolution proceeding, is subject to confidentiality according to EU law on resolution, EU Law on banking supervision, and the Sale Process Letter.

---

[106] Judgment of the EU Court of Justice of 26 November 2002, *First and Franex*, C-275/00, EU:C:2002:711, paragraphs 44 and 45.

92.    The SRM Regulation[107] establishes that SRB staff carrying out resolution duties and potential purchasers contacted to prepare for the resolution of an entity shall be subject to the requirements of professional secrecy pursuant to Article 339 TFEU and the relevant provisions in Union legislation even after their duties have ceased.   This requirement is effective regardless of whether that contact or solicitation was made as preparation for the use of the sale of business tool, and regardless of whether the solicitation resulted in an acquisition. Article 339 TFEU refers, in particular, to information about undertakings, their business relations or their cost components.

93.    Parties subject to these requirements are prohibited from disclosing confidential information received during the course of their professional activities or from a competent authority or resolution authority in connection with the resolution process to any person or authority, unless it is in the exercise of their functions under the SRM Regulation or in summary or collective form so that entities cannot be identified or with the express and prior consent of the authority or the entity which provided the information.

94.    Similar provisions apply to the supervisory tasks of the ECB. Confidential information which the ECB receives in the course of its tasks may be disclosed only in summary or aggregate form, such that individual credit institutions cannot be identified, without prejudice to cases covered by criminal law.  Only where a credit institution has been declared bankrupt or is being compulsorily wound up may confidential information that does not concern third parties involved in attempts to rescue that credit institution be disclosed in civil or commercial proceedings.[108]

---

[107] *See* SRM Regulation art. 88(1) (Ex. 1).

[108] *See* Article 53 of the Directive 2013/36/EU of the European Parliament and of the Council, of 26 June 2013 on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms, amending Directive 7/EC and repealing Directives 2006/48/EC and 2006/49/EC (OJ L 176, 27.6.2013, p. 338).

95.     According to the Cooperation Arrangement between the SRB and the FDIC, the sharing and disclosure of confidential information is also subject to strict requirements.[109]  Both agencies agreed, "[t]o the extent permitted by law," to "hold confidential all information (other than publicly available information) received from a Requested Authority pursuant to this CA and will not disclose such information other than as necessary."[110]

96.     Although EU law allows the disclosure for the purpose of certain legal proceedings, such disclosure, for the purpose of an action of annulment before the EU General Court, is only permitted if the EU General Court requests the information or it is obtained through an access to documents proceeding, which is ultimately under the authority of the EU General Court.  The EU General Court is the sole judge of any need to supplement the information available to it and the fact that the evidence before it is sufficient or not is a matter to be appraised by it alone.  Therefore, it is necessarily through the EU General Court or under its authority that a party must request and obtain evidence subject to these confidentiality restrictions.

**D.     The Use of Evidence in the EU Proceeding**

97.     The EU General Court can order the following measures of inquiry, with the purpose of producing evidence:

(i)     the personal appearance of the parties;

(ii)    a request to a party for information or for production of any material relating to the case;

(iii)   a request for production of documents to which access has been denied by an institution in proceedings relating to the legality of that denial;

---

[109] *See* Cooperation Arrangement ¶¶ 29–30 (Ex. 3).
[110] Cooperation Arrangement ¶ 28 (Ex. 3).

(iv)    oral testimony;

(v)     the commissioning of an expert's report;

(vi)    an inspection of the place or thing in question.[111]

98.     The EU General Court shall prescribe the measures of inquiry that it considers appropriate by means of an order setting out the facts to be proved.[112]

99.     According to EU settled case law, the EU General Court is the sole judge, in principle, of any need to supplement the information available to it in respect of the cases before it.[113] Whether or not the evidence before it is sufficient is a matter to be appraised by it alone and is not subject to review by the Court of Justice on appeal, except where that evidence has been distorted or the inaccuracy of the findings of the EU General Court is apparent from the documents in the case file.[114]

---

[111] RPGC art. 91.

