# EXHIBIT 2

29.10.2013 ⬚EN⬚ Official Journal of the European Union L 287/63

## COUNCIL REGULATION (EU) No 1024/2013

### of 15 October 2013

**conferring specific tasks on the European Central Bank concerning policies relating to the prudential supervision of credit institutions**

THE COUNCIL OF THE EUROPEAN UNION,

Having regard to the Treaty on the Functioning of the European Union, and in particular Article 127(6) thereof,

Having regard to the proposal from the European Commission,

After transmission of the draft legislative act to the national parliaments,

Having regard to the opinion of the European Parliament,

Having regard to the opinion of the European Central Bank,

Acting in accordance with a special legislative procedure,

Whereas:

(1) Over the past decades, the Union has made considerable progress in creating an internal market for banking services. Consequently, in many Member States, banking groups with their headquarters established in other Member States hold a significant market share, and credit institutions have geographically diversified their business, within both the euro area and non-euro area.

(2) The present financial and economic crisis has shown that the integrity of the single currency and the internal market may be threatened by the fragmentation of the financial sector. It is therefore essential to intensify the integration of banking supervision in order to bolster the Union, restore financial stability and lay the basis for economic recovery.

(3) Maintaining and deepening the internal market for banking services is essential in order to foster economic growth in the Union and adequate funding of the real economy. However this proves increasingly challenging. Evidence shows that the integration of banking markets in the Union is coming to a halt.

(4) At the same time, in addition to the adoption of an enhanced Union regulatory framework, supervisors must step up their supervisory scrutiny to take account of the lessons of the financial crisis in recent years, and be able to oversee highly complex and inter-connected markets and institutions.

(5) Competence for supervision of individual credit institutions in the Union remains mostly at national level. Coordination between supervisors is vital but the crisis has shown that mere coordination is not enough, in particular in the context of a single currency. In order to preserve financial stability in the Union and increase the positive effects of market integration on growth and welfare, integration of supervisory responsibilities should therefore be enhanced. This is particularly important to ensure a smooth and sound overview over an entire banking group and its overall health and would reduce the risk of different interpretations and contradictory decisions on the individual entity level.

(6) The stability of credit institutions is in many instances still closely linked to the Member State in which they are established. Doubts about the sustainability of public debt, economic growth prospects, and the viability of credit institutions have been creating negative, mutually reinforcing market trends. This may lead to risks to the viability of some credit institutions and to the stability of the financial system in the euro area and the Union as a whole, and may impose a heavy burden for already strained public finances of the Member States concerned.

(7) The European Supervisory Authority (European Banking Authority) (EBA), established in 2011 by Regulation (EU) No 1093/2010 of the European Parliament and of the Council of 24 November 2010 establishing a European Supervisory Authority (European Banking Authority), (¹), and the European System of Financial Supervision (ESFS) established by Article 2 of that Regulation, and Article 2 of Regulation (EU) No 1094/2010 of the European Parliament and of the Council of 24 November 2010 establishing a European Supervisory Authority (European Insurance and Occupational Pensions Authority) (²) (EIOPA) and Article 2 of Regulation (EU) No 1095/2010 of the European Parliament and of the Council of 24 November 2010 establishing a European Supervisory Authority (European Securities and Markets Authority) (³) (ESMA) have significantly improved cooperation between banking supervisors within the Union. EBA is making important contributions to the creation of a single rulebook for financial services in the Union, and has been crucial in implementing in a consistent way the recapitalisation agreed by the euro Summit of 26 October 2011 of major Union credit institutions, consistent with the guidelines and conditions relating to State aid adopted by the Commission.

(¹) OJ L 331, 15.12.2010, p. 12.
(²) OJ L 331, 15.12.2010, p. 48.
(³) OJ L 331, 15.12.2010, p. 84.

(8)    The European Parliament has called on various occasions for a European body to be directly responsible for certain supervisory tasks over financial institutions, starting with its resolutions of 13 April 2000 on the Commission communication on implementing the framework for financial markets: Action Plan (¹) and of 21 November 2002 on prudential supervision rules in the European Union (²).

(9)    The European Council conclusions of 29 June 2012 invited the President of the European Council to develop a road map for the achievement of a genuine economic and monetary union. On the same day, the euro Summit pointed out that when an effective single supervisory mechanism is established involving the European Central Bank (ECB) for banks in the euro area, the European Stability Mechanism (ESM) could, following a regular decision, have the possibility to recapitalise banks directly which would rely on appropriate conditionality, including compliance with State aid rules.

(10)   The European Council on 19 October 2012 concluded that the process towards deeper economic and monetary union should build on the Union institutional and legal framework and be characterised by openness and transparency towards Member States whose currency is not the euro and by respect for the integrity of the internal market. The integrated financial framework will have a single supervisory mechanism which will be open to the extent possible to all Member States wishing to participate.

(11)   A banking union should therefore be set up in the Union, underpinned by a comprehensive and detailed single rulebook for financial services for the internal market as a whole and composed of a single supervisory mechanism and new frameworks for deposit insurance and resolution. In view of the close links and interactions between Member States whose currency is the euro, the banking union should apply at least to all euro area Member States. With a view to maintaining and deepening the internal market, and to the extent that this is institutionally possible, the banking union should also be open to the participation of other Member States.

(12)   As a first step towards a banking union, a single supervisory mechanism should ensure that the Union's policy relating to the prudential supervision of credit institutions is implemented in a coherent and effective manner, that the single rulebook for financial services is applied in the same manner to credit institutions in all Member States concerned, and that those credit institutions are subject to supervision of the highest quality, unfettered by other, non-prudential considerations. In particular, the Single Supervisory Mechanism (SSM) should be consistent with the functioning of the internal market for financial services and with the free movement of capital. A single supervisory mechanism is the basis for the next steps towards the banking union. This reflects the principle that the ESM will, following a regular decision, have the possibility to recapitalise banks directly when an effective single supervisory mechanism is established. The European Council noted in its conclusions of 13/14 December 2012 that 'In a context where banking supervision is effectively moved to a single supervisory mechanism, a single resolution mechanism will be required, with the necessary powers to ensure that any bank in participating Member States can be resolved with the appropriate tools' and that 'the single resolution mechanism should be based on contributions by the financial sector itself and include appropriate and effective backstop arrangements'.

(13)   As the euro area's central bank with extensive expertise in macroeconomic and financial stability issues, the ECB is well placed to carry out clearly defined supervisory tasks with a focus on protecting the stability of the financial system of the Union. Indeed many Member States' central banks are already responsible for banking supervision. Specific tasks should therefore be conferred on the ECB concerning policies relating to the supervision of credit institutions within the participating Member States.

(14)   The ECB and the competent authorities of Member States that are not participating Member States ('non-participating Member States') should conclude a memorandum of understanding describing in general terms how they will cooperate with one another in the performance of their supervisory tasks under Union law in relation to the financial institutions referred to in this Regulation. The memorandum of understanding could, inter alia, clarify the consultation relating to decisions of the ECB having effect on subsidiaries or branches established in the non-participating Member State whose parent undertaking is established in a participating Member State, and the cooperation in emergency situations, including early warning mechanisms in accordance with the procedures set out in relevant Union law. The memorandum should be reviewed on a regular basis.

(15)   Specific supervisory tasks which are crucial to ensure a coherent and effective implementation of the Union's policy relating to the prudential supervision of credit institutions should be conferred on the ECB, while other tasks should remain with national authorities. The ECB's tasks should include measures taken in pursuance of macroprudential stability, subject to specific arrangements reflecting the role of national authorities.

(16)   The safety and soundness of large credit institutions is essential to ensure the stability of the financial system. However, recent experience shows that smaller credit institutions can also pose a threat to financial stability. Therefore, the ECB should be able to exercise supervisory tasks in relation to all credit institutions authorised in, and branches established in, participating Member States.

---

(¹) OJ C 40, 7.2.2001, p. 453.
(²) OJ C 25 E, 29.1.2004, p. 394.

(17) When carrying out the tasks conferred on it, and without prejudice to the objective to ensure the safety and soundness of credit institutions, the ECB should have full regard to the diversity of credit institutions and their size and business models, as well as the systemic benefits of diversity in the banking industry of the Union.

(18) The exercise of the ECB's tasks should contribute in particular to ensure that credit institutions fully internalise all costs caused by their activities so as to avoid moral hazard and the excessive risk taking arising from it. It should take full account of the relevant macro-economic conditions in Member States, in particular the stability of the supply of credit and facilitation of productive activities for the economy at large.

(19) Nothing in this Regulation should be understood as changing the accounting framework applicable pursuant to other acts of Union and national law.

(20) Prior authorisation for taking up the business of credit institutions is a key prudential technique to ensure that only operators with a sound economic basis, an organisation capable of dealing with the specific risks inherent to deposit taking and credit provision, and suitable directors carry out those activities. The ECB should therefore have the task of authorising credit institutions that are to be established in a participating Member State and should be responsible for the withdrawal of authorisations, subject to specific arrangements reflecting the role of national authorities.

(21) In addition to the conditions set out in Union law for the authorisation of credit institutions and the cases for withdrawal of such authorisations, Member States may currently provide for further conditions for authorisation and cases for withdrawal of authorisation. The ECB should therefore carry out its task with regard to authorisation of credit institutions and withdrawal of the authorisation in case of non-compliance with national law on a proposal by the relevant national competent authority, which assesses compliance with the relevant conditions laid down in national law.

(22) An assessment of the suitability of any new owner prior to the purchase of a significant stake in a credit institution is an indispensable tool for ensuring the continuous suitability and financial soundness of credit institutions' owners. The ECB as a Union institution is well placed to carry out such an assessment without imposing undue restrictions on the internal market. The ECB should have the task of assessing the acquisition and disposal of significant holdings in credit institutions, except in the context of bank resolution.

(23) Compliance with Union rules requiring credit institutions to hold certain levels of capital against risks inherent to the business of credit institutions, to limit the size of exposures to individual counterparties, to publicly disclose information on credit institutions' financial situation, to dispose of sufficient liquid assets to withstand situations of market stress, and to limit leverage is a prerequisite for credit institutions' prudential soundness. The ECB should have the task of ensuring compliance with those rules, including in particular by granting approvals, permissions, derogations, or exemptions foreseen for the purposes of those rules.

(24) Additional capital buffers, including a capital conservation buffer, a countercyclical capital buffer to ensure that credit institutions accumulate, during periods of economic growth, a sufficient capital base to absorb losses in stressed periods, global and other systemic institution buffers, and other measures aimed at addressing systemic or macroprudential risk, are key prudential tools. In order to ensure full coordination, where national competent authorities or national designated authorities impose such measures, the ECB should be duly notified. Moreover, where necessary the ECB should be able to apply higher requirements and more stringent measures, subject to close coordination with national authorities. The provisions in this Regulation on measures aimed at addressing systemic or macroprudential risk are without prejudice to any coordination procedures provided for in other acts of Union law. National competent authorities or national designated authorities and the ECB shall act in respect of any coordination procedure provided for in such acts after having followed the procedures provided for in this Regulation.

(25) The safety and soundness of a credit institution depend also on the allocation of adequate internal capital, having regard to the risks to which it may be exposed, and on the availability of appropriate internal organisation structures and corporate governance arrangements. The ECB should therefore have the task of applying requirements ensuring that credit institutions in the participating Member States have in place robust governance arrangements, processes and mechanisms, including strategies and processes for assessing and maintaining the adequacy of their internal capital. In case of deficiencies it should also have the task of imposing appropriate measures including specific additional own funds requirements, specific disclosure requirements, and specific liquidity requirements.

(26) Risks for the safety and soundness of a credit institution can arise both at the level of an individual credit institution and at the level of a banking group or of a financial conglomerate. Specific supervisory arrangements to mitigate those risks are important to ensure the safety and soundness of credit institutions. In addition to supervision of individual credit institutions, the ECB's tasks should include supervision at the consolidated level, supplementary supervision, supervision of financial holding companies and supervision of mixed financial holding companies, excluding the supervision of insurance undertakings.

(27) In order to preserve financial stability, the deterioration of an institution's financial and economic situation must be remedied at an early stage. The ECB should have the task of carrying out early intervention actions as laid down in relevant Union law. It should however coordinate its early intervention action with the relevant resolution authorities. As long as national authorities remain competent to resolve credit institutions, the ECB should, moreover, coordinate appropriately with the national authorities concerned to ensure a common understanding about respective responsibilities in case of crises, in particular in the context of the cross-border crisis management groups and the future resolution colleges established for those purposes.

(28) Supervisory tasks not conferred on the ECB should remain with the national authorities. Those tasks should include the power to receive notifications from credit institutions in relation to the right of establishment and the free provision of services, to supervise bodies which are not covered by the definition of credit institutions under Union law but which are supervised as credit institutions under national law, to supervise credit institutions from third countries establishing a branch or providing cross-border services in the Union, to supervise payments services, to carry out day-to-day verifications of credit institutions, to carry out the function of competent authorities over credit institutions in relation to markets in financial instruments, the prevention of the use of the financial system for the purpose of money laundering and terrorist financing and consumer protection.

