# EXHIBIT 10



*Non-confidential version*

**SRB-GREEN**

# DECISION OF THE SINGLE RESOLUTION BOARD
# IN ITS EXECUTIVE SESSION

## of 7 June 2017

## concerning the adoption of a resolution scheme in respect of Banco Popular Español, S.A., (the "Institution") with a Legal Entity Identifier:  80H66LPTVDLM0P28XF25, Addressed to FROB

### (SRB/EES/2017/08)

**THE SINGLE RESOLUTION BOARD IN ITS EXECUTIVE SESSION,**

Having regard to Regulation (EU) No 806/2014 of the European Parliament and of the Council of 15 July 2014 establishing uniform rules and a uniform procedure for the resolution of credit institutions and certain investment firms in the framework of a Single Resolution Mechanism and a Single Resolution Fund and amending Regulation (EU) No 1093/2010[1] (the "**SRMR**"), and in particular Article 18 thereof, and

Having regard to Directive 2014/59/EU of the European Parliament and of the Council of 15 May 2014 establishing a framework for the recovery and resolution of credit institutions and investments firms and amending Council Directive 82/891/EEC, and Directives 2001/24EC,  2002/47/EC,  2004/25/EC,  2005/56/EC,  2007/36/EC,  2011/35/EU, 2012/30/EU and 2013/36/EU, and Regulations (EU) No 1093/2010 and EU No 648/2012, of the European Parliament and of the Council[2] (the "**BRRD**"),

**WHEREAS:**

### 1.  Competence of the Single Resolution Board

(1)    The Institution is a credit institution established in Spain, a participating Member State within the meaning of Article 4(1) of the SRMR, and therefore, falls within the scope of the SRMR in accordance with its Article 2(a);

(2)    Since the Institution is considered to be significant, in accordance with Article 6(4) of Regulation (EU) No 1024/2013[3] ("**SSMR**"), the Single Resolution Board (the "**Board**" or "**SRB**") is responsible for adopting all decisions relating to resolution for the Institution in accordance with Article 7(2)(a) SRMR, including the adoption of a

---

[1]  OJ L 225, 30.7.2014, p.1.
[2]  OJ L 173, 12.6.2014, p.190.
[3]  OJ L 287, 29.10.2013, p. 63.



**Single Resolution Board**

*Non-confidential version*

**SRB-GREEN**

resolution scheme when the Board assesses that the conditions as referred to in Article 18(1) of the SRMR are met;

## 2. The Institution and current developments

### 2.1   Description of the Institution

(3)   Banco Popular Group, comprising of the Institution and its subsidiaries, ("**Group**") is a Spanish banking group, whose business strategy is focused on providing banking services to natural persons, small and medium enterprises ("SMEs") and large corporations. The Group plays an important role in providing services to the SMEs in Spain.

(4)   As of end of the first quarter of 2017, the Group had total assets for an amount of EUR 147,114 million and own funds for an amount of EUR 11,069 million. The Group had 1,644 branches in Spain and around 10,634 employees.[4]

(5)   The Institution is the parent undertaking of the Group and is listed in the Spanish stock exchange.

(6)   The Group consists, *inter alia*, of four credit institutions within the participating Member States ("**Banking Union**"):
  (i)    Banco Popular Español S.A., (parent undertaking of the Group, established in Spain),
  (ii)   Banco Pastor, S.A. (Spain),
  (iii)  Popular Banca Privada, S.A. (Spain) and
  (iv)   Banco Popular Portugal, S.A. (Portugal).
  The credit institutions mentioned in point (ii), (iii) and (iv) above are wholly-owned subsidiaries of Banco Popular Español.

(7)   Furthermore, the Group has a presence in third countries through subsidiaries, branches and representative offices. The Group has a wholly-owned subsidiary in the United States, TotalBank, and holds a 24.9% stake in the Mexican Financial Group Bx+.

(8)   The Group also participates in a number of joint ventures that characterise the business model of the Group, in particular WiZink Bank S.A. (Spain), which is specialised in credit card business, and Aliseda Servicios de Gestion Inmobiliaria S.L. (Spain), a service provider managing the real estate business of the Group.

---

[4] Institution's Quarterly report for 1st Quarter 2017.



**Single Resolution Board**

*Non-confidential version*

**SRB-GREEN**

## 2.2    Description of Spanish Insolvency proceedings and Resolution Plan

### 2.2.1  Description of Spanish Insolvency proceedings

(9)     Credit institutions in Spain are subject to the normal insolvency proceedings as per Law 22/2003, of 9 July, on insolvency ("SIL"). Notwithstanding this general rule, Second Additional Provision of the law provides that, in the insolvency proceedings followed, inter alia, with respect to credit institutions, the specific terms provided in their special legislation shall also apply and will be considered *lex specialis* applicable to insolvency situations. In particular, the Second Additional Provision lists the specific regulation that is considered special legislation. Specifically, that includes Law 11/2015, of 18 June, on the recovery and resolution of credit institutions and investment firms (which transposes the BRRD into the Spanish legislation).

(10)    The Spanish Insolvency Law establishes a single insolvency procedure (concurso), applied to any insolvent debtor, which includes a common phase (during which, among others, the insolvency administrator is appointed, an inventory of the assets and a list of creditors are prepared, and claims ranked) and two potential results: (i) a composition agreement or (ii) the debtor's liquidation. The whole insolvency process is managed under the supervision of the Spanish Mercantile Courts specialized in insolvency matters. The declaration of insolvency may be requested by the debtor or by its creditors.

(11)    The Spanish Mercantile Courts are competent to hear and decide on insolvency proceedings of a credit institution. The primary objective of the insolvency proceedings is to maximise the value of assets of the failed firm in the interest of creditors.

(12)    The competent authority and FROB's role in normal insolvency proceedings of credit institutions is limited to:
-    Informing the Court as to whether or not an early intervention or resolution process has been initiated;
-    In the case of the FROB, presenting the Court with a proposed list of insolvency administrators from which the Court must select whom to appoint.

(13)    According to Article 8(1)(h) of Law 10/2014 of 26 June, on the organization, supervision and solvency of credit institutions, as regards an insolvency proceedings followed with respect a Spanish credit institution, the revocation of the authorization shall take place only when the opening of the liquidation phase adopted by the Court.



