# EXHIBIT A

**BEFORE THE INTERNATIONAL CENTRE FOR THE SETTLEMENT OF
INVESTMENT DISPUTES**

---

BETWEEN:

**GBM GLOBAL, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE, FONDO DE
INVERSIÓN DE RENTA VARIABLE, ET AL.,**

*Claimants*

**vs.**

**KINGDOM OF SPAIN,**

*Respondent*

---

**REQUEST FOR ARBITRATION**

Javier H. Rubinstein
Lauren F. Friedman
Lucila I. M. Hemmingsen
Pilar Colomés Iess
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel: +1 212-446-6405

*Counsel for Claimants*

Date:  August 23, 2018

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND SUMMARY .............................................................. 1

II.  PARTIES TO THE ARBITRATION ............................................................ 4

III.  FACTUAL BACKGROUND ...................................................................... 6

    A.  Banco Popular ................................................................................. 6

    B.  Claimants' Investments in Banco Popular ............................................ 7

    C.  The Spanish Government's Traditional and Consistent Role in Actively Supporting Spanish Banks Facing Liquidity Crises. .............................................. 8

    D.  Banco Popular's Efforts to Overcome the 2008 Financial Crisis. ........................ 11

    E.  The EU SRM Framework and Banco Popular's 2016 Resolution Plan. .............. 11

    F.  Respondent Substantially Causes the Liquidity Crisis That Led to Banco Popular's Demise. .......................................................... 14

    G.  Banco Popular's Efforts to Overcome the Growing Liquidity Crisis. .................. 17

    H.  The Final Run on the Bank and Resolution of Banco Popular. ........................... 20

    I.  Respondent's "Auction" and Fire Sale of Banco Popular to Santander. .............. 24

    J.  Respondent's Unlawful Destruction of Claimants' Investments. ......................... 31

IV.  RESPONDENT'S MULTIPLE VIOLATIONS OF THE MEXICO-SPAIN TREATY ......................................................................................... 34

    A.  Respondent Breached Its Obligation to Offer Fair and Equitable Treatment and Full Protection and Security To Claimants' Investments, in Violation of Article IV of the Treaty. ................................................................. 35

    B.  Respondent Failed To Accord Claimants the More Favorable Fair and Equitable Treatment Guarantees Accorded to Investors from Third States in Other BITs, In Violation of Article III of the Treaty. ........................................... 38

    C.  Respondent Failed To Accord Claimants With Treatment As Favorable As It Accorded To Its Own Investors And Investors From Third States. .................. 39

    D.  Respondent Expropriated Claimants' Investments without Compensation.......... 40

V.  JURISDICTION ...................................................................................... 41

    A.  Claimants are Protected Investors under the Treaty and the ICSID Convention. ...................................................................................... 41

   1. Physical persons who are nationals of Mexico ......................................... 41

   2. Companies and Entities Organized In Accordance With The Laws Of Mexico ................................................................................................. 42

  B. The Banco Popular Investors Made Qualifying Investments Under the Treaty. ................................................................................................. 43

  C. Claimants Meet all Treaty Requirements. ........................................... 44

  D. Respondent Provided its Consent to ICSID Jurisdiction Under the Treaty. ......... 45

VI. THE JURISDICTIONAL REQUIREMENTS UNDER THE ICSID CONVENTION ARE MET ................................................................. 45

VII. CONSTITUTION OF THE TRIBUNAL, SEAT AND LANGUAGE ............................ 47

VIII. CLAIMANTS' REQUEST FOR RELIEF ...................................................... 48

## I.      INTRODUCTION AND SUMMARY

1.   Pursuant to Chapter III, Section One of the Agreement on the Promotion and Reciprocal Protection of Investments Between the United Mexican States and the Kingdom of Spain (**Treaty**),[1] and Article 36 of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the **ICSID Convention**), a group of Mexican shareholders and bondholders in Banco Popular Español, S.A. (collectively **Claimants**) hereby submit their Request for Arbitration (the **Request**) against the Kingdom of Spain (**Spain** or **Respondent**) under the Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings (**ICSID Institution Rules**) and the Rules of Procedure for Arbitration Proceedings (**ICSID Arbitration Rules**) of the International Centre for the Settlement of Investment Disputes (**ICSID** or the **Centre**).

2.   The instant arbitration is commenced concurrently with a second arbitration brought under the United Nations Commission on International Trade Law (**UNCITRAL**) Arbitration Rules by another group of Mexican investors in Banco Popular Español, S.A. (the **UNCITRAL Arbitration**).  Claimants in the UNCITRAL Arbitration are dual nationals holding both Mexican and Spanish citizenship, and therefore are prevented from participating in the present arbitration (**ICSID Arbitration**) pursuant to Article 25(2)(a) of the ICSID Convention.  However, in order to promote the efficient resolution of the parallel disputes, Claimants have proposed to Spain a consensual consolidation of the UNCITRAL Arbitration and the present ICSID Arbitration to be administered by ICSID.  Claimants seek to empanel one single tribunal to consider the parallel disputes in one single proceeding with joint filings, documents, and hearings, while respecting the separate rules applicable to the two groups of Claimants.  Should such a voluntary consolidation not be agreed between Claimants and Spain, Claimants shall communicate this to the tribunal and/or ICSID.

3.   On January 22, 2018, Claimants filed a letter of notification to submit a claim to arbitration under the Treaty and requested that Spain engage in settlement discussions.[2]  To date,

---

[1]   *See* Agreement on the Promotion and Reciprocal Protection of Investments between the United Mexican States and the Kingdom of Spain, dated 10 October 2006, **Exhibit CRFA-1**.

[2]   *See* Notice of Dispute Pursuant to Agreement on the Promotion and Reciprocal Protection of Investments between the United Mexican States and the Kingdom of Spain sent to the President of Spain, dated 22 January 2018, **Exhibit CRFA-7**.

Respondent has failed to contact the Claimants or accept the invitation to discuss settlement. Pursuant to Articles IX(3) and XI of the Treaty, Claimants submit this Request more than six months after delivery of their letter of notification to Spain.

4. Claimants' claims against Respondent arise out of events that caused the destruction of Claimants' investments in Banco Popular Español, S.A. (**Banco Popular**), and Respondent's acts and omissions leading to the loss of their investments, all in violation of the Treaty.

5. In 2017, Banco Popular was Spain's sixth largest bank and one of the only Spanish banks that never requested or received state aid in the form of capital injections or asset transfers during the financial crisis. Banco Popular did have its share of financial challenges, mostly due to a significant number of non-performing loans dating back to 2007. Banco Popular implemented a series of transactions and strategies thereafter to stabilize and improve its financial condition. This included capital raises in 2013 and 2016, in which Claimants participated, investing, in conjunction with the claimants in the UNCITRAL Arbitration, more than € 470 million. While challenges remained, Banco Popular continued as a solvent and valuable financial institution, with a leading position in the Spanish SME market.

6. In 2016, Respondent and other depositors started withdrawing substantial volumes of deposits from Banco Popular, progressively weakening the bank's liquidity position. Concerned about these withdrawals, and particularly the government's withdrawals of over € 5.5 billion in late 2016/early 2017, Banco Popular expressed its liquidity concerns to the Spanish central bank (the **Banco de España**) by February 2017 and sought to arrange liquidity assistance. In April/May 2017, deposit withdrawals continued to increase, causing Banco Popular to fall below the required regulatory minimum liquidity threshold by May 2017.

7. Banco Popular was not the first Spanish bank to experience such problems. In fact, dozens of Spanish banks had suffered serious liquidity and capital shortages during and after the financial crises of 2008-2009 (worldwide financial crisis) and 2010-2012 (Spanish sovereign bond crisis, which also affected other European countries such as Portugal, Ireland, Greece and Italy). Throughout those periods, and even to the present day, Respondent has provided support to Spanish banks through a combination of measures, including emergency liquidity assistance and debt guarantees (issued in 2009 and guaranteed by the Kingdom of Spain to

support certain financial institutions).  In all, Respondent provided more than € 100 billion in financial support to Spanish banks during and after the financial crisis.

8.    Yet, in 2017, when Banco Popular faced a liquidity crisis, Respondent inexplicably refused to provide assistance until just hours before Banco Popular's resolution, when it was too late and the assistance offered was far less than was required.  Respondent also precipitated the eventual run on the bank that led to Banco Popular's demise and the destruction of Claimants' investments.  Through its withdrawal of billions of Euros in deposits, Respondent substantially weakened Banco Popular's financial condition.  Respondent also refused to offer any meaningful liquidity assistance, insisting on unprecedented and unreasonable collateral requirements.  Respondent also failed to take measures to stop the growing deposit outflows in 2017, such as public expressions of confidence in Banco Popular to depositors, public encouragement of depositors to keep their deposits at Banco Popular, communicating Respondent's express support to Banco Popular, taking steps to stop Respondent's own continuing deposit withdrawals from Banco Popular, and other measures that Respondent has used for other banks facing liquidity crises.  In fact, Respondent itself contributed to a further loss of depositor confidence by publicly stating it would *not* provide any financial support to Banco Popular.  In May 2017, the media reported statements by Spanish and EU officials suggesting that Banco Popular was in imminent risk of being placed into resolution, leading to an all-out run on the bank in the last week of May and first week of June, with billions of Euros withdrawn each day.  Throughout this grave liquidity crisis, Respondent simply stood by and watched, opting to let a solvent bank fail in order to engineer the bank's sale to Santander or another large bank via the EU's newly implemented resolution framework.

9.    On June 6, 2017, unable to withstand the continuing run on its deposits, Banco Popular's President, Emilio Saracho, informed the European Central Bank that it was running out of cash and therefore was "likely to fail." Banco Popular was placed into resolution within a matter of hours, sold to Santander for € 1 through a fire sale process that Respondent already had engineered, with Santander as the only bidder.

10.    The consequences of the resolution were devastating, wiping out the investments of more than 300,000 Banco Popular shareholders and Additional Tier 1 bondholders at a time when Banco Popular had a net assets value of €10.8 billion.  Claimants alone lost their entire

original investment, which, together with the investment of the claimants in the UNCITRAL Arbitration, was of more than € 470 million.

11.     Banco Popular was a solvent and valuable financial institution that never should have been placed into resolution, and would not have been but for Respondent's unlawful conduct in precipitating Banco Popular's liquidity crisis and then using it to justify the bank's resolution and "sale" to Santander.  Respondent's lack of active support of Banco Popular and the facilitation of its resolution also ignored the many private solutions that would have stabilized Banco Popular's financial situation, averting a resolution and protecting the rights and interests of Banco Popular investors.

12.     Respondent's acts and omissions violated Claimants' rights under the Treaty, including its rights to fair and equitable treatment and full protection and security (Article IV), national treatment and most favored nation treatment (Article III), and protection against expropriation without due process and just compensation (Article V).

13.     Claimants seek to recover the damages arising from Respondent's breaches of its obligations under the Treaty, in an amount to be determined, together with compound interest calculated from the date of the breach until the date of payment of the award, and the costs of this arbitration, including, without limitation, attorney's fees and other expenses, and any further relief that the Tribunal deems appropriate.

## II.     PARTIES TO THE ARBITRATION

14.     Claimants in this arbitration are 35 Mexican physical persons and 11 Mexican entities organized under the laws of Mexico.  Pursuant to Article X(3) of the Treaty, Claimants submit their claims individually and on their own behalf.  Proof of Claimants' Mexican nationality is included with this Request.[3]  The contact information for Claimants appears below[4]:

> Kaluz, S.A. de C.V.
> Paseo de la Reforma 365
> Ciudad de México, 06500 México
>
> DRB Abogados
> Bosque de Alisos 45 A Piso 3

---

[3]     Copies of the Identity Documents of Claimants are attached hereto as **Appendices CRFA-A-1** to **CRFA-A-46**.

[4]     A list of contact details for all Claimants is provided in Appendix CRFA-D.

<div style="margin-left:2em">

Col. Bosques de las Lomas
Ciudad de México, 05120 México

Graham Abogados, S.C.
Tehuantepec 170, Torre B piso 3
Colonia Roma Sur
Ciudad de México, 06760 México

</div>

15.   Claimants are represented in these proceedings by Kirkland & Ellis LLP and have authorized their lawyers to act and sign on their behalf in these proceedings.[5]  All correspondence and notices to Claimants should be addressed to counsel for Claimants at the following address:

<div style="margin-left:4em">

Javier H. Rubinstein
Lauren F. Friedman
Lucila I. M. Hemmingsen
Pilar Colomés Iess
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Tel: 212-446-4800
Fax: 212-446-4900
Email: javier.rubinstein@kirkland.com
       lauren.friedman@kirkland.com
       lucila.hemmingsen@kirkland.com
       pilar.colomes@kirkland.com

</div>

16.   Respondent is the Kingdom of Spain.  Claimants understand that Respondent's address, for the purposes of these proceedings, is as follows:

<div style="margin-left:4em">

Abogacía General del Estado – Dirección del Servicio Jurídico del Estado
Calle San Bernardo, 45
28015 Madrid
España

</div>

17.   This Request for Arbitration has been served on Respondent at each of the following addresses:

<div style="margin-left:4em">

Sr. Pedro Sánchez Pérez-Castejón
Presidente del Gobierno
Gobierno de España
Complejo de La Moncloa
Avda. Puerta de Hierro s/n
28071 Madrid

</div>

---

[5]   Copies of the Powers of Attorney of Claimants are attached hereto as **Appendices CRFA-B-1** to **CRFA-B-46**.