[112] RPGC art. 92.

[113] *See* Judgments of 26 January 2017, *Maxcom/City Cycle Industries*, C-248/15 P, C-254/15 P and C-260/15 P, EU:C:2017:62, paragraph 106; of 9 June 2016, *PROAS/Commission*, C-616/13 P, EU:C:2016:415, paragraph 66; and of 14 March 2013, *Viega/Commission*, C-276/11 P, EU:C:2013:163, paragraph 39 and the case-law cited.

[114] *See* Judgments of 26 January 2017, *Maxcom/City Cycle Industries*, C-248/15 P, C-254/15 P and C-260/15 P, EU:C:2017:62, paragraph 106; of 28 January 2016, *Heli-Flight/AESA*, C-61/15 P, EU:C:2016:59, paragraph 94; of 16 July 2009, *Der Grüne Punkt - Duales System Deutschland/Commission*, C-385/07 P, EU:C:2009:456, paragraph 163; and of 11 June 2015, *EMA/Commission*, C-100/14 P, EU:C:2015:382, paragraph 80.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Madrid, Spain, on April 12, 2018.

_____

Juan Manuel Rodríguez Cárcamo

**LIST OF DOCUMENTS ANNEXED TO THIS DECLARATION**

**Exhibit 1**      Single Resolution Mechanism Regulation.

**Exhibit 2**      Single Supervisory Mechanism Regulation.

**Exhibit 3**      Cooperation Arrangement by the FDIC and the SRB concerning the resolution of insured depository institutions and certain other financial companies with cross-border operations in the United States and the European Banking Union.

**Exhibit 4**      Relevant Fact Notification submitted to the Spanish National Securities Market Commission announcing Mr. Del Valle's election as a director of Popular.

**Exhibit 5**      Relevant Fact Notification submitted to the Spanish National Securities Market Commission announcing Mr. Del Valle's resignation and Mr. Ruiz's election as a director as a director of Popular.

**Exhibit 6**      Pages from BPE 2014 Annual Report

**Exhibit 7**      Pages from BPE 2015 Annual Report

**Exhibit 8**      Pages from BPE 2016 Annual Report

**Exhibit 9**      Relevant Fact Notification submitted to the Spanish National Securities Market Commission announcing the resignation of Popular's Board of Directors.

**Exhibit 10**     SRB Decision.

**Exhibit 11**     SRB Marketing Decision.

**Exhibit 12**     Valuation 1 Report made by the SRB.

**Exhibit 13**    FOLTF Assessment.

**Exhibit 14**    Valuation 2 Report made by an independent person.

**Exhibit 15**    Sale Process Letter.

**Exhibit 16**    SRB's Notice summarising the effects of the Resolution of Popular.

**Exhibit 17**    FROB Implementing Decision.

**Exhibit 18**    Acknowledgement of receipt by the EU General Court of the application for leave to intervene submitted by Santander in the EU Proceeding.

**Exhibit 19**    The EU General Court's certificate declaring that the application for leave to intervene submitted by Santander in the EU Proceeding is still pending.

**Exhibit 20**    Regulation 1049/2001 regarding public access to documents.

**Exhibit 21**    ECB Decision on public access.

**Exhibit 22**    SRB Decision on public access.

**Exhibit 23**    SRB's Appeal Panel Decisions issued in cases 40/17, 41/17 and 42/17 on access to documents.

**CERTIFICATE OF SERVICE**

I hereby CERTIFY that the foregoing document was electronically filed with the Clerk of the Court using the Court's CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

This 12th day of April, 2018.

/s/ Joseph J. Saltarelli
Joseph J. Saltarelli

## **CERTIFICATE OF SERVICE**

I hereby CERTIFY that the foregoing document was electronically filed with the Clerk of the Court using the Court's CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

This 12th day of April, 2018.

/s/ Joseph J. Saltarelli
Joseph J. Saltarelli