(29) The ECB should cooperate, as appropriate, fully with the national authorities which are competent to ensure a high level of consumer protection and the fight against money laundering.

(30) The ECB should carry out the tasks conferred on it with a view to ensuring the safety and soundness of credit institutions and the stability of the financial system of the Union as well as of individual participating Member States and the unity and integrity of the internal market, thereby ensuring also the protection of depositors and improving the functioning of the internal market, in accordance with the single rulebook for financial services in the Union. In particular the ECB should duly take into account the principles of equality and non-discrimination.

(31) The conferral of supervisory tasks on the ECB should be consistent with the framework of the ESFS and its underlying objective to develop the single rulebook and enhance convergence of supervisory practices across the whole Union. Cooperation between the banking supervisors and the supervisors of insurance and securities markets is important to deal with issues of joint interest and to ensure proper supervision of credit institutions operating also in the insurance and securities sectors. The ECB should therefore be required to cooperate closely with EBA, ESMA and EIOPA, the European Systemic Risk Board (ESRB), and the other authorities which form part of the ESFS. The ECB should carry out its tasks in accordance with the provisions of this Regulation and without prejudice to the competence and the tasks of the other participants within the ESFS. It should also be required to cooperate with relevant resolution authorities and facilities financing direct or indirect public financial assistance.

(32) The ECB should carry out its tasks subject to and in compliance with relevant Union law including the whole of primary and secondary Union law, Commission decisions in the area of State aid, competition rules and merger control and the single rulebook applying to all Member States. EBA is entrusted with developing draft technical standards and guidelines and recommendations ensuring supervisory convergence and consistency of supervisory outcomes within the Union. The ECB should not replace the exercise of those tasks by EBA, and should therefore exercise powers to adopt regulations in accordance with Article 132 of the Treaty on the Functioning of the European Union (TFEU) and in compliance with Union acts adopted by the Commission on the basis of drafts developed by EBA and subject to Article 16 of Regulation (EU) No 1093/2010.

(33) Where necessary the ECB should enter into memoranda of understanding with competent authorities responsible for markets in financial instruments describing in general terms how they will cooperate with one another in the performance of their supervisory tasks under Union law in relation to financial institutions referred to in this Regulation. Such memoranda should be made available to the European Parliament, to the Council and to the competent authorities of all Member States.

(34) For the carrying out of its tasks and the exercise of its supervisory powers, the ECB should apply the material rules relating to the prudential supervision of credit institutions. Those rules are composed of the relevant Union law, in particular directly applicable Regulations or Directives, such as those on capital requirements for credit institutions and on financial conglomerates. Where the material rules relating to the prudential supervision of credit institutions are laid down in Directives, the ECB should apply the national legislation transposing those Directives. Where the relevant Union law is composed of Regulations and in areas where, on the date of entry into force of this Regulation, those Regulations explicitly grant options for Member States, the ECB should also apply the national legislation exercising such options. Such options should be construed as excluding options available only to competent or designated authorities. This is without prejudice to the principle of the primacy of Union law. It follows that the ECB should, when adopting guidelines or recommendations or when taking decisions, base itself on, and act in accordance with, the relevant binding Union law.

(35) Within the scope of the tasks conferred on the ECB, national law confers on national competent authorities certain powers which are currently not required by Union law, including certain early intervention and precautionary powers. The ECB should be able to require national authorities in the participating Member States to make use of those powers in order to ensure the performance of full and effective supervision within the SSM.

(36) In order to ensure that supervisory rules and decisions are applied by credit institutions, financial holding companies and mixed financial holding companies, effective, proportionate and dissuasive penalties should be imposed in case of a breach. In accordance with Article 132(3) TFEU and Council Regulation (EC) No 2532/98 of 23 November 1998 concerning the powers of the European Central Bank to impose sanctions ([1]), the ECB is entitled to impose fines or periodic penalty payments on undertakings for failure to comply with obligations under its regulations and decisions. Moreover, in order to enable the ECB to effectively carry out its tasks relating to the enforcement of supervisory rules set out in directly applicable Union law, the ECB should be empowered to impose pecuniary penalties on credit institutions, financial holding companies and mixed financial holding companies for breaches of such rules. National authorities should remain able to apply penalties in case of failure to comply with obligations stemming from national law transposing Union Directives. Where the ECB considers it appropriate for the fulfilment of its tasks that a penalty is applied for such breaches, it should be able to refer the matter to national competent authorities for those purposes.

(37) National supervisors have important and long-established expertise in the supervision of credit institutions within their territory and their economic, organisational and cultural specificities. They have established a large body of dedicated and highly qualified staff for those purposes. Therefore, in order to ensure high-quality, Union-wide supervision, national competent authorities should be responsible for assisting the ECB in the preparation and implementation of any acts relating to the exercise of the ECB supervisory tasks. This should include, in particular, the ongoing day-to-day assessment of a credit institution's situation and related on-site verifications.

(38) The criteria laid down in this Regulation defining the scope of institutions that are less significant should be applied at the highest level of consolidation within participating Member States based on consolidated data. Where the ECB carries out the tasks conferred on it by this Regulation with regard to a group of credit institutions that is not less significant on a consolidated basis, it should carry out those tasks on a consolidated basis with regard to the group of credit institutions and on an individual basis with regard to the banking subsidiaries and branches of that group established in participating Member States.

(39) The criteria laid down in this Regulation defining the scope of institutions that are less significant should be specified in a framework adopted and published by the ECB in consultation with national competent authorities. On that basis, the ECB should be responsible to apply those criteria and verify, through its own calculations, whether those criteria are met. The ECB's request for information to perform its calculation should not force the institutions to apply accounting frameworks differing from those applicable to them pursuant to other acts of Union and national law.

(40) Where a credit institution has been considered significant or less significant, that assessment should generally not be modified more often than once every 12 months, except if there are structural changes in the banking groups, such as mergers or divestitures.

(41) When deciding, following a notification by a national competent authority, whether an institution is of significant relevance with regard to the domestic economy and should therefore be supervised by the ECB, the ECB should take into account all relevant circumstances, including level-playing field considerations.

(42) As regards the supervision of cross-border credit institutions active both inside and outside the euro area the ECB should cooperate closely with the competent authorities of non-participating Member States. As a competent authority the ECB should be subject to the related obligations to cooperate and exchange information under Union law and should participate fully in the colleges of supervisors. In addition, since the exercise of supervisory tasks by a Union institution brings about clear benefits in terms of financial stability and sustainable market integration, Member States whose currency is not the euro should therefore also have the possibility to participate in the SSM. However, it is a necessary pre-condition for an effective exercise of supervisory tasks, that supervisory decisions are implemented fully and without delay. Member States wishing to participate in the SSM should therefore undertake to ensure that their national competent authorities will abide by and adopt any measure in relation to credit institutions requested by the ECB. The ECB should be able to establish a close cooperation with the competent authorities of a Member State whose currency is not the euro. It should be obliged to establish the cooperation where the conditions set out in this Regulation are met.

(43) Taking into account that participating Member States whose currency is not the euro are not present in the Governing Council for as long as they have not adopted the euro in accordance with the TFEU, and they cannot

---

([1]) OJ L 318, 27.11.1998, p. 4.

fully benefit from other mechanisms provided for Member States whose currency is the euro, additional safeguards in the decision-making process are provided for in this Regulation. However, those safeguards, in particular the possibility of the participating Member States whose currency is not the euro to request the immediate termination of the close cooperation after informing the Governing Council of its reasoned disagreement with a draft decision of the Supervisory Board, should be used in duly justified, exceptional cases. They should only be used as long as those specific circumstances apply. The safeguards are due to the specific circumstances in which participating Member States whose currency is not the euro are under this Regulation, since they are not present in the Governing Council and cannot fully benefit from other mechanisms provided for Member States whose currency is the euro. Therefore, the safeguards cannot and should not be construed as a precedent for other areas of Union policy.

(44) Nothing in this Regulation should alter in any way the current framework regulating the change of legal form of subsidiaries or branches and the application of such framework, or be understood or applied as providing incentives in favour of such change. In this respect, the responsibility of competent authorities of non-participating Member States should be fully respected, so that those authorities continue to enjoy sufficient supervisory tools and powers over credit institutions operating in their territory in order to have the capacity to fulfil this responsibility and effectively safeguard financial stability and public interest. Moreover, in order to assist those competent authorities in fulfilling their responsibilities, timely information on a change of legal form of subsidiaries or branches should be provided to depositors and to the competent authorities.

(45) In order to carry out its tasks, the ECB should have appropriate supervisory powers. Union law on the prudential supervision of credit institutions provides for certain powers to be conferred on competent authorities designated by the Member States for those purposes. To the extent that those powers fall within the scope of the supervisory tasks conferred on the ECB, for participating Member States the ECB should be considered the competent authority and should have the powers conferred on competent authorities by Union law. This includes powers conferred by those acts on the competent authorities of the home and the host Member States and the powers conferred on designated authorities.

(46) The ECB should have the supervisory power to remove a member of a management body in accordance with this Regulation.

(47) In order to carry out its tasks effectively, the ECB should be able to require all necessary information, and to conduct investigations and on-site inspections, where appropriate in cooperation with national competent

authorities. The ECB and the national competent authorities should have access to the same information without credit institutions being subject to double reporting requirements.

(48) Legal profession privilege is a fundamental principle of Union law, protecting the confidentiality of communications between natural or legal persons and their advisors, in accordance with the conditions laid down in the case-law of the Court of Justice of the European Union (CJEU).

(49) When the ECB needs to require information from a person established in a non-participating Member State but belonging to a credit institution, financial holding company or mixed financial holding company established in a participating Member State, or to which such credit institution, financial holding company or mixed financial holding company has outsourced operational functions or activities, and when such requirements will not apply and will not be enforceable in the non-participating Member State, the ECB should coordinate with the competent authority in the non-participating Member State concerned.

(50) This Regulation does not affect the application of the rules established by Articles 34 and 42 of Protocol No 4 on the statute of the European System of Central Banks and of the European Central Bank, attached to the Treaty on European Union (TEU) and to the TFEU ('Statute of the ESCB and of the ECB'). The acts adopted by the ECB under this Regulation should not create any rights or impose any obligations in non-participating Member States, except where such acts are in accordance with relevant Union law, in accordance with that Protocol and with Protocol No 15 on certain provisions related to the United Kingdom of Great Britain and Northern Ireland, attached to the TEU and to the TFEU.

(51) Where credit institutions exercise their right of establishment or to provide services in another Member State, or where several entities in a group are established in different Member States, Union law provides for specific procedures and for attribution of competences between the Member States concerned. To the extent that the ECB takes over certain supervisory tasks for all participating Member States, those procedures and attributions should not apply to the exercise of the right of establishment or to provide services in another participating Member State.

(52) When carrying out its tasks under this Regulation and when requesting assistance from national competent authorities, the ECB should have due regard to a fair balance between the involvement of all national competent authorities involved, in line with the responsibilities set out in applicable Union law for solo supervision and for supervision on a sub-consolidated basis and on a consolidated basis.

(53) Nothing in this Regulation should be understood as conferring on the ECB the power to impose penalties on natural or legal persons other than credit institutions, financial holding companies or mixed financial holding companies, without prejudice to the ECB's power to require national competent authorities to act in order to ensure that appropriate penalties are imposed.

(54) As established by the Treaties, the ECB is an institution of the Union as a whole. It should be bound in its decision-making procedures by Union rules and general principles on due process and transparency. The right of the addressees of the ECB's decisions to be heard should be fully respected as well as their right to request a review of the decisions of the ECB according to the rules set out in this Regulation.

(55) The conferral of supervisory tasks implies a significant responsibility for the ECB to safeguard financial stability in the Union, and to use its supervisory powers in the most effective and proportionate way. Any shift of supervisory powers from the Member State to the Union level should be balanced by appropriate transparency and accountability requirements. The ECB should therefore be accountable for the exercise of those tasks towards the European Parliament and the Council as democratically legitimised institutions representing the citizens of the Union and the Member States. That should include regular reporting, and responding to questions by the European Parliament in accordance with its Rules of Procedure, and by the euro Group in accordance with its procedures. Any reporting obligations should be subject to the relevant professional secrecy requirements.

(56) The ECB should also forward the reports, which it addresses to the European Parliament and to the Council, to the national parliaments of the participating Member States. National parliaments of the participating Member States should be able to address any observations or questions to the ECB on the performance of its supervisory tasks, to which the ECB may reply. The internal rules of those national parliaments should take into account details of the relevant procedures and arrangements for addressing the observations and questions to the ECB. In this context particular attention should be attached to observations or questions related to the withdrawal of authorisations of credit institutions in respect of which actions necessary for resolution or to maintain financial stability have been taken by national authorities in accordance with the procedure set out in this Regulation. The national parliament of a participating Member State should also be able to invite the Chair or a representative of the Supervisory Board to participate in an exchange of views in relation to the supervision of credit institutions in that Member State together with a representative of the national competent authority. This role for national parliaments is appropriate given the potential impact that supervisory measures may have on public finances, credit

institutions, their customers and employees, and the markets in the participating Member States. Where national competent authorities take action under this Regulation, accountability arrangements provided for under national law should continue to apply.