(14)   In case of groups of companies, the law provides for some procedural consequences, including the possibility for a creditor to request the opening of insolvency proceedings for several debtors when they belong to the same group of companies. However, according to the limited liability principle applicable to Spanish companies, the objective preconditions that trigger the normal insolvency proceedings must exist in relation to every and each debtor subject to the declaration of joint insolvency proceedings.

(15)   The limited liability principle implies that the joint opening of proceedings does not mean that the assets and liabilities of the companies concerned will be consolidated but that different proceedings will be co-ordinated.

(16)   The treatment and safeguards provided to the various classes of creditors, as well as the ranking of their claims in the event of insolvency proceedings of Spanish credit institutions are the same established by the law for creditors or claims relating to any other non-banking businesses subject to insolvency proceedings.

(17)   Notwithstanding that, paragraph 1 of Fourteenth Additional Provision of Law 11/2015 transposing BRRD provides that, in the event of an insolvency proceeding of a Spanish credit institution, the following credits shall qualify as credits with general preference, placed in the ranking junior to the claims with general preference established in Article 91(5) of SIL: a) the deposits covered by the Spanish deposit guarantee scheme (Fondo de Garantía de Depósitos) and the rights to which this scheme had subrogated in the event that it had made effective its guarantee over the covered deposits; and b) the part of the deposits of individuals and micro, small and medium sized enterprises in excess of the covered threshold as well as the deposits of individuals and micro, small and medium sized enterprises which would be covered deposits if they were not created through branches located out of the European Union of entities registered within the European Union.

(18)   In addition, according to paragraph 2 of Fourteenth Additional Provision of Law 11/2015, the subordinated claims included in article 92.2 of SIL will have, in the case of insolvency proceedings of entities subject to Law 11/2015, the following ranking: a) the principal amount of the subordinated debt which does not constitute Additional Tier 1 and Tier 2 capital; b) the principal amount of Tier 2 capital instruments; and c) the principal amount of the Additional Tier 1 capital instruments.

### 2.2.2  Resolution Plan

(19)   On 5 December 2016, the SRB in its Executive Session adopted the 2016 version of the Resolution Plan for the Group. In the resolution plan, the SRB assessed that



*Non-confidential version*

**SRB-GREEN**

the liquidation of the Group under normal insolvency proceedings is not credible, given the adverse impact that the liquidation of the Group is likely to have on the real economy and the financial system of Spain. This was mainly due to the Group's size, the number of deposits, the number of customers (retail, corporate and financial market participants) and its interconnections. Moreover, the liquidation of the Institution was considered that it is likely to have a material adverse effect on other institutions due to the high risk of contagion, through direct exposures to other institutions and due to the similarity of their business model (direct and indirect contagion).

(20)   The SRB also concluded that the sudden disruption of the provision of critical functions may directly and indirectly impact other credit institutions and have adverse effects on customers (mostly individuals and SMEs). The following critical functions were identified: deposit taking; lending to SMEs, payment and cash services.

(21)   Moreover, in accordance with Article 25 of the Commission Delegated Regulation (EU) 2016/1075 ("**Commission Regulation 2016/1075**")[5], the SRB determined that the most appropriate resolution strategy would be a Single Point of Entry ("SPE") strategy in light of the centralised business model of the Group. The point of entry for resolution would be the Institution, parent undertaking of the Group.

(22)   The preferred resolution tool as identified in the 2016 resolution plan was the application of the bail-in in accordance with Article 27(1)(a) SRMR. The preferred resolution strategy would consist of two phases:
   a) a stabilization phase, in which the bail-in tool would be applied at the level of the Institution; and
   b) a restructuring phase, in which the management of the entity or group in resolution would submit a business reorganization plan within one month after the application of the bail-in tool, as required by Article 27(2) SRMR in combination with Article 52 BRRD.

## 2.3   The Institution's difficulties

(23)   As described in the "failing or likely to fail" ("**FOLTF**") assessment received from the European Central Bank ("**ECB**"), the liquidity situation of the Institution has deteriorated significantly since October 2016, due to the material cash outflow across all customer segments. As a result, the Institution has insufficient options to restore its liquidity position in order to ensure that it will be in a stable position to meet its liabilities as they fall due.

---

[5] OJ L 184, 8.7.2016, p. 1.



(24)  The liquidity situation of the Institution rapidly deteriorated, in particular, because of the following circumstances:

a)  In February 2017, the Institution disclosed the need for extraordinary provisions in an amount of EUR 5,700 million, leading to losses of EUR 3,485 million in 2016 and appointed a new Chairman who initiated a revision of the Institution's strategy;

b)  On 10 February 2017, DBRS downgraded the rating of the Institution;[6]

c)  On 3 April 2017, the Institution released an ad-hoc public statement informing about the outcome of several internal audits with potentially significant impact on the Institution's financial statements and confirmed that it will replace the Chief Executive Officer ("**CEO**") of the Institution after less than one year in office;

d)  On 7 April 2017, Standard & Poor's downgraded the rating of the Institution;[7]

e)  On 10 April 2017, the Institution announced that it would not pay dividends and that a capital increase or a corporate transaction could be required due to the Group tight capital position and the level of the non-performing assets ("**NPAs**").

f)  On 21 April 2017, Moody's downgraded the rating of the Institution;[8]

g)  On 3 May 2017, the Group disclosed its quarterly results for the first quarter of 2017, which were worse than the market expected;

h)  [...].

i)  The continuous negative press coverage about the financial results of the Institution and the allegedly imminent risk of bankruptcy/illiquidity has resulted in an increase of the deposits outflows;

j)  On 6 June 2017, DBRS and Moody's downgraded the rating of the Institution.

(25)  The above circumstances resulted in significant deposits outflows. [...]