España

Abogacía General del Estado – Dirección del Servicio Jurídico del Estado
Calle San Bernardo, 45
28015 Madrid
España

## III.   FACTUAL BACKGROUND

### A.   Banco Popular

18.   Banco Popular was formed in 1926 as a local bank servicing Spanish customers.  Over time, Banco Popular substantially grew and by December 2016 had become Spain's sixth largest bank, with total assets of approximately € 148 billion and 1,739 branches worldwide.[6]

19.   Historically, Banco Popular's core business consisted of a strong Spanish retail franchise, with a focus on lending of credit to small and medium-sized enterprises (**SMEs**), including mortgages and other home loans to retail customers.  Banco Popular was widely regarded for its leading position in serving the SME segment of the economy.

20.   Banco Popular played an important role in the provision of financial services to the Spanish economy, with a leading market position and a market share of 17.7% as of December 31, 2016 (up from 14.0% in 2012).[7]

21.   Banco Popular was also a significant employer in Spain with 10,671 employees as of December 31, 2016.[8]  Banco Popular was listed on the Spanish Stock Exchanges (Madrid, Barcelona, Valencia and Bilbao), was part of the IBEX35 (consisting of the 35 most liquid and highest market capitalization companies in Spain), and was an active participant in both Spanish and European capital markets until its resolution on June 7, 2017.

---

[6]   Banco Popular, *Annual Report of 2016*, http://www.grupobancopopular.com/EN/InvestorRelations/Financial Information/Documents/2017/Annual%20Report_popular2016_%20PC_EN.pdf (last accessed 14 August 2018), p. 26, 99.

[7]   *Id*. p. 35; Banco Popular, *Annual Report of 2012*, http://www.grupobancopopular.com/EN/InvestorRelations/FinancialInformation/Documents/2012/Annualreport 2012.pdf (last accessed 14 August 2018), p. 34.

[8]   Banco Popular, *Annual Report of 2016*, http://www.grupobancopopular.com/EN/InvestorRelations/Financial Information/Documents/2017/Annual%20Report_popular2016_%20PC_EN.pdf (last accessed 14 August 2018), p. 11. Banco Popular branches comprised 5.5% of the total number of bank branches in Spain (i.e. 28,959), *see* Statistical Bulletin from Bank of Spain, Number of branches and representative offices of credit institutions and Banco de España, https://www.bde.es/webbde/es/estadis/infoest/a0447e.pdf (last accessed 14 August 2018), § 4.47.

### B.    Claimants' Investments in Banco Popular

22.    In 2013, Banco Popular executives visited Mr. Antonio del Valle Ruiz and certain other Claimants in Mexico to propose mutual investments between Banco Popular and Mexican bank Ve por Más, part of the Mexican financial group Grupo Financiero Ve por Más, S.A. de C.V., which was primarily owned by the del Valle family.   In late 2013, a group of Mexican investors, including Claimants, negotiated a capital raise for Banco Popular, expressly carried out for, and fully subscribed by, the group of Mexican investors, totaling € 450 million.[9] It also was agreed that Banco Popular would cross-invest € 100 million in Ve por Más, acquiring a 24.9% stake and obtaining two seats on its board.  The group of Mexican investors, including Claimants, completed the capital raise in December 2013 at a price of € 3.95 per share, acquiring approximately 6% of the Banco Popular's capital (this participation was later reduced to 4.3% as some of the group's investors sold their shares). In February 2014, some of the Claimants met with the Governor of the Banco de España, Luis Linde, who thanked the Claimants for their trust in Spain and the considerable investment made in one of its banks.  Mr. Linde also stated that Banco Popular was in good financial standing and that he trusted its management, thus confirming the Mexican investors' understanding of the bank's financial condition and that Banco Popular was a sound investment.   The investment made by the Mexican group of investors, including Claimants, was so considerable that they earned a seat on the Banco Popular Board.  In April 2014, after clearance from the Spanish banking authorities, Mr. del Valle was appointed as a member of Banco Popular's Board of Directors, representing Claimants' interests.

23.    During the ensuing years, some of the Claimants made additional investments in Banco Popular; many of Claimants opted to receive the dividends paid by Banco Popular as shares, thus reinvesting those dividends and increasing their investment.

24.    On May 26, 2016, Banco Popular announced a plan to raise the bank's capital by € 2.5 billion, issuing approximately two billion new shares at a price of € 1.25 euros per

---

[9]    Comisión Nacional del Mercado de Valores of Spain ("**CNMV**"), *Relevant Fact from Banco Popular*, 18 December 2013, https://www.cnmv.es/portal/HR/ResultadoBusquedaHR.aspx?nif=A28000727 (last accessed 14 August 2018).

share.[10] The capital raise was part of a broader plan announced in 2016, known as "Plan 2018," the goal of which was to strengthen the bank's balance sheet and improve its profitability, and allow the bank to achieve a Common Equity Tier 1 (**CET1**) capital ratio of 12%.

25.    The group of Mexican investors, including Claimants, decided to invest in the 2016 capital raise both to support Banco Popular's strategic objectives and to prevent a dilution of their ownership stake.    The group of Mexican investors, including Claimants, invested approximately € 100 million to maintain their ownership position of 4.3%.

> **C.**    **The Spanish Government's Traditional and Consistent Role in Actively Supporting Spanish Banks Facing Liquidity Crises.**

26.    Starting in 2007, Spain suffered one of the most severe financial crises amongst the EU member states.   From 2009 to 2013, Spain's gross domestic product contracted by 8.9%, with public debt reaching a record high of 100.4% of GDP in 2014 and unemployment peaking at 26.1% in March 2013.[11]

27.    The crisis heavily impacted the country's financial industry, which had over-invested in the real estate sector during the years leading up to 2008.   By November 2012, bad debt in the banking sector had reached a record high of € 197 billion—more than ten times higher than the € 17 billion recorded in December 2007.[12] During this period, numerous Spanish banks experienced solvency and liquidity problems, aggravated by increasing difficulties in accessing wholesale funding and the drying up of short-term interbank liquidity.

28.    Throughout the banking crisis, the Banco de España, consistent with the internationally accepted role of national central banks, discharged its duties and responsibilities as the lender of last resort in Spain, including the provision of liquidity support to solvent Spanish banks facing liquidity crises.

---

[10]    Official Bulletin of Spanish Commercial Registry, No. 100, *Announcement of Capital Raise o Banco Popular Español. S.A.,* 27 May 2016,  https://www.boe.es/borme/dias/2016/05/27/pdfs/BORME-C-2016-5690.pdf (last accessed 14 August 2018).

[11]    World Bank Database, showing annual GDP growth for the years 2009 through 2013 was: -3.57%, +0.01%, -1.00%, -2.93%, -1.71%;  https://data.worldbank.org/country/spain (last accessed 14 August 2018). *See also* Statistical Bulletin of Bank of Spain, https://www.bde.es/webbde/es/estadis/infoest/bolest.html, §§ 2.9, 24.1.

[12]    *Id*. § 4.1.

29.  Through the Banco de España and other public entities, the Spanish government consistently played an active role in helping to stabilize banks, enhance depositor and investor confidence and reform its ailing savings bank sector.  This was done through a combination of measures, including state guarantees of senior debt and the strengthening of solvency rules.  The Banco de España also adopted various measures to strengthen the liquidity of financial institutions, seeking to enhance depositor and investor confidence, rescuing troubled banks, and reforming the savings bank sector.

30.  In 2009, Spain created the Fondo de Reestructuración Ordenada Bancaria ("Fund for Orderly Bank Restructuring") (**FROB**), for the purpose of overseeing mergers, acquisitions and the orderly restructuring of failing financial institutions.  In 2012, Spain created the Sociedad de Gestión de Activos Procedentes de la Reestructuración Bancaria (Sareb), designed for nationalized financial institutions and those being restructured to submit their non-performing or problematic assets.

31.  Between 2009 and 2012, Spain provided substantial liquidity assistance in the form of guaranteed senior debt totaling € 110.9 billion,[13] of which € 96.2 billion (86.7%) was granted to Spanish savings banks.  Five banks alone received € 72.8 billion in liquidity guarantees, including Bankia (€ 34.8 billion), Catalunya Caixa (€ 10.8 billion), Banco Cívica (€ 10.7 billion), Banco CAM (€ 8.9 billion), and Novacaixagalicia (€ 7.6 billion).[14]  Respondent also granted liquidity support to Spanish banks outside of the Spanish Guarantee Scheme, most notably to Bankia, Banco CAM, Caja Castilla-La Mancha, CajaSur and Banco Gallego, totaling € 26.3 billion between 2009 and 2013.[15]

---

[13]  Spanish Treasury, *Liabilities guaranteed by the Spanish General State Administration under the 2008 Year Programme*, http://www.tesoro.es/en/guaranteed-issues-general-state-administration-under-2008-year-programme (last accessed 14 August 2018); Spanish Treasury, *Liabilities guaranteed by the Spanish General State Administration under the 2009 Year Programme*, http://www.tesoro.es/en/guaranteed-issues-general-state-administration-under-2009-year-programe (last accessed 14 August 2018); Spanish Treasury, *Liabilities guaranteed by the Spanish General State Administration under the 2012 Year Programme*, http://www.tesoro.es/en/guaranteed-issues-general-state-administration-0#overlay-context=prevencion-del-blanqueo-y-movimiento-de-efectivo (last accessed 14 August 2018).

[14]  Own production made from information at Spanish Treasury website, http://www.tesoro.es/en/search/node/emisiones%20avaladas (last accessed 14 August 2018).

[15]  Bankia received €19 billion in 2012, Banco CAM, € 3 billion in 2011, Caja Castilla de la Mancha € 1.5 billion in 2009, Caja Sur € 1.98 billion between 2009 and 2012 and Banco Gallego €0.8 billion in 2013. *See*, EC Competition Database Files SA.34820, SA.34255, NN61/2009, N202-2010 and SA.36500 respectively,

32.   As of December 31, 2016, the Banco de España estimated that the total net cost of all bank rescue measures since the beginning of the financial crisis would reach € 62.8 billion, including the Spanish government rescues of BFA-Bankia (€ 13.2 billion), Catalunya Banc (€ 12.7 billion), CAM (€ 11.1 billion), Novacaixagalicia (€ 9.3 billion), and Banco de Valencia (€ 6.2 billion).[16]

33.   Throughout this period, the Banco de España actively and consistently fulfilled its duty as lender of last resort in Spain, aiding banks facing liquidity crises, in line with the duties entrusted to all national central banks globally.  As investors in a Spanish bank, Claimants reasonably expected that the Banco de España would duly and properly discharge its role as lender of last resort if Banco Popular ever faced a liquidity crisis.  After the implementation of the EU SRM framework in 2014, the national central banks of the EU retained the responsibility for providing liquidity assistance, which investors reasonably relied upon. Claimants also reasonably expected that Respondent would continue to provide other forms of supervisory and regulatory support to solvent banks facing liquidity crises, including public expressions of support designed to reassure depositors, mitigate bank runs and assist banks in overcoming liquidity crises in order to maintain the stability of the Spanish banking system.

34.   Claimants' reasonable expectations regarding Respondent's historic support of solvent Spanish banks, including, but not limited to, the Banco de España's role as the lender of last resort in Spain, was reinforced by Respondent's consistent and active support of Spanish banks that were experiencing liquidity and solvency challenges in order to stabilize them and protect the Spanish banking sector.  Such supervisory and regulatory support was essential to Respondent's obligation to provide a stable, predictable and reliable legal, regulatory and commercial environment, making it safe to invest in Spanish banks.

---

http://ec.europa.eu/competition/elojade/isef/index.cfm?clear=1&policy_area_id=3 (last accessed 14 August 2018).

[16]   Bank of Spain, *Report on the Financial and Banking Crisis in Spain, 2008-2014*, https://www.bde.es/f/webbde/Secciones/Publicaciones/OtrasPublicaciones/Fich/InformeCrisis_Completo_web_en.pdf (last accessed 14 August 2018), p. 236.

**D.  Banco Popular's Efforts to Overcome the 2008 Financial Crisis.**

35.  In contrast to most other Spanish banks, Banco Popular emerged from the 2008 financial crisis on its own, without requesting or receiving any state aid in the form of capital injections or asset transfers.  Like many other European banks, Banco Popular held many non-performing loans (**NPLs**) in 2008 and was minimizing the effect they had on its balance sheet.  As a result, starting in 2008, Banco Popular took a number of significant asset write-downs.

36.  To overcome the financial crisis and the growing provisions required as a result of the NPLs and non-performing assets (**NPAs**), Banco Popular carried out capital raises in 2012 and 2013.  In November 2012, Banco Popular raised € 2.5 billion.[17]  The following year, Banco Popular carried out the capital increase designed exclusively for the group of Mexican investors, including the Claimants, raising € 450 million.[18]

37.  Notwithstanding the effect of the NPAs on Banco Popular's financial position, Banco Popular still did not seek or receive any state aid in the form of capital injections or asset transfers.  This again stood in sharp contrast to other troubled Spanish banks that regularly received state aid from Respondent in multiple forms.

**E.  The EU SRM Framework and Banco Popular's 2016 Resolution Plan.**

38.  On July 15, 2014, the EU Single Resolution Mechanism Regulation (the **SRMR**) was enacted, consisting of two pillars: the Single Supervisory Mechanism (**SSM**) and the Single Resolution Mechanism (**SRM**).[19]

39.  The SSM is a system of banking supervision for Europe, comprising the European Central Bank (**ECB**) and the national supervisory authorities of the EU Member States.  Under the SSM, each systemically important bank in the EU (which included Banco Popular given the size of its balance sheet) is required to establish and maintain a resolution plan that would guide any eventual resolution process if the bank were ever failing or likely to fail.