(57) This Regulation is without prejudice to the right of the European Parliament to set up a temporary Committee of Inquiry to investigate alleged contraventions or maladministration in the implementation of Union law pursuant to Article 226 TFEU or to the exercise of its functions of political control as laid down in the Treaties, including the right for the European Parliament to take a position or adopt a resolution on matters which it considers appropriate.

(58) In its action, the ECB should comply with the principles of due process and transparency.

(59) The regulation referred to in Article 15(3) TFEU should determine detailed rules enabling access to documents held by the ECB resulting from the carrying out of supervisory tasks, in accordance with the TFEU.

(60) Pursuant to Article 263 TFEU, the CJEU is to review the legality of acts of, inter alia, the ECB, other than recommendations and opinions, intended to produce legal effects vis-à-vis third parties.

(61) In accordance with Article 340 TFEU, the ECB should, in accordance with the general principles common to the laws of the Member States, make good any damage caused by it or by its servants in the performance of their duties. This should be without prejudice to the liability of national competent authorities to make good any damage caused by them or by their servants in the performance of their duties in accordance with national legislation.

(62) Council Regulation No 1 determining the languages to be used by the European Economic Community ([1]) applies to the ECB by virtue of Article 342 TFEU.

(63) When determining whether the right of access to the file by persons concerned should be limited, the ECB should respect the fundamental rights and observe the principles recognised in the Charter of Fundamental Rights of the European Union, in particular the right to an effective remedy and to a fair trial.

([1]) OJ 17, 6.10.1958, p. 385.

(64) The ECB should provide natural and legal persons with the possibility to request a review of decisions taken under the powers conferred on it by this Regulation and addressed to them, or which are of direct and individual concern to them. The scope of the review should pertain to the procedural and substantive conformity with this regulation of such decisions while respecting the margin of discretion left to the ECB to decide on the opportunity to take tho*se decisions*. For that purpose, and for reasons of procedural economy, the ECB should establish an administrative board of review to carry out such internal review. To compose the board, the Governing Council of the ECB should appoint individuals of a high repute. In making its decision, the Governing Council should, to the extent possible, ensure an appropriate geographical and gender balance across the Member States. The procedure laid down for the review should provide for the Supervisory Board to reconsider its former draft decision as appropriate.

(65) The ECB is responsible for carrying out monetary policy functions with a view to maintaining price stability in accordance with Article 127(1) TFEU. The exercise of supervisory tasks has the objective to protect the safety and soundness of credit institutions and the stability of the financial system. They should therefore be carried out in full separation, in order to avoid conflicts of interests and to ensure that each function is exercised in accordance with the applicable objectives. The ECB should be able to ensure that the Governing Council operates in a completely differentiated manner as regards monetary and supervisory functions. Such differentiation should at least include strictly separated meetings and agendas.

(66) Organisational separation of staff should concern all services needed for independent monetary policy purposes and should ensure that the exercise of the tasks conferred by this Regulation is fully subject to democratic accountability and oversight as provided for by this Regulation. The staff involved in carrying out the tasks conferred on the ECB by this Regulation should report to the Chair of the Supervisory Board.

(67) In particular, a Supervisory Board responsible for preparing decisions on supervisory matters should be set up within the ECB encompassing the specific expertise of national supervisors. The board should therefore be chaired by a Chair, have a Vice Chair and include representatives from the ECB and from national competent authorities. The appointments for the Supervisory Board in accordance with this Regulation should respect the principles of gender balance, experience and qualification. All members of the Supervisory Board should be timely and fully informed on the items on the agenda of its meetings, so as to facilitate the effectiveness of the discussion and the draft decision making process.

(68) When exercising its tasks, the Supervisory Board should take account of all relevant facts and circumstances in the participating Member States and should perform its duties in the interest of the Union as a whole.

(69) With full respect to the institutional and voting arrangements set by the Treaties, the Supervisory Board should be an essential body in the exercise of supervisory tasks by the ECB, tasks which until now have always been in the hands of national competent authorities. For this reason, the Council should be given the power to adopt an implementing decision to appoint the Chair and the Vice-Chair of the Supervisory Board. After hearing the Supervisory Board, the ECB should submit a proposal for the appointment of the Chair and the Vice-Chair to the European Parliament for approval. Following the approval of this proposal, the Council should adopt that implementing decision. The Chair should be chosen on the basis of an open selection procedure, on which the European Parliament and the Council should be kept duly informed.

(70) In order to allow for an appropriate rotation while ensuring the full independence of the Chair, the Chair's term of office should not exceed five years and should not be renewable. In order to ensure full coordination with the activities of EBA and with the prudential policies of the Union, the Supervisory Board should be able to invite EBA and the Commission as observers. The Chair of the European Resolution Authority, once established, should participate as observer in the meetings of the Supervisory Board.

(71) The Supervisory Board should be supported by a steering committee with a more limited composition. The steering committee should prepare the meetings of the Supervisory Board, perform its duties solely in the interest of the Union as a whole, and work in full transparency with the Supervisory Board.

(72) The Governing Council of the ECB should invite the representatives from participating Member States whose currency is not the euro whenever it is contemplated by the Governing Council to object to a draft decision prepared by the Supervisory Board or whenever the concerned national competent authorities inform the Governing Council of their reasoned disagreement with a draft decision of the Supervisory Board, when such decision is addressed to the national authorities in respect of credit institutions from participating Member States whose currency is not the euro.

(73) With a view to ensuring separation between monetary policy and supervisory tasks, the ECB should be required to create a mediation panel. The setting up of the panel, and in particular its composition, should ensure that it resolves differences of views in a balanced way, in the interest of the Union as a whole.

(74) The Supervisory Board, the steering committee and staff of the ECB carrying out supervisory duties should be subject to appropriate professional secrecy requirements. Similar requirements should apply to the exchange of information with the staff of the ECB not involved in supervisory activities. This should not prevent the ECB from exchanging information within the limits and under the conditions set out in the relevant Union legislation, including with the Commission for the purposes of its tasks under Articles 107 and 108 TFEU and under Union law on enhanced economic and budgetary surveillance.

(75) In order to carry out its supervisory tasks effectively, the ECB should exercise the supervisory tasks conferred on it in full independence, in particular free from undue political influence and from industry interference which would affect its operational independence.

(76) The use of cooling-off periods in supervisory authorities forms an important part of ensuring the effectiveness and independence of the supervision conducted by those authorities. To this end, and without prejudice to the application of stricter national rules, the ECB should establish and maintain comprehensive and formal procedures, including proportionate review periods, to assess in advance and prevent possible conflicts with the legitimate interest of the SSM/ECB where a former member of the Supervisory Board begins work within the banking industry he or she once supervised.

(77) In order to carry out its supervisory tasks effectively, the ECB should dispose of adequate resources. Those resources should be obtained in a way that ensures the ECB's independence from undue influences by national competent authorities and market participants, and separation between monetary policy and supervisory tasks. The costs of supervision should be borne by the entities subject to it. Therefore, the exercise of supervisory tasks by the ECB should be financed by annual fees charged to credit institutions established in the participating Member States. It should also be able to levy fees on branches established in a participating Member State by a credit institution established in a non-participating Member State to cover the expenditure incurred by the ECB when carrying out its tasks as a host supervisor over these branches. In the case a credit institution or a branch is supervised on a consolidated basis, the fee should be levied on the highest level of a credit institution within the involved group with establishment in participating Member States. The calculation of the fees should exclude any subsidiaries established in non-participating Member States.

(78) Where a credit institution is included in supervision on a consolidated basis, the fee should be calculated at the highest level of consolidation within participating Member States and allocated to the credit institutions established in a participating Member State and included in the supervision on a consolidated basis, based on objective criteria relating to the importance and risk profile, including the risk weighted assets.

(79) Highly motivated, well-trained and impartial staff is indispensable to effective supervision. In order to create a truly integrated supervisory mechanism, appropriate exchange and secondment of staff with and among all national competent authorities and the ECB should be provided for. To ensure a peer control on an on-going basis, particularly in the supervision of large credit institutions, the ECB should be able to request that national supervisory teams involve also staff from competent authorities of other participating Member States, making it possible to install supervisory teams of geographical diversity with specific expertise and profile. The exchange and secondment of staff should establish a common supervisory culture. On a regular basis the ECB should provide information on how many staff members from the national competent authorities are seconded to the ECB for the purposes of the SSM.

(80) Given the globalisation of banking services and the increased importance of international standards, the ECB should carry out its tasks in respect of international standards and in dialogue and close cooperation with supervisors outside the Union, without duplicating the international role of EBA. It should be empowered to develop contacts and enter into administrative arrangements with the supervisory authorities and administrations of third countries and with international organisations, while coordinating with EBA and while fully respecting the existing roles and respective competences of the Member States and the institutions of the Union.

(81) Directive 95/46/EC of the European Parliament and of the Council of 24 October 1995 on the protection of individuals with regard to the processing of personal data and on the free movement of such data (¹) and Regulation (EC) No 45/2001 of the European Parliament and of the Council of 18 December 2000 on the protection of individuals with regard to the processing of personal data by the Community institutions and bodies and on the free movement of such data (²) are fully applicable to the processing of personal data by the ECB for the purposes of this Regulation.

(82) Regulation (EC) No 1073/1999 of the European Parliament and of the Council of 25 May 1999 concerning investigations conducted by the European Anti-Fraud Office (OLAF) (³) applies to the ECB. The

(¹) OJ L 281, 23.11.1995, p. 31.
(²) OJ L 8, 12.1.2001, p. 1.
(³) OJ L 136, 31.5.1999, p. 1.

ECB has adopted Decision ECB/2004/11 (¹) concerning the terms and conditions for European Anti-Fraud Office investigations of the European Central Bank.

(83) In order to ensure that credit institutions are subject to supervision of the highest quality, unfettered by other, non-prudential considerations, and that the negative mutually reinforcing impacts of market developments which concern credit institutions and Member States are addressed in a timely and effective way, the ECB should start carrying out specific supervisory tasks as soon as possible. However, the transfer of supervisory tasks from national supervisors to the ECB requires a certain amount of preparation. Therefore, an appropriate phasing-in period should be provided for.

(84) When adopting the detailed operational arrangements for the implementation of the tasks conferred on the ECB by this Regulation, the ECB should provide for transitional arrangements which ensure the completion of ongoing supervisory procedures, including any decision and/or measure adopted or investigation commenced prior to the entry into force of this Regulation.

(85) The Commission has stated in its Communication of 28 November 2012 on a Blueprint for a deep and genuine economic and monetary union that Article 127(6) TFEU could be amended to make the ordinary legislative procedure applicable and to eliminate some of the legal constraints it currently places on the design of the SSM (e.g. enshrine a direct and irrevocable opt-in by Member States whose currency is not the euro to the SSM, beyond the model of 'close cooperation', grant Member States whose currency is not the euro participating in the SSM fully equal rights in the ECB's decision-making, and go even further in the internal separation of decision-making on monetary policy and on supervision). It has also stated that a specific point to be addressed would be to strengthen democratic accountability over the ECB insofar as it acts as a banking supervisor. It is recalled that TEU provides that proposals for treaty change may be submitted by the Government of any Member State, the European Parliament, or the Commission, and may relate to any aspect of the Treaties.

(86) This Regulation respects the fundamental rights and observes the principles recognised in the Charter of Fundamental Rights of the European Union, in particular the right to the protection of personal data, the freedom to conduct a business, the right to an effective remedy and to a fair trial, and has to be implemented in accordance with those rights and principles.

(87) Since the objectives of this Regulation, namely setting up an efficient and effective framework for the exercise of specific supervisory tasks over credit institutions by a Union institution, and ensuring the consistent application of the single rulebook to credit institutions, cannot be sufficiently achieved at the Member State level and can therefore, by reason of the pan-Union structure of the banking market and the impact of failures of credit institutions on other Member States, be better achieved at the Union level, the Union may adopt measures, in accordance with the principle of subsidiarity as set out in Article 5 TEU. In accordance with the principle of proportionality, as set out in that Article, this Regulation does not go beyond what is necessary in order to achieve those objectives,

HAS ADOPTED THIS REGULATION:

CHAPTER I

**Subject matter and definitions**

*Article 1*

**Subject matter and scope**

This Regulation confers on the ECB specific tasks concerning policies relating to the prudential supervision of credit institutions, with a view to contributing to the safety and soundness of credit institutions and the stability of the financial system within the Union and each Member State, with full regard and duty of care for the unity and integrity of the internal market based on equal treatment of credit institutions with a view to preventing regulatory arbitrage.