**2.4    Measures attempting to address the difficulties**

(26)  The Group attempted to address the liquidity problems of the Institution by taking various additional measures over the past weeks, including the following:

a)  In April 2017, the Institution initiated a private sales process with a view to achieving its sale to a strong competitor, which would restore the financial situation of the Institution. The deadline for potential purchasers interested in acquiring the Institution to submit their offers was initially set on 10 June

---

[6] Source: DBRS Downgrades Popular's Senior Ratings to BBB, Negative Trend.
[7] Source: S&P Full Analysis (11/04/2017).
[8] Source: Moody's - Moody's downgrades Banco Popular's senior unsecured debt ratings to B1 and deposit ratings to Ba3, outlook negative.



Single
Resolution Board

2017. In the beginning of June, this deadline was extended to end of June. However, the negotiations have so far not led to a positive outcome.

b) On 2 June 2017, the Institution sold its participation in Targobank to Credit Mutuel;

c) On 5 June 2017, the Governing Council of the ECB, based on the request from Banco de España ("**central bank**") did not object to grant Emergency Liquidity Assistance ("**ELA**"). The institution has received ELA for an amount of […]. […] the central bank was not in a position to pay out further ELA to the Institution.

d) Furthermore, the Institution has put in place several other measures to correct the liquidity position […].

## 3.  Procedure

(27)   On 2 May 2017, the ECB organised a meeting of the institution-specific crisis management group to discuss the situation of the Institution. On 18 May 2017, given the rapidly deteriorating situation of the Group, the SRB requested the ECB to provide it with specific and updated information with regard to the Group.

(28)   On 24 May 2017, the SRB decided to request the Institution to supply with information necessary to perform the valuation under Article 20 SRMR.

(29)   On 2 June 2017, the ECB informed the SRB about the rapidly deteriorating situation of the Institution and that given the significant deposit outflows, the Institution may not be able to pay its liabilities as they fall due within the following week.

(30)   On the same date, the SRB decided to request the Institution to supply information about the private sales process as well as to stand ready to provide potential purchasers participating in a potential marketing procedure of the resolution authorities, with access to the Virtual data room ("**VDR**") established as part of the private sales process.

(31)   On 3 June 2017, following the receipt of information from the Institution regarding the private sales process, the SRB decided to initiate the marketing procedure of the Institution and provided FROB with the marketing requirements, in accordance with Article 39 BRRD.

(32)   On the same date, the identified potential purchasers were requested to sign a Non-disclosure agreement ("**NDA**").

(33)   On 4 June 2017, two interested potential purchasers duly signed the NDAs.



**Single Resolution Board**

***Non-confidential version***

**SRB-GREEN**

(34)   On 5 June 2017, the two potential purchasers were provided with access to the VDR and the sale documentation was provided to them.

(35)   On 6 June 2017, the ECB communicated to the SRB its draft FOLTF assessment of the Institution, for the purpose of consulting the SRB on this matter in accordance with Article 18(1)(second subparagraph) of the SRMR.

(36)   On the same date, the Bank notified the ECB that its board of directors has assessed that the Institution is likely to fail.

(37)   On the same date, following the receipt of the SRB's response to the above consultation, the ECB has reached the conclusion that the Institution is failing, or in any case likely to fail in the near future, in accordance and as a consequence of the circumstances established in Article 18(4)(c) of the SRMR. On the same date, the ECB communicated its assessment to the SRB.

(38)   On 7 June 2017, one binding offer was received.

(39)   On 7 June 2017, the SRB adopted the resolution scheme and transmitted to the European Commission.

(40)   On 7 June 2017, the Commission endorsed the resolution scheme.

### 4. Valuation (see <u>Annexes</u>)

(41)   On 23 May 2017, the SRB hired an independent valuer, Deloitte, in order to perform an economic valuation in accordance with Article 20 SRMR.

(42)   Given the urgency of the circumstances of the case, Deloitte carried out a provisional valuation, in accordance with Article 20(10) SRMR. Such provisional valuation was carried out with the purpose of:
    a) Assessing the economic value of the assets and liabilities of the entity meeting the conditions for resolution according to Article 20(4) SRMR;
    b) Providing for an estimate of the treatment that the shareholders and creditors would have received if the entity had entered into normal insolvency proceedings;
    c) Informing the decision on the shares or instruments of ownership to be transferred and the SRB's understanding of what constitutes commercial terms for the purposes of the sale of business tool.

(43)   Furthermore, the SRB performed a provisional valuation to inform the determination whether the conditions for resolution are met. […]



**Single Resolution Board**

*Non-confidential version*

**SRB-GREEN**

### 5.  Deviation from the resolution plan

(44)  The 2016 Resolution Plan was based on the assumption that the institution's failure would be related to a deterioration of its capital position. However, as noted in Section 2.3 above, the events leading to the failure of the Institution are mainly related to the circumstances that the Institution will, in the near future, be unable to pay its debts or other liabilities as the fall due (i.e. its liquidity position).

(45)  Given the fact that the failure of the Institution follows from the deterioration of the liquidity situation of the Institution, it cannot be ensured that the application of the bail in tool of Article 27(1)(a)SRMR, as provided for in the 2016 resolution plan, would immediately and effectively address the liquidity situation of the Institution, hence, restoring it to financial soundness and long-term viability. This is, in particular, the case due to the already large number of encumbered assets of the Institution when entering resolution.

(46)  Given the specific circumstances of the case, the sale of business tool would meet the resolution objectives more effectively than the resolution strategy provided in the resolution plan, i.e. the bail-in tool of Article 27(1)(a) SRMR.

**WHEREAS**

the SRB has duly taken into account the principles as referred to in Article 6 SRMR, the resolution objectives, as referred to in Article 14(2) SRMR, and the general principles governing resolution, as referred to in Article 15 SRMR.



**Single Resolution Board**

*Non-confidential version*

**SRB-GREEN**

**HEREBY DECIDES**:

**TITLE I – PLACING THE INSTITUTION UNDER RESOLUTION AND CONDITIONS FOR RESOLUTION**

### Article 1
### Placing the Institution under resolution

Given that the conditions of Article 18(1) SRMR are met, the SRB decides to place the Institution under resolution as of the Resolution Date, as referred to in Article 12 of this Decision.