---

[17]  CNMV, *Relevant Fact from Banco Popular*, 10 November 2012, https://www.cnmv.es/portal/HR/ResultadoBusquedaHR.aspx?nif=A28000727 (last accessed 14 August 2018), *Relevant Fact from Banco Popular*, 4 December 2012, https://www.cnmv.es/portal/HR/ResultadoBusquedaHR.aspx?nif=A28000727 (last accessed 14 August 2018).

[18]  CNMV, *Relevant Fact from Banco Popular*, 18 December 2013, https://www.cnmv.es/portal/HR/ResultadoBusquedaHR.aspx?nif=A28000727 (last accessed 14 August 2018).

[19]  The SRMR entered into force on 19 August 2016.

40.   The SRM is comprised of the Single Resolution Board (**SRB**), a central resolution authority, and the national resolution authorities of EU Member States.  The ECB is the supervisor of the SRM process, and plays a key role in deciding whether a bank is failing or likely to fail.

41.   A resolution pursuant to the SRM involves the restructuring of a bank using a combination of specified statutory resolution tools.  Pursuant to the SRM Regulation, there are four possible resolution tools:

   a.   the sale of business tool (total or partial disposal of an entity's assets, liabilities and/or shares to a private purchaser);

   b.   the bridge institution tool (transfer of part or all of the assets, liabilities and/or shares to a controlled temporary entity);

   c.   the asset separation tool (transfer of assets to an asset management vehicle); and

   d.   the bail-in tool (write-down or conversion of equity and debt, placing the burden on the shareholders and creditors of a bank, rather than on the public).[20]

The selection of tool(s) to be used is agreed and reflected in each bank's resolution plan.

42.   In order to place an entity into resolution, the SRB must confirm that: (1) the bank is failing or likely to fail, (2) there are no supervisory or private sector measures that can restore the bank to viability within a reasonable timeframe, and (3) resolution is necessary for the public interest (i.e., that resolution is preferable to normal insolvency proceedings).[21]

43.   On October 2, 2015, almost two years after the Claimants' original investment in Banco Popular, Spain ratified the Intergovernmental Agreement, which authorized implementation of the SRM framework in Spain.[22] The Agreement entered into force on January 1, 2016, the date on which the SRM became fully operational, over two years after the Claimants' first investment in Banco Popular.

---

[20]   Regulation (EU) No 806/2014 of the European Parliament and of the Council of 15 July 2014 establishing uniform rules and uniform procedure for the resolution of credit institutions and certain investment firms in the framework of a Single Resolution Mechanism and a Single Resolution Fund and amending Regulation (EU) No 1093/2010 ("**SRM Regulation**"), 15 July 2014, Official Journal of the European Union, https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32014R0806&from=EN (last accessed 14 August 2018), Arts. 21, 22, 24-27.

[21]   *Id*. Art. 18.

[22]   Instrument for the ratification of the Agreement on the transfer and mutualization of contributions to the Single Resolution Fund, 21 May 2014, Spanish Official Bulletin, https://boe.es/diario_boe/txt.php?id=BOE-A-2015-13769 (last accessed 14 August 2018).

44. While systemically important banks are subject to supervision by the ECB and SRB under the SRM, the responsibility for monitoring bank liquidity and providing emergency liquidity assistance to such banks remained with the Member States even after the SRM went into effect, and remains so to this day. Emergency liquidity assistance is subject to ECB approval only when the ELA requested exceeds € 2 billion, with ECB review then limited to ensuring that the provision of ELA would not violate ECB guidelines.

45. With respect to Spanish banks, including Banco Popular, the responsibility for monitoring the bank's liquidity position, considering ELA requests and providing ELA rested with Spain's lender of last resort, the Banco de España, not the ECB. Respondent, through the Banco de España and other government authorities, continued to provide various forms of assistance to Spanish banks even after the introduction of the SRM framework.

46. Member States also play a key role in the resolution process. According to the SRB Directive, because of the consequences that failure of a financial institution may have on the economy, including the possible need for public funds, "the Ministries of Finance and other relevant ministries should be closely involved, at an early stage, in the process of crisis management and resolution."[23] As explained by the European Commission:

> "National resolution authorities are closely involved in the resolution process. They assist the Board in preparing its actions which will draw on their expertise and experience, for example in the form of staff exchanges. Crucially, national authorities are also in charge of implementing the resolution decisions in line with national company and insolvency law. Member States are thus integrated into the mechanism in the preparatory and implementation stage regarding banks in their jurisdiction."[24]

47. Accordingly, the Spanish government played an active and central role at every stage of the resolution process with Banco Popular (described below). As the Chair of the SRB, Ms.

---

[23] Directive 2014/59/EU of the European Parliament and of the Council of 15 May 2014 establishing a framework for the recovery and resolution of credit institutions and investment firms and amending Council Directive 82/891/EEC, and Directives 2001/24/EC, 2002/47/EC, 2004/25/EC, 2005/56/EC, 2007/36/EC, 2011/35/EU, 2012/30/EU and 2013/36/EU, and Regulations (EU) No 1093/2010 and (EU) No 648/2012, of the European Parliament and of the Council L173/193,15 May 2014. Official Journal of the European Union, https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32014L0059&from=en (last accessed 14 August 2018), Whereas (16).

[24] European Commission, *Memo, A Single Resolution Mechanism for the Banking Union - frequently asked questions*, Brussels, 15 April 2014, http://europa.eu/rapid/press-release_MEMO-14-295_es.htm (last accessed 14 August 2018), p. 4.

Elke König, confirmed in a public hearing of the ECON Committee of the European Parliament, the decision to resolve Banco Popular was taken jointly by the SRB and the Spanish government: "the SRB, together with the Spanish national authorities, unanimously decided to take resolution action with respect to Banco Popular."[25]

48.  A resolution decision is taken by the SRB Executive Committee, which includes a representative of the Member State where the subject bank is located.[26] If a resolution decision is taken, national resolution authorities then implement the resolution decisions at the Member State level, in accordance with EU and local laws.[27]

49.  In 2016, following the implementation of the SRM framework in Spain, Banco Popular developed and agreed a resolution plan with the SRB and Respondent to govern any future resolution of the bank (**2016 Resolution Plan**). The 2016 Resolution Plan called for a restructuring of the bank, *not* the sale of the bank to a third party. It also authorized Spanish resolution authorities to "carry out additional measures during this restructuring phase in order to fully restore the group's viability while maintaining market confidence at all times."[28] The 2016 Resolution Plan was finalized and adopted on December 5, 2016.[29]

   **F.  Respondent Substantially Causes the Liquidity Crisis That Led to Banco Popular's Demise.**

50.  Starting in approximately October 2016, Banco Popular faced a significant increase in deposit withdrawals. Spanish government entities and institutions led these heavy

---

[25]  SRB, *EP Hearing, Elke König*, 4 December 2017, https://srb.europa.eu/sites/srbsite/files/2017-12-04_ep_ek_speech.pdf (last accessed 14 August 2018), p. 5.

[26]  European Commission, *Memo, A Single Resolution Mechanism for the Banking Union - frequently asked questions*, 15 April 2014, http://europa.eu/rapid/press-release_MEMO-14-295_es.htm (last accessed 14 August 2018), p. 3.

[27]  Regulation (EU) No 806/2014 of the European Parliament and of the Council of 15 July 2014 establishing uniform rules and uniform procedure for the resolution of credit institutions and certain investment firms in the framework of a Single Resolution Mechanism and a Single Resolution Fund and amending Regulation (EU) No 1093/2010 ("**SRM Regulation**"), 15 July 2014, Official Journal of the European Union, https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:32014R0806&from=EN (last accessed 14 August 2018), Art. 29.

[28]  SRB, *Banco Popular Group Resolution Plan*, 2016, https://srb.europa.eu/sites/srbsite/files/resolution_plan_2016.pdf (last accessed 14 August 2018), p. 23.

[29]  SRB, *Decision of the Single Resolution Board in its Executive Session of 7 June 2017 concerning the adoption of a resolution scheme in respect of Banco Popular Español, S.A. (the "Institution") with a Legal Entity Identifier: 80H66LPTVDLM0P28XF25, Addressed to FROB (SRB/EES/2017/08)*, 7 June 2017, https://srb.europa.eu/sites/srbsite/files/resolution_decision.pdf (last accessed 14 August 2018), p. 4.

withdrawals.  During the last quarter of 2016, Spanish public entities withdrew over 38% of its deposits (over € 4 billion).  Deposit withdrawals continued in January and February 2017, with Banco Popular losing over € 2.6 billion in deposits.  These withdrawals understandably concerned the Board of Directors of Banco Popular, which noted in March 2017 that the worsening liquidity situation was substantially attributable to the withdrawal of € 4 billion by Spanish public entities.  Yet, despite these continuing withdrawals, Banco Popular's liquidity coverage ratio (**LCR**) remained above 100% (the regulatory minimum was 80%) during the first quarter of 2017.

51.     Concerned about the effect of deposit withdrawals on its liquidity position, Banco Popular established a liquidity working group in February 2017, which began implementing a "Liquidity Action Plan" to continually monitor Banco Popular's liquidity situation and implement all possible measures to strengthen its liquidity position.  Members of this liquidity group sent daily reports to the ECB.  Banco Popular also kept the Banco de España regularly informed of these measures and all developments regarding its liquidity and financial position.

52.     In March 2017, Banco Popular met with the Banco de España to discuss the bank's potential need for liquidity assistance.  While Banco Popular was still in compliance with regulatory liquidity requirements and was actively taking measures to strengthen its liquidity position, it became concerned that the upcoming announcement of an adjustment to its 2016 financial results at the April 2017 shareholders meeting would destabilize the market and lead to a run on the bank's deposits.[30]

53.     Starting in March 2017, Banco Popular sent the Banco de España daily information regarding its liquidity position as well as assets that could be used as collateral for potential emergency liquidity assistance.  As of March 2017, the Banco de España was fully aware of Banco Popular's ongoing liquidity position, its growing need for liquidity support, and the assets that could be used as collateral to support emergency liquidity assistance.

54.     On April 3, 2017, Banco Popular publicly announced the results of an internal audit of the bank's 2016 financial statements, concluding that the financial statements would need to be

---

[30]   El Confidencial, *Popular 'corrige' las cuentas de 2016 tras una auditoría y se desploma en bolsa un 5%*, 3 April 2017,   https://www.elconfidencial.com/empresas/2017-04-03/popular-corregira-las-cuentas-de-2016-de-forma-retroactiva-tras-una-auditoria-interna_1359667/.

adjusted. The announcement triggered an acceleration in deposit withdrawals and a drop in the stock price. On April 6 and 7, Dun & Bradstreet and Standard & Poor's downgraded Banco Popular's short-term and long-term credit ratings.[31]

55. On April 12, 2017, the Spanish Secretary of Economy and Support for Enterprises, Irene Garrido, publicly stated that Banco Popular needed "private solutions" because it was a "private bank," thereby communicating to the market that Banco Popular would not be receiving assistance from the Spanish government. This was repeated by Minister of Economy Luis de Guindos on April 19, 2017.[32] On April 21, 2017, based on solvency and creditworthiness concerns, Moody's downgraded Banco Popular's standalone Baseline Credit Assessment from B1 to B3 causing a further spike in deposit withdrawal levels.

56. During the course of April 2017, Banco Popular suffered deposit outflows of over € 5.3 billion. By the end of that month, the situation was sufficiently critical that Banco Popular initiated daily conference calls with the Banco de España to discuss its liquidity situation and the potential need for liquidity assistance.

57. Despite Respondent's knowledge of Banco Popular's rapidly deteriorating liquidity position, Respondent took no steps to help stop the escalating withdrawal of Banco Popular's deposits. This was in stark contrast to the proactive measures that Respondent had taken before and after the Banco Popular resolution to assist other similarly situated Spanish banks that were experiencing liquidity problems. For instance, Respondent failed to take steps to reassure Banco Popular depositors that it was safe to leave their money in Banco Popular, or any other measures to slow or stop deposit outflows. In fact, Respondent took no apparent steps even to stop its own entities from continuing deposit withdrawals from Banco Popular. Deposit withdrawals by Spanish public entities actually *increased* in mid-April 2017, leading to a further weakening of the bank's liquidity. These actions and omissions were contrary to the obligations established under Spanish law requiring the government,

---

[31] CNMV, *Relevant Fact from Banco Popular,* 6 April 2017, https://www.cnmv.es/portal/HR/ResultadoBusquedaHR.aspx?nif=A28000727 (last accessed 14 August 2018); CNMV, *Relevant Fact from Banco Popular,* 7 April 2017, https://www.cnmv.es/portal/HR/ResultadoBusquedaHR.aspx?nif=A28000727 (last accessed 14 August 2018).

[32] EFE Empresas, *El Gobierno insiste en que el Popular es un banco privado y solvente,* 19 April 2017, https://www.youtube.com/watch?v=RZ8p1NlztN4, (last accessed 14 August 2018).

particularly the Banco de España, to promote the good functioning and stability of the Spanish financial system.

**G.      Banco Popular's Efforts to Overcome the Growing Liquidity Crisis.**

58.    Since early 2016, before the liquidity issues developed later in the year, Banco Popular continued to implement measures to address the high levels of NPAs.  As part of those measures, Banco Popular carried out the May 2016 capital raise as part of its "Plan 2018" discussed above.  Together with the capital raise of May 2016, Banco Popular announced a plan to improve its NPA coverage ratios, liquidity ratios, and the bank's overall financial health to be carried out in the ensuing years.  However, the effective implementation of this plan and related measures were hindered by the growing liquidity crisis that started in 2016 and ultimately led to Banco Popular's resolution in June 2017.