The institutions referred to in Article 2(5) of the Directive 2013/36/EU of the European Parliament and of the Council of 26 June 2013 on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms (²) are excluded from the supervisory tasks conferred on ECB in accordance with Article 4 of this Regulation. The scope of the ECB's supervisory tasks is limited to the prudential supervision of credit institutions pursuant to this Regulation. This Regulation shall not confer on the ECB any other supervisory tasks, such as tasks relating to the prudential supervision of central counterparties.

When carrying out its tasks according to this Regulation, and without prejudice to the objective to ensure the safety and soundness of credit institutions, the ECB shall have full regard to the different types, business models and sizes of credit institutions.

No action, proposal or policy of the ECB shall, directly or indirectly, discriminate against any Member State or group of Member States as a venue for the provision of banking or financial services in any currency.

This Regulation is without prejudice to the responsibilities and related powers of the competent authorities of the participating Member States to carry out supervisory tasks not conferred on the ECB by this Regulation.

---

(¹) Decision ECB/2004/11 of the European Central Bank of 3 June 2004 concerning the terms and conditions for European Anti-Fraud Office investigations of the European Central Bank, in relation to the prevention of fraud, corruption and any other illegal activities detrimental to the European Communities' financial interests (OJ L 230, 30.6.2004, p. 56).

(²) OJ L 176, 27.6.2013, p. 338.

This Regulation is also without prejudice to the responsibilities and related powers of the competent or designated authorities of the participating Member States to apply macroprudential tools not provided for in relevant acts of Union law.

## Article 2

### Definitions

For the purposes of this Regulation, the following definitions shall apply:

(1) 'participating Member State' means a Member State whose currency is the euro or a Member State whose currency is not the euro which has established a close cooperation in accordance with Article 7;

(2) 'national competent authority' means a national competent authority designated by a participating Member State in accordance with Regulation (EU) No 575/2013 of the European Parliament and of the Council of 26 June 2013 on prudential requirements for credit institutions and investment firms [1] and Directive 2013/36/EU;

(3) 'credit institution' means a credit institution as defined in point 1 of Article 4(1) of Regulation (EU) No 575/2013;

(4) 'financial holding company' means a financial holding company as defined in point 20 of Article 4(1) of Regulation (EU) No 575/2013;

(5) 'mixed financial holding company' means a mixed financial holding company as defined in point 15 of Article 2 of Directive 2002/87/EC of the European Parliament and of the Council of 16 December 2002 on the supplementary supervision of credit institutions, insurance undertakings and investment firms in a financial conglomerate [2];

(6) 'financial conglomerate' means a financial conglomerate as defined in point 14 of Article 2 of Directive 2002/87/EC;

(7) 'national designated authority' means a designated authority of a participating Member State, within the meaning of the relevant Union law;

(8) 'qualifying holding' means a qualifying holding as defined in point 36 of Article 4(1) of Regulation (EU) No 575/2013;

(9) 'Single supervisory mechanism' (SSM) means the system of financial supervision composed by the ECB and national competent authorities of participating Member States as described in Article 6 of this Regulation.

[1] OJ L 176, 27.6.2013, p. 1.
[2] OJ L 35, 11.2.2003, p. 1.

## CHAPTER II

### Cooperation and tasks

#### Article 3

##### Cooperation

1. The ECB shall cooperate closely with EBA, ESMA, EIOPA and the European Systemic Risk Board (ESRB), and the other authorities which form part of the ESFS, which ensure an adequate level of regulation and supervision in the Union.

Where necessary the ECB shall enter into memoranda of understanding with competent authorities of Member States responsible for markets in financial instruments. Such memoranda shall be made available to the European Parliament, to the Council and to competent authorities of all Member States.

2. For the purposes of this Regulation, the ECB shall participate in the Board of Supervisors of EBA under the conditions set out in Article 40 of Regulation (EU) No 1093/2010.

3. The ECB shall carry out its tasks in accordance with this Regulation and without prejudice to the competence and the tasks of EBA, ESMA, EIOPA and the ESRB.

4. The ECB shall cooperate closely with the authorities empowered to resolve credit institutions, including in the preparation of resolution plans.

5. Subject to Articles 1, 4 and 6, the ECB shall cooperate closely with any public financial assistance facility including the European Financial Stability Facility (EFSF) and the ESM, in particular where such a facility has granted or is likely to grant, direct or indirect financial assistance to a credit institution which is subject to Article 4.

6. The ECB and the competent authorities of non-participating Member States shall conclude a memorandum of understanding describing in general terms how they will cooperate with one another in the performance of their supervisory tasks under Union law in relation to the financial institutions referred to in Article 2. The memorandum shall be reviewed on a regular basis.

Without prejudice to the first subparagraph the ECB shall conclude a memorandum of understanding with the competent authority of each non-participating Member State that is home to at least one global systemically important institution, as defined in Union law.

Each memorandum shall be reviewed on a regular basis and shall be published subject to appropriate treatment of confidential information.

*Article 4*

**Tasks conferred on the ECB**

1. Within the framework of Article 6, the ECB shall, in accordance with paragraph 3 of this Article, be exclusively competent to carry out, for prudential supervisory purposes, the following tasks in relation to all credit institutions established in the participating Member States:

(a) to authorise credit institutions and to withdraw authorisations of credit institutions subject to Article 14;

(b) for credit institutions established in a participating Member State, which wish to establish a branch or provide cross-border services in a non participating Member State, to carry out the tasks which the competent authority of the home Member State shall have under the relevant Union law;

(c) to assess notifications of the acquisition and disposal of qualifying holdings in credit institutions, except in the case of a bank resolution, and subject to Article 15;

(d) to ensure compliance with the acts referred to in the first subparagraph of Article 4(3), which impose prudential requirements on credit institutions in the areas of own funds requirements, securitisation, large exposure limits, liquidity, leverage, and reporting and public disclosure of information on those matters;

(e) to ensure compliance with the acts referred to in the first subparagraph of Article 4(3), which impose requirements on credit institutions to have in place robust governance arrangements, including the fit and proper requirements for the persons responsible for the management of credit institutions, risk management processes, internal control mechanisms, remuneration policies and practices and effective internal capital adequacy assessment processes, including Internal Ratings Based models;

(f) to carry out supervisory reviews, including where appropriate in coordination with EBA, stress tests and their possible publication, in order to determine whether the arrangements, strategies, processes and mechanisms put in place by credit institutions and the own funds held by these institutions ensure a sound management and coverage of their risks, and on the basis of that supervisory review to impose on credit institutions specific additional own funds requirements, specific publication requirements, specific liquidity requirements and other measures, where specifically made available to competent authorities by relevant Union law;

(g) to carry out supervision on a consolidated basis over credit institutions' parents established in one of the participating Member States, including over financial holding companies and mixed financial holding companies, and to participate in supervision on a consolidated basis, including in colleges of supervisors without prejudice to the participation of national competent authorities in those colleges as observers, in relation to parents not established in one of the participating Member State;

(h) to participate in supplementary supervision of a financial conglomerate in relation to the credit institutions included in it and to assume the tasks of a coordinator where the ECB is appointed as the coordinator for a financial conglomerate in accordance with the criteria set out in relevant Union law;

(i) to carry out supervisory tasks in relation to recovery plans, and early intervention where a credit institution or group in relation to which the ECB is the consolidating supervisor, does not meet or is likely to breach the applicable prudential requirements, and, only in the cases explicitly stipulated by relevant Union law for competent authorities, structural changes required from credit institutions to prevent financial stress or failure, excluding any resolution powers.

2. For credit institutions established in a non-participating Member State, which establish a branch or provide cross-border services in a participating Member State, the ECB shall carry out, within the scope of paragraph 1, the tasks for which the national competent authorities are competent in accordance with relevant Union law.

3. For the purpose of carrying out the tasks conferred on it by this Regulation, and with the objective of ensuring high standards of supervision, the ECB shall apply all relevant Union law, and where this Union law is composed of Directives, the national legislation transposing those Directives. Where the relevant Union law is composed of Regulations and where currently those Regulations explicitly grant options for Member States, the ECB shall apply also the national legislation exercising those options.

To that effect, the ECB shall adopt guidelines and recommendations, and take decisions subject to and in compliance with the relevant Union law and in particular any legislative and non-legislative act, including those referred to in Articles 290 and 291 TFEU. It shall in particular be subject to binding regulatory and implementing technical standards developed by EBA and adopted by the Commission in accordance with Article 10 to 15 of Regulation (EU) No 1093/2010, to Article 16 of that Regulation, and to the provisions of that Regulation on the European supervisory handbook developed by EBA in accordance with that Regulation. The ECB may also adopt regulations only to the extent necessary to organise or specify the arrangements for the carrying out of the tasks conferred on it by this Regulation.

Before adopting a regulation, the ECB shall conduct open public consultations and analyse the potential related costs and benefits, unless such consultations and analyses are disproportionate in relation to the scope and impact of the regulations concerned or in relation to the particular urgency of the matter, in which case the ECB shall justify that urgency.

Where necessary the ECB shall contribute in any participating role to the development of draft regulatory technical standards or implementing technical standards by EBA in accordance with Regulation (EU) No 1093/2010 or shall draw the attention of EBA to a potential need to submit to the Commission draft standards amending existing regulatory or implementing technical standards.

*Article 5*

**Macroprudential tasks and tools**

1.    Whenever appropriate or deemed required, and without prejudice to paragraph 2 of this Article, the national competent authorities or national designated authorities of the participating Member States shall apply requirements for capital buffers to be held by credit institutions at the relevant level in accordance with relevant Union law in addition to own funds requirements referred to in point (d) of Article 4(1) of this Regulation, including countercyclical buffer rates, and any other measures aimed at addressing systemic or macro-prudential risks provided for, and subject to the procedures set out, in the Regulation (EU) No 575/2013 and Directive 2013/36/EU in the cases specifically set out in relevant Union law. Ten working days prior to taking such a decision, the concerned authority shall duly notify its intention to the ECB. Where the ECB objects, it shall state its reasons in writing within five working days. The concerned authority shall duly consider the ECB's reasons prior to proceeding with the decision as appropriate.

2.    The ECB may, if deemed necessary, instead of the national competent authorities or national designated authorities of the participating Member State, apply higher requirements for capital buffers than applied by the national competent authorities or national designated authorities of participating Member States to be held by credit institutions at the relevant level in accordance with relevant Union law in addition to own funds requirements referred to in point (d) of Article 4(1) of this Regulation, including countercyclical buffer rates, subject to the conditions set out in paragraphs 4 and 5 of this Article, and apply more stringent measures aimed at addressing systemic or macroprudential risks at the level of credit institutions subject to the procedures set out in the Regulation (EU) No 575/2013 and Directive 2013/36/EU in the cases specifically set out in relevant Union law.

3.    Any national competent authority or a national designated authority may propose to the ECB to act under paragraph 2, in order to address the specific situation of the financial system and the economy in its Member State.

4.    Where the ECB intends to act in accordance with paragraph 2, it shall cooperate closely with the national designated authorities in the Member States concerned. It shall in particular notify its intention to the concerned national competent authorities or national designated authorities ten working days prior to taking such a decision. Where any of the concerned authorities objects, it shall state its reasons in writing within five working days. The ECB shall duly consider those reasons prior to proceeding with the decision as appropriate.

5.    When carrying out the tasks referred to in paragraph 2, the ECB shall take into account the specific situation of the financial system, economic situation and the economic cycle in individual Member States or parts thereof.

*Article 6*

**Cooperation within the SSM**

1.    The ECB shall carry out its tasks within a single supervisory mechanism composed of the ECB and national competent authorities. The ECB shall be responsible for the effective and consistent functioning of the SSM.

2.    Both the ECB and national competent authorities shall be subject to a duty of cooperation in good faith, and an obligation to exchange information.

Without prejudice to the ECB's power to receive directly, or have direct access to information reported, on an ongoing basis, by credit institutions, the national competent authorities shall in particular provide the ECB with all information necessary for the purposes of carrying out the tasks conferred on the ECB by this Regulation.

3.    Where appropriate and without prejudice to the responsibility and accountability of the ECB for the tasks conferred on it by this Regulation, national competent authorities shall be responsible for assisting the ECB, under the conditions set out in the framework mentioned in paragraph 7 of this Article, with the preparation and implementation of any acts relating to the tasks referred to in Article 4 related to all credit institutions, including assistance in verification activities. They shall follow the instructions given by the ECB when performing the tasks mentioned in Article 4.

4.    In relation to the tasks defined in Article 4 except for points (a) and (c) of paragraph 1 thereof, the ECB shall have the responsibilities set out in paragraph 5 of this Article and the national competent authorities shall have the responsibilities set out in paragraph 6 of this Article, within the framework and subject to the procedures referred to in paragraph 7 of this Article, for the supervision of the following credit institutions, financial holding companies or mixed financial holding companies, or branches, which are established in participating Member States, of credit institutions established in non-participating Member States:

— those that are less significant on a consolidated basis, at the highest level of consolidation within the participating Member States, or individually in the specific case of branches, which are established in participating Member States, of credit institutions established in non-participating Member States. The significance shall be assessed based on the following criteria:

  (i) size;

  (ii) importance for the economy of the Union or any participating Member State;

(iii) significance of cross-border activities.