### Article 2
### Failing or Likely to Fail

2.1    In accordance with Article 18(1)(a) and (4)(c) of the SRMR and after consulting the SRB, the ECB has assessed that the Institution is failing, or in any case likely to fail in the near future, and notified the SRB on 6 June 2017. In particular […] there are objective elements indicating that the Institution is likely in the near future to be unable to pay its debts or other liabilities as they fall due. […]

2.2    Following the ECB assessment, the SRB concludes that the condition specified in Article 18(1)(a) of the SRMR is satisfied in respect of the Institution.

### Article 3
### Alternative Measures

3.1    Following close cooperation with the ECB, the SRB concludes that there are no alternative measures which could prevent the failure of the Institution within a reasonable timeframe and, therefore, the condition specified in Article 18(1)(b) of the SRMR is satisfied in respect of the Institution. In order to reach this conclusion, the SRB has taken into account, in particular, the ECB's assessment that there are no measures that could prevent the failure of the Institution.

3.2    There is no reasonable prospect that any alternative private sector measures could prevent the failure of the institution. The lack of such measures can be inferred, in particular, from:

a)    The Institution itself has recognized by letter to the ECB dated 6 June 2017 that it assesses that it meets the conditions for FOLTF;



b)   The private sales process has not led to a positive outcome within a timeframe that would allow the Institution to be able to pay its debts or other liabilities as they fall due;

c)   It is unlikely that the Institution would be able to mobilise sufficient additional liquidity through regular market transactions or central bank operations nor via the measures foreseen in its contingency funding and recovery plans within the necessary timeframe.

d)   Emergency Liquidity Assistance will be insufficient with regard to the timing of the deterioration of the liquidity position.

3.3.   There is no reasonable prospect that any supervisory action, including early intervention measures could prevent the failure of the Institution. In its FOLTF assessment, the ECB has confirmed that there are no available supervisory or early intervention measures that could restore the liquidity position of the Institution in an immediate way and allow it to ensure sufficient time in order to implement a corporate transaction or other solution. The available measures to the ECB as competent authority under the national transposition of Article 104 of Directive 2013/36/EU[9] and Article 27-29 BRRD or under Article 16 of Regulation (EU) No 1024/2013[10] cannot ensure that the institution will be in a position to meet its liabilities and other debt as they fall due, given the extent and pace of the liquidity deterioration observed.

3.4.   There is no reasonable prospect that the independent exercise of the write down and conversion powers, as referred to in Article 21 SRMR, would prevent the failure of the Institution within a reasonable timeframe. In particular, given that the Institution is likely to fail due to its liquidity position, the write down and conversion of capital would not be sufficient to restore the liquidity situation of the Institution.

### Article 4
### Public Interest

4.1   Having considered all of the matters outlined in the following paragraphs and balancing the resolution objectives specified in Article 14(2) of the SRMR to the nature and circumstances of the current case in accordance with Articles 14(3) of the SRMR, the SRB concludes that the resolution action in the form of a sale of business tool in respect of the Institution is necessary in the public interest within the meaning of Articles 18(1)(c) and 18(5) of the SRMR.

---

[9] OJ L 176, 27.6.2013, p. 338
[10] OJ L 287, 29.10.2013, p. 63



*Non-confidential version*

**SRB-GREEN**

4.2    In determining whether resolution action in respect of the Institution is necessary in the public interest, the SRB has taken into account as a starting point the assessment included in the 2016 Resolution Plan about the credibility of the liquidation of the Institution under normal insolvency proceedings. On this basis, and in view of the circumstances of this case, it was concluded that:

    (i)    resolution action is necessary for the achievement of, and is proportionate to the following resolution objectives, referred to in Article 14(2) SRMR:

        i.    to ensure the continuity of critical functions; and

        ii.    to avoid significant adverse effects on financial stability, in particular by preventing contagion, including to market infrastructures, and by maintaining market discipline.

    (ii)    winding up of the Institution under normal insolvency proceedings would not achieve the above resolution objectives to the same extent as resolution action.

4.3    For the purposes of this determination:

    a)    resolution action refers to the resolution action carried out through use of the resolution tools and powers as referred to in Articles 6 *et seq.* of this Decision;

    b)    winding up of the institution under normal insolvency proceedings refers to the application to the institution of the regime of the insolvency proceedings, as provided included in Spanish Law 22/2003, of 9 of July 2003.

4.4    **Analysis in the light of the resolution objectives under the current circumstances**

    **4.4.1    Ensuring the continuity of critical functions: Article 14(2)(a) SRMR**

The Institution provides critical functions, within the meaning of Article 2(1)(35) of the BRRD and in accordance with the criteria set out in Article 6 of the Commission Delegated Regulation 2016/778 ("**DR 2016/778**").[11] In particular, the Institution performs activities, services or operations the discontinuance of which would be likely to lead to: (i) the disruption of services that are essential to the real economy in Spain (ii) disruption of financial stability in Spain.

[...] the Institution has identified the following functions as critical:

- Deposit taking from Households and non-financial corporations (small and medium sized enterprises –"**SMEs**"- and non-SMEs);
- Lending to SMEs; and
- Payment and Cash Services.

[...]

The table below presents the number of branches of the Institution in Spain.

---

[11] OJ L 131, 20.5.2016, p. 41.



*Non-confidential version*

**SRB-GREEN**

| Region | Number of Institution's Branches |
|---|---|
| Western Andalusia | 143 |
| Easter Andalusia | 145 |
| Catalonia and Balearic Islands | 304 |
| Central Region | 284 |
| Levante Region | 158 |
| North Western Region | 204 |
| Northern Region | 140 |

*Table 1: National presence of the Institution, Source: Annual report (2016).*

**(i) Deposit taking**

Deposit taking (i.e. the acceptance of deposits from non-financial intermediaries) is considered to constitute a critical function given the fact it meets the following criteria:

a) This service is provided by the Institution to households and non-financial corporations (SMEs – and non-SMEs), which are third parties not affiliated to the Group;

b) the sudden disruption of that function would likely have a material negative impact on the above clients, undermine the general confidence of market participants and therefore give rise to contagion.