59.    Respondent was well aware of these private measures and the harm that investors would suffer if those measures were not allowed to proceed.  In December 2016, Mr. Antonio del Valle met with Mr. Luis Linde and Mr. Fernando Restoy, the Governor and Sub-Governor of the Banco de España, respectively.  In that meeting, Banco de España officials sought Mr. del Valle's views regarding the future of the bank.  They suggested a potential merger of Banco Popular with a larger bank such as BBVA or Santander.  Mr. del Valle expressed significant concerns about a merger with a larger bank, indicating that such a transaction would severely harm Banco Popular investors.  Mr. del Valle insisted that the best solution for Banco Popular was a capital raise; he also confirmed that Claimants and other investors were ready to substantially participate in a fresh Banco Popular capital raise.

60.    Through the combination of measures it was implementing, and despite its ongoing financial challenges, Banco Popular continued to be a solid and valuable franchise going into 2017, consistently exceeding regulatory requirements and passing all solvency tests with a net asset value of € 10.78 billion at the end of the first quarter of 2017.  First quarter 2017 results also confirmed that Banco Popular's main business had remained profitable with a return on tangible equity of 17.0%.[33]

---

[33]    Banco Popular, *Quarterly Report*, 1st Quarter 2017, http://www.grupobancopopular.com/ES/Accionistas Inversores/Documents/Quarterly%20Report%201Q17.pdf (last accessed 14 August 2018), p. 27.

61.    In 2017, Banco Popular continued implementing a series of measures to generate additional capital and liquidity, including the sale of Totalbank, the sale or closure of bank branches, sales of loans and asset portfolios, real estate sales, issuance of equity instruments, and divestment of certain assets in Portugal.

62.    As part of its plan to obtain additional capital, in April 2017, Banco Popular started the process to initiate a capital raise.  The additional capital raised would not only provide a cushion to account for the high levels of NPAs and NPLs, but would also address the liquidity issues the bank was facing, which by April were becoming more acute.  In order to enable a new capital raise to proceed, Banco Popular's shareholders, at their annual meeting on April 10, 2017,[34] voted to authorize the bank's Board to increase share capital by up to 50% and issue fixed income securities.  Following that meeting, Banco Popular immediately commenced the process of determining how much additional capital it needed to raise.

63.    Banco Popular's capital raise generated substantial interest in the investor community.  In May 2017, Deutsche Bank recommended a € 3 billion capital infusion.  Mr. del Valle communicated with numerous investors who expressed interest in investing in Banco Popular and participating in a capital raise, including Andrónico Luksic, a high net-worth investor from Chile who had recently invested approximately € 100 million in Banco Popular through the purchase of shares in the open market.  Claimants and the Luksic group alone were ready to commit at least 50% of the capital that Deutsche Bank had recommended.  Mr. del Valle also was in talks with other institutional and individual investors, including Allianz and Crédit Mutuel, both of which expressed interest in participating in a plan to raise capital.

64.    On June 3, 2017, Barclays also sent a letter to Banco Popular offering to participate in a capital raise, affirming that "Popular is a solid franchise" and that, following the capital raise, "Popular has the potential to deliver return on equity levels that would be attractive to new investors."[35]  Similarly, on June 5, 2017, Deutsche Bank sent a letter to Banco Popular expressing its interest in securing 50% of a possible € 4 billion capital raise, noting that it

---

[34]    Banco Popular, *Agreements adopted by BPE's General Ordinary Shareholders Meeting*, 10 April 2017, http://www.grupobancopopular.com/ES/AccionistasInversores/GobiernoCorporativo/JuntaGeneraldeAccionistas/Documents/Junta%20General%20Ordinaria%20(Abril%202017)/ACUERDOS%20ADOPTADOS%20JGO%20(ABRIL%202017).pdf (last accessed 14 August 2018), p. 2.

[35]    Letter from Barclays to Banco Popular, dated 3 June 2017, **Exhibit CRFA-2**.

"could be accomplished to stabilize the bank."[36]  PIMCO, one of the largest managers of fixed income securities in the world, likewise confirmed its commitment to provide up to € 300 million in a capital raise.  The main step that remained was to determine the amount of capital needed, the calculation of which Banco Popular was set to finish by early June 2017.

65.     In addition to the capital raise, Banco Popular was in the midst of selling high-value assets such as its stakes in Banco Popular Portugal, Popular Private Banking, BX+, Allianz, Euroautomatic Cash, Wizink and Totalbank, in order to generate additional liquidity.  As of June 2017, Banco Popular had either concluded or was in advanced stages of implementing a series of measures to raise capital and liquidity, including:

    a.     Transfer of Asset Backed Securities (expected to generate over €300 million);

    b.     Sale of corporate loans (over €500 million);

    c.     Sale of leasing portfolio (over €750 million);

    d.     Sale of Popular Servicios Financieros (over €150 million);

    e.     Sale of Merlin stock (over €140 million);

    f.     Sale of NPLs (over €50 million euros);

    g.     Sale of loan portfolio (over €1 billion);

    h.     Sale of shares in Totalbank (sale was set to be closed beginning to mid-June for €545 million);

    i.     Sale of shares in Targo Bank (closed a week before the Resolution); and

    j.     Sale of shares in Wizink (board approval for sale had been obtained).[37]

66.     In or about April 2017, Banco Popular launched a process to consider a private sale of Banco Popular.  By that point, the loss of deposits had significantly increased, making the liquidity crisis more evident.  Respondent's acts and omissions, which exacerbated the ongoing run on deposits, sent a clear signal to the market that it would not assist Banco Popular to avert or stop the growing liquidity crisis.  As a result, Banco Popular seriously considered the sale of the bank as a potential measure to address its liquidity situation.  In May 2017, Banco

---

[36]     Letter from Deutsche Bank to Banco Popular, dated 5 June 2017, **Exhibit CRFA-5**.

[37]     Following the Banco Popular Resolution, Santander actually carried out a number of these transactions, including the sale of Banco Popular's real estate assets, Totalbank and Wizink, thereby confirming that the transactions were indeed viable.

Popular opened a data room for potentially interested buyers.  Several banks, including Bankia and Santander, visited the data room.  In order to give other potential bidders more time to consider and formulate a potential offer, Banco Popular extended the sales process until the end of June 2017.

67. As of June 6, 2017, despite the extreme run on the bank that it was facing, Banco Popular continued to operate as a solvent bank, with strong future prospects and multiple private transactions underway designed to further enhance and stabilize its financial condition.

   **H.     The Final Run on the Bank and Resolution of Banco Popular.**

68. The private sale process that Banco Popular was conducting in May 2017 became increasingly difficult due to the escalating run on the bank's deposits.

69. As noted above at ¶¶ 11 and 66, Santander participated in this private sale process and accessed the virtual data room that Banco Popular made available to interested buyers. While conducting its due diligence, starting in early May, Santander developed different valuation scenarios for Banco Popular.  Santander believed it was unlikely it would be able to acquire Banco Popular in a private sale because Santander was unwilling to offer a price that would be sufficiently attractive to Banco Popular shareholders.  Santander therefore concluded that the best way to acquire Banco Popular would be either: (1) a government intervention (i.e., a resolution process), which would allow Santander to "rescue" the bank at a "symbolic" price; or (2) a share price collapse (possibly caused by negative media), after which a very low bid would more likely be accepted by Banco Popular's shareholders. Santander's preferred solutions in fact materialized.

70. By the second week of May, Banco Popular's liquidity crisis grew even worse because of media reports and public statements attributed to Spanish and EU government officials.  On May 11, 2017, the press published an article called "urgent sale of Popular due to bankruptcy risk."  The following day, Banco Popular lost € 1 billion in deposits.  This marked the first time that Banco Popular's LCR fell below the required regulatory minimum of 80%.

71. In the meantime, throughout May, Banco Popular continued preparing a suitable portfolio of assets to use as collateral for ELA.  Banco Popular also continued its discussions with the Banco de España to seek emergency liquidity assistance, recognizing the growing need for liquidity assistance, particularly by the second half of May.

72. On May 18, 2017, and in line with Ms. Garrido's April 12th statement that Banco Popular required private solutions, Spanish Minister of Economy, Luis de Guindos, publicly stated that the Spanish government "did not foresee injecting any public capital" to Banco Popular[38] and that Banco Popular was being supervised by the ECB, not by local authorities, thereby wrongly implying to the public that Banco Popular was the EU's problem, not Spain's problem.[39] This public confirmation that Respondent would not support Banco Popular further eroded depositor and investor confidence in the bank and further deepened the run on the bank that would ultimately lead to Banco Popular's demise and the destruction of Claimants' investments in Banco Popular.

73. On May 18, 2017, Banco Popular's Board approved an action plan to bring its LCR back above 89% by the end of the month, and established a Liquidity Monitoring Committee. The Board also notified the ECB regarding the breach of the LCR regulatory minimum and its plan to restore the LCR to a compliant level by the end of the month.

74. By May 18, Banco Popular presented the Banco de España a portfolio of at least € 22 billion in collateral for the provision of ELA.  Despite this substantial collateral, a few days earlier, the Banco de España informed Banco Popular that it would only provide ELA of € 700M based on the assets it had reviewed, potentially representing only 3% of the total collateral that Banco Popular had presented.  Such a large and unprecedented haircut was tantamount to a refusal by the Banco de España to provide any meaningful liquidity assistance, both because such a low amount of ELA would not have been sufficient to overcome the bank run that Banco Popular was facing, and because it would have required Banco Popular to post an unreasonably large amount of assets as collateral, thereby precluding Banco Popular from selling assets or pursuing other measures to obtain further liquidity.

---

[38] EFE Empresas, *De Guindos asegura que no se prevé inyectar dinero público en el Popular*, 18 May 2017, https://www.efeempresas.com/noticia/de-guindos-inyectar-dinero-banco-popular/ (last accessed 14 August 2018); Expansión, *Guindos descarta inyectar capital público en Popular*, 19 May 2017, http://www.expansion.com/empresas/banca/2017/05/18/591de69bca47410a4d8b4591.html (last accessed 14 August 2018) ("independent of the community regulations, the Government of course has no intention of injecting public resources"). (free translation).

[39] El Economista, *Guindos asegura que no se va a inyectar dinero público en Banco Popular*, 18 May 2017 http://www.eleconomista.es/banca-finanzas/noticias/8368092/05/17/Guindos-asegura-que-no-se-va-a-inyectar-dinero-publico-en-banco-popular.html (last accessed 14 August 2018).

75. On May 23, 2017, the Chair of the SRB, Elke König, publicly stated that Banco Popular was being "watched" by the SRB, leading depositors to conclude that Banco Popular was facing imminent resolution, predictably exacerbating the ongoing run on the bank.[40] Respondent again made no attempt to clarify Mr. de Guindos' or Ms. König's statements or to instill public confidence to stop or slow the heavy deposit withdrawals that these statements triggered. Respondent simply stood by and watched.

76. On May 29, 2017, Banco Popular's Board of Directors met and expressed significant frustration and concern with the Banco de España's apparent unwillingness to provide meaningful liquidity assistance. The Liquidity Monitoring Committee of Banco Popular's Board nevertheless continued the ongoing submission of additional collateral to the Banco de España to support its request for ELA.

77. On May 31, 2017, Reuters quoted Ms. König as warning EU officials that Banco Popular may need to be wound down should it fail to find a buyer. The article noted that "[o]ne of Europe's top bank watchdogs has warned European Union officials that Spain's Banco Popular POP.MC may need to be wound down if it fails to find a buyer."[41] The article included a comment by an EU official that "König has said ... that the Single Resolution Board is following the (Banco Popular) procedure with particular attention with a view to a possible intervention," adding that "the bank's merger bid "may be fruitless," and that "general preparations are under way although no concrete steps have yet been taken."[42]

78. That same day, the SRB issued a press release in which it said it would "not comment on any bank-specific matters."[43] Following these media articles, the Banco Popular stock price plummeted even further and led to even higher deposit outflows. Between June 1 and June 5, 2017, Banco Popular suffered deposit withdrawals of approximately € 5.742 billion. The

---

[40] Bloomberg, *Single Resolution Board says EU shouldn´t be bailing out banks*, https://www.bloomberg.com/news/videos/2017-05-23/single-resolution-eu-shouldn-t-be-bailing-banks-video (last accessed 14 August 2018).

[41] Reuters, *Exclusive: EU warned of wind-down risk for Spain's Banco Popular*, 31 May 2017, https://www.reuters.com/Art./us-banco-popular-m-a-eu-exclusive-idUSKBN18R25V (last accessed 14 August 2018).

[42] *Id*.

[43] SRB, *Press Release – Media allegations regarding a specific bank*, 31 May 2017, 18:47, https://srb.europa.eu/en/node/312 (last accessed 14 August 2018).

price of Banco Popular shares on the Spanish stock exchange also fell drastically. Banco Popular's LCR fell to 24% by June 5.

79.   On June 1, 2017, Banco Popular requested a line of ELA totaling € 2 billion from the Banco de España, which the Banco de España later approved based on Banco Popular's solvency and its compliance with ECB ELA guidelines.

80.   On June 2, 2017, *El Economista* reported that Santander was the only bank interested in purchasing Banco Popular via the ongoing private sale process, and that Bankia was not going to submit an offer.[44] Banco Popular stock price fell drastically immediately after the publication of that article, leading also to a further spike in deposit withdrawals. On June 5, 2017 (the next business day), withdrawals totaled approximately € 3 billion.