With respect to the first subparagraph above, a credit institution or financial holding company or mixed financial holding company shall not be considered less significant, unless justified by particular circumstances to be specified in the methodology, if any of the following conditions is met:

(i) the total value of its assets exceeds EUR 30 billion;

(ii) the ratio of its total assets over the GDP of the participating Member State of establishment exceeds 20 %, unless the total value of its assets is below EUR 5 billion;

(iii) following a notification by its national competent authority that it considers such an institution of significant relevance with regard to the domestic economy, the ECB takes a decision confirming such significance following a comprehensive assessment by the ECB, including a balance-sheet assessment, of that credit institution.

The ECB may also, on its own initiative, consider an institution to be of significant relevance where it has established banking subsidiaries in more than one participating Member States and its cross-border assets or liabilities represent a significant part of its total assets or liabilities subject to the conditions laid down in the methodology.

Those for which public financial assistance has been requested or received directly from the EFSF or the ESM shall not be considered less significant.

Notwithstanding the previous subparagraphs, the ECB shall carry out the tasks conferred on it by this Regulation in respect of the three most significant credit institutions in each of the participating Member States, unless justified by particular circumstances.

5.   With regard to the credit institutions referred to in paragraph 4, and within the framework defined in paragraph 7:

(a) the ECB shall issue regulations, guidelines or general instructions to national competent authorities, according to which the tasks defined in Article 4 excluding points (a) and (c) of paragraph 1 thereof are performed and supervisory decisions are adopted by national competent authorities.

Such instructions may refer to the specific powers in Article 16(2) for groups or categories of credit institutions for the purposes of ensuring the consistency of supervisory outcomes within the SSM;

(b) when necessary to ensure consistent application of high supervisory standards, the ECB may at any time, on its own initiative after consulting with national competent authorities or upon request by a national competent authority, decide to exercise directly itself all the relevant powers for one or more credit institutions referred to in paragraph 4, including in the case where financial assistance has been requested or received indirectly from the EFSF or the ESM;

(c) the ECB shall exercise oversight over the functioning of the system, based on the responsibilities and procedures set out in this Article, and in particular point (c) of paragraph 7;

(d) the ECB may at any time make use of the powers referred to in Articles 10 to 13;

(e) the ECB may also request, on an ad hoc or continuous basis, information from the national competent authorities on the performance of the tasks carried out by them under this Article.

6.   Without prejudice to paragraph 5 of this Article, national competent authorities shall carry out and be responsible for the tasks referred to in points (b), (d) to (g) and (i) of Article 4(1) and adopting all relevant supervisory decisions with regard to the credit institutions referred to in the first subparagraph of paragraph 4 of this Article, within the framework and subject to the procedures referred to in paragraph 7 of this Article.

Without prejudice to Articles 10 to 13, the national competent authorities and national designated authorities shall maintain the powers, in accordance with national law, to obtain information from credit institutions, holding companies, mixed holding companies and undertakings included in the consolidated financial situation of a credit institution and to perform on site inspections at those credit institutions, holding companies, mixed holding companies and undertakings. The national competent authorities shall inform the ECB, in accordance with the framework set out in paragraph 7 of this Article, of the measures taken pursuant to this paragraph and closely coordinate those measures with the ECB.

The national competent authorities shall report to the ECB on a regular basis on the performance of the activities performed under this Article.

7.   The ECB shall, in consultation with national competent authorities, and on the basis of a proposal from the Supervisory Board, adopt and make public a framework to organise the practical arrangements for the implementation of this Article. The framework shall include, at least, the following:

(a) the specific methodology for the assessment of the criteria referred to in the first, second and third subparagraph of paragraph 4 and the criteria under which the fourth subparagraph of paragraph 4 ceases to apply to a specific credit institution and the resulting arrangements for the purposes of implementing paragraphs 5 and 6. Those arrangements and the methodology for the assessment of

EN

the criteria referred to in the first, second and third subparagraph of paragraph 4 shall be reviewed to reflect any relevant changes, and shall ensure that where a credit institution has been considered significant or less significant that assessment shall only be modified in case of substantial and non-transitory changes of circumstances, in particular those circumstances relating to the situation of the credit institution which are relevant for that assessment.

(b) the definition of the procedures, including time-limits, and the possibility to prepare draft decisions to be sent to the ECB for consideration, for the relation between the ECB and the national competent authorities regarding the supervision of credit institutions not considered as less significant in accordance with paragraph 4;

(c) the definition of the procedures, including time-limits, for the relation between the ECB and the national competent authorities regarding the supervision of credit institutions considered as less significant in accordance with paragraph 4. Such procedures shall in particular require national competent authorities, depending on the cases defined in the framework, to:

  (i) notify the ECB of any material supervisory procedure;

  (ii) further assess, on the request of the ECB, specific aspects of the procedure;

  (iii) transmit to the ECB material draft supervisory decisions on which the ECB may express its views.

8.    Wherever the ECB is assisted by national competent authorities or national designated authorities for the purpose of exercising the tasks conferred on it by this Regulation, the ECB and the national competent authorities shall comply with the provisions set out in the relevant Union acts in relation to the allocation of responsibilities and cooperation between competent authorities from different Member States.

*Article 7*

**Close cooperation with the competent authorities of participating Member States whose currency is not the euro**

1.    Within the limits set out in this Article, the ECB shall carry out the tasks in the areas referred to in Articles 4(1), 4(2) and 5 in relation to credit institutions established in a Member State whose currency is not the euro, where close cooperation has been established between the ECB and the national competent authority of such Member State in accordance with this Article.

To that end, the ECB may address instructions to the national competent authority or to the national designated authority of the participating Member State whose currency is not the euro.

2.    Close cooperation between the ECB and the national competent authority of a participating Member State whose currency is not the euro shall be established, by a decision adopted by the ECB, where the following conditions are met:

(a) the Member State concerned notifies the other Member States, the Commission, the ECB and EBA the request to enter into a close cooperation with the ECB in relation to the exercise of the tasks referred to in Articles 4 and 5 with regard to all credit institutions established in the Member State concerned, in accordance with Article 6;

(b) in the notification, the Member State concerned undertakes:

  — to ensure that its national competent authority or national designated authority will abide by any guidelines or requests issued by the ECB, and

  — to provide all information on the credit institutions established in that Member State that the ECB may require for the purpose of carrying out a comprehensive assessment of those credit institutions;

(c) the Member State concerned has adopted relevant national legislation to ensure that its national competent authority will be obliged to adopt any measure in relation to credit institutions requested by the ECB, in accordance with paragraph 4.

3.    The decision referred to in paragraph 2 shall be published in the *Official Journal of the European Union*. The decision shall apply 14 days after its publication.

4.    Where the ECB considers that a measure relating to the tasks referred to in paragraph 1 should be adopted by the national competent authority of a concerned Member State in relation to a credit institution, financial holding company or mixed-financial holding company, it shall address instructions to that authority, specifying a relevant timeframe.

That timeframe shall be no less than 48 hours unless earlier adoption is indispensable to prevent irreparable damage. The national competent authority of the concerned Member State shall take all the necessary measures in accordance with the obligation referred to in point (c) of paragraph 2.

5.    The ECB may decide to issue a warning to the Member State concerned that the close cooperation will be suspended or terminated if no decisive corrective action is undertaken in the following cases:

(a) where, in the opinion of the ECB, the conditions set out in points (a) to (c) of paragraph 2 are no longer met by the Member State concerned; or

(b) where, in the opinion of the ECB, the national competent authority of the Member State concerned does not act in accordance with the obligation referred to in point (c) of paragraph 2.

If no such action has been undertaken within 15 days of notification of such a warning, the ECB may suspend or terminate the close cooperation with that Member State.

The decision to suspend or terminate the close cooperation shall be notified to the Member State concerned and shall be published in the *Official Journal of the European Union*. The decision shall indicate the date from which it applies, taking due consideration of supervisory effectiveness and legitimate interests of credit institutions.

6.    The Member State may request the ECB to terminate the close cooperation at any time after a lapse of three years from the date of the publication in the *Official Journal of the European Union* of the decision adopted by the ECB for the establishment of the close cooperation. The request shall explain the reasons for the termination, including, when relevant, potential significant adverse consequences as regards the fiscal responsibilities of the Member State. In this case, the ECB shall immediately proceed to adopt a decision terminating the close cooperation and indicate the date from which it applies within a maximum period of three months, taking due consideration of supervisory effectiveness and legitimate interests of credit institutions. The decision shall be published in the *Official Journal of the European Union*.

7.    If a participating Member State whose currency is not the euro notifies the ECB in accordance with Article 26(8) of its reasoned disagreement with an objection of the Governing Council to a draft decision of the Supervisory Board, the Governing Council shall, within a period of 30 days, give its opinion on the reasoned disagreement expressed by the Member State and, stating its reasons to do so, confirm or withdraw its objection.

Where the Governing Council confirms its objection, the participating Member State whose currency is not the euro may notify the ECB that it will not be bound by the potential decision related to a possible amended draft decision by the Supervisory Board.

The ECB shall then consider the possible suspension or termination of the close cooperation with that Member State, taking due consideration of supervisory effectiveness, and take a decision in that respect.

The ECB shall take into account, in particular, the following considerations:

(a) whether the absence of such suspension or termination could jeopardize the integrity of the SSM or have significant adverse consequences as regards the fiscal responsibilities of the Member States;

(b) whether such suspension or termination could have significant adverse consequences as regards the fiscal responsibilities in the Member State which has notified a reasoned disagreement in accordance with Article 26(8);

(c) whether or not it is satisfied that the national competent authority concerned has adopted measures which, in the ECB's opinion:

— ensure that credit institutions in the Member State which notified its reasoned disagreement pursuant to the previous subparagraph are not subject to a more favourable treatment than credit institutions in the other participating Member States, and

— are equally effective as the decision of the Governing Council under the second subparagraph of this paragraph in achieving the objectives referred to in Article 1 and in ensuring compliance with relevant Union law.

The ECB shall include these considerations in its decision and communicate them to the Member State in question.

8.    If a participating Member State whose currency is not the euro disagrees with a draft decision of the Supervisory Board, it shall inform the Governing Council of its reasoned disagreement within five working days of receiving the draft decision. The Governing Council shall then decide about the matter within five working days, taking fully into account those reasons, and explain in writing its decision to the Member State concerned. The Member State concerned may request the ECB to terminate the close cooperation with immediate effect and will not be bound by the ensuing decision.

9.    A Member State which has terminated the close cooperation with the ECB may not enter into a new close cooperation before a lapse of three years from the date of the publication in the *Official Journal of the European Union* of the ECB decision terminating the close cooperation.

*Article 8*

**International relations**

Without prejudice to the respective competences of the Member States and institutions and bodies of the Union, other than the ECB, including EBA, in relation to the tasks conferred on the ECB by this Regulation, the ECB may develop contacts and enter into administrative arrangements with supervisory authorities, international organisations and the administrations of third countries, subject to appropriate coordination with EBA. Those arrangements shall not create legal obligations in respect of the Union and its Member States.

CHAPTER III

## Powers of the ECB

### Article 9

#### Supervisory and investigatory powers

1.    For the exclusive purpose of carrying out the tasks conferred on it by Articles 4(1), 4(2) and 5(2), the ECB shall be considered, as appropriate, the competent authority or the designated authority in the participating Member States as established by the relevant Union law.

For the same exclusive purpose, the ECB shall have all the powers and obligations set out in this Regulation. It shall also have all the powers and obligations, which competent and designated authorities shall have under the relevant Union law, unless otherwise provided for by this Regulation. In particular, the ECB shall have the powers listed in Sections 1 and 2 of this Chapter.

To the extent necessary to carry out the tasks conferred on it by this Regulation, the ECB may require, by way of instructions, those national authorities to make use of their powers, under and in accordance with the conditions set out in national law, where this Regulation does not confer such powers on the ECB. Those national authorities shall fully inform the ECB about the exercise of those powers.

2.    The ECB shall exercise the powers referred to in paragraph 1 of this Article in accordance with the acts referred to in the first subparagraph of Article 4(3). In the exercise of their respective supervisory and investigatory powers, the ECB and national competent authorities shall cooperate closely.

3.    By derogation from paragraph 1 of this Article, with regard to credit institutions established in participating Member States whose currency is not the euro, the ECB shall exercise its powers in accordance with Article 7.

### S e c t i o n  1

#### I n v e s t i g a t o r y  p o w e r s

### Article 10

#### Request for information

1.    Without prejudice to the powers referred to in Article 9(1), and subject to the conditions set out in relevant Union law, the ECB may require the following legal or natural persons, subject to Article 4, to provide all information that is necessary in order to carry out the tasks conferred on it by this Regulation, including information to be provided at recurring intervals and in specified formats for supervisory and related statistical purposes:

(a) credit institutions established in the participating Member States;

(b) financial holding companies established in the participating Member States;

(c) mixed financial holding companies established in the participating Member States;

(d) mixed-activity holding companies established in the participating Member States;

(e) persons belonging to the entities referred to in points (a) to (d);

(f) third parties to whom the entities referred to in points (a) to (d) have outsourced functions or activities.