In particular, the Group is the sixth largest banking group in Spain, having a granular network of branches (1,644) and ATMs (2,368) throughout the national territory. Moreover, the Group has an important presence in Madrid, Castilla y León, Galicia and Andalusia. The Institution representing 93% of the total assets of the Group is one of the few market participants, which after the Spanish financial system restructuring process, are currently located and operating in almost the entire national territory. According to data reported by the Institution, as of December 2016, the Institution had around 1.6 million clients. The customers affected would be mainly households, SMEs, individual entrepreneurs and non-SMEs (large enterprises). The table below presents the main figures with regard to the provision of deposit taking by the Institution in Spain.

| Sub – function: Deposits from: | Value on accounts (in mn EUR) | Nb of clients (in # thousands) | Nb of accounts (in # thousands) |
|---|---|---|---|
| Households | 32,680.7 | 1,381.5 | 1,869.6 |



| Non-financial corporations – SMEs | 14,453.7 | 193.5 | 231.6 |
|---|---|---|---|
| Non-financial corporations – non SMEs | 3,887.9 | 1.9 | 4 |

*Table 2: Deposit taking of the Institution (value on accounts, number of clients and number of accounts) in Spain – Source: 2017 Critical function template (data as of December 2016).*

The market share of the Institution in the national market for deposit taking in Spain is between 5% and 10%.

Given the national reach and the size of the Institution, the discontinuance of the Institution's deposit services could have a material negative impact on its clients and have indirect adverse effects on other stakeholders. In particular, it could result in an increased uncertainty with regard to the rest of Spanish national banks, and, therefore, increase the cost of funding for other institutions with a similar business model and liquidity, as well as liquidity difficulties for other affected stakeholders;

c)  The function is not considered to be substitutable as it cannot be replaced in an acceptable manner and within a reasonable time frame thereby avoiding systemic problems for the real economy and the financial markets.

[...]

### (ii) Lending to SMEs

Lending to SMEs (i.e. provision of funds to non-financial SMEs in the form of wide range of products, e.g. loans, short terms credit, factoring) is considered to constitute a critical function given the fact it meets the following criteria:

a)  This service is provided by the Institution to non-financial corporations (SMEs), which are third parties not affiliated to the Group;

b)  The sudden disruption of that function would likely have a material negative impact on the third parties, give rise to contagion or undermine the general confidence of market participants due to the systemic relevance of the function for the third parties and the systemic relevance of the institution or group in providing the function.

The customers affected would be mainly SMEs and individual entrepreneurs, which have a high relative importance in the Spanish corporate segment. The Institution leads the Spanish market share of lending to SMEs with a range between 15% and 20% of the total. The Institution has a significant number of

14



*Non-confidential version*

**SRB-GREEN**

clients (155,200) classified as SMEs and individual entrepreneurs that represent 22% of the clients to which it has granted loans.

The table below presents the main figures with regard to lending to SMEs. :

| Sub-function: Lending to | Value outstanding (in mn EUR) | Value committed (in mn EUR) | Nb of clients (in # thousands) |
|---|---|---|---|
| Non-financial corporations – SMEs | 42,308,6 | 5,684 | 155,2 |

*Table 3: Lending to SMEs – Source: 2017 Critical Function Template (Data as of December 2016).*

Given the high market share of the Institution in the market for lending of SMEs, the discontinuance of the relevant function may have a significant impact on a great number of the SMEs. In light of the high relative importance of the SMEs in the Spanish corporate segment, the potential discontinuance of the function by a one of the main national funding providers, i.e. the Institution, could have an impact on the real economy;

c) The function is not considered to be substitutable as it cannot be replaced in an acceptable manner and within a reasonable time frame thereby avoiding systemic problems for the real economy and the financial markets.

[...].

### (iii)   Payment and cash services

Payment services to Monetary Financial Institutions (MFIs) and to non-MFIs and cash services to non-FMIs are considered to constitute a critical function given the fact it meets the following criteria:

a) The services are provided by the Institution to MFIs and non-MFIs, which are third parties not affiliated to the Group;

b) The sudden disruption of that function would likely have a material negative impact on the third parties, give rise to contagion or undermine the general confidence of market participants due to the systemic relevance of the function for the third parties and the systemic relevance of the institution or group in providing the function.
The Institution has a large number of clients, derived from its national coverage and its consideration as systemic entity. The Institution provides the above services to a broad range of customers (such as households, non-financial corporations – SMEs and non-SMEs - and General Governments). Due to the systemic consideration of the Institution and its large number of clients, the



Institution intervenes in a significant volume of payments. According to the data provided by the Institution, the total value of transactions carried out by the Group in 2016 amounted to EUR 103 bn. Considering the central role that the payment services function plays in the economy, the interruption of this function may have a high impact on third parties and could generate financial stability problems.

With regard to the cash services, the table below presents the main figures.

| Sub- function | Value of transactions (in mn EUR) | Nb of transactions (in # thousands) |
|---|---|---|
| Cash services | 7,816 | 8,535 |

*Table 4: Cash services of the Institution - Source: 2017 Critical Function Template*

Considering the market share of the Institution for cash services in Spain (between 5% and 10%) […]. Therefore, the disruption of this function may have a high impact on third parties, potentially affecting the real economy;

c) The function is not considered to be substitutable as it cannot be replaced in an acceptable manner and within a reasonable time frame thereby avoiding systemic problems for the real economy and the financial markets.
   […].

Overall, in case of initiation of the insolvency proceedings and withdrawal of the full banking license of the Institution by the ECB, the Institution would not be able to continue providing the above critical functions, i.e. deposits, lending to SMEs and payment and cash services. In particular, in respect of deposit taking, the initiation of normal insolvency proceedings would render the deposits unavailable. Therefore, the Spanish deposit guarantee scheme (Fondo de Garantía de Depósitos de Entidades de Crédito) would be required to repay the covered deposits in accordance with Article 11(1) of the Directive 2014/49. The Spanish deposit guarantee scheme would make the repayable amount available to the clients within a maximum of 20 business days. In respect of lending, although the initiation of insolvency proceedings does not affect the contracts of the debtors, it cannot be excluded that, with the approval of the competent Court, the insolvency trustee considers that the termination of the contracts would be in the interests of the insolvency estate. [...]

On the contrary, the sale of business tool is necessary and proportionate to ensure the continuity of the above described critical functions provided by the Institution.