81.   As of June 5, 2017, Respondent still made no effort to stop the run on the bank or to help Banco Popular stabilize its depleting liquidity with announcements of support or any other apparent actions. To the contrary, as the Spanish Ministry of Finance later confirmed, Spanish government withdrawals of deposits continued to escalate, further eroding the bank's financial condition and fueling the run on the bank. In fact, Spain's Minister of Economy later admitted that approximately 30% of *all* withdrawals from Banco Popular were initiated by Spanish public entities, all attributable to Respondent.[45]

82.   On June 5, 2017, in view of the ongoing and massive withdrawals of deposits, Banco Popular activated its earlier request for ELA, obtaining € 1.9 billion from the Banco de España.[46] That amount, though, was no longer enough. Given the rapidly accelerating run on the bank, Banco Popular expanded its ELA request to € 9.5 billion later the same day. However, the Banco de España only provided an additional € 1.6 billion on June 6, resulting in a total of

---

[44]   El Economista, *Santander se queda solo en la puja por el Popular: Bankia no quiere sorpresas*, http://www.eleconomista.es/banca-finanzas/noticias/8402835/06/17/Santander-se-queda-solo-en-la-puja-por-el-Popular-Bankia-no-quiere-sorpresas.html (last accessed 14 August 2018).

[45]   Spanish Parliament, *Diary of Sessions of the House of Representatives*, Plenary Session and Permanent Deputation, No. 29, 16 January 2018, Year 2017, XII Legislature, http://www.congreso.es/public_oficiales/L12/CONG/DS/CI/DSCD-12-CI-29.PDF (last accessed 14 August 2018), p. 55.

[46]   La Información, *El Popular esperaba un déficit de 8.000 millones, imposible de cubrir por el BCE*, https://www.lainformacion.com/empresas/banca/el-popular-esperaba-un-deficit-de-8-000-millones-imposible-de-cubrir-por-el-bce/6343205, 1 March 2018 (last accessed 14 August 2018).

€ 3.5 billion in ELA, less than one-third of the amount requested, apparently still reflecting the unprecedented and unreasonable collateral haircut applied by the Banco de España.[47]

83. On June 6, 2017, in view of the massive and continuing deposit withdrawals and the Banco de España's refusal to provide the ELA that Banco Popular needed to overcome the bank run, Banco Popular was left with no choice but to inform the ECB that Banco Popular would be unable to cover its customer deposits the following day and thus was "likely to fail".

### I.   Respondent's "Auction" and Fire Sale of Banco Popular to Santander.

84. Months before Banco Popular's resolution, Respondent apparently decided that Banco Popular needed to be sold to a larger bank.  In mid-May, Santander informed Respondent that it was unwilling to offer a price high enough that would likely be approved by Banco Popular's shareholders to purchase the bank through a private sale, but that Santander was willing to buy Banco Popular through a resolution process that involved a nominal purchase price.  Shortly thereafter, Respondent set the resolution process in motion.  Apparently determined to achieve a sale, Respondent failed to take any steps to save Banco Popular as an independent bank or to protect the rights and interests of Banco Popular's existing investors.

85. On or about May 14, 2017, Santander informed the Banco de España that it would not make an offer for Banco Popular through a private sale but that Santander was still interested in a potential transaction that would align with its preferred financial terms.

86. Two days later, on May 16, Santander sent a letter to Banco Popular communicating its decision not to submit an offer to acquire Banco Popular on the ground that Santander was unable to offer a purchase price that would be sufficiently attractive to Banco Popular shareholders.  *That same day*, the SRB and Respondent launched the process that eventually led to the resolution of Banco Popular by commencing the tender to engage a valuation expert.

87. On May 22, Santander's Board of Directors formally authorized its Executive Committee to submit a bid to purchase Banco Popular through a resolution process.  The bid was authorized under the following conditions: (1) the offer price was to be €0, with a negotiation

---

[47]   *Id.*; Economía Crítica y Crítica de la Economía, *Las preguntas sin respuesta en la quiebra del Banco Popular*, http://www.economiacritica.net/?p=9469, 26 June 2017 (last accessed 14 August 2018).

margin of up to €200 million; (2) a bail-in of Additional Tier 1 and Tier 2 bonds worth €2 billion; and (3) a €7 billion rights issue to follow the resolution.

88.   The next day, on May 23, 2017, more than two weeks before any 'fail or likely to fail' (**FOLTF**) assessment or determination, and the same day that Ms. König publicly announced that Banco Popular was being "observed," the SRB and FROB instructed Deloitte to carry out a valuation of Banco Popular, taking the first step towards the eventual resolution of Banco Popular.  The purpose of the valuation was, *inter alia*, "assessing the economic value of the assets and liabilities of the entity meeting the conditions for resolution according to Article 20(4) SRMR."[48] Presumably aware that they had a willing resolution buyer, the SRB and FROB instructed Deloitte to assume that the sale of business tool would be used in Banco Popular's resolution,[49] even though the 2016 Resolution Plan established only six months earlier did not contemplate the use of the sale of business tool.  Deloitte was not asked to consider or evaluate any other resolution tools in order to then determine the appropriate one to use, as was Deloitte's responsibility pursuant to the SRM framework, thereby indicating that the decision had already been made to sell Banco Popular via resolution without any prior independent assessment supporting that decision.

89.   On June 2, 2017, before Deloitte submitted its Valuation Report and again before any finding that Banco Popular was FOLTF, the SRB and FROB initiated the sale process for Banco Popular.  That day, Banco Popular was asked to provide information about its ongoing private sale process, including identification of potential purchasers.  Upon receipt of that information on June 3, 2017, the SRB issued its "Marketing Decision," instructing the FROB to commence the sale of Banco Popular.[50] According to the SRB, the marketing process "had to be as transparent as possible," "not unduly favour or discriminate against any

---

[48]   SRB, *Decision of the Single Resolution Board in its Executive Session of 7 June 2017 concerning the adoption of a resolution scheme in respect of Banco Popular Español, S.A. with a Legal Entity Identifier: 80H66LPTVDLM0P28XF25, Addressed to FROB (SRB/EES/2017/08)*, 7 June 2017, https://srb.europa.eu/sites/srbsite/files/resolution_decision.pdf, (last accessed 14 August 2018), p. 8

[49]   SRB, Deloitte, *Hippocrates Valuation Report [Sale of Business Scenario]*, https://srb.europa.eu/sites/srbsite/files/valuation_2_-_main_report.pdf (last accessed 14 August 2018), pp. 1, 3.

[50]   SRB, *Decision of the Executive Session of the Board of 3 June 2017 concerning the marketing of Banco Popular Español (hereinafter the ¨Bank¨) Addressed to the Fund for Orderly Bank Restructuring (hereinafter ¨FROB¨) (SRB/EES/2017/06)*, https://srb.europa.eu/sites/srbsite/files/marketing_decision.pdf (last accessed 14 August 2018).

potential acquirers," and "aim to maximize the sale price, while taking into account the need to effect a rapid resolution plan."[51]

90.    The next day, on June 4, 2017, the FROB, through its external advisors, asked potential purchasers to sign a non-disclosure agreement, as a pre-requisite to "participate in an eventual acquisition [of Banco Popular] within the framework of a potential resolution,"[52] referred to as the "Hippocrates Project." The letter was sent only to five Spanish banks that had previously shown interest in Banco Popular's still ongoing private sale process.  Those who signed the confidentiality agreement were given access to a virtual data room on Monday, June 5.[53]

91.    On June 5, 2017, the FROB sent a "Process Letter" to the two banks that had signed the confidentiality agreements, Santander and BBVA, laying out the timeline and requirements for the auction process.  On June 6, the FROB sent an amended Sale Process Letter to Santander and BBVA, shortening the bidding deadline and requiring them to submit a binding offer for the acquisition of Banco Popular before midnight *that same day*.  The Revised Process Letter thus gave prospective buyers less than 24 hours to review the information contained in the Virtual Data Room and submit their binding offers.

92.    Consistent with the terms that already had been pre-approved by Santander's Board of Directors two weeks earlier, the FROB's Process Letter stated that the calculation of the bid price should consider three options, including a bail-in of all the existing shares and the Additional Tier 1 capital instruments and a conversion of 100% of Tier 2 additional capital instruments and issuance of shares for the value of those instruments.  The FROB's Process Letter also required that any offers include a purchase price "equal to or greater than one Euro," thereby signaling to buyers that the FROB would accept offers as low as € 1 (also consistent with Santander's pre-approved terms).  Finally, the Process Letter indicated that prospective buyers would not necessarily receive any further information beyond what was available in the Virtual Data Room.

---

[51]    *Id*. pp. 2, 3.

[52]    Extracts of process letter from FROB to potential buyers, dated 4 June 2017, **Exhibit CRFA-4**.

[53]    Letter from Jefferies Arcano to potential buyers, dated 4 June 2017, **Exhibit CRFA-3**.

93.   Hours after receiving the Revised Process Letter, BBVA informed the FROB that the information it provided was not sufficient to enable BBVA to submit a bid within the shortened timeframe:

> "In relation to the Hippocrates Project, I confirm that, given the limitations on price and the remaining conditions required in accordance with the process letter, as well as the insufficient information available, BBVA is not in a position to present an offer under the terms of that process letter and the purchase agreement (SPA) submitted today."

BBVA also confirmed that, if it were given additional information and time, BBVA would be interested in participating in the bidding process:

> "Notwithstanding the foregoing, we also confirm that if sufficient information was available to allow its governing bodies to properly analyze the operation and the conditions, and if the conditions of the process could be modified, BBVA would be interested in participating in it."[54]

94.   BBVA's request for more time and information was ignored by the FROB, leaving Santander as the only "bidder".  In fact, Santander was the only bidder that could reasonably been expected to submit a bid within a matter of hours since it was the only bidder that had previously completed a due diligence process concerning Banco Popular and already had developed its offer.

95.   Although the sale process was already well underway, it was not until June 6, 2017, with only two weeks to complete its work, that Deloitte delivered a tentative valuation report to the SRB and the FROB.  Deloitte underscored that it had "not had access to certain critical information," "had limited opportunity to discuss [their] conclusions with management, auditors, supervisors and other familiar with the institution," and had "been required to draft [their] Report in an extremely short period of time," noting that "[their] valuation should therefore be regarded as highly uncertain, and provisional for the purposes of article 36 BRRD."[55]

96.   Deloitte's report also made clear that it had not carried out any analysis of whether the conditions for resolution were met.  Deloitte also confirmed that its report, as per original

---

[54]   Letter from BBVA, dated 6 June 2017, **Exhibit CRFA-6**.

[55]   SRB, *Deloitte, Hippocrates Valuation Report [Sale of Business Scenario]*, https://srb.europa.eu/sites/srbsite/files/valuation_2_-_main_report.pdf (last accessed 14 August 2018), p. 3.

instructions, "assume[d] as the resolution scenario to be considered a sale of the whole bank through an open, fair and competitive sale process, using the sale of business tool under article 38 of the BRRD." Deloitte also noted that if Banco Popular was to be sold, the price negotiated in a *private* sale transaction (*not* a fire sale via resolution) was "likely to be the best and most reliable indication of the value of the bank."[56]

97. Deloitte's June 6 report confirmed that Banco Popular was a solvent bank with a strong market position. The report did not analyze Banco Popular's liquidity position or assess whether resolution was the proper solution to address the bank's ongoing liquidity crisis.

98. Without a supporting valuation from Deloitte, the SRB prepared its own Valuation Report "for the purpose of informing the determination of whether [Banco Popular] meets the conditions for resolution or the conditions for the write down or conversion of capital instruments." In that report, the SRB acknowledged that there was no basis for considering Banco Popular to be insolvent, and found "no indication" that Banco Popular had infringed any regulatory capital requirements "or that its assets, in the near future, will be less than its liabilities…" Instead, the SRB concluded that the "liquidity of the group is the key factor that is triggering the failure of the bank."[57]

99. As of June 6, 2017, Respondent was well aware that Banco Popular was solvent and in compliance with regulatory capital requirements. Indeed, Spain's Minister of Economy, Luis de Guindos,[58] and the Governor of the Banco de España, Luis Maria Linde de Castro,[59] both later confirmed this in testimony before the Spanish Parliament.

---

[56]   *Id.*

[57]   SRB, *Valuation Report for the purpose of Art. 20(5)(a) of Regulation(EU) No 806/2014 informing the determination of whether the conditions for resolution of the conditions for the write down or conversion of capital instruments are met (¨Valuation 1¨)*, https://srb.europa.eu/sites/srbsite/files/bpe_valuation_1.pdf (last accessed 14 August 2018), pp. 8, 9, 10.

[58]   Video of Interview to Luis de Guindos, https://www.youtube.com/watch?v=RZ8p1NlztN4 ("El Banco Popular, cuando yo le pregunto al supervisor como está me dicen: es un banco solvente, es un banco que no tiene ningún problema de liquidez y evidentemente pues el Ministerio de Economía y el Gobierno no tiene inspectores, los tiene el supervisor que es el que analiza la situación de la entidad. Y eso es lo que me dicen, ni problemas de solvencia ni problemas de liquidez […]").