2.    The persons referred to in paragraph 1 shall supply the information requested. Professional secrecy provisions do not exempt those persons from the duty to supply that information. Supplying that information shall not be deemed to be in breach of professional secrecy.

3.    Where the ECB obtains information directly from the legal or natural persons referred to in paragraph 1 it shall make that information available to the national competent authorities concerned.

### Article 11

#### General investigations

1.    In order to carry out the tasks conferred on it by this Regulation, and subject to other conditions set out in relevant Union law, the ECB may conduct all necessary investigations of any person referred to in Article 10(1) established or located in a participating Member State.

To that end, the ECB shall have the right to:

(a) require the submission of documents;

(b) examine the books and records of the persons referred to in Article 10(1) and take copies or extracts from such books and records;

(c) obtain written or oral explanations from any person referred to in Article 10(1) or their representatives or staff;

(d) interview any other person who consents to be interviewed for the purpose of collecting information relating to the subject matter of an investigation;

2.    The persons referred to in Article 10(1) shall be subject to investigations launched on the basis of a decision of the ECB.

When a person obstructs the conduct of the investigation, the national competent authority of the participating Member State where the relevant premises are located shall afford, in compliance with national law, the necessary assistance including, in the cases referred to in Articles 12 and 13, facilitating the access by the ECB to the business premises of the legal persons referred to in Article 10(1), so that the aforementioned rights can be exercised.

## Article 12

### On-site inspections

1. In order to carry out the tasks conferred on it by this Regulation, and subject to other conditions set out in relevant Union law, the ECB may in accordance with Article 13 and subject to prior notification to the national competent authority concerned conduct all necessary on-site inspections at the business premises of the legal persons referred to in Article 10(1) and any other undertaking included in supervision on a consolidated basis where the ECB is the consolidating supervisor in accordance with point (g) of Article 4(1). Where the proper conduct and efficiency of the inspection so require, the ECB may carry out the on-site inspection without prior announcement to those legal persons.

2. The officials of and other persons authorised by the ECB to conduct an on-site inspection may enter any business premises and land of the legal persons subject to an investigation decision adopted by the ECB and shall have all the powers stipulated in Article 11(1).

3. The legal persons referred to in Article 10(1) shall be subject to on-site inspections on the basis of a decision of the ECB.

4. Officials and other accompanying persons authorised or appointed by the national competent authority of the Member State where the inspection is to be conducted shall, under the supervision and coordination of the ECB, actively assist the officials of and other persons authorised by the ECB. To that end, they shall enjoy the powers set out in paragraph 2. Officials of the national competent authority of the participating Member State concerned shall also have the right to participate in the on-site inspections.

5. Where the officials of and other accompanying persons authorised or appointed by the ECB find that a person opposes an inspection ordered pursuant to this Article, the national competent authority of the participating Member State concerned shall afford them the necessary assistance in accordance with national law. To the extent necessary for the inspection, this assistance shall include the sealing of any business premises and books or records. Where that power is not available to the national competent authority concerned, it shall use its powers to request the necessary assistance of other national authorities.

## Article 13

### Authorisation by a judicial authority

1. If an on-site inspection provided for in Article 12(1) and (2) or the assistance provided for in Article 12(5) requires authorisation by a judicial authority according to national rules, such authorisation shall be applied for.

2. Where authorisation as referred to in paragraph 1 of this Article is applied for, the national judicial authority shall control that the decision of the ECB is authentic and that the coercive measures envisaged are neither arbitrary nor excessive having regard to the subject matter of the inspection. In its control of the proportionality of the coercive measures, the national judicial authority may ask the ECB for detailed explanations, in particular relating to the grounds the ECB has for suspecting that an infringement of the acts referred to in the first subparagraph of Article 4(3) has taken place and the seriousness of the suspected infringement and the nature of the involvement of the person subject to the coercive measures. However, the national judicial authority shall not review the necessity for the inspection or demand to be provided with the information on the ECB's file. The lawfulness of the ECB's decision shall be subject to review only by the CJEU.

## Section 2

### Specific supervisory powers

### Article 14

### Authorisation

1. Any application for an authorisation to take up the business of a credit institution to be established in a participating Member State shall be submitted to the national competent authorities of the Member State where the credit institution is to be established in accordance with the requirements set out in relevant national law.

2. If the applicant complies with all conditions of authorisation set out in the relevant national law of that Member State, the national competent authority shall take, within the period provided for by relevant national law, a draft decision to propose to the ECB to grant the authorisation. The draft decision shall be notified to the ECB and the applicant for authorisation. In other cases, the national competent authority shall reject the application for authorisation.

3. The draft decision shall be deemed to be adopted by the ECB unless the ECB objects within a maximum period of ten working days, extendable once for the same period in duly justified cases. The ECB shall object to the draft decision only where the conditions for authorisation set out in relevant Union law are not met. It shall state the reasons for the rejection in writing.

4. The decision taken in accordance with paragraphs 2 and 3 shall be notified by the national competent authority to the applicant for authorisation.

5. Subject to paragraph 6, the ECB may withdraw the authorisation in the cases set out in relevant Union law on its own initiative, following consultations with the national competent authority of the participating Member State where the credit institution is established, or on a proposal from such national competent authority. These consultations shall in particular ensure that before taking decisions regarding withdrawal, the ECB allows sufficient time for the national authorities to decide on the necessary remedial actions, including possible resolution measures, and takes these into account.

Where the national competent authority which has proposed the authorisation in accordance with paragraph 1 considers that the authorisation must be withdrawn in accordance with the relevant national law, it shall submit a proposal to the ECB to that end. In that case, the ECB shall take a decision on the proposed withdrawal taking full account of the justification for withdrawal put forward by the national competent authority.

6. As long as national authorities remain competent to resolve credit institutions, in cases where they consider that the withdrawal of the authorisation would prejudice the adequate implementation of or actions necessary for resolution or to maintain financial stability, they shall duly notify their objection to the ECB explaining in detail the prejudice that a withdrawal would cause. In those cases, the ECB shall abstain from proceeding to the withdrawal for a period mutually agreed with the national authorities. The ECB may extend that period if it is of the opinion that sufficient progress has been made. If, however, the ECB determines in a reasoned decision that proper actions necessary to maintain financial stability have not been implemented by the national authorities, the withdrawal of the authorisations shall apply immediately.

*Article 15*

**Assessment of acquisitions of qualifying holdings**

1. Without prejudice to the exemptions provided for in point (c) of Article 4(1), any notification of an acquisition of a qualifying holding in a credit institution established in a participating Member State or any related information shall be introduced with the national competent authorities of the Member State where the credit institution is established in accordance with the requirements set out in relevant national law based on the acts referred to in the first subparagraph of Article 4(3).

2. The national competent authority shall assess the proposed acquisition, and shall forward the notification and a proposal for a decision to oppose or not to oppose the acquisition, based on the criteria set out in the acts referred to in the first subparagraph of Article 4(3), to the ECB, at least ten working days before the expiry of the relevant assessment period as defined by relevant Union law, and shall assist the ECB in accordance with Article 6.

3. The ECB shall decide whether to oppose the acquisition on the basis of the assessment criteria set out in relevant Union law and in accordance with the procedure and within the assessment periods set out therein.

*Article 16*

**Supervisory powers**

1. For the purpose of carrying out its tasks referred to in Article 4(1) and without prejudice to other powers conferred on the ECB, the ECB shall have the powers set out in paragraph 2 of this Article to require any credit institution, financial holding company or mixed financial holding company in participating Member States to take the necessary measures at an early stage to address relevant problems in any of the following circumstances:

(a) the credit institution does not meet the requirements of the acts referred to in the first subparagraph of Article 4(3);

(b) the ECB has evidence that the credit institution is likely to breach the requirements of the acts referred to in the first subparagraph of Article 4(3) within the next 12 months;

(c) based on a determination, in the framework of a supervisory review in accordance with point (f) of Article 4(1), that the arrangements, strategies, processes and mechanisms implemented by the credit institution and the own funds and liquidity held by it do not ensure a sound management and coverage of its risks.

2. For the purposes of Article 9(1), the ECB shall have, in particular, the following powers:

(a) to require institutions to hold own funds in excess of the capital requirements laid down in the acts referred to in the first subparagraph of Article 4(3) related to elements of risks and risks not covered by the relevant Union acts;

(b) to require the reinforcement of the arrangements, processes, mechanisms and strategies;

(c) to require institutions to present a plan to restore compliance with supervisory requirements pursuant to the acts referred to in the first subparagraph of Article 4(3) and set a deadline for its implementation, including improvements to that plan regarding scope and deadline;

(d) to require institutions to apply a specific provisioning policy or treatment of assets in terms of own funds requirements;

(e) to restrict or limit the business, operations or network of institutions or to request the divestment of activities that pose excessive risks to the soundness of an institution;

(f) to require the reduction of the risk inherent in the activities, products and systems of institutions;

(g) to require institutions to limit variable remuneration as a percentage of net revenues when it is inconsistent with the maintenance of a sound capital base;

(h) to require institutions to use net profits to strengthen own funds;

(i) to restrict or prohibit distributions by the institution to shareholders, members or holders of Additional Tier 1 instruments where the prohibition does not constitute an event of default of the institution;

(j) to impose additional or more frequent reporting requirements, including reporting on capital and liquidity positions;

(k) to impose specific liquidity requirements, including restrictions on maturity mismatches between assets and liabilities;

(l) to require additional disclosures;

(m) to remove at any time members from the management body of credit institutions who do not fulfil the requirements set out in the acts referred to in the first subparagraph of Article 4(3).

*Article 17*

**Powers of host authorities and cooperation on supervision on a consolidated basis**

1. Between participating Member States the procedures set out in the relevant Union law for credit institutions wishing to establish a branch or to exercise the freedom to provide services by carrying on their activities within the territory of another Member State and the related competences of home and host Member States shall apply only for the purposes of the tasks not conferred on the ECB by Article 4.

2. The provisions set out in the relevant Union law in relation to the cooperation between competent authorities from different Member States for conducting supervision on a consolidated basis shall not apply to the extent that the ECB is the only competent authority involved.

3. In fulfilling its tasks as defined in Articles 4 and 5 the ECB shall respect a fair balance between all participating Member States in accordance with Article 6(8) and shall, in its relationship with non-participating Member States, respect the balance between home and host Member States established in relevant Union law.

*Article 18*

**Administrative penalties**

1. For the purpose of carrying out the tasks conferred on it by this Regulation, where credit institutions, financial holding companies, or mixed financial holding companies, intentionally or negligently, breach a requirement under relevant directly applicable acts of Union law in relation to which administrative pecuniary penalties shall be made available to competent authorities under the relevant Union law, the ECB may impose administrative pecuniary penalties of up to twice the amount of the profits gained or losses avoided because of the breach where those can be determined, or up to 10 % of the total annual turnover, as defined in relevant Union law, of a legal person in the preceding business year or such other pecuniary penalties as may be provided for in relevant Union law.

2. Where the legal person is a subsidiary of a parent undertaking, the relevant total annual turnover referred to in paragraph 1 shall be the total annual turnover resulting from the consolidated account of the ultimate parent undertaking in the preceding business year.

3. The penalties applied shall be effective, proportionate and dissuasive. In determining whether to impose a penalty and in determining the appropriate penalty, the ECB shall act in accordance with Article 9(2).

4. The ECB shall apply this Article in accordance with the acts referred to in the first subparagraph of Article 4(3) of this Regulation, including the procedures contained in Regulation (EC) No 2532/98, as appropriate.

5. In the cases not covered by paragraph 1 of this Article, where necessary for the purpose of carrying out the tasks conferred on it by this Regulation, the ECB may require national competent authorities to open proceedings with a view to taking action in order to ensure that appropriate penalties are imposed in accordance with the acts referred to in the first subparagraph of Article 4(3) and any relevant national legislation which confers specific powers which are currently not required by Union law. The penalties applied by national competent authorities shall be effective, proportionate and dissuasive.

The first subparagraph of this paragraph shall be applicable in particular to pecuniary penalties to be imposed on credit institutions, financial holding companies or mixed financial holding companies for breaches of national law transposing relevant Directives, and to any administrative penalties or measures to be imposed on members of the management board of a credit institution, financial holding company or mixed financial holding company or any other individuals who under national law are responsible for a breach by a credit institution, financial holding company or mixed financial holding company.

6. The ECB shall publish any penalty referred to paragraph 1, whether it has been appealed or not, in the cases and in accordance with the conditions set out in relevant Union law.

7.    Without prejudice to paragraphs 1 to 6, for the purposes of carrying out the tasks conferred on it by this Regulation, in case of a breach of ECB regulations or decisions, the ECB may impose sanctions in accordance with Regulation (EC) No 2532/98.