**Single Resolution Board**

*Non-confidential version*

SRB-GREEN

### 4.4.2    <u>Avoiding significant adverse effects on financial stability: Article 14(2)(b) SRMR</u>

The situation of the Institution entails an increased risk of significant adverse effects on financial stability in Spain. This is inferred from the following elements:

- The size and relevance of the Institution, which constitutes the parent undertaking of the sixth largest banking group in Spain, of which total assets amount to EUR 147 billion. It is classified as a significant institution ("**SI**") of a systemic nature. Banco de España has designated it between other systemically important institutions ("**O-SIIs**") in 2017. Its O-SII score (402), calculated according to the guidelines of the European Banking Authority on the identification of O-SIIs[12], is above the threshold of 350 points.

  The Institution is one of the main market participants in Spain, with a significant market share in the SME segment. The Institution serves around 25% of the SMEs in Spain. The Institution has a relatively high market share of deposits (close to 6%), and a large number of retail clients (approximately 1.4 million) distributed throughout Spain. The table below present the value of deposits of the Institution.

| In mn EUR | 31 December 2016 | 31 March 2017 |
|---|---|---|
| Covered deposits | 28,382 | 21,191 |
| Institution liabilities < 7 days | 193 | 338 |
| Non covered deposits | 48,201 | 47,117 |
| *o/w preferential* | *13,873* | *12,279* |
| *o/w non preferential* | *34,328* | *34,837* |

*Table 5: Deposits and Institution Liabilities with a maturity lower than 7 days – Source: Liability Data Report.*

Non-covered non-preferred deposits amount 34,837 million EUR, granted mainly in the form of intragroup (11,445 million EUR, 32%) and to corporate firms (7,887 million EUR, 23%).

- The nature of its business, which is around commercial banking activities and focuses primarily on offering financing, savings management and financial services to individuals, families and companies (particularly SMEs): The similarity of the Institution's business model to that of other Spanish commercial

---

[12] EBA Guidelines on the criteria to determine the conditions of application of Article 131(3) of Directive 2013/36/EU (CRD) in relation to the assessment of other systemically important institutions (O-SIIs), EBA/GL/2014/10.



*Non-confidential version*

**SRB-GREEN**

banks may contribute to the potential for indirect contagion to the above banks, which might be perceived as facing the same difficulties.[13]

[…].

Therefore, swift resolution action is necessary and proportionate to avoid the adverse effects that the failure of the Institution would have on financial stability and, in particular, to limit the contagion effect which would result from the winding up of the Institution under normal insolvency procedures.

### 4.4.3   Other resolution objectives

The SRB concludes that the resolution action would meet the other resolution objectives, i.e.:

    a) to protect public funds by minimising reliance on extraordinary public financial support;

    b) to protect depositors covered by Directive 2014/49/EU and investors covered by Directive 97/9/EC;

    c) to protect client funds and client assets;

at least to the same extent as insolvency proceedings.

4.5    The SRB concludes that the resolution action also contributes to the minimization of the destruction of value. The winding up of the institution under normal insolvency proceedings, which is a long and complex procedure, would result in the creditors bearing higher losses than in resolution, since the liquidation of the Institution would result in its assets being sold at a low exit price.

4.6    Considering the previous factors, the conclusion is that the disadvantages and costs of the adoption of this resolution action (mainly the losses suffered by the current shareholders and subordinated creditors) would be outweighed by the benefits derived from it (mainly the maintenance of the critical functions and minimization of adverse effects for the economy and the financial stability and the avoidance of further losses that could be suffered by other senior creditors, especially if insolvency proceedings were to be applied).

4.7    Pursuant to Article 6(3) and 6(5) of the SRMR, taking into account that this decision concerns an Institution which has a subsidiary in Portugal, the interests of Portugal have been taken into account. The resolution action and in particular, the application of the sale of business tool, with the purpose of transferring shares to a private purchaser, has as a result that there will be no impact on the Portuguese subsidiary. On the contrary, in case of insolvency proceedings of the

---

[13] During the recent crisis of 2012, there was a widespread perception that the Spanish financial sector problems were limited to the saving banks model and not to the Spanish commercial banks, which were considered to be financially robust.



**Single
Resolution Board**

***Non-confidential version***

**SRB-GREEN**

Institution, it is likely that the Portuguese subsidiary would have been negatively impacted.

## TITLE II – RESOLUTION TOOLS AND POWERS

### Article 5
### Selection of the resolution tools

5.1   The resolution tool to be applied to the Institution shall consist in the sale of business pursuant to Article 24 of the SRMR for transferring shares to a purchaser. The write down and conversion of capital instruments will be exercised immediately before the application of the sale of business tool.

5.2   The application of the resolution tool as referred to in the previous paragraph provides an appropriate, necessary and proportionate way to meet the resolution objectives referred to in Article 14(2) of the SRMR, as substantiated in Article 4 of this Decision. By the application of the sale of business tool, the SRB mainly aims to protect critical functions for the functioning of the real economy and preserving financial stability.

5.3   The SRB considers that the application of other resolution tools set out in Article 22(2) of the SRMR would not meet the resolution objectives to the same extent in the case at stake. In particular:

a) With regard to the bail in tool of Article 27(1)(a)SRMR (even if combined with the asset separation tool) it cannot be ensured that it would immediately and effectively address the liquidity situation of the Institution, hence, restoring it to financial soundness and long-term viability. Given the specific circumstances of the case, the sale of business tool would meet the resolution objectives more effectively than the bail-in tool of Article 27(1)(a) SRMR;

b) With regard to the bridge institution tool (even if combined with the asset separation tool), given that the bridge institution aims to maintain access to critical functions and sell the Institution within a timeframe of, in principle, two years, and to the extent that the sale of business tool achieves the same result within a short timeframe, the sale of business tool is considered to achieve the resolution objectives more effectively than the bridge institution tool.