[59]   Spanish Parliament, *Diary of Sessions of the House of Representatives*, Commission, No. 260, Year 2017, XII Legislature, 20 June 2017, p. 21 http://www.congreso.es/public_oficiales/L12/CONG/DS/CO/DSCD-12-CO-260.PDF (last accessed 14 August 2018); Spanish Parliament, *Diary of Sessions of the House of Representatives*,

100. Despite its knowledge that Banco Popular was solvent and was primarily suffering from a short-term liquidity crisis (substantially caused by the Spanish government itself), Respondent continued to pursue its pre-determined plan to sell Banco Popular via resolution. Respondent also arbitrarily continued to refuse the level of liquidity assistance that Banco Popular needed, thereby denying Banco Popular the time necessary to implement the transactions described above that would have stabilized the bank's liquidity and capital position. By refusing to take any steps to support and stabilize Banco Popular, Respondent effectively forced Banco Popular into a resolution that never should have occurred.

101. In the early hours of June 7, 2017, Santander submitted its offer of € 1, which immediately was accepted by the FROB,[60] even though the offer was well below Banco Popular's fair market value and was not obtained via a fair, transparent or competitive tender process.

102. Within hours of receiving Santander's offer, the SRB Executive Committee issued its Resolution Decision, declaring that Banco Popular was FOLTF, solely on the basis of Banco Popular's liquidity crisis. The resolution decision was taken by unanimous vote of the Executive Committee, including Respondent's representative.

103. Less than an hour later, in the dawn hours of June 7th, the FROB immediately implemented the Resolution, handing Banco Popular over to Santander, without any prior notice to investors and without any due process whatsoever.[61]

104. Specifically, the FROB ordered: (i) the reduction of Banco Popular's share capital to zero, wiping out the billions of Euros in shares then outstanding; (ii) the conversion of the Additional Tier 1 capital instruments to shares, then writing those shares down to 0 as well;

---

Investigative Commission, No. 9, Year 2017, XII Legislature, http://www.rdmf.es/wp-content/uploads/2017/11/julio.pdf (last accessed 14 August 2018), p. 16.

[60]   SRB, *Decision of the Single Resolution Board in its Executive Session of 7 June 2017 concerning the adoption of a resolution scheme in respect of Banco Popular Español, S.A. with a Legal Entity Identifier: 80H66LPTVDLM0P28XF25, Addressed to FROB (SRB/EES/2017/08)*, 7 June 2017, https://srb.europa.eu/sites/srbsite/files/resolution_decision.pdf (last accessed 14 August 2018).

[61]   FROB, *7 June 2017 Resolution of the FROB Governing Committee adopting the measures required to implement the Decision of the Single Resolution Board in its Extended Executive Session of 7 June 2017 concerning the adoption of the resolution scheme in respect of Banco Popular Español, S.A., addressed to FROB, in accordance with Art. 29 of Regulation (EU) No. 806/2014 of the European Parliament and of the Council of 15 July 2014 establishing uniform rules and a uniform procedure for the resolution of credit institutions and certain investment firms in the framework of a Single Resolution Mechanism and a Single Resolution Fund and amending Regulation (EU) No 1093/2010*, http://www.frob.es/en/Lists/Contenidos/Attachments/419/Proyectode Acuerdoreducido_EN_v1.pdf (last accessed 14 August 2018).

(iii) the conversion of all Tier 2 capital instruments into newly-issued Banco Popular shares; and (iv) the transfer of all newly issued Banco Popular shares to Santander for 1 Euro.

105. The Resolution Decision was publicly released on June 7, 2017, without any specific explanation as to why Banco Popular had been placed into resolution, without providing the factual basis for the resolution decision itself, with no explanation as to why the specific resolution tools were chosen, or how the resolution decision itself was made.  The public version of the resolution decision was heavily redacted, omitting critical information regarding the factual basis for the SRB's findings and the decision-making process that led to the resolution decision.  To this day, the public version of the Resolution Decision contains no reference to the private solutions that were then underway to enhance Banco Popular's financial condition, including the pending capital increase and the sale of Banco Popular assets, nor any explanation as to why the private solutions underway were not a viable alternative to resolution.  There also is no discussion of why emergency liquidity assistance or the provision of government guarantees[62] were not suitable alternatives to resolution given that Banco Popular was solvent and only was being placed into resolution on liquidity grounds.

106. The announcement of the Resolution Decision came as a complete shock to Claimants, who learned of the resolution and the destruction of their Banco Popular investments by reading of it in the media.  Claimants were not given any opportunity by Respondent to be heard as to whether resolution was necessary or whether there were any private sector solutions that could have averted resolution, including the transactions that Claimants were personally organizing and which they previously informed Respondent they were ready to implement.

107. Claimants and many other Banco Popular investors filed numerous requests with the SRB and the FROB to obtain copies of the unredacted documents on which the SRB and the FROB's Resolution decisions were based, including the unredacted valuation reports.  To this day, more than one year after the Resolution Decision, investors' requests have been

---

[62]  Spain could have granted government guarantees for senior debt newly issued by Banco Popular as an alternative approach to ELA.

repeatedly rejected by Respondent.  Indeed, Respondent still refuses to disclose the full, unredacted version of the Resolution Decision and related valuation reports.[63]

108.  Before, during and after the Resolution Decision, Respondent acted without any degree of transparency to investors such as Claimants, including: (1) the evaluation of potential resolution tools and alternatives; (2) the determination of whether resolution was necessary; (3) negotiations with Santander and other potential purchasers regarding the sale of Banco Popular; and (4) why Respondent failed to take any action to stop the bank run and resulting liquidity crisis that Banco Popular was facing, or to otherwise support Banco Popular.

**J.      Respondent's Unlawful Destruction of Claimants' Investments.**

109.  Following the announcement of the resolution, Respondent immediately declared its support for the resolution decision, proclaiming how fortunate it was that a purchaser (Santander) had appeared in the resolution process,[64] allowing for the process to be carried out "without the use of public resources" and "without any spread in the sector."[65]

110.  In fact, the impact of the resolution on Banco Popular's investors was devastating, wiping out all of the bank's shares and Additional Tier 1 bonds and destroying the investments of more than 300,000 investors who lost everything overnight.  Claimants lost their entire original investment of, jointly with the investment of the claimants in the UNCITRAL Arbitration, more than € 470 million.

111.  Although Santander offered small investors in Banco Popular "fidelity bonds" in exchange for giving up any litigation rights against Banco Popular's resolution, no such opportunity was afforded to Claimants.

112.  Claimants' losses are entirely attributable to Respondent's acts and omissions, before, during and after the resolution decision.  As explained above, Respondent played a critical role in the planning and implementation of the resolution of Banco Popular, and in engineering the

---

[63]    SRB, *Deloitte, Hippocrates Valuation Report [Sale of Business Scenario]*, https://srb.europa.eu/sites/srbsite/files/valuation_2_-_main_report.pdf (last accessed 14 August 2018).

[64]    El Confidencial, *Linde admite que fue un error no nacionalizar Banco Popular en 2012*, 10 April 2018, https://www.elconfidencial.com/empresas/2018-04-10/banco-popular-quiebra-linde-saracho-culpa-garantias_1547538/ (last accessed 14 August 2018).

[65]    ABC, *De Guindos: La compra del Banco Popular se lleva a cabo «sin la utilización de recursos públicos»*, 7 June 2017, https://www.abc.es/economia/abci-guindos-compra-banco-popular-lleva-cabo-sin-utilizacion-recursos-publicos-201706070935_noticia.html (last accessed 14 August 2018).

pre-determined sale of Banco Popular.  It is highly unlikely that the resolution decision would have been taken without Respondent's active support, facilitation and approval.

113.  It is also apparent that Banco Popular never would have or could have been placed into resolution but for Respondent's wrongful acts and omissions.  The SRB Resolution Decision and Marketing Decision both make clear that Banco Popular was placed into resolution *solely* because of the liquidity crisis that Banco Popular faced in the weeks and months preceding the resolution — culminating with a run on the bank that left Banco Popular in a position where it ran out of cash and could not open its doors on June 7, 2017.

114.  Banco Popular's liquidity crisis was caused by the withdrawal of more than €17 billion in deposits starting in December 2016, at a rate of € 1 billion per day in its final days.  The Spanish government was responsible for the withdrawal of at least 30% of those deposits, more than any other single depositor.  Yet, despite its awareness of Banco Popular's increasingly precarious liquidity position, Respondent did nothing to stop the continuing withdrawal of its own deposits.  Respondent also arbitrarily failed to take any of the multitude of measures it had previously taken and subsequently took to stabilize other banks that were also facing liquidity problems.

115.  In the weeks and months before the Banco Popular resolution, Respondent was fully aware that the bank's liquidity position was progressively deteriorating.  By at least February 2017, the Banco de España was receiving daily reports regarding Banco Popular's liquidity position and deposit withdrawals and was asked by Banco Popular to assist in helping the bank to overcome its liquidity crisis.  Charged with the supervisory responsibility to monitor and preserve the financial condition and stability of its banks, Respondent was uniquely positioned to help Banco Popular avoid and overcome the panic-based run on the bank that ultimately led to its demise by helping to restore depositor confidence through public expressions of support and reassurances to depositors.

116.  For example, only a few weeks after the resolution of Banco Popular, two of the principal banks in the province of Cataluña, Caixabank and Sabadell, were facing a threatened bank run as a result of depositor panic caused by the potential Catalan secession.  In order to quell the bank run and restore depositor confidence, Respondent acted quickly by making public statements of support for both banks and allowing those banks to reincorporate outside of Cataluña.  The Spanish Minister of Economy made several public statements that "there is

nothing to fear," expressly stating that Spain would "act with the adequate instruments," aimed at reassuring depositors that the situation was under control.[66]  These measures quickly and successfully stopped the run on both banks.

117.  Similarly, one week after the resolution of Banco Popular, another Spanish bank, Liberbank, was threatened by speculative short-selling of shares.  Respondent quickly responded by prohibiting the short sale of Liberbank's shares for five months, again successfully preventing the bank's failure.[67] As these cases demonstrate, Spain had a broad array of measures at its disposal to actively support and protect Spanish banks in crisis, in the discharge of its duty to maintain the stability of the Spanish banking sector and to protect the rights and interests of investors in that sector.

118.  These measures confirm that Respondent was fully aware of the measures it could take to restore depositor confidence, how to stabilize Spanish banks that were facing liquidity problems, and the government's unique responsibility to step in and to protect otherwise-solvent banks.  Respondent had done so on multiple occasions dating back to at least 2008, utilizing a combination of measures uniquely at its disposal.

119.  Yet, in the case of Banco Popular, Respondent not only failed to take the necessary measures to help Banco Popular overcome its liquidity crisis, but then shockingly *contributed* actively to Banco Popular spiraling liquidity crisis by withdrawing billions of Euros in deposits.  Only at the eleventh hour, after it was too late, did Respondent provide € 3.5 billion in ELA, by then only a fraction of the liquidity assistance that Banco Popular requested (€ 9.5 billion) and urgently needed.  Had Respondent acted publicly and proactively to reassure Banco Popular depositors and restore public confidence in Banco Popular, just as it had done on other occasions with other Spanish banks, the bank run that caused Banco Popular's demise

---

[66]   Cinco Días, *Guindos: los clientes de los bancos catalanes no deben temer por sus ahorros*, 4 October 2017, https://cincodias.elpais.com/cincodias/2017/10/04/mercados/1507103824_082370.html (last accessed 14 August 2018).

[67]   The prohibition was dictated on 12 June 2017, was extended two times, and was finally lifted on 20 November 2017, *see* CNMV, *La CNMV prohíbe con efectos inmediatos y por el plazo de 1 mes las ventas a corto y operaciones similares (posiciones cortas) relacionadas con acciones de Liberbank S.A., al amparo del Artículo 20 del Reglamento No 236/2012*, http://cnmv.es/Portal/HR/ResultadoBusquedaHR.aspx?nreg=253229&th=H and   http://www.cnmv.es/Portal/Utilidades/BuscadorResultados.aspx?busqueda=liberbank&grupo=ZH&tb=2 (last accessed 14 August 2018).

never would have occurred and the resolution of Banco Popular never would have been possible.

120.  To be clear, Claimants are *not* seeking in this arbitration to challenge the EU resolution decision taken by the SRB, the EC, the ECB or any other EU institution.  The challenge to that decision has been filed by Claimants with the Court of Justice of the European Union. In this case, Claimants only seek to hold Respondent responsible for its own acts and omissions and its own unlawful conduct in directly precipitating a resolution that never should have occurred and never would have been possible but for Respondent's unlawful actions.

121.  Claimants seek to hold Respondent responsible for its unlawful conduct, in violation of the Treaty, including, among other things: (a) Respondent's arbitrary conduct in causing the liquidity crisis that led to the resolution of Banco Popular, both by continuing to withdraw government deposits from Banco Popular despite the knowledge of its spiraling liquidity crisis and by the failure to take similar measures to the ones taken with respect to other Spanish banks to help Banco Popular overcome its liquidity crisis; (b) Respondents' failure to provide a stable, reliable and predictable legal, regulatory and commercial environment for Claimants' investments in Banco Popular; (c) conducting a sham sale process that was required to be conducted on a competitive basis but instead was carried out as a non-competitive fire sale in which only one bidder was predictably able to submit an offer, armed with guidance that encouraged the bidder to offer as little as € 1, thereby completely disregarding the interests of Claimants and other Banco Popular investors; (d) its decision to sell Banco Popular for € 1, far below the bank's fair market value; (e) failing to provide any notice or opportunity to be heard before completely depriving Claimants of their investments in Banco Popular; (f) failing to act with any transparency regarding the decisions and steps taken in connection with the resolution and the sale of Banco Popular to Santander; and (g) failing to provide Claimants with any just compensation, all as required by both the BIT and by Spanish law.