CHAPTER IV

*Organisational principles*

Article 19

**Independence**

1.    When carrying out the tasks conferred on it by this Regulation, the ECB and the national competent authorities acting within the SSM shall act independently. The members of the Supervisory Board and the steering committee shall act independently and objectively in the interest of the Union as a whole and shall neither seek nor take instructions from the institutions or bodies of the Union, from any government of a Member State or from any other public or private body.

2.    The institutions, bodies, offices and agencies of the Union and the governments of the Member States and any other bodies shall respect that independence.

3.    Following an examination of the need for a Code of Conduct by the Supervisory Board, the Governing Council shall establish and publish a Code of Conduct for the ECB staff and management involved in banking supervision concerning in particular conflicts of interest.

Article 20

**Accountability and reporting**

1.    The ECB shall be accountable to the European Parliament and to the Council for the implementation of this Regulation, in accordance with this Chapter.

2.    The ECB shall submit on an annual basis to the European Parliament, to the Council, to the Commission and to the euro Group a report on the execution of the tasks conferred on it by this Regulation, including information on the envisaged evolution of the structure and amount of the supervisory fees mentioned in Article 30.

3.    The Chair of the Supervisory Board of the ECB shall present that report in public to the European Parliament, and to the euro Group in the presence of representatives from any participating Member State whose currency is not the euro.

4.    The Chair of the Supervisory Board of the ECB may, at the request of the euro Group, be heard on the execution of its supervisory tasks by the euro Group in the presence of representatives from any participating Member States whose currency is not the euro.

5.    At the request of the European Parliament, the Chair of the Supervisory Board of the ECB shall participate in a hearing on the execution of its supervisory tasks by the competent committees of the European Parliament.

6.    The ECB shall reply orally or in writing to questions put to it by the European Parliament, or by the euro Group in accordance with the its own procedures and in the presence of representatives from any participating Member States whose currency is not the euro.

7.    When the European Court of Auditors examines the operational efficiency of the management of the ECB under Article 27.2 of the Statute of the ESCB and of the ECB, it shall also take into account the supervisory tasks conferred on the ECB by this Regulation.

8.    Upon request the Chair of the Supervisory Board of the ECB shall hold confidential oral discussions behind closed doors with the Chair and Vice-Chairs of the competent committee of the European Parliament concerning its supervisory tasks where such discussions are required for the exercise of the European Parliament's powers under the TFEU. An agreement shall be concluded between the European Parliament and the ECB on the detailed arrangements for organising such discussions, with a view to ensuring full confidentiality in accordance with the confidentiality obligations imposed on the ECB as a competent authority under relevant Union law.

9.    The ECB shall cooperate sincerely with any investigations by the European Parliament, subject to the TFEU. The ECB and the European Parliament shall conclude appropriate arrangements on the practical modalities of the exercise of democratic accountability and oversight over the exercise of the tasks conferred on the ECB by this Regulation. Those arrangements shall cover, inter alia, access to information, cooperation in investigations and information on the selection procedure of the Chair of the Supervisory Board.

Article 21

**National parliaments**

1.    When submitting the report provided for in Article 20(2), the ECB shall simultaneously forward that report directly to the national parliaments of the participating Member States.

National parliaments may address to the ECB their reasoned observations on that report.

2.    National parliaments of the participating Member States, through their own procedures, may request the ECB to reply in writing to any observations or questions submitted by them to the ECB in respect of the tasks of the ECB under this Regulation.

3.    The national parliament of a participating Member State may invite the Chair or a member of the Supervisory Board to participate in an exchange of views in relation to the supervision of credit institutions in that Member State together with a representative of the national competent authority.

4.    This Regulation is without prejudice to the accountability of national competent authorities to national parliaments in accordance with national law for the performance of tasks not conferred on the ECB by this Regulation and for the performance of activities carried out by them in accordance with Article 6.

*Article 22*

**Due process for adopting supervisory decisions**

1.    Before taking supervisory decisions in accordance with Article 4 and Section 2 of Chapter III, the ECB shall give the persons who are the subject of the proceedings the opportunity of being heard. The ECB shall base its decisions only on objections on which the parties concerned have been able to comment.

The first subparagraph shall not apply if urgent action is needed in order to prevent significant damage to the financial system. In such a case, the ECB may adopt a provisional decision and shall give the persons concerned the opportunity to be heard as soon as possible after taking its decision.

2.    The rights of defence of the persons concerned shall be fully respected in the proceedings. They shall be entitled to have access to the ECB's file, subject to the legitimate interest of other persons in the protection of their business secrets. The right of access to the file shall not extend to confidential information.

The decisions of the ECB shall state the reasons on which they are based.

*Article 23*

**Reporting of violations**

The ECB shall ensure that effective mechanisms are put in place for reporting of breaches by credit institutions, financial holding companies or mixed financial holding companies or competent authorities in the participating Member States of the legal acts referred to in Article 4(3), including specific procedures for the receipt of reports of breaches and their follow-up. Such procedures shall be consistent with relevant Union legislation and shall ensure that the following principles are applied: appropriate protection for persons who report breaches, protection of personal data, and appropriate protection for the accused person.

*Article 24*

**Administrative Board of Review**

1.    The ECB shall establish an Administrative Board of Review for the purposes of carrying out an internal administrative review of the decisions taken by the ECB in the exercise of the powers conferred on it by this Regulation after a request for review submitted in accordance with paragraph 5. The scope of the internal administrative review shall pertain to the procedural and substantive conformity with this Regulation of such decisions.

2.    The Administrative Board of Review shall be composed of five individuals of high repute, from Member States and having a proven record of relevant knowledge and professional experience, including supervisory experience, to a sufficiently high level in the fields of banking or other financial services, excluding current staff of the ECB, as well as current staff of competent authorities or other national or Union institutions, bodies, offices and agencies who are involved in the carrying out of the tasks conferred on the ECB by this Regulation. The Administrative Board of Review shall have sufficient resources and expertise to assess the exercise of the powers of the ECB under this Regulation. Members of the Administrative Board of Review and two alternates shall be appointed by the ECB for a term of five years, which may be extended once, following a public call for expressions of interest published in the *Official Journal of the European Union*. They shall not be bound by any instructions.

3.    The Administrative Board of Review shall decide on the basis of a majority of at least three of its five members.

4.    The members of the Administrative Board of Review shall act independently and in the public interest. For that purpose, they shall make a public declaration of commitments and a public declaration of interests indicating any direct or indirect interest which might be considered prejudicial to their independence or the absence of any such interest.

5.    Any natural or legal person may in the cases referred to in paragraph 1 request a review of a decision of the ECB under this Regulation which is addressed to that person, or is of a direct and individual concern to that person. A request for a review against a decision of the Governing Council as referred to in paragraph 7 shall not be admissible.

6.    Any request for review shall be made in writing, including a statement of grounds, and shall be lodged at the ECB within one month of the date of notification of the decision to the person requesting the review, or, in the absence thereof, of the day on which it came to the knowledge of the latter as the case may be.

7.    After ruling on the admissibility of the review, the Administrative Board of Review shall express an opinion within a period appropriate to the urgency of the matter and no later than two months from the receipt of the request and remit the case for preparation of a new draft decision to the Supervisory Board. The Supervisory Board shall take into account the opinion of the Administrative Board of Review and shall promptly submit a new draft decision to the Governing Council. The new draft decision shall abrogate the initial decision, replace it with a decision of identical content, or replace it with an amended decision. The new draft decision shall be deemed adopted unless the Governing Council objects within a maximum period of ten working days.

EN

8.   A request for review pursuant to paragraph 5 shall not have suspensory effect. However, the Governing Council, on a proposal by the Administrative Board of Review may, if it considers that circumstances so require, suspend the application of the contested decision.

9.   The opinion expressed by the Administrative Board of Review, the new draft decision submitted by the Supervisory Board and the decision adopted by the Governing Council pursuant to this Article shall be reasoned and notified to the parties.

10.   The ECB shall adopt a decision establishing the Administrative Board of Review's operating rules.

11.   This Article is without prejudice to the right to bring proceedings before the CJEU in accordance with the Treaties.

*Article 25*

**Separation from monetary policy function**

1.   When carrying out the tasks conferred on it by this Regulation, the ECB shall pursue only the objectives set by this Regulation.

2.   The ECB shall carry out the tasks conferred on it by this Regulation without prejudice to and separately from its tasks relating to monetary policy and any other tasks. The tasks conferred on the ECB by this Regulation shall neither interfere with, nor be determined by, its tasks relating to monetary policy. The tasks conferred on the ECB by this Regulation shall moreover not interfere with its tasks in relation to the ESRB or any other tasks. The ECB shall report to the European Parliament and to the Council as to how it has complied with this provision. The tasks conferred by this Regulation on the ECB shall not alter the ongoing monitoring of the solvency of its monetary policy counterparties.

The staff involved in carrying out the tasks conferred on the ECB by this Regulation shall be organisationally separated from, and subject to, separate reporting lines from the staff involved in carrying out other tasks conferred on the ECB.

3.   For the purposes of paragraphs 1 and 2, the ECB shall adopt and make public any necessary internal rules, including rules regarding professional secrecy and information exchanges between the two functional areas.

4.   The ECB shall ensure that the operation of the Governing Council is completely differentiated as regards monetary and supervisory functions. Such differentiation shall include strictly separated meetings and agendas.

5.   With a view to ensuring separation between monetary policy and supervisory tasks, the ECB shall create a mediation panel. This panel shall resolve differences of views expressed by the competent authorities of participating Member States concerned regarding an objection of the Governing Council to a draft decision by the Supervisory Board. This panel shall include one member per participating Member State, chosen by each Member State among the members of the Governing Council and the Supervisory Board, and shall decide by simple majority, with each member having one vote. The ECB shall adopt and make public a regulation setting up such mediation panel and its rules of procedure.

*Article 26*

**Supervisory board**

1.   The planning and execution of the tasks conferred on the ECB shall be fully undertaken by an internal body composed of its Chair and Vice Chair, appointed in accordance with paragraph 3, and four representatives of the ECB, appointed in accordance with paragraph 5, and one representative of the national competent authority in each participating Member State ('Supervisory Board'). All members of the Supervisory Board shall act in the interest of the Union as a whole.

Where the competent authority is not a central bank, the member of the Supervisory Board referred to in this paragraph may decide to bring a representative from the Member State's central bank. For the purposes of the voting procedure set out in paragraph 6, the representatives of the authorities of any one Member State shall together be considered as one member.

2.   The appointments for the Supervisory Board in accordance with this Regulation shall respect the principles of gender balance, experience and qualification.

3.   After hearing the Supervisory Board, the ECB shall submit a proposal for the appointment of the Chair and the Vice-Chair to the European Parliament for approval. Following the approval of this proposal, the Council shall adopt an implementing decision to appoint the Chair and the Vice-Chair of the Supervisory Board. The Chair shall be chosen on the basis of an open selection procedure, on which the European Parliament and the Council shall be kept duly informed, from among individuals of recognised standing and experience in banking and financial matters and who are not members of the Governing Council. The Vice Chair of the Supervisory Board shall be chosen from among the members of the Executive Board of the ECB. The Council shall act by qualified majority without taking into account the vote of the members of the Council which are not participating Member States.

Once appointed, the Chair shall be a full-time professional and shall not hold any offices at national competent authorities. The term of office shall be five years and shall not be renewable.

4.   If the Chair of the Supervisory Board no longer fulfils the conditions required for the performance of his duties or has been guilty of serious misconduct, the Council may, following a proposal by the ECB, which has been approved by the European Parliament, adopt an implementing decision to remove the Chair from office. The Council shall act by qualified majority without taking into account the vote of the members of the Council which are not participating Member States.

Following a compulsory retirement of the Vice-Chair of the Supervisory Board as a member of the Executive Board, pronounced in accordance with the Statute of the ESCB and of the ECB, the Council may, following a proposal by the ECB, which has been approved by the European Parliament, adopt an implementing decision to remove the Vice-Chair from office. The Council shall act by qualified majority without taking into account the vote of the members of the Council which are not participating Member States.

For those purposes the European Parliament or the Council may inform the ECB that they consider that the conditions for the removal of the Chair or the Vice Chair of the Supervisory Board from office are fulfilled, to which the ECB shall respond.

5. The four representatives of the ECB appointed by the Governing Council shall not perform duties directly related to the monetary function of the ECB. All the ECB representatives shall have voting rights.

6. Decisions of the Supervisory Board shall be taken by a simple majority of its members. Each member shall have one vote. In case of a draw, the Chair shall have a casting vote.

7. By derogation from paragraph 6 of this Article, the Supervisory Board shall take decisions on the adoption of regulations pursuant to Article 4(3), on the basis of a qualified majority of its members, as defined in Article 16(4) TEU and in Article 3 of Protocol No 36 on transitional provisions attached to the TEU and to the TFEU, for the members representing the participating Member State's authorities. Each of the four representatives of the ECB appointed by the Governing Council shall have a vote equal to the median vote of the other members.