### Article 6
### Write down of capital instruments and Sale of Business Tool



*Non-confidential version*

**SRB-GREEN**

6.1   In exercise of its rights and powers under Article 21 SRMR, the SRB decides:

a) To write down the nominal amount of the Institution's share capital in an amount of EUR 2,098,429,046. This shall result in the cancellation of 100% of the Institution's share capital, consisting in 4,196,858,092 shares, of the same class and series, each with a nominal value of EUR 0.50 and represented by means of book-entries, which are publicly listed on the Spanish Stock Exchanges (*Bolsas de Valores de Madrid, Barcelona, Bilbao y Valencia*) under ISIN ES0113790531 (the "**Existing Shares**").

b) Subsequently, to convert all principal amount of Additional Tier 1 instruments issued by the Institution and outstanding as at the date hereof – that is,

| # | Item (ISIN) | Nominal value (in EUR) |
|---|---|---|
| 1 | XS0288613119 | 5,400,000 € |
| 2 | DE0009190702 | 64,695,000 € |
| 3 | DE000A0BDW10 | 19,115,000 € |
| 4 | XS0225590362 | 7,359,000 € |
| 5 | XS0979444402 | 499,985,000 € |
| 6 | XS1189104356 | 749,988,000 € |

– into newly issued shares of the Institution, all of the same class and series, each with a nominal amount as determined by FROB (the "**New Shares I**"). In accordance with Art. 21(1)(a) and (10) SRMR and the exercise of the power to convert capital instruments as provided for in Law 11/2015, this shall result in a conversion of all claims of the respective holders with respect to the principal amount outstanding under the items listed under (1) to (6) in the table above (each an "**Outstanding AT1 Principal Receivable**") into New Shares I. The Outstanding AT1 Principal Receivables will be converted into New Shares I at par value, so that EUR 1 of Outstanding AT1 Principal Receivables shall be converted into EUR 1 of nominal value of New Shares I.

c) Subsequently, to write down to zero the nominal amount of the New Shares I. This shall result in the cancellation of 100% of the New Shares I issued as a result of the conversion of the Outstanding AT1 Principal Receivables.



d) Subsequently, to convert all principal amount of Tier 2 instruments issued by the Institution and outstanding as at the date hereof – that is,

| # | Item (ISIN) | Nominal value (in EUR) |
|---|---|---|
| 1 | ES0213790001 | 99,700,000 € |
| 2 | ES0213790019 | 200,000,000 € |
| 3 | ES0213790027 | 250,000,000 € |
| 4 | XS0550098569 | 91,700,000 € |
| 5 | SUBORDINATED DEBT TOTALBANK 1 | 10,978,957 € |
| 6 | SUBORDINATED DEBT TOTALBANK 2 | 10,978,957 € |
| 7 | SUBORDINATED DEBT TOTALBANK 3 | 10,978,957 € |
| 8 | SUBORDINATED DEBT TOTALBANK 4 | 10,978,957 € |

– into newly issued shares of the Institution, all of the same class and series, each with a nominal amount as determined by FROB (the "**New Shares II**"). In accordance with Art. 21 para 10 SRMR, this shall result in a conversion of all claims of the respective holders of Tier 2 instruments with respect to the principal[14] amount outstanding under the items listed under (1) to (8) in the table above (each an "**Outstanding T2 Principal Receivable**") into New Shares II. The Outstanding T2 Principal Receivable will be converted into New Shares II at par value, so that EUR 1 of Outstanding T2 Principal Receivables shall be converted into EUR 1 of nominal value of New Shares II.

6.2 All measures ordered in paragraphs (a), (b), (c) and (d) above shall be implemented by the FROB, which is the Spanish executive resolution authority.

To that end, the FROB is hereby instructed to make use of the powers conferred thereto by Spanish Law 11/2015 (and the provisions developing the former) in order to execute such resolution measures and take all the steps (this including ordering all third parties whose actions or omissions are required in this context to comply with this Decision) which are necessary or expedient to effect the write downs and conversions.

---

[14]   According to Article 39.1.c) of Law 11/2015.



6.3    The above-mentioned write down and conversion measures are based on the valuation mentioned in Section 4 of the recitals of this Decision (the "**Valuation**"), as supplemented and corroborated by the results of an open and transparent marketing process that has been conducted by the FROB (within the available timeframe under the given circumstances).

6.4    The Valuation informs the SRB that in view of the independent valuer, the conservative estimate of the adjusted equity of the Institution is a negative amount of EUR 8.2 billion. It follows from the ratio of Article 20(10) SRMR that such amount, including buffers, shall be decisive. However, in light of the bid received from the Purchaser and in accordance with the principles set out in Article 15 SRMR, in particular Article 15 para 2 SRMR, the SRB has refrained from ordering further actions in addition to the ones set out herein.

The implied amount of required adjustments is equal to the aggregate amount of the Institution's entire Common Equity Tier 1 items included in its balance sheet and the entire principal amount of Additional Tier 1 instruments and Tier 2 instruments. Accordingly, it is necessary and appropriate that all such items and instruments, respectively, shall, with economic effect, be written down to zero or converted (cf. Article 21(11) SRMR) in the manner set out above to absorb implied adjustments as per the Valuation.

For the purpose hereof, all further Common Equity Tier 1 items of the Institution existing as at the date hereof shall be treated as set to zero, absorbing adjustments following from the Valuation in an amount corresponding to the amounts of such Common Equity Tier 1 items.

6.5    In exercise of its rights and powers under Article 24(1)(a) SRMR, the SRB hereby orders that the New Shares II shall be transferred to **Banco Santander S.A.**, a public limited liability company, incorporated under Spanish law, with registered office at Paseo de Perenda, 9-12,39004, Santander, Spain, with Spanish tax Identification number A39000013, licensed as a credit institution, registered with the Bank of Spain's Official Register under code 0049 (the "**Purchaser**"), free and clear of any rights or liens of any third party.

Such transfer shall occur in consideration of a purchase price to be paid by the Purchaser of

**EUR 1**

(the "**Transfe**r").

The Purchaser has already consented to the Transfer.



6.6     The ordering of the Transfer is both necessary and adequate.

In arriving at this assessment, the SRB has determined that the marketing efforts conducted with respect to the Institution by the FROB prior to this decision have complied with the requirements set forth in Article 24 SRMR in connection with Article 39 BRRD.

The Institution had initiated a marketing and sales process with respect to itself during the period immediately preceding this resolution. During the week commencing on 29 May 2017 it became apparent that such privately managed sales process would fail.