## IV.   RESPONDENT'S MULTIPLE VIOLATIONS OF THE MEXICO-SPAIN TREATY

122.  Respondent's acts and omissions, as summarized in Section III above, breached Respondent's Treaty obligations to Claimants in multiple respects, including, but not limited to, Respondents' failure to:

(a)  Accord Claimants' investments fair and equitable treatment as well as full protection and security as required by Article IV of the Treaty;

(b)  Accord Claimants' investments treatment no less favorable than that given in similar circumstances to the investments of its other investors, as required by Article III of the Treaty, including protections offered by the State to foreign investors under other investment treaties; and

(c)  Refrain from expropriating investments directly and indirectly through measures tantamount to expropriation except for a public purpose, in a non-discriminatory manner, upon payment of adequate and effective compensation without delay, in accordance with due process, and in accordance with the standards and requirements of Article V of the Treaty.

**A.    Respondent Breached Its Obligation to Offer Fair and Equitable Treatment and Full Protection and Security To Claimants' Investments, in Violation of Article IV of the Treaty.**

123. Under Article IV of the Treaty, Claimants were guaranteed "treatment in accordance with international customary law, including fair and equitable treatment, as well as full protection and security" in connection with their investments in Banco Popular.

124. The requirement to provide "fair and equitable treatment" is widely interpreted as protecting foreign investors against arbitrary and discriminatory treatment, thus requiring that the State be guided by legal standards and reasoned decision-making, not arbitrary preference. "Fair and equitable treatment" requires that the State provide a stable and predictable legal and regulatory environment, and act in a consistent and even-handed way in accordance with applicable laws and regulations. The guarantee of fair and equitable treatment also includes the State's obligation to act with transparency and openness in enacting measures that affect protected investments.

125. The guarantee of full protection and security similarly requires the State to maintain a stable and secure legal and commercial environment, by taking reasonable measures available to the State to protect investments against acts that may threaten the investment.

126. As detailed above, Respondent breached the requirement to provide fair and equitable treatment and full protection and security through a series of acts and omissions, including, but not limited to, the following:

a.    Respondent took active measures that damaged the financial condition of Banco Popular prior to its Resolution that effectively destroyed Claimants' investments, including (i) its continuous and unprecedented withdrawal of billions of Euros from Banco Popular through Spanish Government entities, thereby substantially damaging Banco Popular's liquidity position, despite the knowledge of Banco Popular's weakening liquidity position; and (ii) unprecedented and alarming public announcements that harmed the reputation of Banco Popular and contributed to a lack of public confidence in Banco Popular, with no rational policy basis;

b.    In sharp contrast to its consistent pattern of assisting other Spanish banks experiencing financial difficulties, Respondent arbitrarily failed to take any measures to stabilize Banco Popular's liquidity position, including stopping short-sales and restoring public confidence to mitigate the run on bank deposits, despite the fact that Respondent itself had substantially contributed to Banco Popular's weakened liquidity position;

c.    Respondent breached its obligation to provide a secure and stable environment by disregarding its own laws and regulations, including the disregard of the Banco de España's pivotal role to provide for financial stability and serve as lender of last resort;

d.    Respondent arbitrarily failed to consider alternative private sector solutions that would have avoided the Resolution, including Claimants' alternative plans to enhance Banco Popular's capital position and its liquidity position.  Claimants communicated these alternatives to Respondent, along with the fact that those alternatives were supported by other institutional investors; Respondent also arbitrarily failed to contact Claimants prior to the resolution in order to determine whether there were private sector alternatives to resolution;

e.    Instead of taking steps to help Banco Popular overcome the liquidity crisis that it was facing, and to protect Claimants' investments in Banco Popular, Respondent actively participated in the process to engineer the pre-conceived sale of Banco Popular via resolution.  Just one day after Santander told the Banco de España that it would "rescue" Banco Popular at zero cost, the authorities sought out an "independent" valuation expert (Deloitte) that was then instructed to carry out its

work on the assumption that Banco Popular would be sold using the sale-of-business tool.  Respondent advocated the use of the sale-of-business tool and bail-in, and the resultant destruction of Banco Popular's existing shares and convertible bonds, without any prior and independent legal or economic analysis supporting that decision.  Respondents' decision to support the sale of Banco Popular via resolution also was taken weeks before there was any finding that Banco Popular was FOLTF, before the eventual run on the bank that was used to justify the resolution had even started, and without any assessment of private sector alternatives that could have avoided resolution, as required by the regulatory framework.  Respondent's pre-conceived decision to sell Banco Popular via resolution arbitrarily ignored the array of resolution tools available, including those contemplated in the then-standing 2016 Resolution Plan.  Instead of basing its decisions on a neutral analysis of available alternatives, Respondent drove a resolution process informed by backdoor conversations, disregarding  the massive losses that its decision would cause to hundreds of thousands of investors, including Claimant;

f.      Respondent provided no notification to Claimants or any opportunity to be heard before the resolution, despite Respondents' knowledge that Claimants had a substantial equity ownership position in Banco Popular, had previously consulted with Claimants regarding the financial future of Banco Popular, and that Claimants were ready and able, working with other significant investors, to implement private transactions to stabilize and enhance Banco Popular's financial condition;

g.      Respondent conducted a fire sale of Banco Popular in which it invited only five buyers to consider bidding a suggested minimum bid of € 1 for Banco Popular, along with a compressed transaction timetable and insufficient information that prevented other bidders from participating in a meaningful and competitive sales process altogether.  Santander, having already obtained internal Board approval following its presentation to the Banco de España, was the only buyer able to participate in the auction.  Meanwhile, foreign investors, including Claimants, were excluded from that sales process despite their substantial equity holdings in Banco

Popular and the cross-ownership arrangements between Banco Popular and the Mexican bank owned by a number of the Claimants, Ve por Más (**Bx+**); and

h.     Before, during and after the resolution process, Respondent acted without any transparency.  Even now, *more than one year* after the resolution of Banco Popular, Respondent still refuses to provide critical information regarding the facts and circumstances that led to the resolution and sale of Banco Popular.  Respondent has withheld its unredacted decisions and documents reflecting the underlying legal basis and reasoning for its conduct in facilitating the resolution of a bank that was otherwise solvent and only facing a liquidity crisis that Respondent itself had substantially caused in the first place.

127.   Through these acts, Respondent violated the Claimants' rights under the Treaty to fair and equitable treatment and to full protection and security.

**B.     Respondent Failed To Accord Claimants the More Favorable Fair and Equitable Treatment Guarantees Accorded to Investors from Third States in Other BITs, In Violation of Article III of the Treaty.**

128.   Pursuant to Articles III(1) and (2) of the Treaty, Claimants were guaranteed treatment that is "no less favourable than that given in similar circumstances" to any other investors, including "to investors of any third State." Tribunals have held that this guarantee requires the host State to extend to investors the strongest investment protections granted by the State under investment treaties with third countries, including the autonomous formulation of the fair and equitable treatment standard.

129.   As set out above, Article V of the Mexico-Spain BIT provides investors with fair and equitable treatment protection, which tribunals have defined to provide equivalent protection as that granted by the autonomous fair and equitable treatment standard.  However, to the extent that Article V is interpreted as providing a limited form of fair and equitable treatment protection, Claimants invoke Article III(2) of the Mexico-Spain Treaty in order to receive the benefit of the strongest fair and equitable treatment protection granted by Respondent to investors in third countries.

130.  In particular, Claimants invoke the fair and equitable treatment standard provided under Article 4 of the Spain-Dominican Republic BIT,[68] Article 3 of the Spain-Libya BIT[69] and Article IV(1) of the Spain-Turkey BIT[70] amongst others.  For the same reasons set out in Section IV.A above, Respondent's conduct violates the fair and equitable treatment standard required by these treaties, and therefore breaches Article III(2) of the Mexico-Spain Treaty.

     **C.**     **Respondent Failed To Accord Claimants With Treatment As Favorable As It Accorded To Its Own Investors And Investors From Third States.**

131.  Articles III(1) and (2) of the Treaty provide that Respondent shall give "treatment that is no less favourable than that given in similar circumstances" to "its own investors or to investors of any third State, whichever is more favourable to the investor."

132.  Respondent provided the Claimants' investments with treatment less favorable than the treatment it provided to other investments in its territory under similar circumstances.  As described above, in similar circumstances, Respondent regularly took steps to stabilize other Spanish banks before and even after the Banco Popular resolution, yet arbitrarily failed to take measures to stabilize Banco Popular's liquidity position.

133.  Respondent also only offered Spanish banks the opportunity to bid on the purchase of Banco Popular in connection with the resolution process, but did not provide this opportunity to foreign investors or foreign banks.  Claimants, as Mexican nationals, were denied that opportunity despite the cross-ownership between Banco Popular and Claimants' bank, Bx+ and despite Respondents' knowledge of Claimants' substantial investments and their ability to implement private transactions that could have averted a resolution.  As a result of its private communications with Respondent on or about May 14, 2017, Santander had sufficient time to seek and obtain internal Board approval to buy Banco Popular through resolution.  Such advanced notice was critical, as the FROB later required internal Board approval for any purchaser seeking to submit a bid for Banco Popular, and to do so in a matter of hours.  Respondent provided no such notice or opportunity to Claimants.

---

[68]   Signed 16 March 1995, in force 7 October 1996.

[69]   Signed 17 December 2007, in force 1 August 2009.

[70]   Signed 15 February 1995, in force 3 March 1998.

134.    By according the Claimants' investment worse treatment than that given to investments in its territory in similar circumstances, Respondent breached its obligations under Articles III(1) and (2) of the Treaty.

**D.    Respondent Expropriated Claimants' Investments without Compensation.**

135.    Article V(1) of the Treaty provides that:

> "Neither of the Contracting Parties shall, directly or indirectly, expropriate or nationalize an investment through measures equivalent to expropriation or nationalization ("expropriation"), unless it is: (a) for reasons of public interest; (b) on a non-discriminatory basis; (c) in accordance with the rule of law; and (d) upon payment of indemnification in accordance with [the Treaty standards]".

136.    As described above, Respondent expropriated Claimants' investments in Banco Popular by destroying the value of such investments through a combination of acts and omissions. Respondent's conduct effectively destroyed the value of the Claimants' investment until it became worthless, through a combination of acts and omissions, including:

    a.    Public officials were responsible for billions of Euros in deposit withdrawals and negative statements to the press, which eroded the value of Banco Popular and led to its resolution—which Spanish and European authorities acknowledge was only possible due to the liquidity crisis that Respondent substantially caused;

    b.    After it learned of Santander's decision not to purchase Banco Popular through a private sale and its willingness to take Banco Popular at no cost, Respondent actively engineered and facilitated the sale of Banco Popular via resolution, which foreseeably led to the destruction of Claimants' investments in Banco Popular;

    c.    Respondent effectively destroyed the remaining value of Banco Popular by conducting a sham, non-competitive auction of the bank, in which it invited five participants to submit a bid of € 1 and created circumstances under which only Santander would be able to submit an offer; this fire sale process, carried out by the FROB, was never designed to achieve a fair market value price, and

    d.    Respondent immediately accepted Santander's € 1 bid and proposed to the SRB that Santander be allowed to purchase Banco Popular for € 1, an amount far below the bank's fair market value as established by contemporaneous, independent third parties.

137.   Respondent carried out these expropriatory acts in disregard of the requirements of the Treaty.   Among other things, Respondent provided no notice or opportunity to be heard before depriving Claimants' of their investment in Banco Popular, and then failed to provide any compensation, in disregard of the Treaty requirements, Spanish law, and the rule of law.

138.   Claimants reserve their right to raise additional claims of Treaty violations by Respondent, including their right to assert new claims as and when new information is provided with respect to Respondent's actions and/or the circumstances that led to the resolution of Banco Popular.   Claimants also reserve their right to present additional arguments and evidence as may be necessary to present or supplement their claims and/or to address any new developments that may arise following the filing of this Request for Arbitration.

## V.     JURISDICTION

139.   The jurisdiction of the Centre over this dispute is established under Article XI of the Treaty and Article 25 of the ICSID Convention.

140.   As explained below, all jurisdictional requirements under the Treaty are satisfied.   Claimants have also complied with all procedural requirements of the Treaty for submission of a claim to arbitration.

### A.     Claimants are Protected Investors under the Treaty and the ICSID Convention.

141.   Claimants comprise two types of investors protected by Article 1 of the Treaty: (*a*) physical persons who are nationals of Mexico; and (*b*) entities organized in accordance with the laws of Mexico.   Both types of investors are protected by the Treaty and the ICSID Convention

### 1.     Physical persons who are nationals of Mexico

142.   Pursuant to Article 1(5)(a), the Treaty applies to "physical persons who are nationals of one of the Contracting Parties." A physical person qualifies under the nationality requirement of Article 25 of the ICSID Convention by virtue of its nationality.   Claimants include the following 35 physical persons who are all nationals of Mexico, and are not nationals of Spain:

(1)     Abraham Abadi Tawil
(2)     Alejandra Pérez Mina
(3)     Alejandro Finkler Kudler
(4)     Alejandra Rojas Velasco
(5)     Alonso de Garay Gutiérrez
(6)     Antonio del Valle Perochena

41

    (7)     Arantzazu del Valle Diharce
    (8)     Arturo Grinberg Kreimerman
    (9)     David Troice Jalife
   (10)    Divo Milan Haddad
   (11)    Edmundo del Valle Diharce
   (12)    Elías Abadi Cherem
   (13)    Enrique Rojas Blasquez
   (14)    Eugenio Santiago Clariond Reyes
   (15)    Fernando Ramos González de Castilla
   (16)    Francisco Javier del Valle Perochena
   (17)    Gerardo Madrazo Gómez
   (18)    Germán Larrea Mota Velasco
   (19)    Georgina Rojas Velasco
   (20)    Isabel Rojas Velasco
   (21)    Jacobo Troice Jalife
   (22)    Jaime Abadi Cherem
   (23)    Jorge Rojas Mota Velasco
   (24)    José Eduardo del Valle Diharce
   (25)    José María Casanueva Y Llaguno
   (26)    Juan Pablo del Valle Perochena
   (27)    Julio Andrés Maza Casas
   (28)    Luis Francisco Suinaga Aguilar
   (29)    María Blanca del Valle Perochena
   (30)    María de Guadalupe del Valle Perochena
   (31)    María Eugenia Velasco Fernández
   (32)    María Rojas Velasco
   (33)    Pedro de Garay Montero
   (34)    Sofía de Garay Montero
   (35)    Xochitl de Guadalupe Montero Motta (Xochitl Montero De De Garay)

143. Due to their Mexican nationality, and their lack of Spanish nationality, these individuals each qualify as persons protected under the Treaty, with the requisite nationality under Article 25 of the ICSID Convention.