8. Without prejudice to Article 6, the Supervisory Board shall carry out preparatory works regarding the supervisory tasks conferred on the ECB and propose to the Governing Council of the ECB complete draft decisions to be adopted by the latter, pursuant to a procedure to be established by the ECB. The draft decisions shall be transmitted at the same time to the national competent authorities of the Member States concerned. A draft decision shall be deemed adopted unless the Governing Council objects within a period to be defined in the procedure mentioned above but not exceeding a maximum period of ten working days. However, if a participating Member State whose currency is not the euro disagrees with a draft decision of the Supervisory Board, the procedure set out in Article 7(8) shall apply. In emergency situations the aforementioned period shall not exceed 48 hours. If the Governing Council objects to a draft decision, it shall state the reasons for doing so in writing, in particular stating monetary policy concerns. If a decision is changed following an objection by the Governing Council, a participating Member State whose currency is not the euro may notify the ECB of its reasoned disagreement with the objection and the procedure set out in Article 7(7) shall apply.

9. A secretariat shall support the activities of the Supervisory Board, including preparing the meetings on a full time basis.

10. The Supervisory Board, voting in accordance with the rule set out in paragraph 6, shall establish a steering committee from among its members with a more limited composition to support its activities, including preparing the meetings.

The steering committee of the Supervisory Board shall have no decision-making powers. The steering committee shall be chaired by the Chair or, in the exceptional absence of the Chair, the Vice-Chair of the Supervisory Board. The composition of the steering committee shall ensure a fair balance and rotation between national competent authorities. It shall consist of no more than ten members including the Chair, the Vice-Chair and one additional representative from the ECB. The steering committee shall execute its preparatory tasks in the interest of the Union as a whole and shall work in full transparency with the Supervisory Board.

11. A representative of the Commission may participate as an observer in the meetings of the Supervisory Board upon invitation. Observers shall not have access to confidential information relating to individual institutions.

12. The Governing Council shall adopt internal rules setting out in detail its relation with the Supervisory Board. The Supervisory Board shall also adopt its rules of procedure, voting in accordance with the rule set out in paragraph 6. Both sets of rules shall be made public. The rules of procedure of the Supervisory Board shall ensure equal treatment of all participating Member States.

## Article 27

### Professional secrecy and exchange of information

1. Members of the Supervisory Board, staff of the ECB and staff seconded by participating Member States carrying out supervisory duties, even after their duties are ceased, shall be subject to the professional secrecy requirements set out in Article 37 of the Statute of the ESCB and of the ECB and in the relevant acts of Union law.

The ECB shall ensure that individuals who provide any service, directly or indirectly, permanently or occasionally, related to the discharge of supervisory duties are subject to equivalent professional secrecy requirements.

2. For the purpose of carrying out the tasks conferred on it by this Regulation, the ECB shall be authorised, within the limits and under the conditions set out in the relevant Union law, to exchange information with national or Union authorities and bodies in the cases where the relevant Union law allows national competent authorities to disclose information to those entities or where Member States may provide for such disclosure under the relevant Union law.

*Article 28*

**Resources**

The ECB shall be responsible for devoting the necessary financial and human resources to the exercise of the tasks conferred on it by this Regulation.

*Article 29*

**Budget and annual accounts**

1.   The ECB's expenditure for carrying out the tasks conferred on it by this Regulation shall be separately identifiable within the budget of the ECB.

2.   The ECB shall, as part of the report referred to in Article 20, report in detail on the budget for its supervisory tasks.The annual accounts of the ECB drawn up and published in accordance with Article 26.2 of the Statute of the ESCB and of the ECB shall include the income and expenses related to the supervisory tasks.

3.   In line with Article 27.1 of the Statute of the ESCB and of the ECB the supervisory section of the annual accounts shall be audited.

*Article 30*

**Supervisory fees**

1.   The ECB shall levy an annual supervisory fee on credit institutions established in the participating Member States and branches established in a participating Member State by a credit institution established in a non-participating Member State. The fees shall cover expenditure incurred by the ECB in relation to the tasks conferred on it under Articles 4 to 6 of this Regulation. These fees shall not exceed the expenditure relating to these tasks.

2.   The amount of the fee levied on a credit institution or branch shall be calculated in accordance with the arrangements established, and published in advance, by the ECB.

Before establishing those arrangements, the ECB shall conduct open public consultations and analyse the potential related costs and benefits, and publish the results of both.

3.   The fees shall be calculated at the highest level of consolidation within participating Member States, and shall be based on objective criteria relating to the importance and risk profile of the credit institution concerned, including its risk weighted assets.

The basis for calculating the annual supervisory fee for a given calendar year shall be the expenditure relating to the supervision of credit institutions and branches in that year. The ECB may require advance payments in respect of the annual supervisory fee which shall be based on a reasonable estimate. The ECB

shall communicate with the national competent authority before deciding on the final fee level so as to ensure that supervision remains cost-effective and reasonable for all credit institutions and branches concerned. The ECB shall communicate to credit institutions and branches the basis for the calculation of the annual supervisory fee.

4.   The ECB shall report in accordance with Article 20.

5.   This Article is without prejudice to the right of national competent authorities to levy fees in accordance with national law and, to the extent supervisory tasks have not been conferred on the ECB, or in respect of costs of cooperating with and assisting the ECB and acting on its instructions, in accordance with relevant Union law and subject to the arrangements made for the implementation of this Regulation, including Articles 6 and 12.

*Article 31*

**Staff and staff exchange**

1.   The ECB shall establish, together with all national competent authorities, arrangements to ensure an appropriate exchange and secondment of staff with and among national competent authorities.

2.   The ECB may require as appropriate that supervisory teams of national competent authorities taking supervisory actions regarding a credit institution, financial holding company or mixed financial holding company located in one participating Member State in accordance with this Regulation also involve staff from national competent authorities of other participating Member States.

3.   The ECB shall establish and maintain comprehensive and formal procedures including ethics procedures and proportionate periods to assess in advance and prevent possible conflicts of interest resulting from subsequent employment within two years of members of the Supervisory Board and ECB staff members engaged in supervisory activities, and shall provide for appropriate disclosures subject to applicable data protection rules.

Those procedures shall be without prejudice to the application of stricter national rules. For members of the Supervisory Board who are representatives of national competent authorities, those procedures shall be established and implemented in cooperation with national competent authorities, without prejudice to applicable national law.

For the ECB staff members engaged in supervisory activities, those procedures shall determine categories of positions to which such assessment applies, as well as periods that are proportionate to the functions of those staff members in the supervisory activities during their employment at the ECB.

EN

4.    The procedures referred to in paragraph 3 shall provide that the ECB shall assess whether there are objections that members of the Supervisory Board take paid work in private sector institutions for which the ECB has supervisory responsibility after they have ceased to hold office.

The procedures referred to in paragraph 3 shall apply as a rule for two years after the members of the Supervisory Board have ceased to hold office and may be adjusted, on the basis of due justification, proportionate to the functions performed during that term of office and the length of time that office was held.

5.    The Annual Report of the ECB in accordance with Article 20 shall include detailed information, including statistical data on the application of the procedures referred to in paragraphs 3 and 4 of this Article.

CHAPTER V

*General and final provisions*

*Article 32*

**Review**

By 31 December 2015, and subsequently every three years thereafter, the Commission shall publish a report on the application of this Regulation, with a special emphasis on monitoring the potential impact on the smooth functioning of the internal market. That report shall evaluate, inter alia:

(a)   the functioning of the SSM within the ESFS and the impact of the supervisory activities of the ECB on the interests of the Union as a whole and on the coherence and integrity of the internal market in financial services, including its possible impact on the structures of the national banking systems within the Union, and regarding the effectiveness of cooperation and information sharing arrangements between the SSM and competent authorities of non-participating Member States;

(b)   the division of tasks between the ECB and the national competent authorities within the SSM, the effectiveness of the practical arrangements of organisation adopted by the ECB, and the impact of the SSM on the functioning of the remaining supervisory colleges;

(c)   the effectiveness of the ECB's supervisory and sanctioning powers and the appropriateness of conferring on the ECB additional sanctioning powers, including in relation to persons other than credit institutions, financial holding companies or mixed financial holding companies;

(d)   the appropriateness of the arrangements set out respectively for macroprudential tasks and tools under Article 5 and for the granting and withdrawal of authorisations under Article 14;

(e)   the effectiveness of independence and accountability arrangements;

(f)   the interaction between the ECB and the EBA;

(g)   the appropriateness of governance arrangements, including the composition of, and voting arrangements in, the Supervisory Board and its relation with the Governing Council, as well as the collaboration in the Supervisory Board between Member States whose currency is the euro and the other participating Member States in the SSM;

(h)   the interaction between the ECB and the competent authorities of non-participating Member States and the effects of the SSM on these Member States;

(i)   the effectiveness of the recourse mechanism against decisions of the ECB;

(j)   the cost effectiveness of the SSM;

(k)   the possible impact of the application of Article 7(6), 7(7) and 7(8) on the functioning and integrity of the SSM;

(l)   the effectiveness of the separation between supervisory and monetary policy functions within the ECB and of the separation of financial resources devoted to supervisory tasks from the budget of the ECB, taking into account any modifications of the relevant legal provisions including at the level of primary law;

(m)   the fiscal effects that supervisory decisions taken by the SSM have on participating Member States and the impact of any developments in relation to resolution financing arrangements;

(n)   the possibilities of developing further the SSM, taking into account any modifications of the relevant provisions, including at the level of primary law, and taking into account whether the rationale of the institutional provisions in this Regulation is no longer present, including the possibility to fully align rights and obligations of Member States whose currency is the euro and other participating Member States.

The report shall be forwarded to the European Parliament and to the Council. The Commission shall make accompanying proposals, as appropriate.

*Article 33*

**Transitional provisions**

1.    The ECB shall publish the framework referred to in Article 6(7) by 4 May 2014.

2.    The ECB shall assume the tasks conferred on it by this Regulation on 4 November 2014 subject to the implementation arrangements and measures set out in this paragraph.

After 3 November 2013, the ECB shall publish by means of regulations and decisions the detailed operational arrangements for the implementation of the tasks conferred on it by this Regulation.

From 3 November 2013, the ECB shall send a quarterly report to the European Parliament, to the Council and to the Commission on progress in the operational implementation of this Regulation.

If on the basis of the reports referred to in the third subparagraph of this paragraph and following discussions of the reports in the European Parliament and in the Council, it is shown that the ECB will not be ready for exercising in full its tasks on 4 November 2014, the ECB may adopt a decision to set a date later than the one referred to in the first subparagraph of this paragraph to ensure continuity during the transition from national supervision to the SSM, and based on the availability of staff, the setting up of appropriate reporting procedures and arrangements for cooperation with national competent authorities pursuant to Article 6.

3.    Notwithstanding paragraph 2, and without prejudice to the exercise of investigatory powers conferred on it under this Regulation, from 3 November 2013, the ECB may start carrying out the tasks conferred on it by this Regulation other than adopting supervisory decisions in respect of any credit institution, financial holding company or mixed financial holding company and following a decision addressed to the entities concerned and to the national competent authorities concerned.

Notwithstanding paragraph 2, if the ESM unanimously requests the ECB to take over direct supervision of a credit institution, financial holding company or mixed financial holding company as a precondition for its direct recapitalisation, the ECB may immediately start carrying out the tasks conferred on it by this Regulation in respect of that credit institution, financial holding company or mixed financial holding company, and following a decision addressed to the entities concerned and to the national competent authorities concerned.

4.    From 3 November 2013, in view of the assumption of its tasks, the ECB may require the national competent authorities and the persons referred to in Article 10(1) to provide all relevant information for the ECB to carry out a comprehensive assessment, including a balance-sheet assessment, of the credit institutions of the participating Member State. The ECB shall carry out such an assessment at least in relation to the credit institutions not covered by Article 6(4). The credit institution and the competent authority shall supply the information requested.

5.    Credit institutions authorised by participating Member States on 3 November 2013 or, where relevant, on the dates referred to in paragraphs 2 and 3 of this Article shall be deemed to be authorised in accordance with Article 14 and may continue to carry out their business. National competent authorities shall communicate to the ECB before the date of application of this Regulation or, where relevant, before the dates referred to in paragraphs 2 and 3 of this Article, the identity of those credit institutions together with a report indicating the supervisory history and the risk profile of the institutions concerned, and any further information requested by the ECB. The information shall be submitted in the format requested by the ECB.

6.    Notwithstanding Article 26(7), until 31 December 2015, qualified majority voting and simple majority voting shall be applied together for the adoption of the regulations referred to in Article 4(3).

*Article 34*

**Entry into force**

This Regulation shall enter into force on the fifth day following that of its publication in the *Official Journal of the European Union*.

This Regulation shall be binding in its entirety and directly applicable in all Member States.

Done at Luxembourg, 15 October 2013.

*For the Council*
*The President*
R. ŠADŽIUS