The decision to limit its marketing efforts to those institutions that had already expressed a general interest in acquiring the Institution within the privately managed sales process complied with the requirements set out in Article 39 BRRD.

Following the implementation of the marketing procedure by FROB, ultimately, two institutions were invited to participate in the marketing process. All such potential bidders were approached at the same time, received access to the same data room and their bids were subject to the same conditions and deadline.

Ultimately, out of the two potential bidders, one valid bid was received. Given that the Purchaser was the sole bidder submitting a bid, it was prudent for the SRB to accept its conditions and thereby prevent an uncontrolled insolvency of the Institution that would have, inter alia, endangered the critical functions referred to under Article 4(4) of this Decision.

6.7     The New Shares II shall be transferred to, and the Transfer shall be accepted by, the Purchaser on the basis of the Purchaser's binding offer dated 7 June 2017. The Purchaser has represented that it has adopted the relevant corporate approvals for the acquisition of the New Shares II.

6.8     The Transfer shall take place in a single step, on the following commercial terms and conditions set out in the Purchaser's binding offer. Prior to the Transfer, the FROB shall enter into a shares sale and purchase agreement with the Purchaser.

6.9     The FROB shall utilise the proceeds obtained from the sale of the New Shares II ("**Transfer Proceeds**") in the following order of priority: (1) towards the payment of all reasonable costs and expenses incurred by the SRB and FROB in connection with the Transfer and the preparation of this resolution scheme, (2) toward the payment of a compensation to the holders of the Outstanding Tier 2 Principal



*Non-confidential version*

**SRB-GREEN**

Receivables affected by the mandatory conversion.  In this respect, those holders of Outstanding Tier 2 Principal Receivables converted into New Shares II must be compensated to the extent possible and, between them, on a pro rata basis.

6.10    The SRB has been informed by the liquidation values determined as per the Valuation that the holders of Existing Shares and AT1 and Tier 2 instruments could not expect to receive any recovery on their holding position in an insolvency of the Institution as the value of the distributable assets of the Institution's insolvency estate would be lower than the amount of outstanding liabilities so that, as per SIL, no distribution to shareholders would be forthcoming. Hence, the Shareholders will not incur any greater losses under this resolution scheme than they would have incurred under normal insolvency proceedings.

6.11    The Transfer ordered above shall be implemented by the FROB.
To that end, the FROB is hereby instructed to make use of the powers conferred thereto by Spanish Law 11/2015 (and the provisions developing the former) in order to execute this resolution measure and take all the steps (this including ordering all third parties whose actions or omissions are required in this context to comply with this Decision), which are necessary or expedient to effect the Transfer without delay.

6.12    In connection with the implementation of this Decision by the FROB, the FROB shall at all times ensure:
   a) Prompt information of the SRB of any powers exercised and steps taken in compliance with this Decision and the conditions laid down in Spanish applicable regulations; and
   b) Fully collaborate with all authorities whose authorisation or approval is required in connection with the Transfer, providing them inter alia with all necessary information in order for such authority to duly complete the relevant authorisation process.

### Article 7
### Replacing the management of the Institution

Pursuant to Article 15(1)(c) SRMR, FROB is entitled to remove and replace the management body and the senior management of the Institution. In accordance with Article 23(fifth subparagraph) SRMR and Article 35 BRRD, FROB may appoint a special manager. In this regard, FROB may take into account the proposal of the Purchaser.



**Single Resolution Board**

*Non-confidential version*

SRB-GREEN

## TITLE III –FINAL PROVISIONS AND EXECUTION

### Article 8
### Informing and consulting employee representatives

In accordance with Article 15(4) of the SRMR, FROB shall inform and consult employee representatives, where appropriate according to the Spanish law.

### Article 9
### Implementation

9.1    FROB shall take all necessary measures to proceed with the execution and implementation of this Decision in accordance with Article 18(9) and Article 29 of the SRMR. Such measures include, inter alia, the resolution powers as referred to in Articles 63-72 BRRD, in order to meet the resolution objectives and implement this Decision.

9.2    In accordance with Article 6(7) of the SRMR, FROB may specify further the measures to be taken, provided that such specifications comply with this Decision.

### Article 10
### Monitoring

10.1    In order to allow the SRB to closely monitor the execution of this Decision by FROB, as required by Article 28 of the SRMR, FROB shall provide the SRB with accurate, reliable and complete information on the execution of this Decision, the application of the resolution tools and the exercise of resolution powers on a frequent basis, to be determined by the SRB.

10.2    Without prejudice to paragraph 1, FROB shall submit annually to the SRB a report on the execution of this Decision. FROB shall submit to the SRB a final report on the execution of this Decision.

### Article 11
### Amendments

11.1    This Decision may be amended and updated anytime it is deemed appropriate by the SRB during the course of the resolution process, in accordance with Article 23 (fourth subparagraph) and Article 28(3) of the SRMR, and following the procedure laid down in Article 18 SRMR.



11.2   FROB shall inform the SRB if an amendment or update of this Decision during the course of the resolution process could be deemed appropriate in the light of the circumstances of the case.

## Article 12
### Entry into force and language

12.1   This decision shall enter into force on 7 June 2017 ("**Resolution Date**") at 06:30 CET, in accordance with the procedure laid down in Article 18(6) of the SRMR.

12.2   Annexes to this Decision shall constitute an integral part thereof.

12.3   The present Decision is adopted in English in line with Article 4 of the Cooperation Framework.[15]

## Article 13
### Communication to the Addressee

This Decision is addressed to FROB and shall be notified to FROB upon its endorsement by the Commission or the Council.

## Article 14
### Publication

In accordance with Article 29(5) of the SRMR, a notice summarizing the effects of the resolution action shall be published on the SRB's official website. FROB shall comply with the procedural obligations under Article 83 of the BRRD as transposed into Article 24 of Law 11/2015, including by publishing a notice summarising the effects of the resolution action.

*Done at Brussels, on 7 June 2017*

*For the Executive Session of the Board*

*The Chair*
*Elke König*

---

[15] Decision of the Single Resolution Board in its Plenary Session of 28 June 2016, SRB/PS/2016/07.