### 2. Companies and Entities Organized In Accordance With The Laws Of Mexico

144. Under Article 1(5)(b), the Treaty applies to any company, entity or organization "established or, in any case, organized in accordance with the law of one of the Contracting Parties and has its head office in the territory of that country." A corporate entity qualifies under the nationality requirement of Article 25 of the ICSID Convention by virtue of its place of incorporation.

42

145. The following entities are legally constituted under the laws of Mexico including on the date of filing of this Request for Arbitration:

(1)　　Consultores CGEK, S.C.
(2)　　Fondo Administrado 5, S.A de C.V., Fondo de Inversión de Renta Variable
(3)　　GBM Capital Bursátil, S.A. de C.V., Fondo de Inversión de Renta Variable
(4)　　GBM Fondo de Inversión Total, S.A. de C.V., Fondo de Inversión de Renta Variable
(5)　　GBM Global, S.A. de C.V., Fondo de Inversión de Renta Variable
(6)　　Grow Investments S.A. de C.V.
(7)　　Hechos con Amor, S.A. de C.V.
(8)　　Inmobiliaria Asturval, S.A. de C.V.
(9)　　Simple Investments, S.A. de C.V.
(10)　GBM, S.A. de C.V., Casa de Bolsa, as trustee of Trusts F/000138; F/000139; F/101; and F/100; and
(11)　BBVA Bancomer Servicios, S.A., Institución de Banca Múltiple, Grupo Financiero BBVA Bancomer, as trustee of Trust F/703850.[71]

146. In addition, each of the above entities has its head office (*sede*) in Mexico. The address of the head office for each entity listed above is included in Appendix CRFA-D.[72]

147. As such, these entities qualify as entities protected under the Treaty, with the requisite nationality under Article 25 of the ICSID Convention.

**B.　The Banco Popular Investors Made Qualifying Investments Under the Treaty.**

148. Claimants each have made investments in Spain that are protected by the Treaty. Article 1(4) of the Treaty defines "investments" protected by the Treaty to include certain types of "assets owned or controlled by investors of one of the Contracting Parties and established in the territory of the other Contracting party in accordance with the legislation of the latter." Qualifying investments under Article 1(4) include "shares … and other forms of participation in the capital of an enterprise" (subsection (b)). Qualifying investments also include "debt instruments of an enterprise … when the debt instrument has an original

---

[71] For investments held through trusts, the beneficiary of the trust and the trust appear as Claimants in this dispute. However, Claimants do not intend to collect on behalf of both the beneficiary and the trust, but rather include both holders of rights in this Request for Arbitration in light of inconsistent jurisprudence regarding the standing of beneficiaries and trustees to claim for investments held through trusts. Claimants offer to drop the names of the trust or the beneficiaries once the proper Claimant is determined, either by decision of the Tribunal or by agreement of the parties.

[72] List of Addresses of Claimants is attached hereto as **Appendix CRFA-D**.

maturity of at least three years, but does not include an obligation of a Contracting Party or State enterprise, irrespective of the original maturity" (subsection (c)).

149. Claimants directly and indirectly own assets that qualify as Spanish investments under subsections (b) and (c) of the definition of "investment" under the Treaty, including, *inter alia*, shares and bonds in Banco Popular.

### C. Claimants Meet all Treaty Requirements.

150. Article X(3) of the Treaty allows an investor of a Party or an enterprise under his direct or indirect control to submit to arbitration a claim that the other Party breached an obligation under the Treaty provided that "the investor or his investment has suffered losses or damages by virtue of the alleged violation." Claimants' claims concern breaches of Respondent's obligations under the Treaty and the Claimants and their investments have lost their entire value due to those breaches.

151. Claimants' submission of their claims to arbitration is timely. Article X(4) of the Treaty provides that "[a]n investor may not submit a claim…if more than three years have elapsed from the date on which the investor had, or should have had, knowledge of the alleged violation and of the losses or damages suffered." Claimants' claims are timely under the Treaty, as no more than three years have elapsed from the date on which the Claimants knew of the alleged violation and the losses or damages suffered.

152. Under Articles IX and XI of the Treaty, an investor must deliver to the disputing Party written notice of the dispute more than six months before submitting the claim to arbitration.[73] Claimants delivered their letter to the Spanish Government on January 22, 2018, which is more than six months prior to the date of this Request for Arbitration.

153. Claimants also satisfy the conditions precedent to the submission of a claim under the Treaty. Pursuant to Articles X(5)(a) and X(6)(a) of the Treaty, Claimants' and Claimants' enterprises consent to arbitration in accordance with the procedures set out in the Treaty. Claimants and Claimants' Mexican enterprises also waive their right to initiate or continue before any

---

[73] "Article IX. Notification 1. Any dispute which may arise between one of the Contracting Parties and an investor of the other Contracting Party due to alleged non-compliance with an obligation under this Agreement shall be notified in writing by the investor to the Contracting Party receiving the investment. Article XI(1). Provided that six months have elapsed since the notification referred to in article IX, the disputing investor may submit the claim to arbitration in accordance with: (a) the ICSID Convention, provided that both Contracting Parties are States party … [or] (c) the UNCITRAL Arbitration Rules…".

administrative or judicial tribunal in accordance with the legislation of a Party or other dispute settlement procedures in respect of the measures by Respondent that constitutes an alleged failure to comply with the Treaty, with the exception of procedures requesting the application of declarative or extraordinary or precautionary measures having a suspensive effect, which do not involve the payment of damages.   The written consent and waiver required by Articles X(5)(b) and X(6)(b) is included with this Request for Arbitration as Appendix CRFA-C-1 and shall be delivered to Respondent.[74]

**D.**     **Respondent Provided its Consent to ICSID Jurisdiction Under the Treaty.**

154.   The exercise of the Centre's jurisdiction is proper under the Treaty.  Under Article XII of the Treaty, Respondent provided its "unconditional consent to the submission of a dispute to international arbitration in accordance with…(a) ICSID, provided that both Contracting Parties are States party thereto."   Respondent became a Contracting State to the ICSID Convention on September 17, 1994.[75]   Mexico became a Contracting State to the ICSID Convention on July 27, 2018.[76] Accordingly, under Article XI(a) of the Treaty, Claimants are entitled to submit a claim to arbitration under the ICSID Convention.

**VI.     THE JURISDICTIONAL REQUIREMENTS UNDER THE ICSID CONVENTION ARE MET**

155.   All jurisdictional requirements of the ICSID Convention are also met.  Pursuant to Article 25(1) of the ICSID Convention:

> The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an *investment*, between a *Contracting State*…and a *national of another Contracting State*, which the parties to the dispute *consent in writing* to submit to the Centre.

156.   Article 25(2) defines what "national of another Contracting States" means for the purpose of Article 25(1) as follows:

> (a) any natural person who had the nationality of a Contracting State other than the State party to the dispute on the date on which the

---

[74]   Letter of consent and waiver of rights of Claimants pursuant to Article X(5) of the Treaty is attached hereto as **Appendix CRFA-C-1**.

[75]   Spain signed the ICSID Convention on March 21, 1994 and deposited its instrument of ratification on August 18, 1994. The ICSID Convention entered into force for Spain 30 days later, on September 17, 1994.

[76]   Mexico signed the ICSID Convention on January 11, 2018 and deposited its instrument of ratification on July 23, 2018. The ICSID Convention entered into force for Mexico 30 days later, on August 26, 2018.

parties consented to submit such dispute to conciliation or arbitration as well as on the date on which the request was registered … but does not include any person who on either date also had the nationality of the Contracting State party to the dispute; and

(b) any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration.

157. This dispute involves a "Contracting State" and "national[s] of another Contracting State." As set out above, Mexico and Spain are both Contracting States to the ICSID Convention, as required by Article 25(1) of the ICSID Convention.[77]  Claimants are, and at all times have been, nationals of Mexico because they are natural persons and juridical persons as defined by Article 25(2).  In particular, the Claimants include juridical persons incorporated in Mexico in accordance with Mexican law and have their headquarters (*sede*) in Mexico.[78]  Claimants also include natural persons who are nationals of Mexico, and are not nationals of Spain.

158. Claimants also have "investments" within the meaning of Article 25(1) of the ICSID Convention.  Although Article 25 does not provide a definition of "investment," Claimants' ownership of shares and bonds in Banco Popular constitute investments under any reasonable definition.

159. In addition, as required under ICSID Convention Article 25(1), there exists a legal dispute arising directly out of Claimants' investment in Spain, as described above in Sections B and C.

160. Finally, the parties to the dispute have consented in writing to submit this dispute to arbitration before the Centre.  Respondent's "unconditional consent" to submit investment disputes to ICSID Convention is set forth in writing in Article XII(1) of the Treaty.  Claimants hereby provide their written consent to submit this dispute to arbitration under the ICSID Convention, as also contained in the written expressions of consent attached hereto as Appendix CRFA-C-1 to this Request.  As provided in Article XII(2) of the Treaty,

---

77   *See* ¶ 154 above.

78   *See* ¶ 14 above.

Respondent's unconditional consent provided in Article XII(1) coupled with the submission of the claim by a disputing investor meets the requirements set out in Chapter II of the ICSID Convention.  Accordingly, the date of consent, as defined in ICSID Institutional Rule 2(3), is the date of this Request for Arbitration.

161.  Therefore, all procedural requirements set forth by Article 25 of the ICSID Convention have been met.

162.  Claimants have provided in this Request for Arbitration the information and materials listed in ICSID Institution Rules 2 and 3.  Pursuant to ICSID Institution Rule 2(1)(f), Claimants confirm that they have taken all internal steps necessary to authorize this Request for Arbitration.[79]  Claimants have also paid the US $25,000 filing fee required, a copy of the wire transfer receipt is attached as Exhibit CRFA-8.  Accordingly, all procedural requirements under the ICSID Convention and ICSID Institution Rules are met.

## VII.   CONSTITUTION OF THE TRIBUNAL, SEAT AND LANGUAGE

163.  Pursuant to Article XIII of the Treaty, Claimants request the constitution of a Tribunal comprised of three arbitrators, with one arbitrator appointed by each party and the third arbitrator appointed by the disputing parties by mutual agreement.  Claimants hereby nominate Professor William Park as their party-appointed arbitrator.  If the remainder of the Tribunal has not been constituted within 90 days from the date of the receipt of this Request by Respondent, the procedures set out in Article XIII(3) of the Treaty shall apply.

164.  The Treaty is silent on the question of the language of the arbitration, and the parties have not discussed or reached an agreement on this issue.  Claimants propose English as the language of the arbitration.  Claimants also propose that exhibits and authorities in Spanish may be submitted by the parties without translation into English, and have adopted this practice in the present Request for Arbitration.

165.  Claimants propose Washington, D.C. as the seat of arbitration.

---

[79]   Letters of authorization of Claimants to submit request of arbitration pursuant to Rule 2(1)(f) of the ICSID Institutional Rules are attached hereto as **Appendix CRFA-C-2**.

## VIII.  CLAIMANTS' REQUEST FOR RELIEF

166.  On the basis of the foregoing, without limitation and reserving their right to adjust the relief requested during the course of the arbitration, Claimants respectfully request that the Tribunal:

(a)  DECLARE that this dispute and the claims asserted by Claimants fall within the jurisdiction of the Tribunal;

(b)  DECLARE that Respondent has breached:

1.  Articles IV of the Treaty by failing to provide fair and equitable treatment and full protection and security and, through incorporation via Article III(2) of the Treaty, as guaranteed in Article 4 of the Spain-Dominican Republic BIT and Article 3 of the Spain-Libya BIT;

2.  Article III of the Treaty by failing to provide Claimants' investments treatment no less favorable than that given to other investors; and

3.  Article V of the Treaty by unlawfully expropriating and/or taking measures tantamount to expropriation with respect to Claimants' investments in Spain;

(c)  ORDER Respondent to pay damages arising from Respondent's breaches of its obligations under the Treaty, in an amount to be determined together with compound interest calculated from the date of the breach until the date of payment of the award, and the costs of this arbitration, including, without limitation, attorney's fees and other expenses; and

(d)  AWARD such other relief as the Tribunal considers appropriate.

Respectfully submitted,

Javier H. Rubinstein
Lauren F. Friedman
Lucila I. M. Hemmingsen
Pilar Colomés Iess
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel: +1 212-446-4800

*Counsel for Claimants*